# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RTD BROS LLC, TODD BENN, TOM BENN, TOMASZ RZEDZIAN, and PRESTON MILLION, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>LOTTERY.COM, INC. F/K/A TRIDENT ACQUISITIONS CORP., ANTHONY DIMATTEO, MATTHEW CLEMENSON, KATHRYN LEVER, RYAN DICKINSON, MARAT ROSENBERG, VADIM KOMISSAROV, THOMAS GALLAGHER, GENNADII BUTKEVYCH, and ILYA PONOMAREV,<br><br>     Defendants. | Case No. 1:22-cv-07111-JLR<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ...................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................6

III.   PARTIES ................................................................................................................7

       A.     Plaintiffs ....................................................................................................7

       B.     Defendant Lottery .....................................................................................8

       C.     Individual Lottery Defendants ..................................................................8

       D.     Individual TDAC Defendants .................................................................10

IV.    SUBSTANTIVE ALLEGATIONS .......................................................................11

       A.     Special Purpose Acquisition Companies And Their Inherent Conflicts Of
              Interest.....................................................................................................11

       B.     TDAC, a SPAC, Takes Lottery Public ...................................................13

              1.     Background Of TDAC: A SPAC Focused On The Energy Sector In
                     Eastern Europe ............................................................................13

              2.     TDAC's Management Faced Pressure To Complete A Qualifying
                     Business Combination .................................................................15

              3.     TDAC Uses Its Dwindling Funds To Acquire Lottery ..............18

       C.     Lottery Misrepresented Its Compliance With State And Federal Laws ...............19

       D.     Defendants Admit That They Massively Overstated Lottery's Cash Balance
              And Revenue And That Lottery Lacked Adequate Internal Controls,
              Resulting In The Termination Of Key Corporate Executives ...............20

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
       AND OMISSIONS IN VIOLATION OF SECTION 10(b) AND 14(a) OF THE
       EXCHANGE ACT................................................................................................22

       A.     Materially False And Misleading Statements Regarding The Company's
              Regulatory Compliance Made Prior To The Business Combination...................23

       B.     Defendants' Material Misstatements And Omissions In The Proxy
              Statement In Violation Of Section 14(a) Of The Exchange Act .........................24

C.      Materially False And Misleading Statements Following The Issuance Of The Proxy Statement .................................................................................28

D.      Materially False And Misleading Sarbanes-Oxley Certifications ........................34

VI.    ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER............36

A.      The Company's Regulatory Compliance Was Central To Lottery's Business ...............................................................................................37

B.      TDAC And The Individual TDAC Defendants Knew Or Recklessly Disregarded The Falsity Of Their Statements ........................................37

C.      The Overstated Cash And Revenue Comprised A Substantial Amount Of The Company's Revenue Such That Knowledge or Extreme Recklessness On The Part Of Defendants Is The Only Reasonable Inference ...........................38

D.      Almost All Of The Company's Revenue For 2022 Fiscal First Quarter Was From One Customer.......................................................................39

E.      The Company's Senior Executives And Auditor All Resigned Or Were Forced Out .....................................................................................39

F.      As Lottery Has Admitted, The Company Failed To Maintain Effective Internal Controls Even After Being Aware Of Prior Internal Control Issues That Defendants Had Pledged To Remedy............................................41

G.      Defendants' GAAP Violations ..............................................................48

H.      The Individual Defendants Had Financial Motivations For Causing The Company To Consummate The Business Combination .................................49

I.      Corporate Scienter And *Respondeat Superior* ........................................50

VII.   LOSS CAUSATION.............................................................................50

A.      Investors Suffered Significant Losses Due To The Materially Misleading Statements Issued During The Class Period ............................................50

B.      Shareholders Who Were Eligible To Vote At The October 28, 2021 Special Meeting Suffered Damages.................................................................54

VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..................................................................55

IX.    PLAINTIFFS' CLASS ACTION ALLEGATIONS.......................................57

X.     NO SAFE HARBOR ............................................................................59

ii

XI.    CAUSES OF ACTION ................................................................................................. 59

XII.   PRAYER FOR RELIEF ............................................................................................. 64

XIII.  DEMAND FOR TRIAL BY JURY ........................................................................... 65

Lead Plaintiffs RTD Bros LLC, Todd Benn, Tom Benn, and Tomasz Rzedzian ("Lead Plaintiffs"), and additional plaintiff Preston Million ("Additional Plaintiff" together with Lead Plaintiffs, "Plaintiffs"), by and through the undersigned attorneys, on behalf of Plaintiffs and all others similarly situated, allege the following upon information and belief, except as to allegations specifically concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (i) review and analysis of regulatory filings made by Lottery.com, Inc. ("Lottery" or the "Company"), f/k/a Trident Acquisitions Corp. ("TDAC") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of analyst and media reports; (iii) review and analysis of press releases and other public statements issued and disseminated by the Company or its authorized agents, including the Individual Lottery Defendants and the Individual TDAC Defendants; and (iv) review of other publicly available information concerning Lottery.

## I.      NATURE OF THE ACTION

1.      Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who or which: (1) purchased or otherwise acquired the publicly traded securities of Lottery during the period from November 19, 2020 through July 29, 2022, inclusive (the "Class Period"), and who were damaged thereby, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and/or (2) held common stock of TDAC as of October 28, 2021 and were eligible to vote at TDAC's October 28, 2021 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.

2.       TDAC was a special acquisition corporation. TDAC's stated purpose was to locate and acquire an appropriate company doing business in the energy/oil sector in Eastern Europe. However, as TDAC failed to find such a company and its shareholders began redeeming their shares, the amount of funds available to TDAC to pursue and complete an energy/oil acquisition dwindled from more than $205 million to less than $70 million. In order to prevent the return of the remaining money and squander an opportunity to enrich themselves – as the Individual TDAC Defendants (defined herein) stood to reap millions from any merger – TDAC rushed to orchestrate a merger between TDAC and Lottery (the "Business Combination"), even though Lottery was a provider of domestic and international lottery products and services, and was not in the energy sector.

3.       Lottery's proprietary business-to-consumer ("B2C") platform (the "Platform") enabled consumers and businesses to make online purchases of purportedly legally sanctioned lottery tickets in the United States and abroad. Lottery purports to be a leader in the transition of the $100 billion U.S. lottery market online based in substantial part on that the Company's ability to show governmental authorities that it operated a regulatory compliant platform. The Company also generated revenues through sales of lottery products and services to business affiliates, who in turn resold lottery games ("B2B2C").

4.       To drum up support for the Business Combination, Defendants touted Lottery's purportedly strong revenue figures and future prospects, as well as its strong relationships with state regulators – an important fact to investors, given the highly regulated space in which Lottery conducted it business. Specifically, in the proxy statement and prospectus on Form 424B3, dated October 18, 2021 (the "Proxy"), through which Defendants solicited approval of the Business

Combination, the Company represented that Lottery's revenue projection for fiscal 2021 was $71 million.

5.     On November 15, 2021, following the completion of the Business Combination, the Company reported $32.25 million revenue for the quarter ending September 30, 2021, a **1,911.8% increase** over the prior year period. Significantly, Lottery specified that the "increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits," during the quarter. As such, nearly all of the $32.25 million in revenue for the quarter was derived from a single sale of marketing credits to an affiliate.[1]

6.     Thereafter, on April 1, 2022, the Company disclosed that its 2021 fiscal year revenue was $68.5 million, which was "driven by the sale of $47.1 million in LotteryLink Credits for prepaid advertising, prepaid lottery games, marketing materials and development services in the third and fourth quarters of 2021." Notably, the Company reported accounts receivable of just $21.7 million. Since the accounts receivable figure was lower than the amount of the $30 million sale of LotteryLink Credits announced the prior quarter, the Company was representing to investors that it had been paid, at least partially, by the customer who purchased the aforementioned $30 million of "affiliate marketing credits." However, as investors subsequently learned, there was no revenue from the purported $30 million sale. As such, Lottery's representation that it had collected this revenue was false.

7.     Throughout the Class Period, Defendants attempted to maintain the illusion, as represented in the Proxy soliciting approval of the Business Combination, that the Company had

---

[1] The Company termed these credits "LotteryLink Credits." LotteryLink Credits could be purchased by the Company's third-party marketers and redeemed as advertising credits to support flexible promotional packages (such as prepaid advertising, prepaid lottery games, among other things) via the Company's LotteryLink affiliate marketing program.

significant revenue growth, that it had adequate internal controls over financial reporting, and that the Company was in compliance with applicable laws and regulations – again, a critical fact for a company operating in the highly regulated gaming industry.

8.     As the Company ultimately admitted, throughout the Class Period, Defendants misrepresented and/or omitted to disclose material facts to investors regarding the financial and operational health of Lottery, including with respect to the Company's cash position and revenue, its regulatory compliance, and the adequacy of its internal controls over financial reporting.

9.     Beginning on July 6, 2022, a series of disclosures revealed the true state of Lottery's financial and operational condition. On that date, Lottery disclosed that an internal investigation had revealed "issues pertaining to the Company's internal accounting controls" and "instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment." On this news, Lottery's shares fell more than 12%, or $0.15, from a closing price of $1.22 per share on July 5, 2022 to a closing price of $1.07 per share on July 6, 2022, on abnormally high volume.

10.     Little more than a week later, on July 15, 2022, the Company announced that its Chief Revenue Officer had resigned on July 11, 2022. Providing an update on its internal investigation, the Company stated that it "preliminarily conclude[d] that it has ***overstated its available unrestricted cash balance by approximately $30 million*** and that, relatedly, in the prior fiscal year, it ***improperly recognized revenue*** in the same amount."[2] On this news, shares of Lottery fell more than 14.5%, or $0.14, from a closing price of $0.96 per share on July 15, 2022 to a closing price of $0.82 per share on July 16, 2022, on abnormally high volume.

