**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE LOTTERY.COM, INC.
SECURITIES LITIGATION

Case No. 22 Civ. 07111 (JLR)

**PLAINTIFFS' OPPOSITION TO DEFENDANT LOTTERY.COM'S MOTION
TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ....................................................................................1

II.    STATEMENT OF FACTS ...........................................................................................2

      A.     SPAC's Conflicts Of Interest.........................................................................2

      B.     Lottery's Business And TDAC's Acquisition Of Lottery .....................................3

      C.     Lottery's False And Misleading Statements ...................................................3

          1.     Misstatements Concerning Cash....................................................3

          2.     Misstatements Relating To Revenue In The Proxy And Other Public Disclosures....................................................................................4

          3.     Misstatements Concerning Financial Reporting And Internal Controls.....................................................................................5

          4.     Misstatements Concerning Regulatory Compliance And Compliance Risks In The Proxy And Other Public Statements ...................6

      D.     The Fallout From Lottery's Fraud ...............................................................7

III.    ARGUMENT...........................................................................................................7

      A.     Applicable Legal Standards Disfavor Lottery's Motion.......................................7

      B.     The AC States A Claim Under Section 10(b) Of The Exchange Act ......................8

          1.     Plaintiffs Have Sufficiently Pled Falsity.........................................8

                a)     Plaintiffs Have Identified The Alleged Misstatements With Particularity.....................................................................8

                b)     Plaintiffs' Allegations Establish Contemporaneous Falsity ............9

                c)     Lottery's Purported "Belief" Regarding Its Legal Compliance Is Actionable..........................................................11

                d)     Defendants' Statements Regarding Lottery's Relationship With Regulators Are Not Puffery ....................................12

                e)     Lottery's Misrepresentations Are Not Protected By The Safe Harbor Or Bespeaks Caution Doctrine .........................13

          2.     The AC Raises A Strong And Compelling Inference Of Scienter.............14

i

|   | a) | Motive And Opportunity | 15 |
|   | b) | Conscious Misbehavior And/Or Recklessness | 16 |
|   | c) | Fraud Is The Far More Compelling Inference | 20 |
| C. | The AC States A Claim Under Section 14(a) Of The Exchange Act | | 21 |
|   | 1. | Lottery Had A Duty To Disclose The Full Truth | 22 |
|   | 2. | Lottery's Cautionary Language In The Proxy Is Inadequate | 23 |
|   | 3. | Lottery's Risk Disclosures In The Proxy Were Themselves Misleading | 24 |
| IV. | THE AC ALLEGES CONTROL PERSON LIABILITY UNDER SECTION 20(a) | | 25 |
| V. | CONCLUSION | | 25 |

**TABLE OF AUTHORITIES**

**Cases**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
398 F. Supp. 2d 244 (S.D.N.Y. 2005) ............................................................... 10, 12

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..................................................................... 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 8

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................... 19

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................................... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 8

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) .............................................................. 23

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) .......................................................... 23

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) .................................................................... 13

*In re Carter-Wallace, Inc. Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000) ..................................................................................... 15

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) .......................................................... 11

*Christine Asia Co. Ltd. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ................................................................................ 7

*Cohen v. Kitov Pharm. Holdings, Ltd.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .......................................................... 18

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
2017 WL 4049253 (S.D.N.Y. June 28, 2017) .......................................................... 9

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012) ................................................................ 16

*In re DraftKings Inc. Sec. Litig.*,
    2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) ........................................................ 10

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ............................................................................... 15

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ................................................................ 25

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ........................................... 9, 18, 19, 21

*In re Gen. Elec. Co. Sec. Litig.*,
    856 F. Supp. 2d 645 (S.D.N.Y. 2012) ................................................................ 17

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL2277476 (S.D.N.Y. Sept. 19, 2005) .................................................... 18

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012) .................................................................. 8

*HsingChing Hsu v. Puma Biotechnology Inc.*,
    2017 WL 3205774 (C.D. Cal. July 25, 2017) .................................................... 16

*Kusnier v. Virgin Galactic Holdings, Inc.*,
    2022 WL 16745512 (E.D.N.Y. Nov. 7, 2022) ..................................................... 8

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ......................................................................... 20

*Lemen v. Redwire Corp.*,
    2023 WL 2598402 (M.D. Fla. Mar. 22, 2023) .................................................... 16

*In re Longwei Petroleum Inv. Holding Sec. Litig.*,
    2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ................................................. 16, 17

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ............................................................................... 20

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) .................................................................. 12

*Mateo v. Bristow*,
   2013 WL 3863865 (S.D.N.Y. July 16, 2013)..........................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................................................8

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016) .................................................................................11

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................................................22

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...........................................................................15, 25

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................................11

*In re Oxford Health Plans Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999)..........................................................................................24

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) ................................................................................................23

*In re Pareteum Sec. Litig.*,
   2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) .....................................................................19

*Patriot Exploration, LLC v. SandRidge Energy, Inc.*,
   951 F. Supp. 2d 331 (D. Conn. 2013) .................................................................................14

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) .................................................................................12

*Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021)....................................................................................................10

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)..................................................................7, 24

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................................................23

*In re Reserve Fund Sec. & Deriv. Litig.*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010) ................................................................ 19

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ............................................................................ 25

*City of Roseville Emp.'s Ret. Sys. v. Energysolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011) ............................................................... 15

*Rudman v. CHC Grp. Ltd.*,
    217 F. Supp. 3d 718 (S.D.N.Y. 2016) ............................................................... 12

*In re Salix Pharm., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016). .................................................... 24

*S.E.C. v. Espueles*,
    908 F. Supp. 2d 402 (S.D.N.Y. 2012) ................................................................. 9

*S.E.C. v. Hurgin*,
    484 F. Supp. 3d 98 (S.D.N.Y. 2020) ................................................................. 21

*S.E.C. v. Takeyasu*,
    2018 WL 2849777 (S.D.N.Y. June 11, 2018) .................................................... 17

*Set Capital LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021). ............................................................................. 16

