# EXHIBIT 6

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| MATTHEW K. McDONALD, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 1:22-cv- 1025 |
| | § | CLASS ACTION |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| LOTTERY.COM, INC. f/k/a TRIDENT ACQUISITIONS CORP., ANTHONY DiMATTEO, RYAN DICKINSON, MATTHEW CLEMENSON, VADIM KOMISSAROV, MARAT ROSENBERG, ILYA PONOMAREV, THOMAS GALLAGHER, and GENNADII BUTKEVYCH, | § § § § § § § § § | |
| Defendants. | § § § | |
| | § | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Matthew K. McDonald ("plaintiff"), individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts and other information prepared for investors by Lottery.com, Inc. ("Lottery.com" or the "Company"), f/k/a Trident Acquisitions Corp. ("TDAC"), as well as media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities fraud class action on behalf of all persons or entities who purchased or otherwise acquired Lottery.com publicly traded securities between November 19, 2020 and July 29, 2022, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against the Company and certain of the Company's officers and directors under §10(b), and SEC Rule 10b-5 promulgated thereunder, and §20(a) of the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

4. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b), because the Company maintains its corporate headquarters in and conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Matthew K. McDonald, as set forth in the accompanying certification, purchased Lottery.com securities during the Class Period and was damaged thereby.

7. Defendant Lottery.com is incorporated under the laws of Delaware with principal executive offices located in Spicewood, Texas. Prior to the Business Combination (defined below), the securities of Lottery.com – then known as TDAC – were traded on the NASDAQ under the ticker symbols "TDAC," "TDACW," and "TDACU." Following the Business Combination, Lottery.com's shares and warrants began trading on the NASDAQ under the symbols "LTRY" and "LTRYW," respectively.

8. Defendant Anthony DiMatteo ("DiMatteo") was a co-founder of AutoLotto, Inc. ("AutoLotto"), which was doing business as "Lottery.com" prior to the Business Combination, and served as an officer and director of AutoLotto since 2015. Defendant DiMatteo became Chief Executive Officer ("CEO") of the Company and the Company's Chairman upon the closing of the Business Combination. He served in those roles at the Company until his resignation as CEO on July 22, 2022 and his resignation as a director on September 8, 2022.

- 2 -

9. Defendant Ryan Dickinson ("Dickinson") served as President, Treasurer, and Acting Chief Financial Officer of the Company from October 2021 and Chief Financial Officer ("CFO") from March 2022 until his termination effective July 1, 2022. Defendant Dickinson joined AutoLotto in June 2018 and served as Executive Vice President of Product until October 2018, at which time he was appointed President and Chief Operating Officer.

10. Defendant Matthew Clemenson ("Clemenson") was a co-founder of AutoLotto and served as its President from 2015 to 2019 and its Chief Commercial Officer since 2019. Upon the consummation of the Business Combination, defendant Clemenson became the Company's Chief Commercial Officer and served in that role until March 2022 at which time he became the Company's Chief Revenue Officer. He served as a Company director from October 2021 until his resignation on July 11, 2022.

11. Defendant Vadim Komissarov ("Komissarov") was CEO and a director of the Company, then known as TDAC, prior to the Business Combination. Defendant Komissarov was also TDAC's CFO until he resigned from this position on November 20, 2020.

12. Defendant Marat Rosenberg was Chairman of the Board of Directors of the Company prior to the Business Combination.

13. Defendant Ilya Ponomarev was a director of the Company prior to the Business Combination.

14. Defendant Thomas Gallagher was a director of the Company prior to the Business Combination.

15. Defendant Gennadii Butkevych was a director of the Company prior to the Business Combination.

16. The defendants referenced above in ¶¶8-15 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that

artificially inflated the price of Lottery.com securities during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lottery.com's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

17.     The defendants referenced above in ¶¶11-15 are referred to herein as the "Blank Check Defendants." The Blank Check Defendants were responsible for the statements of TDAC prior to the Business Combination.

## FACTUAL BACKGROUND

18.     Lottery.com began as TDAC, a blank check company formed by the Blank Check Defendants. A blank check company is sometimes referred to as a special purpose acquisition company – or "SPAC" – and does not initially have any operations or business of its own. Rather, it raises money from investors in an initial public offering and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results. As a result, investors in blank check companies rely on the skill, transparency, and honesty of the blank check company's sponsor to spend the offering

proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

19. TDAC completed its initial public offering ("IPO") on June 1, 2018. The IPO consisted of 20.125 million units offered at $10 per unit, with each unit representing one share of common stock and one warrant to purchase one share of common stock at an exercise price of $11.50 per share. Later, TDAC units were separated into their stock and warrant components, which now trade separately.

20. TDAC's business objective as stated in IPO offering documents was to acquire a target business with a "focus" on "seeking a business combination with an oil and gas or other natural resources companies in Eastern Europe or interested in expanding into Eastern Europe." After failing to identify a target company within the allotted time frame, TDAC repeatedly sought (and received) extensions from its shareholders of the deadline to complete a business merger. If the Blank Check Defendants failed to complete a merger within the allotted time, they would need to essentially return the money raised in the IPO to investors, causing them to forfeit lucrative merger benefits, described in more detail below.

21. On November 19, 2020, TDAC announced that it had signed a letter of intent to combine with Lottery.com, which was then a private company.

22. Lottery.com is a provider of domestic and international lottery products and services that enable consumers and businesses to purchase purportedly legally sanctioned lottery tickets in the United States and abroad online through its proprietary business-to-consumer ("B2C") platform (the "Platform"). The Company also generates revenues through sales of lottery products and services to business affiliates who in turn resell lottery games ("B2B2C"). The Company additionally sells global lottery data, including winning numbers and results.

