UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE LOTTERY.COM, INC. SECURITIES
LITIGATION

Case No. 1:22-cv-07111 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

This consolidated case involves two federal securities-fraud lawsuits brought against

ten defendants.

In the first lawsuit, RTD Bros LLC, Todd Benn, Tom Benn, Tomasz Rzedzian, and

Preston Million (collectively, the "Class Plaintiffs") bring a putative class action against

Lottery.com, Inc. ("Lottery") formerly known as Trident Acquisitions Corp. ("Trident"),

Anthony DiMatteo ("DiMatteo"), Matthew Clemenson ("Clemenson"), Kathryn Lever

("Lever"), Ryan Dickinson ("Dickinson"), Marat Rosenberg ("Rosenberg"), Vadim

Komissarov ("Komissarov"), Thomas Gallagher ("Gallagher"), Gennadii Butkevych

("Butkevych"), and Ilya Ponomarev ("Ponomarev").  ECF No. 52 (the "Amended Class-

Action Complaint" or "Class Compl.").[1]

The Amended Class-Action Complaint asserts four causes of action.  First, the Class

Plaintiffs allege that Lottery, DiMatteo, Clemenson, Lever, Dickinson, Rosenberg,

Komissarov, Gallagher, Butkevych, and Ponomarev (collectively, "Defendants") violated

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§ 78j(b) ("Section 10(b)"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5

---

[1] All citations to "ECF" refer to the docket for Case No. 1:22-cv-07111.  All citations to
"Hoffman ECF" refer to the docket for Case No. 1:22-cv-10764.  Except for the parties'
briefs, all citations herein to the page numbers of documents filed by the parties refer to the
ECF-provided page numbers, not to internal pagination.

("Rule 10b-5").  *Id.* ¶¶ 170-174 ("Class Claim I").  Second, the Class Plaintiffs allege that all Defendants except Lottery (the "Individual Defendants") violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), as controlling persons with respect to the conduct underlying Claim I.  *Id.* ¶¶ 175-178 ("Class Claim II").  Third, the Class Plaintiffs allege that Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) ("Section 14(a)"), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 ("Rule 14a-9").  *Id.* ¶¶ 179-182 ("Class Claim III").  Fourth, the Class Plaintiffs allege that the Individual Defendants violated Section 20(a) as controlling persons with respect to the conduct underlying Claim III.  *Id.* ¶¶ 183-188 ("Class Claim IV").  The Class Plaintiffs define the "Class Period" as "the period from November 19, 2020 through July 29, 2022, inclusive."  *Id.* ¶ 1.

Six Defendants – Lottery, DiMatteo, Clemenson, Dickinson, Lever, and Komissarov – have moved to dismiss the Amended Class-Action Complaint under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  ECF Nos. 77 ("Lottery Class Br."), 86 ("DiMatteo Class Br."), 92 ("C&D Class Br."), 112 ("Lever Br."), 116 ("Komissarov Br."); *see also* ECF Nos. 95 ("Lottery Class Opp."), 96 ("DCD Opp."), 98 ("Lottery Class Reply"), 100 ("C&D Class Reply"), 102 ("DiMatteo Reply"), 118 ("Lever Opp."), 119 ("Komissarov Opp."), 121 ("Komissarov Reply"), 122 ("Lever Reply").  Four other Defendants – Rosenberg, Gallagher, Butkevych, and Ponomarev – have not been served.

In the second lawsuit, Harold M. Hoffman ("Hoffman"), an attorney proceeding *pro se*, brings an individual action against Lottery, DiMatteo, Clemenson, and Dickinson.  Hoffman ECF No. 1 (the "Hoffman Complaint" or "Hoffman Compl.").  Hoffman raises two claims.  First, Hoffman alleges that Lottery, DiMatteo, Clemenson, and Dickinson violated Section 10(b) and Rule 10b-5.  *Id.* ¶¶ 53-62 ("Hoffman Claim I").  Second, Hoffman alleges

that DiMatteo, Clemenson, and Dickinson violated Section 20(a) as controlling persons with respect to the conduct underlying Hoffman Claim I. *Id.* ¶¶ 63-68 ("Hoffman Claim II"). Lottery, DiMatteo, Clemenson, and Dickinson have moved to dismiss the Hoffman Complaint. ECF Nos. 81 ("Lottery Hoffman Br."), 89 ("DiMatteo Hoffman Br."), 94 ("C&D Hoffman Br."); *see also* ECF Nos. 97 ("Hoffman Opp."), 99 ("Lottery Hoffman Reply"), 101 ("C&D Hoffman Reply"); DiMatteo Reply.

For the following reasons, the motions to dismiss the Amended Class-Action Complaint and the Hoffman Complaint are granted. But the Court grants the Class Plaintiffs and Hoffman (collectively, "Plaintiffs") leave to amend their complaints.

## BACKGROUND

### I.   Factual Allegations

Because this case is at the motion-to-dismiss stage, the Court assumes that the complaints' factual allegations are true and construes them in the light most favorable to the respective plaintiffs. *See New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023).

As previously noted, this case features two consolidated lawsuits. Consolidation "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties[] in one suit parties in another." *MacAlister v. Guterma*, 263 F.2d 65, 68 (2d Cir. 1958) (quoting *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933)). Thus, the Court will not credit the Hoffman Complaint with allegations contained solely in the Amended Class-Action Complaint, and vice versa. Nevertheless, for the sake of telling this story only once, the Court will tell it in full, relying primarily on the longer and more detailed Amended Class-Action Complaint.

### A.  Introduction to SPACs

To appreciate the potential significance of the alleged events, one must understand several aspects of a particular type of corporate entity: the special-purpose-acquisition corporation (the "SPAC").  Ordinarily, a privately held corporation becomes a publicly traded corporation through an initial public offering (an "IPO"), a process entailing various legal requirements and associated expenses.  *See* 1 Thomas Lee Hazen, Law Sec. Reg. ("Hazen") § 3:2 (Westlaw database updated Nov. 2023) (overview of the traditional registration process).  SPACs offer another route for a private company to go public.

"The creation of a SPAC begins with a sponsor forming a corporation and working with an underwriter to take the SPAC public in an IPO."  Michael Klausner, Michael Ohlrogge & Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. on Regul. 228, 236 (2022) ("Klausner et al.").  "Nominally, the SPAC is managed by its own officers and directors, who are selected by the sponsor.  Those officers and directors typically overlap with the individuals who own and created the sponsor, and the compensation of the SPAC's officers and directors typically aligns their interests with those of the sponsor."  *Id.*  Following its IPO, a SPAC has "no business activities" except seeking "to acquire an existing [privately] operating company," thus allowing the private company to become a public company without conducting an IPO.  Class Compl. ¶ 40.  "The capital from the SPAC's initial public offering . . . is held in trust for a specific period of time to fund the acquisition."  *Id.*  "SPACs usually have an 18-to-24-month period to find an acquisition target and completion of the SPAC business combination."  1 Hazen § 3:58.  The resulting business combination "is often referred to as a de-SPAC transaction."  *Id.*

"If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's

securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares)."  Class Compl. ¶ 41.  But "if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless."  *Id.*; *accord* Klausner et al., *supra*, at 237 ("If the SPAC does not merge within the period provided for in the charter (or have its shareholders vote to extend its life by a few months), the SPAC must liquidate and distribute the funds in the trust to its public shareholders.  In the event of a liquidation, the sponsor loses its investment.").  Plaintiffs contend that, as a result, "the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious."  Class Compl. ¶ 41.

"Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team."  *Id.* ¶ 43.  "Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination."  *Id.*  "Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions."  *Id.*

### B.  Formation of Trident and Early Efforts to De-SPAC

Trident was a SPAC incorporated in Delaware on March 17, 2016.  *Id.* ¶ 46.  Trident filed its IPO prospectus (dated May 29, 2018) with the Securities and Exchange Commission (the "SEC") on May 30, 2018.  *Id.* ¶ 47; Trident Acquisitions Corp., Prospectus (Form 424B4) (May 29, 2018) (the "IPO Prospectus"), https://www.sec.gov/Archives/edgar/data/1673481/ 000161577418004472/s110477_424b4.htm [https://perma.cc/98JY-L5CK]; *see* 17 C.F.R.

§ 230.424(b)(4).  In the IPO Prospectus, Trident stated that it "intend[ed] to focus [its] efforts on seeking a business combination with an oil and gas or other natural resources companies in Eastern Europe or interested in expanding into Eastern Europe."  Class Compl. ¶ 49 (brackets in original; emphasis omitted).  The IPO Prospectus also reported that seven people served as officers and/or directors of Trident, including four of the Individual Defendants: Ponomarev (chief executive officer ("CEO") and director), Komissarov (president, chief financial officer ("CFO"), and director), Gallagher (director), and Butkevych (director).  *Id.* ¶ 50; IPO Prospectus at 69.  The IPO Prospectus "repeatedly touted" Ponomarev and other officers as "experienced in the energy industries and working in Eastern Europe."  Class Compl. ¶ 50.

On June 1, 2018, Trident completed the IPO of 17,500,000 units.  *Id.* ¶ 47.  Each unit "consist[ed] of one share of common stock and one warrant entitling its holder to purchase one share of common stock at a price of $11.50 per share."  *Id.*  Trident also granted the IPO's underwriters an option to purchase up to 2,625,000 additional units to cover possible over-allotments; the underwriters exercised that option in full on June 4, 2018.  *Id.*  In total, Trident issued a total of 20,125,000 units at a price of $10.00 per unit, resulting in total gross proceeds of $201,250,000 from the IPO.  *Id.* ¶ 48.  Trident's units began trading on the NASDAQ on May 30, 2018, and its common stock and warrants began separately trading on the NASDAQ on June 13, 2018.  *Id.* ¶ 47.  On June 5, 2018, Trident deposited the proceeds from the IPO – along with the proceeds from a private placement of an additional 1,150,000 units at a price of $10.00 per unit – in a trust account for the purpose of funding a business combination.  *Id.* ¶ 48 & n.5.

Under its amended and restated certificate of incorporation, Trident initially had until December 1, 2019, to complete a de-SPAC transaction.  *Id.* ¶ 53.  "If [Trident] was unable to consummate a business combination by then, [Trident] would be required to (i) cease all

operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter, redeem 100% of the outstanding public shares, and (iii) liquidate and dissolve the company." *Id.* Trident could seek shareholder approval of an extension of the business-combination deadline. *Id.* ¶ 54. But "if such an extension was approved, [Trident] was required to provide shareholders with the opportunity to redeem all or a portion of their public shares." *Id.* That scenario risked shareholders "decid[ing] to redeem [Trident] shares in amounts that would significantly deplete [Trident's] trust account and jeopardize its ability to complete a transaction even with an extended deadline." *Id.* The failure to complete an IPO would render "worthless" the millions of shares and warrants acquired by Trident's directors and officers. *Id.* ¶ 55.

Trident "sought and obtained three extensions of the deadline, and each time, a portion of shareholders sought to redeem their shares." *Id.* ¶ 56. As a result of those redemptions, Trident's officers and directors "saw their financial interest in the company continue to dwindle," and "the amount of funds [that Trident] had access to for an acquisition greatly declined, further shrinking the available pool of potential companies for which a potential acquisition by [Trident] would be enticing." *Id.* ¶ 57. The last of these extensions pushed the business-combination deadline until December 1, 2020. *Id.* ¶ 56. Following the third extension and corresponding redemption of shares, Trident had just $62,286,780 left of the original amount of $201,250,000. *Id.*

### C. Trident's Merger with Lottery

On November 19, 2020, Trident announced that it had signed a letter of intent to combine with Lottery, a private company founded in 2015 and based in Austin, Texas. *Id.* ¶¶ 58-59. Lottery offered users an online platform to play lottery games, including state-

sanctioned games such as Powerball and Mega Millions.  *Id.* ¶ 59.  Lottery also provided

lottery-related data to digital publishers.  *Id.*

A press release dated November 19, 2020, filed with the SEC on a Form 8-K,[2]

described Lottery as "ha[ving] been a pioneer in the lottery industry, working closely with

state regulators to advance the industry into the digital age."  *Id.* ¶ 74 (emphasis omitted); *see*

ECF No. 117-3 (the "11/19/20 Form 8-K").  It also stated that Lottery "works closely with

state regulators to advance the lottery industry, providing increased revenues and better

regulatory capabilities, while capturing untapped market share, including millennial players."

Class Compl. ¶ 74 (emphasis omitted).  Lottery "made the same or substantially similar

statements regarding Lottery's work with state regulators throughout the Class Period."  *Id.*

¶ 75 (listing press releases (the "State-Regulator Press Releases") issued on February 8,

February 22, March 22, April 5, April 12, April 21, April 27, and June 9, 2021; all were also

filed with the SEC as Form 8-Ks); *see, e.g.*, ECF No. 120-2 at 9; ECF No. 120-3 at 10.

Lottery filed the final proxy statement and prospectus for the de-SPAC transaction

with the SEC on October 18, 2021.  Class Compl. ¶ 77; ECF No. 78 ("Ali Class Decl.") ¶ 3;

ECF No. 78-1 (the "Proxy").  In the Proxy – and, indeed, "[t]hroughout the Class Period" –

Lottery "represented that it recognized revenue in accordance with generally accepted

accounting principles ('GAAP') and that its financial and other public statements adequately

---

[2] A Form 8-K is a filing with the SEC announcing "material corporate events that should be
known by the shareholders."  *Wyche v. Advanced Drainage Sys., Inc.*, No. 15-cv-05955
(KPF), 2017 WL 971805, at *1 n.1 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 710 F. App'x 471 (2d
Cir. 2017) (summary order).  A Form 8-K/A is used to amend a previously filed Form 8-K.
*See Exchange Act Form 8-K*, SEC (updated Dec. 14, 2023), https://www.sec.gov/divisions/
corpfin/guidance/8-kinterp.htm [https://perma.cc/8PSM-AL49].  A Form 10-Q is a quarterly
report that "provides a continuing view of the company's financial position during the year
and generally includes unaudited financial statements."  *Wyche*, 2017 WL 971805, at *1 n.1.
"A Form 10-K is an annual report that is intended to detail the financial condition and
performance of a particular company for an annual period in a comprehensive manner."  *Id.*

represented its financial condition."  Class Compl. ¶ 64; *see, e.g.*, Proxy at 186 ("Our financial

statements were prepared in conformity with U.S. GAAP.").[3]

The Proxy projected that Lottery would generate more than $70 million in revenue,

more than $3 million in earnings before interest, taxes, depreciation, and amortization

("EBITDA"), a 32 percent gross-profit margin, and a 5 percent EBITDA margin for the 2021

fiscal year.  Class Compl. ¶ 80.  Elsewhere in the document, however, the Proxy warned:

> As a private company, we have not been required to document
> and test our internal controls over financial reporting nor has
> our management been required to certify the effectiveness of
> our internal controls and our auditors have not been required to
> opine on the effectiveness of our internal control over financial
> reporting.  Failure to maintain adequate financial, information
> technology and management processes and controls has resulted
> in and could result in material weaknesses which could lead to
> errors in our financial reporting, which could adversely affect
> our business.

Proxy at 42.

