**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

IN RE LOTTERY.COM, INC.
SECURITIES LITIGATION

Case No. 1:22-cv-07111-JLR

**SECOND AMENDED COMPLAINT
OF *PRO SE* PLAINTIFF
HAROLD M. HOFFMAN**

**JURY TRIAL DEMANDED**

Plaintiff Harold M. Hoffman, *pro se* ("Plaintiff), alleges the following upon information and belief, except as to allegations specifically concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon his investigation, which includes, among other things, (i) review and analysis of regulatory filings made by Lottery.com, Inc. ("Lottery" or the "Company"), f/k/a Trident Acquisitions Corp. ("TDAC") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of analyst and media reports; (iii) review and analysis of press releases and other public statements issued and disseminated by the Company or its authorized agents; and (iv) review of other publicly available information concerning Lottery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities action seeking to recover compensable damages caused by Defendants' violations of the federal securities laws. Plaintiff seeks to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    This action concerns the Company's failure to adhere to gambling regulations and the improper recognition of revenue to appear more profitable ahead of taking the Company public. As a member of Lottery's Board admitted: "We are breaking the law in 42 different ways," and "I am without words. The potential for Homeland Security, AML [anti-money laundering laws], and all the other things that come into play is beyond breathtaking," according to a March 4, 2024 Bloomberg Tax ("Bloomberg") article.[1] That article summarizes the improper conduct at issue here

---

[1] On March 4, 2024, Bloomberg published an investigative article entitled, "From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded," which was written by Nicola M. White. According to the article, the article was the result of interviewing more than a dozen current and former employees, board members and vendors, some of whom spoke on condition of anonymity; obtaining audio recordings, internal communications and board documents; and examining press releases, lawsuits, and securities filings. A copy of the article is attached hereto as Exhibit A.

1

succinctly:

> Lottery.com had promised to do for lottery ticket sales what Uber did for getting a ride or DoorDash for getting a meal. No longer would you have to go into a convenience store to get your weekly fix of Powerball or Mega Millions; you could buy a ticket from anywhere on an app.

> Instead, Lottery.com came to represent all the hubris and excesses of the special purpose acquisition company era: phantom revenues, multiple CEOs hired and fired, accusations of forged documents, an alleged check-kiting scheme, trails of stiffed investors and vendors—including a church— and finally, a promised rescue by a would-be Premier League team owner that turned into something else.

3.      The Bloomberg article confirmed all the allegations contained in Plaintiff's prior amended complaint and provides additional details about the Company's two separate categories of improper conduct: (1) the Company's $30 million dollar sham transaction that it improperly recognized as revenue and (2) the Company's illegal practice of having lottery tickets purchased in states different from their customers' locations, which was contrary to express representations that the Company made in public filings.

4.      As a result of the Individual Defendants' fraud, Lottery is subject to multiple regulatory and criminal investigations. In fact, the Bloomberg article explained that "its past looms large, with Securities and Exchange Commission and Department of Justice investigations underway. At least three company insiders say they've been interviewed by the US Attorney's office for the Southern District of New York."

5.     TDAC was a special purpose acquisition corporation ("SPAC"). TDAC's stated purpose was to locate and acquire an appropriate company doing business in the energy/oil sector in Eastern Europe. After going public in a May 2018 Initial Public Offering ("IPO"), TDAC raised $205 million from investors. If an acquisition failed to take place before a stated deadline, TDAC was required to

2

return all of the capital it had raised from investors. As TDAC failed to find such a target company, its shareholders began redeeming their shares such that the amount of funds available to TDAC to pursue and complete an energy/oil acquisition dwindled from more than $205 million to less than $70 million. To prevent the return of the remaining money and squander an opportunity to enrich themselves – as TDAC's officers and directors, including Defendant Komissarov, stood to reap millions from any merger – TDAC rushed to orchestrate a merger between TDAC and Lottery (the "Business Combination"), even though Lottery was a provider of domestic and international lottery products and services, and was not in the energy sector. As the Bloomberg article explained, even Defendant DiMatteo admits Lottery was not ready to go public:

> The way DiMatteo tells it, the pressure to close the deal and excitement of the SPAC market propelled the company to go public, ready or not.
>
> "They were eager to get a deal done," DiMatteo said. "We had no idea what this game was. They were the grownups in the room."

6. To drum up support for the Business Combination, Defendants touted Lottery's purportedly strong revenue figures and future prospects, as well as its strong relationships with state regulators and its ability to ensure compliance with appropriate laws and regulations – an important fact to investors, given the highly regulated space in which Lottery conducted it business. The Business Combination was ultimately completed, and the Company initially appeared to have made good on its prior revenue projections, reporting quarter after quarter of strong results. Unbeknownst to investors, however, these financial results and claims of regulatory compliance were illusory.

7. Contrary to these purportedly strong financial results, on September 20, 2021 (*i.e.*, prior to issuance of the Proxy Statement filed in advance of the business combination, effective on October

18, 2021 (the "Proxy Statement")), the Company entered into a massive sham transaction specifically to inflate its purported revenue. The purported agreement was with a "major customer" for the sale of Lottery's service credits for a total purchase price of $30 million. Upon execution of the purchase agreement on September 20, 2021 (that is, before Lottery transferred any credits to the customer), the Company recognized the $30 million as revenue and recorded $10 million in cost of sales related to this transaction.

8.    According to the Company, the customer provided payment prior to December 31, 2021, in the form of a check accepted by the Company for deposit, and Lottery included this amount in undeposited funds. But the Company did not actually deposit this check. Instead, the Company apparently used proceeds from the Business Combination to acquire a $30 million business loan through one of Lottery's subsidiaries, which was backed by $30 million Lottery had from the Business Combination. According to the Company, Lottery then allowed the "major customer" to use the $30 million loan to finance the purchase of Lottery's credits.

9.    The Company's executives were aware of the nature and specifics of these transactions. In fact, Defendant Ryan Dickinson was the signatory of the loan. Moreover, given that the $30 million loan was secured by $30 million Lottery already had in its account, there is no rational way that the Individual Lottery Defendants would not have been privy to the transaction—especially in light of the fact that these sums totaled roughly *half* of the $62.6 million that Lottery reported as cash

and cash equivalents as of December 31, 2021.[2] Thus, the Individual Lottery Defendants knew this was a sham transaction: the Company accepted but did not cash a check from a customer, then borrowed $30 million from a bank and allowed the same customer to use the $30 million in funds from the bank as payment to Lottery towards the purchase of Lottery service credits. In sum, the transactions with this customer were a facade to manufacture $30 million in sales, which Lottery recognized before it had even performed its obligations under the agreement.

10.    Long after all of the Individual Lottery Defendants were no longer with the Company, Lottery finally admitted that the entire $30 million transaction was a sham. As the Company explained in its Annual Report with the SEC on Form 10-K/A filed on May 10, 2023, "During 2022, the Company discovered that the service credits it had sold to the customer were non-transferable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits." This disclosure is an admission that the Company's executives had entered into an arrangement with the "major customer" where Lottery would lend the customer money to purportedly buy Lottery service credits. This was not a legitimate transaction, and unsurprisingly the Company had to restate all financial results that contained anything to do with this transaction.

_____

2    The fact that the Company never disclosed the $30 million loan in its financial statements, which would have revealed the true sham nature of these transactions, even though it was obligated to, yet included all positive results on its books further demonstrates that this scheme was intentional.

5

11.    The scheme did not stop there. The Company invoiced more than $35 million to this one customer for "various services and advertising credit" Lottery claimed to have provided it. This was included in the Company's financial results as revenue of $17,117,472 in the fourth quarter of 2021 and $18,539,472 in the first quarter of 2022.

12.    But, as the Company later admitted in its Annual Report filed with the SEC on Form 10-K/A filed on May 10, 2023, Lottery had not actually provided the customer anything of value because the "service credits it had sold to the customer were non-transferrable." In layman's terms, the Company had never actually transferred (or was even able to transfer) these purported "service credits" to the customer *even though Lottery had invoiced them and treated them as revenue*. Of course, all of this was in complete violation of generally accepted accounting principles ("GAAP") and was clearly improper. As such, it is not a surprise that the Company's auditor resigned, and all the top executives of Lottery were forced out of their positions as result of the sham transaction.

13.    When the Company disclosed the sham nature of the transaction in its 2022 Annual Report, Lottery also stated that as a result of the cancellation of the transaction, the Company had "decreased both accounts receivables and revenues by $17,117,472, in the restated financial statements for the year ended December 31, 2021; and $18,539,472, in the restated financial statements for the three months ended March 31, 2022."

14.    The Company also made false statements regarding its compliance with applicable laws and regulations – again, a critical fact for a company operating in the highly regulated gaming industry. According to the Bloomberg article, since before 2020, Lottery was printing out lottery tickets in states where the purchaser was not located, which was an illegal practice. As the Bloomberg article explained:

> Lottery.com had to hire couriers in each state to go to convenience stores and gas stations to buy tickets and store them.
>
> Couriers sometimes couldn't be found when a customer ordered a ticket, however, according to an internal investigation initiated by the company's chief legal officer, Katie Lever. When that happened with an order for a Powerball ticket from a customer in Pennsylvania, for example, the company directed that ticket to get printed in a backup hub in Texas, where the company was headquartered and had a state-licensed lottery retail outlet, the investigation revealed.
>
> This technically made the purchase not a Pennsylvania lottery ticket, but a Texas lottery ticket. That deprived Pennsylvania of revenue from the sale and the tax revenue on any winnings. It's also illegal...

15.     Moreover, the Bloomberg article also explained that while Lottery had said in SEC filings that it had geolocation technology to confirm that web-based customers were in the state where they said they were located, this was simply not true.[3] In fact, anybody using the web-based system, as opposed to the mobile app, could easily just skirt any jurisdictional requirement for ticket purchases.

16.     As the lack of regulatory compliance and ramifications of the sham transaction and phantom revenue were slowly revealed, the value of Lottery's securities plummeted, and Lottery's investors lost millions. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff suffered significant losses and damages.

17.     Beginning on November 15, 2021, a series of disclosures revealed the true state of Lottery's financial and operational condition. On November 15, 2021, Lottery filed with the SEC a Form 8-K announcing that, on November 10, 2021, the Board had dismissed Marcum LLP as

---

[3]     The geolocation technology allegedly utilized by Lottery is known as "geofencing." Geofencing is a type of geolocation technology whereby a mobile app or software uses geolocation technology to create and trigger a defined geographical boundary known as a geofence.

the Company's auditing firm. That same day, the Company disclosed that nearly all of its revenue for the quarter (approximately $32.25 million) was the result of a single $30 million sale of affiliate marketing credits, which was not its primary business activity, during the quarter. On this news, the price of Lottery shares declined from a closing price of $13.25 per share on November 12, 2021, to close at a price of $6.98 per share on November 22, 2021, a decline of nearly 50%.

18.     On July 6, 2022, Lottery disclosed that an independent investigation by outside counsel revealed "instances of non-compliance with state and federal laws concerning the state in which tickets are purchased as well as order fulfillment." The investigation also identified "issues pertaining to the Company's internal accounting controls." On this news, Lottery's shares fell more than 12%, or $0.15, from a closing price of $1.22 per share on July 5, 2022, to a closing price of $1.07 per share on July 6, 2022, on abnormally high volume.

19.     Little more than a week later, on July 15, 2022, the Company announced that its Chief Revenue Officer ("CRO"), Defendant Matthew Clemenson, had resigned on July 11, 2022. Providing an update on its internal investigation, the Company stated that it "preliminarily conclude[d] that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount." On this news, shares of Lottery fell more than 14.5%, or $0.14, from a closing price of $0.96 per share on July 15, 2022, to a closing price of $0.82 per share on July 16, 2022, on abnormally high volume.

20.     A week later, on July 22, 2022, Lottery further disclosed that (i) the Company's new auditor, Armanino LLP, had determined that financial statements for the full-year fiscal 2021 and first quarter 2022 should no longer be relied upon, and that a Company subsidiary

entered into an undisclosed line of credit in January 2022, and (ii) troublingly, its CEO and co-founder, Lawrence Anthony "Tony" DiMatteo III, was resigning, effective immediately. On this news, Lottery shares declined another 12%, or $0.10, over the next two trading days, from a closing price of $0.82 per share on July 22, 2022, to a closing price of $0.72 per share on July 26, 2022.

21.     Finally, on July 29, 2022, Lottery revealed that its "capital resources are not sufficient to fund its operations for a twelve-month period and, therefore, there is substantial doubt about the Company's ability to continue as a going concern." The Company also disclosed that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll," that it therefore intended to furlough "certain employees," effective July 29, 2022. The market had clearly not been conditioned to the Company's dire condition, as on this news, shares declined 64%, falling $0.52 per share, from a closing price of $0.81 per share on July 28, 2022, to a close of $0.29 per share on July 29, 2022.

22.   Things only worsened thereafter. Two weeks after the furlough announcement and the "going concern" disclosure, on August 16, 2022, the Company revealed that it had "furloughed the majority of its employees effective July 29, 2022," and absent being able to "secure additional capital resources," it would "be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets." In short, within months, all of Lottery's senior management were either terminated or resigned, Lottery's auditor resigned due to an inability to rely on management, and the Company's entire board of directors turned over.

23.     On June 15, 2023, the Company was forced to admit that "Certain of our former officers are currently the subject of investigations and inquiries by the SEC and the U.S.

Department of Justice (the "DOJ") relating to the findings of the Internal Investigation and other matters, and we are cooperating fully with such investigations and inquiries."

24.    The failures at Lottery were so blatant that a subsequent CEO of the Company described it as either a "perfect fraud" or "perfect stupidity." That this executive found the misconduct so obvious highlights the intentional, or at least severely reckless, nature of Defendants' actions and misleading statements.

