**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LOTTERY.COM, INC. SECURITIES LITIGATION | Case No. 1:22-cv-07111-JLR |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT......................................................................................... 1

II.   STATEMENT OF RELEVANT FACTS ........................................................................ 4

    A.    A SPAC That Sought To Purchase An Oil Or Gas Company In Eastern Europe, Up Against A Time Limit, Instead Used Shareholders Funds To Acquire An Online Lottery Company In The United States ...................................................... 4

    B.    Lottery Admits That Its Executives Knowingly And Intentionally Engaged In A Revenue Inflation Scheme And Sham $30 Million Transaction Prior To The Proxy Or Other Public Revenue Statements ........................................................ 6

    C.    A Recent Bloomberg Article Confirms That The Individual Lottery Defendants Were Intimately Involved In The September 2021 Sham Transaction And That These Individuals Remain Under Investigation By the DOJ And SEC ..............11

    D.    Lottery And Its Executives Knew That The Company Was Not In Compliance With State And Federal Gaming And Lottery Laws........................................... 13

III.  THE TAC ADEQUATELY ALLEGES SECTION 10(B) CLAIMS AGAINST THE LOTTERY DEFENDANTS ......................................................................................... 15

    A.    Applicable Legal Standards Disfavor Defendants' Attempt To Dismiss Section 10(b) Claims ................................................................................................... 15

    B.    The TAC Adequately Alleges That Defendants Made False And/Or Materially Misleading Statements................................................................................... 16

        1.    The Court Previously Determined That The Lottery Defendants' Post-Business Combination Financial Performance And Financial Reporting Statements Are False And/Or Misleading................................................. 17

        2.    Plaintiffs Have Sufficiently Pled Falsity With Respect To Statements Regarding Lottery's Adherence To ASC 606........................................... 17

        3.    Plaintiffs Have Sufficiently Pled The False And Misleading Nature Of Defendants' Legal Compliance Representations ..................................... 19

        4.    The TAC Properly Relies On The Bloomberg Article .............................. 20

        5.    The TAC's Falsity Allegations Are Sufficiently Particularized ................ 21

        6.    The Geofencing Statements Were Materially Misleading ........................ 22

        7.    The Statements Of Belief Are Actionable................................................. 23

i

8.    The Statements Regarding Lottery's Compliance With Applicable Law Are Not Inactionable Puffery ...................................................... 24

C.    The TAC Raises A Strong And Compelling Inference Of Scienter .................... 25

    1.    Defendants' Knowledge Of The Fraud Made Their Statements Reckless ...................................................................................... 25

        a)    Defendants' Knowingly Violated Applicable Lottery Laws And Regulations ............................................................ 26

        b)    Lottery Has Admitted That Defendants Were Actively Involved With Improper Financial Reporting And Accounting Practices For The September 2021 Sham Transaction ...................................... 31

    2.    Additional Facts Further Support Defendants' Knowledge Of The Fraud And Recklessness ...................................................................... 34

    3.    The Defendants Also Had The Motivation And Opportunity To Engage In The Fraud ...................................................................... 40

    4.    The Inference Of Fraud Is Clearly More Plausible Than Any Competing Inference .................................................................................... 42

IV.    THE TAC ADEQUATELY ALLEGES SECTION 14(A) CLAIMS AGAINST THE LOTTERY DEFENDANTS ................................................................... 44

    A.    Applicable Legal Standards Disfavor Dismissal Of Section 14(a) Claims ........ 44

    B.    The Lottery Defendants Are Liable For The Misrepresentations Contained In The Proxy .................................................................................. 46

V.    THE TAC ADEQUATELY ALLEGES SECTION 14(A) CLAIMS AGAINST KOMISSAROV ...................................................................................... 48

    A.    Komissarov Is Liable For Material Misleading Statements In The Proxy ......... 48

    1.    The TAC Adequately Alleges That The Proxy's 2021 Revenue Projections Were Materially Misleading ...................................................... 48

    2.    The Preliminary Q3'21 Revenue Figure Contained In The October 21, 2021 Press Release Gives Rise To A Section 14(a) Claim ...................... 51

    B.    Komissarov Is Responsible For The Misrepresentations And Omissions In The Proxy Materials ................................................................................ 53

    1.    *Janus* Does Not Apply To Section 14(a) Claims .................................... 53

ii

2.    Even If *Janus* Applies, Komissarov Was The "Maker" Of The Alleged
Misstatements And Omissions .................................................................... 54

C.    The TAC Adequately Alleges Komissarov's Negligence ................................... 56

VI.    THE TAC ALLEGES CONTROL PERSON LIABILITY AGAINST THE INDIVIDUAL
DEFENDANTS UNDER SECTION 20(a) ......................................................................... 58

VII.    CONCLUSION ................................................................................................................. 58

## TABLE OF AUTHORITIES

<u>CASES</u>

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020) ...................................................................................... 49

*Alaska Elec. Pension Fund v. Asar*,
  768 F. App'x 175 (5th Cir. 2019) ............................................................................. 35

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ...................................................................................... 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................... 15

*Baum v. Harman Int'l Indus., Inc.*,
  575 F. Supp. 3d 289 (D. Conn. 2021) ....................................................................... 46

*Beck v. Dobrowski*,
  559 F.3d 680 (7th Cir. 2009) ............................................................................... 45, 46

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... 15

*Bishins v. CleanSpark, Inc.*,
  2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ................................................................ 52

*Brown v. Brewer*,
  2010 WL 2472182 (C.D. Cal. June 17, 2010) .......................................................... 57

*Christine Asia Co. Ltd. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ................................................................................. 15

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
  No. 17 Civ. 10014 (LGS), 2019 WL 719751 (S.D.N.Y. Feb. 19, 2019) ................... 35

*City of Providence v. Aeropostale, Inc.*,
  No. 11 Civ. 7132 (CM), 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ............... 15, 51

*City of Roseville Emps.' Ret. Sys. v. Energysolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ....................................................................... 41

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020) ....................................................... 21, 30, 34, 39

*Cohen v. Kitov Pharm. Holdings, Ltd.*,
   No. 17 Civ. 0917 (LGS), 2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .................................. 35

*Cullen v. RYVYL Inc.*,
   No. 23 Civ. 0185, 2024 WL 898206 (S.D. Cal. Mar. 1, 2024) .................................................. 36

*Dekalb Cnty. Pension Fund v. Transocean Ltd.*,
   817 F.3d 393 (2d Cir. 2016) ..................................................................................................... 56

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012) ...................................................................................... 33

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ............................................................................................... 16, 25

*Fresno Cnty. Emps.' Ret. Assoc. v. Comscore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ............................................................................. *passim*

*Gas Nat. Inc. v. Osborne*,
   624 F. App'x 944 (6th Cir. 2015) ............................................................................................. 51

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018) ...................................................................................... 20

*Hill on Behalf of Republic First Bancorp Inc. v. Cohen*,
   40 F.4th 101 (3d Cir. 2022) ..................................................................................................... 52

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012) ...................................................................................... 15

*Hsu v. Puma Biotechnology Inc.*,
   No. SA Civ. 15 00865, 2017 WL 3205774 (C.D. Cal. July 25, 2017)...................................... 41

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010) ...................................................................................... 58

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...................................................................................... 25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................................... 37

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................................. 45, 46, 53, 54

*In re Banc of California Sec. Litig.*,
  No. 17 Civ. 00118, 2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ............................................. 44

*In re Barclays PLC Sec. Litig.*,
  No. 22 Civ. 8172 (KPF), 2024 WL 757385 (S.D.N.Y. Feb. 23, 2024) ..................................... 27

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................................................... 24

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................................. 22, 23

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) ...................................................................................... 40

*In re Carter-Wallace, Inc. Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000) ...................................................................................................... 25

*In re EQT Corp. Sec. Litig.*,
  504 F. Supp. 3d 474 (W.D. Pa. 2020) ...................................................................................... 39

*In re Gen. Elec. Co. Sec. Litig.*,
  856 F. Supp. 2d 645 (S.D.N.Y. 2012) ...................................................................................... 35

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................................. 25, 40

*In re Gilat Satellite Networks, Ltd.*,
  No. 2 Civ. 1510 (CPS), 2005 WL 2277476 (S.D.N.Y. Sept. 19, 2005) .................................. 36

*In re Grupo Televisa Sec. Litig.*,
  368 F. Supp. 3d 711 (S.D.N.Y. 2019) ...................................................................................... 29

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ............................................................................................... 43, 44

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
  236 F. Supp. 3d 824 (S.D.N.Y. 2017) ...................................................................................... 38

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  No. 20 Civ. 4953 (JPO), 2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021).................................. 43

*In re L & L Energy, Inc.*,
  No. 11 Civ. 1423, 2013 WL 6244654 (W.D. Wash. Dec. 3, 2013) .......................................... 44

*In re Longwei Petroleum Inv. Holding Sec. Litig.*,
No. 13 Civ. 214 (HB), 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .................................. 33, 34

*In re Lottery.com, Inc. Sec. Litig.*,
No. 22 Civ. 07111 (JLR), 2024 WL 454298 (S.D.N.Y. Feb. 6, 2024) .............................. *passim*

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...................................................................... 29

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010) ...................................................................... 39

*In re Mindbody, Inc. Sec. Litig.*,
489 F. Supp. 3d 188 (S.D.N.Y. 2020) ...................................................................... 53

*In re Mylan N.V. Sec. Litig.*,
No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .................................. 40

*In re Mylan N.V. Sec. Litig.*,
No. 20 Civ. 955, 2023 WL 3539371 (W.D. Pa. May 18, 2023)................................................. 30

*In re Nielsen Holdings PLC Sec. Litig.*,
510 F. Supp. 3d 217 (S.D.N.Y. 2021) ...................................................................... 28

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009) ...................................................................... 39

*In re Optionable Sec. Litig.*,
577 F. Supp. 2d 681 (S.D.N.Y. 2008) ...................................................................... 30

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y 1999)........................................................................ 50, 51

*In re Pareteum Sec. Litig.*,
No. 19 Civ. 9767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ........................... 27, 32

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .......................................................................... 52

*In re Renewable Energy Grp. Sec. Litig.*,
No. 22-335, 2022 WL 14206678 (2d Cir. Oct. 25, 2022)........................................................ 56

*In re Reserve Fund Sec. & Deriv. Litig.*,
732 F. Supp. 2d 310 (S.D.N.Y. 2010) ...................................................................... 37

*In re Salix Pharm., Ltd.*,
No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................................. 50

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ................................................................................................... 42

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ............................. 16, 17

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014) ..................................................................................... 41

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ................................................................................................. 15

*In re Teva Sec. Litig.*,
671 F. Supp. 3d 147 (D. Conn. 2023) ..................................................................... 27, 29, 39

*In re Veeco Instruments, Inc. Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) .......................................................................................... 36

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) .................................................................................. 22

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) ................................................................................... 50

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) ................................................................................................. 44

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964) ............................................................................................................. 45

*Katz v. Pels*,
774 F. Supp. 121 (S.D.N.Y. 1991) ........................................................................................ 57

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991) ................................................................................................. 54

*Kusnier v. Virgin Galactic Holdings, Inc.*,
639 F. Supp. 3d 350 (E.D.N.Y. 2022) .................................................................................. 38

*Lea v. TAL Educ. Grp.*,
837 F. App'x 20 (2d Cir. 2020) ............................................................................................ 38

*Lemen v. Redwire Corp.*,
    No. 21 Civ. 1254, 2023 WL 2598402 (M.D. Fla. Mar. 22, 2023) ................................ 36, 41, 42

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ....................................................................................... 16, 17

*Locus Techs. v. Honeywell Int'l Inc.*,
    632 F. Supp. 3d 341 (S.D.N.Y. 2022) ............................................................................. 44

*Long Island Lighting Co. v. Barbash*,
    779 F.2d 793 (2d Cir. 1985) ........................................................................................... 51

*Lopez v. Ctpartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ............................................................................... 29

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ........................................................................................... 58

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) ............................................................................................. 21

*Major Energy Elec. Servs., LLC v. Horowitz*,
    No. 19 Civ. 10431 (NRB), 2020 WL 4432121 (S.D.N.Y. July 31, 2020) ......................... 30

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) .......................................................................................... 39

*Martin v. Altisource Residential Corp.*,
    No. Civ. 15-24, 2019 WL 2762923 (D.V.I. July 2, 2019) ................................................ 43

*Mateo v. Bristow*,
    No. 12 Civ. 5052 (RJS), 2013 WL 3863865 (S.D.N.Y. July 16, 2013) ........................ 15, 46

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..................................................................................................... 15, 16

*McIntosh v. Katapult Holdings, Inc.*,
    No. 21 Civ. 7251 (JPO), 2023 WL 5049044 (S.D.N.Y. Aug. 8, 2023) ..................... 47, 48, 53

*New Mexico State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ......................................................................................... 32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ....................................................................................... 16, 25

ix

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
   No. 22 Civ. 10185 (GHW) (GS), 2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023)...................... 44

*Okemos Home, LLC v. LGF Produce, LLC*,
   No. 17 Civ. 02786, 2019 WL 12248966 (D. Colo. Mar. 27, 2019) .......................................... 36

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).................................................................................................... 49, 50

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010) ........................................................................................... 16, 22

*Peifa Xu v. Gridsum Holding Inc.*,
   No. 18 Civ. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020)...................................... 32

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   No. 15 Civ. 7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ...................................... 28

*Realty Invs. Tax Exempt Fund Ltd. P'ship v. Dominium Tax Exempt Fund L.L.P.*,
   944 F. Supp. 250 (S.D.N.Y. 1996) ................................................................................... 51

*Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*,
   346 F. Supp. 3d 389 (S.D.N.Y. 2018) ................................................................................ 19

*Richard v. Nw. Pipe Co.*,
   No. 9 Civ. 5724, 2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) .......................................... 32

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................................................ 29

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ...................................................................................... 23, 50

*Rudani v. Ideanomics, Inc.*,
   2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) ...................................................................... 50

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   No. 22 Civ. 6339 (AS), 2024 WL 1898512 (S.D.N.Y. May 1, 2024)...................................... 27

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011) ............................................................................................... 16

*Sec. & Exch. Comm'n. v. Takeyasu*,
   No. 17 Civ. 4866 (GHW), 2018 WL 2849777 (S.D.N.Y. June 11, 2018).............................. 35

x

*Sec. & Exch. Comm'n v. Hurgin*,
  484 F. Supp. 3d 98 (S.D.N.Y. 2020) ...................................................................... 45, 47, 48, 53

*Sec. & Exch. Comm'n v. Prakash,*
  No. 23 Civ. 03300, 2024 WL 781037 (N.D. Cal. Feb. 26, 2024) ............................................. 48

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ................................................................................... 26

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015) ................................................................... 43, 48

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  545 F. Supp. 3d 120 (S.D.N.Y. 2021) ................................................................. 21, 39

