O1TQlotO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE LOTTERY.COM, INC.
SECURITIES LITIGATION

                                    22 CV 07111 (JLR)

------------------------------x

                                    New York, N.Y.
                                    January 29, 2024
                                    10:30 a.m.

Before:

                    HON. JENNIFER L. ROCHON

                                        District Judge

                        APPEARANCES

GLANCY PRONGAY & MURRAY LLP
        Attorney for Class Plaintiffs
KEVIN F. RUF


KIRBY McINERNEY LLP
        Attorney for Class Plaintiffs
IRA PRESS (Of Counsel)

HAROLD M. HOFFMAN, Pro Se Plaintiff

KELLY HART & HALLMAN
        Attorney for Defendant Lottery.com Inc.
LARS BERG

PORZIO BROMBERG & NEWMAN PC
        Attorney for Defendant Lottery.com Inc.
STEVEN BENENSON

LOEB & LOEB LLP
        Attorneys for Defendant Komissarov
JOHN A. PISKORA
JAY K. MUSOFF

O1TQlotO

APPEARANCES CONTINUED:

ORRICK HERRINGTON & SUTCLIFFE LLP
     Attorney for Defendants Clemenson & Dickinson
FRANKLIN G. MONSOUR JR.

SCHERTLER ONORATO MEAD & SEARS LLP
     Attorney for Defendant DiMatteo
TARA N. TIGHE

CLARK SMITH VILLAZOR LLP
     Attorney for Defendant Lever
JEFFREY D. ROTENBERG

O1TQlotO

(In open court; case called)

DEPUTY CLERK:  Case number 22 CR 7111, the Honorable Jennifer Rochon presiding.

Counsel, please state your name for the record.

MR. RUF:  Good morning, your Honor.

Kevin Ruf for the plaintiffs.

THE COURT:  Good morning.

MR. PRESS:  Good morning, your Honor.

Ira Press for the plaintiffs.

THE COURT:  Good morning.

MR. HOFFMAN:  Good morning, your Honor.

Harold Hoffman.  I am the pro se litigant.  Your Honor consolidated my case with the class action.

THE COURT:  Yes.  Welcome.  Good morning.

MR. HOFFMAN:  Good morning.

MR. BERG:  Good morning, your Honor.  Lars Berg for Lottery.com.

THE COURT:  Thank you.

MR. BENENSON:  Good morning, Judge.

Steven Benenson on behalf of Lottery.com.

THE COURT:  Good morning.

MR. PISKORA:  Good morning, your Honor.

It's John Piskora.  I have my colleague Jay Musoff.

We're from Loeb & Loeb for defendant Vadim Komissarov.

THE COURT:  Give me one moment before you continue.

O1TQlotO

Go ahead.

MR. MONSOUR:  Franklin Monsour, Orrick Herrington & Sutcliffe on behalf defendants Dickinson and Clemenson.

THE COURT:  If you push it, the light will be brighter.

MR. MONSOUR:  Franklin Monsour, Orrick Herrington & Sutcliffe on behalf defendants Dickinson and Clemenson.

MS. TIGHE:  Good morning, your Honor.

Tara Tighe of Schertler Onorato Mead & Sears on behalf of defendant Anthony DiMatteo.

MR. ROTENBERG:  Good morning, your Honor.

Jeffrey Rotenberg from Clark Smith & Villazor for defendant Kathryn Lever.

THE COURT:  Thank you.

Thank you all for being here.  We are here for an oral argument on several different motions.  We have a consolidated complaints, two complaints, and several motions to dismiss.  So I thought that we would proceed with the defendants since it's their motions to dismiss.  I'm not sure how you would like to break up your argument, but I would suggest that you would argue, the defendants would argue against the class plaintiffs' complaint as well as Mr. Hoffman's complaint.  Then I'll hear from class counsel.  Then I'll hear from Mr. Hoffman if he has anything he'd like to present as well.  And then replies from defendants.

O1TQlotO

But let me hear from defendants.  I'm not sure who I should address this to, maybe Mr. Benenson or Mr. Berg on behalf of the company.

How would you like to begin in terms of presenting argument?  Are we each going to present argument?

MR. MONSOUR:  Your Honor, on behalf of defendants Dickinson and Clemenson, I think it would be prudent to wait to see how the arguments go.  I'm certainly not going to be redundant and waste the Court's time.

THE COURT:  That's fine.

Mr. Piskora?

MR. PISKORA:  Yes.  We represent a former director of Trident.  He's a little differently situated.  I don't mean to repeat anything the company is going to say, but our position is a little different.

THE COURT:  That's fine.  I'll hear from everyone.  I am here to hear you.

Mr. Benenson?

MR. BERG:  Berg.

THE COURT:  Mr. Berg, sorry.  Please proceed.

I'm sorry.  It's Mr. Berg?

MR. BERG:  Berg, yes.

THE COURT:  Thank you very much.  You may proceed.

MR. BERG:  Thank you.

Your Honor, all publicly available information about

O1TQlotO

my client, Lottery.com, reflects the truth that it was, by its very own admissions, a small, unsophisticated company that was struggling, struggling before the SPAC and after.

Judge, the proxy, the Ks and Qs, are all replete with disclaimers about Lottery.com's compliance with the law, and that's important here because they're selling lottery tickets, and the disclaimers show we're not a hundred percent for sure we're in compliance with the law. And if we're not in compliance with all 50 states, our business model is sunk.

Also, the proxy, the Ks and Qs, are replete with information about the precarious circumstance of Lottery's financial controls. We told people everything that anybody would need to know is in those documents. They also make clear that everything Lottery.com said about the future — here is where we hope to go, here is what we expect to have happen — those were just projections, projections of forward-looking events. And, Judge, as you know, such statements are protected by the bespeaks caution doctrine.

Your Honor, the amended class action complaint, which we've been referring to as the ACAC, simply lacks allegations specifically identifying that Lottery.com had any information contrary to what was in its filings and disclosures at the time the filing and disclosure was made. They're just guessing in the complaint, the amended complaint. They have no idea, and they're just making wild accusations and guessing. The ACAC

O1TQlotO

only and merely speculates that such contrary information must have existed.  It boils down to "Well, it was a big deal, so they must have known."  As your Honor knows, that's insufficient.

It goes on to speculate that the defendants knew but doesn't say what they knew, what each individual defendant knew, when they knew it, and why it was important.  So that leads into the next point, which the ACAC simply fails to allege the requisite scienter.  Indeed, there's no allegation--

THE COURT:  Before you get to scienter --

MR. BERG:  Yes, ma'am.

THE COURT:  In terms of falsity, it seemed in your papers that there was a bit of overlap between the falsity and scienter arguments.  For example, statements such as that the speaker would need to know that a statement is false -- a statement of fact is false in order for it to qualify as a false statement.  That seems to me to be an appropriate inquiry for the scienter piece but not necessarily the falsity piece.

To be a little bit more specific, you rely on the *Lululemon* case that talks about a statement believed to be true and made but later shown to be false is insufficient, or at least that's the argument that's made.

Are we conflating falsity and scienter there?

MR. BERG:  They get conflated a little bit, your Honor.  There's no question about it.  They have to.  I don't

O1TQlotO

think there is any way to avoid it.  I would take issue with the way the plaintiffs conflated false with falsity, right?  You know, false.  If there's a new restated financial statement, it necessarily means that the old number was wrong, it was false.  And there's a case that uses that, and that case talks about it in the -- in terms of the allegation, this is what was false.

But you slide over into scienter and falsity, that's a different analysis.  And you have to have known that there has to be some information.  Not just that it was wrong, which could be just false, but falsity that you knew that it was wrong.

So your Honor makes a good point, there's a little bit of conflating the two, but I just don't think there is any way to avoid it.

THE COURT:  Continue, please.

MR. BERG:  Yes, ma'am.

As far as scienter goes, tellingly absent from the ACAC are any allegations that Lottery.com or any of the individual defendants benefited.  That's because they didn't.  Normally in these cases when you're looking at scienter, and the way to prove it -- the best way to prove it is, you know, they shorted the stock, they sold the stock beforehand, whatever.  There were trades.  They don't have any of that in the ACAC.  It just doesn't exist.

O1TQlotO

So they can't meet their burden on scienter.  And scienter is important because it cuts across what we've identified as all 16 of the statements.  There are a few of our arguments that cut across all of them, but that one really does.

THE COURT:  Doesn't that point go to motive and opportunity, but there's other ways of showing scienter other than motive and opportunity.

MR. BERG:  Absolutely, your Honor.

So motive and opportunity is the first way to prove scienter, but the second is conscious misbehavior or reckless conduct.  That's the second way.  I'm happy to address that, your Honor.  But they fail to establish any motive.

And so when that happens, the strength of the circumstantial allegations regarding conscious misbehavior or recklessness must be correspondingly greater.  It means if they don't get it on the motive part, when they're turning to conscious misbehavior and recklessness, they've got to do more.