---

[2] All emphasis is added unless otherwise stated.

11.     A week later, on July 22, 2022, Lottery further disclosed that (i) the Company's auditor determined that financial statements for the full-year fiscal 2021 and first quarter 2022 should no longer be relied upon, and that a Company subsidiary entered into an undisclosed line of credit in January 2022, and (ii) troublingly, its CEO and co-founder, Lawrence Anthony "Tony" DiMatteo III, was resigning, effective immediately. On this news, Lottery shares declined another 12%, or $0.10, over the next two trading days, from a closing price of $0.82 per share on July 22, 2022 to a closing price of $0.72 per share on July 26, 2022.

12.     Finally, on July 29, 2022, investors continued to learn about Lottery's previously concealed problems. Lottery revealed that its "capital resources are not sufficient to fund its operations for a twelve-month period and, therefore, there is substantial doubt about the Company's ability to continue as a going concern." The Company also disclosed that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll," that it therefore intended to furlough "certain employees," effective July 29, 2022. The market had clearly not been conditioned to the Company's dire condition, as on this news, shares declined *64%*, falling $0.52 per share, from a closing price of $0.81 per share on July 28, 2022 to a close of $0.29 per share on July 29, 2022.

13.     Things only worsened after the Class Period. Two weeks after the furlough announcement and the "going concern" disclosure, on August 16, 2022, the Company revealed that it had "furloughed *the majority* of its employees effective July 29, 2022,"and absent being able to "secure additional capital resources," it would "be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets."

14.     Since that time, the Company has ceased to report financial results, or issue financial statements, for any and all periods subsequent to the first quarter of 2022 (*i.e.*, for the

second, third and fourth quarters, and full year, of 2022), purportedly because it "has not yet finalized its reviews of its financial statements or its assessment of the impact of the findings of the ongoing review of the Company's internal accounting controls on its historical financial statements."

15.     In short, Lottery's entire senior management was terminated or resigned. Lottery's auditor resigned citing an inability to rely on management. And the Company's entire board of directors turned over. Additionally, the Company is all but insolvent and has warned of going-concern risk and imminent liquidation unless it secures some funding. Meanwhile, Lottery still has not reported financial results or issued financial statements for any period following Q1 2022, and is still yet to complete its investigation into the effects of improprieties and controls weaknesses on its historical financial statements.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.l0b-5), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). During the Class Period, Lottery's predecessor, TDAC, resided and conducted business in this Judicial District, Lottery stock was listed and traded

on the NASDAQ in this Judicial District, certain Defendants resided or conducted business in this Judicial District, and wrongful conduct took place in this Judicial District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

21.     Lead Plaintiff RTD Bros LLC, as set forth in the Certification filed at Docket No. 30-2, incorporated by reference herein, acquired Lottery's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.     Lead Plaintiff Todd Benn, as set forth in the Certification filed at Docket No. 30-2, incorporated by reference herein, acquired Lottery's publicly traded securities at artificially inflated prices during the Class Period and held common stock of TDAC as of October 28, 2021 eligible to vote at TDAC's October 28, 2021 special meeting, and was damaged upon the revelation of the alleged corrective disclosures.

23.     Lead Plaintiff Tom Benn, as set forth in the Certification filed at Docket No. 30-2, incorporated by reference herein, acquired Lottery's publicly traded securities at artificially inflated prices during the Class Period and held common stock of TDAC as of October 28, 2021 eligible to vote at TDAC's October 28, 2021 special meeting, and was damaged upon the revelation of the alleged corrective disclosures.

24.     Lead Plaintiff Tomasz Rzedzian, as set forth in the Certification filed at Docket No. 30-2, incorporated by reference herein, acquired Lottery's publicly traded securities at

artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Additional Plaintiff Preston Million, as set forth in the Certification filed at Docket No. 31-1, incorporated by reference herein, acquired Lottery's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**B.     Defendant Lottery**

26.     Defendant Lottery is incorporated in Delaware. Lottery's current principal executive offices are 20808 State Hwy 71 W, Unit B, Spicewood, TX 78669. Following the Business Combination, Lottery's shares and warrants began trading on the NASDAQ under the symbols "LTRY" and "LTRYW," respectively. Prior to the Business Combination, the Company was known as Trident Acquisitions Corp., or TDAC, and was a special purpose acquisition company, which was incorporated in Delaware with its principal executive offices located at 77 Water St. Fl 8, New York, NY 10005.

**C.     Individual Lottery Defendants**

27.     Defendant Lawrence Anthony "Tony" DiMatteo III ("DiMatteo") was co-founder of AutoLotto, Inc. ("AutoLotto"), which was doing business as "Lottery.com" prior to the Business Combination, and served as an officer and director of AutoLotto since 2015. Defendant DiMatteo became Chief Executive Officer ("CEO") of the Company and the Company's Chairman upon the closing of the Business Combination. He served in those roles at the Company until his resignation as CEO on July 22, 2022 and his resignation as a director on September 8, 2022.

28.     Defendant Ryan Dickinson ("Dickinson") served as the Company's President, Treasurer and Acting Chief Financial Officer ("CFO") from October 2021 until his termination effective July 1, 2022, and Chief Financial Officer from March 2022, until his termination effective

July 1, 2022. Defendant Dickinson joined AutoLotto in June 2018 and served as Executive Vice President of Product until October 2018, at which time he was appointed President and Chief Operating Officer.

29.     Defendant Matthew Clemenson ("Clemenson") was a co-founder of AutoLotto and served as its President from 2015 to 2019 and its Chief Commercial Officer since 2019. Upon the consummation of the Business Combination, defendant Clemenson became the Company's Chief Commercial Officer and served in that role until March 2022 at which time he became the Company's Chief Revenue Officer ("CRO"). He served as a Company director from October 2021 until his resignation on July 11, 2022.

30.     Defendant Kathryn Lever ("Lever") was the Chief Operating Officer and Chief Legal Officer of Lottery following the Business Combination.

31.     Defendants DiMatteo, Dickinson, Clemenson and Lever are referred to herein as the "Individual Lottery Defendants." The Individual Lottery Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lottery's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.,* the market. The Individual Lottery Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

32.     Lottery and the Individual Lottery Defendants are referred to collectively as "Lottery Defendants."

**D.     Individual TDAC Defendants**

33.     Defendant Marat Rosenberg ("Rosenberg") was Chairman of the Board of Directors of TDAC prior to the Business Combination.

34.      Defendant Vadim Komissarov ("Komissarov") was CEO and a director of the Company, then known as TDAC, prior to the Business Combination. Defendant Komissarov was also TDAC's CFO until he resigned from this position on November 20, 2020.

35.     Defendant Thomas Gallagher ("Gallagher") was a director of the Company prior to the Business Combination.

36.     Defendant Gennadii Butkevych ("Butkevych") was a director of the Company prior to the Business Combination.

37.     Defendant Ilya Ponomarev ("Ponomarev") was Chief Executive Officer of TDAC from the IPO until November 18, 2021 and a director of the Company prior to the Business Combination.

38.     Defendants Rosenberg, Komissarov, Gallagher, Butkevych and Ponomarev are referred to herein as the "Individual TDAC Defendants." The Individual TDAC Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lottery's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.,* the market. The Individual TDAC Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of them

10

knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

39.    The Individual TDAC Defendants and the Individual Lottery Defendants are collectively known as the "Individual Defendants." The Individual Defendants and Lottery are referred to collectively as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Special Purpose Acquisition Companies And Their Inherent Conflicts Of Interest

40.    Special purpose acquisition companies ("SPACs") are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's initial public offering ("IPO") is held in trust for a specific period of time to fund the acquisition.

41.    If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

42.    The business combination effectuated by a SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC

transactions and IPOs have certain key differences. In a traditional IPO, banks underwrite the offering and perform substantial due diligence in order to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. However, in a SPAC transaction, there are no underwriters; the due diligence and the disclosures supporting the business combination are solely determined by the SPAC and its controlling persons, who have strong incentives to agree to and obtain shareholder approval for, an acquisition regardless of its true merits.

43.     Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

44.     Amidst a recent boom in SPAC transactions, regulators – namely the SEC – have warned the public about serious, widespread concerns characteristic of these mergers, including "risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype."[3] These concerns raise questions as to whether SPAC sponsors have "sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter."

45.     Numerous other commentators have similarly noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination.

---

[3] John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at*: https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

For example, in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate."[4] Based on empirical research of post-merger returns to SPAC shareholders, that paper concludes that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

## B.   TDAC, a SPAC, Takes Lottery Public

### 1.   Background Of TDAC: A SPAC Focused On The Energy Sector In Eastern Europe

46.     Trident Acquisitions Corp. (previously defined as "TDAC") was a blank check, special purpose acquisition company, which was formed under the laws of the State of Delaware on March 17, 2016 for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination.

47.     TDAC filed its IPO prospectus (the "IPO Prospectus") with the SEC on May 30, 2018. On June 1, 2018, TDAC consummated the IPO of 17,500,000 units (the "Units"). Each Unit consists of one share of common stock and one warrant entitling its holder to purchase one share of common stock at a price of $11.50 per share. TDAC also granted the underwriters a 45-day option to purchase up to 2,625,000 additional Units to cover over-allotments, if any. On June 4, 2018, the underwriters exercised the option in full, and the closing of the issuance and sale of the additional Units occurred on June 5, 2018. Following its IPO, TDAC's units began to trade on the

---

[4] Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (December 20, 2021). YALE JOURNAL ON REGULATION, 2022, Volume 39, Issue 1, *available at*: SSRN: https://ssrn.com/abstract=3720919

NASDAQ, under the symbol "TDACU" on May 30, 2018, and the common stock and warrants comprising the units began separate trading on NASDAQ on June 13, 2018, under the symbols "TDAC" and "TDACW", respectively.