*In re Signet Jewelers Ltd. Sec. Litig.*,
    389 F. Supp. 3d 221 (S.D.N.Y. 2019) ............................................................... 12

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014) ................................................................. 15

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) .................................................... 15

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ....................................................................... 14, 24

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) .............................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................. 15, 20

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. Dec. 13, 2005)......................................................................... 25

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...................................................................................... 15

*Vanderhoef v. China Auto Logistics, Inc.*,
   2021 WL 3260849 (D.N.J. July 30, 2021) ................................................................................ 20

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009) ........................................................................................ 9

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006)................................................................................................ 18

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ...................................................................................................... 13

*Wang v. Cloopen Grp. Holding Ltd.*,
   2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023)............................................................ 17, 19, 24

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020) ...................................................................................... 17

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ..................................................................... 16, 20

**Statutes**

17 C.F.R. § 229.303(b)(2)(ii)................................................................................................... 23

Fed. R. Civ. P. 8(b) .................................................................................................................. 22

Fed. R. Civ. P. 12(g) .................................................................................................................. 8

The motion to dismiss the amended class action complaint filed by Defendant Lottery.com ("Lottery" or "the Company") (ECF No. 76) should be denied because Plaintiffs have met the applicable pleading standards to allege claims under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934.[1]

## I.    PRELIMINARY STATEMENT

This is a straight-forward case of securities fraud: Lottery has admitted that, in late 2021 and early 2022, it overstated its cash on hand by $30 million (which was *half* of Lottery's alleged total cash reserves) and improperly reported $30 million in revenues (approximately *half* of Lottery's total annual revenues for 2021). As a result of these massive and obvious falsehoods, Lottery was forced to ultimately disclose that its financial statements were not to be relied on, causing investors to lose millions of dollars.

Faced with the well-pled claims, Lottery makes a series of specious legal arguments. For example, Lottery claims that Plaintiffs have not established the contemporaneous falsity of its statements. This is nonsense. Putting aside that the Company has already admitted that its statements were false at the time they were made, Lottery's statements as to its financial condition were, *by definition*, contemporaneously false. Indeed, Lottery did not have $30 million cash in its wallet at year-end 2021 only for it to magically vanish a few months later. Rather, as Lottery admitted, *it never had that money in the first place*, hence the overstatement of its cash and revenue.

Moreover, ignoring that there is no scienter requirement for Plaintiffs' Sections 14(a)

---

[1] This brief primarily addresses arguments raised by Lottery ("Lottery Br.," ECF No. 77). Plaintiffs oppose the individual dismissal motions filed by Defendant Anthony DiMatteo (ECF No. 85) and Defendants Matthew Clemenson and Ryan Dickinson (ECF No. 91) in a concurrently filed opposition brief. Unless otherwise noted, citations to "¶ __" are to the Amended Class Action Complaint ("AC", ECF No. 52) filed in this Action. Unless otherwise noted, all emphasis is added, and internal case citations and quotations are omitted throughout.

1

claims and the Supreme Court's mandate that the scienter analysis is necessarily holistic, Lottery seeks dismissal on the fact that Plaintiffs did not point to any specific reports alerting Lottery's management that they were lying about the cash the Company had on hand. Yet, reports are just one way of alleging scienter. The following facts, among others, support a strong inference of scienter: (i) it would be absurd for the C-suite executives to be unaware of the massive delta between Lottery's actual and reported cash and revenues, which are fundamental financial items; (ii) these metrics were overstated by nearly 200%; (iii) that Lottery did not have the claimed $30 million cash was an obvious, substantial accounting error; and (iv) all of Lottery's senior management were either terminated or resigned in quick succession, and its independent auditor resigned due to its inability to rely on management.

## II.    STATEMENT OF FACTS

### A.    SPAC's Conflicts Of Interest

A special purpose acquisition company, or "SPAC," is a publicly traded company with no business activities of its own that is formed for the specific purpose of acquiring an existing, privately owned company and taking it public. ¶¶ 40, 42. SPAC transactions by their nature, however, give rise to potential conflicts of interest between a SPAC's management and its stockholders. ¶¶ 41, 45. This is because if a SPAC acquires a target company, the SPAC's founders and managers can profit through their ownership of SPAC securities; yet if a SPAC does not complete an acquisition prior to the expiration of the deadline, the SPAC is dissolved, and the funds held in trust are returned to the SPAC's investors, *with no compensation paid to the SPAC's founders and managers*. *Id*. As such, SPAC management is incentivized to complete a deal, even if the deal is a losing proposition for the SPAC's stockholders, because the alternative is liquidation. ¶¶ 45, 52.

### B.    Lottery's Business And TDAC's Acquisition Of Lottery

Lottery claims to operate a proprietary platform that enables consumers to make online purchases of purportedly legally sanctioned lottery tickets. ¶¶ 3, 59, 103. Lottery's business is heavily regulated "by multiple domestic and foreign governmental authorities" (¶ 78), and Lottery has touted its purported compliance with various jurisdictions' laws governing sweepstakes and lottery related operations as material to its success. ¶ 3, 62, 74-75.

Trident Acquisitions Corporation ("TDAC") was a SPAC formed in March 2016, with the stated goal of acquiring a company doing business in the energy/oil sector in Eastern Europe. ¶¶ 2, 46, 49. To that end, TDAC raised approximately $201 million through its IPO and contemporaneous private placement. ¶ 48. Due to multiple extensions of time to complete a merger, each of which enabled shareholders to redeem their shares for cash, the funds available to TDAC to complete a business combination fell from $200 million to about $62 million. ¶¶ 53-57.

On November 19, 2020—with another transaction deadline looming, its funds rapidly dwindling, and apparently no acceptable Eastern European oil/energy concern available for purchase—TDAC announced that it had signed a letter of intent to acquire Lottery. ¶ 58. Lottery filed the final proxy statement and prospectus (the "Proxy") for the proposed business combination on October 18, 2021, which was consummated the next day. ¶¶ 60, 61 & n.6, 77. Lottery's shares began trading on the NASDAQ on November 1, 2021. ¶ 61.