23.     The Company's revenue is derived from: (i) offering the B2C Platform via Lottery.com's app and websites to users located in certain U.S. and international jurisdictions; (ii) selling LotteryLink Credits to third-party master affiliate marketing partners that can be exchanged by them and by their sub-affiliates for LotteryLink promotion packages that include marketing collateral, prepaid advertising, development services, account management, and prepaid lottery games for use in promotions and marketing activities and promoting the B2C Platform; (iii) offering a proprietary business-to-business application programming interface ("API") of the Platform to enable Lottery.com's commercial partners to purchase lottery games from Lottery.com and resell them ("B2B API"); and (iv) delivering global lottery data, such as winning numbers and results, and data sets of their proprietary, anonymized transaction data pursuant to multi-year contracts to commercial digital subscribers ("Data Service").

24.     On February 22, 2021, TDAC and Lottery.com announced that they had entered into the Business Combination agreement.  Pursuant to the agreement, TDAC would contribute all remaining cash from its IPO to the combined business and AutoLotto shareholders would receive the right to receive shares of TDAC stock in exchange for their AutoLotto shares (the "Business Combination").  The aggregate value of the consideration to be paid by TDAC in the business combination (excluding certain seller earnout shares) was estimated to be approximately $444 million (calculated as follows: 40,000,000 shares of TDAC common stock to be issued to the sellers, multiplied by $11.00).

25.     On October 18, 2021, TDAC filed with the SEC a final proxy for the merger which recommended that shareholders vote in favor of the Business Combination (the "Proxy").  On October 28, 2021, based on representations made in the Proxy, TDAC shareholders approved the Business Combination.  On October 29, 2021, the Company issued a press release announcing the completion of the Business Combination.  Lottery.com was merged with and into a subsidiary of

TDAC, with TDAC as the surviving entity and TDAC's name changed to Lottery.com. TDAC also assumed the business and operations of Lottery.com, allowing Lottery.com to become publicly traded.

26.     Based on defendants' representations regarding the strength of Lottery.com's business, the price of Lottery.com stock rose to highs of more than $17 per share in November 2021.

27.     Throughout the Class Period, defendants violated the federal securities laws by disseminating materially false and misleading statements to the investing public and/or failing to disclose adverse facts pertaining to the Company's business, operations, and prospects. Specifically, defendants concealed material information and/or failed to disclose that: (i) the Company was not in compliance with state and federal laws governing the sale of lottery tickets; (ii) the Company lacked adequate internal accounting controls; (iii) the Company lacked adequate internal controls over financial reporting, including, but not limited to, those pertaining to revenue recognition and the reporting of cash; and (iv) as a result of the foregoing, defendants' positive statements about the Company's business, operations, growth, and prospects were materially misleading and/or lacked a reasonable basis.

28.     After the truth was revealed in a series of partial disclosures, the price of Lottery.com securities plummeted, causing investors to suffer significant losses and economic damages under the federal securities laws. By the end of the Class Period, the price of Lottery.com stock had fallen to less than $1 per share and Lottery.com warrants were virtually worthless.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

29.     The Class Period begins on November 19, 2020. On that date, TDAC announced that the Company had signed a binding letter of intent to acquire Lottery.com. The release stated in pertinent part as follows:

Founded in 2015, Lottery.com is a leading online platform to play the lottery from your phone, offering official state-sanctioned lottery games, like Powerball, Mega-Millions and state games, in the U.S. and around the world. Lottery.com is also the world's largest provider of lottery data to over 400 digital publishers, including hundreds of digital newspapers, television and news sites, and major digital publishers such as Google, Verizon/Yahoo, Amazon's Alexa devices and more. Its digital lottery platform provides valuable lottery-related data, such as current and previous winning numbers, jackpots and draw dates, jackpot analysis and more, covering almost 600 lottery games in 38 countries in real time.

Lottery.com has been a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age. Through its online platform, Lottery.com is providing official lottery games increased revenues and better regulatory capabilities by developing innovative blockchain technology, while also capturing untapped market share, including Millennial players. The platform is currently live in the Company's home state of Texas and nine other U.S. states with expansion plans into more than 20 U.S. states and several new countries in 2021. Additionally, the Company is the only lottery platform authorized to sell Powerball tickets in 148 countries, with rapid international expansion plans for next year. Lottery.com's ultimate vision is becoming a global lottery marketplace.

From 2016 to 2019, Lottery.com grew revenues at a compounded annual growth rate of 279%, and the Company anticipates accelerating that growth with the capital infusion from this potential transaction.

"Lottery.com has developed an innovative platform that is revolutionizing the lottery industry and bringing it into the digital age," said Marat Rosenberg, Chairman of Trident. "The Company has developed a world-class safe and secure mobile lottery platform that provides users the ability to play official lottery games right from their phone. Lottery.com is developing blockchain technology to maintain an accurate ledger of each transaction, significantly curtailing the ability for fraudulent activity. With a track record of substantial revenue growth and user base expansion in a relatively short period of time, we believe that Lottery.com has the potential to cement its place as the leading online platform to play the lottery worldwide. We also believe we can replicate our recent success story of brining Triterras, Inc. public through a business combination with Netfin Acquisition Corp. As an experienced SPAC team with a track record in the blockchain-enabled online platform space, we look forward to introducing the story of Lottery.com to the public market."