The Proxy also noted that "[i]n the course of preparing the financial statements that are

included in this proxy statement/prospectus, [Lottery] ha[d] identified a material weakness in

[its] internal control over financial reporting as of December 31, 2020."  *Id.* at 74.  This

material weakness "relate[d] to a deficiency in the design and operation of the financial

statement close and reporting controls, including maintaining sufficient written policies and

---

[3] "The Accounting Standards Codification ('ASC') is the source of authoritative generally
accepted accounting principles, commonly referred to as 'GAAP,' published by the Financial
Accounting Standards Board ('FASB') to be applied by nongovernmental entities such as
[Lottery]."  *DeCarlo*, 80 F.4th at 172 n.9 (further quotation marks and citation omitted); *see*
Class Compl. ¶ 136 & n.10.  "The SEC treats the FASB's standards as authoritative."  *Ganino
v. Citizens Utils. Co.*, 228 F.3d 154, 159 n.4 (2d Cir. 2000); *accord Lucescu v. Zafirovski*, No.
09-cv-04691 (DLC), 2018 WL 1773134, at *7 (S.D.N.Y. Apr. 11, 2018); *see also* 17 C.F.R.
§ 210.4-01(a)(1) ("Financial statements filed with the Commission which are not prepared in
accordance with generally accepted accounting principles will be presumed to be misleading
or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise
provided.").

procedures and the need to use appropriate technical expertise when accounting for complex or non-routine transactions." *Id.*  The Proxy attributed the material weakness to the fact that, up to that point, Lottery was "a private company with limited resources" that "did not have the necessary business processes and related internal controls, or the appropriate resources or level of experience and technical expertise, that would be required to oversee financial reporting processes or to address the accounting and financial reporting requirements." *Id.* The Proxy assured investors that Lottery's "management [wa]s in the process of developing a remediation plan." *Id.*  But it warned that "[t]he material weakness remains unremediated as of June 30, 2021," and that it "could result in misstatements to [Lottery's] financial statements that would be material and would not be prevented or detected on a timely basis." *Id.*

The Proxy further stated that "[d]uring the course of documenting and testing [its] internal control procedures . . . , [Lottery] may identify other weaknesses and deficiencies in [its] internal control over financial reporting." *Id.* at 75.  The Proxy noted that if Lottery "fail[s] to maintain the adequacy of [its] internal control over financial reporting," it "may" suffer various negative consequences.  *Id.*

The Proxy also addressed the possibility that a jurisdiction could "enact, amend, or reinterpret laws and regulations governing [Lottery's] operations" in ways that would impair its "existing operations or planned growth," with potential ramifications for its "operations, cash flow, or financial condition."  Class Compl. ¶ 78 (emphasis omitted).  The Proxy added that Lottery's "business model and the conduct of our operations may have to vary in each U.S. jurisdiction where [it] do[es] business to address the unique features of applicable law to ensure [it] remain[s] in compliance with that jurisdiction's laws.  [Lottery's] failure to adequately do so may have an adverse impact on [its] business, financial condition, and results of operations." *Id.* (emphasis omitted).

On October 21, 2021, Lottery issued a press release announcing its preliminary revenue results for the third quarter of 2021.  *Id.* ¶ 83; ECF No. 120-4 (the "10/21/21 Press Release").  Per the 10/21/21 Press Release, Lottery's third-quarter revenue was "expected to be between $22.0 million and $24.0 million."  Class Compl. ¶ 83.  "The strong growth [compared to the previous quarter] was driven by increased sales in the Company's [business-to-business] segment."  *Id.*  The 10/21/21 Press Release also stated that, "[o]n a preliminary basis, revenue through the first nine months of 2021 is expected to be between $36.8 million and $38.8 million on a reported basis and $38.7 million and $40.7 million on a pro forma basis," reflecting an increase of more than 270 percent compared to "the full twelve months of 2020."  *Id.*

The 10/21/21 Press Release included a "notice regarding forward-looking statements" providing that "this release contains statements that constitute 'forward-looking statements,'" and that "all statements, other than statements of present or historical fact included in this press release, regarding preliminary third quarter revenue results [and other topics] . . . are forward-looking statements."  10/21/21 Press Release at 4 (capitalization omitted).  The notice "caution[ed] . . . that the forward-looking statements contained in this press release are subject to [various] factors," including Lottery's "ability to maintain effective internal controls over financial reporting, including the remediation of identified material weaknesses in internal control over financial reporting relating to segregation of duties with respect to, and access controls to, its financial record keeping system, and [Lottery's] accounting staffing levels."  *Id.* at 5.  "Should one or more of the risks or uncertainties described in this press release materialize," the notice added, "actual results and plans could differ materially from those expressed in any forward-looking statements."  *Id.* at 6.

To ensure consummation of the merger, Trident's board and shareholders approved measures extending the time to complete the deal until as late as December 1, 2021. Class Compl. ¶ 60 n.6. On October 29, 2021, Trident and Lottery announced that they had completed the merger, with the combined entity retaining Lottery's name. *Id.* ¶ 61. Lottery's common shares and warrants began trading on the NASDAQ on November 1, 2021. *Id.*

DiMatteo was a co-founder of Lottery who served as an officer and director prior to the merger; after the merger, he was Lottery's CEO and chairperson. *Id.* ¶ 27. Clemenson, another co-founder of Lottery, was the company's chief commercial officer at the time of the merger; he retained that title until March 2022, at which time he became Lottery's chief revenue officer. *Id.* ¶ 29. Dickinson was Lottery's president and chief operating officer ("COO") prior to the merger; after the merger, he served as Lottery's president, treasurer, and acting CFO. *Id.* ¶ 28. Following the merger, Lever served as Lottery's COO and chief legal officer. *Id.* ¶ 30. Komissarov was CEO and a director of Trident prior to the merger. *Id.* ¶ 34. He also served as Trident's CFO until November 20, 2020. *Id.*

### D. Post-Merger Events

#### 1. The 11/15/21 Form 8-K/A

On November 15, 2021, Lottery filed financial statements as an exhibit to a Form 8-K/A submission. *Id.* ¶¶ 65, 89; *see* ECF No. 120-12 (the "11/15/21 Form 8-K/A"). In that filing, Lottery reported that for the three months ending on September 30, 2021, revenue increased from $1.6 million to $32.25 million – that is, by $30.65 million, or over 1,900 percent – compared to the same three-month period in 2020. Class Compl. ¶ 65; 11/15/21 Form 8-K/A at 13. Lottery stated that "[t]he increase in revenue was driven by a $30 million sale of affiliate marketing credits during the three months ended September 30, 2021." 11/15/21 Form 8-K/A at 13; *see also id.* at 15 (attributing increase in revenue over nine-month

period ending September 30, 2021, to "several factors including a $30 million sale of affiliate marketing credits during the three months ended September 30, 2021"). In other words, "nearly all of the revenue for the quarter was derived from [the sale of] marketing credits to an affiliate." Class Compl. ¶ 65. Lottery "termed these credits 'LotteryLink Credits.'" *Id.* ¶ 5 n.1. "LotteryLink Credits could be purchased by [Lottery's] third-party marketers and redeemed as advertising credits to support flexible promotional packages (such as prepaid advertising, prepaid lottery games, among other things) via [Lottery's] LotteryLink affiliate marketing program." *Id.*

Lottery made similar representations about revenue in a Form 8-K also filed on November 15, 2021. *Id.* ¶ 85 ("Third quarter 2021 revenue was $32.2 million, an increase of $30.6 million from the third quarter of 2020. The growth was driven by the global affiliate marketing program. . . . The Company expects to meet or exceed its previous guidance of $71 million for full year 2021 revenue." (ellipsis in original)); *see* ECF No. 120-11 (the "11/15/21 Form 8-K").

### 2. The Q3 2021 Report

That same day, on November 15, 2021, Lottery filed its quarterly report for the third fiscal quarter of 2021 on a Form 10-Q. Class Compl. ¶ 87; Lottery.com Inc., Quarterly Report (Form 10-Q) (Nov. 15, 2021) (the "Q3 2021 Report"), https://www.sec.gov/Archives/edgar/data/1673481/000121390021059462/f10q0921_lotterycominc.htm [https://perma.cc/3B62-U36F]. The Q3 2021 Report "referenced the fact that [Lottery] had identified a material weakness relating to a technical accounting issue identified by the SEC in SPAC-related guidance." Class Compl. ¶ 87. "Specifically, Lottery determined that its disclosure controls and procedures were not effective as of September 30, 2021, and thus had restated its financial statements . . . , in order to comply with a new SEC Staff Statement regarding the

classification of warrants." *Id.* "Other than" that, the Q3 2021 Report continued, "there were no changes in [Lottery's] internal control over financial reporting . . . during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, [Lottery's] internal control over financial reporting." *Id.* (emphasis omitted). Lottery also announced its "plan to enhance [its] processes to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to [its] financial statements." *Id.* (emphasis omitted).

Several exhibits were "filed as part of, or incorporated by reference into," the Q3 2021 Report. Q3 2021 Report at 25. Among the exhibits were certifications by DiMatteo and Dickinson, as required by the Sarbanes-Oxley Act of 2002 ("SOX") and its implementing regulations. Class Compl. ¶ 99; Q3 2021 Report, Ex. 31.1, https://www.sec.gov/Archives/edgar/data/1673481/000121390021059462/f10q0921ex31-1_lotterycom.htm [https://perma.cc/DR9Z-FNBL] (DiMatteo's SOX certification); Q3 2021 Report, Ex. 31.2, https://www.sec.gov/Archives/edgar/data/1673481/000121390021059462/f10q0921ex31-2_lotterycom.htm [https://perma.cc/5E7H-5FED] (Dickinson's SOX certification); *see* 15 U.S.C. § 7241; 17 C.F.R. § 240.13a-14.

DiMatteo and Dickinson both certified that they had reviewed the Q3 2021 Report and that, "[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Class Compl. ¶ 99. They also certified that, "[b]ased on [their] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." *Id.* DiMatteo

14

and Dickinson further certified that they "ha[d] disclosed, based on [their] most recent

evaluation of internal control over financial reporting, to [Lottery's] auditors and the audit

committee of [Lottery's] board of directors (or persons performing the equivalent functions)":

(1) "[a]ll significant deficiencies and material weaknesses in the design or operation of

internal control over financial reporting which are reasonably likely to adversely affect the

registrant's ability to record, process, summarize and report financial information"; and

(2) "[a]ny fraud, whether or not material, that involves management or other employees who

have a significant role in the registrant's internal control over financial reporting."  *Id.*

DiMatteo and Dickinson made "substantially similar certifications" in "[e]ach of Lottery's

financial statements issued during the Class Period after the [de-SPAC transaction]."  *Id.*

### 3.   The 3/31/22 Form 8-K and the 2021 Annual Report

On March 31, 2022, Lottery "issued a press release, also filed as an attachment to a

Form 8-K filed with the SEC on that date."  *Id.* ¶ 91; *see* ECF No. 120-13 (the "3/31/22 Form

8-K").  In the 3/31/22 Form 8-K, Lottery touted "strong" financial results for the fourth

quarter of 2021 as well as for the full year of 2021.  Class Compl. ¶ 91.  Specifically, Lottery

reported $21.5 million in revenue for the fourth quarter of 2021 (an increase of $18.2 million,

or about 550 percent, compared to the fourth quarter of 2020) and $62.6 million in cash for

the fourth quarter of 2021 (an increase of $58.8 million, or over 1,500 percent, compared to

the fourth quarter of 2020).  *Id.*  Lottery also reported $68.5 million in revenue for 2021 (an

increase of $61 million, or over 800 percent, compared to 2020).  *Id.*

On April 1, 2022, Lottery filed its annual report for 2021 on a Form 10-K.  *Id.* ¶ 62;

*see* ECF No. 78-2 (the "2021 Annual Report").  The 2021 Annual Report "reiterated the

financial results released the prior day" in the 3/31/22 Form 8-K.  Class Compl. ¶ 91.  The

2021 Annual Report added that the $68.5 million in revenue was "driven by the sale of $47.1

million in LotteryLink Credits for prepaid advertising, prepaid lottery games, marketing materials and development services in the third and fourth quarters of 2021." *Id.* ¶ 66. Lottery also reported that its accounts receivable as of December 31, 2021, was $21,696,653. *Id.*[4] "Since the accounts receivable figure was lower than revenue for the same period (which itself was 'driven' by the sale of marketing credits), [Lottery] suggested that it had collected more than half the revenue from marketing credits from the customer." *Id.*

The 2021 Annual Report "also stated that it had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020, but it described this material weakness as one largely related to personnel and staffing – specifically, it related to 'the design and operation of the procedures relating to the closing of financial statements.'" *Id.* ¶ 93. "Defendants reassured investors that [Lottery] had 'commenced measures to remediate' [this] material weakness" and that, "other than the deficiencies identified, 'there was no change in [Lottery's] internal control over financial reporting.'" *Id.*

In the 2021 Annual Report, Lottery further stated that it "rel[ies] on technology services to closely monitor and track amendments, additions, and impositions of regulations in all jurisdictions regarding the authorization of lottery and work to maintain effective relationships with applicable legislative and regulatory authorities in each jurisdiction in which we operate or anticipate operating in." *Id.* ¶ 62. Lottery added that it "use[s] this information . . . to create strong working relationships with the regulatory authorities in the jurisdictions in which [it] do[es] business, to ensure transparent regulatory compliance and promote each jurisdiction's objective for economic benefit through the sale of lottery games."

---

[4] An "account receivable" is "[a]n account reflecting a balance owed by a debtor; a debt owed by a customer to an enterprise for goods or services." *Account*, Black's Law Dictionary (11th ed. 2019); *accord Medi-Cen Corp. of Md. v. Birschbach*, 720 A.2d 966, 969 (Md. Ct. Spec. App. 1998) (collecting similar definitions).

*Id.*  Lottery also stated: "While we believe that we are in compliance with all material domestic and international laws and regulatory requirements applicable to our business, we cannot ensure that our activities or the activities of those third parties with whom we do business will not become the subject of regulatory or law enforcement proceedings."  2021 Annual Report at 43; *see* Class Compl. ¶ 62.

### 4.  The 5/16/22 Form 8-K and the Q1 2022 Report

On May 16, 2022, Lottery "issued a press release, filed with the SEC on Form 8-K." Class Compl. ¶ 95; *see* ECF No. 120-14 (the "5/16/22 Form 8-K").  Lottery reported $21.2 million in revenue during the first quarter of 2022 (an increase of $15.7 million, or about 285 percent, compared to the first quarter of 2021) and $50.8 million in cash during the first quarter of 2022 (an increase of $32.5 million, or about 175 percent, compared to the first quarter of 2021).  Class Compl. ¶ 95.

Also on May 16, 2022, Lottery filed its quarterly report for the first quarter of 2022 on a Form 10-Q.  *Id.* ¶¶ 67, 95; Lottery.com Inc., Quarterly Report (Form 10-Q) (May 16, 2022) (the "Q1 2022 Report"), https://www.sec.gov/Archives/edgar/data/1673481/ 000121390022027217/f10q0322_lotterycom.htm [https://perma.cc/PT85-JQPD].  The Q1 2022 Report "reiterated the financial results disclosed in its press release."  Class Compl. ¶ 95. Lottery stated that "[t]he increase in revenue was driven by the sale of $18 million in LotteryLink Credits for prepaid promotional rewards, marketing materials and development services."  Q1 2022 Report at 10; *see* Class Compl. ¶ 67.  An anonymous "Customer A" accounted for 87.7 percent of Lottery's revenue and 99.6 percent of Lottery's accounts receivable for the quarter.  Class Compl. ¶ 70.