25.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

26.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.l0b-5).

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

28.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). At all relevant times, Lottery stock was listed and traded on the NASDAQ in this Judicial District, certain Defendants resided or conducted business in this Judicial District, and wrongful conduct took place in this Judicial District.

29.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A.    Plaintiff

30.    Plaintiff Harold M. Hoffman, a citizen of the State of New Jersey, purchased 20,000 shares of Lottery.com on November 22, 2021 at a cost of $149,397 and an average, artificially inflated price of $7.47 (hereinafter "Plaintiff's Purchase."). Plaintiff has suffered damages as a result of Defendants' federal securities law violations; Defendants' false and/or misleading statements and/or material omissions alleged herein; and, upon revelation of Defendants' alleged corrective disclosures.

### B.    Defendants

31.    Defendant Lottery is incorporated in Delaware. Lottery's current principal executive offices are 20808 State Hwy 71 W, Unit B, Spicewood, TX 78669. Following the Business Combination, Lottery's shares and warrants began trading on the NASDAQ under the symbols "LTRY" and "LTRYW," respectively. Prior to the Business Combination, the Company was known as Trident Acquisitions Corp., or TDAC, and was a special purpose acquisition company, which was incorporated in Delaware with its principal executive offices located at 77 Water St., FL 8, New York, NY 10005.

32.    Defendant Lawrence Anthony "Tony" DiMatteo III ("DiMatteo") was co-founder of AutoLotto, Inc. ("AutoLotto"), which was doing business as "Lottery.com" prior to the Business Combination, and served as an officer and director of AutoLotto since 2015. Defendant DiMatteo became Chief Executive Officer ("CEO") of the Company and the Company's Chairman upon the closing of the Business Combination. He served in those roles at the Company until his resignation

11

as CEO on July 22, 2022 and his resignation as a director on September 8, 2022. DiMatteo owned approximately 14% of Lottery at the time of the Business Combination and sold 375,000 Purchase Right shares at prices between $6.35 and $6.87 per share on December 2, 2021, to receive proceeds of between approximately $2,381,250 and $2,576,250 shortly after the Business Combination was completed.

33.     Defendant Ryan Dickinson ("Dickinson") served as the Company's President, Treasurer and Acting Chief Financial Officer ("CFO") from October 2021 until his termination effective July 1, 2022, and Chief Financial Officer from March 2022, until his termination effective July 1, 2022. Defendant Dickinson joined AutoLotto in June 2018 and served as Executive Vice President of Product until October 2018, at which time he was appointed President and Chief Operating Officer. According to the Proxy Statement, Dickinson was to be awarded $35 million in restricted stock upon the completion of the Business Combination that would vest after an additional six months of employment.

34.     Defendant Matthew Clemenson ("Clemenson") was a co-founder of AutoLotto and served as its President from 2015 to 2019 and its Chief Commercial Officer since 2019. Upon the consummation of the Business Combination, defendant Clemenson became the Company's Chief Commercial Officer and served in that role until March 2022 at which time he became the Company's CRO. He served as a Company director from October 2021 until his resignation on July 11, 2022. Clemenson, like DiMatteo, owned approximately 14% of Lottery at the time of the Business Combination and sold 375,000 Purchase Right shares at prices between $6.35 and $6.87 per share on December 2, 2021, to receive proceeds of between approximately $2,381,250 to $2,576,250 shortly after the Business Combination was completed.

12

35.     Defendants DiMatteo, Dickinson and Clemenson are referred to herein as the "Individual Lottery Defendants." The Individual Lottery Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lottery's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.,* the market. The Individual Lottery Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to, and indeed were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

36.     Lottery and the Individual Lottery Defendants are referred to collectively as "Lottery Defendants."

37.     Defendant Vadim Komissarov ("Komissarov") was CEO and a director of the Company, then known as TDAC, prior to the Business Combination. Defendant Komissarov was also TDAC's CFO until he resigned from this position on November 20, 2020. Defendant Komissarov, because of his position with the Company, possessed the power and authority to control the contents of Lottery's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.,* the market. Komissarov was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance

13

or cause them to be corrected. Because of Komissarov's position and access to material non-public information available to them but not to the public, he knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

38.    Komissarov was heavily involved in TDAC's decision to enter into the Business Combination with Lottery, and he was highly motivated to complete the transaction at all costs, knowing that his personal financial interest in TDAC was dependent on it. Following three extensions to TDAC's deadline to consummate a business combination, and faced with dwindling funds with which to effectuate such a deal, Komissarov introduced TDAC's management to Lottery as a potential target for acquisition. Thereafter, Komissarov received Lottery's historical and projected financial information, as well as information necessary to perform regulatory due diligence on Lottery, met with Lottery's senior management on numerous occasions, and ultimately signed the Business Combination Agreement with Lottery on TDAC's behalf. Komissarov also enthusiastically solicited proxies urging TDAC shareholders to vote in favor of the Business Combination, and he did so via SEC filings that contained false and misleading information about Lottery's revenue projections and results, as well as its supposed compliance with applicable laws and regulations. The Proxy Statement even referenced Mr. Komissarov's name on no fewer than 42 occasions. Komissarov's signature appeared in the Proxy Statement, and as TDAC's director and CEO, he had the power and authority to control the contents of that document and he reviewed it prior to issuance. Several days later, on October 21, 2021, TDAC filed a press release with the SEC pursuant to Rule 14a12, in order to garner additional support for the Business Combination, as the shareholder vote regarding the transaction was just days away. The press release named Komissarov as TDAC's contact person with respect to the information provided therein, and as alleged herein, contained misleading statements.

14

39.    The Individual Lottery Defendants and Komissarov are collectively known as the "Individual Defendants." The Individual Defendants and Lottery are referred to collectively as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A. Special Purpose Acquisition Companies And Their Inherent Conflicts Of Interest

40.    SPACs are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's IPO is held in trust for a specific period of time to fund the acquisition.

41.    If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

42.    The business combination effectuated by a SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC transactions and IPOs have certain key differences. In a traditional IPO, banks underwrite the offering and perform substantial due diligence to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. However, in a SPAC transaction, there are no underwriters; the due diligence and the disclosures supporting the business combination are solely determined by the SPAC and its controlling persons, who have strong

incentives to agree to and obtain shareholder approval for an acquisition regardless of its true merits.

43.    Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

44.    Amidst a recent boom in SPAC transactions, regulators – namely the SEC – have warned the public about serious, widespread concerns characteristic of these mergers, including "risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype."[4] These concerns raise questions as to whether SPAC sponsors have "sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter."

45.    Numerous other commentators have similarly noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For example, in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate."[5] Based on empirical research of post-merger returns to SPAC shareholders, that paper concludes that "SPAC

---

4  John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at*: https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

5  Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (December 20, 2021). YALE JOURNAL ON REGULATION, 2022, Volume 39, Issue 1, *available at*: SSRN: https://ssrn.com/abstract=3720919.

sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

### B.    TDAC, a SPAC, Takes Lottery Public

#### 1.  Background Of TDAC: A SPAC Focused On The Energy Sector In Eastern Europe

46.     Trident Acquisitions Corp. (previously defined as "TDAC") was a blank check, special purpose acquisition company, which was formed under the laws of the State of Delaware on March 17, 2016 for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination.

47.     TDAC filed its IPO prospectus (the "IPO Prospectus") with the SEC on May 30, 2018. On June 1, 2018, TDAC consummated the IPO of 17,500,000 units (the "Units"). Each Unit consisted of one share of common stock and one warrant entitling its holder to purchase one share of common stock at a price of $11.50 per share. TDAC also granted the underwriters a 45-day option to purchase up to 2,625,000 additional Units to cover over-allotments, if any. On June 4, 2018, the underwriters exercised the option in full, and the closing of the issuance and sale of the additional Units occurred on June 5, 2018. Following its IPO, TDAC's units began to trade on the NASDAQ, under the symbol "TDACU" on May 30, 2018, and the common stock and warrants comprising the Units began separate trading on NASDAQ on June 13, 2018, under the symbols "TDAC" and "TDACW", respectively.

48.     The total aggregate issuance by the Company of 20,125,000 Units at a price of $10.00 per Unit resulted in total gross proceeds of $201,250,000. As of June 5, 2018, a total of $205,275,000 of the net proceeds from the IPO and the private placement consummated

simultaneously with the closing of the IPO[6] were deposited in a trust account established for the benefit of the Company's public shareholders (*i.e.*, to fund a business combination).

49.    Though the IPO Prospectus did not identify a target business with which TDAC would combine, it stated that the company "intend[ed] to focus [its] efforts on seeking a business combination with an ***oil and gas or other natural resources companies in Eastern Europe or interested in expanding into Eastern Europe***." In support thereof, the directors and officers of TDAC held themselves out to investors as highly experienced in industrial businesses in Eastern Europe in the energy sector. As TDAC explained:

> As Europe is striving to achieve energy independence, we believe that Eastern European oil and gas deposits, which are small and technically difficult to access, will attract the interest of investors and governments. We believe that historical exploration data can be reassessed with new geological knowledge to determine which reserves that were previously considered unrecoverable or uneconomic can be profitably recovered. Two of the most promising countries in Europe for exploration and development of oil and gas are Ukraine and Poland.

> We want to take advantage of privately held Eastern European oil and gas operating companies that have significant production volume and positive cash flows, but little or no reserves. By acquiring a company with undeveloped reserves and hiring companies that have engineering and geological expertise to develop the reserves, we believe that we will be able to create value for our investors.

_____

6    Simultaneously with the closing of the IPO, the Company consummated the private placement ("Private Placement") with certain of its initial stockholders of 1,150,000 units (the "Private Units") at a price of $10.00 per Private Unit, generating total proceeds of $11,500,000. The Private Units are identical to the Units sold in the IPO except that the warrants will be non-redeemable and may be exercised on a cashless basis, in each case so long as they continue to be held by the initial purchasers or their permitted transferees. Additionally, such initial purchasers agreed not to transfer, assign, or sell any of the Private Units or underlying securities (except in limited circumstances, as described in the registration statement) until the completion of the Company's initial business combination.

50.     TDAC's only three employees were its executive officers, all of whom claimed to be qualified and experienced in the oil and gas industries. TDAC was led by Ponomarev, whom TDAC repeatedly touted as experienced in the energy industries and working in Eastern Europe. For example, TDAC stated, "Mr. Ponomarev is qualified to serve as a member of our Board of Directors because his understanding of new technologies in oil & gas field and his international network of political and business leaders." Moreover, in its IPO, TDAC similarly touted the energy industry experience of COO Tymofiev and director Verona, stating as to Verona that he is "qualified to serve as a member of our Board of Directors because of his experience in the oil & gas industry, his in-depth, hands-on knowledge of Eastern European business environments, and his prominent international government affairs roles." TDAC also touted other officers' experience in Eastern Europe and CIS countries.

51.     The IPO Prospectus did not disclose whether any of its directors or officers had any experience with online technology companies or lotteries. In fact, TDAC's directors and officers had no meaningful experience in these subjects.

### 2.  TDAC's Management Faced Pressure To Complete A Qualifying Business Combination

52.     Due to the TDAC's management's ownership interests in TDAC and the terms and financial structure of TDAC as a SPAC, TDAC's management, including Defendant Komissarov, possessed strong financial incentives to complete *any* qualifying transaction.

53.     TDAC was subject to certain restrictions in its amended and restated certificate of incorporation regarding its pursuit of an acquisition. Specifically, the Company had until December 1, 2019 to consummate a business combination. If the Company was unable to consummate a business combination by then, the Company would be required to (i) cease all operations except for

19

the purpose of winding up, (ii) redeem 100% of the outstanding public shares as promptly as reasonably possible but no more than ten business days thereafter, and (iii) liquidate and dissolve the Company.

54.     TDAC was authorized to seek stockholder approval for an extension of this deadline. However, if such an extension was approved, TDAC was required to provide shareholders with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment to the deadline. Attempting to obtain such a postponement of its deadline for a business combination thus presented serious risks that: (i) shareholders would not approve the postponement, thus forcing TDAC to liquidate if it failed to complete a transaction on time, or (ii) if a postponement was approved, shareholders may decide to redeem TDAC shares in amounts that would significantly deplete TDAC's trust account and jeopardize its ability to complete a transaction even with an extended deadline.

55.     The directors and officers of TDAC acquired a significant financial interest in TDAC through the acquisition of shares and warrants prior to the IPO. These shares and warrants would be worthless if a business combination did not occur. As TDAC explained:

> In March 2016, the Company issued 3,737,500 shares of common stock to the initial stockholders (the "insider shares") for an aggregate purchase price of $25,000. In February 2018, the Company sold an additional 1,293,750 insider shares for an aggregate purchase price of $8,654, resulting in a total of 5,031,250 insider shares issued and outstanding....

> The initial stockholders have agreed not to transfer, assign or sell any of the insider shares (except to certain permitted transferees) with respect to 50% of the insider shares, until the earlier of (i) six months after the date of the consummation of a Business Combination and on the date on which the closing price of the Company's common stock equals or exceeds $12.50 per share for any 20 trading days within any 30-trading day period following the consummation of a Business Combination and, with respect to the remaining 50% of the insider shares, six months after the date of the consummation of a Business Combination, or if, (ii) subsequent to a Business Combination, the Company consummates a subsequent liquidation, merger, stock exchange or other similar transaction which results in all of the stockholders having the right to exchange their common stock for cash, securities or other property (the "Lock-Up Period").