*Skiadas v. Acer Therapeutics Inc.*,
  No. 19 Civ 6137 (GHW), 2020 WL 3268495 (S.D.N.Y. June 16, 2020)............... 18, 19, 23, 25

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ................................................................................ 39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................... 25, 40, 43

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ................................................................................ 49

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .......................................................................................... 16

*Tung v. Bristol-Myers Squibb Co.*,
  412 F. Supp. 3d 453 (S.D.N.Y. 2019) ..................................................................... 33

*United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*,
  No. 22 Civ. 4838 (LGS), 2024 WL 1312593 (S.D.N.Y. Mar. 27, 2024) ................................. 23

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) ..................................................................... 41

*Vanderhoef v. China Auto Logistics, Inc.*,
  No. 18 Civ. 10174, 2021 WL 3260849 (D.N.J. July 30, 2021) ............................................. 38

*Venkataraman v. Kandi Techs. Grp., Inc.*,
  No. 20 Civ. 8082 (LGS), 2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022) ............................... 22

*Vides v. Amelio*,
265 F. Supp. 2d 273 (S.D.N.Y. 2003) .................................................................................. 45

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023) ..................................................................... 35, 37, 50

*Wilson v. Great Am. Indus., Inc.*,
855 F.2d 987 (2d Cir. 1988) ............................................................................................ 45, 57

*Winter v. Stronghold Digital Mining, Inc.*,
686 F. Supp. 3d 295 (S.D.N.Y. 2023) ................................................................................ 23

*Xu v. Gridsum Holding Inc.*,
624 F. Supp. 3d 352 (S.D.N.Y. 2022) ................................................................................ 54

*Yannes v. SCWorx Corp.*,
No. 20 Civ. 033949 (JGK), 2021 WL 2555437 (S.D.N.Y. June 21, 2021) ......................... 33, 38

*Zappia v. Myovant Scis. Ltd.*,
No. 23 Civ. 8097 (JSR), 2023 WL 8945267 (S.D.N.Y. Dec. 28, 2023) .................................. 56

## STATUTES

18 U.S.C. § 1301 ...................................................................................................................... 27

## RULES

Fed. R. Civ. P. 8(a)(2) ............................................................................................................. 45

Fed. R. Civ. P. 12(g) ............................................................................................................... 15

**GLOSSARY**

| Term | Definition |
|------|------------|
| 2021 Annual Report | Lottery's March 31, 2022 Form 8-K and 2021 annual report filed on Form 10-K on April 1, 2022 |
| Additional Plaintiff | Preston Million |
| Amended Complaint | The Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 52) |
| AutoLotto | AutoLotto, Inc. d/b/a Lottery.com |
| Bloomberg Article | The March 4, 2024 *Bloomberg News* article entitled "From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded" |
| Business Combination | The transaction between TDAC and AutoLotto that closed in October 2021 |
| C&D Br. | Memorandum Of Law In Support Of Defendants Matthew Clemenson And Ryan Dickinson's Motion To Dismiss Third Amended Class Complaint And Second Amended Hoffman Complaint (ECF No. 181) |
| CEO | Chief Executive Officer |
| Clemenson | Matthew Clemenson |
| CRO | Chief Revenue Officer |
| Defendants | Lottery, DiMatteo, Dickinson, Clemenson, and Komissarov |
| Dickinson | Ryan Dickinson |
| DiMatteo | Anthony DiMatteo |
| DiMatteo Br. | Memorandum In Support Of Defendant Anthony DiMatteo's Motion To Dismiss Plaintiffs' Third Amended Class Action Complaint (ECF No. 161) |
| Exchange Act | Securities Exchange Act of 1934 |
| Individual Defendants | DiMatteo, Dickinson, Clemenson, and Komissarov |
| Individual Lottery Defendants | DiMatteo, Dickinson, and Clemenson |

| | |
|---|---|
| Komissarov | Vadim Komissarov |
| Komissarov Br. | Defendant Vadim Komissarov's Memorandum Of Law In Support Of Motion To Dismiss Plaintiffs' Third Amended Complaint (ECF No. 167) |
| Lead Plaintiffs | RTD Bros LLC, Todd Benn, Tom Benn, and Tomasz Rzedzian |
| Lottery Defendants | Lottery, DiMatteo, Dickinson, and Clemenson |
| Lottery or the Company | Lottery.com, Inc. |
| LTRY Br. | Memorandum Of Law In Support Of Defendant Lottery.Com, Inc.'s Motion To Dismiss Class Plaintiffs' Third Amended Class Action Complaint (ECF No. 177) |
| MTD Order | *In re Lottery.com, Inc. Sec. Litig.*, No. 22 Civ. 07111 (JLR), 2024 WL 454298 (S.D.N.Y. Feb. 6, 2024) |
| Piskora Decl. | Declaration of John Piskora (ECF No. 168) |
| Plaintiffs | RTD Bros LLC, Todd Benn, Tom Benn, Tomasz Rzedzian, and Preston Million |
| Post-Business Combination Financial Performance Statements | The challenged statements regarding Lottery's finances in Lottery's November 15, 2021 Forms 8-K and 8-K/A, 2021 Annual Report, and Q1 2022 Report |
| Post-Business Combination Financial Reporting Statements | The challenged statements regarding the Company's internal controls over financial reporting in Lottery's Q3 2021 Report, 2021 Annual Report, and Q1 2022 Report |
| Press Release | The October 12, 2021 press release filed by TDAC with the SEC pursuant to Rule 14a-12 |
| Promissory Note | The $30 million promissory note for the loan acquired by Lottery and signed by Dickinson in the Sham Transaction |
| Provident | Provident Bank |
| Proxy or Proxy Statement | The Proxy filed in advance of the Business Combination, which was declared effective on October 18, 2021 |
| Proxy Materials | The Proxy and the Press Release |

xiv

| Q1 2022 Report | Lottery's May 16, 2022 Form 8-K and Q1 2022 quarterly report filed on Form 10-Q on May 16, 2022 |
|---|---|
| Q3 2021 Report | Lottery's quarterly report for Q3 2021 filed on a Form 10-Q on November 15, 2021 |
| September 2021 Sham Transaction | The September 20, 2021 sham $30 million transaction between Lottery and an unnamed major customer |
| SPAC | Special purpose acquisition company |
| TAC | Third Amended Class Action Complaint (ECF No. 153) |
| TDAC | Trident Acquisitions Corp. |

Plaintiffs respectfully submit this omnibus memorandum of law in opposition to the motions to dismiss filed by: (i) Lottery (ECF No. 176); (ii) Clemenson and Dickinson (ECF No. 180); (iii) DiMatteo (ECF No. 160); and (iv) Komissarov (ECF No. 166).[1] Defendants' motions should be denied because Plaintiffs have met the applicable pleading standards to allege claims under Sections 10(b), 14(a), and 20(a) of the Exchange Act.

## I.    PRELIMINARY STATEMENT

To ensure that the acquisition of an online lottery company would occur before the SPAC's trust was liquidated, Defendants hid that the target company failed to adhere to both state and federal gambling regulations and generally accepted accounting guidelines and that it fabricated revenue projections in a sham transaction to appear more profitable. After the acquisition occurred, the lies did not end. Instead, Defendants doubled-down, reporting revenue from that sham transaction. Only after the culpable officers were no longer in control did the Company admit that those defendants were involved in the complete fabrication of revenue and that they were aware that Lottery was not complying with relevant laws. This conduct was so egregious that one of Lottery's Board members recently conceded that the Company was "breaking the law in 42 different ways." Indeed, Lottery is currently under investigation by the Securities and Exchange Commission and the Department of Justice.

Defendants' motions to dismiss essentially claim that there are no material differences between the TAC and the previously dismissed complaint. But, since the Court's dismissal, Plaintiffs have revised their complaint to include Lottery's admissions that its executives engaged in a massive sham revenue transaction; the nature of the sham transaction, *i.e.*, Lottery "sold"

---

[1] Unless otherwise noted, citations to "¶ __" are to the TAC, all emphasis is added, and internal case citations and quotations are omitted throughout.

1

worthless non-transferable credits to a client and simultaneously lent the client $30 million to pay back to the Company, all in the hope to appear more profitable; and evidence that Lottery had a widespread practice of flouting gaming laws.

Specifically, prior to issuance of the Proxy Statement filed in advance of the Business Combination, Lottery entered into a massive sham transaction to inflate its revenue. The purported agreement was with an unnamed "major customer" for the sale of service credits for a total purchase price of $30 million. Lottery immediately recognized revenue upon execution of the purchase agreement in complete violation of generally accepted accounting guidelines. And though the customer provided payment in the form of a check accepted for deposit, the "buyer" never actually had the money for the purchase and the check was never deposited. Instead, Lottery apparently used proceeds from the Business Combination to acquire a $30 million business loan (for which Defendant Dickinson was the signatory) and then allowed the "major customer" to use the loan to finance the purchase of Lottery's credits.[2]

Only after all of the Individual Defendants were no longer with the Company did Lottery admit the whole transaction was a sham, restating its financial results and acknowledging that "the service credits it had sold to the customer were non-transferable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits." In essence, Lottery gave a customer money to buy illusory "credits" from it so that it would appear the Company had actual sales when it did not. This is the epitome of a sham transaction.

---

[2] Amazingly, the Company still invoiced more than $35 million to this single customer for "various services and advertising credit" in the fourth quarter of 2021 and 2022.

Of course, the Individual Defendants were aware of the sham transaction that they negotiated with the customer and for which they obtained a $30 million Promissory Note. It is simply unbelievable that Defendant Dickinson, who signed the Promissory Note that created this sham transaction, and Defendant Clemenson, who oversaw the reporting of revenue, entered into a transaction that caused the Company's quarterly revenue to increase by *nearly 2,000%* over the prior-year period and caused the Company's reported cash to nearly double—without realizing that the Lottery service credits that they were selling were non-transferable.

Not only was Lottery misstating its revenue and compliance with accounting rules, it was also falsely stating that it complied with relevant gaming laws and regulations. According to the Bloomberg Article, which was the product of an in-depth investigation into non-public information including Board knowledge, Lottery evaded state gaming laws by simply printing out lottery tickets in states where the purchaser was not located. This practice was wholly inconsistent with Defendants' claims that Lottery had geolocation technology to confirm that web-based customers were in the state where they said they were located. It is implausible that the 20-employee company and its executives were not aware of these widespread practices, especially when in "a seven-month period, Lottery printed out *more than 500,000 tickets* worth more than $1.1 million in Texas for out-of-state lottery players." The Individual Defendants' scienter is confirmed by their removal from the company, following an internal investigation that revealed wide-spread misconduct and illegality, as well as multiple criminal and civil government investigations into these individuals' misconduct.

In sum, even though Lottery was not ready to go public (as Defendant DiMatteo now admits), the Defendants ignored this and choose to go forward by committing egregious securities fraud. Defendants are liable for this choice.

II.    STATEMENT OF RELEVANT FACTS

A.    A SPAC That Sought To Purchase An Oil Or Gas Company In Eastern Europe, Up Against A Time Limit, Instead Used Shareholders Funds To Acquire An Online Lottery Company In The United States

A SPAC is a publicly traded company with no business activities of its own that is formed for the specific purpose of acquiring an existing, privately owned company and taking it public. ¶ 44. By their nature, SPAC transactions give rise to potential conflicts of interest between a SPAC's management and its stockholders. ¶¶ 45, 48-49. This is because if a SPAC acquires a target company, the SPAC's founders and managers can profit through their ownership of SPAC securities; yet if a SPAC does not complete an acquisition prior to the expiration, the SPAC is dissolved, and the funds held in trust are returned to the SPAC's investors, with no compensation paid to the SPAC's founders and managers. ¶ 45. As such, SPAC management is incentivized to complete a deal, even if the deal is a losing proposition for the SPAC's stockholders, because the alternative is liquidation. ¶¶ 45, 48-49.

TDAC was formed as a SPAC. ¶ 50. On June 1, 2018, TDAC executed an Initial Public Offering and a simultaneous private placement, raising $205,275,000, which was deposited in a trust account established for the benefit of TDAC's public shareholders to fund a business combination. ¶ 52. According to TDAC, it "intend[ed] to focus [its] efforts on seeking a business combination with an *oil and gas or other natural resources companies in Eastern Europe or interested in expanding into Eastern Europe*." ¶ 53. In support thereof, the directors and officers of TDAC held themselves out to investors as highly experienced in industrial businesses in the Eastern European energy sector. ¶ 53. Indeed, TDAC's only three employees were its executive officers, all of whom claimed to be qualified and experienced in the oil and gas industries. ¶ 54.

Due to TDAC's management's ownership interests in TDAC and the SPAC financial structure, TDAC's management, including Defendant Komissarov, possessed strong financial

4

incentives to complete *any* qualifying transaction. ¶ 56. Specifically, TDAC had until December 1, 2019, to consummate a business combination. If TDAC was unable to do so by then, it would be required to cease all operations, redeem 100% of the outstanding public shares, liquidate, and dissolve. ¶ 57. While TDAC was authorized to seek shareholder approval for extensions of the deadline, that process required giving shareholders the opportunity to redeem all or a portion of their public shares, which presented serious risks that: (i) shareholders would not approve the postponement, thus forcing TDAC to liquidate if it failed to complete a transaction on time; or (ii) shareholders *would* approve the postponement, but then decide to redeem TDAC shares in amounts that would significantly deplete TDAC's trust account and jeopardize its ability to complete a transaction even with an extended deadline. ¶ 58. Then, if a business combination did not occur, the directors and officers of TDAC, including Komissarov, would see their significant financial stake in TDAC become worthless. ¶ 59.

TDAC repeatedly failed to enter a business combination within the time allotted and TDAC was forced to seek and ultimately obtain three extensions of the deadline, ultimately giving the Company until December 1, 2020, to complete a business combination. ¶ 60. Each extension resulted in a portion of the shareholders redeeming their shares. At the completion of the third extension, the trust account had been diminished by approximately $137.130 million due to the redemptions and contained only $62.286 million. ¶ 60. With this diminished trust account, the pool of companies which might have found a potential acquisition by TDAC enticing was greatly reduced. ¶ 61.

On November 19, 2020, with its December 1, 2020, business combination deadline fast approaching, TDAC announced that it had signed a letter of intent to combine with AutoLotto, which was then a private company. ¶ 62. AutoLotto, which was doing business as Lottery.com,

was purportedly an Austin, Texas-based company founded in 2015 that represented itself to be: (1) a leading online platform to play the lottery, offering official state-sanctioned lottery games like Powerball, Mega-Millions, and other state games, in the U.S. and around the world; and (2) the world's largest provider of lottery data – such as current and previous winning numbers, jackpots and draw dates, jackpot analysis, and more, covering almost 600 lottery games in 38 countries in real time – to over 400 digital publishers, including hundreds of digital newspapers, television and news sites, and major digital publishers such as Google, Verizon/Yahoo, Amazon's Alexa devices, and more. ¶ 63.