Your Honor, I can go through the details, but we respectfully suggest that they fail.  So here there's no allegation in the ACAC that Lottery.com had specific contradictory information.  At the same time, it made misstatements.  That's required by the Second Circuit.  That's the *In Re Marsh McLennan* case.  Indeed, Lottery's.com corrective disclosure resulted from an internal investigation

O1TQlotO

that occurred after the original disclosures.  And so courts in the Second Circuit just regularly reject this, you know, fraud by hindsight allegation.  That's what we've got here.  They say there are other ways they must have done.  They talk about the restated financial statements, the magnitude of the alleged fraud, and then they talk about the resignation of the executives.  I can go through much of those now.  Yes, ma'am.

Plaintiffs are just wrong about they have access to contrary information.  They say it can be inferred.  And that is something that is woven throughout all of their complaint.  They want you to infer this.  Paragraph 64 on page 20 of the complaint, "Lottery's revenue projects for fiscal '21 was 70 million.  It appears that the company and the individual defendants knew that this figure was overstated."  Appears.  That's the basis of their complaint.  They're just guessing.

Paragraph 66 onto page 21 says -- we're talking about accounts receivable.  "the company suggested that it had collected more than half the revenue from marketing credits from the customer.  However, this representation" --  See, what they've done there, Judge?  They've gone from identifying what correctly is suggestion to, oh, all of a sudden it's a representation.  Their entire complaint is based on those kinds of speculative assertions.

So they have to do more than allege.  They should have known by simply virtue of their high-level positions, and they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1TQlotO

haven't gotten there.

As to restating prior financial statements, Judge, the publication of inaccurate financial results that are restated cannot support a strong inference of scienter to maintain the claim. That's in *In Re Magnum* case. It's just the law in the Second Circuit.

As for the magnitude of the alleged fraud, again, they can't in this case cite to the magnitude to prove scienter. The two cases they did cite were one where an accounting category -- it's not a single entry like this one is, $30 million worth of advertising credits. One of their cases is an entire accounting category. That's the entire category, everything that's in it. That's different than a single entry.

The other case was a swing from $185 million net to a negative 178 million. You're not talking just a few million dollars, and certainly not going from positive to negative. Those are the two cases they cite to support the idea that the magnitude of the alleged fraud and the core operations theory are sufficient. They're just not.

THE COURT: So your argument --

MR. BERG: Yes, ma'am.

THE COURT: -- would be that the magnitude could be enough, but it isn't enough here.

MR. BERG: Yes, ma'am. I think it's clear that the Second Circuit says under certain circumstances, the magnitude

O1TQlotO

is sufficient, but you're talking huge, huge, hundreds of millions of dollars, or you're talking about entire categories of information.  Here, we're talking about a single entry, a single cash entry, for the sale of these credits, the advertising credits.

Happy to tell you all about that if you'd like.  Yes, ma'am.

THE COURT:  What's the relationship between the magnitude of the -- between the magnitude and the core operations doctrine?

MR. BERG:  Well, they're interrelated in as much as the -- to the extent — and I'm not ready to concede that the core operations doctrine remains valid in light of the PSLRA — but they aren't exactly related.  They sort of go in this one hand-in-hand because we're talking about -- this is a small company, and so, you know, in a small company, virtually everything is a core operation.  And they're saying that because it's a small company, the magnitude should be considered more.

That's just not the case, your Honor.  I think it went from – I'm not going to get these numbers exactly right — but from like $68 million that the 30 million came off.  That's less than half, right?  So they go back to try to bring it in, well, it's the core operation, so they should have known. Again, what did they know, when did they know it, and what were

O1TQlotO

they obligated to disclose?  Those things are not in the ACAC.  They're just not.

The idea that, you know, the executives leaving the company shortly after the amended disclosures, again, that's just insufficient.  That's the *BYSIS* case, Southern District of New York; it's kind of old, 20 years.  Because there are any number of reasons that executives leave a company that resign, and most of those are not related to fraud.  They just did a bad job or they've got other opportunities.  There is nothing that makes it seem like fraud is the more compelling reason for that exit, Judge.

The Lottery.com discovered some mistakes, your Honor.  It made corrective disclosures and took remedial measures.  Plaintiff is trying to use that as the basis for saying, well, there was fraud.  But they don't show fraud.  At most, they show there was a mistake, a mistake on the entry of how that $30 million was supposed to be recorded.

The ACAC tries to paint this broad picture of a fraud that's based almost exclusively on the size of the mistake.  But the ACAC lacks the specific detailed allegations required by the high pleading standard of the PSLRA and Rule 9(b).  Indeed, Lottery.com's chart -- and I hope that was useful.  We spent a lot of time coming up with that chart at the end.  That chart shows exactly how the ACAC collapses under those standards.

O1TQlotO

Your Honor, I am happy to go through in more detail than we've already discussed any of the points, but I think the briefing does an excellent job of making our points, and I'm really here to give you the outline of our arguments and answer any questions you may have like I've hopefully done up to this point.

THE COURT:  A couple of questions.

When you talk about magnitude or core operations, wasn't the $30 million half of the company's revenues

MR. BERG:  I think that's about right.  I think maybe a little bit less.  But like I said, I thought it was 68 million and down -- and it was 30.  But one thing that your Honor should consider is as far as core operations, remember -- excuse me I've got allergies -- those were the sale of advertising credits.  So Lottery, when it was Auto Lotto, they went out and they got some advertising credits, I think it was from I Heart media and maybe one of the other big advertisers, and in exchange they gave them stock.  So they're going to try and advertise across all 50 states here's how you buy your Lottery tickets.  Well, that's an asset on the books because it's got this $30 million advertising credit, and then they end up selling it to someone else.  So their core business really is selling Lottery tickets, right?  That's their core business. That's what they're focused on.

My phone is off, obviously, but pull out your phone,

O1TQlotO

you want to buy a lottery ticket, you got it Lotto.com.  That's their core business.  So I'm not convinced that this $30 million sale of advertising credits is part of their core business.  I hope that answers your question.

THE COURT:  It does.

How do you distinguish the *Adelphi* case cited by the class plaintiffs with respect to when information is particularly within the defendant's knowledge?

MR. BERG:  Let me slide over to my case law.

THE COURT:  Sure.

MR. BERG:  So the *Adelphi* case -- what was the question, your Honor?

THE COURT:  How do you distinguish the *Adelphi* case that's cited by the class plaintiffs?  I'm going to see if I can find it particularly in your brief to -- one moment.

In the plaintiff's opposition to defendant Lottery.com's motion to dismiss amended complaint, plaintiff cites to *Adelphi* at page 11 of the brief, 11 to 12.  I'm sorry, it starts on 10.

MR. BERG:  Right.  I found it, ma'am.

That's really back to the *Omnicare* case, is what we think is going to be the controlling.  And it's a misstatement about opinions, legal compliance are actionable only if the speaker did not hold the belief professed or the supporting facts were untrue.  If they believed that the supporting facts

O1TQlotO

were untrue.

That's *Omnicare*. What they're trying to do is say, well, again, they must have known. And that's why I think they're citing the *Adelphi* case for, but you can't connect the dots in that fashion. The *Omnicare* case says that they have to specifically identify the mistakes. I think the plaintiffs admit that they have no evidence or allegation to show that Lottery.com did not believe it was in legal compliance when it said it was, and they don't have any information or supporting facts that such a statement was untrue; that it was wrong.

I mean, that's -- you got 50 states. And, again, back at my original presentation, we told everybody, we think we're in compliance. We believe we're in compliance. Not a hundred percent absolutely for sure we are in compliance. We believe we're in compliance. We told everybody, if we're wrong, and these states start pulling the plug on us, our business model collapses. So I just don't think that the *Adelphi* case bridges the gap over *Omnicare* in this particular set of facts, your Honor

THE COURT: But that's different, your emphasis on the statements made about "if we're wrong," all the cautionary language which you're pointing to is different than a misstatement with respect to -- a factual misstatement with respect to $30 million in advertising credits, is it not?

MR. BERG: Yes, ma'am. I was JUST highlighting one of

O1TQlotO

my previous arguments, tying it together.  But you're absolutely right.

THE COURT:  All right.  That's all I have for now.  Thank you.

MR. BERG:  Thank you, your Honor.

THE COURT:  Who would like to go next?

MR. MONSOUR:  Thank you, your Honor.

Franklin Monsour on behalf of defendants, Ryan Dickinson and Matthew Clemenson.

Your Honor, Mr. Berg covered some of our arguments already, and, obviously, Mr. Dickinson and Mr. Clemenson as individual defendants are subject to the same complaints, and the arguments that were outlined for your Honor are equally applicable.  So I will just focus on a few that I think are especially poignant for our clients.