48.     The total aggregate issuance by the Company of 20,125,000 units at a price of $10.00 per unit resulted in total gross proceeds of $201,250,000. As of June 5, 2018, a total of $205,275,000 of the net proceeds from the IPO and the private placement consummated simultaneously with the closing of the IPO[5] were deposited in a trust account established for the benefit of the Company's public shareholders (*i.e.*, to fund a business combination).

49.     Though the IPO Prospectus did not identify a target business with which TDAC would combine, it stated that the company "intend[ed] to focus [its] efforts on seeking a business combination with an ***oil and gas or other natural resources companies in Eastern Europe or interested in expanding into Eastern Europe***." In support thereof, the directors and officers of TDAC held themselves out to investors as highly experienced in industrial businesses in Eastern Europe, in particular in the energy sector. As TDAC explained:

> As Europe is striving to achieve energy independence, we believe that Eastern European oil and gas deposits, which are small and technically difficult to access, will attract the interest of investors and governments. We believe that historical exploration data can be reassessed with new geological knowledge to determine which reserves that were previously considered unrecoverable or uneconomic can be profitably recovered. Two of the most promising countries in Europe for exploration and development of oil and gas are Ukraine and Poland.

---

[5] Simultaneously with the closing of the IPO, the Company consummated the private placement ("Private Placement") with certain of its initial stockholders of 1,150,000 units (the "Private Units") at a price of $10.00 per Private Unit, generating total proceeds of $11,500,000. The Private Units are identical to the Units sold in the IPO except that the warrants will be non-redeemable and may be exercised on a cashless basis, in each case so long as they continue to be held by the initial purchasers or their permitted transferees. Additionally, such initial purchasers agreed not to transfer, assign or sell any of the Private Units or underlying securities (except in limited circumstances, as described in the registration statement) until the completion of the Company's initial business combination.

> We want to take advantage of privately held Eastern European oil and gas operating companies that have significant production volume and positive cash flows, but little or no reserves. By acquiring a company with undeveloped reserves and hiring companies that have engineering and geological expertise to develop the reserves, we believe that we will be able to create value for our investors.

50.     TDAC's only three employees were its executive officers, all of whom claimed to be qualified and experienced in the oil and gas industries. TDAC was led by Ponomarev, whom TDAC repeatedly touted as experienced in the energy industries and working in Eastern Europe. For example, TDAC stated "Mr. Ponomarev is qualified to serve as a member of our Board of Directors because his understanding of new technologies in oil & gas field and his international network of political and business leaders." Moreover, in its IPO, TDAC similarly touted the energy industry experience of COO Tymofiev and director Verona, stating as to Verona that he is "qualified to serve as a member of our Board of Directors because of his experience in the oil & gas industry, his in-depth, hands-on knowledge of Eastern European business environments, and his prominent international government affairs roles." TDAC also touted other officers' experience in Eastern Europe and CIS countries.

51.     The IPO Prospectus did not disclose whether any of its directors or officers had any experience with online technology companies or lotteries. In fact, TDAC's directors and officers had no meaningful experience in these subjects.

### 2.     TDAC's Management Faced Pressure To Complete A Qualifying Business Combination

52.     Due to the Individual TDAC Defendants' ownership interests in TDAC and the terms and financial structure of TDAC as a SPAC, the Individual TDAC Defendants possessed strong financial incentives to complete *any* qualifying transaction.

53.     TDAC was subject to certain restrictions in its amended and restated certificate of incorporation regarding its pursuit of an acquisition. Specifically, the Company had until

15

December 1, 2019 to consummate a business combination. If the Company was unable to consummate a business combination by then, the Company would be required to (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter, redeem 100% of the outstanding public shares, and (iii) liquidate and dissolve the company.

54. TDAC was authorized to seek stockholder approval for an extension of this deadline. However, if such an extension was approved, TDAC was required to provide shareholders with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment to the deadline. Attempting to obtain such a postponement of its deadline for a business combination thus presented serious risks that: (i) shareholders would not approve the postponement, thus forcing TDAC to liquidate if it failed to complete a transaction on time, or (ii) if a postponement was approved, shareholders may decide to redeem TDAC shares in amounts that would significantly deplete TDAC's trust account and jeopardize its ability to complete a transaction even with an extended deadline.

55. The directors and officers of TDAC acquired a significant financial interest in TDAC through the acquisition of shares and warrants prior to the IPO. These shares and warrants would be worthless if a business combination did not occur. As TDAC explained:

> In March 2016, the Company issued 3,737,500 shares of common stock to the initial stockholders (the "insider shares") for an aggregate purchase price of $25,000. In February 2018, the Company sold an additional 1,293,750 insider shares for an aggregate purchase price of $8,654, resulting in a total of 5,031,250 insider shares issued and outstanding….

> The initial stockholders have agreed not to transfer, assign or sell any of the insider shares (except to certain permitted transferees) with respect to 50% of the insider shares, until the earlier of (i) six months after the date of the consummation of a Business Combination and on the date on which the closing price of the Company's common stock equals or exceeds $12.50 per share for any 20 trading days within any 30-trading day period following the consummation of a Business Combination and, with respect to the remaining 50% of the insider shares, six months after the

date of the consummation of a Business Combination, or if, (ii) subsequent to a Business Combination, the Company consummates a subsequent liquidation, merger, stock exchange or other similar transaction which results in all of the stockholders having the right to exchange their common stock for cash, securities or other property (the "Lock-Up Period").

56.     TDAC had failed to enter into a business combination as the December 1, 2019 deadline approached. TDAC then sought and obtained three extensions of the deadline, and each time, a portion of shareholders sought to redeem their shares:

(a)     In November 2019, TDAC sought an extension of the deadline until May 29, 2020. Stockholders approved the proposal. However, in connection with the approval of the extension, stockholders had the right to redeem their shares for cause, and shareholders elected to redeem an aggregate of 13,081,434 shares of the Company's common stock. As a result, an aggregate of approximately $137,130,484 (or approximately $10.48 per share) was removed from the Company's trust account to pay such stockholders.

(b)     Even with this extension, TDAC was unable to find an appropriate company to purchase by the once-extended May 29, 2020 deadline. So, they again sought an extension of the business combination deadline, and second extension until September 1, 2020 was approved. However, holders of another 627,059 shares of TDAC's common stock redeemed their shares for cash, resulting in a trust account balance of $68,219,114.98 after giving effect to the redemptions.

(c)     TDAC then sought a third extension prior to the September 1, 2020 deadline, and shareholders approved an additional three month extension to December 1, 2020. However, holders of a further 630,037 shares of the Company's common stock redeemed their shares for cash, resulting in a trust account balance of approximately $62,286,780 after giving effect to the redemptions.

57.     With each extension and corresponding redemptions by shareholders, the Individual TDAC Defendants saw their financial interest in the company continue to dwindle.

Moreover, as the Individual TDAC Defendants were certainly aware, as redemptions occurred, the amount of funds TDAC had access to for an acquisition greatly declined, further shrinking the available pool of potential companies for which a potential acquisition by TDAC would be enticing.

### 3.  TDAC Uses Its Dwindling Funds To Acquire Lottery

58.  On November 19, 2020, with another business combination deadline fast approaching, TDAC announced that it had signed a letter of intent to combine with Lottery, which was then a private company.

59.  Founded in 2015, AutoLotto, Inc., doing business as Lottery.com, was an Austin, TX-based company. Lottery represented itself to be: (1) a leading online platform to play the lottery, offering official state-sanctioned lottery games like Powerball, Mega-Millions and other state games, in the U.S. and around the world; and (2) the world's largest provider of lottery data – such as current and previous winning numbers, jackpots and draw dates, jackpot analysis and more, covering almost 600 lottery games in 38 countries in real time – to over 400 digital publishers, including hundreds of digital newspapers, television and news sites, and major digital publishers such as Google, Verizon/Yahoo, Amazon's Alexa devices and more.

60.  TDAC's announcement regarding a letter of intent with Lottery disclosed that the transaction would be structured so that Lottery's stockholders would roll 100% of their equity into the business combination, with no minimum cash requirement, and that the parties anticipated closing the business combination in first quarter of 2021.[6]

---

[6] Thereafter, on November 30, 2020, TDAC held a Special Meeting of Stockholders, pursuant to which the stockholders approved the extension from December 1, 2020 to March 1, 2021, with an ability to further extend for an additional three months to June 1, 2021 if approved by the board of directors. On February 26, 2021, the board of directors approved the extension to June 1, 2021 to permit sufficient time to consummate the proposed business combination with Lottery. On May

61.     On October 29, 2021, the Company announced the completion of the Business Combination, and upon the closing, the combined entity was renamed Lottery.com. On November 1, 2021, Lottery's common shares and warrants began trading on the NASDAQ under the ticker symbols "LTRY" and "LTRYW," respectively.

### C.     Lottery Misrepresented Its Compliance With State And Federal Laws

62.     Throughout the Class Period, including in the Proxy, which solicited approval of the business combination, Lottery touted its compliance with state and federal gaming and lottery laws. For example, in the press release announcing the proposed business combination, the Company claimed that "Lottery.com has been a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age." Likewise, in Lottery's Annual Report on Form 10-K for the year ended December 31, 2021, filed with the SEC on April 1, 2022 (the "2021 Annual Report"), the Company touted that it ensures compliance with regulators:

> We rely on technology services to closely monitor and track amendments, additions, and impositions of regulations in all jurisdictions regarding the authorization of lottery and work to maintain effective relationships with applicable legislative and regulatory authorities in each jurisdiction in which we operate or anticipate operating in. We use this information in the development of our strategic expansion and growth framework and model, but additionally, and importantly, to create strong working relationships with the regulatory authorities in the jurisdictions in which we do business, to ensure transparent regulatory compliance and promote each jurisdiction's objective for economic benefit through the sale of lottery games.