### C.    Lottery's False And Misleading Statements

Throughout the Class Period, Lottery misrepresented: (i) its financial and operational health, including its projected and actual revenues, and its cash position; (ii) the adequacy of its internal controls over financial reporting; and (iii) its regulatory compliance. ¶¶ 8-12, 62-100.

#### 1.    Misstatements Concerning Cash

On November 15, 2021, Lottery announced that it had completed "a $30 million sale of

3

affiliate marketing credits" also known as "LotteryLink Credits," which accounted for nearly all of Lottery's Q3 2021 revenues and which represented more than 40% of Lottery's projected $71 million annual revenues for 2021. ¶¶ 64-66, 89. Thereafter, in a Form 8-K, dated March 21, 2022, and its 2021 Annual Report on Form 10-K, dated April 1, 2022, Lottery represented that it possessed a cash balance of $62.6 million. ¶ 91. And in a Form 8-K, dated May 16, 2022, Lottery claimed cash in hand of $50.8 million. ¶ 95. These representations were false.

Specifically, on July 15, 2022, Lottery admitted that it had previously "overstated its available unrestricted cash balance by approximately $30 million," the exact same amount as the sale of marketing credits it announced on November 15, 2021. ¶ 69. Lottery conceded that it, in fact, never received payment from its purported $30 million sale (assuming that the sale was not wholly fictional in the first place) and that it should never have counted those non-existent funds as part of its reported cash balance. ¶¶ 66-70, 90.

### 2. Misstatements Relating To Revenue In The Proxy And Other Public Disclosures

In its Proxy, Lottery projected that it would receive approximately $70 million in revenue for fiscal year 2021. ¶ 80. Similar statements were also made in other public disclosures after the issuance of the proxy statement. ¶ 85. The Company ultimately reported approximately $68 million in revenues in a Form 8-K, filed on March 31, 2022. ¶¶ 64-66, 91. Lottery explained in financial statements, annexed to a Form 8-K filed on November 15, 2021, its Q3 revenue, and therefore its annual revenue projection, was driven largely by its purported sale of $30 million of affiliated advertising credits. ¶¶ 65, 89. Relatedly, in its April 1, 2022 Annual Statement for fiscal year 2021, Lottery stated that its revenue was "driven by the sale of 47.1 million in LotteryLink Credits for prepaid advertising . . . *in the third and fourth quarters of 2021*[,]" which by definition included the purported $30 million transaction announced on November 15, 2021. ¶ 66. These

statements were false and misleading.

On July 15, 2022, Lottery admitted that, in addition to overstating its available cash by $30 million, it "relatedly . . . improperly recognized" $30 million in revenue in its prior financial statements. ¶ 69. Approximately one week later, Lottery disclosed that its "audited financial statements for the year ended December 31, 2021 and the unaudited statements for the quarter ended March 31, 2022 should no longer be relied upon," and would have to be restated. ¶ 71. This was as an admission that its prior financial statements were inconsistent with GAAP and were materially misstated when originally issued. ¶¶ 136-37.

### 3.    Misstatements Concerning Financial Reporting And Internal Controls

On November 15, 2021, Lottery disclosed in its Q3 Form 10-Q that it had identified a "material weakness" purportedly limited to a technical accounting issue identified by the SEC in SPAC-related guidance. ¶ 87. Thereafter, on April 1, 2022, Lottery disclosed that its "management ha[d] identified a material weakness in internal control over financial reporting as of December 31, 2021 and 2020" but described this weakness as one largely related to personnel and staffing: specifically, "deficiencies in the design and operation of the procedures relating to the closing of the financial statements." ¶ 93. Lottery nonetheless assured investors that "[they] ha[d] commenced measures to remediate the identified material weakness." *Id.*

Finally, on May 16, 2022, Lottery disclosed in its Q1 2022 Form 10-Q that management had concluded that "as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting with respect to our financial statement close and reporting process . . . " ¶ 97. Notwithstanding these material weaknesses, Lottery assured investors that "our condensed [] financial statements included in this Quarterly Report fairly present, in all material respects, our financial position . . . ." *Id.* These statements were false and misleading.

Specifically, Lottery omitted that the identified material weaknesses were not limited to personnel or staffing-related issues, but involved insufficient internal accounting controls, which resulted in Lottery improperly recognizing $30 million in revenue and overstating its cash balance by the same amount, in connection with the purported sale of $30 million in LotteryLink credits announced on November 15, 2021. *E.g.*, ¶¶ 65, 70. Similarly, Lottery's May 2022 representation that "our condensed [] financial statements included in this Quarterly Report fairly present, in all material respects, our financial position[]" was, by definition, false when made because Lottery had already materially overstated its cash position and revenues. ¶¶ 69-71, 97.

### 4. Misstatements Concerning Regulatory Compliance And Compliance Risks In The Proxy And Other Public Statements

Throughout the Class Period, including in the Proxy, the Company touted its compliance with state and federal gaming and lottery law. ¶¶ 62, 74-75. For example, in its 2021 Annual Report filed on April 1, 2022, Lottery's management stressed that they worked "closely with state regulators," strived to "maintain effective relationships with applicable legislative and regulatory authorities in each jurisdiction in which we operate," and that they "believe that [they] are in compliance with all material domestic and international laws and regulatory requirements applicable to [their] business." ¶ 62. These statements were all false and misleading because as the Company ultimately disclosed on July 6, 2022, "an internal investigation had uncovered instances of non-compliance with state and federal laws concerning the state in which the tickets are procured as well as order fulfilment." ¶ 63.

The Company's Proxy was similarly misleading and negligently prepared since it described numerous risks related to the Company regarding compliance with state and federal gaming and lottery law (¶ 78) without disclosing that "it was not complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment." ¶ 79.