Co-founder and CEO of Lottery.com, Tony DiMatteo, commented: "Since the inception of Lottery.com, it was our aim to cooperatively transform a legacy industry with innovative technologies and capture significant market share of a large population of smartphone-using potential customers. We have already been successful in our mission, accelerating revenue growth each year, expanding our footprint and making the lottery much more accessible to modern consumers through an easy-to-use and secure mobile application and core technology. As we look to further capitalize on current trends with more consumers shopping from home and interacting through mobile applications than ever before, we believe the

business combination with Trident will provide us ample capital to accelerate our growth and enter our next stage as a public company."

Lottery.com is supported by a strong advisory board and notable investors within the venture capital, gaming and entertainment industries, including:

- Jason Robins, CEO of DraftKings

- Peter Diamandis, Chairman of XPRIZE Foundation

- Ben Narasin, Venture Partner of NEA

- Paraag Marathe, President of 49ers Enterprises

- Matthew Le Merle, Co-founder and Managing Partner of Fifth Era and Keiretsu Capital

- Jamie Gold, The Poker Philanthropist

30. On February 22, 2021, TDAC and Lottery.com issued a press release announcing the Business Combination agreement, which stated in pertinent part as follows:

Trident Acquisitions Corp. ("Trident") and AutoLotto, Inc. ("Lottery.com"), a leading online platform to play the lottery online or from a mobile device, have entered into a definitive agreement for a business combination that would result in Lottery.com becoming a publicly listed company.

Founded in 2015, Lottery.com empowers users to play the lottery from their phone and on the go. It offers official state-sanctioned lottery games, like Powerball, Mega Millions and state games where permissible. Lottery.com is also the world's largest provider of lottery data to over 400 digital publishers, including hundreds of digital newspapers, television and news sites, and major digital publishers such as Google, Verizon/Yahoo and Amazon's Alexa devices.

Lottery.com has been a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age. Through its online platform, Lottery.com provides official lottery games and enhanced regulatory capabilities by developing innovative blockchain technology, while also capturing untapped market share, including digitally native players.

With the expected proceeds to be received by Lottery.com upon the closing of the transaction, Lottery.com would be well-positioned to accelerate its revenue growth through further expansion in its existing markets and into new high-growth markets both domestically and internationally.

**Lottery.com Investment Highlights**

- **Potential to Significantly Expand Global Market Share**: Leveraging its successful playbook in the U.S., Lottery.com intends to become a global marketplace for legally available lottery games to consumers across the world.  At $430 billion of global lottery sales with only 4% online penetration, this is a large market opportunity that is expected to shift to transact online during the next decade.

- **Innovative Ecommerce Platform Bringing an Outdated Industry into the Digital Age**: Lottery.com has developed a world-class safe and secure mobile lottery platform and app leveraging blockchain technology to maintain an accurate ledger that provides users the ability to play official lottery games and other games of chance directly from their phone. Lottery.com has benefited from a customer acquisition cost of $4.01, with those users producing an average of $30.90 of gross revenue in their first year.

*      *      *

- **Easing Regulatory Environment Propelling Market Growth**: Many states and international governments have been easing restrictions on lottery games in an effort to increase ticket sales and revenue contribution in the form of tax as more and more gaming companies collaborate on lobbying efforts.

- **Poised for Expansion**: From 2016 to 2020, Lottery.com grew gross revenue at a compounded annual growth rate of 322%, and forecasts gross revenue equal to approximately $71 million in 2021, $280 million in 2022 and $571 million in 2023.  Lottery.com is currently operating in 11 states across the U.S. and has plans to cover 34 states by the end of 2023. Lottery.com looks forward to announcing upcoming partnerships with significant room to expand into other countries, along with opportunities to grow deeper within its current footprint.

- **Large and Growing Player Pool for Cross Selling Additional Games**: With over 7.5 million visitors in 2020, the Lottery.com platform is capable of distributing a range of wagering and games of chance across large and growing national and international markets.

"Lottery.com's innovative platform has already made significant progress bringing the lottery industry into the digital age and continuing to expand its markets both domestically and internationally," said Vadim Komissarov, CEO of Trident.  "With a track record of substantial growth and user base expansion in a relatively short period of time, we are confident that Lottery.com has the ability to cement its place as a leading online platform to both play the lottery and to introduce additional wagering and games of chance worldwide.  We believe this transaction will allow Lottery.com to be on a path to reach its true growth potential,

and we look forward to working with the team as we introduce their compelling story to the public markets."

Co-founder and CEO of Lottery.com, Tony DiMatteo, commented: "Lottery.com is innovating a legacy industry with ground-breaking technologies poised to capitalize on the large population of active internet and smartphone users in the U.S. and throughout the world. Over the past several months, we have made significant progress, launching our app in the Google Play Store and expanding domestically into Colorado and internationally through announced partnership plans in Turkey and Ukraine. We believe this transaction will further enhance our ability to grow into new markets as consumers are now, more than ever, engaging with digital and online platforms. The team at Trident shares our vision of growing into a global marketplace for legally available lottery games, and other games of chance, to consumers across the world and we firmly believe this partnership will accelerate our growth."

31. On the following day, February 23, 2021, TDAC filed a Form 8-K with the SEC which included a copy of the February 22, 2021 press release.