The Q1 2022 Report further stated that Lottery had "evaluated the effectiveness of [its] disclosure controls and procedures."  *Id.* ¶ 97.  Based on this evaluation, Lottery's CEO and

CFO – that is, DiMatteo and Dickinson – "ha[d] concluded that, as of the end of the period covered by this Quarterly Report, [Lottery's] disclosure controls and procedures were not effective due to the material weakness in [its] internal control over financial reporting with respect to [its] financial statement close and reporting process." *Id.* (emphasis omitted). But Lottery reassured investors that "[n]otwithstanding such material weakness in [its] internal control over financial reporting, [Lottery's] management concluded that [its] condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, [its] financial position, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP." *Id.* (emphasis omitted).

### 5.  The July 2022 Disclosures

In a Form 8-K filed with the SEC on July 6, 2022 (but signed the day before), "Lottery disclosed that an internal investigation had revealed 'issues pertaining to the Company's internal accounting controls' and 'instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment.'" *Id.* ¶ 76 (emphasis omitted); *see id.* ¶¶ 63, 68; ECF No. 117-5 (the "7/6/22 Form 8-K"). Lottery also revealed that, on June 30, 2022, its board had fired Dickinson from his positions as Lottery's CFO, president, and treasurer, effective July 1, 2022. Class Compl. ¶ 68; 7/6/22 Form 8-K at 3.

On July 15, 2022, Lottery announced in a Form 8-K that Clemenson, its chief revenue officer, had resigned on July 11, 2022, effective immediately. Class Compl. ¶ 69; *see* ECF No. 113-2 (the "7/15/22 Form 8-K") at 3. Lottery also "reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls," it "preliminarily conclude[d] that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly

recognized revenue in the same amount."  Class Compl. ¶ 69 (brackets in original; emphasis omitted).

On July 22, 2022, Lottery filed a Form 8-K disclosing that its independent auditor had "determined 'that the audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon,' and 'that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.'"  *Id.* ¶ 71 (emphasis omitted); *see* Lottery.com Inc., Current Report (Form 8-K) (July 22, 2022) (the "7/22/22 Form 8-K"), https://www.sec.gov/Archives/edgar/data/1673481/000121390022041017/ea163230-8k_lottery.htm [https://perma.cc/6Y68-GHQG].  Lottery also disclosed that DiMatteo, Lottery's CEO, was resigning, effective immediately.  Class Compl. ¶ 71.  Subsequently, on October 6, 2022, Lottery disclosed that its independent auditor had resigned, effective immediately.  *Id.* ¶ 115.

## II. Procedural History

On August 19, 2022, Preston Million filed a putative class action against Lottery, DiMatteo, Clemenson, and Dickinson, asserting one count under Section 10(b) and Rule 10b-5 and a second count under Section 20(a).  ECF No. 1.  On September 22, 2022, the case was reassigned to the undersigned.  ECF No. 14.

On October 18, 2022, Preston Million, Tim Weisheipl, Stephan de Bernede, Connor Hitt, and Solutions Tabarnapp Inc. (collectively, the "Securities Group") moved to serve as lead plaintiffs.  ECF No. 26.  That same day, RTD Bros LLC, Todd Benn, Tom Benn, and Tomasz Rzedzian (collectively, the "Investor Group") also moved to serve as lead plaintiffs.  ECF No. 27.  On November 18, 2022, the Court granted the Investor Group's motion and

denied the Securities Group's motion.  *See Million v. Lottery.com Inc.*, No. 22-cv-07111 (JLR), 2022 WL 17076749, at *4 (S.D.N.Y. Nov. 18, 2022).

Hoffman filed his complaint on December 21, 2022.  Hoffman Compl.  The Class Plaintiffs filed the Amended Class-Action Complaint on January 31, 2023.  Class Compl.  On March 2, 2023, Lottery, Clemenson, and Dickinson jointly moved to consolidate the Class Plaintiffs' action with Hoffman's action.  Hoffman ECF No. 24.  Hoffman opposed the consolidation motion.  Hoffman ECF No. 26; *see also* Hoffman ECF Nos. 27-28 (additional filings).  On March 10, 2023, the Court granted the motion to consolidate, explaining that "both actions involve substantially identical questions of law and fact."  ECF No. 71 at 5.

On April 3, 2023, four Defendants – Lottery, DiMatteo, Clemenson, and Dickinson – moved to dismiss the Amended Class-Action Complaint.  Lottery Class Br.; DiMatteo Class Br.; C&D Class Br.; *see also* Ali Class Decl.  Also on April 3, 2023, the same Defendants filed motions to dismiss the Hoffman Complaint.  Lottery Hoffman Br.; DiMatteo Hoffman Br.; C&D Hoffman Br.; *see also* ECF No. 84 (attorney declaration).  These motions are fully briefed.  Lottery Class Opp.; DCD Opp.; Hoffman Opp.; Lottery Class Reply; Lottery Hoffman Reply; C&D Class Reply; C&D Hoffman Reply; DiMatteo Reply.

On September 15, 2023, Lever moved to dismiss the Amended Class-Action Complaint.  Lever Br.; *see also* ECF No. 113 (attorney declaration).  On September 20, 2023, Komissarov moved to dismiss the Amended Class-Action Complaint.  Komissarov Br.; *see also* ECF No. 117 (attorney declaration).  These motions are fully briefed.  Lever Opp.; Komissarov Opp.; Komissarov Reply; Lever Reply; *see also* ECF No. 120 (attorney declaration).

Several of the parties requested oral argument via notations on their briefs. The Court held oral argument on January 29, 2024. ECF No. 124; Jan. 29, 2024 Oral Arg. Tr. ("Tr.").[5]

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court accepts a complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *DeCarlo*, 80 F.4th at 168. Still, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (on motion to dismiss securities-fraud complaint, district court properly took judicial notice of offer to purchase and

---

[5] In his brief, Hoffman fully adopted all of the Class Plaintiffs' arguments without qualification or addition. *See* Hoffman Opp. at 3 ("Plaintiff Hoffman adopts all arguments advanced by class counsel in opposition to Defendants' motions. The filing by Hoffman of memoranda repeating those same arguments is unnecessary and counterproductive to the purpose of consolidation."). During oral argument, Hoffman conceded that if the Amended Class-Action Complaint fails to state a claim, then the Hoffman Complaint does as well. *See* Tr. at 58:25-59:3. The Court notes that Hoffman "is a lawyer and, therefore, he cannot claim the special consideration which the courts customarily grant to *pro se* parties." *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981) (emphasis added).

proxy statement).  A court may also consider a document, even if not incorporated into the complaint or subject to judicial notice, if "the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (further quotation marks and citation omitted), so long as there is no dispute about the document's "authenticity or accuracy," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

## DISCUSSION

### I.  Service of Process

Preliminarily, the Court addresses service of process.  "[A]bsent consent, a basis for service of a summons on the defendant is prerequisite to the exercise of personal jurisdiction." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 409 (2017); *accord Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (personal jurisdiction requires that "the plaintiff's service of process upon the defendant [was] procedurally proper" (citation omitted)).  Service of process in federal court generally is governed by Federal Rule of Civil Procedure 4 ("Rule 4").  *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *Buon v. Spindler*, 65 F.4th 64, 74 (2d Cir. 2023).  Rule 4(m) provides that "[i]f a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."  Fed. R. Civ. P. 4(m).

Five Defendants were not timely served: Rosenberg, Gallagher, Butkevych, Ponomarev, and Komissarov.  Of those five, the first four have still not yet been served.  At

oral argument, the Class Plaintiffs confirmed that they were no longer proceeding against those individuals and agreed that they should be dismissed from the case.  Tr. at 56:16-22.

Komissarov is another matter.  As noted, the Class Plaintiffs filed the Amended Class-Action Complaint on January 31, 2023.  Class Compl.  Komissarov was served on July 4, 2023.  ECF No. 103.  In other words, Komissarov was "not served within 90 days after the complaint [wa]s filed."  Fed. R. Civ. P. 4(m).  Komissarov argues that this untimely service of process provides a sufficient basis to dismiss the claims against him, and that the Court should do so.  *See* Komissarov Br. at 21-22.  The Class Plaintiffs do not deny that service was untimely or claim to have good cause for failing to timely serve Komissarov.  *See* Komissarov Opp. at 22-24.  Nonetheless, they contend that the Court should excuse their delay.  *See id.*

"[I]t is well settled that district courts have discretion to grant extensions under Rule 4(m) even in the absence of good cause."  *Buon*, 65 F.4th at 75 (original brackets, quotation marks, and citation omitted).  "In determining whether a discretionary extension is appropriate in the absence of good cause, a court considers the following four factors: (1) whether any applicable statutes of limitations would bar the action once refiled; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether [the] defendant attempted to conceal the defect in service; and (4) whether [the] defendant would be prejudiced by extending plaintiff's time for service."  *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010).

On the present facts, the decisive factor is the fourth: lack of prejudice.  Notably, Komissarov has offered no good reason to believe that he "would be prejudiced by extending [the Class Plaintiffs'] time for service."  *Id.*  Given this lack of prejudice and the Second Circuit's "strong preference for resolving disputes on the merits," *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (citation omitted), the Court excuses the

Class Plaintiffs' delay in serving Komissarov and thus declines to dismiss the Class Plaintiffs' claims against Komissarov for untimely service.

The Court now proceeds to the merits.

## II. Section 10(b) Claims

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citation omitted).

Section 10(b) claims must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "To do so, a plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Synchrony*, 988 F.3d at 167 (quotation marks and citation omitted).

For its part, the PSLRA "imposes procedural and substantive limitations upon the scope of the private right of action available under § 10(b) and Rule 10b-5." *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 383 (2014). The PSLRA requires that with respect to falsity – that is, the "material misrepresentation or omission" element of a securities-fraud

claim – "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," that is, scienter. *Id.* § 78u-4(b)(2).

Defendants challenge two elements of Plaintiffs' Section 10(b) and Rule 10b-5 claims: falsity and scienter. The Court addresses each in turn.

### A. Falsity

#### 1. Overview of Falsity

The first element of a securities-fraud claim is "a material misrepresentation or omission by the defendant." *Halliburton*, 573 U.S. at 267 (citation omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *DeCarlo*, 80 F.4th at 182 (ellipsis and citation omitted). Put otherwise, there must be a "substantial likelihood" that the statement or omission "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation marks and citation omitted).

"The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) ("*APERS*") (citation omitted). Ultimately, "whether a statement is 'misleading' depends on the perspective of the reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,

575 U.S. 175, 186 (2015).  "The inquiry (like the one into materiality) is objective," *id.* at 187, and it considers not only a statement's "literal truth," but also the "context and manner of presentation," *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation omitted).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Matrixx Initiatives*, 563 U.S. at 45 (citation omitted).  In other words, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (citation omitted).  "This duty may arise when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or a statement is made that would be inaccurate, incomplete, or misleading without further context."  *In re Synchrony*, 988 F.3d at 167 (brackets, quotation marks, and citation omitted).

The distinction between statements of fact and statements of opinion presents another wrinkle.  "In general, a fact is 'a thing done or existing or an actual happening,' while an opinion is 'a belief, a view, or a sentiment which the mind forms of persons or things.'"  *DeCarlo*, 80 F.4th at 169 (quoting *Omnicare*, 575 U.S. at 183).  "A statement of fact 'expresses certainty about a thing,' while a statement of opinion does not."  *Id.* (quoting *Omnicare*, 575 U.S. at 183).  Statements of opinion often, but not always, "include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact."  *Id.*; *see In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) ("[L]anguage like 'we believe' or 'we think' is *sufficient* – not *necessary* – to render a statement one of opinion rather than fact.").  "A reasonable person understands, and takes into

account, the difference . . . between a statement of fact and one of opinion." *Omnicare*, 575 U.S. at 187.

Under *Omnicare*, statements of opinion are actionable misrepresentations or omissions in at least three situations: (1) when "the speaker did not hold the belief she professed"; (2) when "the statement of opinion contains embedded statements of fact that are untrue"; and (3) when "the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." *DeCarlo*, 80 F.4th at 171 (citation omitted); *see also id.* at 170 ("In the context of a securities transaction, a reasonable investor expects that opinion statements rest on some meaningful inquiry, fairly align with the information in the issuer's possession at the time, and do not reflect baseless, off-the-cuff judgments." (ellipsis, brackets, quotation marks, and citation omitted)). Although *Omnicare* involved Section 11 of the Securities Act of 1933, that provision "shares the relevant text concerning false and misleading statements with Rule 10b-5." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). Consequently, the Second Circuit has "applied the holding in *Omnicare* to claims brought under Section 10(b) of the Exchange Act." *DeCarlo*, 80 F.4th at 178 n.16.

### 2. Particularity and Puzzle Pleading

At the outset, Defendants assert that "Plaintiffs have not sufficiently identified the alleged false statements and have not explained with particularity why each statement is false." Lottery Class Br. at 7. The Court disagrees.

It is true that so-called "puzzle pleading" – that is, "reproducing blocks of text from allegedly deceptive . . . statements without specifying which portions are misleading," *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004), and offering only "pro forma reasons why the statements quoted are allegedly false," *Born v. Quad/Graphics, Inc.*, 521 F.

Supp. 3d 469, 477 (S.D.N.Y. 2021) (citation omitted) – is insufficiently particular under the

pleading requirements of the PSLRA, *see In re AstraZeneca plc Sec. Litig.*, No. 21-cv-00722

(JPO), 2022 WL 4133258, at *6 (S.D.N.Y. Sept. 12, 2022), *aff'd sub nom. Nandkumar v.

AstraZeneca PLC*, No. 22-2704, 2023 WL 3477164 (2d Cir. May 16, 2023) (summary

order).  A court should not have to "search the long quotations in the complaint for particular

false statements, and then determine on its own initiative how and why the statements were

false and how other facts might show a strong inference of scienter."  *Boca Raton Firefighters

& Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (summary order); *see,

e.g.*, *Lanigan Grp., Inc. v. Li-Cycle Holdings Corp.*, No. 22-cv-02222 (HG), 2023 WL

6541884, at *4 (E.D.N.Y. Oct. 6, 2023) (complaint which "never identifie[d] with any

specificity what portions of th[e] [challenged] documents or excerpts it t[ook] issue with"

failed to plead with requisite particularity); *Plumbers & Steamfitters Loc. 773 Pension Fund v.

Danske Bank A/S*, No. 19-cv-00235 (VEC), 2020 WL 4937461, at *3 (S.D.N.Y. Aug. 24,

2020) (complaint which "use[d] two terse paragraphs generically to allege why 36 pages of

quotations spanning 83 paragraphs contain[ed] false or misleading statements" failed to plead

with requisite particularity), *aff'd*, 11 F.4th 90 (2d Cir. 2021) ("*Plumbers II*").

        The Court finds that neither the Amended Class-Action Complaint nor the Hoffman

Complaint constitutes "puzzle pleading" warranting dismissal.  On the contrary, each

complaint "identifies statements and omissions, describes relevant predicate events, and

alleges how those events make the statements and omissions false or misleading.  In doing so,

[each complaint] describes what portion of each quotation constitutes a false representation

and avoids placing the burden on the Court to sort out the alleged misrepresentations and then

match them with the corresponding adverse facts."  *Constr. Laborers Pension Tr. for S. Cal.

v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (quotation marks and citation

omitted); *see, e.g.*, *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 368 (E.D.N.Y. 2022) (declining to find impermissible puzzle pleading where the plaintiff "identified specific statements (and added emphasis where challenged assertions [we]re embedded in longer passages) and followed each by a list of reasons why those statements [we]re allegedly misleading"); *In re Vale S.A. Sec. Litig.*, No. 19-cv-00526 (RJD), 2020 WL 2610979, at *18-19 (E.D.N.Y. May 20, 2020) (similar); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (similar); *see also In re AppHarvest Sec. Litig.*, --- F. Supp. 3d ----, 2023 WL 4866233, at *19 n.5 (S.D.N.Y. July 31, 2023) ("Although it is true that Plaintiff challenges numerous statements made by Defendants, the breadth of the Operative Complaint alone does not create the type of puzzle-like complaint that warrants dismissal." (brackets, quotation marks, and citation omitted)).