20

56.    TDAC had failed to enter into a business combination as the December 1, 2019 deadline approached. TDAC then sought and obtained three extensions of the deadline, and each time, a portion of shareholders sought to redeem their shares:

(a)    In November 2019, TDAC sought an extension of the deadline until May 29, 2020. Stockholders approved the proposal. However, in connection with the approval of the extension, stockholders had the right to redeem their shares for cause, and shareholders elected to redeem an aggregate of 13,081,434 shares of the Company's common stock. As a result, an aggregate of approximately $137,130,484 (or approximately $10.48 per share) was removed from the Company's trust account to pay such stockholders.

(b)    Even with this extension, TDAC was unable to find an appropriate company to purchase by the once-extended May 29, 2020 deadline. So, TDAC again sought an extension of the business combination deadline, and second extension until September 1, 2020 was approved. However, holders of another 627,059 shares of TDAC's common stock redeemed their shares for cash, resulting in a trust account balance of $68,219,114.98 after giving effect to the redemptions.

(c)    TDAC then sought a third extension prior to the September 1, 2020 deadline, and shareholders approved an additional three month extension to December 1, 2020. However, holders of a further 630,037 shares of the Company's common stock redeemed their shares for cash, resulting in a trust account balance of approximately $62,286,780 after giving effect to the redemptions.

57.    With each extension and corresponding redemptions by shareholders, TDAC's management saw their financial interest in the company continue to dwindle. Moreover, as TDAC's management, including Defendant Komissarov, was certainly aware, as redemptions occurred, the amount of funds TDAC had access to for an acquisition greatly declined, further shrinking the available pool of potential companies for which a potential acquisition by TDAC would be enticing.

21

### 3.      TDAC Uses Its Dwindling Funds To Acquire Lottery

58.      On November 19, 2020, with another business combination deadline fast approaching, TDAC announced that it had signed a letter of intent to combine with Lottery, which was then a private company.

59.      Founded in 2015, AutoLotto, Inc., doing business as Lottery.com, was an Austin, Texas-based company. Lottery represented itself to be: (1) a leading online platform to play the lottery, offering official state-sanctioned lottery games like Powerball, Mega-Millions and other state games, in the U.S. and around the world, and (2) the world's largest provider of lottery data – such as current and previous winning numbers, jackpots and draw dates, jackpot analysis and more, covering almost 600 lottery games in 38 countries in real time – to over 400 digital publishers, including hundreds of digital newspapers, television and news sites, and major digital publishers such as Google, Verizon/Yahoo, Amazon's Alexa devices and more.

60.      TDAC's announcement regarding a letter of intent with Lottery disclosed that the transaction would be structured so that Lottery's stockholders would roll 100% of their equity into the business combination, with no minimum cash requirement, and that the parties anticipated closing the business combination in first quarter of 2021.[7]

61.      On October 29, 2021, the Company announced the completion of the Business Combination, and upon the closing, the combined entity was renamed Lottery.com. On

---

[7]  Thereafter, on November 30, 2020, TDAC held a Special Meeting of Stockholders, pursuant to which the stockholders approved the extension from December 1, 2020 to March 1, 2021, with an ability to further extend for an additional three months to June 1, 2021 if approved by the board of directors. On February 26, 2021, the board of directors approved the extension to June 1, 2021 to permit sufficient time to consummate the proposed business combination with Lottery. On May 27, 2021, the stockholders approved a further extension from June 1, 2021 to September 1, 2021, with the ability to further extend for an additional three months to December 1, 2021, if approved by the board of directors.

November 1, 2021, Lottery's common shares and warrants began trading on the NASDAQ under the ticker symbols "LTRY" and "LTRYW," respectively.

### 4. Komissarov Was Incentivized To Complete The Business Combination

62.     Subject to the achievement of certain stock price targets after completion of the Business Combination, Komissarov was entitled to receive his pro rata share of up to 4,000,000 additional shares of common stock as a founder of TDAC.

63.     As an initial stockholder and founder of TDAC, Komissarov received his pro rata share of over 5 million shares of TDAC (valued at over $85 million at its height) for nominal consideration and 1.15 million private units (valued at $17.825 million in the Proxy Statement) that would be rendered worthless if the Business Combination was not completed, as he had waived his right to any liquidation distribution. Komissarov also contributed over $3.4 million in cash to the Company that would not be repaid in the event the Business Combination was not completed. Moreover, Komissarov received his pro rata share of over $5 million for reimbursement of work performed in connection with the Business Combination.

64.     As Komissarov stood to gain financially only if the Business Combination was consummated, he had the incentive to not look too closely into the legality of Lottery's operations or the assumptions underlying the Business Combination. In fact, TDAC's raison d'être was to effectuate the Business Combination. To do so, Komissarov was required to conduct due diligence of Lottery, the target business to be acquired. Indeed, TDAC purported to conduct extensive due diligence, including: "extensive meetings and calls with Lottery.com's management team, including with regards to operations and forecasts;" "commercial, operational, financial, accounting, tax legal, insurance, environmental, technology, and regulatory due diligence carried out by the Trident Team

and Trident's legal and financial advisors;" "the financial projections provided by Lottery.com's management team and the assumptions underlying such projections;" and "Lottery.com's audited and unaudited financial statements."

65.     Komissarov was heavily involved in TDAC's decision to combine with Lottery, and he was highly motivated to complete the transaction at all costs, knowing that his personal financial interest in TDAC was dependent on it. Following three extensions to TDAC's deadline to consummate a business combination, and faced with dwindling funds with which to effectuate such a deal, Komissarov introduced TDAC's management to Lottery as a potential target for acquisition. Thereafter, Komissarov received Lottery's historical and projected financial information, as well as information necessary to perform regulatory due diligence on Lottery, he met with Lottery's senior management on numerous occasions, and he ultimately signed the Business Combination Agreement with Lottery on TDAC's behalf.

66.     Komissarov had the power to control the Proxy Statement disclosures and the October 21, 2021 press release, which provided materially overstated preliminary revenue results for Lottery.com's third quarter 2021. *See* Section V., *infra*. Komissarov enthusiastically solicited proxies urging TDAC shareholders to vote in favor of the Business Combination, and he did so via SEC filings that contained false and misleading information about Lottery's revenue projections and results, as well as its supposed compliance with applicable laws and regulations, and the Company's alleged use of geofencing technology to ensure such compliance. In fact, the Proxy Statement referenced Komissarov's name on no fewer than 42 occasions. Komissarov's signature appeared in the Proxy Statement; as TDAC's director and CEO, he had the power and authority to control the contents of that document, and he reviewed it prior to issuance. Several days later, on October 21, 2021, TDAC filed a press release with the SEC pursuant to Rule 14a-12, which named Komissarov

as TDAC's contact person with respect to the information provided therein. That press release falsely represented that Lottery's preliminary revenue results for the third quarter of 2021 were between $22 million and $24 million, while again omitting to disclose that these results were based entirely on the imaginary sale of marketing credits discussed above.

### 5. The Lottery Defendants Had Financial Motivation For Causing the Company to Consummate The Business Combination

67.    The Lottery Defendants received far more shares than they would have been entitled to had the true value of Lottery been disclosed in connection with the Business Combination. Moreover, these executives received lucrative pay and benefit packages to the extent they remained employees of Lottery following the Business Combination.

#### a)    Defendant DiMatteo

68.    DiMatteo owned approximately 14% of Lottery at the time of the Business Combination and sold 375,000 Purchase Right shares for between $6.35 and $6.87 per share on December 2, 2021, to receive proceeds of between approximately $2,381,250 and $2,576,250 shortly after the Business Combination was completed.

#### b)    Defendant Dickinson

69.    According to the Company's Schedule 14A Proxy Statement filed on April 28, 2021, Dickinson was to be awarded $35 million in restricted stock upon the completion of the Business Combination that would vest after an additional six months of employment.

#### c)    Defendant Clemenson

70.    Clemenson, like DiMatteo, owned approximately 14% of Lottery at the time of the Business Combination and sold 375,000 Purchase Right shares at prices between $6.35 and

$6.87 per share on December 2, 2021, to receive proceeds of between approximately $2,381,250 and $2,576,250 shortly after the Business Combination was completed.

### C. Lottery Admits That The Company's Management Knowingly Engaged In A Revenue Inflation Scheme And Sham $30 Million Transaction

71.    On September 20, 2021 – well before the Proxy Statement was issued and the Business Combination was consummated – the Company entered into an agreement with a major customer for the sale of Lottery's service credits with a total purchase price of $30 million. According to the Company, the customer was required to pay the purchase price within 90 days pursuant to this agreement. Upon execution of the purchase agreement (that is, before Lottery transferred any credits to the customer), the Company recognized the $30 million as income and recorded $10 million in cost of sales related to this transaction (the "September 2021 Sham Transaction").[8]

72.    According to the Company, the customer provided payment prior to December 31, 2021, in the form of a check. But the Company did not actually deposit this check. Instead, the Company apparently used proceeds from the Business Combination to acquire a $30 million business loan on January 4, 2022 through one of Lottery's subsidiaries, AutoLotto, with Provident Bank ("Provident"), which was evidenced by a $30 million promissory note ("the Promissory Note")[9] signed by Dickinson. This Promissory Note was "utilized by the customer to provide the Company with payment towards the purchase of the service credits."

---

[8] The same day that the Company disclosed that a large portion of its revenue for the quarter (approximately $32.25 million) was the result of this single $30 million sale of affiliate marketing credits during the quarter (November 15, 2021), they also announced the dismissal of Marcum LLP as the Company's auditing firm.

[9] Business Loan Agreement dated January 4, 2022 between Autolotto, Inc. and The Provident Bank, sec.gov/Archives/edgar/data/1673481/000149315223018441/ex10-1.htm.

73.    The Company's executives were aware of the nature and specifics of these transactions, as well as their intended purpose. Even if the Individual Lottery Defendants were unaware of the particulars in failing to deposit the customer's $30 million check, which is highly unlikely, they were aware that Lottery had obtained a $30 million loan from Provident: Defendant Dickinson was the signatory of the loan agreement for the Promissory Note, as indicated in the Company's Form 10-Q filed with the SEC on May 22, 2023 for the quarterly period ended June 30, 2022. Given that the $30 million Promissory Note was secured by $30 million Lottery already had in its account, reasonable people managing their own affairs would have inquired as to the reasons for obtaining the Promissory Note—especially because these sums totaled about half of Lottery's cash and cash equivalents of $62.6 million as of December 31, 2021. Thus, the Individual Lottery Defendants would and should have learned that this was a sham: the Company borrowed $30 million from Provident and then allowed the customer to use the funds to purchase Lottery's credits. In sum, the transactions with this customer were a façade to manufacture $30 million in sales, which Lottery recognized as revenue before it had even performed its obligations under the agreement.

74.    Yet, the Company continued to include revenue from the September 2021 Sham Transaction in its financial statements without disclosing the related $30 million loan. For example, on November 15, 2021, Lottery reported $32.25 million revenue for the quarter ended September 30, 2021, which was a *1,911.8% increase* over the prior year period. Significantly, Lottery specified that this "increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits" during the quarter. That is, *nearly all* of the

27

$32.25 million in revenue for the quarter was derived from the sham transaction.[10]

75.    Thereafter, on April 1, 2022, the Company filed its 2021 Annual Report on Form 10-K with the SEC, reporting $68.5 million in revenue, which was "driven by the sale of $47.1 million in LotteryLink Credits for prepaid advertising, prepaid lottery games, marketing materials and development services in the third and fourth quarters of 2021." Notably, the Company reported accounts receivable of just $21.7 million. Since the accounts receivable figure was lower than the amount of the $30 million sale of LotteryLink Credits announced the prior quarter, the Company was representing to investors that it had been paid, at least partially, by the customer who purchased the aforementioned $30 million of "affiliate marketing credits." However, as investors subsequently learned, there was no revenue from the purported $30 million sale. As such, Lottery's representation that it had collected this revenue was false.

76.    On May 16, 2022, in a Form 10-Q filed with the SEC, the Company reported $21.2 million in revenue for the period ended March 31, 2022, which were "driven by the sale of $18 million in LotteryLink Credits for prepaid promotional awards, marketing materials and development services." This revenue figure for the first quarter 2022 was significantly overstated and false, as Defendants subsequently admitted, because $18,539,472 in the first quarter of 2022 was from a fictitious transaction and would be reversed out in May 2023.

77.    On July 15, 2022, providing an update on its internal investigation, the Company stated that it "preliminarily conclude[d] that it has overstated its available unrestricted cash

---

10 The Company termed these credits "LotteryLink Credits." LotteryLink Credits could be purchased by the Company's third-party marketers and redeemed as advertising credits to support flexible promotional packages (such as prepaid advertising, prepaid lottery games, among other things) via the Company's LotteryLink affiliate marketing program.

balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount."

78.    A week later, on July 22, 2022, Lottery further disclosed that the Company's auditor, Armanino LLP, determined that financial statements for the full-year fiscal 2021 and first quarter 2022 should no longer be relied upon, and that a Company subsidiary entered into an undisclosed line of credit in January 2022.

79.    Long after all of the Defendants were no longer with the Company, Lottery admitted on May 15, 2023 in its filing on Form 10-Q/A with the SEC for the quarterly period ended March 31, 2022 that the entire $30 million transaction was a sham. As the Company explained:

> On September 20, 2021, the Company entered into a purchase agreement with a major customer for the sale of various service credits with a total purchase price of $30,000,000. In accordance with the terms of the purchase agreement, the customer was required to pay the purchase price within 90 days. Upon execution of the purchase agreement, the Company recognized the $30,000,0000 as income. The customer provided payment prior to December 31, 2021, in the form of a check accepted by the Company for deposit and included in undeposited funds. ***During 2022, the Company discovered that the service credits it had sold to the customer were non-transferrable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits.*** Since the Company was prohibited from transferring the advertising portion of the service credits and therefore could not complete the sale of such credits, the Company cancelled the transaction and could not recognize the income, or recognize a cash payment in the Company's financial statements.