On October 18, 2021, Lottery filed the final Proxy Statement and prospectus for the Business Combination on Form 424B3, which was signed by Komissarov. The Proxy Statement solicited shareholder approval of the Business Combination and attendant proposals necessary to effectuate the Business Combination. ¶ 146. Several days later, on October 21, 2021, TDAC filed the Press Release in order to garner additional support for the Business Combination, as the shareholder vote regarding the transaction was just days away. ¶ 43.

On October 29, 2021, TDAC and AutoLotto announced the completion of the Business Combination, and upon the closing, the combined entity was renamed Lottery.com. On November 1, 2021, Lottery's common shares and warrants began trading on the NASDAQ under the ticker symbols "LTRY" and "LTRYW," respectively. ¶ 65.

**B.      Lottery Admits That Its Executives Knowingly And Intentionally Engaged In A Revenue Inflation Scheme And Sham $30 Million Transaction Prior To The Proxy Or Other Public Revenue Statements**

On September 20, 2021 – well before the Proxy Statement was issued and the Business Combination was consummated – Lottery entered into an agreement with a major customer for the sale of "LotteryLink Credits," also called "affiliate marketing credits" or "service credits," for a total purchase price of $30 million. ¶ 75. According to Lottery, the customer was required to pay

6

the purchase price within 90 days. ¶ 75. Upon execution of the purchase agreement (that is, before Lottery transferred any credits to the customer), Lottery recognized the $30 million as income and recorded $10 million in cost of sales related to this transaction. ¶ 75. On November 15, 2021, Lottery announced it had increased its quarterly revenue from $1.6 million to $32.25 million (an increase of nearly 2,000%), driven by this single $30 million sale of affiliate marketing credits. ¶ 75. On the same day, the Company disclosed the dismissal of Lottery's auditing firm, Marcum LLP. ¶ 75 n.8.

Lottery subsequently admitted that instead of actually being paid by the customer, the customer provided Lottery with a check prior to December 31, 2021, which the Company did not deposit. ¶ 76. Instead, on January 4, 2022, Lottery apparently used proceeds from the Business Combination to acquire a $30 million business loan through one of Lottery's subsidiaries, AutoLotto, with Provident, which was evidenced by the $30 million Promissory Note signed by Defendant Dickinson. ¶ 76. Thereafter, the Promissory Note was "utilized by the customer to provide the Company with payment towards the purchase of the service credits." ¶ 76. In essence, Lottery borrowed $30 million from Provident and then allowed its customer to use those funds to purchase Lottery's own service credits. As such, the transactions with this customer were a façade to manufacture $30 million in sales, which Lottery then recognized as revenue before it had even performed its obligations under the agreement.

In spite of this, throughout the Class Period, the Company included revenue from the September 2021 Sham Transaction in its financial statements without disclosing the related $30 million loan. ¶ 78. For example, on November 15, 2021, Lottery reported $32.25 million revenue for the quarter ended September 30, 2021, which was a *1,911.8% increase* over the prior year period, and Lottery merely stated that this "increase in revenue was driven by *several factors*

7

including a $30 million sale of affiliate marketing credits" during the quarter. ¶ 78. However, *nearly all* of the $32.25 million in revenue for the quarter was derived from the September 2021 Sham Transaction. ¶ 78. The Company further claimed in its financial filings that it was being paid by the customer for the $30 million of "affiliate marketing credits," but as Lottery later admitted, this was simply untrue as there was no actual revenue generated from the $30 million September 2021 Sham Transaction. ¶¶ 79, 80.

On July 6, 2022, Lottery disclosed that an independent investigation by outside counsel identified "issues pertaining to the Company's internal accounting controls." ¶¶ 18, 101. Further, Lottery's Board disclosed that, as a result of this investigation, the Company had terminated Lottery's CFO, President, and Treasurer, Defendant Dickinson, effective July 1, 2022, with cause – just *one day* after the independent investigation concluded. ¶ 101.

On July 15, 2022, the Company announced that its CRO, Defendant Clemenson, had resigned on July 11, 2022, and provided an update on its internal investigation, disclosing that it "preliminarily conclude[d] that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount." ¶¶ 19, 81, 102. This was, effectively, an admission that the $30 million "sale" of LotteryLink Credits previously announced on November 15, 2021, which would have made the purchaser Lottery's by far largest customer, was entirely fabricated, and that Defendants orchestrated the September 2021 Sham Transaction to create the illusion of substantial revenue. ¶ 103.

A week later, on July 22, 2022, Lottery further disclosed that (i) the Company's new auditor, Armanino LLP, had determined that Lottery's financial statements for the full-year fiscal 2021 and first quarter 2022 should no longer be relied upon, and that a Company subsidiary entered

into an undisclosed line of credit in January 2022, and (ii) that Lottery's CEO and co-founder, Defendant DiMatteo, was resigning, effective immediately. ¶¶ 20, 82.

On September 9, 2022, Lottery disclosed that four members of its Board had resigned, including now-former CEO DiMatteo. ¶ 105. Tellingly, two of Lottery's independent directors stated in their resignation letters that the events leading to Dickinson's departure could not be chalked up to mere incompetence or mismanagement but were indicative of "*potentially inappropriate activity*." ¶ 105.

Lottery did not admit that the entire $30 million September 2021 Sham Transaction was a sham until May 10, 2023, long after the Individual Lottery Defendants had been removed from Lottery. ¶¶ 83, 108. As the Company explained:

> On September 20, 2021, the Company entered into a purchase agreement with a major customer for the sale of various service credits with a total purchase price of $30,000,000. In accordance with the terms of the purchase agreement, the customer was required to pay the purchase price within 90 days. Upon execution of the purchase agreement, the Company recognized the $30,000,0000 as income. The customer provided payment prior to December 31, 2021, in the form of a check accepted by the Company for deposit and included in undeposited funds. *During 2022, the Company discovered that the service credits it had sold to the customer were non-transferrable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits.* Since the Company was prohibited from transferring the advertising portion of the service credits and therefore could not complete the sale of such credits, the Company cancelled the transaction and could not recognize the income, or recognize a cash payment in the Company's financial statements.

¶¶ 83, 108. "[T]hat the services credits it had sold to the customer were non-transferable" demonstrates that the September 2021 Sham Transaction was a knowingly executed sham. ¶¶ 84, 108. This is because the Individual Lottery Defendants that negotiated the terms of the September 2021 Sham Transaction knew that the purported service credits were non-transferable, and therefore could not be utilized by the customer to this transaction. As Lottery later admitted,

"*[s]ince the Company was prohibited from transferring the advertising portion of the service credits and therefore could not complete the sale of such credits, the Company cancelled the transaction and could not recognize the income or recognize a cash payment in the Company's financial statements*." ¶ 85.

That the transaction was sham is further confirmed by the fact that Lottery reported invoices of more than $35 million to the customer over the two fiscal quarters following the transaction for various alleged "services and advertising credit[s]" Lottery claimed to have provided. However, providing said "services and advertising credits" was impossible given that the credits *were never transferable to the customer*, as the Company later admitted. ¶¶ 84, 85.

Further, the way Lottery ultimately accounted for the purported $30 million dollar transaction confirms the transaction was a known sham. When faced with the discovery of its malfeasance, Lottery removed every single cent of revenue and cash previously recorded from the transactions with the "major customer" and wiped the transaction from its reported financial statements. ¶ 85. To say this is not a common accounting practice for legitimate transactions is an understatement—normally, a company faced with disposing of worthless assets or accounts receivable would report such a loss either as a bad debt deduction, a capital loss, or using any number of write off accounting treatments—companies do not simply cancel all revenue and accounts receivable for legitimate transactions and erase the transaction from their books. ¶ 86. By removing the transactions from the Company's financial records in their entirety, and feigning that the transactions simply never occurred, Defendants admitted that the transactions had no basis under proper accounting and were entirely fictitious. ¶ 86.

It is evident that the Individual Lottery Defendants were aware of the September 2021 Sham Transaction. Lottery's executives who entered into the September 2021 Sham Transaction

10

negotiated the sale of LotteryLink credits and were aware the credits were non-transferable. Lottery's executives who (i) sought out and received $30 million from Provident, and then (ii) turned around and orchestrated it such that the major customer utilized those funds to "purchase" the LotteryLink Credits, were necessarily aware of where the funds came from and how they came back to the Company. ¶ 88. Indeed, Defendant Dickinson signed the Promissory Note from Provident that was fundamental to executing the September 2021 Sham Transaction and therefore, his knowledge of the fraudulent nature of the collateral is undeniable. ¶ 88. Defendant Dickinson would also have known that Lottery was not disclosing the Provident line of credit in the Company's financial statements. ¶ 89. Defendant Dickinson's intentionality is further demonstrated by the fact that Lottery included lesser sized loans in its financial statements while failing to disclose its biggest one. ¶89.

On June 15, 2023, the Company was forced to admit it was being investigated by the SEC and the Department of Justice for its conduct. ¶ 109. Lottery disclosed:

> Certain of our former officers are currently the subject of investigations and inquiries by the SEC and the U.S. Department of Justice (the "DOJ") relating to the findings of the Internal Investigation and other matters, and we are cooperating fully with such investigations and inquiries.

¶ 109.

### C.    A Recent Bloomberg Article Confirms That The Individual Lottery Defendants Were Intimately Involved In The September 2021 Sham Transaction And That These Individuals Remain Under Investigation By the DOJ And SEC

On March 4, 2024, *Bloomberg News* published an investigative article entitled "From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded," written by Nicola M. White. The Bloomberg Article was put together "by interviewing more than a dozen current and former employees, board members and vendors, some of whom spoke on condition of anonymity; obtaining audio recordings, internal communications and board documents; and examining press

11

releases, lawsuits, and securities filings." ¶ 132.

The Bloomberg Article confirms Plaintiffs' characterization of Lottery's admissions: that the September 2021 Sham Transaction was a complete sham and that the Individual Lottery Defendants were aware of it. As the Bloomberg Article explains, while the "company's first earnings report in November 2021 boasted $32.2 million in revenue, an almost 2,000% increase from the year before," "nearly all of that, $30 million, was based on the sale of credits the company had amassed with media partners that turned out to be nontransferable, meaning they weren't supposed to be sold, the company later said when it had to correct its financials to fix its mistakes." ¶ 135. The Bloomberg Article further confirms that the "buyer" of the credits did not actually have the money for the purchase, so the Company and its executives executed the September 2021 Sham Transaction to make the sale appear legitimate. ¶ 136. As the article explained:

> The payment hadn't come in because the buyer — a payments platform company — didn't actually have the money on hand. ***So the company and the buyer struck a complex financing agreement in which Lottery.com pledged its own assets to secure a line of credit that the buyer would then use to pay up***, the company would disclose to the SEC a year later.

Citing "people involved in the transaction and an audit committee memo," the Bloomberg Article explained the motivation for this sham – in part, the Company was "[f]eeling pressure to make year-end revenue projections[.]" ¶ 137.

According to the Bloomberg Article, a member of the Company's management team later referred to the whole transaction as a "check kite." ¶ 138. "Check kiting" is the practice of drawing on uncollected funds during the time needed to clear a check deposited in a bank, especially if the check is worthless; essentially, it entails fraudulently obtaining a loan by floating a bad check, and depositing that loan before the bad check bounces. Finally, the Bloomberg Article reported that, when asked about the Sham Transaction, "Lottery.com's current leadership said the transaction is

12

one of the subjects of SEC and DOJ scrutiny, and the company has been fully cooperating with authorities in their reviews." ¶ 138.

> **D.  Lottery And Its Executives Knew That The Company Was Not In Compliance With State And Federal Gaming And Lottery Laws**

Throughout the Class Period, including in the Proxy Statement which solicited approval of the Business Combination, Lottery touted its compliance with state and federal gaming and lottery laws. ¶ 129. In the Proxy and numerous times thereafter, Lottery informed the public of the existence of these very regulations. ¶ 150. Specifically, Lottery claimed in the Proxy that "we only purchase lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted, unless an exception were to be authorized by the applicable lottery authorities." ¶ 130. But this was not true.

Just two quarters after completing the Business Combination, Lottery admitted it had not been complying with certain state and federal laws. ¶ 131. Specifically, on July 6, 2022, Lottery disclosed that an internal investigation had uncovered "instances of ***non-compliance with state and federal laws*** concerning the state in which tickets are procured as well as order fulfillment." ¶ 131. According to the Bloomberg Article, since before 2020, Lottery was printing lottery tickets in states where the purchaser was not located, which is an illegal practice in violation of applicable gaming and lottery laws. ¶ 14. Under state lottery regulations at the time, if a lottery ticket was purchased online, companies would have to hire couriers in each state to physically go to a store to purchase a lottery ticket which the online retainer would then store. ¶ 139. This was necessary because taxes paid on lottery tickets must be paid to the state where the ticket was purchased. But as reported by the Bloomberg Article, and "according to an internal investigation initiated by the company's chief legal officer, Katie Lever," Lottery did not follow these rules, as "[c]ouriers sometimes couldn't be found when a customer ordered a ticket[.]" ¶ 139. Instead, according to the

13

Bloomberg Article, Lottery would print the ticket at its backup hub in Texas. However, this resulted in the purchase not occurring in the correct state and more importantly, rendered the purchase illegal. ¶ 140. As the article explained:

> . . . When that happened with an order for a Powerball ticket from a customer in Pennsylvania, for example, the company directed that ticket to get printed in a backup hub in Texas, where the company was headquartered and had a state-licensed lottery retail outlet, the investigation revealed.

> This technically made the purchase not a Pennsylvania lottery ticket, but a Texas lottery ticket. That deprived Pennsylvania of revenue from the sale and the tax revenue on any winnings. It's also illegal, board members learned as the investigation progressed. What if someone in Pennsylvania won the Powerball with a ticket produced somewhere else?

¶ 140. Violations of state laws on ticket sales were apparently commonplace, according to an internal memo cited by the Bloomberg Article; the practice had been going on since before 2020 and was so wide-spread that in "a seven-month period, Lottery.com printed out *more than 500,000 tickets* worth more than $1.1 million in Texas for out-of-state lottery players." ¶ 141.

According to the Bloomberg Article, despite the fact that Lottery.com had said in SEC filings that it had geolocation technology to confirm that web-based customers were in the state where they said they were located, internal investigations discovered that was not true either. As the Bloomberg Article explained, anybody using the web-based system (as opposed to Lottery's mobile application) could easily skirt any jurisdictional requirement for ticket purchases. ¶¶ 15, 142. In fact, according to a transcript of a June 2022 meeting cited in the Bloomberg Article, one board member had explained, *"[w]e are breaking the law in 42 different ways"* and "*I am without words. The potential for Homeland Security, AML [anti-money laundering laws], and all the other things that come into play is beyond breathtaking*." The Bloomberg Article reported that Board members allegedly told the Company to shut down the web-based application. ¶ 143.