One thing that I think is important for the Court to take note of is, if you look at jurisprudence in the Second Circuit, it is sometimes the case where a pleading could be sufficient as to a corporate defendant but not as to individual defendants.  And that's simply because you can piece together certain pieces of evidence versus the corporate defendant, but might be much more limited as it comes to an individual.  I'm certainly not suggesting I think the pleadings are sufficient here as to Lottery.com, but I think -- this is an important distinction because I think they are especially thin when it

comes to Mr. Clemenson and Mr. Dickinson.

Here, your Honor, as counsel already argued, the amended complaint is really one of inference, and almost inference only.  There is no affirmative allegations such as a confidential witness speaking to the state of mind or the actual beliefs held at the time the statements are made, no contrary legal opinion, no information cited at all that was put before my clients, Mr. Dickinson and Mr. Clemenson, at the time that they made the statements that are alleged in the complaint.  That's important.  This case is in many ways an outlier for that reason alone because when you look at other cases that have been cited in the briefs, there is usually some sort of affirmative evidence of beliefs that were held at the time that are contrary that demonstrates that the beliefs, the statements that were made were not sincere at the time.

Here, your Honor, in particular I'll highlight Mr. Clemenson.  The allegations particular to him are simply that he signed one SEC filing, and that he resigned from the company after the internal investigation was announced and after the restatement was announced.  That is particularly thin.  It stands out among all the cases that I've read in the Second Circuit on this point.  It's simply not enough to satisfy Rule 9 and the other pleading requirements under the PSLRA as to Mr. Clemenson.

Mr. Dickinson is in the same boat, your Honor.  He

O1TQlotO

signed, by virtue of his role with the company, a couple of additional SEC filings.  But again, the cases are clear in this district in this circuit:  Signing SEC filings is not enough.  It's not sufficient to show scienter particularly, and as to falsity, under *Omnicare*, these are statements of belief.  These are statements based on knowledge at the time.

What is lacking here is any allegation that demonstrates that Mr. Dickinson or Mr. Clemenson did not hold the beliefs at that time.  Maybe the best example is the allegation that there are misstatements regarding the controls that were in place, the compliance with regulators in 50 states.

Your Honor, if you look at the complaint itself, it includes all of the qualifications that came with those announcements that this required laws in all 50 states; that the laws were ever changing; and that they were impactful to the business model.  There was a lot of qualification to whether or not the company was in compliance with these regulators.

And as we all know, and as most people in this room wouldn't be as nearly as hard at work as they are if meeting regulators' needs was easy to do.  Half of our business is because it's difficult to comply with regulators, and it's certainly difficult to comply with 50 states.

And so the idea that simply because there was

O1TQlotO

restatement or a revision that came much later in time that laws that -- and, your Honor, also to focus on the language itself.  The revision that came in July of 2022, there were instances of noncompliance.  That's what the restatement said. And that alone is simply insufficient to show that at the time statements were made that the company was in compliance with the laws, those statements were not sincerely held.  They were not believed at that time.  There is no evidence to show that they weren't.  It's just not proper in the complaint.

And, your Honor, as to -- I will just reiterate.  As to scienter — and I know your Honor already pointed out — the reason why falsity in this case and scienter are so easily conflated is because there's just not a lot of particularized allegations in the complaint, especially when it comes to the individual defendants in the case.

It is simply inferences from their positions held, signatures on SEC filings, and their resignation.  Timing of resignation and termination, certainly there's no compelling inference that that alone -- or any of the facts that are proffered in the complaint, that that alone gives a more compelling case for fraud than one of innocence.  People resign all the time because mistakes are made.  People get terminated all the time because mistakes are made.  There is nothing here that shows or demonstrates fraud is the cause of any of this. It's simply not in the complaint.

O1TQlotO

THE COURT:  What about the $30 million advertising credits different than -- it seems different than representations regarding compliance with laws or regulators' compliance.

MR. MONSOUR:  Your Honor, absolutely.  I will say this:  The complaint is still void of any particularized allegations as to Mr. Clemenson or Mr. Dickinson or the individual defendants in the case.  It's still resting on the inference that by virtue of their position alone they should have known and that this cannot be a mistake.  And there is simply no basis for that.

As counsel already noted, when courts in this district in this circuit when they talk about magnitude, that alone is seldom enough, and there are no facts to corroborate it here.  There's no allegation here to corroborate it here that you would expect.

For example, if we were talking about magnitude, and then as in some of the cases, like the *BYSIS* case, if there were six corroborating confidential informants putting information before your Honor about beliefs held at the time the statements were made, that would be one thing.  But here, what the plaintiffs are doing is, they're talking about magnitude, not in a vacuum, but simply corroborated by timing of resignation, virtue of the positions held, and SEC filings that are heavily qualified and statements of belief under

O1TQlotO

prevailing case law.

I will say, as counsel noted, in this circuit when magnitude is considered a basis or -- I don't know that there is a case where magnitude alone serves as the basis, that's my fundamental point. Even in the cases where it's a factor, it's much larger in amount. It's much larger in percentage. For example, the *BYSIS* case cites a case *@Chavroux*, and in that case, the Court notes in *BYSIS*, it was 158 percent overstatement that bankrupted the company.

There are no correlating facts in this case. The magnitude, certainly when viewed in conjunction with the other allegations made and the lack of particularized allegations, I would say to the corporate defendants as well, but specifically and especially as to the individual defendants, Mr. Dickinson and Mr. Clemenson, there is just simply not enough here to overcome the pleading requirements.

THE COURT: Thank you.

One question. In your papers, there's reliance on *AmTrust*, *AmTrust Financial Services*, which is a 2020 Southern District case, what was the impact of the Second Circuit's opinion in *DeCarlo* on that case? It seems to me that *DeCarlo* cuts the sort of, if not reversed in relevant part, certainly undermines the *AmTrust* case.

MR. MONSOUR: Your Honor, I don't know that I can speak to that specific question at the moment, but in the

O1TQlotO

interim, I have a stack of cases in a binder, and I'll take a look and try to get you an answer on my reply.

THE COURT:  Sure.  That will be great.  Thank you.

MR. MONSOUR:  Thank you, your Honor.

MS. TIGHE:  Good morning, your Honor.

Tara Tighe on behalf of defendant, Anthony DiMatteo. Again, I won't reiterate everything my colleagues have said, but just a few points with respect to Mr. DiMatteo.  First, throughout the briefing on the motions to dismiss, plaintiffs understate and minimize the demanding burden of proof that they face here.  Because they have asserted securities fraud, they must plead their securities fraud claims with particularity. And here that means that they have to plead sufficient facts to create a strong inference that the defendants acted with the requisite state of mind to defraud or deceive.  And that narrative, that inference, must be cogent and at least as compelling as any other opposing inference that is offered.

Here, that is quite simply missing with respect to defendant DiMatteo.  First, plaintiffs must prove -- one way to prove the requisite state of mind is direct motive, but the Second Circuit is clear that requires some allegation of a concrete and personal benefit specific to the individual defendant.  Here, plaintiffs allege that Mr. DiMatteo was the CEO and owned approximately 14 percent of the company and therefore had an incentive to take the company public and

O1TQlotO

maximize its value.  But this Court and the Second Circuit have been clear that that incentive that's common to any shareholder or executive of a company is quite simply not enough to create the specific concrete and personal motive to support a securities fraud claim.

So the other way that defendants can create this inference, strong inference of scienter, is to plead information that shows a strong inference of either conscious misbehavior or recklessness, and here the plaintiffs ask this Court to take into consideration all the circumstances and simply assume or infer that the defendants were misstating material information.

With respect to Mr. DiMatteo specifically, they point to the fact that he was the CEO.  But his position within the company is not enough to create that inference of conscious misbehavior or recklessness.  Specifically, the plaintiffs rely on a case this Court decided in 2018, *Cohen v. Kitov Pharmaceutical Holdings Securities Litigation*.  But in *Cohen*, the CEO was not found liable simply by virtue of his position in the company.  Instead, there were multiple corroborating witnesses that had supported the fact that the CEO made incorrect statements.  Here, we don't have anything alleged to that degree.

And even taken holistically, the circumstances that the plaintiffs point to, the revision of the financial

O1TQlotO

statements to revise the compliance information and the financials, the defendant's positions within the company, their departure from the company, even taken holistically, those do not create a strong inference that there was any fraud because the plaintiffs have throughout their briefing and the complaints not pointed to any information that was available to the defendants, especially Mr. DiMatteo, that contradicted anything that was said in the financial statements and the representations.  There has to be some indication that at the time the statements were made, the defendants were in possession of some contradictory information, and that is quite simply not the case here in anything that either the class action plaintiffs or Mr. Hoffman have alleged.

So under the heightened pleading standards that plaintiffs face here to put forth those specific and particularized facts, they have failed to do so with respect to Mr. DiMatteo.

THE COURT:  Thank you.

MS. TIGHE:  Thank you.

THE COURT:  Well, before you go --

MS. TIGHE:  Sure.

THE COURT:  What about the doctrine of collective corporate scienter set forth by the Second Circuit in *Jackson* and others where they talk about where it's possible to raise an inference about a corporate defendant because of their

O1TQlotO

position in the company?