In fact, the Company specifically informed investors that they "believe that we are in compliance with all material domestic and international laws and regulatory requirements applicable to our business."

---

27, 2021, the stockholders approved a further extension from June 1, 2021 to September 1, 2021, with the ability to further extend for an additional three months to December 1, 2021, if approved by the board of directors.

63. Notwithstanding these representations, a mere two quarters following the Business Combination, Lottery admitted it had not been complying with such state and federal laws. Specifically, on July 6, 2022, in a Form 8-K filed with the SEC, Lottery disclosed that an internal investigation had uncovered "instances of **non-compliance with state and federal laws** concerning the state in which tickets are procured as well as order fulfillment."

> **D.    Defendants Admit That They Massively Overstated Lottery's Cash Balance And Revenue And That Lottery Lacked Adequate Internal Controls, Resulting In The Termination Of Key Corporate Executives**

64. Throughout the Class Period, the Company represented that it recognized revenue in accordance with generally accepted accounting principles ("GAAP") and that its financial and other public statements adequately represented its financial condition. Specifically, in the Proxy, the Company represented that Lottery's revenue projection for fiscal 2021 was $71 million. It appears that the Company and the Individual Defendants knew that this figure was overstated, as discussed *infra*.

65. On November 15, 2021, the Company filed AutoLotto's financial statements as an exhibit to a Form 8-K. Therein, Lottery reported $32.25 million revenue for the quarter ended September 30, 2021, which was a 1911.8% increase over the prior year period. This "increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits" during the quarter. That is, nearly all of the revenue for the quarter was derived from marketing credits to an affiliate.

66. On April 1, 2022, the Company filed its 2021 Annual Report, reporting $68.5 million in revenue, which was "driven by the sale of $47.1 million in LotteryLink Credits for prepaid advertising, prepaid lottery games, marketing materials and development services in the third and fourth quarters of 2021." Lottery also disclosed that its accounts receivable as of December 31, 2021 was $21,696,653. Since the accounts receivable figure was lower than revenue

for the same period (which itself was "driven" by the sale of marketing credits), the Company suggested that it had collected more than half the revenue from marketing credits from the customer. However, this representation was materially misleading insofar as Lottery did not collect that $30 million sale of affiliate marketing credits.

67.    On May 16, 2022, the Company reported $21.2 million in revenue for the period ended March 31, 2022. Revenues were "driven by the sale of $18 million in LotteryLink Credits for prepaid promotional awards, marketing materials and development services." These revenue figures for fiscal 2021 and the first quarter 2022, were significantly overstated and false, due to a lack of adequate internal controls within the Company, as Defendants subsequently admitted.

68.    On July 6, 2022, Lottery disclosed that an internal investigation had revealed "issues pertaining to the Company's internal accounting controls." Further, the Board had terminated Lottery's CEO, President, and Treasurer, Defendant Dickinson, effective July 1, 2022.

69.    Thereafter, on July 15, 2022, Company announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. As an update to the previously disclosed internal investigation, the Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery had:

> preliminarily conclude[d] that it has **overstated its available unrestricted cash balance by approximately $30 million** and that, relatedly, in the prior fiscal year, it **improperly recognized revenue** in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

70.    The July 15, 2022 disclosure of a $30 million cash overstatement represents an admission that the $30 million "sale" of LotteryLink Credits previously announced on November 15, 2021, was entirely fabricated, and that Defendants faked the collection of that money in order

to create the illusion of revenues. This is plainly documented by the fact that the Company essentially had one customer. As the Company explained in its May 16, 2022 quarterly report, "Customer A" accounted for 87.7% of the Company's revenue and 99.6% of the Company's accounts receivable for the Lottery's 2022 fiscal first quarter.

71.     On July 22, 2022, Lottery filed a Form 8-K that disclosed that the Company's auditor, Armanio LLP, determined "that the ***audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon***," and "that a ***Company subsidiary entered into a line of credit in January 2022 that was not disclosed*** in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements." Further, the Company disclosed in the Form 8-K that CEO and co-founder Defendant DiMatteo was resigning, effective immediately.

72.     As the Company has not yet restated its financial statements or concluded the internal investigation, including as to the regulatory violations, investors are still in the dark regarding the full extent of Defendants' fraud.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN VIOLATION OF SECTION 10(b) AND 14(a) OF THE EXCHANGE ACT

73.     Throughout the Class Period – prior to the Business Combination, in the Proxy soliciting approval of the Business Combination, and after the closing of the Business Combination – Defendants misrepresented and/or omitted to disclose material facts to investors regarding the financial and operational health of the Company, including with respect to the Company's cash position, its regulatory compliance, the adequacy of its internal controls over financial reporting – all of which were critical to investors.

**A.      Materially False And Misleading Statements Regarding The Company's Regulatory Compliance Made Prior To The Business Combination**

74.      Throughout the Class Period, the Company touted its compliance with applicable regulations and its close communication with regulators. On November 19, 2020, the Company issued a press release entitled, "Trident Acquisitions Corp. Announces Binding Letter of Intent to Combine with Lottery.com." This press release, which was also filed with the SEC on November 23, 2020 in a Form 8-K signed by Defendant Komissarov, in relevant part, stated:

> Trident Acquisitions Corp. (NASDAQ: TDACU, TDAC, TDACW) ("Trident"), announced that it has entered into a binding letter of intent ("LOI") for a business combination transaction with Lottery.com, which would result in Lottery.com (the "Company") becoming a publicly traded company on The Nasdaq Stock Market.
>
> ***
>
> ***Lottery.com has been a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age***. Through its online platform, Lottery.com is providing official lottery games increased revenues and better regulatory capabilities by developing innovative blockchain technology, while also capturing untapped market share, including Millennial players. The platform is currently live in the Company's home state of Texas and nine other U.S. states with expansion plans into more than 20 U.S. states and several new countries in 2021. Additionally, the Company is the only lottery platform authorized to sell Powerball tickets in 148 countries, with rapid international expansion plans for next year. Lottery.com's ultimate vision is becoming a global lottery marketplace.
>
> ***
>
> Lottery.com is an Austin, TX-based company enabling consumers to play state-sanctioned lottery games from their home or on the go. ***The Company works closely with state regulators to advance the lottery industry, providing increased revenues and better regulatory capabilities, while capturing untapped market share, including millennial players***. Lottery.com is also gamifying charitable giving to fundamentally change how non-profits engage with their donors and raise funds.

75.      The Company made the same or substantially similar statements regarding Lottery's work with state regulators throughout the Class Period. For example, the Company's February 8, 2021 press release entitled, "Lottery.com Enters MOU with MSL to Offer U.S. Lottery

Products in Ukraine," which was also filed with the SEC on February 8, 2021 in a Form 8-K signed by Defendant Komissarov, in relevant part, stated: "The Company works closely with state regulators to advance the lottery industry, providing increased revenues and better regulatory capabilities, while capturing untapped market share, including millennial players." Likewise, press releases issued on February 22, 2021, March 22, 2021, April 5, 2021, April 12, 2021, April 21, 2021, April 27, 2021, June 9, 2021, which were also filed with the SEC on Form 8-Ks, contained the same language.

76.     As the Company later admitted (*see* Section IV.C., *supra*), these statements concerning the Company's regulatory compliance were materially false or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, as the Company failed to disclose that, in fact, it was not complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment. Indeed, on July 6, 2022, Lottery disclosed that an internal investigation had revealed "issues pertaining to the Company's internal accounting controls" and "***instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment***."

## B.     Defendants' Material Misstatements And Omissions In The Proxy Statement In Violation Of Section 14(a) Of The Exchange Act

77.      On October 18, 2021, Lottery filed the final Proxy statement and prospectus for the Business Combination on Form 424B3, which was signed by the Individual TDAC Defendants. The Proxy solicited shareholder approval of the Business Combination and attendant proposals necessary to effectuate the Business Combination.

78.     The Proxy negligently included the following false or misleading statements regarding Lottery's regulatory compliance and potential compliance risks:

*Regulatory and Compliance Risks*

**There is no certainty that in the future a jurisdiction will not enact, amend, or reinterpret laws and regulations governing our operations in ways that impair our revenues, cause us to incur additional legal and compliance costs and other operating expenses, or are otherwise not favorable to our existing operations or planned growth, all of which may have a material adverse effect on us or our results of operations, cash flow, or financial condition.**

Our business is subject to extensive regulation by multiple domestic and foreign governmental authorities and the laws and regulations governing companies conducting sweepstakes and lottery related operations on the Internet and over mobile networks and purchasing of lottery tickets on behalf of others. Such laws and regulations within the U.S. and international jurisdictions are subject to change and the effect of such changes on our ongoing and potential operations cannot be predicted with certainty. Governmental authorities continually evaluate a wide range of issues that impact the mobile and online lottery and gaming industries. Accordingly, there can be no guarantee that in the future a jurisdiction will not enact, amend, or reinterpret laws and regulations governing our operations in ways that impair our revenues, cause us to incur additional legal and compliance costs and other operating expenses, or are otherwise not favorable to our existing operations or planned growth, all of which may have a material adverse effect on us or our results of operations, cash flow, or financial condition.

There have been several proposed state and federal bills to prohibit or restrict interactive or online lottery sales, some of which have been successful. For example, in 2015, the Minnesota legislature passed an amendment to the state's lottery law prohibiting the sale of scratch lottery tickets over the Internet. In certain jurisdictions, the sale of lottery tickets through couriers is expressly unlawful. For example, it is a Class 1 misdemeanor to operate a lottery ticket courier service within the Commonwealth of Virginia. We cannot assure you that laws restricting the sale of lottery tickets via the Internet, through mobile networks or by courier, or that otherwise materially impact our operations, including those relating to sweepstakes, will not be proposed or passed in the future at either the federal or state level or by international governments. Any proposal or passage of such laws may reduce our revenues or require us to expend a significant amount of our funds and resources and incur additional legal and other expenses, thereby creating a material adverse effect on us or our results of operations, cash flow, or financial condition.