6

### D.        The Fallout From Lottery's Fraud

Defendants' fraud has left Lottery in shambles. In mid-2022, Lottery's entire senior management was either terminated or resigned, and by September 2022, four members of Lottery's Board had resigned. ¶¶ 15, 68-69, 114-116. Relatedly, in late July and mid-August 2022, Lottery informed investors that: (i) its "capital resources are not sufficient to fund its operations for a twelve-month period[,] and, therefore, there is substantial doubt about the Company's ability to continue as going concern[;]" and (ii) that it lacked "sufficient financial resources to fund its operations" and "had furloughed the majority of its employees . . . ." ¶¶ 12-13.

Further, in October 2022, Lottery's accounting firm Armanino resigned because, "based on Armanino's evaluation of the facts and circumstances pertaining to matters disclosed in the Company's recent Form 8-K filings regarding the resignations of certain officers and directors, Armanino [was] unable to rely on the representations of management." ¶ 115. Lottery has ceased reporting financial results since these revelations and, to date, has not issued corrected financial statements for 2021 and Q1 2022 (¶¶ 14, 71-72), because it "has not yet finalized its reviews of its financial statements or its assessment of the impact of the findings of the ongoing review of the Company's internal accounting controls on its historical financial statements." ¶ 4.

In sum, Lottery's share price dropped precipitously with each partial corrective disclosure, causing shareholders to suffer substantial damages. ¶¶ 143-153.

## III.    ARGUMENT

### A.        Applicable Legal Standards Disfavor Lottery's Motion

Rule 12(b)(6) requires courts to accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *See Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *8 (S.D.N.Y. Mar. 25, 2013). The complaint need only "contain sufficient factual matter . . . to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (complaint need only allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting claims); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) ("The task of the Court in ruling on a motion to dismiss is to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.").

### B.    The AC States A Claim Under Section 10(b) Of The Exchange Act

To state a claim, Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[2]

#### 1.    Plaintiffs Have Sufficiently Pled Falsity

##### a)    Plaintiffs Have Identified The Alleged Misstatements With Particularity

Lottery's claim that the AC fails to identify the alleged false statements with particularity is without merit. *See* Lottery Br. at 7-8. The AC clearly emphasizes, and thereby expressly pinpoints, each alleged false or misleading statement within the larger context in which it was made and then immediately follows with a paragraph explaining why that statement was false or misleading. *See, e.g.*, ¶¶ 74-76, 78-81, 87-88. This suffices. *See, e.g.*, *Kusnier v. Virgin Galactic Holdings, Inc.*, 2022 WL 16745512, at *8 (E.D.N.Y. Nov. 7, 2022) (falsity adequately pled where complaint "identified specific statements (and added emphasis where challenged assertions are embedded in longer passages) and followed each by a list of reasons why those statements are

---

[2] Defendant challenges only falsity and scienter. Defendant waived its right to challenge the other elements of § 10(b), and these non-contested elements are not addressed herein. *See* Fed. R. Civ. P. 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013).

allegedly misleading.").[3]

### b)      Plaintiffs' Allegations Establish Contemporaneous Falsity

Lottery argues that the AC does not sufficiently allege the statements were false at the time they were made. *See* Lottery Br. at 8-10. This assertion is easily refuted.

The primary false and/or misleading statements concern Lottery's reported cash position and revenues as of third quarter 2021. *See* Section II.C, *supra*. By definition, these statements are contemporaneously false. *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) ("Misreported financial information clearly amounts to a false statement of fact."). In fact, Lottery's subsequent admissions, that it "improperly recognized" $30 million in revenues and that its financial statements for the year ended 2021 and for Q1 2022 could no longer be relied upon and would have to be restated (¶¶ 69, 71), are a concession that its revenue figures were not properly reported *at the time those financial statements were issued. See S.E.C. v. Espueles*, 908 F. Supp. 2d 402, 410 n.5 (S.D.N.Y. 2012) ("[T]he mere fact that financial statements were restated *is sufficient basis for pleading that those statements were false when made*."); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 545-46 (S.D.N.Y. 2017) (company's admission that it reported inflated revenue numbers established contemporaneous falsity of prior financial statements).

Likewise, statements regarding the effectiveness of Lottery's internal controls were contemporaneously false. These assertions were made about the Company's controls as of the financial reporting period. *E.g.*, ¶ 87 (Q3 2021 Form 10-Q stating "due solely to the material

---

[3] Lottery's reliance on *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) is misplaced. There, plaintiffs alleged misstatements "[o]ver the course of sixty pages," which referenced one of four paragraphs describing the reasons for falsity. *Id.* at *3, 5.

weakness [regarding warrants] identified . . . our disclosure controls and procedures were not effective as of September 30, 2021"). By Lottery's circuitous logic, no other material weakness existed when the Q3 2021 10-Q was issued, but the cash position and revenues for that same period were later revised due to some unspecified reason having nothing to do with the Company's internal controls. Nonsense. The very admission that there were "issues pertaining to the Company's internal accounting controls" that led to an overstatement of cash balances and revenues is a concession that the alleged misstatements were false when made. ¶¶ 68-69.

Finally, the AC sufficiently alleges that Lottery's statements of compliance with applicable laws and regulations and its purported close working relationship with government regulators were false and misleading because Lottery omitted that it had, in fact, violated several laws pertinent to its business operations. ¶¶ 62, 74-75. In response, Lottery argues that because it never disclosed when those violations occurred and the exact law it violated, Plaintiffs' allegations fail. *See* Lottery Br. at 22-23. But Lottery admitted that it had discovered *prior* instances of non-compliance just two quarters after its compliance-related assurances to investors. ¶¶ 62-63. This admission coupled with Defendants' egregious conduct satisfies Plaintiffs' burden prior to discovery. *See, e.g.*, *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 255 (S.D.N.Y. 2005) (holding in § 10(b) case that "the requirements of Rule 9(b) are relaxed as to matters particularly within the opposing party's knowledge.").[4]

---

[4] Lottery's cited cases are inapposite (*see* Lottery Br. at 22-23) because neither case included *admitted violations of the law*, and therefore, it was incumbent on the plaintiff to specify the laws and the circumstances of the violations. *See Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99-100 (2d Cir. 2021) (where bank did not admit violating any laws, plaintiffs did not satisfy their pleading burden where they "*baldly* state[d] that the challenged deposit contracts are unenforceable because some of the [bank's] clients were illegally laundering money . . . ."); *In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *20 (S.D.N.Y. Jan. 10, 2023) (where defendant company did not admit legal violations, allegations that company violated