32. On October 18, 2021, TDAC filed the final proxy statement and prospectus for the Business Combination on Form 424B3, which was signed by the Blank Check Defendants (the "Proxy"). The Proxy stated that shareholders should vote in favor of the business proposal. The purported reasons provided in the Proxy for this recommendation were as follows:

- Leading provider of products and services for the domestic and international lottery industry. Trident believes Lottery.com operates a proprietary platform Lottery.com that enables the purchase of lottery games from a user's mobile device. In the U.S., Lottery.com offers this service in the states of California, Colorado, Georgia, Michigan, Minnesota, New Hampshire, Oregon, Pennsylvania, Texas, Washington and the District of Columbia as of the end of 2020. In 2020, Lottery.com delivered 1,291,870 lottery game games to users of Lottery.com, worldwide, and Lottery.com Platform hosted 29,190 daily average users, including 11,092 daily average repeat users.

- Trident believes Lottery.com the only consumer-facing lottery company that opens its API and offers a proprietary sales platform such as Lottery.com Platform to third-party resellers. Trident believes that these resellers would not otherwise have access to the regulated and compliant lottery games that are offered by Lottery.com. In 2020, Lottery.com delivered over 413,184 lottery game tickets to end users of B2B API, worldwide. In 2019, the first year Lottery.com offered the B2B API, it accounted for only 0.75% of the Lottery.com's total gross revenues; in 2020, gross revenues generated from our B2B API accounted for 31% of

- 11 -

Lottery.com total gross revenues and represented an increase in B2B API gross revenue of more than 142 times.

- Innovative technology stack. Lottery.com is developing a decentralized application for the distribution of lottery games that is verified through the blockchain and that creates a verifiable, distributed ledger of transactions that is not subject to alteration. In Trident's opinion, this may improve the security of and enhance the trust in the lottery industry and the companies that participate in it. Lottery.com currently deploys the blockchain in our Platform to encode the data transfer system to ensure transactional security.

- Large and growing market with consumer preferences shifting to online lottery. According to Technavio, the global lottery game market was valued at $356 billion in worldwide gross sales in 2020 and is forecasted to grow by 54% to more than $550 billion in worldwide gross sales in 2025. Many national, state, provincial and territorial governments rely on revenues from the sale of lottery games as a significant source of public program funding, including recreational programs, educational programs, and environmental efforts. Only 4% of lottery tickets in the U.S. are sold online, and Trident believes that the consumer shift to online lotteries represents a significant growth opportunity for the Lottery.com platform. Lottery.com is a pioneer in the resale of iLottery tickets, which Trident's believe offers Lottery.com Platform a significant advantage over our competitors.

- Public market-ready scale, profitability and favorable user distribution and network effect. Trident believes Lottery.com has reached critical mass as a highly valuable alternative for buying lottery tickets in brick-and-mortar stores, which in turn is driving significant revenue, EBITDA and net income growth. This year, Lottery.com is anticipated to generate more than US$70 million in revenue and more than $3 million in EBITDA. For its fiscal year 2023, the Projections (as defined below) forecast US$571 million in Gross Revenue, US$59 million EBITDA, and US$44 million net profit. The pro forma market cap is expected to be approximately US$563 million at estimated trust value per share at closing (US$11.00), assuming no redemptions in connection with the Business Combination.

- Fast growing business with strong execution, exceeding forecasts. Lottery.com is experiencing significant growth, and it has already booked US$5.5 million of total revenue for the 3-month period ending March 2021. This represents a 270% increase in total revenue year-on-year. Projections forecast US$70 million in revenue and more than $3 million in EBITDA for fiscal year 2021. The Projections forecast 750% FY19-FY21E Revenue CAGR.

- High profit margin. Lottery.com is a pure-play, with an all fee-based business and zero balance sheet exposure. The Projections forecast a 32% FY21E Gross Profit margin and 5% FY21E EBITDA margin. Lottery.com has a 100% fee-based model that generates service fees for

lottery ticket sales, as well as subscription fees and data set fees for selling lottery data. Trident views the fact that Lottery.com has modest exposure to debt as advantageous in the COVID-19 environment. Lottery.com is a pure play fast growing online gaming company in a high earnings multiple segment. Trident's board of directors believes that this capital-light, highly profitable business model with minimal credit or commodity risk will continue to generate strong margins and free cash flow.

- High barriers to entry and sticky user base exhibiting a referral network effect, showing significant growth potential. Lottery.com's business is subject to extensive regulation by multiple domestic and foreign laws and regulations governing companies conducting lottery related operations on the internet, over mobile networks, and by delivery of lottery tickets for a fee by messengers or resellers. Launching a working and effective platform of this type for users requires significant time and resource investment to achieve compliance with regulatory bodies. Platform launches are a difficult undertaking, and Lottery.com had a strategic advantage in accomplishing this goal in 2016-2019, which allowed it to have early scale and profitability, which Trident believes would be difficult to replicate.

- Diverse distribution ecosystem. Lottery.com has established a Platform with strong and effective proprietary technology capable of handling high levels of user traffic and transaction volume, to ensure expediency, security, and reliability in processing and prize redemption process. In addition to the organic growth of users of Lottery.com Platform and purchasers of lottery games from third-party resellers on B2B API, Lottery.com is consistently increasing its distribution ecosystem to create non-organic growth. For example, Lottery.com's partner is Payrange, Inc., a California-based company that offers patented technology to utilize consumer's smart phone connectivity to enable a user's mobile payment wallet for use at traditionally coin-operated machines, including amusement and arcade games, vending machines, and laundry machines. PayRange utilizes B2B API to offer lottery games on its mobile application for purchase by its customers in permitted jurisdictions. Lottery.com's affiliate marketing partners include Accuweather, Inc. and iHeartMedia, Inc. Typically, Lottery.com pays its affiliates an amount equal to up to 50% of the gross profits derived from new users to Lottery.com Platform acquired as a direct result of such affiliate's marketing efforts.