The statements that Plaintiffs allege are false or misleading may be generally divided into three groups: (1) pre-merger statements, including the Proxy; (2) post-merger statements regarding Lottery's finances; (3) and post-merger statements regarding Lottery's regulatory compliance and controls.  The Court addresses them in turn.

### 3. Pre-Merger Statements

Statements made prior to the consummation of the merger included:

- The statement in the 11/19/20 Form 8-K that Lottery "has been a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age," Class Compl. ¶ 74 (emphasis omitted);

- The statement in the 11/19/20 Form 8-K that Lottery "works closely with state regulators to advance the lottery industry, providing increased revenues and better regulatory capabilities, while capturing untapped market share, including millennial players," *id.* (emphasis omitted);

- The statements "regarding Lottery's work with state regulators," made in the State-Regulator Press Releases, that were "the same or substantially similar" to the statements in the 11/19/20 Form 8-K, *id.* ¶ 75;

- The Proxy's financial projections for the 2021 fiscal year, *id.* ¶ 80;

- The Proxy's discussion of regulatory compliance and potential compliance risks, *id.* ¶ 78;

- The absence of a disclosure under Item 303 of Regulation S-K ("Item 303") in the Proxy, *id.* ¶ 82 (referring to 17 C.F.R. § 229.303); and

- The statements in the 10/21/21 Press Release regarding Lottery's revenue in the third quarter of 2021, *id.* ¶ 83.

Plaintiffs contend that the statements regarding Lottery's work with state regulators in the 11/19/20 Form 8-K, the State-Regulator Press Releases, and the Proxy constituted material misstatements or omissions because, "in fact, [Lottery] was not complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment." *Id.* ¶ 76.  Plaintiffs assert that, by filing the 7/6/22 Form 8-K, Lottery admitted that these statements were material misstatements or omissions.  *Id.* ¶¶ 76, 79; *see id.* ¶ 146 (quoting the 7/6/22 Form 8-K: "The Audit Committee of the Board of the Directors . . . retained outside counsel to conduct an independent investigation that has revealed instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment." (emphasis omitted)).  As for the Proxy's financial projections for the 2021 fiscal year and the 10/21/21 Press Release's statements regarding Lottery's revenue in the third quarter of 2021, Plaintiffs argue that they were material misstatements or omissions "because [Lottery] failed to disclose: (i) that [Lottery] lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue; (ii) that [Lottery] was improperly recognizing revenue; and (iii) that [Lottery's] financial results as to cash and revenue were materially overstated."  *Id.* ¶¶ 81, 84.  Plaintiffs further contend that the Proxy was "materially false and misleading because it negligently failed to disclose known adverse trends and/or uncertainties that Defendants were required to disclose under Item 303,

including the fact that [Lottery] was not complying with state and federal laws and overstating its cash and revenue which would have a material negative impact on [Lottery's] sales, revenues, and/or results of operations going forward." *Id.* ¶ 82.

### i.   The Pre-Merger Regulatory-Compliance Statements

The pre-merger statements regarding regulatory compliance – contained in the 11/19/20 Form 8-K, the State-Regulator Press Releases, and the Proxy – were non-actionable puffery.  "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  "[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *Id.* at 183 (quotation marks and citation omitted).  Such statements "cannot have misled a reasonable investor," and therefore they "cannot constitute actionable statements under the securities laws." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996); *accord Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 101 (2d Cir. 2023) ("[T]he duty to disclose more [information] is triggered only when that which *is* disclosed is sufficiently specific to evoke a reasonable investor's reliance.").

As presently pleaded, the statements in the 11/19/20 Form 8-K, the State-Regulator Press Releases, and the Proxy regarding Lottery's work with state regulators were "too general to cause a reasonable investor to rely upon them." *City of Pontiac*, 752 F.3d at 183 (citation omitted).  "Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level

of materiality required to form the basis for assessing a potential investment." *Id.* In other words, these statements "lack[ed] the sort of definite positive projections that might require later correction." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (citation omitted).

The challenged pre-merger regulatory-compliance statements are akin to other statements about regulatory compliance and integrity that courts have deemed non-actionable puffery. *See, e.g.*, *Plumbers II*, 11 F.4th at 103 (bank asserted that it "strives to conduct our business in accordance with internationally recogni[z]ed principles in the area of anti-corruption"; court held that "no investor would take such statements seriously in assessing a potential investment because almost every bank makes these statements" (original brackets, ellipsis, quotation marks, and citation omitted)); *Singh*, 918 F.3d at 60, 63 (defendant "issued several public statements concerning [its] commitment to regulatory compliance," including a Form 10-K claiming that the defendant had "established policies and procedures to comply with applicable requirements"; court held that "a reasonable investor would not rely on the . . . Form 10-K statements as representations of satisfactory compliance," and explained that "when [courts] have found that descriptions of compliance efforts amounted to actionable assurances of actual compliance, the descriptions of such efforts were far more detailed"); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197, 205-06 (2d Cir. 2009) (defendant's "numerous misrepresentations regarding its 'highly disciplined' risk management and its standard-setting reputation for integrity" were "no more than 'puffery'" and such "statements did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices"); *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, --- F. Supp. 3d ----, 2023 WL 3628244, at *10 (E.D.N.Y. May 24, 2023) (collecting cases where "numerous district courts in this Circuit have found general

policy- and compliance-related statements . . . to be unactionable"); *In re EZCorp., Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016) (statement in Form 8-K, which "only generally mentioned" the defendant's "efforts on the regulatory front that have been very successful, eschewing any claims of specific actions taken," was puffery because a "reasonable investor could not rely on such general, even equivocal, statements" (bracket, ellipsis, and citation omitted)).

The cases cited by Plaintiffs are distinguishable. *See* Lottery Class Opp. at 12-13. In *In re Signet Jewelers Ltd. Securities Litigation*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019), the defendant company – following "a credible accusation" that it "suffered from rampant sexual harassment" – "sought to reassure the investing public that [it] did not, in fact, have a toxic workplace." The defendant "did so by including representations in their periodic SEC filings that the company expressly 'denie[d] the allegations,'" "by pointing to [its] corporate policies (which were incorporated in [the defendant's] securities filings)," and "by emphasizing that [its] senior executives held themselves to the highest standards of all." *Id.* Given this "context," *id.* at 230, the court held that the defendant's statements went beyond mere puffery, *see id.* at 231. In contrast, as presently pleaded, Lottery's pre-merger statements about regulatory compliance arise in a much different context. Therefore, unlike in *In re Signet*, a reasonable investor would not understand those statement as concrete responses to credible accusations of malfeasance. Similarly, in *In re Petrobras Securities Litigation*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015), the challenged statements were more concrete and less laudatory than the statements in the instant case. There, too, the court emphasized the context in which the alleged misrepresentations were made and concluded that because "the statements were made repeatedly in an effort to reassure the investing public about the [defendant's] integrity, a reasonable investor could rely on them as reflective of the

[defendant's] true state of affairs."  *Id.*  That conclusion cannot reasonably be drawn in the context of the facts alleged here.  Finally, in *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012), the defendant represented that it "conducted 'extensive' training and safety programs."  The court explained that "[i]n an industry as dangerous as deepwater drilling, it is to be expected that investors will be greatly concerned about an operator's safety and training efforts," so it declined to "say, as a matter of law, that [the defendant's] representation that such efforts were extensive was obviously unimportant to [its] shareholders."  *Id.* at 244 (quotation marks omitted).  The Court does not doubt that lottery-industry investors are concerned about a company's compliance with the law.  Nevertheless, the Court concludes that, as pleaded, Lottery's pre-merger statements about regulatory compliance do not rise above "[g]eneric, indefinite statements of corporate optimism."  *Abramson*, 965 F.3d at 173.

### ii.    The Proxy's Financial Projections

The Proxy's revenue, EBITDA, and profit projections for the full 2021 fiscal year are protected by the bespeaks-caution doctrine.

"Two doctrines – one statutory, the other judge-made – protect certain forward-looking statements from serving as the basis for claims of securities fraud."  *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 597 (S.D.N.Y. 2022) (citation omitted), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) (summary order). "First, the Private Securities Litigation Reform Act of 1995 creates a statutory 'safe harbor' for certain statements."  *Id.* (brackets and citation omitted).  "Second, courts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks-caution doctrine."  *Id.* (citation omitted).  The PSLRA safe harbor does not apply to any forward-looking statement that is "included in a financial statement prepared in

accordance with generally accepted accounting principles," 15 U.S.C. § 78u-5(b)(2)(A), and the Proxy itself states that its "financial statements were prepared in conformity with U.S. GAAP," Proxy at 186.  Therefore, only the bespeaks-caution doctrine may apply to the Proxy.

Under the bespeaks-caution doctrine, a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) ("*IPERS I*").  The question thus becomes (1) whether the Proxy's 2021 financial projections were forward-looking statements, and (2) if so, whether they were accompanied by sufficient cautionary language.

The Court holds that the Proxy's 2021 financial projections were forward-looking statements.  "As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are forward-looking statements." *In re Philip Morris*, 89 F.4th at 428 (quotation marks and citation omitted).  Under this standard, the Proxy's financial projections were forward-looking statements because they were predictions made in October 2021 about the company's financial performance for *all* of 2021, and thus their truth necessarily could not be assessed until 2021 had concluded.  Because these statements "project[ed] results in the future," they are "plainly forward-looking." *Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010); *accord Gissin v. Endres*, 739 F. Supp. 2d 488, 507 (S.D.N.Y. 2010) (statements "cast in predictive terms . . . are by definition forward-looking").

The Court also holds that the Proxy's 2021 financial projections were accompanied by sufficient cautionary language.  Generally, cautionary language must "not [be] boilerplate" and must "convey[] substantive information." *Slayton*, 604 F.3d at 772.  "Plaintiffs may [overcome cautionary language] by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss."

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002); *accord In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) (the bespeaks-caution doctrine "applies only where the cautionary language is reasonably specific as opposed to generic or boilerplate so as to constitute a real warning to investors"). The Court rejects Plaintiffs' contention that the Proxy's cautionary language was inadequate. *See* Lottery Class Opp. at 23-25.

The Proxy warned that Lottery "ha[d] not been required to document and test [its] internal controls over financial reporting," and that Lottery's management and auditors had not previously spoken publicly about the effectiveness of the company's internal controls. Proxy at 74. It also cautioned that the failure to maintain adequate internal controls "ha[d] resulted in and could result in material weaknesses which could lead to errors in [Lottery's] financial reporting, which could adversely affect [its] business." *Id.* The Proxy further noted that Lottery had identified an existing "material weakness in [its] internal control over financial reporting" relating to "the design and operation of the financial statement close and reporting controls," that this weakness "remain[ed] unremediated," and that this weakness "could result" in Lottery's financial statements containing material misstatements. *Id.* In short, the Proxy addressed the very risk that Plaintiffs allege it failed to disclose: that Lottery "lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue," and that the Proxy's statements regarding revenue and cash could therefore be inaccurate. Class Compl. ¶ 81. Hence, the Proxy's cautionary language sufficiently warned about this risk.

### iii.    The Proxy and Item 303

The warnings provided in the Proxy also discharged Defendants' obligations under Item 303 with respect to the Proxy. In relevant part, Item 303 of Regulation S-K required the

Proxy to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii); *see* Lottery Class Opp. at 22-23. Item 303 requires disclosure "where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (quotation marks and citation omitted).  Significantly, "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it *actually knows of* when it files the relevant report with the SEC.  It is not enough that it should have known of the existing trend, event, or uncertainty." *Iowa Pub. Emps.' Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("*IPERS II*") (emphasis added).

Plaintiffs argue that the Proxy "failed to disclose . . . the fact that [Lottery] was not complying with state and federal laws and overstating its cash and revenue which would have a material negative impact on [Lottery's] sales, revenues, and/or results of operations going forward."  Class Compl. ¶ 82.  This argument fails.

Regarding noncompliance with state and federal laws, Plaintiffs do not sufficiently allege that management "actually kn[ew]" about this noncompliance "when it file[d] [the Proxy] with the SEC." *IPERS II*, 818 F.3d at 95.  To be sure, in the 7/6/22 Form 8-K, "Lottery disclosed that an internal investigation had uncovered 'instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment.'"  Class Compl. ¶ 63 (emphasis omitted).  Even if the Court indulges Plaintiffs' invitation to speculate (without further factual underpinning) that "those past violations were ongoing at the time the Proxy Statement was issued," Komissarov Opp. at 21, Plaintiffs do not

allege that Lottery's management "actually kn[ew]" about the noncompliance when the Proxy

was filed, *IPERS II*, 818 F.3d at 95.

Meanwhile, by virtue of the cautionary statements discussed in the previous section,

Defendants also complied with the duty to disclose known risks about the accuracy of the

Proxy's cash and revenue statements.  Thus, with respect to the Proxy, Defendants discharged

any duty to disclose under Item 303.[6]

### iv.    The 10/21/21 Press Release

The 10/21/21 Press Release's statements regarding Lottery's preliminary revenue

results are nonactionable under the bespeaks-caution doctrine because they, too, are

"statements whose truth [could not] be ascertained until some time after the time they [we]re

made."  *In re Philip Morris*, 89 F.4th at 428 (citation omitted).  Plaintiffs contend that these

statements were "simply not forward-looking" because they "concern[ed] revenue results for

Q3 2021, a quarter that had already closed when the statement was made."  Lottery Class

Opp. at 13.  Although this line of reasoning has some intuitive appeal, the Court disagrees.

When applying the bespeaks-caution doctrine, courts in the Second Circuit generally treat

"corporate statements of projections as to corporate earnings" as forward-looking statements,

"without regard to whether the last day of the covered earnings period had passed."  *Lopez v.

Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016).

---

[6] In their opposition to Lottery's motion to dismiss, the Class Plaintiffs suggest that Item
303's disclosure obligations also applied to subsequent statements, including those statements
involving the (allegedly nonexistent) sale of $30 million in LotteryLink Credits.  *See* Lottery
Class Opp. at 22-23.  But the Amended Class-Action Complaint raises Item 303 only with
respect to the Proxy, *see* Class Compl. ¶ 82, and the Hoffman Complaint does not make any
claim based on Item 303, *see generally* Hoffman Compl.  "[T]he law is clear that a party may
not amend pleadings through a brief."  *Gamma Traders - I LLC v. Merrill Lynch
Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) (quotation marks and citation omitted).
Thus, the Court will not engraft additional Item 303-based claims onto either complaint.