If the customer's check were deposited, then the payment would have been completed and there would be no need for the customer to use a credit facility to purchase the credits from Lottery. It follows, then, that Lottery did not deposit the customer's check and instead obtained the Promissory Note using Lottery's own funds.

80.    Additionally, the sham nature of the transaction is further demonstrated by the fact that Lottery subsequently admitted in the same filing "that the services credits it had sold to

the customer were non-transferable." At the time this statement was made by Lottery, the Individual

Lottery Defendants were no longer with the Company.[11] Certainly, the Individual Lottery Defendants

that negotiated the terms of the September 2021 transaction knew that their purported service credits

were non-transferable. This is further confirmed by the fact that the Company invoiced more than

$35 million to the customer over the next two fiscal quarters for purported "various services and

advertising credit" Lottery claimed to have provided. But this is impossible given that the credits

were never transferable to the customer. In fact, the Company's whole explanation defies common

sense. There were approximately nine months between the September 2021 Sham Transaction and

the Company's July 2022 disclosure during which the service credits were non-transferable. It strains

credulity to suggest that an individual at the Company, who was either involved in or responsible for

accounting for all of these transactions totaling more than $35 million, never realized it was

non-transferable.

85.    Furthermore, that the entire September 2021 transaction was a sham is further

confirmed by the Company's accounting treatment for the purported "revenue" and "accounts

receivable" from the "major customer." As the Company explained, "Since the Company was

prohibited from transferring the advertising portion of the service credits and therefore could not

complete the sale of such credits, the Company cancelled the transaction and could not recognize the

income or recognize a cash payment in the Company's financial statements." As such, the Company

simply took off its books every single cent of the transactions with the "major customer." As the

Company explained:

> the Company had invoiced the customer a further $17,117,472 for various services
> and advertising credits for the year ended December 31, 2021 and

---

[11]   This is probably why Lottery claims that the Company only discovered in 2022 that the service
credits were not transferable.

$18,539,472 during the three months ending March 31, 2022. The Company recorded such amounts to both revenue and accounts receivable. As a result of the cancellation of the transaction, the Company decreased both accounts receivables and revenues by $17,117,472, in the Restated Audited Financials; and $18,539,472, in the restated financial statements for the three months ended March 31, 2022 included in this Amended Report.

86.      Companies do not cancel all revenue and accounts receivable for legitimate transactions. Instead, they would treat said revenue or accounts receivable as bad debt or some other accounting treatment if they were legitimate transactions. By pretending the transactions simply never occurred on their books, Defendants are admitting that the transactions were fictitious.

87.      Moreover, that the Company actually invoiced the major customer more than $17 million in 2021 and more than $18 million in the first quarter of 2022, demonstrates that the Individual Lottery Defendants had to be aware of the fraud.[12] If "the Company was prohibited from transferring the advertising portion of the service credits" what was the "major customer" even buying that needed to invoiced? The answer was nothing, demonstrating that these transactions were shams.

88.      Likewise, it belies belief that the Company's executives who negotiated the terms with the major customer and the bank that enabled the scheme would not know the entire transaction was a sham. Certainly, as the CFO, Defendant Dickinson had to have known what

---

[12] These amounts were extremely material to the Company. In fact, this major customer is likely the largest customer of the Company responsible for 87.7% of the revenue and 99.6% of the accounts receivable for Lottery's 2022 fiscal first quarter. At these percentages, it is impossible, or at a minimum highly reckless, that management would not be aware of transactions of a customer that represented almost all of the Company's revenue and account receivables.

was used as collateral for the Promissory Note with Provident that he negotiated and signed, and that the loan was made specifically to lend money to the major customer.[13]

89.    Finally, the fact that the Company failed to disclose in its financial statements that AutoLotto had entered into the line of credit in January 2022 further supports a deliberate lack of disclosure. In the Company's April 1, 2022 Annual Report filed on Form 10-K with the SEC, the Company discussed Lottery's loans and promissory notes. Yet, the $30 million Promissory Note was not disclosed at all even though it should have been, as its accountant later confirmed.[14] The fact that the Company failed to disclose its largest loan while discussing numerous smaller loans demonstrates that this was intentional, or at a minimum extremely reckless.

**D. The Lottery Defendants Engaged in Other Acts of Improper Revenue Recognition**

90.    On May 15, 2023, after disclosing that the entire $30 million transaction was a sham in its filing on Form 10-Q/A with the SEC for the quarterly period ended March 31, 2022, the Company explained:

> In an unrelated transaction, the Company entered into an arrangement with another customer totaling $5,000,000 in 2021. The Company recognized the full amount of the arrangement and recorded $5,000,000 as revenue and accounts receivable for the year ended December 31, 2021. The Company started performing the services

---

13  Further, it is simply illogical that the Individual Lottery Defendants would have not known the details of the large transactions. The Company's entire 2021 revenue was only $68.5 million and its 2022 fiscal first quarter revenue was $21.2 million. Likewise, the Company only had $60.6 million in cash at the end of the 2021 fiscal year and $50.8 million in cash at the end of its 2022 fiscal first quarter. As such, the $30 million in overstated cash and revenue constituted almost half of the entire Company's revenue and cash for the 2021 fiscal year.

14  As the Company admitted on July 22, 2022: "Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements."

under the arrangement during 2021, which services were to be completed in 2022. In October of 2021, the customer paid $500,000 towards these services. Subsequently, the Company determined that, in accordance with ASC 606, due to an uncertainty of collect ability of the remaining accounts receivable, the Company should not have recognized any revenue from this arrangement during the year ended December 31, 2021. As a result of the payment of $500,000 received during the year ended December 31, 2021, the Company is allowed to record deferred revenue in the amount of $500,000. As a result, the Company (i) decreased accounts receivable by $4,500,000, increased deferred revenue by $500,000 and decreased revenue by $5,000,000, for the year ended December 31, 2021 in the Restated Audited Financials; and (ii) recorded revenue of $500,000 for the three months ended March 31, 2022.

In addition, related to the transaction stated above, in February 2022, the Company loaned the customer $450,000 and initially recorded it as a bridge loan receivable from the customer. In March 2022, the parties executed a formal agreement for the arrangement described above, in the form of a secured promissory note (the "Secured Promissory Note"). The Secured Promissory Note includes provisions regarding the development, implementation, operation, and maintenance of the technology platform contemplated in the arrangement and also indicates that all work previously performed on the project is to be considered performed under and governed by the Secured Promissory Note. The Secured Promissory Note provides that the $450,000 bridge loan made in February be rolled into such note. In connection with the execution of the Secured Promissory Note, an escrow was established and the Company deposited a total of $6,050,000 in the escrow account. The parties subsequently agreed that the conditions of the escrow had been met and all of the funds were released, with $4,500,000 going back to the Company and $1,550,000 going to the customer. The Company recorded the entire $6,500,000 as a Note Receivable and reported it as such in the Original Report. In connection with the restatement of the financial statements included in the Original Report, the Company reviewed this transaction again and determined that since the Company had received $4,500,000 of the $6,050,000 from the escrow, the actual amount loaned to the customer under the Secured Promissory Note was $1,550,000 along with the $450,000 bridge loan, for a total of $2,000,000. As a result, the amount of the Note Receivable has been corrected to $2,000,000 for the three months ended March 31, 2022.

91.    Further, the Company determined that approximately $2 million of "prepaid advertising credits purchased during 2017 and 2018 may not be able to be fully utilized," and as a result, the Company decreased its prepaid expenses by $2 million and increased its revenue loss for prepaid advertising credits by $2 million as of December 31, 2022.

**E. The Company's Egregious GAMP Violations Demonstrate That The Individual Lottery Defendants Must Have Known About The Sham Transactions**

92.     Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Lottery to comply with GAMP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.[15] Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAMP. (17 C.F.R. § 210.10-01(a)). Filings that do not comply with GAMP are "presumed to be misleading or inaccurate." 17 C.F.R. § 210.4- 01(a)(1).

93.     As the Company represented in its financial statements, ASC 606 governed the Company's revenue recognition policy. Under ASC 606, Revenues are recognized upon the application of the following steps: (1) Identification of a contract or contracts with a user, customer or subscriber; (2) Identification of performance obligation(s) in the contract; (3) Determination of the transaction price; (4) Allocation of the transaction price to the performance obligations in the contract; and (5) Recognition of revenue when, or as, the performance obligation is satisfied.

---

[15] Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAMP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAMP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants (ASC 105-10-05-1).

94.     For contracts within the scope of ASC 606, the first step is to determine whether a contract exists, for accounting purposes, between an entity and its customer. ASC 606-10-25-1 lists the criteria that must be met for a contract to exist.

a.     The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.

b.     The entity can identify each party's rights regarding the goods or services to be transferred.

c.     The entity can identify the payment terms for the goods or services to be transferred.

d.     The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).

e.     It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer (*see* paragraphs 606-10-55-3A through 55-3C). In evaluating whether collect ability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due. The amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession (see paragraph 606-10-32-7).

95.     As the Company admitted, it had pledged its own cash accounts to secure a $30 million line of credit for its customer to use in the sham transaction. As such, prongs d. and e. of ASC 606-10-25-1 had not been satisfied.

96.     Likewise, the Company included the $30 million of Collateral Security for the loan as cash on the Company's March 31, 2022 balance in violation of GAMP (ASC 230-10-20). This was clearly improper, and the Company's executives must have known as much since the collateral "became restricted and remained restricted until October 12, 2022, when AutoLotto defaulted on its obligations under the Business Loan and Provident foreclosed on the $30,000,000 of Collateral Security." This overstated the Company's cash balance and operating cash flows. Moreover, restricted funds are not the same as cash. As such, it is not surprising that in the ultimate restatement it was reclassified to "restricted cash."

97.     The Company's failure to include its $30 million loan as a liability (it was not disclosed on the balance sheet at all) was clearly an egregious violation of GAMP as well. Of course, a loan is a liability to a company. Any accountant or individual with basic accounting knowledge, such as the Individual Lottery Defendants, would know as much. In fact, this abject failure to follow GAMP was noted in its auditor's resignation announcement: "Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements." If the Company had included the $30 million loan as a liability, it would have exposed the revenue fraud and related errors.

98.     Furthermore, the fact that Lottery stated that its financial statements should not be relied upon is an admission that the financial statements were false and misleading when

36

originally issued. (Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board Statement No. 154 at ¶ 25).

99.    GAMP rules and regulations regarding earnings management and revenue recognition are fundamental for publicly traded companies. Likewise, proper presentation of cash balances and loans are, presumably, also fundamental for publicly traded companies. As such, brazen violation of these basic and well-known rules, as Lottery admittedly did, further demonstrates intent, or at least severe recklessness.

**F.  The Company Slowly Discloses That Its Public Statements Were False And Misleading Due To Lottery's Failure To Disclose The September 2021 Sham Transaction And That Its Executives Were Aware Of It, And That Lottery's Executives Are Currently Under Investigation By The SEC And DOJ**

100.    On November 15, 2021, Lottery filed with the SEC a Form 8-K announcing that, on November 10, 2021, the Board announced the dismissal of Marcum LLP as the Company's auditing firm. That same day, the Company disclosed that virtually all of its $32.5 million of revenue for the quarter was the result of a single $30 million sale of affiliate marketing credits, which was not its primary business activity. Investors would later learn this was just the slightest hint at the tip of a large iceberg of bogus revenue recognition and sham transactions.

101.    On July 6, 2022, Lottery disclosed in a Form 8-K filed with the SEC that an internal investigation had revealed "issues pertaining to the Company's internal accounting controls." Further, the Board disclosed that as a result of this investigation, the Company had terminated Lottery's CEO, President, and Treasurer, Defendant Dickinson, effective July 1, 2022, with cause – just *one day* after the independent investigation concluded. As the Company explained:

37

Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022.[16]

102. Thereafter, on July 15, 2022, the Company announced in a Form 8-K filed with the SEC that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. As an update to the previously disclosed internal investigation, the Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery had:

preliminarily conclude[d] that it has ***overstated its available unrestricted cash balance by approximately $30 million*** and that, relatedly, in the prior fiscal year, it ***improperly recognized revenue*** in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

103. The July 15, 2022 disclosure of a $30 million cash overstatement represents an admission that the $30 million "sale" of LotteryLink Credits previously announced on November 15, 2021, was entirely fabricated, and that Defendants faked the collection of that money to create the illusion of revenues. This is plainly documented by the fact that the Company essentially had one customer. As the Company explained in its May 16, 2022 quarterly report, "Customer A" accounted for 87.7% of the Company's revenue and 99.6% of the Company's accounts receivable for the Lottery's 2022 fiscal first quarter.

---

16 The fact that he was terminated with cause as part of the investigation supports that he was an active and knowing participant in the fraud. The Company itself has confirmed this fact. In a lawsuit styled, A*utoLotto, Inc., d/b/a Lottery.com v. J. Streicher Financial, LLC*, Case No. 20220661 (Del. Ch. Ct. Jul. 29, 2022) (Dkt. No. 1) that relates to the undisclosed line of credit, Lottery asserts that "its available unrestricted cash balance had been overstated by approximately $30 million by the actions of [Dickinson], which actions were undertaken without the knowledge of LTRY's Audit Committee."

104.    On July 22, 2022, Lottery filed a Form 8-K with the SEC that disclosed that the Company's auditor, Armanio LLP, determined "that the *audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon*," and "that a *Company subsidiary entered into a line of credit in January 2022 that was not disclosed* in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements." Further, the Company disclosed in the Form 8-K that CEO and co-founder Defendant DiMatteo was resigning, effective immediately.