14

## III.    THE TAC ADEQUATELY ALLEGES SECTION 10(B) CLAIMS AGAINST THE LOTTERY DEFENDANTS

### A.    Applicable Legal Standards Disfavor Defendants' Attempt To Dismiss Section 10(b) Claims

Rule 12(b)(6) requires courts to accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Christine Asia Co. Ltd. v. Ma*, 718 F. App'x. 20, 23 (2d Cir. 2017); *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM), 2013 WL 1197755, at *8 (S.D.N.Y. Mar. 25, 2013). The complaint need only "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (complaint need only allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting claims); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) ("The task of the Court in ruling on a motion to dismiss is to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.").

To plead a Section 10(b) claim, Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[3] In accordance with the Second Circuit's direction, the court "must be careful not to mistake [the PSLRA's] heightened pleading standards for impossible ones," and plaintiffs "need not prove their entire case within the confines of the complaint." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021). "Even under the [PSLRA], which establishes heightened

---

[3] The Lottery Defendants challenge only falsity and scienter. As such, the Lottery Defendants have waived their right to challenge the other elements of § 10(b), and these non-contested elements are not addressed herein. *See* Fed. R. Civ. P. 12(g); *Mateo v. Bristow*, No. 12 Civ. 5052 (RJS), 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013).

15

pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *10 (S.D.N.Y. Nov. 26, 2018).

### B.    The TAC Adequately Alleges That Defendants Made False And/Or Materially Misleading Statements

A complaint adequately pleads falsity when it: (i) specifies the allegedly false statement; (ii) identifies the speaker; (iii) states where and when the statement was made; and (iv) explains why the statement was false. *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Indeed, "[t]he law is well settled . . . that so-called 'halftruths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013). Falsity may thus be established by allegations of contemporaneous facts inconsistent with the alleged statements. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).

Materiality is an "inherently fact-specific finding," which imposes a low bar on a plaintiff at the motion to dismiss stage. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011). A fact is material under Section 10(b) "when there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx*, 563 U.S. at 38 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). A district court may not dismiss for lack of materiality unless "the alleged omissions and misstatements 'are so obviously unimportant to a

16

reasonable investor that reasonable minds could not differ on the question of their importance.'"
*Litwin*, 634 F.3d at 718.

> **1.    The Court Previously Determined That The Lottery Defendants' Post-Business Combination Financial Performance And Financial Reporting Statements Are False And/Or Misleading**

In its February 6, 2024 MTD Order, the Court determined that Plaintiffs sufficiently pled falsity with respect to the admittedly inaccurate Post-Business Combination Financial Performance Statements. *See* MTD Order at *22-24. The Court also held that the Post-Business Combination Financial Reporting Statements contained material omissions and thus, were false and/or misleading. *See id.* at *25-27.

Those determinations are now law of the case and apply to the TAC's allegations with respect to those same misstatements and omissions. *See* ¶¶ 156, 158, 160, 162, 164, 170, 172. Notably, the Lottery Defendants do not attempt to argue otherwise. Accordingly, for the reasons stated in the MTD Order, the TAC sufficiently alleges falsity with respect to the Post-Business Combination Financial Performance and Financial Reporting Statements.

> **2.    Plaintiffs Have Sufficiently Pled Falsity With Respect To Statements Regarding Lottery's Adherence To ASC 606**

In the TAC, Plaintiffs newly allege that the Proxy contained false and/or misleading statements regarding Lottery's adherence to ASC 606 when recognizing revenue. Specifically, the Proxy stated that Lottery recognized revenue in accordance with ASC 606, which, in turn, required Lottery to recognize revenues only "upon the transfer of control of promised products provided to [its] users, customers, and subscribers, reflecting the amount of consideration [it] expect[ed] to receive for those products." ¶ 147, *see also id.* ¶¶ 92-95. But, as Lottery subsequently admitted, those statements were false and/or misleading. Indeed, on September 20, 2021, prior to the issuance of the Proxy, Lottery had recognized revenue from the $30 million Sham Transaction

17

with its "major customer," despite the fact that Lottery had not (and could not have) transferred control of the promised affiliate marketing credits to said customer either at that point, or at *any* point, because such credits were legally non-transferable. *See id.* ¶¶ 12, 147, 149.

Notably, the Individual Lottery Defendants do not challenge the falsity of the above-mentioned statements. As for Defendant Komissarov, he argues that such statements were not actually or contemporaneously false because the Proxy only reported Lottery's revenues through June 30, 2021, and thus, the Proxy's representation – that Lottery had adopted ASC 606 effective January 1, 2018 – was not only literally true, but it purportedly only indicated that Lottery had recognized its pre-June 30, 2021 revenues in accordance with ASC 606, not that it would recognize its post-June 30, 2021 revenues that way. *See* Komissarov Br. at 17. This is nonsensical. A statement that the Company had adopted the ASC 606 revenue recognition standard in 2018 clearly indicated to investors that the Company was currently recognizing revenue in accordance with those standards. *See Skiadas v. Acer Therapeutics Inc.*, No. 19 Civ. 6137 (GHW), 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020) ("A statement is misleading if a reasonable investor would have received a false impression from the statement.").

Moreover, while it is true that the Proxy only *reported* revenues through June 30, 2021, and that the September 2021 Sham Transaction was not *reported* to investors until November 15, 2021 (*see* Komissarov Br. at 17-18),[4] that is irrelevant because ASC 606 is only concerned with

---

[4] Komissarov also argues that because the $30 million Sham Transaction only became a "sham" after (i) Lottery received the customer's check for payment on December 29, 2021 (which went uncashed), and (ii) Lottery's affiliate obtained a $30 million loan on January 4, 2022 to fund the customer's payment – all of which happened after the Proxy was published – the Proxy's statements regarding ASC 606 were not contemporaneously false. *See* Komissarov Br. at 18. This misses the point. The reason those statements were false and/or misleading was not because of the sham nature of the transaction, but because Lottery recognized the $30 million in revenue when

18

the timing of revenue *recognition*, not revenue reporting, and the TAC alleges that the Company *recognized* the $30 million in revenues from the Sham Transaction when it signed the purchase agreement on September 20, 2021, almost a full month before the Proxy's publication. *See* ¶¶ 7, 147. It was materially misleading to tell investors that the Company had been using the ASC 606 revenue recognition standards since 2018, while omitting to disclose that one month earlier, in September 2021, the Company had recognized revenue in connection with its largest-ever transaction in direct contravention of ASC 606. Accordingly, such statements are actionable. *See Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 403 (S.D.N.Y. 2018) (even statements containing "no technical falsehoods" are "nonetheless actionable if they are rendered misleading by the omission of material information"); *Skiadas*, 2020 WL 3268495, at *7 ("[L]iterally true statements are actionable if they create a materially misleading impression.").

### 3. Plaintiffs Have Sufficiently Pled The False And Misleading Nature Of Defendants' Legal Compliance Representations

The TAC also clearly alleges that Defendants' statements that (i) Lottery only purchased lottery tickets for customers physically situated in the jurisdiction where the lottery game was being conducted (¶¶ 130, 150, 168), (ii) Lottery employed geofencing technology to confirm that its customers were, in fact, within the jurisdiction where they claimed to be located (*id.*), (iii) the Lottery Defendants believed that Lottery was in compliance with all applicable laws and regulations (*id.* ¶¶ 129, 152, 166), and (iv) Lottery only purchased lottery games "in accordance with applicable laws," and conducted its operations so as to "ensure that [it] remain[ed] in

---

the contract was signed, and not when the contracted-for affiliate credits were transferred to the customer (which, of course, never happened).

compliance with applicable laws" (*id*.), were all false and/or misleading. As the Bloomberg Article revealed, Lottery routinely and brazenly purchased hundreds of thousands of tickets in Texas for out-of-state customers, in direct contravention of legal requirements, and customers could evade Lottery's so-called geofencing technology simply by purchasing tickets via Lottery's web-based platform, rather than its mobile application. *See id.* ¶¶ 2-4, 14-15, 18, 131, 139-44, 151, 153, 167, 169. As such, Lottery was not in compliance with all applicable laws and regulations during the Class Period, nor did Defendants honestly believe that to be the case. *See id.* As discussed below, Defendants' arguments to the contrary must be rejected.

### 4.     The TAC Properly Relies On The Bloomberg Article

The Individual Lottery Defendants first challenge the reliability of the Bloomberg Article that serves as the source of much of the TAC's falsity allegations. *See* C&D Br. at 20-21. Specifically, they claim that the Bloomberg Article is unreliable because it (i) quotes an "unnamed" *board member* a handful of times, and (ii) relies, in part, on information derived from an allegedly privileged internal investigation that they claim would be inadmissible at trial. *See id.* But as discussed at Section III.C.1, *infra*, courts routinely credit allegations in a PSLRA complaint that are derived from internal company investigations and/or detailed news articles, such as the Bloomberg Article here. The Bloomberg Article's reliance, in part, on an "unnamed" source is of no consequence, given that the source's position as a *board member* of the Company was specifically identified. *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 407-08 n.21 (S.D.N.Y. 2018), *aff'd*, *Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35 (2d Cir. 2018) ("a plaintiff may rely on an unnamed confidential witness" so long as the plaintiff "identif[ies] the roles occupied by the witness with sufficient particularity to support the probability that a person in th[at] position … would possess the information alleged"). And even if the Individual Lottery Defendants were correct that information obtained during Lottery's internal investigation would

20

ultimately be inadmissible at trial, that also is of no consequence. It is well-established that "a plaintiff need not offer admissible proof of its allegations for the Court to accept them as true at th[e] [motion to dismiss] stage." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 133 (S.D.N.Y. 2020); *see Lynch v. City of New York*, 952 F.3d 67, 82 (2d Cir. 2020) (similar).

In any event, the Bloomberg Article relied on numerous additional sources of information, including "more than a dozen current and former employees, board members and vendors," most of whom *were specifically named* in the Article, as well as "audio recordings, internal communications and board documents, … press releases, lawsuits, and securities filings." ¶ 132. As such, the Bloomberg Article has clear indicia of reliability.

### 5.    The TAC's Falsity Allegations Are Sufficiently Particularized

The Individual Lottery Defendants also claim that the TAC's falsity allegations are insufficient because the TAC allegedly fails to specify (i) when the out-of-state ticket purchasing and geofencing-related misconduct occurred, and/or (ii) whether the Lottery Defendants knew about these issues prior to the internal investigation. *See* C&D Br. at 21-22. These arguments too must be rejected.

The TAC plainly alleges that Lottery's out-of-state ticket purchasing and geofencing related misconduct was ongoing since at least 2020 (*i.e.,* prior to the start of the Class Period). *See* ¶¶ 139-44. And contrary to the Individual Lottery Defendants' contentions, the TAC also alleges that those practices were so "widespread" that during a seven-month period (which necessarily occurred prior to June 30, 2022, when the internal investigation culminated), Lottery printed in Texas more than 500,000 tickets (worth more than $1.1 million) for out-of-state lottery players. *See id.* ¶ 141. This is more than sufficient to allege the falsity of the Individual Lottery Defendants' Class Period statements at the motion to dismiss stage. *See Sjunde AP-Fonden v. Goldman Sachs*

21

*Grp., Inc.*, 545 F. Supp. 3d 120, 141 (S.D.N.Y. 2021) ("[A] plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based."); *In re Venator Materials PLC Sec. Litig.,* 547 F. Supp. 3d 624, 664 (S.D. Tex. 2021) (where there is a "factual basis establishing that [the] underlying specificity exists," failure to "plead[] the precise dates" of the reports that rendered the defendant's statements false is "not . . . fatal").

As for when Defendants *knew* about the alleged misconduct and thus, *knew* that their statements were false and/or misleading, this is irrelevant to the question of falsity. *See* MTD Order at *21 (plaintiffs need not show that defendants "had knowledge or a belief that they were making a material misrepresentation or omission in order to satisfy the element [of falsity]" because it would "effectively (and improperly) collapse the falsity and scienter inquiries"); *Venkataraman v. Kandi Techs. Grp.,* Inc., No. 20 Civ. 8082 (LGS), 2022 WL 4225562, at *6 (S.D.N.Y. Sept. 13, 2022) ("Whether Defendants knew of their falsity when making the statements is the scienter question, not the falsity question."). In any event, as discussed at Section III.C.1, *infra*, the TAC sufficiently alleges that Defendants knew or should have known that their out-of-state ticket purchasing and geofencing statements were false and/or misleading when made.

### 6.    The Geofencing Statements Were Materially Misleading

The Individual Lottery Defendants also claim that their statements indicating that Lottery utilized geofencing technology were literally true because Lottery did, in fact, have such technology in place. *See* C&D Br. at 22. But as discussed at Section III.B, *supra*, the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (quoting *Operating Local 649 Annuity*, 595 F.3d at 92). The Individual Lottery Defendants' repeated assurances that Lottery employed geofencing technology to prevent

22

customers from purchasing lottery tickets in states other than where they were located were highly misleading given the Individual Lottery Defendants' concurrent failure to disclose that such technology could not identify where customers using Lottery's web-based system (as opposed to its mobile application) were located. *See* ¶¶ 131, 142. Having chosen to speak on the subject of Lottery's geofencing technology, the Individual Lottery Defendants were obligated to speak "in an accurate and complete manner." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 727; *Skiadas*, 2020 WL 3268495, at *7 (similar). Their failure to do so is actionable.

Nor are the Individual Lottery Defendants saved from the consequences of their misleading statements by the fact that at times they warned of possible glitches in Lottery's application and web-based products. *See* C&D Br. at 23. Such warnings cannot immunize the Individual Lottery Defendants from liability for failing to disclose that *existing* glitches in those products *were already preventing* legal compliance. *See United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*, No. 22 Civ. 4838 (LGS), 2024 WL 1312593, at *5 (S.D.N.Y. Mar. 27, 2024) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.") (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)); *Winter v. Stronghold Digital Mining, Inc.*, 686 F. Supp. 3d 295, 309 (S.D.N.Y. 2023) (cautionary language is insufficient "where a risk disclosed … has *already transpired* at the time the statements at issue were made").

### 7. The Statements Of Belief Are Actionable

Defendants next claim that the TAC fails to cure the deficiencies previously identified by the Court with respect to Defendants' statements indicating that they believed Lottery was in compliance with all applicable laws. *See* LTRY Br. at 7-8; C&D Br. at 19. In the MTD Order, this Court found that such statements, as pled in the Amended Complaint, were inactionable opinion statements because the Amended Complaint failed to sufficiently allege that they were not honestly held at the time they were made. *See* MTD Order *28-29. But as discussed further at Section

23

III.C.1, *infra*, the information alleged in the TAC changes that. Throughout the Class Period, Lottery personnel were purchasing hundreds of thousands of tickets in Texas for out-of-state customers, in direct contravention of legal requirements that the Defendants repeatedly discussed in public filings. This clearly demonstrates that Defendants did not, in fact, honestly believe that Lottery was in compliance with applicable legal requirements.