MS. TIGHE:  Your Honor, even assuming we are talking about a collective view here, there still is, quite simply, no fact that the plaintiffs have alleged that show any of the corporate defendants or individual defendants were aware of any contradictory information.  There still has to be some allegation that at the time the statements were made, the defendants knew they were false or were acting in reckless disregard for their truth, and that, quite simply, is missing from any of the allegations here.

THE COURT:  Thank you.

You may proceed.  Thank you.

MR. ROTENBERG:  Good morning, your Honor.

Jeffrey Rotenberg from Clark Smith Villazar for Kathryn Lever.

Counsel earlier made an important point which is that scienter allegations can suffice for a corporation without sufficing for individual defendants.  At the same time, scienter allegations and allegations generally in securities fraud context can suffice for some individual defendants and not others.  My client, Kathryn Lever, is truly an afterthought in plaintiff's amended complaint.  We see that in the complaint itself.  We see that in plaintiff's briefing.  In particular, plaintiff's opposition to Lottery's motion to dismiss, which mentions Ms. Lever, I believe, once in connection with a

restricted stock award which actually cuts against plaintiff's case.

Truly, your Honor, Ms. Lever has no business being a defendant in this case. The allegations in the amended complaint against her individually are what her job was at the company, which was chief legal officer for a period of time and briefly chief operating officer; that she signed three form 8-Ks that were cover pages to company financial presentations. And then on July 6, 2022, she would start reporting directly to the board of co-chairs. As is in the record, she started reporting to the board of co-chairs because she had brought to the board's attention concerns she had identified regarding certain goings-on at the company after she became chief operating officer.

Again — and it's in the company's disclosures which are in the record — Ms. Lever initiated the internal investigation that brought the issues that are the impetus for plaintiff's amended complaints to a head. And after that, she was appointed by the independent directors to coordinate that independent investigation with outside counsel.

Once that work was done, she decided to pursue other options for herself voluntarily resigning from the organization. That is a unique fact. It is a unique, overwhelming, competing inference of scienter of her intents, and it demonstrates, frankly in a way I have not seen in many

O1TQlotO

of the cases I have done in this area, that she really has no business being a defendant in this lawsuit.

THE COURT:  Mr. Rotenberg.

MR. ROTENBERG:  Yes.

THE COURT:  While I understand that argument and its impact on a scienter requirement, can we take one step back about whether she actually made statements?  I see in the papers the argument that plaintiffs have not alleged that Ms. Lever ever made an alleged false statement to be liable under *Janus*.  But she signed these 8-Ks.  Now whether she had the requisite scienter or not, we can get to as a second piece. But do you dispute that she doesn't meet the standard for having made a statement under the *Janus* case?

MR. ROTENBERG:  Our position is those are not statements for purposes of *Janus*.  We cite -- I think it's the only three cases cited between the parties on the briefing. Three cases:  The *Xu* case from the Southern District, the *Cognizant* case from New Jersey, and the *Levy* case from New Hampshire.  Those are the only three cases cited by the parties that I'm aware of where a person signed a cover page that attached a different document that they had nothing to do with. And in all three of those cases, the court found that the person who signed the cover page was not the maker of the statement under *Janus*.  So there are cases where someone can sign something, and that can make them a maker of a statement

O1TQlotO

depending on the additional circumstantial allegations that surround the making of that statement.

But in this case, as in the three cases I just mentioned, there are no other allegations. It's simply that she signed the cover page. And if you look at the cover page, it really is a cover page. It's a cover page that attaches, in three of the four instances, a press release that was independently issued on the company's website.

THE COURT: You're distinguishing between signing the 8-Ks and signing the cover page to the 8-Ks.

MR. ROTENBERG: Right. I'll give you an example. Ms. Lever in July of 2022, in connection with the independent investigation, signed 8-Ks that had all narratives on them. That is a different situation than signing a cover page that attaches a document that quotes other officers of the company and refers you to speak to other people at the company that makes no mention of her and involves the financial function which she had nothing to do with. So that is the distinction we are drawing here, and I think it's supported by the cases we cited that I just mentioned.

THE COURT: Thank you.

MR. ROTENBERG: Your Honor, unless you have other questions, that's -- and, again, I agree with counsel for the company's position on the statements and agree with the counsel for the other individual statements on the sufficiency of the

O1TQlotO

allegations and a burden that is on plaintiffs here with respect to pleading particularized individualized allegations as to individual defendants.

THE COURT:  Thank you.

MR. PISKORA:  Almost.

THE COURT:  Now we're going to move over to the other company.  Go ahead.

MR. PISKORA:  Cut me off before my solo.  Thank you for having us, your Honor.

As I mentioned before, it's John Piskora for defendant, Vadim Komissarov.  He is with the other company.  He is with the merger partner, Trident.  I'm not going to repeat the things that happened at Lottery because Mr. Komissarov was out after the merger.  So we definitely are going to discuss some maker type of *Janus* issues, but those things, those statements that are alleged as to Mr. Komissarov — and we're going to actually look at them — there is a huge issue here about whether he's making a certain underlying factual statement or whether he's saying, "Lottery told me this."  And I'm going to submit to you that all of it is "Lottery told me this."  And those statements are true.

So there are a couple of claims that plaintiffs make against Mr. Komissarov.  It's securities fraud.  It's a Rule 14 type of proxy misstatement, control personal liability.  And they fall within these two categories:  Financial projection

O1TQlotO

and then the other one goes to Lottery's belief that it's compliant with various state and federal laws.

So I'm going to stop there to say what this is not about, right?  So there was a lot of discussion earlier this morning, you had questions, I think it was a $30 million advertising credit or something like that.  That's got nothing to do with Mr. Komissarov.

As to the financial aspect of the alleged misstatements, that concerns a financial projection that's in the proxy.  It's at page 89.  And in the pages right before that financial projection is made, there are a number of things that Trident says about that financial projection.

First and foremost, a financial projection, what that company's revenues are going to be in a year, two years or whatever, that's not actionable.  You know, the Second Circuit has already said we don't expect you to be clairvoyant and a mind-reader.  You don't need to know.  Our law requires you make a statement of material fact, you know, at that time. It's false at that time the statement was made.

Number one, I don't even think that the projection is actionable.  But number two, if you look at the proxy, and particularly page 88 thereof, what has to happen in a proxy, your Honor, is that the board — and this is Trident's boar — when it's telling its shareholders to consider this merger, it has to tell them the things that they considered and why

O1TQlotO

they're even offering this option to the shareholders.  So they're obligated to say what Lottery told them, and that's the projection that's contained therein.

But on page 88 in the lead-in to the projection, it says neither Trident or management or its directors make any representation as to the projections.  So there is no representation by Mr. Komissarov.  Stated alternately, he's not the maker of that projection statement.  He's only the maker of the statement that Lottery made that projection and conveyed it to Trident.

But the claim based on the projections get even worse.  Trident said it's not fact, it's forward-looking.  There are seven or eight bullet points, material assumptions that would have to come together.  They actually said it's forward-looking, not a guarantee of actual future performance, and, critically, it should not be relied upon.

Now, to state a claim for securities fraud, you have to have reasonable reliance.  You have to have some scienter, right?  Real intent to defraud the shareholders.  But here, Mr. Komissarov and Trident is saying we're not making this representation.  You shouldn't rely on it.  It's not factual.  And kind of do-your-own-homework sort of thing.  None of the elements are present for a 10b-5 claim.  But, secondly, it's obviously a statement in a proxy.  They say, well, this is somehow actionable under Rule 14(p).  But it's not.  Again,

O1TQlotO

there is no statement, first of all.  But, secondly, there is not even negligence here.  There can be no negligence when Mr. Komissarov and Trident say "don't rely.  It's not audited." You know, it has all these assumptions.

I won't dwell on it too much more.  There's another series of statements.  I say series but it's one statement in the proxy and there were some -- I don't even think they're related, but there's some alleged statements in some press releases following sort of the binding letter of intent.  All of these statements go to the same issue, which is whether Lottery was in compliance with the state laws.

You know, you have to read the proxy as a whole, and the statement is on 147 of the proxy, and this is in the section attributable to Lottery.  I'm sorry, let me just go back a few pages and start at 132.  The statement is on 147. The 132 is called The Business of Lottery.com, and it says that this is a statement making references to Lottery.  "We" and "us" means Lottery.  And the statement on 147 is that "We believe that we are currently in compliance in all material respects with the applicable laws and regulatory requirements." And, again, that's a statement of Lottery that Trident then is required to disclose in its proxy.  The maker of the statement is Lottery.  That Trident says Lottery made the statement to us is true.  It's not actionable anyway.