***

**Our business model and the conduct of our operations may have to vary in each U.S. jurisdiction where we do business to address the unique features of applicable law to ensure we remain in compliance with that jurisdiction's laws.**

**Our failure to adequately do so may have an adverse impact on our business, financial condition, and results of operations.**

Lottery laws vary from U.S. jurisdiction to U.S. jurisdiction. This means that our business model and the conduct of our operations may have to vary in each jurisdiction where we do business to ensure we remain in compliance with applicable laws. For example, some jurisdictions in the U.S. prohibit lottery ticket courier services, while some jurisdictions in the U.S. prohibit charging certain fees to the user, and further still, some jurisdictions in the U.S. require us to be licensed or registered, which will require us to incur certain costs in connection with the licensing or registration process. In each jurisdiction in the U.S., we may be required to structure our business model and conduct our operations to address the unique features of applicable law.

Many of the U.S. jurisdictions in which we currently do business or anticipate doing business require that lottery game tickets to be sold only by licensed retailers and prohibit sale or resale of lottery games at prices in excess of the purchase price designated by the applicable regulatory authority. Because lottery games are typically considered bearer instruments, we can purchase tickets on behalf of our users and customers and charge certain service fees within the limits of the applicable laws in each U.S. jurisdiction. In most cases, with Virginia being a notable exception, the laws do not specifically prohibit users from engaging our services to purchase lottery games on their behalf. However, certain types of fees are prohibited in certain jurisdictions. For example, Pennsylvania prohibits "any fee associated with the acquisition or transportation of lottery tickets or shares" and Illinois law prohibits service charges, handling fees or other costs added to the established price of a ticket. In those states and other states with similar prohibitions, we will need to structure our business model to comply with the law, while still endeavoring to operate profitably.

If a U.S. jurisdiction prohibits our services, imposes onerous licensing or regulatory requirements, or imposes restrictions on the fees we charge, either by enacting new statutes or regulations or by reinterpreting existing statutes and regulations, such restrictions and requirements could have a material adverse effect on our results of operations, cash flow, or financial condition.

79.     As the Company later admitted (*see* Section IV.C., *supra*), including in an announcement on July 6, 2022, these statements concerning the Company's regulatory compliance were materially false or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, as the Company failed to disclose that it was not

complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment.

80.   The Proxy stated that the Individual TDAC Defendants had approved the Business Combinations for several reasons, including but not limited to the following statements about Lottery's financial results and projections:

- Public market-ready scale, profitability and favorable user distribution and network effect. Trident believes Lottery.com has reached critical mass as a highly valuable alternative for buying lottery tickets in brick-and-mortar stores, which in turn is driving significant revenue, EBITDA and net income growth. ***This year, Lottery.com is anticipated to generate more than US$70 million in revenue and more than $3 million in EBITDA*** . . . .

- Fast growing business with strong execution, exceeding forecasts. Lottery.com is experiencing significant growth, and it has already booked US$5.5 million of total revenue for the 3-month period ending March 2021. This represents a 270% increase in total revenue year-on-year. ***Projections forecast US$70 million in revenue and more than $3 million in EBITDA for fiscal year 2021.*** The Projections forecast 750% FY19-FY21E Revenue CAGR.

- High profit margin. Lottery.com is a pure-play, with an all fee-based business and zero balance sheet exposure. The Projections forecast a 32% FY21E Gross Profit margin and 5% FY21E EBITDA margin. Lottery.com has a 100% fee-based model that generates service fees for lottery ticket sales, as well as subscription fees and data set fees for selling lottery data. Trident views the fact that Lottery.com has modest exposure to debt as advantageous in the COVID-19 environment. Lottery.com is a pure play fast growing online gaming company in a high earnings multiple segment. Trident's board of directors believes that this capital-light, highly profitable business model with minimal credit or commodity risk will continue to generate strong margins and free cash flow.

81.   As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's financial results and projections were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose: (i) that the Company lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue; (ii) that the Company

27

was improperly recognizing revenue; and (iii) that the Company's financial results as to cash and revenue were materially overstated.

82.     The Proxy was further materially false and misleading because it negligently failed to disclose known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303, including the fact that the Company was not complying with state and federal laws and overstating its cash and revenue which would have a material negative impact on the Company's sales, revenues, and/or results of operations going forward.

### C.     Materially False And Misleading Statements Following The Issuance Of The Proxy Statement

83.     On October 21, 2021, Lottery issued a press release entitled, "Preliminary Revenue Figures Represent Quarterly Sequential Growth of Greater than 135%." Therein, the Company, in relevant part, stated:

> AutoLotto, Inc., doing business as Lottery.com ("Lottery.com" or the "Company"), a leading technology company that is transforming how, where and when lottery is played, and Trident Acquisitions Corp. (Nasdaq: TDACU, TDAC, TDACW) ("Trident") today provided preliminary revenue results for Lottery.com's third quarter 2021, which are expected to be between $22.0 million and $24.0 million. This represents sequential revenue growth of greater than 135% compared to $9.3 million in the second quarter of 2021. The strong growth was driven by increased sales in the Company's B2B segment.
>
> On a preliminary basis, revenue through the first nine months of 2021 is expected to be between $36.8 million and $38.8 million on a reported basis and $38.7 million and $40.7 million on a pro forma basis giving effect to the acquisition of 80% interests in JuegaLotto and Aganar, two companies with legalized lottery operations within Mexico. Through the first nine months of 2021, pro forma revenue is expected to be more than 270% above the full twelve months of 2020, after giving effect to the acquisition of the interests in JuegaLotto and Aganar.

84.     As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's financial results and projections were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting

controls, including controls over financial reporting of cash and revenue, (ii) the Company was improperly recognizing revenue, and (iii) that as such, the Company's financial results were materially overstated.

85.      On November 15, 2021, the Company issued a press release entitled, "Lottery.com Announces Strong Third Quarter Results and Year-to-Date Revenue Increase of $42.8 Million Over Prior-Year Period." This press release, which was also filed with the SEC on November 15, 2021 in a Form 8-K signed by Defendant Lever, in relevant part, stated:

> Third quarter 2021 revenue was $32.2 million, an increase of $30.6 million from the third quarter of 2020. The growth was driven by the global affiliate marketing program.
>
> ***
>
> The Company expects to meet or exceed its previous guidance of $71 million for full year 2021 revenue.

86.      As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's financial results and projections were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue, (ii) the Company was improperly recognizing revenue, and (iii) that as such, the Company's financial results were materially overstated.

87.      Also on November 15, 2021, the Company filed its quarterly report on Form 10-Q for the 2021 fiscal third quarter. The November 15, 2021 Form 10-Q referenced the fact that the Company had identified a material weakness relating to a technical accounting issue identified by the SEC in SPAC-related guidance. Specifically, Lottery determined that its disclosure controls and procedures were not effective as of September 30, 2021, and thus had restated its financial

statements on Form 10-K/A on June 28, 2021 (the "10-K/A"), in order to comply with a new SEC

Staff Statement regarding the classification of warrants. With respect to Lottery's Controls and

Procedures, the Company stated:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, ***due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021***.

***

> Other than what was described in the 10-K/A, ***there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*** In light of the restatement of our financial statements included in the 10-K/A, we plan to enhance our processes to identify and appropriately apply applicable ***accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements.*** Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

88.     As the Company later admitted (*see* Section IV.D., *supra*), these statements

concerning the Company's internal controls were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because the

Company failed to disclose that (i) the Company lacked adequate internal accounting controls over

financial reporting of cash and revenue, (ii) the Company was improperly recognizing revenue,

and (iii) that as such, the Company's financial results were materially overstated.

89.     Moreover, also on November 15, 2021, the Company attached a copy of AutoLotto, Inc's Management's Discussion And Analysis Of Financial Condition And Results Of Operations to the Company's Form 8-K that day, which was signed by Kathryn Lever. Therein, Lottery disclosed that $32.25 million revenue for the quarter ended September 30, 2021 and that "[t]he increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits" during the quarter.

90.     As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's revenue were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the purported $30 million sale affiliated marketing credits should not have been booked as revenue and that as such, the Company's financial results were materially overstated.

91.     On March 31, 2022, the Company issued a press release, also filed as an attachment to a Form 8-K filed with the SEC on that date that was signed by Kathryn Lever. Therein, Lottery outed "strong" financial results for the fourth quarter ("Q4") and full-year 2021. Among the information provided, the Company reported revenue of $21.5 million for Q4 2021 (an increase of $18.2 million over the prior year period) and revenue of $68.5 million for the full year 2021 (an increase of $61 million over 2020). The Company also reported cash for Q4 2021 of $62.6 million – an increase of $58.8 million over the prior year period. Thereafter, on April 1, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021. The annual report, which was signed by Defendants DiMatteo, Clemenson and Dickinson, reiterated the financial results released the prior day.

92.     As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's cash and revenue were materially false or misleading when made, or

31

omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) the Company was claiming it had cash that it did not have and was improperly recognizing revenue, and (iii) that as such, the Company's financial results were materially overstated.