Defendants are also incorrect that their statements about compliance with internet gambling regulations were not misleading because they purportedly had no duty to disclose that Lottery was engaged in illegal cross-border lottery transactions. *See* Lottery Br. at 20-22. "A statement or omission is materially misleading when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to the market." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at \*6 (S.D.N.Y. May 24, 2018). As a company whose business primarily constituted lottery sales, Lottery's misstatements about its compliance with regulators over this industry certainly would have been deemed material to the investing public.[5]

### c) Lottery's Purported "Belief" Regarding Its Legal Compliance Is Actionable

Lottery's belief of legal compliance is actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). *Cf.* Lottery Br. at 23-24. The crux of Lottery's argument is that, by virtue of the Company's own concealment of wrongdoing, Plaintiffs have failed to establish that Defendants were in possession of contradictory information at the time they made their compliance-related assurances to investors. *See id.* Putting aside the abject cynical opportunism of Lottery's position, the Complaint adequately alleges that Lottery disclosed *past* material violations of applicable laws in close temporal proximity to Defendants' compliance-related statements. ¶¶ 74-76. Rule 9(b) is relaxed where, as here, the missing factual context is

---

foreign gambling laws were insufficient where complaint did not provide facts demonstrating that company had engaged in illicit, transactions under foreign laws).

[5] A company's statements regarding its legal compliance are actionable by way of omission where the company (i) "fails to disclose that a material source of its success is the use of improper or illegal business practices" or (ii) "when [it] makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581-82 (S.D.N.Y. 2016). Here, Lottery's disclosures fit both prongs.

11

particularly within Defendants' knowledge. *See, e.g.*, *Adelphia*, 398 F. Supp. 2d at 255. And here, any questions regarding the timing of Lottery's violations *vis-à-vis* Lottery's statement that it believed that it had complied with applicable laws and regulations are due entirely to Lottery's continued concealment of that information.

> **d)** **Defendants' Statements Regarding Lottery's Relationship With Regulators Are Not Puffery**

Whether a given statement is puffery is context dependent, which includes an examination of "the specificity of the statements and whether the statements are clearly designed to distinguish the company . . . ." *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229-30 (S.D.N.Y. 2019). Where the context makes it clear that a "reasonable investor could rely on [the statements alleged to be puffery] as reflective of the true state of affairs at the Company," courts in this district routinely hold that such statements are actionable. *See, e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).[6]

When Defendants' statements regarding Lottery's relationship with regulators are viewed in context, they are clearly reflective of Lottery's claims that it was compliant with state and federal laws and regulations, which is critical to Lottery's ability to conduct its business. ¶¶ 63, 74-76. Such statements were especially material to investors considering that: (i) Defendants made those statements at the time they were seeking shareholder approval of the business combination; (ii) Defendants were the only ostensibly reliable source of compliance-related information

---

[6] Lottery's authorities are inapposite because either: (i) the court did not reach issue of materiality; or (ii) the statements at issue concerned the defendant company's general reputation. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 576 n.15 (S.D.N.Y. 2014) (noting that court did not reach issue of materiality and puffery for challenged statements); *Menaldi*, 164 F. Supp. 3d at 581 (holding that statements about compliance with regulatory investigations were *not* puffery). *Rudman v. CHC Grp. Ltd.*, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) ("statements regarding [company's] strong relationships with its customers was no more than puffery . . . .").

available to shareholders; and (iii) Defendants conceded shortly thereafter that Lottery was not, in fact, in material compliance with applicable laws and regulations. Under these circumstances, Defendants' statements regarding Lottery's relationships with regulators are actionable. *See, e.g.*, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012) (statement that defendant was "in compliance with all applicable environmental laws" shortly before an oil rig explosion could have been material to shareholders who chose to invest in the oil drilling industry).

**e)      Lottery's Misrepresentations Are Not Protected By The Safe Harbor Or Bespeaks Caution Doctrine**

Lottery next argues that its statements issued on October 21, 2021 and November 15, 2021 are not actionable because they: (i) are "forwarding looking" statements; and (ii) were purportedly accompanied by cautionary language, thereby shielding them under the "bespeaks caution" doctrine. *See* Lottery Br. at 18. Lottery is mistaken.

*First*, the statement on October 21, 2021 is simply not forward-looking. ¶ 83. The statement at issue concerns revenue results for Q3 2021, a quarter that had already closed when the statement was made. For the same reason, the first part of the statement on November 15, 2021, which is also the third quarter 2021 revenue results, is not forward-looking. ¶ 85. Even though the second part of the statement on November 15, 2021 is arguably forward-looking (regarding the expected revenue guidance for full year 2021), that does not make the first part of the statement forward-looking. *See* ¶ 85; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (the protections accorded "forward looking" statements do not encompass misstatements of present or historical facts, even if embedded within a purportedly "forward looking" statement).

In regard to the second part of the November 15, 2021 statement, the crux of Plaintiffs' claims is that Lottery's revenue projections for full year 2021 were based substantially on a $30

13

million transaction, which purportedly occurred in Q3 2021, *i.e.*, before September 30, 2021. The purported occurrence of the transaction is a historical fact that is objectively verifiable, so the projections that embed that fact are not protected by the safe harbor. *See Patriot Exploration, LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 365 (D. Conn. 2013) (safe harbor does not apply where projections for future profitability were based on data that defendants "knew or should have known" was misleading).

But even if Lottery's projections were forward-looking, they are still actionable because Plaintiffs have alleged sufficient facts from which it can be inferred that Defendants: "(1) did not genuinely believe the [forward looking] statement[;] (2) actually knew that they had no reasonable basis for making the statement[;] or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement . . . ." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 775 (2d Cir. 2010) (discussing actionability of forward-looking statements). Indeed, despite having reported only $10 million in the first six months of 2021, and despite the fact that $30 million of the $32 million in revenues Lottery reported in Q3 2021 *did not exist*, Lottery baselessly asserted on November 15, 2021 that it believed it would reach $70 million in annual revenues *with just six weeks left in the year*. ¶ 75; *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at *3 (S.D.N.Y. Aug. 25, 2022) (defendants liable when they "were aware of undisclosed facts tending to seriously undermine the accuracy of those projections.").