- Proven and experienced management team with industry and technology expertise. Lottery.com benefits from a strong entrepreneurial leadership team that links two complementary skill sets: technology development and consumer marketing expertise. Trident believes this combination provides a competitive advantage as trade finance and physical commodities trading businesses are often slow to adopt technology.

- Terms of Business Combination Agreement and related agreements. Trident's board of directors reviewed the financial and other terms of the

- 13 -

Business Combination Agreement and related agreements and determined that they were the product of arm's-length negotiations among the parties.

- Shareholder Approval. Trident's board of directors considered the fact that in connection with the Business Combination, Lottery.com Shareholders will remain stockholders of the Company.

33.     On October 21, 2021 – only one week prior to the special stockholders' meeting to approve the Business Combination – TDAC and Lottery.com jointly issued a press release claiming that Lottery.com had achieved "Strong Preliminary Third Quarter 2021 Revenues" in the range of $22 million to $24 million. The release stated that "[t]his represents sequential revenue growth of greater than 135% compared to $9.3 million in the second quarter of 2021." The release continued in pertinent part as follows:

> On a preliminary basis, revenue through the first nine months of 2021 is expected to be between $36.8 million and $38.8 million on a reported basis and $38.7 million and $40.7 million on a pro forma basis giving effect to the acquisition of 80% interests in JuegaLotto and Aganar, two companies with legalized lottery operations within Mexico. Through the first nine months of 2021, pro forma revenue is expected to be more than 270% above the full twelve months of 2020, after giving effect to the acquisition of the interests in JuegaLotto and Aganar.
>
> Tony DiMatteo, Chief Executive Officer of Lottery.com, stated, "I am proud of our strong third quarter preliminary results, which our team achieved while also focusing on completing our business combination. Lottery.com is a nimble organization with multiple avenues for growth and we have demonstrated our ability to generate very positive results with modest capital. With the completion of our business combination expected in the very near future, we anticipate using the proceeds from the business combination to accelerate growth by leveraging our favorable customer acquisition costs in continuing to expand our customer base."

34.     On October 27, 2021, TDAC issued a press release stating that "[s]tockholders holding 5,765,400 shares, or 99.6% of Trident's outstanding shares, elected to retain their common stock. As a result, Lottery.com expects to receive over $63 million in gross proceeds at the closing of the Business Combination." The release continued in pertinent part as follows:

> "We are grateful for the support of our and Trident's more than 12,500 stockholders and would like to thank them for believing in our vision of bringing the lottery industry into the digital age," said Tony DiMatteo, CEO of Lottery.com. "Our team is ready to enter our next growth phase and we look forward to using the proceeds of this transaction to execute our strategic plan to expand in our existing

markets, grow into new domestic and international markets, and execute on synergistic acquisitions."

Vadim Komissarov, CEO of Trident, commented, "With a $400 billion global lottery market, a track record of substantial revenue and user base growth in a relatively short period of time, and an experienced management team, we believe that Lottery.com is on track to achieve its growth potential and will generate long-term value as a public company.  We look forward to completing the business combination and being stockholders in Lottery.com."

35.     The statements referenced in ¶¶29-34 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Lottery.com was not in compliance with state and federal laws governing the sale of lottery tickets;

(b)     that the Company lacked adequate internal accounting controls;

(c)     that the Company lacked adequate internal controls over financial reporting, including, but not limited to, those pertaining to revenue recognition and the reporting of cash; and

(d)     that, as a result of the foregoing, defendants' positive statements about the Company's business, operations, growth, and prospects were materially misleading and/or lacked a reasonable basis.

36.     On October 28, 2021, TDAC shareholders approved the Business Combination at a special meeting based on the materially false and misleading Proxy and other representations detailed herein.  Upon closing, TDAC was renamed Lottery.com.

37.     On November 15, 2021, Lottery.com filed with the SEC a Form 8-K announcing that, on November 10, 2021, the Board had approved the engagement of Armanino LLP ("Armanino") as the Company's independent registered public accounting firm to audit the

Company's consolidated financial statements for the year ended December 31, 2021, and the dismissal of Marcum LLP as the Company's auditing firm.

38.     That same day, Lottery.com filed with the SEC its quarterly report on Form 10-Q reporting its financial results for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q stated that, "[i]n connection with the preparation of the Company's financial statements as of September 30, 2021, management identified errors made in its historical financial statements where, at the closing of the Company's Initial Public Offering, the Company improperly valued its common stock subject to possible redemption." Accordingly, the 3Q21 10-Q provided restated financials for Lottery.com.

39.     In addition, the 3Q21 10-Q referenced the fact that the Company had identified a material weakness and determined that its disclosure controls and procedures were not effective as of September 30, 2021. Specifically, with respect to Lottery.com's Controls and Procedures, the 3Q21 10-Q stated:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021.

40.     The 3Q21 10-Q went on to state that, other than the matters set forth in the Form 10-K/A, there were no changes in internal control over financial reporting. Further, the 3Q21 10-Q represented that Lottery.com intended to "enhance [its] processes to identify and appropriately apply applicable accounting requirements." The 3Q21 10-Q stated in pertinent part as follows:

- 16 -

**Changes in Internal Control Over Financial Reporting**

Other than what was described in the 10-K/A, there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a- 15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. In light of the restatement of our financial statements included in the 10-K/A, we plan to enhance our processes to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements. Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

41. On this news, the price of Lottery.com securities fell. The price of Lottery.com stock fell from a price of $13.25 per share on November 12, 2021 to a price of $6.98 per share on November 22, 2021, a decline of nearly 50%. However, because defendants did not disclose the full truth and continued to make material misrepresentations regarding Lottery.com, the price of Lottery.com securities remained artificially inflated.