*Lopez* is on point.  In relevant part, the case involved a press release issued on January 21, 2015, announcing the company's "preliminary earnings results."  *Id.*  "[T]he release said that the [c]ompany 'expected' earnings per share of $0.06 to $0.08 per share for [the fourth quarter of 2014]."  *Id.*  The court rejected as "incorrect" the plaintiff's argument that these preliminary results did not "qualify as a forward-looking statement, because they addressed a quarter that was complete."  *Id.*  It noted that just because "a quarter has concluded does not mean that the quarter's results have yet been tabulated."  *Id.*  And it explained that the press release's statement of preliminary results "was a forward-looking projection, insofar as it gave a 'preliminary' calculation of what the final quarterly financial results would be 'based on currently available financial and operating information and management's preliminary analysis of the unaudited financial results for the quarter.'"  *Id.* at 40 (quoting the press release at issue).  "In other words, the preliminary results were a prediction, based on incomplete or provisional information, of what the [c]ompany would ultimately declare its financial performance to have been."  *Id.*

The Court agrees with *Lopez*'s reasoning and adopts it here.  Accordingly, the Court holds that the 10/21/21 Press Release's revenue-related statements were forward-looking statements.  The Court also holds that the 10/21/21 Press Release's notice regarding forward-looking statements contained "sufficient cautionary language" to render the 10/21/21 Press Release "not actionable," *IPERS I*, 620 F.3d at 141, at least with respect to Plaintiffs' theory that Defendants failed to disclose that Lottery "lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue," with potential consequences for the accuracy of Lottery's financial statements, Class Compl. ¶ 84; *see* 10/21/21 Press Release at 5-6 (warning that "the forward-looking statements contained in this press release are subject to [various] factors," including Lottery's "ability to maintain effective internal

controls over financial reporting," and that if this risk "materialize[d]," the "actual results . . . could differ materially from those expressed in any forward-looking statements").

In sum, none of the pre-merger statements challenged by Plaintiffs was materially false or misleading.  Defendants' motions to dismiss are granted with respect to the claims in the Amended Class-Action Complaint and the Hoffman Complaint that rely on the pre-merger statements.

The Class Plaintiffs "concede that Mr. Komissarov is not responsible for statements made *after* the [merger] was effectuated on October 29, 2021."  Komissarov Opp. at 14 n.5.  Because none of the Class Plaintiffs' claims against Komissarov survives – and because Hoffman makes no claims against Komissarov, *see generally* Hoffman Compl. – the Court declines to reach the parties' remaining arguments regarding asserted bases for dismissing the claims against Komissarov.

### 4.  Post-Merger Financial-Performance-Related Statements

This set of statements includes:

- The statements in the 11/15/21 Form 8-K and the 11/15/21 Form 8-K/A regarding Lottery's finances for the third quarter of 2021, Class Compl. ¶¶ 65, 85, 89;

- The statements in the 3/31/22 Form 8-K and the 2021 Annual Report regarding Lottery's finances for the fourth quarter of 2021 and for 2021 overall, *id.* ¶¶ 66, 91; and

- The statements in the 5/16/22 Form 8-K and the Q1 2022 Report regarding Lottery's finances for the first quarter of 2022, *id.* ¶¶ 67, 70, 95.

Plaintiffs contend that these statements were materially false or misleading because they accounted for Lottery's purported sale of $30 million in affiliate-marketing credits – a sale that, Plaintiffs allege, never happened.  *See, e.g.*, *id.* ¶¶ 66, 70; Lottery Class Opp. at 3-5, 9.

None of the post-merger financial-performance-related statements was a forward-looking statement, so none can benefit from the PSLRA safe harbor or the bespeaks-caution doctrine.  *See* 15 U.S.C. § 78u-5(a) (the PSLRA safe harbor "shall apply only to a forward-looking statement"); *IPERS I*, 620 F.3d at 142 ("It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking."); *see also P. Stolz Fam. P'ship v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) ("[T]he misrepresentation of present or historical facts cannot be cured by cautionary language.").  Unlike the financial projections in the Proxy and the 10/21/21 Press Release, none of the post-merger financial-performance-related statements labeled itself a preliminary estimate.  And there is no other reason to believe that these statements' truth could only be "ascertained . . . some time after the time they are made."  *In re Philip Morris*, 89 F.4th at 428 (citation omitted).[7]

Defendants contend that Plaintiffs have failed to plead sufficient facts to establish the "contemporaneous falsity" of the post-merger financial-performance-related statements.  Lottery Class Br. at 8 (emphasis omitted); *see id.* ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." (emphasis omitted) (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("*Lululemon I*"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("*Lululemon II*") (summary order))).  The Court accepts the general principle that, for an affirmative misrepresentation of fact to be actionable, the factual assertion must have been

---

[7] The fact that some of the financial statements were labeled as "unaudited" does not require a different conclusion. *See, e.g.*, 3/31/22 Form 8-K at 9, 11.  "[T]he facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified as forward-looking."  *Slayton*, 604 F.3d at 769.  Other than stating that the financial results were "unaudited," nothing in any of the documents containing the post-merger financial-performance-related statements gives any indication that those statements were forward-looking.  And Lottery knew how to communicate that its financial announcements were forward-looking – as it did, for example, in the Proxy and the 10/21/21 Press Release.

false when made.  *See, e.g.*, *Plumbers II*, 11 F.4th at 103; *San Leandro*, 75 F.3d at 812. Plaintiffs' allegations have satisfied this standard.

As noted, Rule 9(b) requires a securities-fraud complaint to "explain why the [challenged] statements were fraudulent."  *In re Synchrony*, 988 F.3d at 167 (citation omitted). Thus, in *San Leandro*, the Second Circuit held that the complaint should be dismissed because it "lack[ed] sufficient allegations demonstrating the falsity of any statements made by [the defendant] during the class period."  75 F.3d at 812.  One allegation was "that, although [the defendant] represented to the market that retail sales were strong, retail sales were declining at a rate of 8.3 percent – significantly higher than the previously announced rate of 2.5 percent." *Id.*  Yet the plaintiffs "allege[d] no circumstances to support their allegation that the allegedly false statements, made at least three weeks before the 8.3 percent figure was announced, were false at the time made.  Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales [wa]s insufficient to survive a motion to dismiss."  *Id.*

Subsequent decisions have cited this portion of *San Leandro* for the proposition that "a material misstatement must be false at the time it was made."  *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 12 (2d Cir. 2019) (summary order); *see also Bristol Cnty. Ret. Sys. v. Adient PLC*, No. 20-3846, 2022 WL 2824260, at *1 (2d Cir. July 20, 2022) (summary order) ("A statement is false for the purpose of Section 10(b) and Rule 10b-5 if it was false at the time it was made."); *Lululemon II*, 604 F. App'x at 63 (affirming dismissal of complaint which "failed adequately to plead that any of the statements attributed to the defendants were materially misleading at the time that they were made").

Defendants, however, assert an additional corollary of *San Leandro*: that "a statement believed to be true when made, but later shown to be false, is insufficient" to establish that a

statement of fact is false for purposes of Section 10(b) and Rule 10b-5.  Lottery Class Br. at 8 (quoting *Lululemon I*, 14 F. Supp. 3d at 571).  Defendants cite no binding precedent supporting this proposition, and the Court is aware of none.  Certainly, *San Leandro* does not so hold.  Further, Defendants' preferred understanding would effectively (and improperly) collapse the falsity and scienter inquiries.

The chief authority relied upon by Defendants for this point is *Lululemon I*.  *See, e.g.*, *id.*; Komissarov Br. at 16.  *Lululemon I* cited *San Leandro* for the proposition that a "statement believed to be true when made, but later shown to be false, is insufficient."  14 F. Supp. 3d at 571.  *Lululemon I* also purported to quote *San Leandro* as stating that "[f]alsity is a failure to be truthful – it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made."  *Id.*  Problematically, however, no such statement appears in *San Leandro*.  *Lululemon I* apparently intended to quote *C.D.T.S. v. UBS AG*, No. 12-cv-04924 (KBF), 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) (summary order).  For its part, *C.D.T.S.* cited a single case in support: *San Leandro*.  But *San Leandro* did not hold that falsity centers on whether the fact was "believed to be true when made."  Rather, *C.D.T.S.* asserted that such a requirement exists, and *Lululemon I* parroted *C.D.T.S.* on this point.

Notably, the Second Circuit affirmed *C.D.T.S.* solely on scienter grounds.  *See Westchester Teamsters*, 604 F. App'x at 7.  In a footnote, the court stated:

> We disagree with the district court's suggestion in its analysis of the first element (material misrepresentation or omission) that Plaintiffs had to show that a Defendant "k[new] (or ha[d] reason to know) at the time that he was making an alleged statement that the statement was in fact false." *C.D.T.S. v. UBS AG*, No. 12 Civ. 4924, 2013 WL 6576031, at *4 (S.D.N.Y. Dec. 13, 2013).  Plaintiffs need not demonstrate Defendants had knowledge or a belief that they were making "a material misrepresentation or omission" in order to satisfy the element.

> Rather, to prove this first element Plaintiffs need show only that
> a false statement was made or that an omission of material fact
> occurred.

*Id.* at 7 n.2 (brackets in original).  Thus, the Second Circuit (albeit in a summary order)

squarely rejected the theory of falsity advanced in *C.D.T.S.*  And although the Second Circuit

also affirmed *Lululemon I* by summary order in *Lululemon II*, the latter conspicuously

declined to state that, with respect to statements of fact, a plaintiff must plead that the

defendant knew that it was making a false statement.

Accordingly, the Court find unpersuasive the cases cited by Defendants that rely on

*C.D.T.S.* and its progeny or otherwise employ similar reasoning.  *See, e.g.*, Lottery Class Br.

at 9 (quoting *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 210 (S.D.N.Y. 2020));

Komissarov Br. at 17 (same); Lottery Class Reply at 2 (quoting *Ressler v. Liz Claiborne, Inc.*,

75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189

F.3d 460, 1999 WL 568023 (2d Cir. 1999) (unpublished table decision)).  The Court

recognizes that *Fishbaum* adopted a reading of *San Leandro* similar to the reading advanced

by Defendants.  *See Fishbaum*, 1999 WL 568023, at *3 (citing *San Leandro* for the

proposition that a "plaintiff must detail specific contemporaneous information known to the

defendant that was inconsistent with the representation in question").  *Westchester Teamsters*

and *Fishbaum* are both unpublished decisions, so neither case is binding precedent here.  *See*

*Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011); *Monterey Bay Mil. Hous., LLC v. Ambac*

*Assurance Corp.*, 531 F. Supp. 3d 673, 713 (S.D.N.Y. 2021).  Still, a court may "consider

summary orders for their persuasive value."  *Force v. Facebook, Inc.*, 934 F.3d 53, 66 n.21

(2d Cir. 2019) (citation omitted).  For the reasons stated herein, the Court finds *Westchester*

*Teamsters* more persuasive than *Fishbaum* in the context of assessing the falsity of a

statement of fact, so the Court follows the former instead of the latter.  "Whether Defendants

*knew* of their falsity when making the statements is the scienter question, not the falsity

question." *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20-cv-08082 (LGS), 2022 WL

4225562, at *6 (S.D.N.Y. Sept. 13, 2022).

In turn, the Court holds that Plaintiffs have plausibly alleged that each of the post-

merger financial-performance-related statements was "false [or misleading] at the time it was

made." *In re Express Scripts*, 773 F. App'x at 12. This conclusion follows from Lottery's

admissions that: (1) Lottery "overstated its available unrestricted cash balance by

approximately $30 million," 7/15/22 Form 8-K at 3; (2) during the 2021 fiscal year, Lottery

"improperly recognized revenue in the same amount," *id.*; (3) Lottery's auditor determined

that "the audited financial statements for the year ended December 31, 2021, and the

unaudited financial statements for the quarter ended March 31, 2022, should no longer be

relied upon," 7/22/22 Form 8-K at 1; and (4) a subsidiary of Lottery "entered into a line of

credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021

financial statements and was not recorded in the March 31, 2022 financial statements," *id.*; *see*

Class Compl. ¶¶ 69, 71; Lottery Class Opp. at 9.

Defendants assert that the remarks in the 7/15/22 Form 8-K and the 7/22/22 Form 8-K

are irrelevant because "restated financials are 'not an admission of wrongdoing.'" Lottery

Class Reply at 2 (quoting *SEC v. Espuelas*, 908 F. Supp. 2d 402, 410 (S.D.N.Y. 2012)).

Troublingly, Defendants quote *Espuelas* for the opposite of its holding. In *Espuelas*, the court

*rejected* the defendant's argument that, because "a restatement is not an admission of

wrongdoing," summary judgment should be granted. *Id.* The court instead held that "the

restatement is fairly considered" on summary judgment because "the SEC need only establish

at this stage a genuine issue of material fact as to whether [the company's] filings materially

misstated the quality or quantity of revenue." *Id.* In a footnote, the court added that "[t]he

same is true on a motion to dismiss: Although a restatement is not an admission of

wrongdoing, *the mere fact that financial results were restated is sufficient basis for pleading*

*that those statements were false when made*." *Id.* at 410 n.5 (quotation marks and citation

omitted; emphasis added).

Other courts in this District have likewise held that "misreported financial data are

false statements of fact." *Africa v. Jianpu Tech. Inc.*, No. 21-cv-01419 (JMF), 2022 WL

4537973, at *9 (S.D.N.Y. Sept. 28, 2022) (ellipsis and citation omitted); *see, e.g.*,

*Venkataraman*, 2022 WL 4225562, at *2, *6 ("[The company] filed a Form 8-K disclosing

that its financial statements for 2014, 2015 and the first three quarters of 2016 would need to

be restated. . . . Contrary to Defendants' argument, this is not an allegation of 'fraud by

hindsight,' but rather an admission by [the company] that earlier statements were false when

made."); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544

(S.D.N.Y. 2017) ("In light of comScore's admission that it must restate its financial

statements, there can be no dispute that the SAC pleads numerous false and misleading

misstatements with respect to revenue, revenue related metrics, and comScore's compliance

with GAAP."); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606

(S.D.N.Y. 2009) ("Misreported financial information clearly amounts to a false statement of

fact."); *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008)

("The Individual Defendants do not, and cannot, dispute the actual falsity of the financial

statements that were contained in Aspen's press releases and SEC filings for the thirteen

quarters at issue and were subsequently restated in the Amended Form 10-K.").  The Court

agrees with their reasoning and follows it here.

Defendants alternatively argue that the post-merger financial-performance-related

statements were statements of opinion, rather than statements of fact, and that Plaintiffs have

failed to satisfy *Omnicare*'s pleading standard for statements of opinion. *See, e.g.*, C&D Class Br. at 17 ("[A]s to the overstatement of revenue and cash, the recognition of revenue under GAAP calls for 'the exercise of judgment' or a 'subjective evaluation' about a particular transaction, [and therefore] it too is a statement of opinion." (quoting *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-01545 (LAK), 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 19, 2019) ("*AmTrust I*")); C&D Class Reply at 6-7 (urging the Court to follow *AmTrust I* instead of *Espuelas* and *Varghese*).

The Court is unconvinced. Defendants rely heavily on *AmTrust I*. But in *DeCarlo*, 80 F.4th at 169-76, the Second Circuit reversed in relevant part *In re AmTrust Financial Services, Inc. Securities Litigation*, No. 17-cv-01545 (LAK), 2020 WL 2787117 (S.D.N.Y. Apr. 20, 2020) ("*AmTrust II*") – and *AmTrust II* had essentially reiterated the holdings of *AmTrust I*. *DeCarlo*, not *AmTrust I* or *AmTrust II*, guides the Court's analysis here.

The defendant in *DeCarlo* restated five years of financial results, including income and earnings. *See* 80 F.4th at 167. "The restatement identified two material accounting errors." *Id.* One involved the treatment of revenue from warranty contracts, and the other concerned the treatment of employee bonuses as expenses. *See id.* The district court had "determined that [the originally issued] financial statements reflected the exercise of subjective judgment and were thus non-actionable statements of opinion." *Id.* at 169.