105.    On September 9, 2022, Lottery disclosed in a Form 8-K filed with the SEC that four members of its Board had resigned, including former CEO DiMatteo. Tellingly, two of Lottery's independent directors stated in their resignation letters, attached as exhibits to the Company's Form 8-K filed on September 2, 2022, that the events leading to Dickinson's departure could not be chalked up to mere incompetence or mismanagement, but were indicative of "potentially inappropriate activity."

106.    All three of the Individual Lottery Defendants' terminations and resignations were related to the investigation and misconduct. Kathryn Lever, Lottery's general counsel, has confirmed as much. According to Ms. Lever, who claims to be the person who made the report of possible misconduct to the Company's Independent Directors and supervised the resulting independent investigation for the Audit Committee, "[h]er efforts and this investigation caused the quick termination or resignation of the three other members of senior management." Dkt. No. 112 *at* 2. This admission further confirms that the Individual Lottery Defendants were involved in the misconduct at issue.

107.    On August 16, 2022, the Company provided a further update on the internal investigation when it filed a notification of inability to timely file Form 10-Q with the SEC. As the Company disclosed:

As previously disclosed, the Audit Committee of the Board of the Directors (the "Board") of the Company retained outside counsel to conduct an independent investigation, which was initiated after it received certain information from Katie Lever, the Company's Chief Legal Officer and Chief Operating Officer, which investigation revealed instances of non-compliance with state and federal laws concerning the state in which tickets were procured as well as order fulfillment. ***The investigation also identified issues pertaining to the Company's internal accounting controls. Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022.*** Effective July 1, 2022, Harry Dhaliwal was named as the Company's Interim Chief Financial Officer and principal financial officer. In connection with the appointment of Mr. Dhaliwal, the Company initiated a review of its cash balances and related disclosures as well as its revenue recognition processes and other internal accounting controls. ***The review led the Company to preliminarily conclude that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount. On July 20, 2022, the Company was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal years ended December 31, 2022 and December 31, 2021, that the audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon.*** Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, ***that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements***.

On July 28, 2022, the Board determined that the Company did not have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations, and the Company furloughed the majority of its employees effective July 29, 2022. As the Company's capital resources are not sufficient to fund its operations for a twelve-month period, there is substantial doubt about the Company's ability to continue as a going concern. If the Company is not able to secure additional capital resources or otherwise fund its operations, the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets, including equipment and intellectual property. As a result, the Company has not yet finalized its reviews of its financial statements or its assessment of the impact of the findings of the ongoing review of the Company's internal accounting controls on its historical financial statements or for the financial statements for the quarter

ended June 30, 2022, and is therefore unable to file the Form 10-Q on a timely basis. The Company is working toward filing the Form 10-Q as soon as practicable, but does not expect to be in a position to file it within five calendar days following the prescribed due date.

108.    While the Company originally announced the need to restate its financial results in July of 2022, the full truth did not come out into May of 2023 well after all of the Individual Lottery Defendants had left the Company.[17] On May 15, 2023, the Company finally disclosed the truth about the September 2021 sham transaction in a report on Form 10-Q/A with the SEC for the quarterly period ended March 31, 2022:

> On September 20, 2021, the Company entered into a purchase agreement with a major customer for the sale of various service credits with a total purchase price of $30,000,000. In accordance with the terms of the purchase agreement, the customer was required to pay the purchase price within 90 days. Upon execution of the purchase agreement, the Company recognized the $30,000,0000 as income. The customer provided payment prior to December 31, 2021, in the form of a check accepted by the Company for deposit and included in undeposited funds. ***During 2022, the Company discovered that the service credits it had sold to the customer were non-transferrable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits.*** Since the Company was prohibited from transferring the advertising portion of the service credits and therefore could not complete the sale of such credits, the Company cancelled the transaction and could not recognize the income or recognize a cash payment in the Company's financial statements. In addition, the Company had recorded cost of sales related to this transaction in the amount of $10,000,000. As a result, in the restated December 31, 2021 financial statements included in the Amended Annual Report (the "Restated Audited Financials"), the Company decreased both cash and revenue by $30,000,000 for the year ended December 31, 2021 and reversed the related cost of sales which resulted in a decrease to cost of sales and an increase in prepaid assets by $10,000,000 each for the year ended December 31, 2021.

---

[17]  On July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. Then on July 22, 2022, the Company reported that CEO and co-founder Defendant DiMatteo was resigning, effective immediately. That is, about the same time the investigation was announced into accounting issues, the top three executives (CEO, CFO, and CRO) responsible for revenue and accounting had departed.

In addition, the Company had invoiced the customer a further $17,117,472 for various services and advertising credits for the year ended December 31, 2021 and $18,539,472 during the three months ending March 31, 2022. The Company recorded such amounts to both revenue and accounts receivable. As a result of the cancellation of the transaction, the Company decreased both accounts receivables and revenues by $17,117,472, in the Restated Audited Financials; and $18,539,472, in the restated financial statements for the three months ended March 31, 2022 included in this Amended Report.

**\*\*\***

On January 4, 2022, AutoLotto entered into a Business Loan Agreement (the "Business Loan") with The Provident Bank ("Provident"), pursuant to which the Company borrowed $30,000,000 from Provident, which was evidenced by a $30,000,000 Promissory Note. In accordance with the terms of the Business Loan, upon entering into the agreement, $30,000,000 in a separate account with Provident was pledged as security for the amount outstanding under the loan ("Collateral Security"). The $30,000,000 Collateral Security became restricted and remained restricted until October 12, 2022, when AutoLotto defaulted on its obligations under the Business Loan and Provident foreclosed on the $30,000,000 of Collateral Security. The Collateral Security, which was in the form of restricted cash, was presented as a contingent liability on the Company's balance sheet from March 31, 2022 until the obligation was satisfied in October of 2022.

As previously disclosed in the Current Report on Form 8-K filed by the Company with the Securities and Exchange Commission ("SEC") on July 22, 2022, as amended on July 22, 2022, the Company's Management met on July 19, 2022 in consultation with the Chairman of the Board of Directors of the Company, the Company's legal counsel and the Company's auditors at that time (Armanino LLP) and concluded that the Company's previously issued audited consolidated financial statements for the fiscal year ended December 31, 2021, and the unaudited consolidated financial statements for the quarter ended March 31, 2022, previously filed with the SEC should no longer be relied upon and should be restated.

The need for the restatement arose out of the Company's reexamination of various transactions that occurred in 2021 and which were later rescinded or canceled in 2022. The Company has restated its financial statements for the year ended December 31, 2021, as included herein as discussed below and to reflect a change in the recognition of income in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 606.

109.    On June 15, 2023, the Company was forced to admit it was being investigated by

the SEC and Department of Justice for its conduct. As the Company admitted:

Certain of our former officers are currently the subject of investigations and inquiries by the SEC and the U.S. Department of Justice (the "DOJ") relating to the findings of the Internal Investigation and other matters, and we are cooperating fully with such investigations and inquiries.

**G.  As Lottery Has Admitted, The Company Failed To Maintain Effective Internal Controls Even After Being Aware Of Prior Internal Control Issues That Defendants Had Pledged To Remedy**

110.    The Individual Lottery Defendants failed to comply with their obligations imposed by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and to prepare financial statements in accordance with GAAP. Section 13(b)2 of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–

i.    transactions are executed in accordance with management's general or specific authorization;

ii.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

111.    A functional and strong system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its

financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[18]

112.    The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. More broadly, a system of internal control also includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

113.    The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. To prepare financial statements in conformity with GAAP, management's responsibility is acknowledged in a set of standards known as generally accepted auditing standards ("GAAS"). *See* COSO Report, Executive Summary. GAAS outlines the responsibilities of an auditor, but also explains that management is responsible for its own financial reporting:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with

---

[18] Generally accepted auditing standards codified in AU § 319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO report was issued in September 1992 as a four-volume set. Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. AU § 110.03 (emphasis added).

114.    Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

> \*   the accounting principles selected and applied have general acceptance;
>
> \*   the accounting principles are appropriate in the circumstances;
>
> \*   the financial statements are informative of matters that may affect their use, understanding and interpretation; and
>
> \*   the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[19]

115.    The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications, and (5) monitoring.

116.    Lottery's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAMP.

---

[19] *See* COSO Report, Chapter 3; *see also* Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

117. The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

118. Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAMP. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAMP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

119. Everyone in an organization has responsibility for internal controls. Nevertheless, it is the chief executive officer who sets the "tone at the top," affecting integrity, ethics, and other crucial elements of a positive control environment. "In any organization, 'the buck stops' with

the chief executive. He or she has ultimate ownership responsibility for the internal control system. . . . The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they control the business.

120.    The Addendum to the COSO Report makes it clear that the company's chief accounting officer plays a critical role with respect to the internal control system. As described herein, Lottery exhibited a material weakness in its internal controls, which were necessary for the accurate preparation of financial statements and for ensuring compliance with regulatory filing requirements applicable to public companies. A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." Lottery's internal control system completely failed to live up to the standards as set forth in the five elements of the internal control framework described above.

121.    The Company's failure to have adequate internal controls over financial reporting is even more egregious considering previous control issues and prior pledges to remedy these issues.

122.    On November 15, 2021, the Company disclosed in its Form 10-Q for the quarterly period ended September 30, 2021 that it had uncovered a material weakness in its internal controls related to the classification of warrants. As the Company explained:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as

47

liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021.

123. In the same disclosure, the Company claimed that there were no changes in internal control over financial reporting and that Lottery intended to "enhance [its] processes to identify and appropriately apply applicable accounting requirements." As the Company explained:

**Changes in Internal Control Over Financial Reporting**

Other than what was described in the 10-K/A, *there were no changes in our internal control over financial reporting* (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. In light of the restatement of our financial statements included in the 10-K/A, *we plan to enhance our processes to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements. Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications*. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

124. On April 1, 2022, the Company filed with the SEC its Annual Report on Form 10K for the year ended December 31, 2021. Therein, the Company disclosed that it had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020, but described this material weakness as mainly a personnel and staffing issue related to "the design and operation of the procedures relating to the closing of [Lottery] financial statements." However, the Company reassured investors that the Company had "commenced measures to

48

remediate" this material weakness and "there was no change in our internal control over financial reporting."

125.    Then again, on May 16, 2022, the Company disclosed in its Form 10-Q for the quarterly period ended March 31, 2022 that "a material weakness in internal control over financial reporting related to ineffective controls within the Company's financial close process existed." Yet, the Company still claimed that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position, results of operations and cash flows as of the dates and for the periods presented in conformity with GAMP.

126.    On July 6, 2022, the Company admitted in a Form 8-K filed with the SEC that an internal investigation, conducted by outside counsel, revealed "issues pertaining to the Company's internal accounting controls" and in light of the findings of the investigation, on June 30, 2022, the Board had terminated Defendant Dickinson, the Company's CFO, President, and Treasurer. Then, on July 15, 2022, the Company announced in a Form 8-K filed with the SEC that Defendant Clemenson, the Company's Chief Revenue Officer, had resigned on July 11, 2022, effective immediately, and that the independent investigation previously disclosed had determined after a review of Lottery's cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery had overstated its unrestricted cash balance by approximately $30 million and that, "relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount."

127.    On June 15, 2023, the Company disclosed in its Annual Report on Form 10-K for the year ended December 31, 2022 that:

> Specifically, management did not design and maintain sufficient procedures and controls related to revenue recognition including those related to ensuring

accuracy of revenue recognized from non-routine transactions such as the sales of LotteryLink Credits. As a result, we determined that there was an overstatement of revenue in the consolidated statement of operations of approximately $52.1 million during the year ended December 31, 2021, which required a restatement of the previously issued financial statements for the year ended December 31, 2021 contained in the Amended 2021 Annual Report.

128.    The Company acknowledged minor internal control issues and then continued to pledge that its executives would work on ensuring that adequate internal controls were in place without uncovering a massive accounting scheme with sham transactions. The only rational inference is that executives were aware of the sham transactions and that cash balances and revenue were grossly overstated. This inference is supported by the fact that the individuals that oversaw Lottery's financial accounting were immediately removed from their positions. It begets belief that Lottery's finance and accounting team would miss such basic and massive accounting issues while working to "enhance [its] processes to identify and appropriately apply applicable accounting requirements."

### H.    Lottery Misrepresented Its Compliance With State And Federal Laws

129.    At all relevant times, including in the Proxy Statement which solicited approval of the business combination, Lottery touted its compliance with state and federal gaming and lottery laws. For example, in the press release announcing the proposed business combination, the Company claimed that "[Lottery.com](Lottery.com) has been a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age." Likewise, in Lottery's Annual Report on Form 10-K for the year ended December 31, 2021, filed with the SEC on April 1, 2022 (the "2021 Annual Report"), the Company touted that it ensures compliance with regulators:

> We rely on technology services to closely monitor and track amendments, additions, and impositions of regulations in all jurisdictions regarding the authorization of lottery and work to maintain effective relationships with applicable legislative and regulatory authorities in each jurisdiction in which we

operate or anticipate operating in. We use this information in the development of our strategic expansion and growth framework and model, but additionally, and importantly, to create strong working relationships with the regulatory authorities in the jurisdictions in which we do business, ***to ensure transparent regulatory compliance*** and promote each jurisdiction's objective for economic benefit through the sale of lottery games. (emphasis added).

In fact, the Company specifically informed investors that they "believe that we are in compliance with all material domestic and international laws and regulatory requirements applicable to our business."