### 8.    The Statements Regarding Lottery's Compliance With Applicable Law Are Not Inactionable Puffery

The Individual Lottery Defendants erroneously claim that their statements indicating that the Company operated so as to "ensure" Lottery's regulatory compliance are "quintessential puffery" and inherently inactionable. *See* C&D Br. at 22. In making this argument, the Individual Lottery Defendants cite the Court's MTD Order. *See id*. But there, the Court only dismissed, as inactionable puffery, statements in the Amended Complaint that Lottery had "strong working relationships with the regulatory authorities," and "work[ed] to maintain effective relationships with applicable legislative and regulatory authorities" – statements that are not the focus of the TAC's allegations. MTD Order at *28. Nowhere did the Court hold that Defendants' statements about ensuring continued regulatory compliance were inherently inactionable.

In any event, representations that the Company (i) was being operated to "ensure [Lottery] remain[ed] in compliance with applicable laws" (¶ 152), (ii) was "fully committed to full compliance with all applicable laws" (*id.* ¶ 166), and (iii) "only purchase[d] lottery games … in accordance with applicable laws" (*id.*), are clearly actionable. Such statements indicated to investors that Lottery was presently in compliance with all applicable laws and was being operated *to remain* that way. However, as the TAC's detailed allegations demonstrate, Lottery was, in fact, doing the exact opposite. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 459 (S.D.N.Y. 2011) (statement that defendant was "in compliance with CSE

24

regulatory capital requirements" when it was not, was a material misstatement); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 277 (S.D.N.Y. 2010) (statement that defendant was in "compliance with current Ambac Assurance underwriting standards" when it was not, was a material misstatement); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013) (statement that the company was "in compliance with Medicare standards and regulations" when it was not, was an actionable misstatement).

### C.        The TAC Raises A Strong And Compelling Inference Of Scienter

A complaint adequately pleads scienter where "all of the facts alleged, taken collectively," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007), support a strong inference (a) that "defendants had both motive and opportunity to commit fraud," or (b) "that constitute[s] strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Knowledge or "access to information suggesting that [the defendants'] public statements were not accurate" suffices to plead recklessness. *Blanford*, 794 F.3d at 306. In fact, "[a]n egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000).

No "smoking-gun" is necessary, but a complaint's scienter allegations suffice where the inference is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 322-24. "[A] tie on scienter goes to the plaintiff." *Skiadas.*, 2020 WL 3268495, at *10. Here, the TAC establishes a strong inference of scienter under both prongs, either of which is independently sufficient to satisfy Plaintiffs' pleading burden.

#### 1.        Defendants' Knowledge Of The Fraud Made Their Statements Reckless

Defendants had actual knowledge of the fraudulent conduct at issue. This satisfies recklessness or conscious misbehavior as they "knew facts or had access to information suggesting

25

that their public statements were not accurate." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79 (2d Cir. 2021). In fact, Defendant DiMatteo admitted that Lottery was not ready to go public yet and that the Company recklessly did so anyway. As the Bloomberg Article explains:

> The way DiMatteo tells it, the pressure to close the deal and excitement of the SPAC market propelled the company to go public, ready or not.
>
> "They were eager to get a deal done," DiMatteo said. "We had no idea what this game was. They were the grownups in the room." [¶ 5.]

###### a)      Defendants' Knowingly Violated Applicable Lottery Laws And Regulations

The TAC details how the Lottery Defendants violated numerous laws and regulations concerning the location of lottery ticket purchases. Specifically, the TAC details Lottery's repeated violations of applicable rules that require lottery tickets be purchased in the jurisdiction where the customer is located. ¶¶ 129-31, 139-44. A Company investigation ultimately confirmed these violations. ¶ 131. The Bloomberg Article notes that the Company's senior management members were clearly aware of these hundreds of thousands of repeated legal violations, with one member of the Board explaining: "We are breaking the law in 42 different ways." ¶¶ 131, 143.

The Lottery Defendants respond that the Complaint pleads (i) no facts supporting the inference that this misconduct was occurring at the time of the alleged misstatements concerning legal compliance, and/or (ii) no evidence that the Lottery Defendants knew that they were violating the law at the time of the alleged misstatements. *See* LTRY Br. at 18. These arguments misrepresent Plaintiffs' well-pled allegations. The Complaint clearly pleads that as far back as 2020, when the Company's operations were overwhelmed, Lottery resorted to purchasing lottery tickets in Texas, regardless of the location of its customers, due to its understaffing of couriers tasked with purchasing tickets in individual states, as confirmed by an internal investigation initiated by the Company's Chief Legal Officer who later resigned. ¶ 140. This was not a rare one-off "mistake"

26

occurrence. According to an internal memo reviewed by *Bloomberg*, the practice had been going on since before 2020 and was so wide-spread that in "a seven-month period, Lottery printed out *more than 500,000 tickets* worth more than $1.1 million in Texas for out-of-state lottery players." ¶¶ 140-41.

Given that nearly all of the Company's business depends on lottery game sales, the frequency and magnitude of Defendants' violations of applicable lottery laws and regulations supports an inference of scienter. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.,* No. 22 Civ. 6339 (AS), 2024 WL 1898512, at *8 (S.D.N.Y. May 1, 2024) (allegations that the subject of the fraud was key to the company's profits and so defendants would have monitored closely supports an inference of scienter); *In re Barclays PLC Sec. Litig.*, No. 22 Civ. 8172 (KPF), 2024 WL 757385, at *20 (S.D.N.Y. Feb. 23, 2024) ("the magnitude of an alleged fraud can be 'significant' circumstantial evidence of scienter"); *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 215 (D. Conn. 2023) (scheme alleged to have been so central to day-to-day operations created a strong inference for scienter); *In re Pareteum Sec. Litig.*, No. 19 Civ. 9767 (AKH), 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) (the "proximity and size of [] restatements" adds further strength to circumstantial evidence of scienter).

Additionally, Defendants cannot credibly argue that they were not aware of the illegality of Lottery's practice of purchasing tickets in Texas without regard to customer location. In fact, in the Proxy and numerous times thereafter, Defendants themselves informed the public of the existence of these very regulations. As the Proxy stated, "the Interstate Wagering Amendment to 18 U.S.C. § 1301 limits our ability to purchase lottery games for a user located in one state from a lottery authority located in another state" and therefore, "we only purchase lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game

27

they are purchasing is being conducted." ¶ 150. The Company also assured investors, "We only purchase lottery games on behalf our users and customers where our services are permitted and in accordance with applicable laws." ¶ 152.

The specificity in which Defendants discuss these regulations further underscores the fact that the hundreds of thousands of violations thereof were committed intentionally, or at least recklessly. *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15 Civ. 7199 (JMF), 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (frequent public discussion of regulatory compliance is enough to allege awareness of nonpublic fact contradicting public representations of substantial legal compliance); *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 237 (S.D.N.Y. 2021) (defendants' repeated assurances about regulation's effect on the Company supports an inference that defendants knew facts or had access to information suggesting these statements were misleading).

To avoid dealing with this evidence, the Individual Lottery Defendants disingenuously note that during oral argument on the motion to dismiss the Amended Complaint, Plaintiffs acknowledged that they had minimal evidence regarding Defendants' knowledge of the falsity of their representations concerning legal compliance. *See* C&D Br. at 19. That may have been the case with respect to the January 31, 2023 Amended Complaint, which was the subject of that motion to dismiss proceeding, but it certainly is not true of the TAC. The Bloomberg Article provides extensive detail concerning Defendants' lottery law violations during and prior to the Class Period, including that the geolocation technology Lottery claimed could confirm its customers' locations, could easily be skirted if those customers used a web-based system, as opposed to Lottery's mobile application, to place their order. ¶¶ 139-44. It defies common sense that Defendants believed Lottery's geolocation technology was so completely effective that "[a]

28

user physically located in one U.S. jurisdiction *may not* purchase a lottery game sold by a lottery authority in another U.S. jurisdiction," when all a user had to do was avoid using Lottery's mobile app. ¶ 150. And of course, Defendants were aware that they were purchasing lottery tickets for out-of-state customers in Texas. These allegations clearly support scienter. *See In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 722 (S.D.N.Y. 2019) ("engaging in deliberately illegal behavior, as well as admitting there are material weaknesses in internal reporting, is probative of scienter."); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 281 (S.D.N.Y. 2012) ("corporation could not have believed" its statements "that it complied with the law and that its continued success relied upon compliance" in light of illegal conduct); *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 482 (S.D.N.Y. 2006) (awareness of illegal practices are "more than adequate to raise an inference of conscious misbehavior or recklessness").

Faced with the particularized facts supporting scenter, the Individual Lottery Defendants also try to brush aside these allegations by relying on twenty-plus-year-old case law to argue that the Court should not consider it on this motion because the allegations in the Bloomberg Article, as well as allegations from a Delaware Chancery court proceedings involving Lottery, are contested or allegedly inadmissible at trial. *See* C&D Br. at 11-12, 19-21. However, the law is clear that none of that is relevant at this stage of the litigation. A securities fraud pleading may rely on contested allegations and evidence that might be inadmissible at trial, including allegations from news articles and from pleadings in other actions – as long as those allegations are sufficiently particularized. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (crediting news articles as reliable in accordance with heightened pleading standards for securities fraud claims); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 31 (S.D.N.Y. 2016) (crediting newspaper articles indicating particularized facts); *In re Teva*, 671 F. Supp. 3d at 192

29

(investors permitted to reallege allegations brought in prior complaints drafted by experienced counsel); *Major Energy Elec. Servs., LLC v. Horowitz*, No. 19 Civ. 10431 (NRB), 2020 WL 4432121, at *7 (S.D.N.Y. July 31, 2020) (gathering cases holding that plaintiffs may base factual allegations on complaints from other proceedings).

Further, the Individual Lottery Defendants misconstrue the facts to argue that the Bloomberg Article should not be relied upon because it incorporates information purportedly obtained from an internal investigation. *See* C&D Br. at 21. To the contrary, *Bloomberg* interviewed more than a dozen current and former employees, board members, and vendors, obtained audio recordings, internal communications and board documents, and examined public disclosures, much more reliable sources than the articles in the authority cited by Defendants.[5] In fact, the Bloomberg Article even quoted one of the Individual Defendants (DiMatteo). ¶ 5. The Court may credit articles "published in industry journals ... and reputable newspapers" based on detailed reporting, like *Bloomberg*'s publications, because they "meet the requirements of being independent and reliable." *In re Mylan N.V. Sec. Litig.*, No. 20 Civ. 955, 2023 WL 3539371, at *7 (W.D. Pa. May 18, 2023); *City of Warren*, 477 F. Supp. 3d at 133 (crediting allegations from news sources because "a plaintiff need not offer admissible proof of its allegations for the Court to accept them as true at this stage").

---

[5] The news articles at issue in *In re Optionable Sec. Litig.*, (*see* C&D Br, at 20; LTRY Br. at 17) did not identify the bases for their sources at all or simply described the content of a report on the basis of "a source familiar with the report." 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008).

      **b)**      **Lottery Has Admitted That Defendants Were Actively Involved With Improper Financial Reporting And Accounting Practices For The September 2021 Sham Transaction**

The Court already found that the Amended Complaint, which had fewer supporting allegations than the TAC, adequately pled that various financial statements that Lottery issued during the Class Period were false or misleading. *See* MTD Order at *20-25 (finding post-merger financial performance related statements and other post-merger statements to be false or misleading when made). The additional information pled in the TAC provides strong evidence that these materially false or misleading financial statements were made recklessly or knowingly.

The evidence now shows that the $30 million of revenue booked during the third quarter of 2021, several weeks before the Business Combination, was a fraudulent transaction, which the Individual Lottery Defendants were intimately involved with, in violation of ASC 606 (which the Proxy claimed that the Company followed when recognizing revenue). Under ASC 606, revenues are recognized upon the application of the following steps: (1) Identification of a contract or contracts with a user, customer or subscriber; (2) Identification of performance obligation(s) in the contract; (3) Determination of the transaction price; (4) Allocation of the transaction price to the performance obligations in the contract; and (5) Recognition of revenue when, or as, the performance obligation is satisfied. ¶ 93. In determining whether a contract exists for the purposes of ASC 606, certain criteria must be met for a contract to exist, including, but not limited to: (1) that a contract has commercial substance, and (2) it is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for goods or services that will be transferred to the customer. ¶ 94.

In violation of ASC 606, the Company recognized $30 million of revenue, not upon the transfer of the contracted-for service credits (that were, in fact, non-transferable), but upon the mere signing of the contract with its "major customer" on September 20, 2021. ¶ 75. Moreover,

31

the Company recognized this $30 million in revenue despite not receiving payment, and despite the fact that when the Company eventually purported to receive the payment, it did so by secretly borrowing money and forwarding the proceeds of that loan to the purchaser of the Lottery service credits to pay for the credit. ¶ 76. Simply put, this transaction, which accounted for more than 93% of the Company's reported revenue in Q3'21, and nearly half the Company's reported cash as of year-end 2021 (¶¶ 108-09), was a complete sham negotiated and perpetrated by Lottery's executives.

That this transaction accounted for such a large percentage of the Company's finances only further supports an inference of scienter. *Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER), 2020 WL 1508748, at *11 (S.D.N.Y. Mar. 30, 2020) (magnitude of financial figures restated by 9% and 14% was substantial enough at the line-item and company-wide level to indicate fraudulent intent); *Fresno Cnty. Emps.' Ret. Assoc. v. Comscore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) ("[T]he size of the purported fraud may contribute to an inference of scienter") (collecting cases); *In re Pareteum*, 2021 WL 3540779, at *17 ("[T]he size of the alleged fraud can be relevant to the scienter inquiry . . . ."); *Richard v. Nw. Pipe Co.*, No. 9 Civ. 5724, 2011 WL 3813073, at *4 (W.D. Wash. Aug. 26, 2011) (misapplication of GAAP standards "combined with a drastic overstatement of financial results can give rise to a strong inference of scienter") (quoting *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089 (9th Cir. 2011)).

Additionally, Lottery admitted that: (i) its financial statements at the end of 2021 and the beginning of 2022 overstated Lottery's purported cash balance by $30 million; and (ii) the entire $30 million transaction was a sham. ¶¶ 81, 83. In other words, Lottery admitted that its financial disclosures wrongfully included $30 million in cash holdings and revenues that did not exist at the time of those disclosures. Such allegations further support a strong inference of scienter. *See, e.g.*,

32

*Yannes v. SCWorx Corp.*, No. 20 Civ. 033949 (JGK), 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021) (holding that defendants' subsequent admission of facts that were previously known to them and that were contrary to their class period statements adequately pled scienter); *In re Longwei Petroleum Inv. Holding Sec. Litig.*, No. 13 Civ. 214 (HB), 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (same); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 244-45 (S.D.N.Y. 2012) (same).