Now we know that Lottery made this statement to

O1TQlotO

Trident because the proxy itself attaches the business combination agreement, right?  And in the business combination agreement, there are, you know, a wide array of terms, but there are representations and warranties.  And it's an annex that is relevant here.  A33:  Lottery represented to Trident compliance with laws in A33 that they were compliant.  Not only that they were compliant; that they did not know of any litigation, investigation, claim, or potential claim that they would be out of compliance.  So, again, in these two instances, there is no misstatement by Trident or Mr. Komissarov, more particularly.

There was one last thing, your Honor, on this point about compliance with state laws.  It's that there are a number of public disclosures prior to the proxy, and in those public disclosures -- and we've attached them to the motion, and they're all the same -- it doesn't say anything in these news disclosures about compliance with state or federal law, or noncompliance.  What it says is, this is the line:  "Lottery is a pioneer in the industry and is working closely with regulators to bring the Lottery gaming into the digital age."  Working closely with regulators.  I think it's all just puffery, but there is no statement there about compliance or noncompliance with state laws.  So although the plaintiffs here really want to fashion a claim, fashion some sort of misstatement, there is none.  There is no scienter here.  There

O1TQlotO

is no allegation that anybody Trident, let alone Mr. Komissarov, knew that something they were being told was not true. There are actually disclosures, representations whereby Lottery is saying they are true. There can't be reasonable reliance in the case of the financial projection when Trident and Mr. Komissarov said don't rely. These aren't facts. They're not audited.

And just the absolute, absolute, tail on the dog in this case, your Honor, is that my client wasn't timely served. You have 90 days to serve. They didn't serve. Another 90 days go by, he wasn't served. He was finally served at an address right here in Manhattan. We said this case has to be dismissed under 4(m). And the reply back was one of no prejudice. No prejudice type of reply. That's not enough.

You have to show, when you've failed to timely serve, some sort of good cause, some kind of excusable neglect, and then we can get to the issue of prejudice, right? There is no good cause or excusable neglect here. What they said was, oh, Mr. Komissarov, you know, should have known something. Like he could have been sued by somebody, including us, and the reason why he should have known was because somebody sued him down in Dallas and served him at his apartment here in New York. The only thing that proves is if you were diligent, you would have had the address, you could have served him. And so the amended complaint as against Mr. Komissarov should be dismissed on that

O1TQlotO

basis as well.

Unless you have a question, that's all I've got.

THE COURT:  No.  That's fine.  Thank you.

Mr. Ruf?

MR. RUF:  Thank you, your Honor.

Your Honor, I'll be handling the Lottery and the Lottery defendant arguments.  And Mr. Press, my colleague, will be taking Mr. Komissarov.

THE COURT:  Thank you.

MR. RUF:  Your Honor, it is absolutely true that in this particular case, the plaintiffs didn't have access to insiders.  We don't have access to confidential witnesses.  No one would talk to us about this case, and so we were left with a public record after the disaster that was the SPAC known as Lottery.com.

I think the Court understands the context of the case, but if you don't mind, I'll just very, very briefly go through it.  This is a special purpose acquisition company called TDAC.  Their purpose was to buy an Eastern European oil company.  But after several years of looking and not finding an appropriate company and getting three extensions from their shareholders, each time losing portions of their capital — their being TDA — the company finally decided that it was going to pivot, and instead of an oil, gas or mineral company, they're going to buy a company called Auto Lotto.

Now in the proxy regarding this proposed merger, Auto Lotto was described as essentially a company whose secret sauce was that you could buy Lottery tickets online.  Who thought you could do that?  You could buy Lottery tickets online.  Imagine a hub where people can buy Lottery tickets from wherever they are in whatever state they want or at least in their own states.  And here is the description, and it is in paragraph 80 of our complaint.  In the proxy, it describes the reasons why TDAC was entering into this transaction, and it says that Lottery.com has reached critical mass as a highly valuable alternative for buying Lottery tickets in brick-and-mortar stores.  And then immediately thereafter, the proxy describes the expected revenue for the rest of the year 2021.  The deal closed in October, late October of 2021.  The proxy is in, give or take, October 18, 2021.  And very soon thereafter the merger happens, and then the company is actually trading on November 1, 2021 as Lottery.com, LTRY.

The proxy also said about regulatory and compliance risks, it said that the company -- among the risk it describes is our business model, and the conduct of our operations may have to vary in each jurisdiction where we do business to address the unique features of applicable law to ensure "We remain in compliance with the jurisdiction's laws."  It's a realtime statement that they are in compliance with the laws.

So what happens?  It goes public on November 1, and on

O1TQlotO

November 15 in what becomes a theme with this company, which is the slow bleed-out of sort of the real information, the company in its first official Q for the third quarter of 2021 says, oh, we're replacing our accountant. Didn't say anything about that when we just closed this deal a few weeks ago, but yeah, we're replacing our accountant. Also, we have problems with our prior financial reports, which they said was exclusively related to how they would value warrants. And, by the way, we did, in fact, have 30 million or so in revenue, but it's from these affiliated marketing credits. And on that news, the stock loses, give or take, half the value, bam. Within two weeks of going public, it's cut in half.

And then the company throughout the next few months tells everybody everything is fine. And, by the way, it's interesting, when counsel for Lottery was describing this deal, he said -- I quoted it. He said, "Everyone knew Lottery was struggling. Everybody understood Lottery was struggling" at the very beginning. There's no indication in this proxy that anybody is being told that Lottery is struggling.

In fact, what people are being told is Lottery is this very valuable asset that is just sailing in its main business being selling Lottery tickets. Then the earnings are actually described, and they say basically all of our earnings for the third quarter of this from something apparently not selling Lottery tickets, but instead affiliated marketing credits.

O1TQlotO

The company continues on.  Everything seems to be fine.  The stock is getting lower and lower, however.  And then, as the Court knows, the murderer's row of disclosures is in July.  July 6, hey, we've done an internal investigation.  It's revealed that we are not in compliance with certain laws, various federal and state laws.  Plus we've got some issues with our internal accounting.

Oh, by the way, our CFO and president has been fired.

Oh, the guy who cofounded the company and is our board chair, Mr. DiMaggio (sic.), he actually resigned from the board or his board chair, I think he was still on the board.  And Ms. Lever, our chief legal officer, no longer reports to Mr. DiMaggio but instead to the board.

Then on July 15 the company discloses that Mr. Clemenson, the co-founder and co-chief revenue officer -- or sorry, chief revenue officer, has resigned.

Oh, and by the way, the company overstated its cash by $30 million.

In terms of magnitude, your Honor, you know, there are -- I think everyone agrees that there are circumstances where magnitude does give rise to scienter.  And here the magnitude, it's not just a number.  It's also that -- it's like a plane.  You know, if you said a plane dipped 30 feet, and 30 feet is not that much, well, it depends how high the plane is flying when it dipped 30 feet.  The $30 million here is

O1TQlotO

literally 30 million out of 50 million. They said they had 50 million in May when they reported their first quarter, and then suddenly within weeks, they say, oh, that cash -- this cash that we said was 50 million is actually more like 20 million.

And then on July 22 Mr. DiMaggio resigns, oh, and we also found an undisclosed line of credit with one of our related companies that the board didn't know about. The auditors say they can no longer rely on the financials, and that the audited financials for the full year of 2021 no longer are reliable and the unaudited for the first quarter of 2022.

And, by the way, your Honor, in the first quarter of 2022, for the first time, the company uses a metric when they're looking at credit risk, and the metric is significant customers, and there's a reference to customer A. And customer A comprises 87.4 percent, give or take, of the revenue and 99 percent of the accounts receivable for the entire company.

So in the first quarter of 2022, we're being told basically we have one customer, and we have argued that the fact that there is that one customer also leads to scienter in the sense that what are you looking at? What are the chances that you don't know what's happening with apparently your only customer?

But the short of this is that on the two subjects,

O1TQlotO

admittedly the regulatory compliance is the harder argument for us.  It simply is.  As I said, we don't have insiders or confidential witnesses.  Nevertheless, we believe that the company's secret sauce, effectively as they presented it to the world, was in fact that they were able to do this selling of lottery tickets online, and everybody who would even consider doing that would know that's, wow, how did you figure out how to legally do that; that there would be legal impediments and that the company's expertise would in fact be in that legal and compliance area.

The four individuals that we have sued are literally four people in a very small, as counsel said, it is -- we all agree, it's a very small company, but I don't think that works to the advantage of the defendants.  I think it works in favor of the plaintiff's position that it's very hard to imagine that those four people don't understand what's going on and particularly with respect to something as simple as cash.  That's not a complicated metric – cash.

And then, of course, you know when, just to put a button on the importance of this amount of money, this $30 million, on July 29, the company issues 2021 -- 2022, I'm sorry, issues a further 8-K saying basically we're almost completely out of money.  We thought we had 50 million; only have 20 million.  We're going to furlough, and our accountants are telling us the chances of us surviving are slim.

O1TQlotO

THE COURT:  How do you address the cases that were cited by the defendants with respect to magnitude needing to be more than what's been pled here.  What cases do you rely on to the contrary?