93.     The April 1, 2022 annual report also stated that it had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020, but it described this material weakness as one largely related to personnel and staffing – specifically, it related to "the design and operation of the procedures relating to the closing of financial statements." Defendants reassured investors that the Company had "commenced measures to remediate" such material weakness and that that other than the deficiencies identified, "there was no change in our internal control over financial reporting." As the Company, in relevant part, stated:

> In connection with the audits of our condensed consolidated financial statements included in this Annual Report, ***our management has identified a material weakness in internal control over financial reporting as of December 31, 2021 and 2020 relating to deficiencies in the design and operation of the procedures relating to the closing of our financial statements.*** These include: (i) our lack of a sufficient number of personnel with an appropriate level of knowledge and experience in accounting for complex or non-routine transactions, (ii) the fact that our policies and procedures with respect to the review, supervision and monitoring of our accounting and reporting functions were either not designed and in place or not operating effectively; (iii) the timely closing of financial books at the quarter and fiscal year end, and (iv) incomplete segregation of duties in certain types of transactions and processes.
>
> ***We have commenced measures to remediate the identified material weakness***, including (i) adding personnel with sufficient accounting knowledge; (ii) adopting a more rigorous period-end review process for financial reporting; (iii) adopting improved period close processes and accounting processes, and (iv) clearly defining and documenting the segregation of duties for certain transactions and processes. The implementation of our remediation is ongoing and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles. We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting.

94.     As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's internal controls over financial reporting were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, the Company was claiming it had cash that it did not have and was improperly recognizing revenue, and that as such, the Company's financial results were materially overstated.

95.     On May 16, 2022, the Company issued a press release, filed with the SEC on Form 8-K signed by Defendant Lever, announcing its financial results for the Company's 2022 fiscal first quarter, ended March 31, 2022 ("Q1 2022"). In relevant part, Defendants reported that Lottery's 2022 fiscal first quarter revenues were $21.2 million, an increase of $15.7 million over the prior year period and cash of $50.8 million, up $32.5 million over the prior year period. Also on May 16, 2022, the Company filed its quarterly report for the same fiscal quarter and reiterated the financial results disclosed in its press release.

96.     As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's cash and revenue were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) the Company was claiming it had cash that it did not have and was improperly recognizing revenue, and (iii) that as such, the Company's financial results were materially overstated.

97.     The Company's 2022 fiscal first quarter Form 10-Q, which was signed by Defendant Dickinson, stated that management had "evaluated the effectiveness of our disclosure controls and procedures" and that:

> [b]ased on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, *as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting with respect to our financial statement close and reporting process*….

Critically, however, the Company reassured investors that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that *our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position*, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP.

98.     As the Company later admitted (*see* Section IV.D., *supra*), these statements concerning the Company's internal controls and financial position were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) the Company was claiming it had cash that it did not have and was improperly recognizing revenue, and (iii) that as such, the Company's financial results were materially overstated.

## D.     Materially False And Misleading Sarbanes-Oxley Certifications

99.     Each of Lottery's financial statements issued during the Class Period after the Business Combination, contained substantially similar certifications pursuant to the Sarbanes-Oxley Act of 2002, signed by Defendants DiMattero and Dickinson, who certified:

> 1.     I have reviewed this this Quarterly Report on Form 10-Q of Lottery.com Inc;
>
> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

100.   These statements made in the Company's annual and quarterly reports were materially false and/or misleading when made because Defendants failed to disclose or indicate that the Company lacked adequate internal controls, including but not limited to accounting controls over financial reporting of cash and revenue, the Company was claiming it had cash that it did not have and was improperly recognizing revenue, and that as such, the Company's financial results were materially overstated.[7]

## VI.   ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER

101.   As alleged herein, Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of Lottery were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

102.   As alleged herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Lottery, their control over, and/or receipt and/or modification of Lottery's allegedly materially misleading misstatements and/or their associations with Lottery which made them privy to confidential proprietary information concerning Lottery, participated in the fraudulent scheme alleged herein.

---

[7] An Annual report was filed on Form 10-K on April 1, 2022 and quarterly reports were filed on Form 10-Q on November 15, 2021 and May 16, 2022.

### A.     The Company's Regulatory Compliance Was Central To Lottery's Business

103.    Lottery purports to be a leading online platform to play the lottery. Lotteries are extensively regulated by state and federal laws, making whether the Company is following all appropriate regulations vital to the business. Therefore, as the Company discloses, Lottery's employees focus on ensuring compliance and it has technology in place to ensure this compliance.

104.    As such, the Individual Defendants were aware of the Company's compliance issues, particularly that the Company was in "non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment"; or if the Company's CEOs and CFOs were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members. However, the most reasonable inference from this fact is that the Individual Lottery Defendants were aware of this non-compliance with state and federal law as the Company later admitted.

### B.     TDAC And The Individual TDAC Defendants Knew Or Recklessly Disregarded The Falsity Of Their Statements

105.    The positions of the Individual TDAC Defendants give rise to a strong inference of their scienter with respect to issues relating non-compliance with state and federal law.

106.    TDAC's raison d'être was to effectuate the Business Combination, and to do so, the Individual TDAC Defendants were required to conduct due diligence of Lottery, the target business to be acquired. Indeed, they purported to conduct extensive due diligence, including: "extensive meetings and calls with Lottery.com's management team, including with regards to *operations and forecasts*;" "commercial, *operational, financial*, accounting, tax legal, insurance, environmental, technology, and *regulatory due diligence* carried out by the Trident Team and Trident's legal and financial advisors;" "the financial projections provided by Lottery.com's management team and the assumptions underlying such projections; and "Lottery.com's audited

37

and unaudited financial statements." As such, it is reasonable to infer that the Individual TDAC Defendants knew (or recklessly disregarded) the regulatory violations and inadequate revenue controls.

107.    The Individual TDAC Defendants possessed strong personal financial motives to complete the Business Combination, and therefore to cover up problems with TDAC's due diligence and problems at Lottery, and to misleadingly tout the Business Combination. Moreover, the scienter of the Individual TDAC Defendants is imputable to TDAC because they were directors and/or officers of TDAC acting within the scope of their authority.

### C.    The Overstated Cash And Revenue Comprised A Substantial Amount Of The Company's Revenue Such That Knowledge or Extreme Recklessness On The Part Of Defendants Is The Only Reasonable Inference

108.    As discussed herein, the Company admitted that it had overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue that same amount. The Company's entire 2021 revenue was only $68.5 million and its 2022 fiscal first quarter revenue was $21.2 million. Likewise, the Company only had $60.6 million in cash at the end of the 2021 fiscal year and $50.8 million in cash at the end of its 2022 fiscal first quarter. As such, the $30 million in overstated cash and revenue *constituted almost half of the entire Company's revenue and cash* for the 2021 fiscal year.

109.    The Individual Lottery Defendants were certainly aware of the particulars of transactions that constituted almost half of the entire Company's cash and revenues; or if the Company's CEO and CFO were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members. However, the most reasonable inference from this fact is that they were aware that the transactions at issue should not have been put on their books as the Company later admitted.

**D.    Almost All Of The Company's Revenue For 2022 Fiscal First Quarter Was From One Customer**

110.    In the Company's 2022 fiscal first quarter Quarterly Report filed with the SEC May 16, 2022, Lottery disclosed the one customer (Customer A) was responsible for 87.7% of the revenue and 99.6% of the accounts receivable for the quarter. At these percentages, it is highly unlikely, if not impossible, that this costumer's transactions were not part of the $30 million in cash and revenue that was overstated. As such, it is completely illogical that management would not be aware of transactions of a customer that represented almost *all* of a Company's revenue and account receivables.

**E.    The Company's Senior Executives And Auditor All Resigned Or Were Forced Out**

111.    As discussed herein, on July 6, 2022, the Company disclosed that it had retained outside counsel to conduct an independent investigation that revealed instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment, and identified issues pertaining to the Company's internal accounting controls.

112.    Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Mr. Dickinson served as the Company's President and Treasurer since October 2021 and as the Company's Chief Financial Officer since March 2022. In fact, in a lawsuit styled, *AutoLotto, Inc., d/b/a Lottery.com v. J. Streicher Financial, LLC*, Case No. 2022-0661 (Del. Ch. Ct. Jul. 29, 2022) (Dkt. No. 1) that relates to the undisclosed line of credit, Lottery asserts that "its available unrestricted cash balance had been overstated by approximately $30 million by the actions of [Dickinson], which actions were undertaken without the knowledge of LTRY's Audit Committee." Following Mr. Dickinson's

departure from Lottery, Harry Dhaliwal was named as the Company's Interim Chief Financial Officer and principal financial officer.

113.    On July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. Then on July 22, 2022, the Company reported that CEO and co-founder Defendant DiMatteo was resigning, effective immediately. That is, about the same time the investigation was announced into accounting issues, the top three executives (CEO, CFO, and CRO) responsible for revenue and accounting had departed.

114.    On September 9, 2022, Lottery disclosed that four members of its Board had resigned; specifically, former CEO DiMatteo, William Thompson, Jr., Steven Cohen, and Lisa Borders. Moreover, they further disclosed that Lottery's Chief Legal Officer, Chief Operating Officer and Secretary, had also provided her notice of resignation. Richard Kivel was the sole remaining director and appointed two new directors, Vladimir Klechtchev and Dr. Amer Rustom; however, all three had resigned by the end of November 2022.

115.    On October 6, 2022, Lottery disclosed that its independent registered accounting firm, Armanino, had resigned effective immediately. The Company disclosed that the resignation was because, "based on Armanino's evaluation of the facts and circumstances pertaining to matters disclosed in the Company's recent Form 8-K filings regarding the resignations of certain officers and directors, Armanino is unable to rely on the representations of management."

116.    On October 9, 2022, the Company disclosed that Harry Dhaliwal, the Interim Chief Financial Officer and principal financial officer provided a notice of resignation, with immediate effect.

117.    The most logical inference from the firing of the CFO after an independent investigation, followed by a mass departure of Lottery's executives and officers – and relatively new accounting firm – is that Lottery's management, including the Individual Lottery Defendants, had knowledge of the conduct alleged herein or acted recklessly in not knowing.