*Second*, Lottery cannot avail itself of the "bespeaks caution" doctrine because Lottery cites no adequate cautionary language within the November 15, 2021 statement (besides referring to risk disclosures in the Proxy), and the cautionary language in the Proxy is inadequate. *See* Section III.C.2, *infra*.

### 2.    The AC Raises A Strong And Compelling Inference Of Scienter

A complaint adequately pleads scienter where "all of the facts alleged, taken collectively,"

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007), support a strong inference (a) that "defendants had both motive and opportunity to commit fraud" or (b) "that constitute[s] strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Knowledge or "access to information suggesting that their public statements were not accurate" suffices to plead recklessness. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). In fact, "[a]n egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000).

No "smoking-gun" is necessary, but a complaint's scienter allegations suffice where the inference is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 322-24. "[A] tie on scienter goes to the plaintiff." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020). The AC establishes a strong inference of scienter under both prongs, either of which is independently sufficient to satisfy Plaintiffs' pleading burden.

### a)      Motive And Opportunity

The AC pleads cognizable motives for the Lottery Defendants to have engaged in fraud.[7] First, the desire to artificially inflate a company's stock price in advance of a public offering establishes a cognizable motive. *See, e.g.*, *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013); *City of Roseville Emp.'s Ret. Sys. v. Energysolutions, Inc.*, 814 F. Supp. 2d 395, 420-21 (S.D.N.Y. 2011); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014). Here, the Lottery Defendants were motivated to lie to ensure the transactions went through before their shares expired worthless. ¶ 139.

Second, the Lottery Defendants stood to personally gain if the business combination were

---

[7] "The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013).

15

consummated. *See HsingChing Hsu v. Puma Biotechnology Inc.*, 2017 WL 3205774, at *4 (C.D. Cal. July 25, 2017) (allegation that pending transaction would personally benefit defendants supported scienter); *Lemen v. Redwire Corp.*, 2023 WL 2598402, at *4 (M.D. Fla. Mar. 22, 2023) (same). For example, in the event the business combination was consummated, Defendants Dickinson and Lever stood to receive millions, far more than they would have been entitled had the true value of Lottery been disclosed. ¶ 140.

### b) Conscious Misbehavior And/Or Recklessness

Even absent cognizable motive, the AC pleads the Lottery Defendants' scienter through facts giving rise to a strong inference of recklessness or conscious misbehavior; namely that they "knew facts or had access to information suggesting that their public statements were not accurate." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79 (2d Cir. 2021).

Here, Lottery admitted that its financial statements at the end of 2021 and beginning of 2022: (i) overstated Lottery's purported cash balance by $30 million; and (ii) improperly recognized $30 million in revenue. ¶¶ 69, 71. In other words, Lottery admitted that its financial disclosures wrongfully included $30 million in cash holdings and revenues that *did not exist at the time of those disclosures*. Such allegations support a strong inference of scienter. *See, e.g.*, *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021) (holding that defendants' subsequent admission of facts that were previously known to them and that were contrary to their class period statements adequately pled scienter); *In re Longwei Petroleum Inv. Holding Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (same); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 244-45 (S.D.N.Y. 2012) (same).

In response, Lottery argues that Plaintiffs' scienter allegations fail because the AC does not identify "specific instances" where the concealed information—*i.e.*, that Lottery's actual cash balance and revenues were each $30 million less than claimed—was reported directly to the

Lottery Defendants. *See* Lottery Br. at 13. This is not a requirement for demonstrating scienter, and although facts demonstrating a defendant's direct receipt of contradictory information is one way of establishing knowledge, there are numerous other bases for inferring the Lottery Defendants' awareness of such information. *See Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599 at *15 (S.D.N.Y. Mar. 16, 2023) (rejecting that direct reports were required; "facts contrary to a defendants' public representations may also be learned in other ways.").

*First*, a corporate officer's access to contrary information can be inferred where it is facially implausible that he or she would not have been privy to the information or transactions at issue. *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 136 (S.D.N.Y. 2020) ("it is virtually inconceivable that the CEO and Co-Presidents of [the company] would not have been aware of the formal termination . . . of this important contract . . . ."); *Longwei*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("At the very least, [the CFO's] role in financial reporting should have alerted him to [the corporate defendant's] sudden rise in revenues and history of inadequate financial controls.").

Here, it simply beggars belief that the Lottery Defendants were unaware that Lottery's purported Q3 2021 sale of $30 million of marketing credits was either an outright sham or not consummated, when the ostensible proceeds of that sale comprised *half* of Lottery's total reported cash balance and *nearly half* of Lottery's total revenues for fiscal year 2021. ¶¶ 108-09. This is especially the case for Lottery's former CFO and treasurer, Defendant Dickinson. *S.E.C. v. Takeyasu*, 2018 WL 2849777, at *20 (S.D.N.Y. June 11, 2018) (CFO's scienter pled where revenues were "radically inflated and the comptroller and CFO of the company were uniquely situated to control the revenue recognition procedures of the company."); *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 660 (S.D.N.Y. 2012) (implausible that the CFO was ignorant of

17

"roughly one-third of [the Company's] assets."). Moreover, given that Lottery was a small company with as few as seven full time employees, it is similarly incredible that Defendants DiMatteo and Clemeson—as Lottery's co-founders, CEO and CRO and largest shareholders—were unaware of Lottery's true cash holdings and revenues at the time of their misstatements. *Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 WL 1406619, at \*9 (S.D.N.Y. Mar. 20, 2018) ("position as CEO in a small organization" among other factors "give[s] rise to a plausible inference . . . .").