42. On March 31, 2022, the Company issued a press release, filed with the SEC as an attachment to a Form 8-K, claiming that Lottery.com had achieved "strong" financial results for the fourth quarter ("4Q") and full-year 2021. The release stated that Lottery.com had generated revenue of $21.5 million for 4Q 2021 (an increase of $18.2 million over the prior year period) and revenue of $68.5 million for the full year 2021 (an increase of $61 million over 2020). The release also stated that Lottery.com held cash as of December 31, 2021 of $62.6 million – an increase of $58.8 million over the prior year period.

43. On April 1, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), which was signed by defendants DiMatteo, Clemenson, and Dickinson. DiMatteo and Dickinson also signed certifications attesting to the truthfulness and accuracy of the 2021 10-K. In addition to the financial metrics reported in

the press release the day before, the 2021 10-K stated that Lottery.com had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020, but described this material weakness as largely related to personnel and staffing.  Specifically, the 2021 10-K stated that the material weakness related to "the design and operation of the procedures relating to the closing of [Lottery.com's] financial statements."  The 2021 10-K reassured investors that the Company had "commenced measures to remediate" this material weakness.  In particular, the 2021 10-K stated in pertinent part as follows:

> In connection with the audits of our condensed consolidated financial statements included in this Annual Report, our management has identified a material weakness in internal control over financial reporting as of December 31, 2021 and 2020 relating to deficiencies in the design and operation of the procedures relating to the closing of our financial statements.  These include: (i) our lack of a sufficient number of personnel with an appropriate level of knowledge and experience in accounting for complex or non-routine transactions, (ii) the fact that our policies and procedures with respect to the review, supervision and monitoring of our accounting and reporting functions were either not designed and in place or not operating effectively; (iii) the timely closing of financial books at the quarter and fiscal year end, and (iv) incomplete segregation of duties in certain types of transactions and processes.

> We have commenced measures to remediate the identified material weakness, including (i) adding personnel with sufficient accounting knowledge; (ii) adopting a more rigorous period-end review process for financial reporting; (iii) adopting improved period close processes and accounting processes, and (iv) clearly defining and documenting the segregation of duties for certain transactions and processes.  The implementation of our remediation is ongoing and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles.  We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting.

44.     The 2021 10-K further stated that, other than the deficiencies identified, "there was no change in our internal control over financial reporting."

45.     On May 16, 2022, the Company issued a press release, filed with the SEC on Form 8-K, which announced Lottery.com's purportedly "strong" financial results for the first quarter ended March 31, 2022 ("1Q 2022").  The release stated that Lottery.com's 1Q 2022 revenues were

$21.2 million, an increase of $15.7 million over the prior year period. The release further stated that Lottery.com held cash of $50.8 million at the end of the quarter, up $32.5 million over the prior year period.

46.     Also on May 16, 2022, the Company filed with the SEC its quarterly report for 1Q 2022 on Form 10-Q (the "1Q22 10-Q"), which was signed by defendant Dickinson. DiMatteo and Dickinson also signed certifications attesting to the truthfulness and accuracy of the 1Q22 10-Q. In addition to reporting the financial metrics disclosed in the press release on the same day, the 1Q22 10-Q stated that management had "evaluated the effectiveness of our disclosure controls and procedures." The 1Q22 10-Q continued in pertinent part as follows:

> Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting with respect to our financial statement close and reporting process. . . . . Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP.

47.     The statements referenced in ¶¶42-46 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Lottery.com was not in compliance with state and federal laws governing the sale of lottery tickets;

(b)     that the Company lacked adequate internal accounting controls;

(c)     that the Company lacked adequate internal controls over financial reporting, including, but not limited to, those pertaining to revenue recognition and the reporting of cash; and

- 19 -

(d)     that, as a result of the foregoing, defendants' positive statements about the Company's business, operations, growth, and prospects were materially misleading and/or lacked a reasonable basis.

48.     Then, on July 6, 2022, Lottery.com filed with the SEC a Form 8-K disclosing that an internal investigation, conducted by outside counsel, had uncovered "instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment."  In addition, the Form 8-K stated that the investigation revealed "issues pertaining to the Company's internal accounting controls."  The Form 8-K further disclosed that, in light of the findings of the investigation, on June 30, 2022, the Board had terminated defendant Dickinson, the Company's CFO, President, and Treasurer, effective July 1, 2022.

49.     On this news, the price of Lottery.com stock fell $0.15 per share, or more than 12%, from a closing price of $1.22 per share on July 5, 2022 to a closing price of $1.07 per share on July 6, 2022.

50.     On July 15, 2022, after the market closed, the Company filed with the SEC a Form 8-K announcing that defendant Clemenson, the Company's Chief Revenue Officer, had resigned on July 11, 2022, effective immediately.  Moreover, the Form 8-K provided an update on the independent investigation previously disclosed on July 6, 2022.  The Form 8-K stated that, after a review of Lottery.com's cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery.com had overstated its unrestricted cash balance by approximately $30 million and that, "relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount."  The Form 8-K further stated that Lottery.com was "currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures."

51. On this news, the price of Lottery.com stock fell $0.15 per share, or over 15%, from a closing price of $0.97 per share on July 15, 2022 to a closing price of $0.82 per share on July 18, 2022.