The Second Circuit "disagree[d]" with the district court. *Id.* At the outset, the Second Circuit observed that *Omnicare* had "unequivocally rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Id.* (quotation marks and citation omitted). Indeed, *Omnicare* made clear that "a statement of opinion may be actionable . . . if it contains an embedded statement of fact that is not true," or if it "omits material facts about the [defendant's] inquiry into or

knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement." *Id.* at 171 (citation omitted).

The Second Circuit then turned to the plaintiffs' claims based on the revenue-recognition and bonus-expensing issues.  Starting with the former, the Second Circuit noted the defendant's concession that its previous method of revenue recognition was improper under GAAP.  *See id.* at 172 & n.9.  Despite this fact, the district court had "concluded that the restated financial statements were non-actionable opinions because determining the sufficiency of historical evidence that would support [the defendant's previous method of revenue recognition] 'inherently requires a subjective judgment as to whether the exception applies.'" *Id.* at 173.  As the Second Circuit explained, however, "subjective judgments about the sufficiency of historical evidence to support a particular accounting treatment presuppose the existence of *some* historical evidence." *Id.* at 174.  And "no one disputes that GAAP permits [the defendant's previous method of revenue] recognition only if *some* historical evidence justified doing so." *Id.*  "At the pleading stage, . . . the alleged absence of such evidence, if accepted as true, means that [the defendant's] representations about the warranty contract revenue reported in its historical consolidated financial statements misled investors to conclude that the company was aware of some historical evidence in support of [the previous method of revenue recognition], when in (alleged) fact it was not." *Id.*  "In other words, [the defendant] is plausibly alleged to have 'sa[id] one thing and [held] back another.'" *Id.* (first alteration added) (quoting *Omnicare*, 575 U.S. at 192).

Regarding the bonus-expensing issue, the Second Circuit "assum[ed] without deciding" that the statements at issue were statements of opinion. *Id.* at 175.  Even granting this concession, the Second Circuit held that the plaintiffs had plausibly alleged that these statements of opinion were actionable. *See id.* at 175-76.  In dicta, the Second Circuit opined

that the plaintiffs may also "have plausibly alleged that [the defendant's previous] method [of expensing bonuses] was objectively improper rather than an exercise of subjective judgment" – that is, that the bonus-expensing statements were statements of fact rather than statements of opinion.  *Id.* at 175.  The Second Circuit explained:

> Although multiple accounting standards may have been relevant to determining when to expense a bonus, all of the standards in play here support the position that [the defendant's previous method of expensing bonuses was wrong].  We are not aware of a GAAP provision on which [the defendant] relied that suggests otherwise.  And the fact that these GAAP standards, together or alone, are subject to misreading, misinterpretation, or misapplication, as happened here, does not necessarily mean that they entail an exercise of subjective judgment.

*Id.* (footnote omitted).

Applying *Omnicare* and *DeCarlo* to the facts of this case – and taking a cue from *DeCarlo*'s reasoned dicta – the Court first holds that the post-merger financial-performance-related statements were statements of fact, not statements of opinion.  To be sure, "GAAP is not the lucid or encyclopedic set of pre-existing rules that [some] might perceive it to be.  Far from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time."  *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (quotation marks and citation omitted).  But surely any GAAP standard that might be "in play" would "support the position" that, for example, claiming to have sold $30 million of a product – when no such sale took place – contravenes GAAP.  *DeCarlo*, 80 F.4th at 175.  The Court is "not aware of a GAAP provision on which [Defendants] relied that suggests otherwise."  *Id.*  Certainly, Defendants have not named a GAAP provision which might have justified the errors alleged.  Moreover, "the fact that [certain] GAAP standards, together or alone, are subject to misreading, misinterpretation,

or misapplication . . . does not necessarily mean that they entail an exercise of subjective judgment." *Id.*

The Court alternatively holds that even if they are deemed statements of opinion, the post-merger financial-performance-related statements were false or misleading statements of opinion. "[N]o one disputes that GAAP permits [claiming to have sold $30 million of a product] only if *some* historical evidence justified doing so." *Id.* at 174. Plaintiffs have plausibly alleged the "absence of such evidence." *Id.*; *see, e.g.*, Class Compl. ¶ 70 ("The July 15, 2022 disclosure of a $30 million cash overstatement represents an admission that the $30 million 'sale' of LotteryLink Credits previously announced on November 15, 2021, was entirely fabricated, and that Defendants faked the collection of that money in order to create the illusion of revenues."). Accepting these allegations as true, Defendants' various representations about the revenue and resulting cash holdings from the fabricated LotteryLink Credits sales "misled investors to conclude that the company was aware of some historical evidence in support of [the existence of $30 million in LotteryLink Credits sales], when in (alleged) fact it was not." *DeCarlo*, 80 F.4th at 174. In short, Plaintiffs have plausibly alleged that Defendants "said one thing and held back another." *Id.* (brackets and citation omitted).

Plaintiffs have also sufficiently alleged that the post-merger financial-performance-related statements were material. "Because materiality involves a 'fact-specific inquiry,' it can be decided on a motion to dismiss only if 'reasonable minds cannot differ on the question of materiality.'" *Plumbers II*, 11 F.4th at 101 (first quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988); and then quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). The statements at issue "concern[ed] [Lottery's] reported revenue, which is the exact type of information that would be important to a reasonable investor." *SEC v. MiMedx Grp.,*

*Inc.*, No. 19-cv-10927 (NRB), 2022 WL 902784, at *9 (S.D.N.Y. Mar. 28, 2022).  Indeed, "earnings reports are among the pieces of data that investors find *most* relevant to their investment decisions."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000) (citation omitted; emphasis added).  Hence, Plaintiffs have adequately alleged that "a reasonable investor would have considered" the statements at issue to be "significant in making investment decisions."  *DeCarlo*, 80 F.4th at 182 (citation omitted).

Of course, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (quotation marks and citations omitted).  But falsity and scienter must not be conflated.  The Court concludes that Plaintiffs have plausibly alleged that the post-merger financial-performance-related statements were material misrepresentations or omissions.

### 5.  Other Post-Merger Statements

This set of statements includes:

- The discussions of financial-reporting issues in the Q3 2021 Report, the 2021 Annual Report, and the Q1 2022 Report, Class Compl. ¶¶ 87, 93, 97;

- The SOX certifications signed by DiMatteo and Dickinson for each of Lottery's financial statements issued during the Class Period, *id.* ¶ 99; and

- The 2021 Annual Report's discussion of regulatory compliance, *id.* ¶ 62.

Plaintiffs contend that the challenged statements in the Q3 2021 Report, the 2021 Annual Report, the Q1 2022 Report, and the SOX certifications constituted material omissions because "Defendants failed to disclose or indicate" that Lottery "lacked adequate internal controls, including but not limited to accounting controls over financial reporting of cash and revenue"; that Lottery "was claiming it had cash that it did not have and was

improperly recognizing revenue"; and that, as a result, Lottery's "financial results were materially overstated." *Id.* ¶ 100; *see also id.* ¶¶ 87, 94, 98.  Plaintiffs also argue that the 2021 Annual Report's discussion of regulatory compliance was an actionable omission because Lottery "admitted" in the 7/6/22 Form 8-K that "an internal investigation had uncovered 'instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment.'" *Id.* ¶ 63 (emphasis omitted).

### i.     The Discussions of Financial-Reporting Issues in the Q3 2021 Report, the 2021 Annual Report, and the Q1 2022 Report

Plaintiffs have plausibly alleged that the discussions of financial-reporting issues in the Q3 2021 Report, the 2021 Annual Report, and the Q1 2022 Report contained material omissions.  "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *accord Abramson*, 965 F.3d at 175 ("[W]hen a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow.").  Each report discussed the company's internal controls over financial reporting.  Yet all three reports failed to disclose that the purported sale of $30 million of LotteryLink Credits never happened, and that the corresponding cash and revenue statements were overstated by $30 million.  *See* Class Compl. ¶¶ 69-70.  And both the 2021 Annual Report (published on April 1, 2022) and the Q1 2022 Report (published on May 16, 2022) failed to disclose that a subsidiary of Lottery "entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements." *Id.* ¶ 71 (emphasis omitted).

The Q3 2021 Report stated that Lottery's "certifying officers" had "concluded that, due solely to" a technical accounting issue identified by the SEC in a staff statement, Lottery's "disclosure controls and procedures were not effective as of September 30, 2021." *Id.* ¶ 87 (emphasis omitted).  But "[o]ther than" that, "there were no changes in [Lottery's] internal control over financial reporting . . . during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting."  *Id.* (emphasis omitted).  The Q3 2021 Report also discussed Lottery's "plan[s] to enhance [its] processes to identify and appropriately apply applicable accounting requirements."  *Id.* (emphasis omitted).  The Q3 2021 Report did not mention that the 11/15/21 Form 8-K, released that same day, touted revenue and cash figures based on a $30 million sale of LotteryLink Credits that never transpired.  *See generally* Q3 2021 Report.

The 2021 Annual Report noted that Lottery's "management ha[d] identified a material weakness in internal control over financial reporting as of December 31, 2021 and 2020 relating to deficiencies in the design and operation of the procedures relating to the closing of our financial statements."  Class Compl. ¶ 93 (emphasis omitted).  The 2021 Annual Report listed four "deficiencies" and told investors that Lottery had "commenced measures to remediate" these issues.  *Id.*  But it made no mention of the allegedly sham LotteryLink Credits sale or the subsidiary's line of credit.  *See generally* 2021 Annual Report.

For its part, the Q1 2022 Report stated that Lottery's management had "evaluated the effectiveness of [the company's] disclosure controls and procedures."  Class Compl. ¶ 97.  Based on this evaluation, DiMatteo and Dickinson had concluded that, as of March 31, 2022, Lottery's "disclosure controls and procedures were not effective due to the material weakness in [Lottery's] internal control over financial reporting with respect to [Lottery's] financial statement close and reporting process."  *Id.* (emphasis omitted).  Nevertheless, the Q1 2022

Report asserted, Lottery's "management concluded that [Lottery's] condensed consolidated financial statements included in [the Q1 2022] Report fairly present, in all material respects, [Lottery's] financial position, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP." *Id.* (emphasis omitted).  The Q1 2022 Report did not mention that the purported $30 million in sales of LotteryLink Credits never happened, or that a subsidiary had entered a line of credit.  *See generally* Q1 2022 Report.

Defendants argue that "the Proxy disclosed these very issues," and that Lottery "ha[d] no duty to re-disclose what it ha[d] already disclosed once."  Lottery Class Br. at 22.  To be sure, "there is no duty to disclose information to one who reasonably should already be aware of it," or to disclose information "where information is equally available to both parties." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (citation omitted).  But that is hardly the situation here.  The Proxy stated only that the "[f]ailure to maintain adequate financial, information technology and management processes and controls has resulted in and could result in material weaknesses which *could* lead to errors in our financial reporting." Proxy at 42 (emphasis added).  This warning, by itself, did not ensure that reasonable investors would "already be aware" that Lottery would fabricate a $30 million sale or that it would not report a subsidiary's opening of a line of credit.  *Seibert*, 586 F.2d at 952 (citation omitted).

To be clear, as the Court held above, the warning in the Proxy sufficed, for purposes of the bespeaks-caution doctrine, as cautionary language regarding Lottery's general issues with its internal controls at the time of the de-SPAC transaction.  That same language, however, did not sufficiently warn shareholders that (as Plaintiffs allege) Lottery would thereafter feign a $30 million sale of LotteryLink Credits, or that a subsidiary would covertly enter a line of credit.  It may be true that "when defendants warn investors of a *potential risk*, they need not

predict the precise manner in which the risks will manifest themselves." *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 493 (S.D.N.Y. 2017) (citation omitted; emphasis added). But "cautionary words about future risk cannot insulate from liability the failure to disclose that the *risk has transpired*." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (brackets and citation omitted; emphasis added); *accord Meyer*, 761 F.3d at 250 ("A duty to disclose arises whenever secret information renders prior public statements materially misleading." (citation omitted)); *Slayton*, 604 F.3d at 770 n.5 ("In applying the judicially-created bespeaks caution doctrine, on which the cautionary language prong of the PSLRA is based in part, we have held that cautionary language that is misleading in light of historical fact cannot be meaningful." (citation omitted)); *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event.").

By the time Lottery released the Q3 2021 Report, the 2021 Annual Report, and the Q1 2022 Report, the sham sale of LotteryLink Credits had already been announced (or, for the Q3 2021 Report at least, had already been planned and was announced the same day). Likewise, by the time that Lottery released the latter two reports, the undisclosed opening of the line of credit had already happened. Therefore, with respect to each of the three reports in question, the Proxy "cannot insulate [Defendants] from liability [for] the failure to disclose that" these events had taken place. *Wilson*, 671 F.3d at 130 (citation omitted).

### ii.    The SOX Certifications

During the Class Period, DiMatteo and Dickinson made the certifications required by SOX for Lottery's quarterly and annual reports. Class Compl. ¶¶ 99-100. Both executives certified that, "[b]ased on [their] knowledge," Lottery's quarterly and annual reports did not contain material misstatements or omissions, and that the financial information included in

those reports "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Lottery]." *Id.* ¶ 99.  DiMatteo and Dickinson also attested that they had disclosed to Lottery's auditors and audit committee, "based on [their] most recent evaluation of internal control over financial report," "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," as well as "any fraud . . . involv[ing] management or other employees who have a significant role in [Lottery's] internal control over financial reporting." *Id.*

Each of the challenged statements in the SOX certifications is a statement of opinion. DiMatteo and Dickinson's certifications that the reports contained no material misstatements or omissions, and that the financial information in those reports was accurate, "signal that they are opinions by stating that they are 'based on [the] knowledge' of the officer." *DeCarlo*, 80 F.4th at 176 (brackets in original).  Similarly, their certifications regarding disclosures "contain language that conveys management's subjective judgments about the company's internal controls and thus constitute statements of opinion." *Id.*

Here, as in *DeCarlo*, the SOX certifications are "non-actionable." *Id.*  Plaintiffs "point to allegations that [Lottery] later reversed course and that its restatement acknowledged a failure of internal controls," and they "insist that the reversal compels the inference that the SOX certifications were not believed when made." *Id.*  But Plaintiffs have "fail[ed] to adequately allege that [DiMatteo and Dickinson] did not believe what they certified." *Id.* Lottery's "change of opinion, standing alone, does not mean that the original certified opinions were disingenuous." *Id.*

It is true that a statement of opinion may be actionable if it "contains an embedded statement of fact that is not true," or if it "omits material facts about the [defendant's] inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable

investor would take from the statement of opinion itself." *Id.* at 171 (original brackets and citation omitted). But Plaintiffs have not argued that the SOX certifications contained embedded untrue statements of fact, so they have forfeited such an argument for purposes of the present motions to dismiss. *See id.* at 176 n.13 (similarly deeming the plaintiffs to have inadequately presented the argument that "the SOX certifications contained embedded statements of fact"). Plaintiffs have likewise not contended – and have thus forfeited the argument – that the SOX certifications "omit[ted] material facts about the [defendant's] inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189.

The Court therefore concludes that, as presently pleaded, the SOX certifications "were non-actionable statements of opinion." *DeCarlo*, 80 F.4th at 176.