130.    In fact, the Proxy specifically disclosed that "we only purchase lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted, unless an exception were to be authorized by the applicable lottery authorities." As the Proxy explained in full:

State and federal laws in the U.S. govern and, in some cases, limit our business practices. For example, the Interstate Wagering Amendment to 18 U.S.C. § 1301 limits our ability to purchase lottery games for a user located in one state from a lottery authority located in another state, except under certain limited circumstances, such as where the lottery authorities in the respective states allow the sales. Therefore, for our users located within the in the U.S., ***we only purchase lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted***, unless an exception were to be authorized by the applicable lottery authorities. For more information, see "*Risk Factors — If the Interstate Wagering Amendment is interpreted or applied to prohibit transmissions to foreign countries, it could have a negative impact on our business, financial condition, and results of operations.*" (emphasis added).

131.    Notwithstanding these representations, a mere two quarters following the Business Combination, Lottery admitted it had not been complying with such state and federal laws. Specifically, on July 6, 2022, in a Form 8-K filed with the SEC, Lottery disclosed that an internal investigation had uncovered "instances of ***non-compliance with state and federal laws*** concerning the state in which tickets are procured as well as order fulfillment," and as Bloomberg later explained, Lottery did not have the geolocation technology to confirm that web-

51

based customers were in the state where they said they were located. Bloomberg also reported that there were hundreds of thousands of instances where tickets were purchased in states other than the state where the customer was located.

> **I. Bloomberg Confirms Plaintiff's Allegations And Reveals That The Company Was Not In Regulatory Compliance As It Was "Breaking The Law In 42 Different Ways"**

132. On March 4, 2024, Bloomberg published an investigative article entitled, "From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded," which was written by Nicola M. White. According to the article, the article was put together "by interviewing more than a dozen current and former employees, board members and vendors, some of whom spoke on condition of anonymity; obtaining audio recordings, internal communications and board documents; and examining press releases, lawsuits, and securities filings."

> **1. The Individual Defendants Rushed Into The Business Combination**

133. As the article explains, TDAC was running out of time to find a company to merge with before it had to return the money to shareholders, so it pivoted to financial technology even though its executives were not involved in the space. To garner support for the Business Combination, "In investor pitches and SEC filings, Lottery.com predicted an eight-fold surge in revenue by 2023." The endeavor proved successful, and the deal closed in October 2021, bringing in $63 million.

134. According to Defendant DiMatteo, the pressure to close the deal and excitement of the SPAC market propelled the company to go public, whether they were ready or not. As he explained, "They were eager to get a deal done," DiMatteo said. "We had no idea what this game was. They were the grownups in the room."

**2. Defendants Were Intimately Involved In The Sham Transaction, Which Remains Under Investigation By The DOJ And SEC**

135.    As the Bloomberg article summarizes, while "The company's first earnings report in November 2021 boasted $32.2 million in revenue, an almost 2,000% increase from the year before." "But nearly all of that, $30 million, was based on the sale of credits the company had amassed with media partners that turned out to be nontransferable, meaning they weren't supposed to be sold, the company later said when it had to correct its financials to fix its mistakes. Beyond that, the company further erred by recognizing income from the transaction before it had been paid, according to its SEC filings."

136.    The Bloomberg article further explained that the "buyer" of these credits did not actually have the money for the purchase, so the Company and its executives created this sham transaction to make it appear like a legitimate sale. As the article explained:

> The payment hadn't come in because the buyer — a payments platform company — didn't actually have the money on hand. So the company and the buyer struck a complex financing agreement in which Lottery.com pledged its own assets to secure a line of credit that the buyer would then use to pay up, the company would disclose to the SEC a year later.

137.    Citing interviews and an internal Board memo, the article stated: "Feeling pressure to make year-end revenue projections, company officials arranged for a courier to collect a check from the buyer two days before New Year's Eve." This $30 million check was a pure fiction to manufacture revenue that Lottery could and should not have recorded: "When the line of credit came through, the buyer covered the $30 million check and Lottery.com in turn wired the money right back—but continued to count the money as revenue on its books until it restated, or corrected, its financial reporting five months later."

138.    According to Bloomberg, a member of the Company's management team referred to the whole transaction as a "check kite" a year later at a meeting explaining the transaction to

an outside adviser. As Investopedia explains, "Kiting" involves the illegal use of financial instruments to fraudulently obtain additional credit.[20] And when asked about the sham transaction, "Lottery.com's current leadership said the transaction is one of the subjects of SEC and DOJ scrutiny, and the company has been fully cooperating with authorities in their reviews."

### 3.    The Company Was Violating Numerous Laws And Regulations

139.    As explained in the Bloomberg article, under state lottery regulations, even if a lottery ticket was purchased online, Lottery (and other online retailers) would need to send a courier in "each state to go to convenience stores and gas stations to buy tickets and store them." However, Lottery did not actually follow these rules. According to Bloomberg, "Couriers sometimes couldn't be found when a customer ordered a ticket, however, according to an internal investigation initiated by the company's chief legal officer, Katie Lever."

140.    To account for this understaffing, Lottery would print the ticket at its backup hub in Texas. However, this resulted in the purchase not occurring in the correct state and more importantly, rendered it illegal. As the article explains:

> . . . When that happened with an order for a Powerball ticket from a customer in Pennsylvania, for example, the company directed that ticket to get printed in a backup hub in Texas, where the company was headquartered and had a state-licensed lottery retail outlet, the investigation revealed.
>
> This technically made the purchase not a Pennsylvania lottery ticket, but a Texas lottery ticket. That deprived Pennsylvania of revenue from the sale and the tax revenue on any winnings. It's also illegal, board members learned as the investigation progressed. What if someone in Pennsylvania won the Powerball with a ticket produced somewhere else?

141.    This was not an isolated incident. According to an internal memo review by Bloomberg, the practice had been going on since before 2020 and was so wide-spread that in "a

---

[20] https://www.investopedia.com/terms/k/kited.asp

seven-month period, Lottery.com printed out ***more than 500,000 tickets*** worth more than $1.1 million in Texas for out-of-state lottery players." (emphasis added)

142.     Furthermore, while Lottery had said in SEC filings that it had geolocation technology to confirm that web-based customers were in the state where they said they were located, this turned out to be false. According to Lottery's internal investigation, "Anybody using the web-based system, as opposed to the mobile app, could skirt any jurisdictional requirement for ticket purchases, according to the investigation report and interviews."

143.     The Lottery Defendants, as the Company's senior management members, were clearly aware of these hundreds of thousands of repeated legal violations. Lottery's SEC filings repeatedly stressed the importance of legal compliance to the heavily-regulated business in which the Company operated. Moreover, Lottery.com was a small company. According to the Proxy Statement, the Company only had 20 full-time employees as of December 31, 2020. Moreover, according to a transcript of a June 2022 meeting obtained by Bloomberg, one board member had explained that "We are breaking the law in 42 different ways" and "I am without words. The potential for Homeland Security, AML [anti-money laundering laws], and all the other things that come into play is beyond breathtaking." Only after the investigation and at the direction of the Board did management "shut down the web-based application."

144.     According to the article, "The SEC and Department of Justice are investigating the company and some of its founders over the findings of the internal investigation and other matters including the credit sales transaction, according to company filings and an SEC subpoena reviewed by Bloomberg Tax."

## V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

145.    At all relevant times – in the Proxy Statement soliciting approval of the Business Combination and after the closing of the Business Combination – Defendants misrepresented and/or omitted to disclose material facts to investors regarding the financial and operational health of the Company which were critical to investors.

### A.  Defendants' Material Misstatements And Omissions In The Proxy Statement

146.    On October 18, 2021, Lottery filed the final Proxy Statement and prospectus for the Business Combination on Form 424B3, which was signed by Komissarov. The Proxy Statement solicited shareholder approval of the Business Combination and attendant proposals necessary to effectuate the Business Combination.

147.    The Proxy Statement stated that the Company recognized revenue in accordance with ASC 606. However, as discussed above, with the September 2021 sham transaction, the Company recognized revenue upon the signing of the contract, which was before the Proxy Statement and before "the transfer of control of promised products provided to our users" had occurred. As such, the following statement in the Proxy Statement was false:

Revenue

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers (Topic 606) ("ASC 606"), amending revenue recognition guidance and requiring a more structured approach to measuring and recognizing revenue as well as provide more detailed disclosures to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. The amended guidance is effective for accounting periods commencing on or after January 1, 2018.

We have applied ASC 606 to all revenue contracts. The core principle of ASC 606 is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ***Revenues***

*are generally recognized upon the transfer of control of promised products provided to our users, customers and subscribers, reflecting the amount of consideration we expect to receive for those products.* We enter contracts that can include various products, which are generally capable of being distinct and accounted for as separate performance obligations. Revenue is recognized net of any taxes collected from users, commercial partners and subscribers, which are subsequently remitted to governmental authorities. The revenue recognition policy is consistent for sales generated directly with users and sales generated indirectly through affiliates, other solution partners, and our commercial partners.

Revenues are recognized upon the application of the following steps:

   1. Identification of a contract or contracts with a user, customer or subscriber;

   2. Identification of performance obligation(s) in the contract;

   3. Determination of the transaction price;

   4. Allocation of the transaction price to the performance obligations in the contract; and

   5. Recognition of revenue when, or as, the performance obligation is satisfied.

Contracts with users and customers for lottery game sales are at the point of sale and may include transfer of multiple products to a user or a customer and generally do not require future obligations. In these situations, the Company generally considers each transferred product as a separate performance obligation. The Company also has contracts with subscribers for the continued delivery of lottery and anonymized transaction set related data over a defined period of time. In accounting for these contracts, the Company generally considers each set of data as a separate performance obligation and recognizes revenue on their delivery ratably over the service period of the agreement. The Company's products are sold without a right of return or refund; the Company's terms of service and contracts generally include specific language that disclaims any warranties.

148.    The Proxy Statement also stated that TDAC's management, including Defendant Komissarov, had approved the Business Combination for several reasons, including but not limited to the following statements about Lottery's financial results and projections:

● Public market-ready scale, profitability and favorable user distribution and network effect. Trident believes Lottery.com has reached critical mass as a highly valuable alternative for buying lottery tickets in brick-and-mortar stores, which in turn is driving significant revenue, EBITDA and net income growth. *This year, Lottery.com is anticipated to generate*

57

> ***more than US$70 million in revenue and more than $3 million in EBITDA**. . . .*
>
> ● Fast growing business with strong execution, exceeding forecasts. Lottery.com is experiencing significant growth, and it has already booked US$5.5 million of total revenue for the 3-month period ending March 2021. This represents a 270% increase in total revenue year-on-year. ***Projections forecast US$70 million in revenue and more than $3 million in EBITDA for fiscal year 2021.*** The Projections forecast 750% FY19-FY21E Revenue CAGR.
>
> ● High profit margin. Lottery.com is a pure-play, with an all fee-based business and zero balance sheet exposure. The Projections forecast a 32% FY21E Gross Profit margin and 5% FY21E EBITDA margin. Lottery.com has a 100% fee-based model that generates service fees for lottery ticket sales, as well as subscription fees and data set fees for selling lottery data. Trident views the fact that Lottery.com has modest exposure to debt as advantageous in the COVID-19 environment. Lottery.com is a pure play fast growing online gaming company in a high earnings multiple segment. Trident's board of directors believes that this capital-light, highly profitable business model with minimal credit or commodity risk will continue to generate strong margins and free cash flow.

149.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose: (i) that these projections for 2021, which were provided to investors more than two weeks into the fourth quarter of 2021, were premised almost entirely on the sale of various services and advertising credits in the September 2021 Sham Transaction; (ii) that the Company never actually transferred (or was even able to transfer) these purported "service credits" to the customer even though they had invoiced them and treated them as revenue; and (iii) that as a result, the Company's financials, including revenue figures, were materially misleading. Specifically, while investors may have understood there was a risk that the Company's operations for the remainder of 2021 would not go as planned, and therefore the Company would miss its revenue target for the year, the Proxy Statement did not warn that this projected revenue figure, which was

provided to investors more than two weeks into the further quarter of 2021, rested in substantial part (more than 42%) on revenue that had already been booked improperly through a sham transaction. In other words, while the Proxy Statement might have warned investors that the projection might not be realized because the Company might not receive the revenue it was hoping to receive over the remaining seventy-three days of 2021, at no time were investors warned that the projections would not be realized because most of the revenue that had already been booked in the first 292 days of 2021 was the result of a fraudulent sham transaction – a fact known to the Lottery Defendants at that time.

150.    The Proxy Statement also stated that the Company only sold lottery tickets to users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted. As the Proxy Statement, in relevant, part stated:

> State and federal laws in the U.S. govern and, in some cases, limit our business practices. For example, ***the Interstate Wagering Amendment to 18 U.S.C. § 1301 limits our ability to purchase lottery games for a user located in one state from a lottery authority located in another state***, except under certain limited circumstances, such as where the lottery authorities in the respective states allow the sales. ***Therefore, for our users located within the in the U.S., we only purchase lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted***, unless an exception were to be authorized by the applicable lottery authorities. For more information, see "*Risk Factors — If the Interstate Wagering Amendment is interpreted or applied to prohibit transmissions to foreign countries, it could have a negative impact on our business, financial condition, and results of operations.*"
>
> ***
>
> [I]n the U.S., users of our B2C Platform are required to be physically located, at the time of purchase, in the state or jurisdiction of the lottery authority offering the lottery game that they purchase on our Platform. ***We verify their location through geofencing technology*** integrated into our Platform. A user physically located in one U.S. jurisdiction may not purchase a lottery game sold by a lottery authority in another U.S. jurisdiction. Internationally, . . . users may only access lottery games if they are physically located in the jurisdiction of the commercial partner at the time of purchase, as **verified by geofencing technology**.