Lottery argues that, because the Promissory Note (which the Company entered into to obtain the funds ultimately forwarded to the major customer) was not entered into until January 4, 2022, Plaintiffs have not adequately pled that statements in the Proxy and in the November 15, 2021 report of third quarter earnings concerning revenue recognition, and the revenue recognized specifically from this transaction, were made with scienter. *See* LTRY Br. at 14-15. To credit this argument, the Court would have to assume that the Company's CFO (Defendant Dickinson), who signed the Promissory Note that created this Sham Transaction, and the Chief Revenue Officer (Defendant Cleminson), entered into a transaction that caused the Company's quarterly revenue to increase by *nearly 2,000%* over the same quarter (a year earlier), and caused the Company's reported cash to nearly double, without realizing that the Lottery service credits they were selling were non-transferable.[6] This is simply unbelievable.

Similarly, it requires the Court to rule as a matter of law that this gargantuan transaction did not become a sham until the Promissory Note was executed several weeks later. Clearly, an

---

[6] Lottery's citation to *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 460 (S.D.N.Y. 2019) is inapposite. There, plaintiffs attempted to use a pharmaceutical company and its officers' skill or experience as evidence that they were aware of the industry usage of the term "strong" in a clinical trial. Here, the Company's Chief Revenue Officer and CFO would have basic accounting knowledge and be aware of whether the Company had cash or did not.

equally plausible, not more plausible, inference is that the entire transaction was a sham from the start, and it merely took a few weeks following the execution of the customer agreement for the Company to obtain the loan, whose proceeds were then forwarded to the major customer to facilitate the payment. In any event, even if the Court were to merit Lottery's arguments, that would not negate Plaintiffs' scienter allegations with respect to the fraudulent reporting that occurred in the first quarter of 2022. Indeed, the Company's accountant confirmed that the line of credit should have been disclosed either in the footnotes to the December 31, 2021 financial statements or recorded in the March 31, 2022 financial statements. ¶ 89. n. 14. And as the Court previously indicated, the sale had been a sham from the start and did not only become a sham when the Promissory Note was executed. *See* MTD Order at *27 ("By the time Lottery released the Q3 2021 Report . . . the sham sale of LotteryLink Credits had already been announced.").

### 2. Additional Facts Further Support Defendants' Knowledge Of The Fraud And Recklessness

While the Individual Lottery Defendants try to distance themselves from this fraud, this is illogical given their positions within the Company and their acts in furtherance of the fraud. The CEO, CFO, and Chief Revenue Officer are presumed to have knowledge of the revenue recognition practices and the provisions, which are disclosed in the Proxy Statement. ¶ 147. *First*, a corporate officer's access to contrary information can be inferred where it is facially implausible that he or she would not have been privy to the information or transactions at issue. *City of Warren*, 477 F. Supp. 3d at 136 ("it is virtually inconceivable that the CEO and Co-Presidents of [the company] would not have been aware of the formal termination . . . of this important contract . . . ."); *Longwei*, 2014 WL 285103, at *4 ("At the very least, [the CFO's] role in financial reporting should have alerted him to [the corporate defendant's] sudden rise in revenues and history of inadequate financial controls").

34

Here, it simply belies belief that the Individual Lottery Defendants were unaware that Lottery's purported September 2021 sale of $30 million of marketing credits was either an outright sham or not consummated, when the ostensible proceeds of that sale comprised half of Lottery's total reported cash balance, nearly half of Lottery's total revenues for fiscal year 2021, and a 2,000% increase over the previous year's reported revenue. ¶¶ 77-78. This is especially the case for Lottery's former CFO and treasurer, Defendant Dickinson. *Sec. & Exch. Comm'n. v. Takeyasu*, No. 17 Civ. 4866 (GHW), 2018 WL 2849777, at *20 (S.D.N.Y. June 11, 2018) (CFO's scienter pled where revenues were "radically inflated and the comptroller and CFO of the company were uniquely situated to control the revenue recognition procedures of the company."); *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 660 (S.D.N.Y. 2012) (implausible that the CFO was ignorant of "roughly one-third of [the Company's] assets."). Moreover, given that Lottery was a small company with as few as 20 full time employees (¶ 143), it is similarly incredible that Defendants DiMatteo and Clemenson—as Lottery's co-founders, CEO and CRO—were unaware of Lottery's true cash holdings and revenues at the time of their misstatements. *Cohen v. Kitov Pharm. Holdings, Ltd.*, No. 17 Civ. 0917 (LGS), 2018 WL 1406619, at *9 (S.D.N.Y. Mar. 20, 2018) ("position as CEO in a small organization" among other factors "give[s] rise to a plausible inference . . . ."); *City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17 Civ. 10014 (LGS), 2019 WL 719751, at *8 (S.D.N.Y. Feb. 19, 2019) (scienter inferred from defendants' positioning within company to oversee subject of the fraud); *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 234 (S.D.N.Y. 2023) (plausible to infer that officer defendants knew basic facts relating to important details of transactions in the realm of business they managed); *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 188 (5th Cir. 2019) ("the smaller the company the more likely it is that corporate executives would be familiar with the intricacies of day to day

35

operations"); *Okemos Home, LLC v. LGF Produce, LLC*, No. 17 Civ. 02786, 2019 WL 12248966, at *9 (D. Colo. Mar. 27, 2019) (inferring scienter given the company's "small size and limited number of officers); *Cullen v. RYVYL Inc.*, No. 23 Civ. 0185, 2024 WL 898206, at *17 (S.D. Cal. Mar. 1, 2024) ("the small size of the company and that the alleged fraud implicates [the company's] primary source of revenue makes it more likely that the individual defendants knew what was happening."); *Lemen v. Redwire Corp.*, No. 21 Civ. 1254, 2023 WL 2598402, at *4 (M.D. Fla. Mar. 22, 2023) (plausible to infer that officer defendants knew about internal control over financial reporting deficiencies because of their positions).

*Second*, and relatedly, courts recognize that obvious accounting manipulations, such as improper revenue recognition, "are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006); *see also In re Gilat Satellite Networks, Ltd.*, No. 2 Civ. 1510 (CPS), 2005 WL 2277476, at *20 (S.D.N.Y. Sept. 19, 2005) ("premature recognition of revenue has been said to suggest a conscious choice to recognize revenue in a manner improper . . . .") (cleaned up). Here, the inference of scienter is supported by the inherently improper nature of the transaction, namely that the vast majority of the Company's reported revenue came from the sale of non-transferable credits (*i.e.*, something that could not be sold) paid for through a loan secretly obtained by the Defendants and forwarded to the major customer. Relatedly, cases hold that scienter is presumed when the inaccurate financial reporting results from a defendant's violation of a simple GAAP provision. *Comscore*, 268 F. Supp. 3d at 553 (fact that defendants "affirmatively misrepresented that the recognition of the revenue complied with GAAP when it did not . . . [and] the need for a restatement . . . all contribute to the inference of scienter."). It is difficult to imagine an accounting

36

principle simpler than determining how much cash a company has on hand. The recognition of $30 million of non-existent cash, comprising nearly half of the Company's $62 million of reported cash, definitely suggests fraud, as there is no conceivable way that a company can innocently overstate reported cash on hand by nearly 100%. ¶ 77. Additionally, the Court previously concluded that Defendants' various representations about the revenue and resulting cash holdings from the fabricated LotteryLink Credits sales "misled investors to conclude that the company was aware of some historical evidence in support of [the existence of $30 million in LotteryLink Credits sales], when in (alleged) fact it was not." MTD Order at *24.

*Third*, a strong inference of scienter is further supported by "the core operations doctrine, which refers to the principle that [w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that defendant knew or should have known the statements were false when made." *Wang*, 661 F. Supp. 3d at 221. Lottery's sale of marketing credits (which accounted for the vast majority of its revenues) and its compliance with gaming laws and regulations (which Lottery admitted was vital to its ability to conduct its business) were indisputably core operations. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made"); *In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) (if false statements relate to a core operation, an inference arises "that the defendant knew or should have known the statements were false when made").

*Fourth*, the timing and circumstances of the terminations/resignations and the withdrawal of Lottery's independent auditor also support a strong inference of scienter. For example, the Board of Directors fired Defendant Dickinson the day after the independent investigation by outside counsel identified the $30 million overstatement in Lottery's available cash and revenue (¶ 101), and the rest of the Individual Lottery Defendants resigned shortly thereafter. ¶¶ 102-05; *see Yannes*, 2021 WL 2555437, at *6 ("[T]he timing and circumstances of resignations . . . can add to a pleading of circumstantial evidence of fraud.") Similarly, Lottery's auditor resigned in the aftermath of Lottery's revelations, stating that it was "unable to rely on representations of management." ¶ 97; *Vanderhoef v. China Auto Logistics, Inc.*, No. 18 Civ. 10174, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021) (depending on the circumstances, resignation of external auditor can support inference of scienter).

*Fifth*, whether or not the TAC pleads the scienter of the Individual Lottery Defendants (and for the reasons discussed above, it does), there can be no doubt that the TAC has pled Lottery's scienter. A pleading can "raise the required inference with regard to a corporate defendant [*i.e.*, Lottery] without doing so with regard to a specific individual defendant." *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 27 (2d Cir. 2020); *see also In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 835 (S.D.N.Y. 2017) (plaintiffs may sufficiently plead scienter "with regard to the corporate entity" alone); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 389 (E.D.N.Y. 2022) (inference of scienter for misstatement not attributed to any individual defendant). As the Second Circuit has explained:

> [If] General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero ... [t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (quoting *Tellabs*, 513 F.3d at 710). Such an inference is even stronger here because the allegations set forth that Lottery, a very small company compared to General Motors, would have been aware of the fraudulent nature of a transaction accounting for over 93% of the Company's reported revenue and almost 48% of the Company's reported cash.

Indeed, Defendants cannot seriously contend that, for example, Lottery's discussions of its cash balance, revenues, and legal compliance were not approved by a single corporate officer whose scienter can be imputed to the Company. *See Sjunde AP-Fonden*, 545 F. Supp. 3d at 145 (pronouncement about bond transactions "so dramatic that it would have been vetted with and approved by corporate officials" with sufficient knowledge to know it was false); *City of Warren*, 477 F. Supp. 3d at 138 (importance of replacement agreement and defendants' senior positions support the allegation that the company and individual defendants knew or recklessly disregarded the falsity of their statements); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 491 (W.D. Pa. 2020) (certain operational facts were "knowable, quantifiable facts" to management at the time defendants represented that a major acquisition would enable synergy achievements). Here, the combination of the magnitude of the fraudulent transaction (over 93% of reported revenue and almost 48% of reported cash), combined with the small size of the Company (approximately 20 employees), makes the inference of scienter inescapable. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 593 (S.D.N.Y. 2010) (corporate scienter sufficiently alleged with respect to non-disclosure of large exposure to collateralized debt obligations); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 299 (S.D.N.Y. 2009) (corporate scienter sufficiently alleged with respect to misrepresentation of massive capital costs); *In re Teva Sec. Litig.*, 671 F. Supp. 3d at 215 (corporate scienter sufficiently alleged where drugmaker spent $4-$27 million to promote off-label scheme).

*Finally*, the DOJ and the SEC are investigating both the conduct at issue and the Individual Defendants' involvement therein. As the Company admitted, "certain of our former officers are currently the subject of investigations and inquiries by the SEC and the U.S. Department of Justice (the "DOJ") relating to the findings of the Internal Investigation and other matters, and we are cooperating fully with such investigations and inquiries." ¶¶ 23, 109; *see also* ¶ 138 ("Lottery.com's current leadership said the [sham] transaction is one of the subjects of SEC and DOJ scrutiny, and the company has been fully cooperating with authorities in their reviews."). In fact, the SEC has even sent out investigative subpoenas. ¶ 144. Certainly, the DOJ and the SEC would not investigate situations where they did not think the conduct was intentional, or at a minimum so severely reckless as to necessitate both civil and criminal investigations. As such, the investigations are additional support for a finding of scienter. *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (receipt of a DOJ subpoena "may be considered by the Court as part of its analysis."); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (finding the allegation that "the Department of Justice launched an investigation into the Apotex settlement negotiations" was one of many allegations that established a strong inference of scienter); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter.").

### 3. The Defendants Also Had The Motivation And Opportunity To Engage In The Fraud

While motive is not necessary to demonstrate scienter,[7] particularly where plaintiffs have alleged actual knowledge, the TAC pleads cognizable motives for Defendants to have engaged in

---

[7] *See Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation … is not fatal.").

40

fraud. First, the desire to artificially inflate a company's stock price in advance of a public offering establishes a cognizable motive. *See, e.g.*, *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013); *City of Roseville Emps.' Ret. Sys. v. Energysolutions, Inc.*, 814 F. Supp. 2d 395, 420-21 (S.D.N.Y. 2011); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014). Here, Defendants were motivated to lie to ensure the transactions went through before their shares expired worthless. ¶ 139.

Second, the Individual Lottery Defendants stood to personally gain if the Business Combination were consummated. *See Hsu v. Puma Biotechnology Inc.*, No. SA Civ. 15 00865, 2017 WL 3205774, at *4 (C.D. Cal. July 25, 2017) (allegation that pending transaction would personally benefit defendants supported scienter); *Redwire Corp.*, 2023 WL 2598402, at *4 (same). Specifically, in the event the business combination was consummated, the Individual Lottery Defendants stood to receive millions, far more than they would have been entitled to if the true value of Lottery had been disclosed. ¶¶ 36-38, 71. Moreover, these executives received lucrative pay and benefit packages to the extent they remained employees of Lottery following the Business Combination. *See, e.g.*, ¶ 73.

Contrary to Lottery's argument, the Court did not previously reject Plaintiffs' allegations of motive. *See* LTRY Br. at 10. The Court merely ruled that the desire to complete the Business Combination could not serve as a motive for fraud with respect to later statements, after finding that the January 31, 2023 Amended Complaint had not pled that any pre-Business Combination statements were actionable. *See* MTD Order at *30-32 ("Defendants' desire to ensure that the de-SPAC transaction happened [] dissipated once the de-SPAC transaction was complete."). However, for the reasons discussed herein, the TAC has pled numerous pre-Business Combination misrepresentations.