MR. RUF:  Your Honor, I don't have a particular case. In the colloquy before, counsel talked about other cases, you know, swinging from a profit to a loss, et cetera.  I think the truth of the matter is in securities cases, especially in a court like the Southern District of New York, there are lots and lots of cases, each of which ultimately supports the reality that cases are very fact specific.

I would argue that the context here of $30 million out of a total of $50 million in the very earliest stages of a company's existence where the absence of that money literally means you're out of business is sufficient to meet the standard for the size or the magnitude of a restatement.

Do you have other questions, your Honor?

THE COURT:  Yes.  How do you address the argument with respect to Ms. Lever and her supposed scienter given that she was part of the investigation to uncover some of these deficiencies?

MR. RUF:  Well, your Honor, that is a really -- that was a difficult question for us.  As fiduciaries for the class, on the one hand, you have a person who arguably is supporting elements of your case by virtue of the fact that there was an

O1TQlotO

investigation that apparent wrongdoing was reported.  As the Court knows, and as we referenced in our complaint, even the company itself has at one point in response to a different lawsuit said that the $30 million was a result of the actions of Mr. Dickinson that had not been reported to the audit committee.  There is certainly a lot of smoke around this issue.

With respect to Ms. Lever, however, she is still one of four core executives.  Her counsel listed her accomplishments which, of course, are primarily centered around her legal acumen.  And given her legal acumen, it is hard to imagine that she was not aware particularly of the issues with respect to the compliance and regulatory environment.

THE COURT:  And what's your response to — staying with Ms. Lever — that she didn't actually make any statements under *Janus* because she just signed the cover sheet of 8-Ks.

MR. RUF:  I read the cases that were cited.  I think *Cognizant* and *Levy* -- you know, I think *Levy* does essentially say what *Levy* -- Lever's counsel says it says.  Again, it's for persuasive authority only.  It's out of district, New Hampshire.  And we would just argue -- you know, my argument would be again, a very, very small company.  She is signing these 8-Ks.  They're dealing with, you know, relatively small issues in light of the size of the company I believe under *Janus*, and we do make the argument under paragraph 31 of our

O1TQlotO

complaint, we do say that all four of the defendants had the opportunity to review, and make changes if they deemed appropriate all of the filings, including those press releases.

THE COURT:  Thank you.

Do you have authority for the premise that the departure of executives and the independent auditor, for example, are indications that would support a recklessness theory of scienter.  I saw your theories of scienter, and I went through them all.  They all seem to boil down to either a core operations doctrine or sort of an adjacent doctrine of magnitude.  Just they must have known because it's part of their large business, and it's so vague.

Do you have anything -- because people leave companies all the time.  Business people leave companies.  Auditors take different jobs.  How does that support your scienter argument, or is it just that it's in combination?

MR. RUF:  Well, so we've talked a fair amount about *BYSIS* that was Judge Kaplan.  What's interesting about his analysis on the departures and resignations was that he was able to point specifically, I believe, to circumstances that were innocuous.  I think in one case a person was leaving for health reasons, and in another situation or in the same case but the other person was leaving for a different and better job.  I concede that Lever's departure, you know, could certainly fall into those categories.  However, obviously,

O1TQlotO

Dickinson is fired.  Given all of the circumstances surrounding DiMatteo's and Clemenson's departures, I think in context they certainly should support a scienter.

THE COURT:  Why wouldn't the statements, some of the premerger statements about Lottery being a pioneer in the lottery industry and working closely with state regulators, and other statements like that, why wouldn't those be non-actionable puffery?

MR. RUF:  Well, to quote Potter Stewart, "You know, you know it when you see it."  I think in context here, as we've said, yes, for maybe another company who had an aspect of their business associated with those issues, maybe it's puffery.  It's just saying we're great.  But here again, I was thinking of analogies.  There's a company that you probably heard of called, I think, Drizly.  And Drizly is like an Uber Eats for alcohol.  And, of course, probably the very first thing anyone would think about that, you learn there's a delivery service for alcohol, how do you get through the regulatory environment on that?  And if Drizly were to say, hey, we really understand the regulatory environment and have a very good relationship with various people in alcohol control, that wouldn't be puffery because it would be so inherent to the very nature of the business.  I would make the same argument about Lottery.

THE COURT:  Weren't there qualifications placed on the

O1TQlotO

statements about -- I'm not going to quote them correctly -- but equivocation about what some states may require?

MR. RUF:  Yes.

THE COURT:  All right.  Just a moment.

That's all I have.  Thank you.

MR. RUF:  Thank you, your Honor.

THE COURT:  I think what we will do just so everyone knows:  We'll hear from Mr. Press.  We'll hear from Mr. Hoffman.  Then we'll take a break.  I don't want our court reporter to go too long.  And then we'll hear responses.  So that we have a moment for her to rest her hands.

Good morning, Mr. Press.

MR. PRESS:  Good morning, your Honor.

We agree that Mr. Komissarov is certainly situated differently from the other defendants.  He was the CEO of the SPAC of TDAC or Trident, and therefore he left the company when the merger took effect at the very end of October 2021, which means the claims against him really are far more focused.  They relate to statements primarily in the proxy and also in a press release issued three days after the proxy, a few days before the vote on the business combination announcing Lottery.com's preliminary results for the third quarter of 2021 which had closed three weeks earlier.  And the misrepresentations at the heart of the claims against Mr. Komissarov relate to the Lottery's regulatory compliance, Lottery's preliminary revenue

figures for the third quarter of 2021, and the revenue projections for 2021.

Certainly, Mr. Komissarov says that the proxy made it very clear, you shouldn't rely on the revenue projections.  He points to some language in the proxy — let me find it —  about that they're not fact, and they should not be relied upon, but he didn't tell you what that whole disclaimer was.  It shouldn't be relied upon as being indicative of future results, and the projections may be materially different than actual results.  This is at page 87 of the proxy.  And that's the disclaimer that Mr. Komissarov's counsel pointed to.  And this is not a claim about ultimately the failure of Lottery to reach the projected revenue numbers for 2021.  This projection was issued in the proxy in the fourth quarter of 2021.  2021 was already more than three-quarters completed, and it was a projection of $70 million of revenue.  And what was misleading about it is not what Lottery.com would or wouldn't do for the remainder of the fourth quarter, is that the projection for the entire year was based in large part on what Lottery had done or allegedly done for the first three-quarters.  Most notably, $30 million of the revenue that they had realized for the first three-quarters, which ended up being 40 some odd percent of the total revenue they booked for the year were, it turns out, these improperly recognized marketing credits.

So the projection is misleading because of the false

O1TQlotO

historical information that it was based on.  And we did cite cases in our brief for the proposition that, you know, projections that are based -- when you're making a projection, there is inherent misrepresentation that the underlying information that forms the basis of that projection is accurate, and here a large chunk of it wasn't.  As a matter of fact, when they first issued the year end numbers, they announced revenues for the year that were pretty close to the projection.  It was only afterwards when they said you have to remove $30 million there, that didn't really happen, that they ended up falling well short of the projections.

Really what was misleading is there were numbers being given to the public in the fourth quarter about what the expected revenues are for the entire year, and apparently it was based, in large part, on revenue that allegedly had been realized already that was some phantom revenue.

THE COURT:  Why isn't it of covered under the bespeaks caution doctrine as a forward-looking statement?

MR. PRESS:  Certainly the statement about whether we're going to make $70 million, not make $70 million, that's forward looking.  They warned that they might not make what was projected, but what they didn't warn was that a large chunk of the revenue that we allegedly realized so far didn't happen.

That's different than -- remember, this is a projection being given in the fourth quarter, and what we learn

O1TQlotO

is that more than half the revenue that they allegedly had realized to date didn't really happen.  It was that part that was the basis for the projection.  The projection was based on materially inaccurate historical information.

And, you know, three days later, the October 21, 2021 press release, which was issued largely to continue to generate public interest in this upcoming vote on the business combination, they announce preliminary third-quarter revenue. This is October 21.  It's three weeks after the third quarter closed, they announced preliminary third-quarter information. And we later find out that the overwhelming majority of that third-quarter revenue was phony.  That's historic.  And we find out the overwhelming majority of that was phony.  Those are your financial-related misrepresentations.

THE COURT:  But when the October 21, 2021 press release was made, the third-quarter earnings were not calculated yet, right?  So how do you get around the *Lopez v. CT Partners Executive Search* case?

MR. PRESS:  It wasn't that they were wrong.  You get around it, the third quarter had closed, and none of that revenue was real.  It's not they didn't calculate certain things or whatever.  This is -- the whole thing gets wiped off the books, which is a very different type of situation, your Honor.

And then the other misrepresentations that apply to

O1TQlotO

Mr. Komissarov are the compliance misrepresentations, and specifically, as my colleague, Mr. Ruf, had pointed out, there was this representation, it's at paragraph 78 of the complaint, about the steps the company is making to ensure we remain in compliance with the laws. And, you know, to ensure we remain in compliance necessarily means that you are currently in compliance at the time. There are some questions about whether that statement was false when made, and what we know about when they first ceased to be in compliance or when the incidence of noncompliance first existed, we don't know the exact day it happened. The question is how much can be inferred from what the company said afterwards.