**F.    As Lottery Has Admitted, The Company Failed To Maintain Effective Internal Controls Even After Being Aware Of Prior Internal Control Issues That Defendants Had Pledged To Remedy**

118.    The Individual Defendants failed to comply with their obligations imposed by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and to prepare financial statements in accordance with GAAP. Section 13(b)2 of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–
>
> > i.    transactions are executed in accordance with management's general or specific authorization;
> >
> > ii.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
> >
> > iii.    access to assets is permitted only in accordance with management's general or specific authorization; and
> >
> > iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

119.     A functional and strong system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[8]

120.     The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. More broadly, a system of internal control also includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

121.     The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. To prepare financial statements in conformity with GAAP, management's responsibility is acknowledged in a set of standards known as generally accepted auditing standards ("GAAS"). COSO Report, Executive Summary. GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record,

---

[8] Generally accepted auditing standards codified in AU § 319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO report was issued in September 1992 as a four-volume set. Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. AU § 110.03 (emphasis added).

122.     Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

- the accounting principles selected and applied have general acceptance;

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

  the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[9]

123.     The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

124.     Lottery's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

---

[9] *See* COSO Report, Chapter 3; *see also* Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

125.     The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

126.     Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

127.     Everyone in an organization has responsibility for internal controls. However, the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He

or she has ultimate ownership responsibility for the internal control system. . . . The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

128.   The Addendum to the COSO Report makes it clear that the company's chief accounting officer – plays a critical role with respect to the internal control system. As described herein there was a material weakness in the internal controls at Lottery that were necessary to prepare accurate financial statements and ensure compliance with regulatory filing requirements applicable to public companies. A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." Lottery's internal control system completely failed to live up to the standards as set forth in the five elements of the internal control framework described above.

129.   The Company's failure to have adequate internal controls over financial reporting is even more egregious considering previous control issues and prior pledges to remedy these issues.

130.   On November 15, 2021, the Company disclosed that it had uncovered a material weakness in its internal controls related to the classification of warrants. As the Company explained:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities

on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021.

131.    In the same disclosure, the Company claimed that there were no changes in internal control over financial reporting and that Lottery intended to "enhance [its] processes to identify and appropriately apply applicable accounting requirements." As the Company explained:

**Changes in Internal Control Over Financial Reporting**

Other than what was described in the 10-K/A, ***there were no changes in our internal control over financial reporting*** (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. In light of the restatement of our financial statements included in the 10-K/A, ***we plan to enhance our processes to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements. Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications***. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

132.    On April 1, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021. Therein, the Company disclosed that it had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020, but described this material weakness as mainly a personnel and staffing related to "the design and operation of the procedures relating to the closing of [Lottery] financial statements." However, the Company reassured investors that the Company had "commenced measures to remediate" this material weakness and "there was no change in our internal control over financial reporting."

133.    Then again, on May 16, 2022, the Company disclosed in its next Quarterly Report that "a material weakness in internal control over financial reporting related to ineffective controls within the Company's financial close process existed" during the Class Period. Yet, the Company still claimed that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP.

134.    On July 6, 2022, the Company admitted that an internal investigation, conducted by outside counsel, revealed "issues pertaining to the Company's internal accounting controls" and in light of the findings of the investigation, on June 30, 2022, the Board had terminated defendant Dickinson, the Company's CFO, President, and Treasurer. Then on July 15, 2022, the Company announced that defendant Clemenson, the Company's Chief Revenue Officer, had resigned on July 11, 2022, effective immediately, and that the independent investigation previously disclosed had determined after a review of Lottery's cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery had overstated its unrestricted cash balance by approximately $30 million and that, "relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount."

135.    The only rationale inference from the Company's acknowledgment of minor internal controls issues and then continued pledges that its executives would work on Lottery's ensuring adequate internal controls were in place without uncovering a massive accounting scheme simultaneously occurring is that its executives were aware that the cash balances and revenue were grossly overstated. This inference is supported by the fact that the individuals that oversaw Lottery's financial accounting were immediately removed from their positions. It beggars belief

that Lottery's finance and accounting team would miss such basic and massive accounting issues while working to "enhance [its] processes to identify and appropriately apply applicable accounting requirements."

### G.   Defendants' GAAP Violations

136.   Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Lottery to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.[10] Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. (17 C.F.R. § 210.10-01(a)). Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. § 210.4- 01(a)(1).

137.   Furthermore, the fact that Lottery stated that its financial statements should not be relied upon is an admission that they were false and misleading when originally issued. (Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board Statement No. 154 at ¶ 25).

138.   GAAP rules and regulations regarding earnings management and revenue recognition are fundamental for publicly traded companies. As such, brazen violation of these

---

[10] Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. (ASC 105-10-05-1).

basic and well-known rules, as Lottery admittedly did, further demonstrates intent, or at least severe recklessness.

### H.   The Individual Defendants Had Financial Motivations For Causing The Company To Consummate The Business Combination

139.   The Individual Defendants also had the motive and opportunity to defraud investors. For example, the Individual TDAC Defendants received over 5 million shares of TDAC (valued at over $85 million at the Class Period high) for nominal consideration and 1.15 million private units (valued at $17.825 million in the Proxy Statement) that would be rendered worthless if the Business Combination was not completed, as these holders had waived their rights to any liquidation distributions. The Individual TDAC Defendants had also contributed over $3.4 million in cash to the Company that would not be repaid in the event the Business Combination was not completed. Moreover, these Defendants received over $5 million for reimbursement of work performed in connection with the Business Combination.

140.   Likewise, the Individual Lottery Defendants received far more shares than they would have been entitled to had the true value of Lottery been disclosed in connection with the Business Combination. Moreover, these executives received lucrative pay and benefit packages to the extent they remained employees of Lottery following the Business Combination. Additionally, the Individual Defendants stood to receive millions more shares as "earnout" awards and compensation in the event the Business Combination was completed, and certain share price targets were achieved.

141.   These various financial incentives further bolster an already overwhelmingly compelling inference of scienter.

I.      **Corporate Scienter And *Respondeat Superior***

142.    Each of the Individual Defendants was a high-ranking management-level employee that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in his/her role as an executive employee and representative of Lottery. The scienter of each of these individuals and all other management-level employees of Lottery, is therefore imputed to Defendant Lottery.

## VII.   LOSS CAUSATION

### A.     Investors Suffered Significant Losses Due To The Materially Misleading Statements Issued During The Class Period

143.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased Lottery securities at artificially inflated prices. The price of Lottery's securities significantly declined when the misrepresentations made to the market and/or the effects thereof, were revealed or materialized, on November 15, 2021, July 6, 2022, July 18, 2022, July 25, 2022 and July 29, 2022, causing investors' losses.

144.    On November 15, 2021, Lottery filed with the SEC a Form 8-K announcing that, on November 10, 2021, the Board had approved the engagement of Armanino LLP ("Armanino") as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements for the year ended December 31, 2021, and the dismissal of Marcum LLP as the Company's auditing firm. That same day, Lottery filed with the SEC its quarterly report on Form 10-Q reporting its financial results for the period ended September 30, 2021, which in relevant part, stated: "[i]n connection with the preparation of the Company's financial statements as of September 30, 2021, management identified errors made in its historical

financial statements where, at the closing of the Company's Initial Public Offering, the Company improperly valued its common stock subject to possible redemption." Accordingly, the quarterly report provided restated financials for Lottery. Moreover, the November 15, 2021 quarterly report identified a material weakness and determined that its disclosure controls and procedures were not effective as of September 30, 2021. Additionally, the Company disclosed that a large portion of its revenue for the quarter (approximately $47) was the result of a single $30 million sale of affiliate marketing credits during the quarter.

145.     On this news, the price of Lottery stock fell from a price of $13.25 per share on November 12, 2021 to a price of $6.98 per share on November 22, 2021, a decline of nearly 50%.

146.     On July 6, 2022, the Company filed a Form 8-K with the SEC dated July 5, 2022. The Form 8-K, in relevant part, stated:

> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> ***The Audit Committee of the Board of the Directors (the "Board") of Lottery.com (the "Company") retained outside counsel to conduct an independent investigation that has revealed instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment. The investigation also identified issues pertaining to the Company's internal accounting controls.*** Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Mr. Dickinson served as the Company's President and Treasurer since October 2021 and as the Company's Chief Financial Officer since March 2022. The Company is continuing to work with outside counsel with respect to the matters that are the subject of the independent investigation and to institute appropriate remedial measures.
>
> ***
>
> The Company's Chief Executive Officer and Board chair, Tony DiMatteo, has stepped down as Board chair effective July 5, 2022, which will enable him to devote more time to his responsibilities as Chief Executive Officer. Mr. DiMatteo will remain as a member of the Board. In his place as chair, the Board, on July 5, 2022,

appointed Steven M. Cohen and Richard Kivel as co-chairs effective as of that date. In their roles as Board co-chairs, Steven will be primarily responsible for coordinating Board oversight of legal, compliance, and financial reporting matters, and Richard will be primarily responsible for coordinating Board oversight of business and operational matters. Katie Lever, the Company's Chief Legal Officer, will report directly to the Board co-chairs.

147.     On this news, Lottery shares fell $0.15, or more than 12%, from a closing price of

$1.22 per share on July 5, 2022 to a closing price of $1.07 per share on July 6, 2022, on abnormally

high volume.

148.     On July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery

announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022,

effective immediately. Moreover, the Company provided an update on the independent

investigation previously disclosed on July 6, 2022. The Company reported that, after a review of

its cash balances, its revenue recognition policies and procedures, and other internal accounting

controls, Lottery had:

> preliminarily conclude[d] that it has ***overstated its available unrestricted cash balance by approximately $30 million*** and that, relatedly, in the prior fiscal year, it ***improperly recognized revenue*** in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

149.     On this news, shares of Lottery fell $0.14, or more than 14.5%, from a closing price

of $0.96 per share on July 15, 2022 to a closing price of $0.82 per share on July 16, 2022, on

abnormally high volume.