*Second*, and relatedly, courts recognize that obvious accounting manipulations, such as improper revenue recognition, "are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue." *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006); *Fresno Cty.*, 268 F. Supp. 3d at 553 (fact that defendants "affirmatively misrepresented that the recognition of the revenue complied with GAAP when it did not . . . [and] the need for a restatement . . . all contribute to the inference of scienter."); *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at \*20 (S.D.N.Y. Sept. 19, 2005) ("premature recognition of revenue has been said to suggest a conscious choice to recognize revenue in a manner improper . . . .") (cleaned up). Here, notwithstanding the improper revenue recognition, nothing is more obvious than if a bank account has $30 million less cash than claimed.[8]

*Third*, the magnitude of Lottery fraud supports an inference of scienter. The fraud involved

---

[8] Lottery's argument that GAAP violations "standing alone" do not support an inference of scienter is doubly misplaced. *See* Lottery Br. at 16-17. First, the nature of the misconduct at issue *is just one of several factors* supporting a strong inference of scienter. Second, unlike the violations at issue in the cases on which Lottery relies—which were either minor or turned on highly complex or arcane accounting rules—the accounting errors at issue here were large, obvious, and so basic that even a layman would understand that a company cannot claim to have cash in hand that it does not in fact have.

50% of Lottery's total cash balance and close to 50% of its total 2021 revenues and required Lottery's abandonment of its financial statements for 2021 and 2022. ¶¶ 108-09; *see Fresno Cty.*, 268 F. Supp. 3d at 553 ("[T]he size of the purported fraud may contribute to an inference of scienter.") (collecting cases); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) ("[T]he size of the alleged fraud can be relevant to the scienter inquiry . . . .").

*Fourth*, a strong inference of scienter is further supported by "the core operations doctrine, which refers to the principle that [w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that defendant knew or should have known the statements were false when made." *Cloopen*, 2023 WL 2534599 at *17. Lottery's sale of marketing credits (which accounted for the vast majority of its revenues) and its compliance with gaming laws and regulations (which Lottery admitted was vital to its ability to conduct its business) were indisputably core operations. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."); *In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) (if false statements relate to a core operation, an inference arises "that the defendant knew or should have known the statements were false when made.").

*Fifth*, the timing and circumstances of the terminations/resignations and the withdrawal of Lottery's independent auditor also support a strong inference of scienter. For example, the Board of Directors fired Defendant Dickinson the day after an independent investigation by outside counsel identified the $30 million overstatement in Lottery's available cash and revenue (¶ 112),

19

and the rest of the individual Lottery Defendants resigned shortly thereafter. ¶¶ 111-17; *see Yannes*, 2021 WL 2555437 at *6 ("[T]he timing and circumstances of resignations . . . can add to a pleading of circumstantial evidence of fraud."). Similarly, Lottery's auditor resigned in the aftermath of Lottery's revelations, stating that it was "unable to rely on representations of management." ¶115; *Vanderhoef v. China Auto Logistics, Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021) (depending on the circumstances, resignation of external auditor can support inference of scienter).

*Finally*, Plaintiffs can, and have, "raise[d] the required inference with regard to a corporate defendant [i.e., Lottery] without doing so with regard to a specific individual defendant." *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 27 (2d Cir. 2020). Indeed, Defendants cannot seriously contend that, for example, Lottery's discussions of its cash balance, revenues, and legal compliance were not approved *by a single corporate officer* whose scienter can be imputed to the Company. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (corporate scienter pled where the challenged "statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading.").

### c)    Fraud Is The Far More Compelling Inference

Here, all the key facts when viewed holistically support an overwhelming inference of fraud that is far more compelling than Lottery's protestations of innocence. Faced with this reality, Lottery attempts to compartmentalize each scienter element in isolation. This flies in the face of the Supreme Court's mandate that all scienter facts must be viewed holistically. As the Supreme Court explained, the proper inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23, 326 (allegations are to be read "holistically").

20

Lottery also asserts that its announcement of "remedial measures" is inconsistent with an inference of scienter. *See* Lottery Br. at 17. But Lottery does not even attempt to explain *what* those remedial measures were or when they *were* instituted. *See id*. In any event, Lottery's recent dedication to remedial measures—which every company that has engaged in fraud espouses after being caught—does not detract one iota from the strong inference of fraud arising from, *inter alia*: (i) Lottery's massive overstatement of cash deposits and false reporting of revenues in connection with a sham transaction; (ii) the fact that, after an internal investigation discovered those overstatements, all of Lottery's senior management was terminated or resigned; and (iii) Lottery's auditor resigned because it was unable to trust managements' representations. As such, Lottery's bid to pitch its misconduct as mere bumbling mismanagement rings hollow. *See id.*

Lottery further argues that its generic risk disclosures undermine an inference of fraud— but these risks were themselves misleading and thus cannot exonerate the Company. *Id.*; *see* Section III.C.2, *infra*.

### C.      The AC States A Claim Under Section 14(a) Of The Exchange Act

"To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must allege that: (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Fresno Cty.*, 268 F. Supp. 3d at 557. Plaintiffs are not required to allege scienter. Rather, Plaintiffs "must plead only that [Defendants were] *negligent* in connection with the merger." *S.E.C. v. Hurgin*, 484 F. Supp. 3d 98, 116 (S.D.N.Y. 2020). Finally, Section 14(a) is subject to the liberal Rule 8(a) pleading standard, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(b); *Fresno Cty.*, 268 F. Supp. 3d at 558. At best, Lottery

challenges only falsity, thus waiving its challenges to the remaining elements.[9]

Defendants solicited approval of the Business Combination with a Proxy that negligently contained materially misleading statements and omissions about Lottery's business. *See* Section III.C, *supra*. As discussed above, Defendants negligently misrepresented in the Proxy that Lottery's projected revenue, which was significantly based in part of its purported sale of $30 million of affiliated advertising credits, was approximately $70 million in revenue for fiscal year 2021. ¶ 80. Likewise, in the Proxy, Defendants negligently misrepresented that the Company faced numerous risks related to the Company regarding compliance with state and federal gaming and lottery law without disclosing that it was not "complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment." ¶¶ 78-79.