52. Then, on July 22, 2022, Lottery.com filed with the SEC a Form 8-K which disclosed that the Company had been advised by its independent accountant that its audited financial statements for the fiscal year ended December 31, 2021 and unaudited financial statements for the quarter ended March 31, 2022 should no longer be relied upon. In addition, the Form 8-K revealed that Lottery.com's CEO and co-founder, defendant DiMatteo, was resigning as CEO, effective immediately. Specifically, the Form 8-K stated, in pertinent part, as follows:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**.

(b) On July 20, 2022, Lottery.com Inc. (the "Company") was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal year ended December 31, 2022, that the audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon. Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.

\* \* \*

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**.

On July 21, 2022, Lawrence Anthony "Tony" DiMatteo III, the Chief Executive Officer (the "CEO") of the Company and a member of its Board of Directors (the "Board"), provided a notice of resignation as CEO of the Company, its wholly owned subsidiary, AutoLotto, Inc. ("AutoLotto"), and all of its other subsidiaries and affiliates with the exception of LTRY WinTogether, Inc., with immediate effect. The Company accepted his resignation from such positions. Mr. DiMatteo served as an officer and director of AutoLotto since February 2015 and as CEO of the Company since the effectuation of the business combination in October 2021.

53.     As a result of these disclosures, the price of Lottery.com stock fell $0.10 per share, or more than 12%, over the next two trading days, from a closing price of $0.82 per share on July 22, 2022 to a closing price of $0.72 per share on July 26, 2022.

54.     On July 29, 2022, Lottery.com filed with the SEC a Form 8-K which disclosed that the Company did not have "sufficient financial resources to fund its operations or pay certain existing obligations," and that it therefore intended to furlough certain employees effective July 29, 2022.  Moreover, the Form 8-K stated that "there is substantial doubt about the Company's ability to continue as a going concern," and the Company may be forced to wind down its operations or pursue liquidation of the Company's assets.

55.     As a result to this news, the price of Lottery.com stock lost nearly 64% of its value in a single trading day, falling $0.52 per share, from a closing price of $0.82 per share on July 28, 2022 to a close of $0.30 per share on July 29, 2022.

56.     On August 16, 2022, Lottery.com filed with the SEC a notification of its inability to timely file its quarterly report on Form NT 10-Q because of the various accounting and other issues described above.

57.     On August 22, 2022, Lottery.com filed with the SEC a Form 8-K which disclosed that it had received a notification from NASDAQ that the Company was not in compliance with exchange listing rules.

58.     On August 29, 2022, Lottery.com filed with the SEC a Form 8-K which disclosed that the Company remained out of compliance with NASDAQ listing rules.

59.     On September 9, 2022, Lottery.com filed with the SEC a Form 8-K which disclosed that four members of its Board had resigned; specifically, former CEO DiMatteo, William Thompson, Jr., Steven Cohen, and Lisa Borders.  The Form 8-K stated that Kathryn Lever,

Lottery.com's Chief Legal Officer, Chief Operating Officer and Secretary, had also provided her notice of resignation.

60.    On October 6, 2022, Lottery.com filed with the SEC a Form 8-K which disclosed that its independent registered accounting firm, Armanino, had resigned effective immediately. The Form 8-K stated, "based on Armanino's evaluation of the facts and circumstances pertaining to matters disclosed in the Company's recent Form 8-K filings regarding the resignations of certain officers and directors, Armanino is unable to rely on the representations of management."

61.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class (defined below) purchased Lottery.com securities at artificially inflated prices and were damaged thereby.

**ADDITIONAL ALLEGATIONS OF SCIENTER**

62.    As alleged herein, Lottery.com and the Individual Defendants acted with scienter in that: (i) they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

63.    In addition, as set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Lottery.com, their control over and/or receipt and/or modification of Lottery.com's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Lottery.com, participated in the fraudulent scheme alleged herein.  The Individual Defendants also had the motive and opportunity to defraud investors.  For example, the Blank Check Defendants received over 5 million shares of TDAC (valued at over

- 23 -

$85 million at the Class Period high) for nominal consideration and 1.15 million private units (valued at $17.825 million in the Proxy) that would be rendered worthless if the Business Combination was not completed, because these holders had waived their rights to any liquidation distributions. The Blank Check Defendants had also contributed over $3.4 million in cash to the Company that would not be repaid in the event the merger was not completed. In addition, the Blank Check Defendants received over $5 million for reimbursement of work performed in connection with the Business Combination. Similarly, the executives of AutoLotto received far more TDAC shares than they would have been entitled to had the true value of AutoLotto been disclosed in connection with the Business Combination. These executives also received lucrative pay and benefit packages to the extent they remained employees of Lottery.com following the merger, and enjoyed the substantial benefits of running a publicly traded company with liquid securities. Furthermore, the Individual Defendants stood to receive millions more shares as "earnout" awards and compensation in the event the Business Combination was completed and certain share price targets were achieved. These various financial incentives further bolster an already compelling inference of scienter.

## LOSS CAUSATION AND ECONOMIC LOSS

64. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Lottery.com securities and operated as a fraud or deceit on purchasers of Lottery.com securities. As detailed above, when the truth about Lottery.com's misconduct was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up the securities' prices. The declines in Lottery.com's share price were the direct result of the nature and extent of defendants' fraud being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and other members

- 24 -

of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of the Company's securities and the subsequent significant decline in the value of the Company's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

65. At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Lottery.com's business and operations as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Lottery.com securities to be artificially inflated. Plaintiff and other Class members purchased Lottery.com securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE

66. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- 25 -

(e)     plaintiff and other members of the Class purchased Lottery.com securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

67.     At all relevant times, the market for Lottery.com securities was efficient for the following reasons, among others:

(a)     Lottery.com securities met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient market;

(b)     as a regulated issuer, Lottery.com filed periodic public reports with the SEC;

(c)     Lottery.com regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(d)     unexpected material news about Lottery.com was rapidly reflected and incorporated into prices for the Company's securities during the Class Period.