### iii.    The 2021 Annual Report's Discussion of Regulatory Compliance

The 2021 Annual Report stated that Lottery "rel[ied] on technology services to closely monitor and track amendments, additions, and impositions of regulations in all jurisdictions regarding the authorization of lottery and work to maintain effective relationships with applicable legislative and regulatory authorities." Class Compl. ¶ 62. The 2021 Annual Report added that Lottery "use[d] this information" to "create strong working relationships with the regulatory authorities" and to "ensure transparent regulatory compliance." *Id.* These statements were non-actionable puffery. Like the pre-merger statements addressed above, the statements in the 2021 Annual Report were "too general to cause a reasonable investor to rely upon them," *City of Pontiac*, 752 F.3d at 183 (citation omitted), and "lack[ed] the sort of

definite positive projections that might require later correction," *In re Vivendi*, 838 F.3d at 245 (citation omitted).[8]

Also in the 2021 Annual Report, Lottery stated that – although it could not "ensure that [its] activities . . . w[ould] not become the subject of regulatory or law enforcement proceedings" – Lottery "believe[d] that [it was] in compliance with all material domestic and international laws and regulatory requirements applicable to [its] business." 2021 Annual Report at 43; *see* Class Compl. ¶ 62.  This was a statement of opinion.  *See In re Philip Morris*, 89 F.4th at 418 ("language like 'we believe'" suffices "to render a statement one of opinion").  The question is therefore whether it was an *actionable* statement of opinion.

*Omnicare* discussed a similar sentence as an example of "an unadorned statement of opinion about legal compliance: 'We believe our compliance is lawful.'"  575 U.S. at 188.  The Supreme Court explained that "[i]f the [speaker] makes that statement without having consulted a lawyer, it could be misleadingly incomplete.  In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry – rather than, say, on mere intuition, however sincere."  *Id.*  Further, a reasonable investor "expects not just that the

---

[8] In a footnote, Plaintiffs state: "A company's statements regarding its legal compliance are actionable by way of omission where the company (i) 'fails to disclose that a material source of its success is the use of improper or illegal business practices' or (ii) 'when [it] makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring.'"  Lottery Class Opp. at 11 n.5 (brackets in original) (quoting *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581-82 (S.D.N.Y. 2016)).  Plaintiffs then assert, without elaboration, that Lottery's statements about compliance with regulators "fit both prongs."  *Id.*  Plaintiffs have forfeited this argument through inadequate briefing.  *See Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 100 n.9 (2d Cir. 2021) ("We ordinarily deem an argument to be forfeited where it has not been sufficiently argued in the briefs, such as when it is only addressed in a footnote." (quotation marks and citation omitted)); *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 651 (S.D.N.Y. 2021) ("A single, conclusory, one-sentence argument is insufficient to raise an issue in the first instance." (brackets, quotation marks, and citation omitted)).

[speaker] believes the opinion . . . , but that it fairly aligns with the information in the [speaker's] possession at the time." *Id.* at 188-89.  Therefore, a speaker may be liable if a statement "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 189.

But Plaintiffs do not allege enough facts to support the inference that, when Lottery stated in the 2021 Annual Report that it believed it was complying with applicable laws, Lottery did not actually believe that fact, *see id.* at 184, or that Lottery made this statement without undertaking "some meaningful legal inquiry," *id.* at 188.  Nor do Plaintiffs assert sufficient allegations (let alone make a developed argument) that Lottery "omit[ted] material facts about [its] inquiry into or knowledge concerning [that] statement of opinion," or that "those facts [would] conflict with what a reasonable investor would take from the statement itself." *Id.* at 189.

Plaintiffs stress that in the 7/6/22 Form 8-K, "Lottery disclosed that an internal investigation had uncovered 'instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment.'"  Class Compl. ¶ 63 (emphasis omitted).  But "[g]enerally speaking, disclosure is not a rite of confession, so companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *Plumbers II*, 11 F.4th at 98 (quotation marks and citation omitted).  And, by itself, the fact that "instances of non-compliance with state and federal laws" were later uncovered, Class Compl. ¶ 63 (emphasis omitted), does not automatically make a prior statement of belief regarding legal compliance actionable under *Omnicare*.  Altogether, Plaintiffs have failed to establish that the 2021 Annual Report's statement of belief regarding legal compliance was actionable.

**B.  Scienter**

Having addressed falsity, the Court next moves to scienter.  The Court assesses only the scienter of the non-dismissed Defendants, and it does so only as to the statements that (as explained above) contain potentially actionable misstatements or omissions.

Scienter is "the defendant's intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (quotation marks and citation omitted).  The PSLRA requires a private securities-fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "To do so, a complaint must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *APERS*, 28 F.4th at 355 (quotation marks and citation omitted).

The proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 323.  A "court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 324.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences."  *Id.* (quotation marks and citation omitted).  "Yet the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  *Id.*  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

When a corporation is a defendant, a plaintiff must plead "facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the

requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (per curiam) (quotation marks and citation omitted).  Ordinarily, "courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter."  *Id.*  "Under this approach, the most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement."  *Id.* (quotation marks and citation omitted).  "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker."  *Id.*

### 1. Motive and Opportunity

In the securities-fraud context, opportunity can be "shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged."  *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (citation omitted). "The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer."  *In re MF Glob. Holdings*, 982 F. Supp. 2d at 306.  No Defendant denies (for purposes of these motions, at least) that it had the *opportunity* to commit fraud. Defendants' argument, instead, is that Plaintiffs have not adequately alleged that any Defendant had sufficient *motive* to commit fraud.  The Court agrees with Defendants.

"[T]o raise a strong inference of scienter through motive and opportunity to defraud, Plaintiffs must allege that [Defendants] benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553 F.3d at 198 (quotation marks and citation omitted).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*

To support their argument that Defendants had sufficient motive to commit fraud,

Plaintiffs assert that "Defendants stood to personally gain if the business combination were

consummated." Lottery Class Opp. at 15-16. For example, "Dickinson was awarded $35

million in restricted stock, which was contingent on the business combination occurring and

[Trident] acquiring Lottery." DCD Opp. at 7. Likewise, "Lever was awarded $7 million in

restricted stock, which was contingent on the completion of the [b]usiness [c]ombination. The

stock grant dwarfed her non-contingent salary of $318,750 (which increased more than 63%

in expectation of the merger)." Lever Opp. at 10 (footnote omitted). Meanwhile, "DiMatteo

and Clemenson, who both owned about 14% of Lottery at the time of the merger, each sold

375,000 shares shortly after the business combination was completed." DCD Opp. at 7.[9] If

the merger had not taken place, Plaintiffs argue, these executives "would not have been able

to divest themselves of such a substantial number of shares in a liquid market." *Id.* at 8.

Plaintiffs thus conclude that DiMatteo, Clemenson, Dickinson, and Lever "were motivated to

---

[9] Plaintiffs do not plead these precise figures, although they do allege that DiMatteo, Clemenson, Dickinson, and Lever "received far more shares than they would have been entitled to had the true value of Lottery been disclosed in connection with the [b]usiness [c]ombination"; that they "received lucrative pay and benefit packages to the extent they remained employees of Lottery following the [b]usiness [c]ombination"; and that they "stood to receive millions more shares as 'earnout' awards and compensation in the event the [b]usiness [c]ombination was completed, and certain share price targets were achieved." Class Compl. ¶ 140. To support the specific numbers in their brief, Plaintiffs cite public filings by Lottery. *See* DCD Opp. at 3 & n.3, 4 & n.5, 7 & n.9; Lever Opp. at 10 & n.17. Plaintiffs argue that these figures are subject to judicial notice because "documents that are necessary to plaintiffs' allegations[,] even if not explicitly referenced in the complaint[,] are likewise suitable for judicial notice." DCD Opp. at 3 n.3 (original brackets, emphasis, quotation marks, and citation omitted). Defendants object that this "reli[ance] on new facts for which Plaintiffs seek judicial notice rather than any fact alleged in the Complaint" is "an improper means to attempt to correct their pleading deficiencies." C&D Reply at 2.

For purposes of the present motions, the Court assumes that (as Plaintiffs argue) the Court may, through judicial notice, consider non-pleaded facts to support an inference of scienter. The Court's ultimate decision on the instant motions to dismiss would be the same regardless of how it resolved this particular issue.

deceive investors as to the true state of Lottery's affairs, because they stood to benefit personally from the consummation of the business transaction." *Id.*

This argument is not compelling. "[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).[10] In *Acito*, the Second Circuit rejected the plaintiffs' allegation that "defendants were motivated to defraud the public because an inflated stock price would increase their compensation." *Id.* "If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. Incentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Id.* (brackets, quotation marks, and citation omitted). The Second Circuit has reaffirmed this proposition many times. *See, e.g.*, *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (collecting cases); *ECA*, 553 F.3d at 201; *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001); *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). Courts in this Circuit have routinely applied this principle in the context of public offerings where defendants would benefit from a higher share price. *See, e.g.*, *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 192-93, 196-97 (2d Cir. 2008); *Rombach v. Chang*, 355 F.3d 164, 167-68, 177 (2d Cir. 2004); *In re Plug Power, Inc. Sec. Litig.*, No. 21-cv-02004 (ER), 2022 WL 4631892, at *12 (S.D.N.Y. Sept. 29, 2022); *Haw.*

---

[10] The Second Circuit decided *Acito* before Congress enacted the PSLRA. *Compare* 47 F.3d 47 (decided February 1, 1995), *with* 109 Stat. 737 (enacted December 22, 1995). As the Second Circuit has explained, however, "the enactment of [the PSLRA] did not change the basic pleading standard for scienter in this circuit." *Novak*, 216 F.3d at 310; *see id.* at 311 ("[W]e believe that the enactment of paragraph (b)(2) did not change the basic pleading standard for scienter in this circuit (except by the addition of the words 'with particularity'). Accordingly, we hold that the PSLRA adopted our 'strong inference' standard.").

*Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 848-49 (S.D.N.Y. 2019); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 234 (S.D.N.Y. 1997).

Plaintiffs nonetheless insist that "the desire to artificially inflate a company's stock price in advance of a public offering establishes a cognizable motive."  Lottery Class Opp. at 15 (citing *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp 2d 395, 420-21 (S.D.N.Y. 2011)).  The cases noted in the previous paragraph foreclose this contention.  Moreover, none of the cases cited by Plaintiffs held that, by itself, the desire to artificially inflate a company's stock price in advance of a public offering is sufficient to establish motive.

In *In re Silvercorp*, "the plaintiffs d[id] not plead merely motive" based on maximizing stock value ahead of an offering.  26 F. Supp. 3d at 275.  Rather, the complaint "contain[ed] extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress[ed] the motive alleged, and turn[ed] what might [have] be[en] a weak inference standing alone into a strong one."  *Id.*  The court's subsequent suggestion that "[t]he motive alleged may have been strong enough to survive dismissal on its own" plainly was dictum.  *Id.* at 276.

Meanwhile, *Van Dongen* and *City of Roseville* both involved instances of "unusual" (that is, suspicious) stock sales.  *See Van Dongen*, 951 F. Supp. 2d at 475 ("Ultimately, resolving doubts and drawing all reasonable inferences in favor of the plaintiff, the Court is persuaded that these sales qualify as unusual."); *City of Roseville*, 814 F. Supp. 2d at 421 ("Contrary to the defendants' view, such sales could clearly be characterized as unusual insider trading activity during the class period which may permit an inference of scienter."

(ellipsis, quotation marks, and citation omitted)).  It is true that "'[u]nusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  But Plaintiffs fail to establish that any Defendants made unusual sales.  At most, Plaintiffs assert that DiMatteo and Clemenson "each sold 375,000 shares shortly after the business combination was completed."  DCD Opp. at 7.  Yet Plaintiffs provide no further details about the sales, nor do they explain how these sales were sufficiently unusual to support a finding of motive as to DiMatteo and Clemenson (let alone as to Lottery, Dickinson, and Lever).  *See, e.g.*, *APERS*, 28 F.4th at 355 ("The Investors allege only one improper motive: the individual defendants' motive to keep the price of stock high while selling their own shares at a profit.  It is alleged that four of the six individual defendants engaged in stock sales during the putative class period; but the Investors fail to allege unusual stock trades as necessary to raise an inference of bad faith or scienter." (quotation marks and citations omitted)).

The Court does not ignore Plaintiffs' allegations that SPACs are uniquely fraud-enabling.  *See, e.g.*, Class Compl. ¶ 44 ("Amidst a recent boom in SPAC transactions, regulators – namely the SEC – have warned the public about serious, widespread concerns characteristic of these mergers, including 'risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype.'  These concerns raise questions as to whether SPAC sponsors have 'sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter.'" (ellipsis in original; footnote omitted; quoting 2021 statement by then-acting director of the SEC's Division of Corporation Finance); *id.* ¶ 45 (quoting a prior draft of Klausner et al., *supra*, for the proposition that there are "'misaligned incentives inherent in the SPAC structure,' including that 'the sponsor has an

incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate'").  But the Court is unprepared to hold here that SPACs are an exception to the general principle that the prospect of a public offering, standing alone, is insufficient to establish motive.

Even if the Court assumed that the general principle applies less (or even not at all) to SPACs, that would not save Plaintiffs' complaints.  If the alleged motive to commit fraud arose out of Defendants' desire to ensure that the de-SPAC transaction happened, that motive dissipated once the de-SPAC transaction was complete.  Plaintiffs have given the Court no reason to conclude that this motive would inspire post-merger misstatements or omissions. And, for the reasons explained above, Plaintiffs have failed to identify actionable statements or omissions from the pre-merger period.  Even if SPAC-specific incentives could uniquely support a share-price-based theory of motive, they cannot do so in this case.

In sum, the Court holds that Plaintiffs have failed to establish the requisite scienter as to any Defendant under a motive-and-opportunity theory.

### 2.  Conscious Misbehavior or Recklessness

"If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care."  *APERS*, 28 F.4th at 355 (quotation marks and citation omitted). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  *Blanford*, 794 F.3d at 306 (quotation marks and citation omitted).

At the outset, Plaintiffs suggest that the July 2022 disclosures of errors in Lottery's prior financial statements, by themselves, "support a strong inference of scienter."  Lottery Class Opp. at 16.  But "plaintiffs may not plead fraud by hindsight."  *Slayton*, 604 F.3d at 776.  "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  *Novak*, 216 F.3d at 309.  "Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice" to establish scienter under a recklessness theory.  *Id.*; *accord Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 226 (S.D.N.Y. 2009) ("The mere allegation that Defendants failed to disclose a risk does not in and of itself constitute strong evidence that they did so with scienter.").

Plaintiffs offer five reasons why, in their view, the Court should infer that Defendants were aware that their statements were inaccurate: (1) "a corporate officer's access to contrary information can be inferred where it is facially implausible that he or she would not have been privy to the information or transactions at issue"; (2) "courts recognize that obvious accounting manipulations, such as improper revenue recognition, are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue"; (3) "the magnitude of [the alleged] fraud supports an inference of scienter; (4) "a strong inference of scienter is further supported by the core operations doctrine"; and (5) "the timing and circumstances of the terminations/resignations and the withdrawal of Lottery's independent auditor also support a strong inference of scienter."  Lottery Class Opp. at 17-19 (quotation marks and citations omitted); *see also* DCD Opp. at 8-11 (making substantially the same arguments); Lever Opp. at 11-12 (same).