\*\*\*

To register on our B2C Platform and purchase a lottery game, a user must create an account, be the . . . age of majority in the jurisdiction in which they are situated, and be physically located within such jurisdiction, as ***verified by internally and externally deployed geofencing technology***. Individuals that are not physically located within one of the jurisdictions where our services are offered, as ***verified by geofencing technology***, are not permitted to register to purchase a lottery game.(emphasis added).

151.    The foregoing statements were false or misleading. As the Bloomberg article eventually revealed, due to chronic understaffing, Lottery illegally printed hundreds of thousands of lottery tickets in Texas for out-of-state customers. Moreover, Lottery lacked the technological ability to enforce these jurisdictional requirements with respect to customers who purchased through the web-based system (as opposed to the mobile app).

152.  Moreover, the Proxy included the following false or misleading statements regarding Lottery's regulatory compliance and potential compliance risks:

> **Our business model and the conduct of our operations may have to vary in each U.S. jurisdiction where we do business to address the unique features of applicable law to ensure we remain in compliance with that jurisdiction's laws. Our failure to adequately do so may have an adverse impact on our business, financial condition, and results of operations.**

> Lottery laws vary from U.S. jurisdiction to U.S. jurisdiction. This means that our business model and the conduct of our operations may have to vary in each jurisdiction where we do business **to ensure we remain in compliance with applicable laws**. For example, some jurisdictions in the U.S. prohibit lottery ticket courier services, while some jurisdictions in the U.S. prohibit charging certain fees to the user, and further still, some jurisdictions in the U.S. require us to be licensed or registered, which will require us to incur certain costs in connection with the licensing or registration process. In each jurisdiction in the U.S., we may be required to structure our business model and conduct our operations to address the unique features of applicable law.

> We only purchase lottery games on behalf of our users and customers where our services are permitted and **in accordance with applicable laws.**

\*\*\*

We closely monitor . . . regulations in all jurisdictions regarding the authorization of lottery and work to maintain effective relationships and dialogues with applicable legislative and regulatory authorities, including Governors and Attorneys General, in each jurisdiction. We use this information in the development of our strategic expansion and growth framework and model, but additionally, and importantly, to create strong working relationships with the regulatory authorities in the jurisdictions in which we do business, to ensure **transparent regulatory compliance** and promote each jurisdiction's objective for economic benefit through the sale of lottery games.

\*\*\*

While **we believe that we are currently in compliance in all material respects with all applicable laws and regulatory requirements**, we cannot assure that our activities or our users' activities will not become the subject of any regulatory or law enforcement investigation, proceeding, or other governmental action . . . .

\*\*\*

While **we believe that we are in compliance with all material domestic and international laws and regulatory requirements** applicable to us, we cannot ensure that our activities or the activities of those third parties with whom we do business will not become the subject of regulatory or law enforcement proceedings.

\*\*\*

We are in the process of developing a comprehensive internal compliance program, which will ensure compliance with legal requirements imposed in connection with our activities and with legal requirements generally applicable to all publicly traded companies. While **we are firmly committed to full compliance with all applicable laws**, we cannot ensure that our compliance program will prevent the violation of one or more laws or regulations . . . .

153.    As the Company later admitted (*see* Sections IV.H. & IV.I., *supra*), these statements concerning the Company's regulatory and legal compliance were materially false or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, as the Company failed to disclose that, in fact, it was not complying with state and federal laws concerning the state in which tickets are procured as well as order

61

fulfillment. Indeed, on July 6, 2022, Lottery disclosed that an internal investigation had revealed "issues pertaining to the Company's internal accounting controls" and "***instances of noncompliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment***" and as the Bloomberg article explained, for more than a year prior to issuance of the Proxy Statement the Company was illegally having lottery tickets purchased in states that were different than where its customers were located.

### B. Materially False And Misleading Statements Following The Issuance Of The Proxy Statement

154.    On October 21, 2021, in an attempt to further increase shareholder interest in voting in favor of the Business Combination on October 28, 2021, Defendants issued a press release entitled, "Preliminary Revenue Figures Represent Quarterly Sequential Growth of Greater than 135%." The press release listed Defendant Komissarov as one of the two "contacts," and provided his email address and telephone number. In the release, the Company, in relevant part, stated:

> AutoLotto, Inc., doing business as Lottery.com ("Lottery.com" or the "Company"), a leading technology company that is transforming how, where and when lottery is played, and Trident Acquisitions Corp. (Nasdaq: TDACU, TDAC, TDACW) ("Trident") today provided preliminary revenue results for Lottery.com's third quarter 2021, which are expected to be between $22.0 million and $24.0 million. This represents sequential revenue growth of greater than 135% compared to $9.3 million in the second quarter of 2021. The strong growth was driven by increased sales in the Company's B2B segment.

> On a preliminary basis, revenue through the first nine months of 2021 is expected to be between $36.8 million and $38.8 million on a reported basis and $38.7 million and $40.7 million on a pro forma basis giving effect to the acquisition of 80% interests in JuegaLotto and Aganar, two companies with legalized lottery operations within Mexico. Through the first nine months of 2021, pro forma revenue is expected to be more than 270% above the full twelve months of 2020, after giving effect to the acquisition of the interests in JuegaLotto and Aganar.

155.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements concerning the Company's financial results were materially false or misleading when

made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose: that (i) the revenue results were premised almost entirely on the sale of various services and advertising credits in the September 2021 Sham Transaction; (ii) that the Company never actually transferred (or was even able to transfer) these purported "service credits" to the customer even though they had invoiced them and treated them as revenue; (iii) the Company lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue, (iv) the Company was improperly recognizing revenue in the form of undeposited funds, and (v) that as such, the Company's financial results were materially overstated.

156.    On November 15, 2021, the Company issued a press release entitled, "Lottery.com Announces Strong Third Quarter Results and Year-to-Date Revenue Increase of $42.8 Million Over Prior-Year Period." This press release, which was also filed with the SEC on November 15, 2021 in a Form 8-K, in relevant part, stated:

> Third quarter 2021 revenue was $32.2 million, an increase of $30.6 million from the third quarter of 2020. The growth was driven by the global affiliate marketing program.

***

> The Company expects to meet or exceed its previous guidance of $71 million for full year 2021 revenue.

157.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements concerning the Company's financial results and projections were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue, (ii) nearly all of the reported revenue for the quarter was bogus; a result of the Company improperly

63

recognizing revenue from the September 2021 Sham Transaction without disclosing the related $30 million loan, and (iii) that as such, the Company's financial results were materially overstated.

158.    Also on November 15, 2021, the Company filed its quarterly report on Form 10-Q for the 2021 fiscal third quarter ended September 30, 2021. The November 15, 2021 Form 10-Q referenced the fact that the Company had identified a material weakness relating to a technical accounting issue identified by the SEC in SPAC-related guidance. Specifically, Lottery determined that its disclosure controls and procedures were not effective as of September 30, 2021, and thus had restated its financial statements on Form 10-K/A on June 28, 2021, in order to comply with a new SEC Staff Statement regarding the classification of warrants. With respect to Lottery's Controls and Procedures, the Company stated:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, *due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021*.

***

> Other than what was described in the 10-K/A, *there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.* In light of the restatement of our financial statements included in the 10-K/A, we plan to enhance our processes to identify and appropriately apply applicable *accounting requirements to better evaluate and understand the nuances of the complex accounting standards that*

64

***apply to our financial statements.*** Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

159.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements concerning the Company's internal controls were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that: (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) the Company was improperly recognizing revenue, and (iii) that as such, the Company's financial results were materially overstated.

160.    Moreover, also on November 15, 2021, the Company attached a copy of AutoLotto, Inc's Management's Discussion And Analysis Of Financial Condition And Results Of Operations to the Company's Form 8-K that day. Therein, regarding its $32.25 million revenue for the quarter ended September 30, 2021, the Company disclosed that "[t]he increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits" during the quarter.

161.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements concerning the Company's revenue were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company was representing to investors that it had been paid, at least partially, by the customer who purchased the aforementioned $30 million of "affiliate marketing credits." However, as investors subsequently learned, there was no revenue from the purported $30 million sale. As such, Lottery's representation that it had collected this revenue was false.

162.    On March 31, 2022, the Company issued a press release, also filed as an attachment to a Form 8-K filed with the SEC on that date that was signed by Kathryn Lever. Therein, Lottery touted "strong" financial results for the fourth quarter and full-year 2021. Among the information provided, the Company reported revenue of $21.5 million for Q4 2021 (an increase of $18.2 million over the prior year period) and revenue of $68.5 million for the full year 2021 (an increase of $61 million over 2020). The Company also reported cash for Q4 2021 of $62.6 million – an increase of $58.8 million over the prior year period. Thereafter, on April 1, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021. The Annual Report, which was signed by Defendants DiMatteo, Clemenson and Dickinson, reiterated the financial results released the prior day.

163.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements concerning the Company's cash and revenue were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) the Company was claiming it had cash that it did not have and was improperly recognizing revenue from the September 2021 Sham Transaction, while failing to disclose that it had pledged its own cash accounts to secure a line of credit in the amount of $30 million utilized by a major customer to provide the Company with payment towards the purchase of the service credits; and (iii) that as such, the Company's financial results were materially overstated.

164.    The April 1, 2022 Annual Report also stated that the Company had identified a material weakness in its internal control over financial reporting as of year-end 2021 and 2020, but it described this material weakness as one largely related to personnel and staffing –

66

specifically, it related to "the design and operation of the procedures relating to the closing of

financial statements." Defendants reassured investors that the Company had "commenced measures

to remediate" such material weakness and that other than the deficiencies identified, "there was no

change in our internal control over financial reporting." As the Company, in relevant part, stated:

> In connection with the audits of our condensed consolidated financial statements included in this Annual Report, ***our management has identified a material weakness in internal control over financial reporting as of December 31, 2021 and 2020 relating to deficiencies in the design and operation of the procedures relating to the closing of our financial statements.*** These include: (i) our lack of a sufficient number of personnel with an appropriate level of knowledge and experience in accounting for complex or non-routine transactions, (ii) the fact that our policies and procedures with respect to the review, supervision and monitoring of our accounting and reporting functions were either not designed and in place or not operating effectively; (iii) the timely closing of financial books at the quarter and fiscal year end, and (iv) incomplete segregation of duties in certain types of transactions and processes.
>
> ***We have commenced measures to remediate the identified material weakness***, including (i) adding personnel with sufficient accounting knowledge; (ii) adopting a more rigorous period-end review process for financial reporting; (iii) adopting improved period close processes and accounting processes, and (iv) clearly defining and documenting the segregation of duties for certain transactions and processes. The implementation of our remediation is ongoing and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles. We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting.

165.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these

statements concerning the Company's internal controls over financial reporting were materially false

or misleading when made, or omitted to state material facts necessary to make the statements not

misleading, because the Company failed to disclose that: (i) the Company lacked adequate internal

accounting controls over financial reporting of cash and revenue, (ii) the Company was claiming it

had cash that it did not have and was improperly recognizing revenue from the September 2021 Sham

Transaction while failing to disclose that it had pledged its own

cash accounts to secure a line of credit in the amount of $30 million utilized by a major customer to provide the Company with payment towards the purchase of the service credits that were the subject of the September 2021 Sham Transaction; and (iii) that as such, the Company's financial results were materially overstated.

166. The April 1, 2022 Annual Report also contained the following false or misleading assurances of regulatory and legal compliance:

> We only purchase lottery games on behalf of our users and customers where our services are permitted and **in accordance with applicable laws.**

> ***

> We closely monitor . . . regulations in all jurisdictions regarding the authorization of lottery and work to maintain effective relationships and dialogues with applicable legislative and regulatory authorities, including Governors and Attorneys General, in each jurisdiction. We use this information in the development of our strategic expansion and growth framework and model, but additionally, and importantly, to create strong working relationships with the regulatory authorities in the jurisdictions in which we do business, to ensure **transparent regulatory compliance** and promote each jurisdiction's objective for economic benefit through the sale of lottery games.

> While **we believe that we are currently in compliance in all material respects with all applicable laws and regulatory requirements**, we cannot assure that our activities or our users' activities will not become the subject of any regulatory or law enforcement investigation, proceeding, or other governmental action . . . .

> ***

> While **we believe that we are in compliance with all material domestic and international laws and regulatory requirements** applicable to us, we cannot ensure that our activities or the activities of those third parties with whom we do business will not become the subject of regulatory or law enforcement proceedings.

> ***

> We are in the process of developing a comprehensive internal compliance program, which will ensure compliance with legal requirements imposed in connection with our activities and with legal requirements generally applicable to all publicly traded companies. While **we are firmly committed to full**

68

**compliance with all applicable laws**, we cannot ensure that our compliance program will prevent the violation of one or more laws or regulations . . . .

167.    As the Company later admitted (*see* Sections IV.H. & IV.I., *supra*), these statements concerning the Company's regulatory and legal compliance were materially false or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, as the Company failed to disclose that, in fact, it was not complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment. Indeed, on July 6, 2022, Lottery disclosed that an internal investigation had revealed "issues pertaining to the Company's internal accounting controls" and "***instances of noncompliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment***" and as the Bloomberg article explained, the Company was illegally having lottery tickets purchased in states that were different than where its customers were located.

168.    The April 1, 2022 Annual Report contained the following false or misleading statements regarding the efficacy of Lottery's geofencing technology:

> [I]n the U.S., users of our B2C Platform are required to be physically located, at the time of purchase, in the state or jurisdiction of the lottery authority offering the lottery game that they purchase on our Platform. **We verify their location through geofencing technology** integrated into our Platform. A user physically located in one U.S. jurisdiction may not purchase a lottery game sold by a lottery authority in another U.S. jurisdiction. Internationally, . . . users may only access lottery games if they are physically located in the jurisdiction of the commercial partner at the time of purchase, as **verified by geofencing technology**.
>
> ***
>
> To register on our B2C Platform and purchase a lottery game, a user must create an account, be the . . . age of majority in the jurisdiction in which they are situated, and be physically located within such jurisdiction, as **verified by internally and externally deployed geofencing technology**. Individuals that are not physically located within one of the jurisdictions where our services are

69

offered, as **verified by geofencing technology**, are not permitted to register to purchase a lottery game.

*** 

[T]he Interstate Wagering Amendment to 18 U.S.C. § 1301 limits our ability to purchase lottery games for a user located in one state from a lottery authority located in another state . . . . Therefore, for our users located within the U.S., we only purchase lottery games for users **geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted**, unless an exception were to be authorized by the applicable lottery authorities.

169.    These statements concerning the efficacy of Lottery's geofencing technology were materially false or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, as the Company failed to disclose that, in fact, as the Bloomberg article explained, anybody using the web-based system, as opposed to the mobile app, could easily skirt any jurisdictional requirement for ticket purchases.

170.    On May 16, 2022, the Company issued a press release, filed with the SEC on Form 8-K, announcing its financial results for the Company's 2022 fiscal first quarter, ended March 31, 2022. In relevant part, Defendants reported that Lottery's 2022 fiscal first quarter revenues were $21.2 million, an increase of $15.7 million over the prior year period and cash of $50.8 million, up $32.5 million over the prior year period. Also on May 16, 2022, the Company filed its quarterly report for the same fiscal quarter and reiterated the financial results disclosed in its press release.

171.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements concerning the Company's cash and revenue were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) $18,539,472 of revenue in the first

70

quarter of 2022 was from a fictitious transaction and would be reversed out in May 2023; and (iii) that as such, the Company's financial results were materially overstated.

172.    On May 16, 2022, the Company filed a quarterly report on Form 10-Q for the 2022 fiscal first quarter ended March 31, 2022. That filing, which was signed by Defendant Dickinson, stated that management had "evaluated the effectiveness of our disclosure controls and procedures" and that:

> [b]ased on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, *as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting with respect to our financial statement close and reporting process*....

Critically, however, the Company reassured investors that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that *our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position*, results of operations and cash flows as of the dates and for the periods presented in conformity with GAMP.

173.    As the Company later admitted (*see* Sections IV.C. & IV.F., *supra*), these statements concerning the Company's internal controls and financial position were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) $18,539,472 of revenue in the first quarter of 2022 was from a fictitious transaction and would be reversed out in May 2023; and (iii) that as such, the Company's financial results were materially overstated.

## VI.    CORPORATE SCIENTER AND *RESPONDEAT SUPERIOR*

174.    As alleged herein, the Lottery Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of Lottery were

71

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

175.    As alleged herein, the Individual Lottery Defendants, by virtue of their receipt of information reflecting the true facts regarding Lottery, their control over, and/or receipt and/or modification of Lottery's allegedly materially misleading misstatements and/or their associations with Lottery which made them privy to confidential proprietary information concerning Lottery, participated in the fraudulent scheme alleged herein.

176.    Each of the Individual Lottery Defendants was a high-ranking management-level employee that: (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in their role as an executive employee and representative of Lottery. The scienter of each of these individuals and all other management-level employees of Lottery is therefore imputed to Defendant Lottery.

## VII. LOSS CAUSATION

### A. Plaintiff Suffered Significant Loss Due To Materially Misleading Statements

177.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff. Plaintiff purchased Lottery securities at artificially inflated prices. The price of Lottery's securities significantly declined when the misrepresentations made to the market and/or the effects thereof, were revealed or materialized, on July 6, 2022, July 18, 2022, July 25, 2022 and July 29, 2022, causing investors' losses.

178.    On November 15, 2021, Lottery filed with the SEC a Form 8-K announcing that, on November 10, 2021, the Board announced the dismissal of Marcum LLP as the Company's auditing firm. That same day, the Company disclosed that virtually all of its revenue for the quarter (approximately $32.25 million) was the result of a single $30 million sale of affiliate marketing credits, which was not its primary business activity, during the quarter.

179.    On this news, the price of Lottery stock fell from a price of $13.25 per share on November 12, 2021, to a price of $6.98 per share on November 22, 2021, a decline of nearly 50%.

180.    On July 6, 2022, the Company filed a Form 8-K with the SEC dated July 5, 2022. The Form 8-K, in relevant part, stated:

> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> ***The Audit Committee of the Board of the Directors (the "Board") of Lottery.com (the "Company") retained outside counsel to conduct an independent investigation that has revealed instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment. The investigation also identified issues pertaining to the Company's internal accounting controls.*** Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Mr. Dickinson served as the Company's President and Treasurer since October 2021 and as the Company's Chief Financial Officer since March 2022.   The Company is continuing to work with

outside counsel with respect to the matters that are the subject of the independent investigation and to institute appropriate remedial measures.

***

The Company's Chief Executive Officer and Board chair, Tony DiMatteo, has stepped down as Board chair effective July 5, 2022, which will enable him to devote more time to his responsibilities as Chief Executive Officer. Mr. DiMatteo will remain as a member of the Board. In his place as chair, the Board, on July 5, 2022, appointed Steven M. Cohen and Richard Kivel as co-chairs effective as of that date. In their roles as Board co-chairs, Steven will be primarily responsible for coordinating Board oversight of legal, compliance, and financial reporting matters, and Richard will be primarily responsible for coordinating Board oversight of business and operational matters. Katie Lever, the Company's Chief Legal Officer, will report directly to the Board co-chairs.

181.    On this news, Lottery shares fell $0.15, or more than 12%, from a closing price of $1.22 per share on July 5, 2022, to a closing price of $1.07 per share on July 6, 2022, on abnormally high volume.

182.    On July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. Moreover, the Company provided an update on the independent investigation previously disclosed on July 6, 2022. The Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery had:

> preliminarily conclude[d] that it has **overstated its available unrestricted cash balance by approximately $30 million** and that, relatedly, in the prior fiscal year, it **improperly recognized revenue** in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

183.    On this news, shares of Lottery fell $0.14, or more than 14.5%, from a closing price of $0.96 per share on July 15, 2022, to a closing price of $0.82 per share on July 16, 2022, on abnormally high volume.

74

184.    On July 22, 2022, Lottery filed a Form 8-K with the SEC in which the Company disclosed that it had been advised by its independent accountant that its audited financial statements for the fiscal year ended December 31, 2021 and unaudited financial statements for the quarter ended March 31, 2022 should no longer be relied upon. In addition, the Company reported that CEO and co-founder Defendant DiMatteo was resigning, effective immediately. Specifically, the Company's announcement provided that:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> (b) On July 20, 2022, Lottery.com Inc. (the "Company") was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal year ended December 31, 2022, that the *audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon*. Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a *Company subsidiary entered into a line of credit in January 2022 that was not disclosed* in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.
>
> ***
>
> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> On July 21, 2022, Lawrence Anthony "Tony" DiMatteo III, the Chief Executive Officer (the "CEO") of the Company and a member of its Board of Directors (the "Board"), provided a notice of resignation as CEO of the Company, its wholly owned subsidiary, AutoLotto, Inc. ("AutoLotto"), and all of its other subsidiaries and affiliates with the exception of LTRY WinTogether, Inc., with immediate effect. The Company accepted his resignation from such positions. Mr. DiMatteo served as an officer and director of AutoLotto since February 2015 and as CEO of the Company since the effectuation of the business combination in October 2021.

185.    On these disclosures, Lottery shares declined $0.10, or more than 12%, over the next two trading days, from a closing price of $0.82 per share on July 22, 2022, to a closing price of $0.72 per share on July 26, 2022.

75

186.    On July 29, 2022, Lottery disclosed in a filing on Form 8-K with the SEC that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations," and that it therefore intended to furlough certain employees effective July 29, 2022. Moreover, because Lottery's resources were not sufficient to fund its operations for a twelvemonth period, "there is substantial doubt about the Company's ability to continue as a going concern," and the Company may be forced to wind down its operations or pursue liquidation of the Company's assets. In full, the Company stated that:

### Item 8.01 Other Events.

On July, 28, 2022, the Board of Directors of Lottery.com Inc. (the "Company") determined that *the Company does not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations. Accordingly, the Company intends to furlough certain employees effective July 29, 2022*. As of July 29, 2022, the Company owed approximately $425,000 in outstanding payroll obligations. The Company's inability to pay this amount may result in employees terminating their relationship with the Company and/or pursuing legal remedies. Since the Company's business is dependent on the efforts and talents of its employees, particularly its developers and engineers, and the provision of ongoing services to customers by its employees, *a material loss of its employee base may result in the inability of the Company to operate its technology, meet its obligations to customers, the loss of key customer relationships and revenue, and claims for breach of contractual obligations*.

Additionally, *the Company's capital resources are not sufficient to fund its operations for a twelve-month period and, therefore, there is substantial doubt about the Company's ability to continue as a going concern*. If the Company is not able to secure additional capital resources or otherwise fund its operations, *the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets*, including equipment and intellectual property.

187.    On this news, shares of Lottery declined 64%, falling $0.52 per share, from a closing price of $0.81 per share on July 28, 2022 to a close of $0.29 per share on July 29, 2022.

76

## VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

188.    The market for Lottery securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Lottery's securities traded at artificially inflated prices. Plaintiff purchased the Company's securities relying upon the integrity of the market price of Lottery's securities and market information relating to Lottery, and was damaged thereby.

189.    The artificial inflation of Lottery's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff. As described herein, Defendants made, or caused to be made, a series of materially false and/or misleading statements about Lottery's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Lottery and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when corrected, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements resulted in Plaintiff purchasing the Company's securities at an artificially inflated price thereby causing Plaintiff to suffer damage.

190.    At all relevant times, the market for Lottery's securities was an efficient market for the following reason, among others:

(a)    Lottery shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Lottery filed periodic public reports with the SEC and/or the NASDAQ; and/or

77

(c)   Lottery regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and though other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

191.   As a result of the foregoing, the market for Lottery's securities promptly digested current information regarding Lottery from all publicly available sources and reflected such information in Lottery's share price. Under these circumstances, Plaintiff suffered injury through the purchase of Lottery's securities at artificially inflated prices and a presumption of reliance applies.

## IX.   NO SAFE HARBOR

192.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

193.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of Lottery who knew that those statements were false when made.

## X.    CAUSES OF ACTION

### FIRST CLAIM

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against The Lottery Defendants**

194.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

195.    At all relevant times, the Lottery Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

196. The Lottery Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff in connection with his purchase of Lottery's publicly traded securities.

197. Plaintiff suffered damages in that, in reliance on the integrity of the market, he paid artificially inflated prices for Lottery's publicly traded securities. Plaintiff would not have purchased Lottery securities at the prices he paid, or at all, had he been aware that the market prices

had been artificially and falsely inflated by Lottery Defendants' misleading statements.

198.  As a direct and proximate result of the Lottery Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchase of Lottery securities.

## SECOND CLAIM

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Lottery Defendants

199. Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

200. The Individual Lottery Defendants acted as controlling persons of Lottery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Lottery Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Lottery Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

201. In particular, the Individual Lottery Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

202.   As set forth above, the Lottery Defendants each violated Section l0(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Lottery Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Lottery's and the Individual Lottery Defendants' wrongful conduct, Plaintiff  suffered damages in connection with his purchase of the Company's securities.

## THIRD CLAIM

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

203.   Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

204.   Komissarov acted as a controlling person of TDAC within the meaning of Section 20(a) of the Exchange Act as alleged herein and Individual Lottery Defendants acted as controlling persons of Lottery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the companies' operations, these defendants had the power and authority to cause TDAC and Lottery to engage in the wrongful conduct complained of herein. These defendants were able to, and did, control directly and indirectly, the content of the Proxy Statement and Prospectus thereby causing the dissemination of the materially false and/or misleading statements and omissions as alleged herein.

205.   In particular, Komissarov reviewed the Business Combination and all of the underlying due diligence materials, voted to approve the Business Combination, and solicited the approval of the Business Combination through TDAC's management's recommendation to vote in

81

favor of the Business Combination, which appeared in the Proxy Statement and Prospectus. Moreover, the Individual Lottery Defendants reviewed the Business Combination, reviewed and furnished information for inclusion in the Proxy Statement and Prospectus, and solicited the approval of the Business Combination.

206.   As set forth above, in their capacities as officers and/or directors of Lottery, these defendants participated in the misstatements and omissions set forth above. Indeed, each of these defendants had access to information regarding the circumstances surrounding the Business Combination and Lottery, including the terms of the Business Combination, analysis of Lottery's operating results and financial condition, the valuation of Lottery, and the due diligence that had and had not been performed. As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

207.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. The Individual Defendants were culpable participants in the violations because they failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements in the Proxy Statement and Prospectus issued were true and free of any omissions of material fact. As detailed above, during the respective times that these defendants served as officers and/or directors of TDAC and Lottery, each is responsible for the material misstatements and omissions made in the Proxy Statement and Prospectus.

208. Plaintiff was damaged as a direct and proximate cause of the untrue statements and omissions in the Proxy Statement and Prospectus.

## XI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

(a)    Awarding compensatory damages in favor of Plaintiff against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)    Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)    Such other and further relief as the Court may deem just and proper.

## XII.  DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 18, 2024

/s/ Harold M. Hoffman
**Harold M. Hoffman, Esq.,** *Pro Se*
240 Grand Avenue
Englewood, NJ 07631
T. (201) 410 - 8223
Email: hoffman.esq@verizon.net