41

Nor did the Court reject Plaintiffs' insider selling allegations. The Court merely held that the January 31, 2023 Amended Complaint did not plead sufficient information concerning the insider selling. *Id*. at \*31. For example, the Amended Complaint merely stated that the Lottery Defendants "received far more shares than they would have been entitled to had the true value of Lottery been disclosed in connection with the Business Combination." Amended Complaint, ¶ 104. The TAC remedies these defects by pleading far more detail concerning the insider sales, including date of sales, number of shares, share prices, and proceeds. ¶¶ 72 (DiMatteo sold between $2,381,250 and $2,576,250 worth of shares shortly after the Business Combination was completed on December 2, 2021); 74 (Clemenson also sold between $2,381,250 and $2,576,250 worth of shares on December 2, 2021); *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001) (considering amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling in determining whether insider trading activity is unusual). Likewise, the TAC explains that Dickinson was to be awarded $35 million in restricted stock upon the completion of the Business Combination that would vest after an additional six months of employment. ¶ 73. That Dickinson was to be awarded such a large amount of stock, and the other Defendants' ownership of such a large portion of the Company (DiMatteo and Clemenson both owned 14%, ¶¶ 72, 74), provides an explanation for their egregious conduct and why there was so much "pressure to make year-end revenue projections." ¶ 137.

### 4. The Inference Of Fraud Is Clearly More Plausible Than Any Competing Inference

Confronted with a series of well-pled allegations, Lottery attempts to explain away each scienter element in isolation. However, this approach flies in the face of the Supreme Court's mandate that all scienter facts must be viewed holistically. As the Supreme Court explained, the proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference

of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23, 326 (allegations are to be read "holistically"); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20 Civ. 4953 (JPO), 2021 WL 4482151, at *4 (S.D.N.Y. Sept. 30, 2021) (certain of defendants' comments, on their own, may not give rise to a strong inference of scienter, but contribute to overall inference when taken together with other comments); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 99 (S.D.N.Y. 2015) (various pieces of circumstantial evidence did not give rise to a strong inference of scienter on their own but lent overall support to such an inference as a whole).

When viewed holistically, as must be done on a motion to dismiss, the TAC's allegations give rise to a strong inference of knowing or reckless conduct that is far more compelling than any competing inference of innocence. To wit, Lottery.com was a small company that engaged in hundreds of thousands, if not millions of lottery ticket purchase transactions, which it clearly knew (as disclosed in its SEC filings) to have been illegal. Furthermore, virtually all of the reported revenue, and nearly half the Company's reported cash, was illusory and came about as a result of an inherently fraudulent sham transaction whereby the Company recognized tens of millions of dollars of revenue and cash from the sale of something it could not sell, and the payment received therefrom was money that the Company itself borrowed and then gave to the customer in order to make the payment. After an internal investigation discovered these overstatements, all of Lottery's senior management was terminated or resigned and Lottery's auditor resigned because it was unable to trust managements' representations. There is simply no scenario in which innocent explanations for this conduct are more plausible than the obvious inferences of fraud. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021) (inference of scienter bolstered by defendants' "knowledge and involvement in [] channel stuffing practices"); *Martin v.*

*Altisource Residential Corp.*, No. Civ 15-24, 2019 WL 2762923, at \*5 (D.V.I. July 2, 2019) (defendant "would have known whether he recused himself from transactions"); *In re Banc of California Sec. Litig.*, No. 17 Civ. 00118, 2017 WL 3972456, at \*8 (C.D. Cal. Sept. 6, 2017) ("hardly plausible" that defendant did not know about his own ties to an individual convicted of fraud); *In re L & L Energy, Inc.*, No. 11 Civ. 1423, 2013 WL 6244654, at \*3 (W.D. Wash. Dec. 3, 2013) (defendants must have known of the defect of its claim of asset ownership given allegations of breach and forgery).

While the Individual Lottery Defendants attempt to argue mistake or innocence (*see* C&D Br. at 15-18), this is simply unbelievable in light of the facts of the case. And to the extent that Defendants attempt to argue alternative facts than those set out in the TAC, this is entirely improper at this stage of the proceedings. *See IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021) (defendants' contrary and competing explanation of the facts "is entitled to little weight at this stage of the litigation."); *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, No. 22 Civ. 10185 (GHW) (GS), 2023 WL 9102400, at \*18 (S.D.N.Y. Dec. 29, 2023), *report and recommendation adopted sub nom. Northwest Biotherpeutics, Inc. v. Canaccord Genuity LLC*, No. 22 Civ. 10185 (GHW), 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024) (Defendants' version of the facts "raises a dispute that cannot be resolved on a motion to dismiss"); *Locus Techs. v. Honeywell Int'l Inc.*, 632 F. Supp. 3d 341, 355 (S.D.N.Y. 2022) ("this Court cannot accept on a motion to dismiss Defendant's competing version of the facts").

## IV.    THE TAC ADEQUATELY ALLEGES SECTION 14(A) CLAIMS AGAINST THE LOTTERY DEFENDANTS

### A.    Applicable Legal Standards Disfavor Dismissal Of Section 14(a) Claims

The purpose of Section 14(a) of the Exchange Act is ". . . to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosure

44

in proxy solicitation." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). SEC Rule 14a-9 prohibits proxy solicitations from containing statements that are "false or misleading with respect to any material fact" or that omit "any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

To state a claim under Section 14(a) and Rule 14a-9 promulgated thereunder, a plaintiff must allege that: (i) "the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading"; (ii) the misstatement or omission was the result of "knowing, reckless or negligent conduct"; and (iii) "the proxy solicitation was an essential link in effecting the proposed corporate action." *Vides v. Amelio*, 265 F. Supp. 2d 273, 276 (S.D.N.Y. 2003).

For Section 14(a) liability, a plaintiff "need not establish scienter, and must plead only that [the defendant] was negligent in connection with the merger." *Sec. & Exch. Comm'n v. Hurgin*, 484 F. Supp. 3d 98, 116 (S.D.N.Y. 2020) (citing *Wilson v. Great Am. Indus.*, Inc., 855 F.2d 987, 995 (2d Cir. 1988)); *see Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("Section 14(a) requires … at worst negligence."). Thus, a misleading proxy solicitation "violates the section even if the issuer *believed in perfect good faith* that there was nothing misleading in the proxy materials." *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010).

Section 14(a) claims are subject to Rule 8(a)'s liberal pleading standard, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief …." Fed. R. Civ. P. 8(a)(2); *see Comscore*, 268 F. Supp. 3d at 558; *In re Bank of Am. Corp.*, 757 F. Supp. 2d at 303 n.9. And "because negligence is not a state of mind; it is a failure, whether conscious or even unavoidable …, to come up to the specified standard of care," the PSLRA's "elevated

45

pleading standard does not apply to Section 14(a) claims that sound in negligence." *Comscore*, 268 F. Supp. 3d at 559 (citing *Beck*, 559 F.3d at 682); *see Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 301 (D. Conn. 2021) ("Negligence is not a state of mind, so plaintiff need not state with particularity facts giving rise to a strong inference that the [defendant] acted with the required state of mind."); *In re Bank of Am. Corp.*, 757 F. Supp. 2d at 321 (same).

### B. The Lottery Defendants Are Liable For The Misrepresentations Contained In The Proxy

With respect to Plaintiffs' Section 14(a) claims, the Individual Lottery Defendants erroneously claim that the Court previously held, in its MTD Order, that all of the legal and regulatory compliance statements in the Proxy are puffery and inherently inactionable. *See* C&D Br. at 23-24.[8] But as already discussed at Section III.B.8, *supra*, this is simply untrue. The Court's MTD Order only determined that, "[a]s presently pleaded [in the AC], … the statements in the … Proxy regarding Lottery's *work with state regulators* were too general to cause a reasonable investor to rely upon them." MTD Order at *16. In the context of Section 14(a), the Court did not specifically address the statements, alleged in the TAC, that (i) Defendants believed Lottery to be in compliance with all applicable laws and regulations, and/or (ii) the Company only purchased tickets in accordance with applicable laws and was being operated to ensure that it remained in compliance with such laws. *See* ¶¶ 129, 152, 166. Nor has the Court had any occasion to address the newly alleged statements in the Proxy regarding the Company's alleged ticket purchasing

---

[8] Notably, only Individual Lottery Defendants Clemenson and Dickinson specifically challenge the sufficiency of the TAC's allegations for purposes of Section 14(a). Thus, any challenges by the remaining Lottery Defendants have been waived. *See Mateo*, 2013 WL 3863865, at *8.

practices and/or its alleged geofencing technology. *See id.* ¶¶ 130, 150, 168.[9] As discussed at Sections III.B.3-8, *supra*, the TAC sufficiently alleges that these statements were all false and/or misleading. Thus, the Proxy's cautionary language addressed in the MTD Order cannot insulate them from liability.

The Individual Lottery Defendants also claim that the Section 14(a) claims fail because the TAC fails to "identify the roles [they] allegedly played . . . with respect to the geofencing technology." C&D Br. at 24. This is irrelevant. Section 14(a) neither requires proof of an individual defendant's personal involvement in, or knowledge of, the underlying misconduct, nor proof of his or her involvement in the preparation of the misleading proxy materials. *See Hurgin,* 484 F. Supp. 3d at 116-17.[10] Rather, the basis for Section 14(a) liability is simply whether the defendant "has solicited or permitted his or her name to be used in the allegedly unlawful proxy." *McIntosh v. Katapult Holdings, Inc.*, No. 21 Civ. 7251 (JPO), 2023 WL 5049044, at *13 (S.D.N.Y. Aug. 8, 2023).

Here, the Individual Lottery Defendants' names appeared in the Proxy on numerous occasions. *See generally* Proxy (naming Clemenson 33 times, DiMatteo 38 times, and Dickinson 23 times). Moreover, the Proxy contained information about their qualifications and experience and indicated that they would be given high-level positions in the Company following the Business

---

[9] Although the Individual Lottery Defendants claim that the only new allegations in the TAC with respect to the Proxy involve the Company's ticket purchasing practices and geofencing technology, that is incorrect. The TAC also newly alleges that the Proxy made false and/or misleading statements regarding the Company's compliance with ASC 606. *See* ¶ 147. As discussed at Section III.B.2, *supra*, those statements were false and/or misleading and the Individual Lottery Defendants do not argue to the contrary.

[10] The Individual Lottery Defendants also claim that the TAC fails to allege facts to support the inference that when Defendants stated that they believed Lottery was complying with applicable laws, Defendants did not actually believe that fact. *See* C&D Br. at 24. This argument must be rejected for the same reasons discussed at Section III.B.3, *supra*.

Combination. *See id.* at xvi, 113, 142, 197, 199-200, 203. The Proxy also indicated that they were closely involved in the Business Combination negotiations with TDAC (*see id.* at 83-85), and the Business Combination Agreement, annexed to the Proxy, was signed by Clemenson on Lottery's behalf. *See id.* at Annex A-62. This is more than sufficient for Section 14(a) liability. *See Sec. & Exch. Comm'n v. Prakash,* No. 23 Civ. 03300, 2024 WL 781037, at *8 (N.D. Cal. Feb. 26, 2024) (Section 14(a) claim adequately pled where individual defendant's name appeared over 20 times in the proxy materials, and where those materials included information about his qualifications and experience and indicated that he would become the CFO of the merged entity); *Hurgin*, 484 F. Supp. 3d at 116-17 (similar); *McIntosh*, 2023 WL 5049044, at *13 (similar).

## V.    THE TAC ADEQUATELY ALLEGES SECTION 14(A) CLAIMS AGAINST KOMISSAROV

### A.    Komissarov Is Liable For Material Misleading Statements In The Proxy

The TAC adequately alleges Section 14(a) claims against Komissarov. *See* Section IV.A, *supra* (articulating pleading standards for Section 14(a) claims). The TAC pleads actionable misrepresentations concerning Lottery's: (a) adherence to ASC 606 (*see* Section III.B.2, *supra*); (b) compliance with Lottery's regulations (*see* Section III.B.3, *supra*); and (c) practice of only purchasing Lottery tickets in jurisdictions where the customers are located (*see* Section III.B.3, *supra*). Those misrepresentations were incorporated into the Proxy. ¶¶ 147-48, 150, 152.

#### 1.    The TAC Adequately Alleges That The Proxy's 2021 Revenue Projections Were Materially Misleading

The TAC adequately alleges that the 2021 revenue projections included in the Proxy were materially misleading. That is because nearly half the $70 million of revenue projected for 2021 – a year that was 90% complete by the time that the Proxy came out on October 21, 2021 – was attributable to revenue that Lottery.com had booked nearly a month earlier from the $30 million sham sale of Lottery credits. ¶¶ 7, 147. Investors may have understood the risk that Lottery.com

48

might not realize as much revenue as previously-hoped in the remaining ten (10) weeks of 2021. However, they were not apprised of the risk that nearly half of the revenue projection was attributable to a sham transaction that was already booked.

Komissarov argues that the Court previously ruled that the revenue projections are not actionable. *See* Komissarov Br. at 18-19 (citing MTD Order at *17-18). Plaintiffs respectfully submit that Komissarov overstates the Court's prior ruling and ignores new allegations in the TAC. The Court dismissed the Amended Complaint's revenue projection allegations because the Proxy warned of internal control deficiencies. *See* MTD Order at *19. However, the TAC alleges more than internal control deficiencies. The TAC alleges a transaction that was an outright sham on all levels. Revenue was booked for this transaction in September 2021 in violation of ASC 606 – which the Company claimed to follow – through the sale of non-transferable credits, to a customer who lacked the ability to pay, and the ultimate payment only came from money supplied to the customer by Lottery, which Lottery had obtained through an undisclosed loan. *See, generally* Section II.B, *supra*, ¶¶ 12, 147, 149.

For this reason, the Proxy's disclosures are manifestly deficient on their face. Courts routinely recognize that defendants may be liable "when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (discussing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)). "[O]pinions, although sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. at 188-89). A reasonable investor expects that a statement of opinion "fairly

49

aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189. Statements misrepresenting the factual underpinnings of a company's price guidance are actionable. *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, **5-6 (S.D.N.Y. Sept. 25, 2020); *Comscore*, 268 F. Supp. 3d at 548 (safe harbor "inapplicable" to quantitative revenue projections allegedly "based on a false premise: nonexistent revenue"); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 568-70 (S.D.N.Y. 2011); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y 1999) ("[P]laintiffs . . . are not relying on the falsity of Oxford's financial projections . . . but rather the defendants' failure to disclose historical and existing material facts . . . . The safe harbor and bespeaks caution doctrines do not apply to these omissions.").

As explained above, the TAC alleges that Defendants failed to disclose known material facts whose omission either implied the absence of contrary facts or did not fairly align with the information in Defendants' possession at the time. Even assuming the disclosures were sufficiently specific, they are still ineffective because they warned of what *could* happen, when Lottery had *already* improperly based its revenue projections on a sham transaction. *See Wang*, 661 F. Supp. 3d at 228 (quoting *Rombach*, 355 F.3d at 173) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). In this regard, the TAC's principal allegations of falsity relating to revenue projections contained in the Proxy are actionable and based on a failure to disclose material facts. As such, the PSLRA's safe harbor provision and the bespeaks caution doctrine are inapplicable since "[t]he safe harbor also does not protect material omissions." *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016). This is true, "*regardless of whether the statements thereby rendered*

50

*misleading were forward-looking.*" *City of Providence*, 2013 WL 1197755, at \*12; *see also In re Oxford Health*, 187 F.R.D. at 141.

### 2.    The Preliminary Q3'21 Revenue Figure Contained In The October 21, 2021 Press Release Gives Rise To A Section 14(a) Claim

The October 21, 2021 press release is subject to this Section 14(a) claim. Section 14(a) liability is not limited to representations and omissions in the proxy statement itself. Liability attaches to any "solicitation" whether "made by means of a[] proxy statement, form of proxy, notice of meeting *or other communication*, *written* or oral." 17 C.F.R. § 240.14a-9(a). Rule 14a-1 defines "solicitation" to include, *inter alia*, "[t]he furnishing of a ... communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a–1(l)(1)(iii). This rule is declarative of long-established Second Circuit law, which holds that "solicitation" comprehends not only direct requests to furnish proxies, but also "communications which may indirectly accomplish such a result or constitute a step in a chain of communications designed ultimately to accomplish such a result." *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 796 (2d Cir. 1985); *Cap. Realty Invs. Tax Exempt Fund Ltd. P'ship v. Dominium Tax Exempt Fund L.L.P.*, 944 F. Supp. 250, 254 (S.D.N.Y. 1996) (same). Whether a communication constitutes such "a step in the chain" depends upon "whether the challenged communication, seen in the totality of circumstances, is reasonably calculated to influence a shareholder's decision to provide, revoke, or withhold a proxy." *Gas Nat. Inc. v. Osborne*, 624 F. App'x 944, 951 (6th Cir. 2015). In evaluating the totality of the circumstances, courts look to: (i) "the contents of the communication;" (ii) "the conditions under which the communication is distributed," including whether there "will be a request for a shareholders' vote on a matter;" and (iii) the "timing of the communication," including how far "removed the statement is from an act of shareholder suffrage. *Id* at 951.

51

Here, the Press Release discussed the Business Combination and the upcoming shareholder vote thereon, it furnished further positive news about the target company, Lottery, and it was issued on October 21, 2021, mere days before the shareholder vote. *See* ¶ 154. As such, it constitutes a solicitation. *See Hill on Behalf of Republic First Bancorp Inc. v. Cohen*, 40 F.4th 101, 112 (3d Cir. 2022) (accepting allegations that "press releases were proxy solicitations, [because] the contents and timing of the announcements can at least plausibly be characterized as meant to sway shareholders to vote against the [] Directors who were standing for re-election").  Based on the foregoing, the TAC adequately alleges that the preliminary Q3'21 revenue figure contained in the October 21, 2021 press release violated Section 14(a).

The cautionary language provided by Defendants with regard to the preliminary revenue was deficient for the same reasons the projection was deficient. *See* Section IV.A.1, *supra*; *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023) (holding that, to qualify under the bespeaks caution doctrine, a defendant's risk disclosures "must expressly warn of or directly relate to the risk that brought about Plaintiffs' loss, . . . it must convey substantive information, and it must not be boilerplate").[11] The Court previously found the cautionary statements sufficient with regard to the alleged failure to disclose a lack of accounting internal controls. MTD Order at *19. However, the TAC does not rely on the lack of internal controls to allege that the preliminary revenue was misleading; rather, the preliminary revenue was based on a fraudulent transaction.

---

[11] *See also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (cautionary language must "precisely address" the substance of the specific statements at issue).

**B.     Komissarov Is Responsible For The Misrepresentations And Omissions In The Proxy Materials[12]**

Komissarov argues that, under *Janus,* neither he nor TDAC were the "makers" of the revenue projections or compliance-related representations in the Proxy Statement. *See* Komissarov Br. at 14, 15.[13] Not only is this incorrect, but it is irrelevant for purposes of Section 14(a).

**1.     *Janus* Does Not Apply To Section 14(a) Claims**

Unlike with Section 10(b), a plaintiff alleging a violation of Section 14(a) and Rule 14a-9 is not required to allege that the defendant "personally prepared the proxy materials" or "personally made or disseminated the allegedly misleading statements." *Hurgin*, 484 F. Supp. 3d at 116-17; *see also* Section IV.B, *supra*. Rather, a plaintiff need only allege that the defendant "solicited or permitted his or her name to be used in the allegedly unlawful proxy," *McIntosh v. Katapult Holdings, Inc.*, 2023 WL 5049044, at *13 (S.D.N.Y. Aug. 8, 2023) (citing *In re Bank of Am. Corp.*, 757 F. Supp. 2d at 288) (allegation that defendant "permitted his name to be used in the Prospectus" sufficient for Section 14(a)); *see also In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 218 (S.D.N.Y. 2020) ("Although Defendant Liaw argues that he did not personally make any false statements, Liaw, as a member of the board of directors, solicited a proxy via a statement containing misleading statements or omissions, putting him squarely within the ambit of Section 14(a).").

Here, Komissarov's name appeared within the Proxy Statement on no fewer than 42 occasions (*see* ¶¶ 42, 70), he was listed as TDAC's contact person in the Press Release (*see* ¶¶ 42,

---

[12] Plaintiffs concede that Komissarov is not responsible for statements made *after* the Business Combination was effectuated on October 29, 2021. *See* Komissarov Br. at 10 n.6, 14.

[13] Komissarov does not argue that he was not the "maker" of the revenue representations in the *Press Release*. As such, that argument has been waived and, in any event, would be unavailing for the reasons discussed herein.

70), and he was a member of TDAC's Board of Directors (¶¶ 42, 70), which, according to the Proxy Statement, was "soliciting proxies" (*see* Piskora Decl. Ex. 2 (Proxy) at 67), and "unanimously recommend[ing] that TDAC stockholders vote 'FOR'" the combination with Lottery. *See* Piskora Decl. Ex. 2 (Proxy) at 6; *see also* Piskora Decl. Ex. 2 (Proxy) at 14 ("The Board is soliciting your proxy to vote for the Business Combination."); *id.* at 16 (it is the "recommendation of the Board to approve the Business Combination Agreement"); *see* Press Release (noting that TDAC's "directors and officers may be deemed participants in the solicitation of proxies of [TDAC's] stockholders in connection with the proposed business combination").[14] This is more than sufficient to demonstrate Komissarov's involvement in TDAC's proxy solicitations and thus, his liability for the statements and omissions in the Proxy and Press Release. *See In re Bank of Am. Corp.*, 757 F. Supp. 2d at 293 (where proxy stated: "This Proxy is Solicited on Behalf of the Board of Directors," it was sufficient to establish board members' liability under Section 14(a)).

### 2. Even If *Janus* Applies, Komissarov Was The "Maker" Of The Alleged Misstatements And Omissions

In any event, Komissarov was also the "maker" of the revenue and compliance-related representations in the Proxy Materials. An executive is the "maker" of a statement where he or she had "ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive." *Xu*

---

[14] The Press Release, which was quoted and referred to extensively in the TAC (¶¶ 42, 70, 129, 154), was also annexed to an filing. A copy of the Press Release is available at https://www.sec.gov/Archives/edgar/data/1673481/000121390021053974/ea149227-425_tridentacq.htm. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (a district court may "take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'").

*v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 359 (S.D.N.Y. 2022). Here, Plaintiffs sufficiently allege that Komissarov's signature appeared in the Proxy Statement, that he was named as TDAC's contact person with respect to the Press Release, and that as TDAC's director and CEO, he had the power and authority to control the contents of those documents and that he reviewed them prior to issuance. *See* ¶¶ 42, 70.[15]

Notably, Komissarov does not attempt to disclaim responsibility for the contents of the Proxy Statement as a whole. Instead, he claims that he was not the "maker" of the Proxy Statement's revenue projections, specifically, because the Proxy Statement disclosed that "[n]either [TDAC's] management nor any of its respective representatives has made or makes any representations to any person regarding the ultimate performance of Lottery.com *relative to the Projections*." Komissarov Br. at 20 (citing Piskora Decl. Ex. 2 (Proxy) at 88). At most, this indicates that TDAC's management was not guaranteeing that Lottery's ultimate performance would *match* the projections. It does not indicate that they were not the "makers" of the projection representations.

The same is true with respect to the Proxy Statement's compliance-related representations. That Lottery warranted to TDAC – in the parties' separate Business Combination Agreement – that Lottery was in compliance with applicable laws and regulations, *see* Komissarov Br. at 15, does not absolve Komissarov of responsibility for making false statements about Lottery's compliance in TDAC's own public filing.[16]

---

[15] The TAC also sufficiently alleges that Komissarov, as signatory to TDAC's Form 8-Ks, was the "maker" of the compliance-related statements in the November 2020 and February, April, and June 2021 press releases attached thereto. *See* ¶¶ 42, 70. Komissarov does not argue to the contrary.

[16] Notably, while certain sections of the Proxy Statement contained an explicit disclaimer that "References in this section to 'we', 'our', 'us' and the 'Company' generally *refer to Lottery.com*"

## C.      The TAC Adequately Alleges Komissarov's Negligence

Komissarov acknowledges that the TAC does not assert Section 10(b) claims against him but argues that Plaintiffs fails to allege scienter. *See* Komissarov Br. at 20-23. This argument is misplaced. Section 14(a) claims simply require negligence. *See* Section IV.A, *supra*; *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 409 n.95 (2d Cir. 2016) (collecting the "myriad decisions" supporting Section 14(a) liability due to negligence).

In any event, Plaintiffs have adequately alleged negligence with adequate particularity. Komissarov's authorities are inapposite because they address claims arising under Section 10(b) and/or are factually distinguishable from the specific facts alleged against Komissarov here.[17] Specifically, the TAC pleads that Komissarov had the opportunity to perform due diligence, and also that he had a very strong financial incentive not to check to carefully into the accuracy of these statements. Indeed, Komissarov – TDAC's director and CEO – was TDAC's signatory to the Business Combination Agreement, and it was Komissarov's former partner that first introduced Komissarov and TDAC to Lottery as a potential target. *See* ¶¶ 42, 68-69. Komissarov (i) was actively involved in TDAC's due diligence process, which included operational, financial, and regulatory due diligence, (ii) participated in multiple calls and meetings with Lottery's management, and (iii) was in receipt of Lottery's historical and projected financial information. *See* ¶ 68. He also had the power and authority to control the contents of TDAC's SEC filings,

---

(Piskora Decl. Ex. 2 (Proxy) at 151, 199), that disclaimer is absent from the sections containing the alleged misleading representations and omissions, thus further establishing that those sections are attributable to Komissarov and TDAC, not to Lottery. *See, e.g.*, *id.* at 68, 113.

[17] *See, e.g.*, *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *1 (2d Cir. Oct. 25, 2022) (addressing the pleading standards for Section 10(b) claims); *Zappia v. Myovant Scis. Ltd.*, No. 23 Civ. 8097 (JSR), 2023 WL 8945267, at *5-6 (S.D.N.Y. Dec. 28, 2023) (noting that claims arising "under Rule 14a-9 does not require scienter," but faulting "roundabout way the Court could infer defendants' negligence").

including the Proxy Statement and Press Release, and reviewed those documents prior to issuance. *See* ¶ 70. Accordingly, Komissarov was in a position to know, and *should have known*, through the exercise of due diligence, that (i) the revenue projections and results in the Proxy Materials were comprised of tens of millions of dollars of sales *that never actually occurred*, and (ii) Lottery was not, in fact, in compliance with all applicable laws and regulations. His failure to identify and correct the Proxy Materials' glaring inaccuracies and omissions is sufficient to plead negligence. *See Katz v. Pels*, 774 F. Supp. 121, 126 (S.D.N.Y. 1991) (citing *Wilson*, 855 F.2d at 994) (for Section 14(a) liability, "it is sufficient to show that the corporate officers and directors . . . negligently failed to adhere to the rules requiring full disclosure"); *Brown v. Brewer*, 2010 WL 2472182, at *24 (C.D. Cal. June 17, 2010) (director's "failure to notice material omissions" in proxy materials sufficient to establish negligence); *see also Comscore*, 268 F. Supp. 3d at 563 (noting the "low bar for pleading negligence in the Section 14(a) context"). Moreover, Komissarov had every incentive *not* to exercise adequate care in conducting due diligence on Lottery. Komissarov held a significant financial interest in TDAC – an interest that would be rendered worthless if TDAC did not complete a business combination. *See* ¶¶ 66-70.

Moreover, at the time TDAC signed its letter of intent with Lottery, it had been attempting to acquire a target company for *two and a half years* and had sought *three extensions* of its deadline for doing so. *See* ¶¶ 56-61. With each extension and corresponding redemption by shareholders, Komissarov saw both his own financial interest, and the amount of money available to fund an acquisition, shrink precipitously. *See id*. He therefore had every incentive to act with haste, and to complete the Business Combination at all costs. This is more than sufficient to plead negligence.

**VI.   THE TAC ALLEGES CONTROL PERSON LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(a)**

Defendants do not challenge that they are control persons. *See* C&D Br. at 24; DiMatteo Br. at 13-14; Komissarov Br. at 23. Because the TAC adequately alleges a primary violation of both Sections 10(b) and 14(a) of the Exchange Act, the TAC's Section 20(a) claims should be sustained. *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010).

**VII.   CONCLUSION**

The Court should deny Defendants' motions in their entirety. If the Court grants all or part of any of the motions, Plaintiffs request an opportunity to amend pursuant to Rule 15. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (dismissal of fraud claim without leave to amend "violated the liberal spirit of Rule 15").

Dated: August 8, 2024

Respectfully submitted,

By: /s/ *Casey E. Sadler*
**GLANCY PRONGAY & MURRAY LLP**
Casey E. Sadler (admitted *pro hac vice*)
Kevin F. Ruf (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: csadler@glancylaw.com
          kruf@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Counsel for Lead Plaintiffs RTD Bros LLC, Todd Benn, Tom Benn, and Tomasz Rzedzian and Lead Counsel for the Class*

**KIRBY McINERNEY LLP**
Andrew M. McNeela
Thomas W. Elrod
Ira M. Press
250 Park Avenue, Suite 820
New York, York 10177
Telephone: (212) 371-6600
Email: amcneela@kmllp.com
      telrod@kmllp.com
      ipress@kmllp.com

**BERGER MONTAGUE PC**
Sherrie R. Savett
Michael Dell'Angelo
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
mdellangelo@bm.net
aabramowitz@bm.net

*Counsel for Additional Plaintiff*

## PROOF OF SERVICE

I hereby certify that on this 8th day of August, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Casey E. Sadler*
Casey E. Sadler