And what the company said afterwards was the disclosure in July 6, 2022, and what they announced at that point — it's quoted at paragraph 146 of the complaint — is that the company had retained outside counsel to conduct an investigation. That investigation had been completed and "revealed instances of non-compliance." Outside counsel then reported its findings to the board, and in response to the reporting of those findings, on June 30, the board terminated Mr. Dickinson. So what we know for sure is that the noncompliance didn't just happen. It had to have existed before Mr. Dickinson was terminated, before outside counsel reported its findings to the board, before the investigation that ultimately uncovered the noncompliance, and before

O1TQlotO

whatever conditions were first brought to the board's attention that led it to commission its investigation in the first place. How many months before, therefore, did the noncompliance exist? We're arguing that one can infer it certainly existed several months beforehand.

THE COURT:  How can you infer scienter from that?

MR. PRESS:  How can we infer scienter?

Well, for Mr. Komissarov, to the extent we have a 14(a) proxy claim, we don't have to infer scienter, is the answer about inferring scienter from that.

And Mr. Komissarov I know has argued that he and the Trident people have no liability for these statements.  Trident issues a proxy.  It's their proxy.  They filed a proxy.  He certainly was, you know -- first of all, he doesn't have to be a maker of the statements under 14(a).  It's not limited to makers of misrepresentation.  14(a) is anybody who solicits or permits the use of the name in a proxy solicitation. Mr. Komissarov was part of a board that was very clearly soliciting votes.  They said so in the proxy.  He permitted his name to be used.  You hit Control F when you bring up a copy of the proxy, his name appears 42 times.  Certainly permitted his name to be used in the proxy.  He was the CEO and a director of the company that issued the proxy.  I think under 14(a), he's liable for the statements, and I would argue that even though -- even if *Janus* were to apply, and I guess for the

O1TQlotO

10(d) claims *Janus* does apply, he's a speaker.  He's a CEO and director of the issuer.  He has ultimate authority over the statements that are in there.  That's what *Janus* is about.

Janus isn't about who was involved in the business or, you know, who was involved in the business or even who drafted the statements.  What actually happened in *Janus* is the Supreme Court found that the *Janus* fund, a company that said in the prospectus it issued, that it has no business and it has no operations, was still considered to be the speaker for a prospectus, notwithstanding the fact that it outsourced all these functions to -- notwithstanding the fact that it outsourced all of this to a mutual fund management company, and the statements in question were statements drafted by the management company that inaccurately describe actions that the management company said it was undertaking, and yet what the Supreme Court found is that the maker of the statements was the fund itself because it's their prospectus.

That's what happened here.  This is a proxy issued, so they are definitely makers of these statements.  This is a proxy that was filed and issued by Trident.  It's his company's proxy.  He can't say that he didn't make the statements.

Similarly, with that press release on October 21, 2021, Mr. Komissarov is listed on the press release as the contact person, so he is a maker of that statement as well. And I think that statement, in any event, qualifies as a proxy

O1TQlotO

solicitation.  Under Section 14(a), we don't even have to show that he was a maker, but he was a maker there.

The state of mind, such as it was, which might be a misnomer here required for 14(a), is negligence.  The question is do we have negligence by Mr. Komissarov.  And I think the answer is that we do.  I mean, right away he had a very powerful motive at this point not to check too carefully under the hood here.  This was the third time that the deadline to do the SPAC combination had been extended.  And if the combination is not engaged, and they don't do the deal before the deadline, all the money goes back to the investors, and that's it.  He had a very powerful incentive to make sure a deal got done at any cost.  So powerful apparently that they gave up trying to look for Eastern European oil and gas companies, and through the other each time that the SPAC deadline was extended, investors were allowed to redeem their shares.  And by the time we got down to this last deal being on the table, more than half of the funds that Trident had originally raised had been redeemed and had gone back to investors.  So really the sand was running out in the hourglass here.  It was quite a bit of desperation, and there might have been companies that Trident might not have considered initially that now they were going to consider because it was now or never.  So he had a very strong motive not to check that carefully.

Then the question is, did he have access to the

O1TQlotO

information.  The proxy recounts pages 83 to 85 how Mr. Komissarov was the person who actually sort of introduced Lottery to Trident.  He was involved in the meetings and negotiations.  He was involved in the due diligence.  He received the projections and the warranties of compliance.  He signed the business combination agreement.  So clearly he was in a position where he could have known, he could have looked more carefully, and I think he was negligent.

Then we get to the question of scienter.  And for scienter, look, we have motive.  We have a discrete motive to get this deal done right now.  We also have access to information.  I think that if you look at this fact pattern, and you look how courts have handled it with respect to scienter, you'll find sometimes a situation like this is found to be enough to give rise to an inference of recklessness.  Sometimes the courts say, no, it's just negligence.  We definitely have negligence here.  Recklessness, I think some courts would say you did, some courts would say you didn't in this particular case, but we definitely have the 14(a) negligence.

He's also a control person.  He certainly had the power to control the statements, the press release that had his name on as the contact and the proxy that was issued by his company, in which his name litters the proxy.  It's all over the proxy.  Some courts have held that culpable participation

O1TQlotO

is needed; some courts have held that culpable participation is not needed.  Certainly, under the line of authority that says you just need the power to control, he's a control person even for the 10(b) claims.

As far as culpable participation for the 14(a), we don't need it because he's a primary violator for the 14(a) claim, but I guess he is also a culpable participant in that.

The last issue I want to address is the issue of the service of process on Mr. Komissarov.  And service was made in an untimely fashion.  There is no question about that.  There was, however, no prejudice to Mr. Komissarov.  As a matter of fact, he had been timely served in a case that was just like this case, would have been consolidated into the class action.  Was filed the same time.  Same class period.  Has allegations, including allegations of misrepresentations and the same prospectus.

THE COURT:  So why wasn't he served on time?

MR. PRESS:  He was served in that other case on time.

THE COURT:  Why wasn't he served in this case on time?

MR. PRESS:  It was probably a mistake in belief that he had already been served in *McDonalds*.  It's only speculation.  I don't know why he wasn't served on time.  I do know that under the case laws that currently exist — and if you look at the cases cited at pages 23 and 24 of our brief —  The Court has the discretion to grant relief from untimely service

O1TQlotO

even absent good case.  Good cause is not required any more under the law as long as there is actual notice to the defendant.  There certainly was actual notice because he was served in this related case.  I don't know why the related case was dismissed, but it was apparently voluntarily by counsel.  Otherwise, it would have ended up being consolidated into this case, and we wouldn't have this issue right now.  But he certainly was on notice.  There is no prejudice.

Like I said, under the case law, the *Zapata* case, the *Glover* case, you don't have to show good cause.  And also if there's a risk of prejudice to the plaintiffs, in this case dismissal certainly would work a prejudice to the plaintiffs.  These are instances where the court -- when the person who was on notice got served with a complaint, that rug got pulled out, the court does have discretion to uphold this untimely service.

THE COURT:  And I presume you are no longer proceeding against the other four Trident individuals:  Rosenberg, Gallagher, Butkevych and Ponomarev?

MR. PRESS:  That's correct, your Honor.

THE COURT:  So you're voluntarily dismissing against them?

MR. PRESS:  We can, sure.

THE COURT:  Great.  Just like my docket to be clean.

Okay.  Those are my only questions.

Mr. Hoffman, I promised that you were going to go, but

O1TQlotO

we've been going now for a bit of time.  I hesitate to go longer given our court reporter.  Do you mind going after the break?

MR. HOFFMAN:  I would tell the Court I'm going to be very brief.  It might be useful.

THE COURT:  Then why don't we hear from you now? Thank you.

MR. HOFFMAN:  Your Honor, as the Court knows, I am the pro se plaintiff whose action was consolidated with the class action.  I did not amend my complaint.  My claims are solely against Lottery, DiMatteo, Dickinson and Clemenson.  I was actually hoping in the queue of distinguished lawyers here to go early to avoid inflicting the boredom of repetition, but, of course, as fate would have it, probably because I'm from New Jersey, I'm going last.

THE COURT:  That is not why, but go ahead.

MR. HOFFMAN:  I'm attempting to be humorous.

Your Honor, I am simply going to be very brief.  I am going to join the arguments advanced by Mr. Ruf as to magnitude. Each of the individual defendants that I bring claims against were free and able to do something as simple as reviewing a bank statement.  And the magnitude of the misrepresentation, revenues were doubled basically.  Cash on hand was doubled.  The board which terminated Dickinson stated that his actions were undertaken without the knowledge of the

O1TQlotO

audit committee.  He bypassed the audit committee.

There is no credibility to the argument that this was accidental based on magnitude.  Nothing is more contemporaneous than a bank balance, which they chose to double.

I think there is specificity.  There is contemporaneous nature of the misrepresentations.  And it is not poor judgment to certify that there is $10 in the bank when there's $5.  And it is not poor judgment to report revenues of a hundred when it's 50, and no specialized insight is required.

Thank you very much, your Honor.

THE COURT:  Just a couple of quick questions.  And excellent argument.  Thank you, Mr. Hoffman.

First of all, I'm seeing considerable overlap between your complaint and the class plaintiffs complaint, and I see overlap in terms of your reliance on their arguments as well, and that's all fine.

So if I were, for example, to dismiss the plaintiff's complaint, there is nothing in your complaint that is sufficiently different from the plaintiff's complaint or that would distinguish your complaint from the plaintiff's complaint based on what's in there or the arguments made, is there?  Yours sort of rise and fall the same way that plaintiffs does?

MR. HOFFMAN:  I think that the class complaint is far broader based on the amendment than mine.  Mine is very narrowly focused as I've attempted to explain.  I suppose if

O1TQlotO

your Honor chose to dismiss the class complaint against the individuals that I'm suing based on something having to do with lack of specificity or scienter, I suppose I would fall, and I would respectfully reserve the right to amend to address any deficiencies that the Court highlighted.

THE COURT:  That was going to be my next question because I didn't see a request to amend in your papers, but you are making that request now should there be a deficiency.

MR. HOFFMAN:  I'm hoping it won't be needed, but yes.

THE COURT:  Absolutely.

Great.  Thank you very much, Mr. Hoffman.

We are going to take a break and come back with brief replies by the defendants.  Don't take this as now -- you know, now you have a bunch of time to prepare for a lot more argument.  Usually it's a brief reply, but I just feel like we need to take a break before we hear from you.

We'll come back in about -- we'll come back at 12:30. It gives people 12 minutes.  Thank you.

(Recess)

THE COURT:  Before we quickly proceed, I will just put one thing on the record.  Mr. Hoffman, nothing is ever off the record, so let me just put on quickly that Mr. Hoffman just relayed that somebody that I know, Mr. Ken Eckstein, or an attorney says hello.  I assume Mr. Eckstein is not working on this case in any way?

O1TQlotO

MR. HOFFMAN:  No involvement with this case at all.

THE COURT:  Thank you very much.

I worked with Mr. Eckstein about over a decade ago, so I am just letting everyone know there is nothing in this conversation that would affect my ability to be fair or to create any sort of conflict, but I'm just letting everybody know.  And certainly if anybody has a motion to make, you'll make your motion.

Any of the defendants have anything further you'd like to say on reply?

MR. BERG:  Your Honor, I'd like to congratulate my colleagues on the arguments well made.  Thank you for your time.  It's always a pleasure to appear for these oral hearings.  But for a personal issue, I would have adhered to the provision in your local rules suggesting that the younger associates could come do this.  It just wasn't possible, otherwise I would have done that.  So thank you for your time, Judge.

THE COURT:  Thank you very much.

Who else would like to speak?

MR. MONSOUR:  Your Honor, if I may.

THE COURT:  Yes.  Just identify yourself for the record when you get there.

MR. MONSOUR:  Yes, your Honor.  Franklin Monsour on behalf of Mr. Dickinson and Mr. Clemenson.

O1TQlotO

Your Honor tasked me with a case earlier.  I feel a little better about the fact that the case was after the briefing, so I don't feel quite as bad about not being ready at the moment.

Your Honor, the *DeCarlo* case -- my argument on that case would be it certainly does not disturb *Omnicare* and its progeny about the signature on SEC filings.  In fact, I think that case does a good job of underscoring our fundamental argument here.  In that case, actual statements that were made by individuals as to the probability of paying bonuses, for example, were held that even though they were statements of opinion, they were still -- there was enough support alleged to show that those statements were inaccurate and that there were facts underpinning them.  However, the court was very clear that it was not disturbing the long-held view that signatures on SEC filings are non-actionable opinions.

And that is really the heart of our defense here, your Honor.  There are no particularized allegations, statements, affirmative statements, or affirmative allegations about beliefs held by the individuals in this case.  It is merely the signatures on SEC filings, coupled with positions held at the company and resignations and terminations.  And those types of pure inferences, or, as counsel for plaintiffs noted, it's a lot of smoke, and that certainly applies here.  It is a lot of smoke.  There's inferences.  There's appeals to common sense in

O1TQlotO

the oppositions to our motions to dismiss, but there is not the type of particularized allegations that are necessary for the pleading standards here, your Honor.

THE COURT:  Thank you.

Anyone else who would like to be heard?

MS. TIGHE:  Thank you, your Honor.  Tara Tighe on behalf of defendant Anthony DiMatteo.

Although we did appreciate the allusions to baseball great, Joe DiMaggio, very briefly on behalf of Mr. DiMatteo, plaintiffs have repeatedly asked this Court to infer or surmise that there was purposeful misrepresentations or recklessness, but what they have not done is support those inferences with any particularized facts.  So plaintiffs fall far short of the pleading burden they took on when they chose to sue the defendants or securities fraud.

Not only did they not create the necessary strong inference of fraud, but the facts as alleged by plaintiffs by virtue of the statements that were made after the internal investigation correcting the information about the compliance and financial circumstances support the equally plausible inference that this was a correction after an internal investigation, not knowing or reckless misrepresentations.

Thank you, your Honor.

THE COURT:  Thank you.

Anyone else?  Yes, Mr. Rotenberg.

O1TQlotO

MR. ROTENBERG:  Jeff Rotenberg for defendant, Ms. Lever.

Just briefly, your Honor.  I think counsel for plaintiff confirmed a lot of what you and I discussed when I was up here about an hour ago.  Number one, on the *Janus* point, I believe plaintiff's counsel virtually confirmed that the law is in our favor on that, and that Ms. Lever is not a speaker for purposes of Rule 10b-5.

THE COURT:  I think they said that a New Hampshire case might be on point with respect to your argument.

MR. ROTENBERG:  Right.

THE COURT:  Did any other individual sign the 8-Ks that she signed?  I know you keep saying she signed the cover sheet, but did anyone else sign the 8-K?

MR. ROTENBERG:  No.  Typically, there's a one-line signature block for one person.  Then it attached the press release, which is signed by or other people's names on the bottom and quotes other people.

And then in terms of her role in the company and the basis for plaintiffs including her in the case, the answers to your questions included it's hard to imagine that she didn't know; that she's one of the core four, which the record shows she was not one of any core four.  How did she not know about alleged issues with legal incompliance, which is further undermined by the facts that when she did know, she brought

O1TQlotO

those immediately up to the board.

Again, your Honor, I think as we talked about earlier, there are no individualized, particularized allegations against Ms. Lever sufficient to satisfy the PSLRA or Rule 9(b), and she should be dismissed from the case with prejudice.

THE COURT:  Thank you.

MR. PISKORA:  Thank you, your Honor.  Always last.

THE COURT:  Not a problem.

MR. PISKORA:  I will keep it short as well.

I think that in the opposition argument there was much attempt to connect Mr. Komissarov to the proxy and the prospectus, and we're not trying to dodge that question.  The issue isn't whether he could be responsible for statements in the proxy.  The question is what were the statements he made. And Trident and Mr. Komissarov were allowed to, and in fact were legally obligated to, say the things that Lottery told them, and that's what you see in the proxy.

Just one final point.  I think it was mentioned something about a press release a few days after the proxy about the financials of Lottery.  Of course, when the plaintiffs talk about this, and they are trying to impose some sort of liability on Mr. Komissarov, they use these words like "they" and they don't define who that is, but it soon becomes clear that it's not the Trident people.  The "they" who were responsible for some $30 million credit that I don't know that

O1TQlotO

much about, that's Lottery.

And when Lottery reports, you know, that their financials are coming in at a certain point, and this is disclosed three days later, necessarily everything that Mr. Komissarov can say about that is coming from Lottery, and they represented -- you know, because this is after the proxy, they represented in the proxy that all the financial information that they provided subsequent was also true and accurate. That's in the annex, again, at A26 and Section 3.4(b).

And that's all I have, your Honor. Thank you very much.

THE COURT: Thank you very much.

Anything further, Mr. Ruf, or Mr. Hoffman, or Mr. Press?

MR. RUF: Nothing, your Honor. Thank you.

MR. PRESS: Nothing, your Honor. Thank you.

MR. HOFFMAN: Thank you, your Honor. Nothing.

THE COURT: Thank you very much.

Thank you for the excellent argument and the very good papers. I would presume and would appreciate if the parties were going to order the transcript on a relatively rapid basis so that I can consider import when I'm dealing with my opinion.

Mr. Ruf, is that the intention?

MR. RUF: Yes, your Honor.

O1TQlotO

THE COURT:  Terrific.  Thank you very much.

All right.  I think that is all I have.  Have a good rest of the week everyone.  And court is adjourned.

(Adjourned)