150.     On July 22, 2022, Lottery filed a Form 8-K with the SEC in which the Company

disclosed that it had been advised by its independent accountant that its audited financial

statements for the fiscal year ended December 31, 2021 and unaudited financial statements for the

quarter ended March 31, 2022 should no longer be relied upon. In addition, the Company reported

that CEO and co-founder Defendant DiMatteo was resigning, effective immediately. Specifically,

the Company's announcement provided that:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> (b) On July 20, 2022, Lottery.com Inc. (the "Company") was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal year ended December 31, 2022, that the *audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon*. Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a *Company subsidiary entered into a line of credit in January 2022 that was not disclosed* in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.
>
> \*\*\*
>
> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> On July 21, 2022, Lawrence Anthony "Tony" DiMatteo III, the Chief Executive Officer (the "CEO") of the Company and a member of its Board of Directors (the "Board"), provided a notice of resignation as CEO of the Company, its wholly owned subsidiary, AutoLotto, Inc. ("AutoLotto"), and all of its other subsidiaries and affiliates with the exception of LTRY WinTogether, Inc., with immediate effect. The Company accepted his resignation from such positions. Mr. DiMatteo served as an officer and director of AutoLotto since February 2015 and as CEO of the Company since the effectuation of the business combination in October 2021.

151.    On these disclosures, Lottery shares declined $0.10, or more than 12%, over the

next two trading days, from a closing price of $0.82 per share on July 22, 2022 to a closing price

of $0.72 per share on July 26, 2022.

152.    On July 29, 2022, Lottery disclosed in a filing on Form 8-K with the SEC that it

did not have "sufficient financial resources to fund its operations or pay certain existing

obligations," and that it therefore intended to furlough certain employees effective July 29, 2022.

Moreover, because Lottery's resources were not sufficient to fund its operations for a twelve-

month period, "there is substantial doubt about the Company's ability to continue as a going

concern," and the Company may be forced to wind down its operations or pursue liquidation of

the Company's assets. In full, the Company stated that:

> **Item 8.01 Other Events.**
>
> On July, 28, 2022, the Board of Directors of Lottery.com Inc. (the "Company") determined that ***the Company does not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations. Accordingly, the Company intends to furlough certain employees effective July 29, 2022***. As of July 29, 2022, the Company owed approximately $425,000 in outstanding payroll obligations. The Company's inability to pay this amount may result in employees terminating their relationship with the Company and/or pursuing legal remedies. Since the Company's business is dependent on the efforts and talents of its employees, particularly its developers and engineers, and the provision of ongoing services to customers by its employees, ***a material loss of its employee base may result in the inability of the Company to operate its technology, meet its obligations to customers, the loss of key customer relationships and revenue, and claims for breach of contractual obligations***.
>
> Additionally, ***the Company's capital resources are not sufficient to fund its operations for a twelve-month period and, therefore, there is substantial doubt about the Company's ability to continue as a going concern***. If the Company is not able to secure additional capital resources or otherwise fund its operations, ***the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets***, including equipment and intellectual property.

153.    On this news, shares of Lottery declined 64%, falling $0.52 per share, from a

closing price of $0.81 per share on July 28, 2022 to a close of $0.29 per share on July 29, 2022.

**B.      Shareholders Who Were Eligible To Vote At The October 28, 2021 Special Meeting Suffered Damages**

154.    Apart from the decline in Lottery securities caused by the corrective disclosures

above, TDAC shareholders who were eligible to vote on the Business Combination and/or exercise

their redemption rights have also been damaged as a result of the materially false and/or misleading

statements about Lottery's operations and financial results. Had the true financial condition and

operations of Lottery been known, members of the Class eligible to vote on the Business

Combination would have voted against the Business Combination and/or exercised their redemption rights and received $10.94 in cash per share of TDAC stock.

155.    It was foreseeable to Defendants that the false and/or misleading statements about, among other things, Lottery's business operations and financial condition and value: (i) would cause the members of the Class that would have otherwise received $10.94 in cash per share of TDAC stock upon exercising redemption rights, to keep their stock in lieu of receiving $10.94 in cash per share; and (ii) eventually the disclosure of the information about Lottery's business operations and financial condition would cause those members of the Class to instead receive substantially less for each share sold after the Business Combination.

156.    As a result, Defendants' conduct proximately caused foreseeable losses to those Plaintiffs and members of the Class.

## VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

157.    The market for Lottery securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Lottery's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Lottery's securities and market information relating to Lottery, and have been damaged thereby.

158.    During the Class Period, the artificial inflation of Lottery's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements about Lottery's business, prospects, and operations. These material misstatements

and/or omissions created an unrealistically positive assessment of Lottery and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when corrected, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

159.    At all relevant times, the market for Lottery's securities was an efficient market for the following reason, among others:

(a)    Lottery shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Lottery filed periodic public reports with the SEC and/or the NASDAQ; and/or

(c)    Lottery regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and though other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services

160.    As a result of the foregoing, the market for Lottery's securities promptly digested current information regarding Lottery from all publicly available sources and reflected such information in Lottery's share price. Under these circumstances, all purchasers of Lottery's securities during the Class Period suffered similar injury through their purchase of Lottery's securities at artificially inflated prices and a presumption of reliance applies.

161.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

162.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities other than Defendants who or which: (1) purchased or otherwise acquired the publicly traded securities of Lottery during the period from November 19, 2020 through July 29, 2022, inclusive (the "Class Period"), and who were damaged thereby, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and/or (2) held common stock of TDAC as of October 28, 2021 and were eligible to vote at TDAC's October 28, 2021 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.

163.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lottery's securities actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. As of May 9, 2022, Lottery had over 50,760,799

shares of common stock outstanding, which were actively traded on the NASDAQ in an efficient market.

164.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein. Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs. Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

165.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

166.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether Defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)    whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and the proper measure of such damages.

167.    Individualized issues of reliance will not predominate over common issues. The presumption of reliance applies because at all relevant times, the market for Lottery's securities was an efficient market.

## X.    NO SAFE HARBOR

168.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

169.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of Lottery who knew that those statements were false when made.

## XI.    CAUSES OF ACTION

### FIRST CLAIM
**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

170.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

171.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading

in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

172.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)   Employed devices, schemes and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Lottery's publicly traded securities during the Class Period.

173.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lottery's publicly traded securities. Plaintiffs and the Class would not have purchased Lottery securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Lottery Defendants' misleading statements.

174.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Lottery securities during the Class Period.

## SECOND CLAIM
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

175.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

176.    The Individual Defendants acted as controlling persons of Lottery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

177.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

178.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Lottery's and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM
### Violation of Section 14(a) of the Exchange Act and Rule 14a-9
### Against All Defendants

179.     Plaintiffs repeat and re-allege each and every allegation as set forth in ¶¶77-82 as if fully set forth herein.

180.     The claims set forth herein do not sound in fraud and are based on negligent conduct by Defendants.

181.     The Defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that through Defendants' negligence contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary to make the statements therein not false or misleading.

182.     Plaintiffs and other members of the Class were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the Business Combination, and approved the Business Combination without having been advised of material facts. Accordingly, Plaintiffs and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

## FOURTH CLAIM
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

183.     Plaintiffs repeat and re-allege each and every allegation as set forth in ¶¶77-82 as if fully set forth herein.

184.    The Individual TDAC Defendants acted as controlling persons of TDAC as within the meaning of Section 20(a) of the Exchange Act as alleged herein and Individual Lottery Defendants acted as controlling persons of Lottery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the companies' operations, these defendants had the power and authority to cause TDAC and Lottery to engage in the wrongful conduct complained of herein. These defendants were able to, and did, control directly and indirectly, the content of the Proxy Statement and Prospectus there causing the dissemination of the materially false and/or misleading statements and omissions as alleged herein.

185.    In particular, the TDAC Defendants reviewed the Business Combination and all of the underlying due diligence materials, voted to approve the Business Combination, and solicited the approval of the Business Combination through TDAC's management's recommendation to vote in favor of the Business Combination, which appeared in the Proxy Statement and Prospectus. Moreover, the Individual Lottery Defendants reviewed the Business Combination, reviewed and furnished information for inclusion in the Proxy Statement and Prospectus, and solicited the approval of the Business Combination.

186.    As set forth above, in their capacities as officers and/or directors of Lottery, these defendants participated in the misstatements and omissions set forth above. Indeed, each of these defendants had access to information regarding the circumstances surrounding the Business Combination and Lottery, including the terms of the Business Combination, analysis of Lottery's operating results and financial condition, the valuation of Lottery, and the due diligence that had and had not been performed. As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

187.    As set forth above, Defendants violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. Individual Defendants were culpable participants in the violations Section 14(a) because they failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements in the Proxy Statement and Prospectus issued were true and free of any omissions of material fact. As detailed above, during the respective times that these defendants served as officers and/or directors of TDAC and Lottery, each is responsible for the material misstatements and omissions made in the Proxy Statement and Prospectus.

188.    Plaintiffs and Class members eligible to vote on the Business Combination were denied the opportunity to make an informed decision in voting on the Business Combination and were damaged as a direct and proximate cause of the untrue statements and omissions in the Proxy Statement and Prospectus.

## XII.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

(a)    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIII.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: January 31, 2023

By: */s/ Casey E. Sadler*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler (admitted pro hac vice)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Counsel for Lead Plaintiffs RTD Bros LLC,*
*Todd Benn, Tom Benn, and Tomasz Rzedzian*
*and Lead Counsel for the Class*

**KIRBY McINERNEY LLP**
Thomas W. Elrod
Ira M. Press
250 Park Avenue, Suite 820
New York, York 10177
Telephone: (212) 371-6600
Email: telrod@kmllp.com
          ipress@kmllp.com

**BERGER MONTAGUE PC**
Sherrie R. Savett
Michael Dell'Angelo
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
mdellangelo@bm.net
 aabramowitz@bm.net

*Counsel for Additional Plaintiff*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 31, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 31, 2023.

*s/ Casey E. Sadler*
Casey E. Sadler