### 1.    Lottery Had A Duty To Disclose The Full Truth

Defendants appear to be arguing that Lottery did not have a duty to disclose either that its revenue projections included the admittedly fictitious sale of $30 million of affiliated advertising credits or that the Company was not complying with state and federal laws and regulations. Lottery Br. at 20-22. This is not true. First, as Lottery admits, the Company discussed both issues in their Proxy. As such, they had an obligation to disclose the full story so that their limited disclosures were not misleading. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Second, Item 303 of Regulation S-K imposes an affirmative duty on securities issuers to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a

---

[9] Lottery implies, without any support, that Rule 9(b) applies to Plaintiffs' Section 14(a) claims. Lottery Br. at 6-7. This is untrue.

material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). The failure to disclose a trend under Item 303 satisfies falsity. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 104 (2d Cir. 2015). The facts here show that Defendants knew that the Company had not actually been paid for the purported $30 million sale would have a material unfavorable impact on sales and revenue.

Likewise, that the Company was not "complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment" was a known trend to the Company. ¶ 79. As such, the failure to disclose it alleges falsity. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119-22 (2d Cir. 2012) (failure to disclose scope of defect and that company "*might* have to accept returns of a substantial" volume of product is actionable).[10]

### 2. Lottery's Cautionary Language In The Proxy Is Inadequate

Lottery's reliance on the cautionary language in its Proxy[11] is unavailing because the purportedly cautionary language it identifies does not meaningfully warn of the risk at issue: namely, that Defendants would purposefully overstate Lottery's actual and projected revenues (as well as its cash balance). *See Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023) (holding that, to qualify under the bespeaks caution doctrine, a defendant's risk disclosures "must expressly warn of or directly relate to the risk that brought about Plaintiffs' loss, . . . it must convey substantive information, and it must not be boilerplate").[12]

---

[10] *See also In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *6, 8-9 (E.D.N.Y. Apr. 22, 2020) (failure to disclose delays "in opening and ramping up production" at manufacturing facility that existed at time of offering violated Item 303).

[11] The arguments in this section apply with equal force to statements that incorporate by reference the Proxy's cautionary language.

[12] *See also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (cautionary language must "precisely address" the substance of the specific statements at issue).

23

Here, Lottery relies on generic, boilerplate disclosures warning that the failure to maintain certain internal controls "could" result in financial reporting that "could" adversely affect its business. Lottery Br. at 19. But Plaintiffs do not allege a mere accounting snafu. Rather, the AC alleges that Defendants fabricated (or at a minimum misreported) a transaction that accounted for *approximately half of Lottery's projected and actual revenues for all of 2021*, which led Lottery to not only admit that it improperly recognized $30 million in revenue and overstated its cash on hand by the same amount, but also to disavow its financial statements. Lottery's disclosures are manifestly deficient on their face. *See Slayton*, 604 F.3d at 772 (defendants must demonstrate that their cautionary language "was not boilerplate and conveyed substantive information."). But even assuming the disclosures were sufficiently specific, they are still ineffective because they warned of what could happen, when Lottery had *already* improperly based its revenue projections on a sham transaction. *See Cloopen*, 2023 WL 2534599 at *10 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Finally, the AC's principal allegations of falsity are based on a failure to disclose. As such, the PSLRA's safe harbor provision and the bespeaks caution doctrine are inapplicable since "[t]he safe harbor also does not protect material omissions." *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016). This is true, "*regardless of whether the statements thereby rendered misleading were forward-looking*." *City of Providence*, 2013 WL 1197755 at *12; *see also In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("[P]laintiffs . . . are not relying on the falsity of Oxford's financial projections . . . but rather the defendants' failure to disclose historical and existing material facts . . . . The safe harbor and bespeaks caution doctrines do not apply to these omissions.").

**3.      Lottery's Risk Disclosures In The Proxy Were Themselves Misleading**

Lottery claims that the Proxy itself adequately disclosed the risks at issue. But as discussed

in Section II.C, *supra*, the purported risk warnings were not meaningful and were themselves misleading because they presented as hypothetical risks that were already occurring. *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. Dec. 13, 2005) (disclosures warning of possible legal consequences that could occur if company's employees violated NYSE rules were actionable because they failed to disclose that employees were in fact already violating those NYSE rules); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (warning that factors "may" negatively affect revenue actionable where factors already "had" negatively affected revenue). As the Second Circuit has explained, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Moreover, even "[w]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011). "[W]arning of possible risks while failing to disclose critical facts [is like] . . . someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *MF Glob.*, 982 F. Supp. 2d at 318.

## IV.    THE AC ALLEGES CONTROL PERSON LIABILITY UNDER SECTION 20(a)

Defendants do not challenge that they are control persons. As the AC adequately alleges a primary violation of both § 10(b) and § 14(a) of the Exchange Act, the § 20(a) claims should be sustained. *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010).

## V.    CONCLUSION

The Court should deny Lottery's motion in their entirety. If the Court grants all or part of the motion, Plaintiffs request an opportunity to amend pursuant to Rule 15.

Dated: May 18, 2023

By: */s/ Casey E. Sadler*

**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler (admitted *pro hac vice)*
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Counsel for Lead Plaintiffs RTD Bros LLC,
Todd Benn, Tom Benn, and Tomasz Rzedzian
and Lead Counsel for the Class*

**KIRBY McINERNEY LLP**
Andrew M. McNeela
Thomas W. Elrod
Ira M. Press
250 Park Avenue, Suite 820
New York, York 10177
Telephone: (212) 371-6600
Email: amcneela@kmllp.com
        telrod@kmllp.com
        ipress@kmllp.com

**BERGER MONTAGUE PC**
Sherrie R. Savett
Michael Dell'Angelo
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
        mdellangelo@bm.net
        aabramowitz@bm.net

*Counsel for Additional Plaintiff*

26

## PROOF OF SERVICE

I hereby certify that on this 18th day of May 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Casey E. Sadler*
Casey E. Sadler