68.     As a result of the foregoing, the market for Lottery.com securities promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Lottery.com securities.  Under these circumstances, all purchasers of Lottery.com securities during the Class Period suffered similar injury through their purchases of Company securities at artificially inflated prices, and a presumption of reliance applies.

**NO SAFE HARBOR**

69.     Defendants' false or misleading statements during the Class Period were not forward-looking statements ("FLS"), or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

70.     Defendants' verbal "Safe Harbor" warnings accompanying their oral FLS issued during the Class Period were ineffective to shield those statements from liability.

71.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Lottery.com who knew that the FLS was false.  Further, none of the historic or present-tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

**CLASS ACTION ALLEGATIONS**

72.     Plaintiff brings this action on behalf of all purchasers of Lottery.com publicly traded securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, the legal representatives, heirs, successors, or assigns of any of the foregoing, and any entity in which any of the defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lottery.com securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class located geographically throughout the country.

Joinder would be highly impracticable. Record owners and other members of the Class may be identified from records maintained by Lottery.com or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

75. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c) whether the prices of Lottery.com securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

77. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

78.    Plaintiff incorporates the prior paragraphs by reference.

79.    During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Lottery.com securities during the Class Period.

81.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lottery.com securities. Plaintiff and the Class would not have purchased Lottery.com securities at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

82.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Lottery.com securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

83.     Plaintiff incorporates the prior paragraphs by reference.

84.     During the Class Period, defendants acted as controlling persons of Lottery.com within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Lottery.com (including its predecessor entities), the Individual Defendants had the power and ability to control the actions of Lottery.com and its employees. Lottery.com controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

- 30 -

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  October 11, 2022

KENDALL LAW GROUP, PLLC
JOE KENDALL, Attorney-in-Charge
Texas Bar No. 11260700


s/ Joe Kendall
JOE KENDALL

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD W. GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Matthew K. McDonald ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___11___ day of October, 2022.

DocuSigned by:

6202CFA58B944F6...

Matthew K. McDonald

LOTTERY.COM

## SCHEDULE A

## SECURITIES TRANSACTIONS

### Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 11/04/2021 | 20 | $13.25 |
| 11/04/2021 | 20 | $13.25 |
| 11/04/2021 | 10 | $13.25 |
| 11/08/2021 | 2 | $13.87 |
| 11/08/2021 | 0.8589 | $13.89 |
| 11/09/2021 | 40 | $13.75 |
| 11/09/2021 | 20 | $13.75 |
| 11/12/2021 | 32 | $13.20 |
| 11/12/2021 | 30 | $13.25 |
| 11/15/2021 | 16 | $12.97 |
| 11/15/2021 | 0.8012 | $12.98 |
| 11/16/2021 | 53 | $12.90 |
| 11/19/2021 | 88 | $8.25 |
| 11/23/2021 | 58.3901 | $7.19 |
| 12/03/2021 | 78 | $6.40 |
| 12/07/2021 | 96 | $5.20 |
| 12/09/2021 | 54 | $6.45 |
| 12/09/2021 | 23 | $6.45 |
| 12/10/2021 | 0.00404 | $6.20 |
| 12/10/2021 | 1 | $6.20 |
| 12/13/2021 | 0.0548 | $5.74 |
| 12/13/2021 | 12.9445 | $5.77 |
| 12/17/2021 | 0.5587 | $5.32 |
| 12/17/2021 | 37 | $5.32 |
| 03/25/2022 | 4.5851 | $3.35 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/05/2021 | 50 | $14.70 |
| 11/15/2021 | 141 | $15.00 |

### Warrants

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/05/2021 | 500 | $3.19 |
| 02/05/2021 | 200 | $3.15 |
| 02/05/2021 | 300 | $3.14 |
| 02/05/2021 | 580 | $3.11 |
| 02/12/2021 | 685 | $2.88 |
| 02/17/2021 | 678 | $3.12 |
| 02/17/2021 | 674 | $3.07 |
| 02/17/2021 | 6 | $3.06 |

| | | |
|---|---|---|
| 02/17/2021 | 724 | $3.07 |
| 02/17/2021 | 1 | $3.07 |
| 02/22/2021 | 1,072 | $4.15 |
| 03/05/2021 | 1,057 | $1.85 |
| 04/14/2021 | 380 | $2.36 |
| 04/14/2021 | 3 | $2.36 |
| 05/28/2021 | 1,100 | $2.01 |
| 06/17/2021 | 1,383 | $2.10 |
| 07/27/2021 | 1 | $1.67 |
| 03/23/2022 | 199 | $0.65 |
| 03/23/2022 | 300 | $0.65 |
| 03/23/2022 | 100 | $0.66 |
| 03/23/2022 | 14 | $0.66 |
| 03/23/2022 | 187 | $0.66 |
| 03/23/2022 | 200 | $0.66 |
| 03/23/2022 | 200 | $0.66 |
| 03/23/2022 | 199 | $0.66 |
| 03/23/2022 | 410 | $0.66 |
| 03/23/2022 | 700 | $0.68 |
| 03/23/2022 | 1,070 | $0.67 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 02/22/2021 | 1,000 | $4.45 |
| 03/05/2021 | 500 | $1.99 |
| 03/05/2021 | 500 | $1.92 |
| 04/14/2021 | 343 | $2.49 |

Prices listed are rounded to two decimal places.