The first four reasons are variations on a theme: Plaintiffs urge that Defendants simply *must have* known that their statements were false or misleading given the magnitude of the restatement of revenue of a core operation of the company (namely, online lottery games) and Defendants' respective roles at the company. *See, e.g.*, Lottery Class Opp. at 17 ("[I]t simply beggars belief that the Lottery Defendants were unaware that Lottery's purported Q3 2021 sale of $30 million of marketing credits was either an outright sham or not consummated, when the ostensible proceeds of that sale comprised *half* of Lottery's total reported cash balance and *nearly half* of Lottery's total revenues for fiscal year 2021."); *id.* at 19 ("[W]hen a plaintiff has adequately alleged that the defendant made false or misleading statements the fact that [allegedly false or misleading] statements concerned the core operations of the company supports the inference that [the] defendant knew or should have known the statements were false when made." (citation omitted)).  But such allegations are not enough.

Alleging that Defendants had leadership roles at Lottery and that the actionable statements or omissions concerned Lottery's core operations is insufficient to establish scienter.  The seminal Second Circuit decision concerning the core-operations doctrine "preceded the PSLRA by six years."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).  "The Second Circuit has not decided whether the core operations doctrine remains valid as a theory of scienter following [the enactment of] the PSLRA."  *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020) (quotation marks omitted).  In this District, "the majority rule is to consider the core operations allegations to constitute supplementary, but not an independent, means to plead scienter."  *Id.* (quotation marks and citation omitted).  "In other words, the core operations doctrine can only be a buoy, not a life raft."  *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19-cv-06180 (LAP), 2021 WL 1226667, at *15 (S.D.N.Y. Mar. 30, 2021); *see, e.g.*, *In re Skechers*, 444 F. Supp. 3d at 507,

528 (scienter insufficiently alleged when plaintiffs relied solely on the CEO, COO, and CFO's "high-level positions within the [c]ompany" and the fact that "the underlying subject of the alleged fraud . . . [wa]s so fundamental to the [c]ompany's operations that the [CEO, COO, and CFO's] knowledge about it should virtually b[e] presumed"); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 533 (S.D.N.Y. 2020) ("[C]ourts in this circuit have generally invoked the doctrine only to bolster other evidence of scienter, rather than relying on it as an independently sufficient basis.  Here, because the Amended Complaint does not contain other allegations of scienter, plaintiffs' core operations theory fails as well." (citation omitted)), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (summary order); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("[T]o establish an inference of scienter, Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions.  Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." (citations omitted)); *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011) ("[W]hile the Court considers circumstantial allegations pertaining to the Individual Defendants' knowledge of Mechel's key products as part of its holistic assessment of the scienter allegations, in the absence of Second Circuit guidance, the Court does not find them to be independently sufficient to raise a strong inference of scienter." (citation omitted)), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (summary order).[11]

---

[11] At one point, Plaintiffs argue that "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 27 (2d Cir. 2020) (summary order) (quotation marks and citation omitted); *see* Lottery Class Opp. at 20 (quoting this sentence in *Lea*).  This notion,

The magnitude of a restatement of revenue "can, with other factual allegations, 'constitute sufficient pleadings as to recklessness.'"  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 (S.D.N.Y. 2011) (brackets omitted) (quoting *Rothman*, 220 F.3d at 92); *accord Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019).  Here, the ostensible proceeds of the sale of LotteryLink Credits comprised over 90 percent of the $32.25 million in revenue reported during the third quarter of 2021, *see* 11/15/21 Form 8-K/A at 13, and "constituted almost half of the entire [c]ompany's revenue and cash for the 2021 fiscal year," Class Compl. ¶ 108.

Yet while the magnitude of a financial restatement is "certainly a relevant factor, it is well established that the size of the fraud alone does not create an inference of scienter."  *In re Wachovia*, 753 F. Supp. 2d at 366 (citation omitted); *accord Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 493 (S.D.N.Y. 2012); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005).  "The magnitude of a restatement, in other words,

---

labeled "collective corporate scienter" by the Second Circuit, *Jackson*, 960 F.3d at 99, originated in a hypothetical scenario discussed in the Seventh Circuit's decision on remand from *Tellabs*, *see Dynex*, 531 F.3d at 195-96 (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).  It is not obvious what the relationship is between this principle and the core-operations doctrine.  Nonetheless, the Second Circuit has cautioned that "collective corporate scienter may be inferred" only in "exceedingly rare instances." *Jackson*, 960 F.3d at 99.  Plaintiffs have not persuaded the Court that, as presently pleaded, these circumstances qualify, such that the Court should infer Lottery's scienter under a collective-corporate-scienter theory.

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), cited by Plaintiffs, *see* Lottery Class Opp. at 20, is distinguishable.  The claim at issue in *Loreley* was New York common-law fraud, and therefore the PSLRA did not apply.  *See* 797 F.3d at 170.  Moreover, the facts alleged in support of collective corporate scienter were more copious (including quotes taken from internal emails) than those alleged here.  *See id.* at 177-78.  For comparison, in *In re DraftKings Inc. Securities Litigation*, 650 F. Supp. 3d 120, 177-78 (S.D.N.Y. 2023), the court rejected the plaintiffs' attempt to "plead corporate scienter by other means" where the complaint "d[id] not specifically identify the reports or statements containing this information that were accessible to individual defendants" (quotation marks and citation omitted).

must be presented in tandem with other circumstantial evidence to suggest scienter." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-cv-08846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014). "[W]hat is noticeably missing from the [Amended Class-Action Complaint and the Hoffman Complaint] is any allegation that [Defendants] had any contemporaneous basis to believe that the information they related was incorrect that would be sufficient to allege the requisite 'conscious recklessness.'" *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012) (quoting *S. Cherry St.*, 909 F.3d at 109); *see Dynex*, 531 F.3d at 196 (generally, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information" (brackets and citation omitted)). The core-operations doctrine cannot "bridge the gap in this regard." *Dobina*, 909 F. Supp. 2d at 251.

The magnitude of a restatement and the centrality of a revenue category to a company's core operations are insufficient even when combined with "the timing and circumstances of the terminations/resignations and the withdrawal of [an] independent auditor." Lottery Class Opp. at 19. "[T]he timing and circumstances of resignations . . . can add to a pleading of circumstantial evidence of fraud." *Yannes v. SCWorx Corp.*, No. 20-cv-03349 (JGK), 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021); *accord Vanderhoof v. China Auto Logistics, Inc.*, No. 18-cv-10174, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021) ("executive and auditor resignations," when combined with sufficient additional allegations, may give rise to an inference of scienter). But "[o]fficials resign from public companies for many innocuous reasons. These include that better opportunities were available or that personal considerations favored change. It is also axiomatic that nascent companies with uncertain futures are especially prone to turnover." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 415 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) (summary order).

Moreover, "[w]hen corporate misconduct is disclosed, members of management resign [or are terminated] for all sorts of reasons, including that they were negligent in overseeing the responsible employees or simply because the optics of changing management are better for investors and regulators." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019).

"Section 10(b), however, requires more than mere negligence: it requires recklessness." *Id.* at 304; *see Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." (citation omitted)); *S. Cherry St.*, 573 F.3d at 109 ("By reckless disregard for the truth, we mean conscious recklessness – *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." (further emphasis, quotation marks, and citation omitted)).  As presently pleaded, the terminations and resignations "are at least as consistent with punishing those at the helm for their poor judgment and leadership" as with their "relating to concocting a scheme to defraud shareholders." *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383 (2d Cir. 2015); *see, e.g.*, *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 162 (D. Conn. 2007) ("Plaintiffs have alleged and the [New York Insurance Department] found various management problems, accounting deficiencies, and lack of organization.  In the absence of facts connecting [executives of the company] to the alleged fraud, it is more likely that they were terminated and resigned as a result of company mismanagement, not securities fraud."), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (summary order).

As Plaintiffs correctly note, it is improper "to compartmentalize each scienter element in isolation." Lottery Class Opp. at 20.  The scienter analysis must rest "not on the presence or absence of certain types of allegations, but on a practical judgment about whether, accepting the whole factual picture painted by the [c]omplaint, it is at least as likely as not that defendants acted with scienter." *Slayton*, 604 F.3d at 775 (quotation marks and citation omitted).  The only reasons that Plaintiffs give for inferring Defendants' scienter are the magnitude of the restatement, the fact that the restatement concerned a core operation of the company, and the departures of the company's executives and auditor.  These facts, taken together, do not "give rise to a strong inference of scienter" as to any Defendant.  *Tellabs*, 551 U.S. at 323; *see, e.g.*, *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 162-72 (S.D.N.Y. 2021) (scienter not established under conscious-misbehavior-or-recklessness theory based on, among other facts, the magnitude of the alleged fraud, executives' sudden resignations, and the core-operations doctrine); *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 236-41 (S.D.N.Y. 2020) (same); *In re Iconix Brand Grp., Inc.*, No. 15-cv-04860 (PGG), 2017 WL 4898228, at *17-19 (S.D.N.Y. Oct. 25, 2017) (same); *Glaser*, 772 F. Supp. 2d at 594-99 (same).  If scienter could be pleaded based solely on such allegations, virtually every company that issues a large restatement of revenue could be forced to defend securities-fraud actions – a result that is hard to square with this Circuit's understanding of the law.  *Cf. Rombach*, 355 F.3d at 176-77.  As the complaints are currently pleaded, "a reasonable person would deem the inference of scienter [less] compelling [than the] opposing inference" that Defendants were negligent and committed acts of corporate mismanagement, not securities fraud.  *Tellabs*, 551 U.S. at 324.[12]

---

[12] *In re Pareteum Securities Litigation*, No. 19-cv-09767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021), cited by Plaintiffs, *see* Lottery Class Opp. at 19, is distinguishable.

To summarize, Plaintiffs have plausibly alleged that various statements made after the merger between Trident and Lottery were materially false or misleading.  But Plaintiffs have failed to plead sufficient facts to give rise to a strong inference of scienter for any Defendant in relation to any of the potentially actionable post-merger statements.  Therefore, Class Claim I and Hoffman Claim I are dismissed.[13]

## III.  Section 14(a) Claims

Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies in contravention of any rule or regulation promulgated by the SEC."  *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993).  SEC Rule 14a-9 prohibits the issuance of a proxy statement which is "false or misleading with respect to any material fact,

---

In that case, "the [c]ompany's auditors advised Defendants that their internal controls over financial reporting were inadequate and ineffective."  *In re Pareteum*, 2021 WL 3540779, at *16 (quotation marks omitted).  Plaintiffs do not identify a fact or circumstance of comparable import here.

[13] Because the Court holds that the Class Plaintiffs have not adequately alleged Lever's scienter, the Court declines to reach the question of whether – by signing the cover sheets for the 11/15/21 Form 8-K, the 3/31/22 Form 8-K, and the 5/16/22 Form 8-K – Lever was a "maker" of the actionable statements in those 8-Ks for purposes of *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *compare, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) ("[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b)."), *with Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 363 (S.D.N.Y. 2022) ("That Zhang signed the Form 6-K – the cover page – attached to the press release does not mean he is the 'maker' of the press release.").

The Court also need not consider whether other facts about Lever's possible role in discovering the accounting errors – absent from the Amended Class-Action Complaint but asserted by Lever in her brief, *see* Lever Br. at 5-6 – are cognizable on a motion to dismiss, *see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."), or whether those facts would further undermine an inference of scienter as to Lever, *see* Tr. at 42:18-23 (counsel for the Class Plaintiffs admitting that the issue of Lever's scienter "was a difficult question for us" given that Lever "was part of the investigation to uncover some of these deficiencies").

or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

"To state a claim under Section 14(a) of the Securities Exchange Act of 1934, and Rule 14a-9 promulgated thereunder, a shareholder must, at the very least, identify a materially misleading misrepresentation or omission in the proxy materials."  *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 38 (2d Cir. 2020) (summary order).  "Materiality for purposes of Section 14(a) is indistinguishable from the Section 10(b) standard."  *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020); *see TSC Indus.*, 426 U.S. at 449 (announcing the materiality standard applicable to Section 14(a) and Rule 14a-9 claims); *Basic*, 485 U.S. at 232 ("We now expressly adopt the *TSC Industries* standard of materiality for the § 10(b) and Rule 10b-5 context.").

For the reasons stated above regarding Plaintiffs' pre-merger Proxy-related claims under Section 10(b) and Rule 10b-5, the Court holds that the Proxy contains no material misstatements or omissions under Section 14(a) and Rule 14a-9.  *See, e.g.*, *ECA*, 553 F.3d at 206 ("Because we have concluded that Plaintiffs failed to allege any misstatements or omissions by [the defendant] that could be found to be material [for purposes of Section 10(b)], Plaintiffs' claims under section 14(a) of the Exchange Act . . . must also fail.").  Hence, Class Claim III is dismissed.  The Court declines to decide the other issues raised by the parties regarding the requirements of claims under Section 14(a) and Rule 14a-9.

## IV.     Section 20(a) Claims

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act."  *Blanford*, 794 F.3d at 305 (brackets and citation omitted).  Thus, liability under Section 20(a) is "derivative of liability under some other provision of the Exchange Act."  *Morrison v.*

*Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253 n.2 (2010).  Because Plaintiffs' claims under

Sections 10(b) and 14(a) fail, their claims under Section 20(a) – Class Claim II, Class Claim

IV, and Hoffman Claim II – necessarily fail as well.  *See, e.g.*, *In re Philip Morris*, 89 F.4th at

429; *ECA*, 553 F.3d at 207.  The Court declines to decide the other issues raised by the parties

regarding the requirements of claims under Section 20(a).

## V.     Leave to Amend

Plaintiffs request that, in the event of dismissal, the Court grant them leave to amend.

*See* Lottery Class Opp. at 25; Tr. at 59:3-9.[14]  Defendants request that the Court dismiss the

Amended Class-Action Complaint and the Hoffman Complaint with prejudice.  *See, e.g.*,

Lottery Class Br. at 25; Lottery Hoffman Br. at 20.  The Court denies Defendants' request.

Instead, the Court grants Plaintiffs leave to amend their complaints.

A court "should freely give leave" to amend a complaint "when justice so requires."

Fed. R. Civ. P. 15(a)(2).  "This permissive standard is consistent with [the Second Circuit's]

strong preference for resolving disputes on the merits."  *Williams*, 659 F.3d at 212-13

(quotation marks and citation omitted).  To be sure, "it is within the sound discretion of the

district court" to deny leave to amend "for good reason, including futility, bad faith, undue

delay, or undue prejudice to the opposing party."  *Broidy Cap. Mgmt. LLC v. Benomar*, 944

F.3d 436, 447 (2d Cir. 2019) (citation omitted).  But "in the absence of a valid rationale like

undue delay or futility, it is improper to simultaneously dismiss a complaint with prejudice

under Rule 12(b)(6) and deny leave to amend when the district court has not adequately

---

[14] Although Hoffman did not request leave to amend until oral argument, "the lack of a formal motion is not sufficient ground for a district court's dismissal [of the complaint] without leave to amend, so long as the plaintiff has made its willingness to amend clear."  *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992).

informed the plaintiffs of its view of the complaint's deficiencies." *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 363 (2d Cir. 2023).

The Court grants Plaintiffs leave to amend within twenty-one (21) days of the date of this decision. Plaintiffs have not "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed." *Foman v. Davis*, 371 U.S. 178, 182 (1962). And the Court has no reason to conclude that Plaintiffs have unduly delayed or acted in bad faith, that granting leave to amend would unduly prejudice Defendants, or that granting leave to amend would be futile. *See Broidy*, 944 F.3d at 447.

## CONCLUSION

For the foregoing reasons, the Amended Class-Action Complaint and the Hoffman Complaint are DISMISSED with leave to amend **within twenty-one (21) days** of this opinion and order. The Clerk of Court is respectfully directed to terminate the pending motions at ECF Nos. 76, 80, 85, 88, 91, 93, 111, and 115.

Dated: February 6, 2024
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge