P2CARtdO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RTD BROS LLC,et al.,

            Plaintiff,

          v.                                22 Civ. 7111 (JLR)

LOTTERY.COM, INC. et al.,

                             Remote Oral Argument

            Defendant.

------------------------------x
                             New York, N.Y.
                             February 12, 2025
                             11:00 a.m.

Before:

                  HON. JENNIFER L. ROCHON,

                            District Judge

                     APPEARANCES

GLANCY PRONGAY & MURRAY LLP
     Attorney for Class Plaintiffs
KEVIN F. RUF
CASEY E. SADLER


HAROLD M. HOFFMAN, Pro Se Plaintiff

KELLY HART & HALLMAN
     Attorney for Defendant Lottery.com Inc.
LARS BERG

PORZIO BROMBERG & NEWMAN PC
     Attorney for Defendant Lottery.com Inc.
STEVEN BENENSON

AMIR ALI, Esq., Lottery General Counsel


LOEB & LOEB LLP
     Attorneys for Defendant Komissarov
JOHN A. PISKORA

P2CARtdO

APPEARANCES CONTINUED:

MCDERMOTT WILL & EMERY LLP
       Attorney for Defendants Clemenson & Dickinson
FRANKLIN G. MONSOUR JR.
KENTON KWEKU ATTA-KRAH
CHRISTOPHER WHALEN

SCHERTLER ONORATO MEAD & SEARS LLP
       Attorney for Defendant DiMatteo
TARA N. TIGHE
DANNY ONORATO

P2CARtdO

(Case called)

MR. RUF:  Good morning, your Honor.  Kevin Ruf for plaintiffs.

THE COURT:  Good morning, Mr. Ruf.

MR. SADLER:  Good morning, your Honor.  Casey Sadler for plaintiffs.

MR. HOFFMAN:  And good morning, your Honor.  Harold Hoffman, pro se.

THE COURT:  Good morning, Mr. Hoffman.

Okay.  And who do we have --

MR. BERG:  Good morning, your Honor.

THE COURT:  Yes, go ahead.  From defense counsel?

MR. BERG:  Yes, ma'am.  Good morning, your Honor. Lars Berg and Steve Benenson on behalf of Lottery.com.

With us, although who will not be speaking today, is Mr. Amir Ali, the outside general counsel for Lottery.com. He's here to observe.

THE COURT:  Thank you.  Good.

MR. ALI:  I will say good morning, your Honor.  That's about it.

THE COURT:  Well, good morning, Mr. Ali.  Let me just ask, since I have you here, how are we doing on replacement counsel?

MR. ALI:  I think we should be in good shape.  After this hearing, I intend to have a conversation with Mr. Berg and

Mr. Benenson to see if we can manage to retain them.  I understand that the order does release them after this hearing.  But we will try to get that taken care of in very short order, your Honor.

THE COURT:  Wonderful.  What I was going to do is I was going to order that new counsel appear within 14 days of this argument.  So if it is new counsel, they should appear.  If not, and you retain the same counsel, then you'll let me know that in 14 days.

Will that work, Mr. Ali?

MR. ALI:  Yes, your Honor.

THE COURT:  Good.  Thank you.

I jumped right in so let me give my preface, which would be we are here on Microsoft Teams through video conference.  That's at the request of the parties to save some costs.  I was happy to do that.  But court proceedings are public proceedings and, therefore, a listen-only line was noticed on the docket for any public, press, anyone who wishes to join.  We may or may not know all the people who join, so please do presume that this is an open forum, a public forum.

I have on the line my deputy, my clerk.  I also have a court reporter on the line who is transcribing these proceedings.  And as a reminder, no one other than court personnel are permitted to record, rebroadcast, or disseminate proceedings.

Okay.  So this is defendant's motion to dismiss, and so who will be arguing on behalf of defendant?  Is that you, Mr. Berg?

MR. BERG:  Yes, your Honor.

THE COURT:  Okay.  And then who is going to be responding on behalf of plaintiff, the class?

MR. RUF:  I will.  Kevin Ruf, your Honor.

THE COURT:  Thank you.  And, Mr. Hoffman, you'll be speaking on behalf of yourself or joining Mr. Ruf's arguments.

MR. HOFFMAN:  Your Honor, I will be joining Mr. Ruf's argument, but there is one argument advanced by Mr. Komissarov's counsel, which is applicable only to me, so I would like a very brief opportunity to address that.

THE COURT:  Absolutely.  Absolutely.

Okay.  I do not have strict time limits with respect to oral argument.  But please be reasonable in presenting your argument.  I'm here to listen.  I have some questions, but basically I'm here to listen.  I read your very good papers. And we will start then with you, Mr. Berg.

MR. RUF:  Yes, ma'am.  Thank you.

May it please the Court.  Your Honor, at a very high level, other than attaching an online article to their third amended complaint and some additional granularity, which is largely not relevant, around the stock sales of some insiders, the third amended complaint actually brings nothing new to the

P2CARtdO

table.

I think you will note from our appendix to our reply brief, that's appendix A, we identify what the differences are. But in a big picture, the third amended complaint essentially asks the Court to consider the totality of the revenue recognition, compliance with the law, and the geofencing technology used by Lottery.com, and infer from those three things that the company must have known, must have known that the public statements were false when made.

We suggest that's simply not enough.  They don't offer any inside witness statements, no testimony, no communications. They reference governmental investigations to prove contemporaneous knowledge of falsity, but there's no information from those.  It's just a passing comment.

Your Honor, we submit that the Congress passed the PLSRA to prevent investors from flooding the Court with securities class actions every time a company's restated earning and do so out of mere negligence, incompetence, or even mismanagement.

What's required, your Honor, is proof of contemporaneous scienter, actual knowledge or reckless disregard of falsity.  And we respectfully submit that it is simply lacking here.

The third amended complaint, your Honor, that's their fourth try at -- allege adequately claims based on the general

statements of legal and regulatory compliance.  But they simply have not gotten past what your Honor in her original opinion on the motion to dismiss held was simply non-actionable puffery and also non-actionable statements of opinion.  And those are along the lines of:  We believe we've complied with the state law, we're in close contact with regulators.  Statements of that nature.  There's nothing additional to change the fact that that is -- those are non-actionable statements.

We believe, your Honor, that scienter still is not adequately pleaded.  But they did try by beefing up their complaint.  And they added some granularity, some details that we just don't think are relevant.  There are really three areas.  There's revenue recognition, there's the legal and regulatory compliance issues, and then there's the geolocation technology.

Relative to the recognition, your Honor, and I'll talk more about that in detail later, there just aren't any allegations of motive and opportunity to commit fraud.  That's because it didn't occur.

They have not pled strong substantial evidence of conscious misbehavior or reckless.  Rather, they continue to rely on this idea of, well, it's so egregious, the company must have known.  That's not the standard.

Relative to the legal and regulatory compliance, as I mentioned earlier, all they really allege are after the fact

revelations coupled with their must-have-known theory, none of which get them across the line. Vis-a-vis the geolocation technology, they cite -- knowing about the problems at time is just not alleged. Again, they say must have known. And the Courts in the Second Circuit have widely rejected this must-have-known argument.

Now, your Honor, the plaintiffs I believe recognize that they have problems with their ability to make sufficient allegations and so they try to persuade the Court with an unverified salacious online article. And as the Court is well aware, that just is not something that should be relied on.

Moreover, if you closely inspect that article and set aside the salacious nature of it, even it doesn't get over the high bar of scienter. And that's true even with all its hearsay, all of its speculation, and all of its unnamed sources.

Lottery.com is very suspicious of this story because of the timing. It was after the opinion by this Court dismissing the case. And I'm not suggesting at all ever, nor would I suggest, that plaintiff's lawyers here were involved in that in any way. I absolutely do not believe that.

Nonetheless, it's very suspicious. For all we know, this entire article is a plant by some disgruntled investors who are trying to save the day. And speculation and unnamed sources support that.

P2CARtdO

Judge, I feel like in reviewing -- there was a lot to review, as your Honor is aware, the previous complaints and the previous briefing and your previous opinion, that really what the third amended complaint seems to focus primarily on is this idea of a sham transaction. And your Honor is familiar with what the plaintiffs refer to as the sham transaction and that's the sale of the $30 million in advertising credits.

Now, they focus on the interesting financing at issue, but that is essentially owner financing. It happens all the time. There are a myriad of circumstances where the seller ends up doing the financing. But that's not the real issue here. Indeed, if everything had gone as planned, Lottery would have gotten the cash, the $30 million cash up front, the buyer would have repaid the loan, over time, and then used the credits. And everything would have been just fine. The real issue is the non-transferability of those advertising credits. They don't really -- they mention it, in all honesty, but they don't focus on it. They want to focus on this idea of owner financing. But that's not the issue because it would have been all okay.

The problem was that the credits were not transferable. And it was that non-transferability that stopped this sale from occurring. And even the article that they attach to their third amended complaint admits that it was sometime later. It was discovered that these credits were

P2CARtdO

nontransferable.  And so when it was discovered that they were nontransferable, the entire deal was unwound.  And, frankly, Lottery.com was in no worse position.  They still had the advertising credits.  They still had the ability to use those advertising credits.  And they were still worth $30 million.

So we respectfully submit that non-transferability is the issue here.  And there are no allegations, simply none, that anyone at Lottery.com knew that those were nontransferable at the time they tried to do this deal.  It's just completely absent.

So if you look, your Honor, at appendix A, and that's the alleged improper revenue recognition, we've got three columns there.  The current argument, the previous argument, and the previous ruling.  And we go through in some detail quite a few of the new or the current arguments and identify how your previous rulings defeat those arguments and the same case should hold true here in this instance.  Because the current arguments add granularity that is not really relevant to the issue at hand.  So we suggest that the same ruling should apply.

Your Honor, I believe they also add some information, granularity, about the details of the sales by DiMatteo and Clemenson, and I'll let their lawyer maybe address that in more detail.  But it's the *Acedo* case that talks about just how increasing the stock price and being tied to executive

P2CARtdO

compensation does not equate to scienter.  They don't have any allegations of unusual sales.  Your Honor is familiar with the *Glasser* case.  There's seven factors in the *Glasser* case that talk about unusual sales.  They just didn't even address four of those I believe.  So, consequently, it's just not an unusual sale.

They added details about some number of shares and prices, but they don't make any claims of insider trading or unusual sales of the nature that would establish scienter.

The last thing that I think is pertinent to what they've added is the SEC and DOJ investigations.  Judge, the case law is clear that certainly can be considered, but it's not enough in and of itself to establish scienter.  And the facts of investigations just are not enough to bolster nonexistent facts claiming scienter.  And they just don't have sufficient facts asserting scienter.  For the consequence that we believe the PSLRA requires dismissal of both the third amended complaint and Mr. Hoffman's amended complaint.

That is by and large it from my presentation, your Honor.  I would be happy to answer any questions you may have.

THE COURT:  Thank you.  I do.  And could others who aren't speaking please mute your line.  I'm just getting a little bit of feedback.

All right.  Mr. Berg, a question about the sales that were made.  I think the reference is to about 100,000 sales

P2CARtdO

that were made in Texas for individuals who resided outside of Texas, where I think the representation was originally made that we, we being Lottery, only purchased tickets in the location where the purchasers reside, we sent couriers, etc., and there were these sales that were effectuated in Texas that didn't comport with that representation of how sales were facilitated through Lottery.

Can you speak to that, please?

MR. BERG:  Yes, ma'am, those allegations are certainly there.  But I don't believe there's sufficient allegations of we knew there was a problem and we knew that there was something going wrong and we knew at the time we made the assertions that we were in compliance with all the law that we actually weren't.

And this goes back to the geofencing issue.  And apparently, there may have been an issue with people who were not using the app that may have been purchasing online.  So the geofencing, as my understanding, the way it works is that it is tied to the app.  And with the consequence that if you're standing in, you know, New York City, it's got you geofenced in New York City, and you can't buy a ticket through Texas.  If, on the other hand, you're not standing there, maybe you're using VPN from your desktop computer, it may happen.

So my understanding is those things may have happened. It was not an issue about which there are any allegations that

we knew at the time that there was something wrong and we knew at the time that we were making a representation.

I hope that answers your question, Judge.

THE COURT:  Well, somewhat.

MR. BERG:  I apologize.  I am not trying to be evasive.

THE COURT:  No, no, not at all.  Let me frame it a little bit better.  And I'm just looking at something.  Give me one moment.

I think you've answered -- I guess I'm asking more specifically about that seven-month period before 2020 where Lottery.com allegedly printed out $500,000 worth of tickets for $1.1 million in Texas for out-of-state Lottery players.

And you're saying that that was as a result of the mobile versus web based application?

MR. BERG:  I am not making that specific representation to the Court because I don't know, because I have not thoroughly investigated it.  I am saying that that is my current understanding from limited investigations into what happened.

But, the bottom line here, your Honor, is that there are no allegations that Lottery.com knew this had occurred at the time they made the representations that we believe we're in compliance with the regulatory schemes of each state.

THE COURT:  So, Mr. Berg, isn't $1.1 million of sales

P2CARtdO

and tickets a significant amount of tickets for the corporation or those in high level leadership to be unaware of?

MR. BERG:  There are no allegations in the complaint about the relative percentage of total sales that that is.  And so, you know, just based on common knowledge from my perspective having represented entities that sell Lottery tickets, that's just not that much, Judge.  I mean, hundreds of millions of dollars are spent on lottery tickets every week. And so what percentage -- there are just no allegations in the complaint establishing that that number, 500,000 tickets, is a big portion of what Lottery.com sales were.

THE COURT:  Okay.  All right.

Thank you.  Those are my questions.

MR. BERG:  Thank you, Judge.

THE COURT:  And I will give you an opportunity to reply after we hear from plaintiff's counsel as well.  But were there other defense counsel who wished to make an initial presentation?  Okay.

No.  All right.

MS. TIGHE:  We do, your Honor.

THE COURT:  Okay.  And who is speaking?

MR. MONSOUR:  I guess I'll move first, your Honor. This is Franklin Monsour, McDermott, Will & Emery on behalf of defendants Matthew Clemenson and Ryan Dickinson.  With me are my colleagues Kenton Atta-Krah and Christopher Whalen.

P2CARtdO

THE COURT:  Thank you.  Go ahead, Mr. Monsour.

MR. MONSOUR:  Yes, your Honor.  May it please the Court.  Good morning.

We echo the sentiments that Mr. Lars presented to the Court, and we don't want to be redundant so we won't repeat those, but we certainly adopt his arguments.  They obviously overlap significantly for all the defendants here.

We'll address specifically the allegations as they pertain to Mr. Clemenson and Mr. Dickinson.  And the primary point, your Honor, as you might imagine, is that there aren't a lot of those allegations that are specific to our clients.  The allegations almost wholly concern their positions with the company and what they must have known by virtue of those positions, which of course is a variation of the court operations doctrine, which your Honor dismissed previously.

The rest of the allegations concerned largely signatures on various documents, but this complaint, like the prior complaint that was dismissed, does not allege contemporaneous basis to demonstrate scienter or intentional misrepresentation as required under the PSLRA.

And, your Honor, I think briefly, just to walk through the types of evidence that pertains specifically to Mr. Clemenson and Mr. Dickinson.  First, the complaint contains no allegation attributing any statements to either Mr. Clemenson or Mr. Dickinson.  It's just, it's not present in

P2CARtdO

the complaint.

Secondly, the complaint alleges various signatures on documents.  For Mr. Clemenson, it is literally one document. It's the form 10-K for 2021.  And, your Honor, that makes the allegation specific to Mr. Clemenson exactly the same as they were in the previously dismissed complaint that he signed one 10-K.  And of course he resigned from the company.  It stops there.

For Mr. Dickinson, the allegations really concern his signatures on documents.  Two of those documents were alleged in the previous complaint that was dismissed.  Those are the 10-K's for 2021 and 2022.  Plaintiffs add only two additional documents that Mr. Dickinson signed.  And that's the $30 million promissory note and the loan agreement associated with the promissory note.  Those are the two additional documents for which he signed.  Even the *Bloomberg* article, your Honor, that you were referencing earlier in connection with the geofencing technology and the statement regarding the sale of shares out of state, I mean, that does come from the *Bloomberg* argument.  We've of course briefed the Court.

THE COURT:  Sure.

MR. MONSOUR:  As have everybody else with all the faults and unreliability of that article.  But even still, your Honor, that article on which defendants heavily rely does not attribute statements or actions to either Mr. Clemenson or

Mr. Dickinson. It attributes nothing to them specifically.

You know, your Honor, I'm obviously here to answer any questions. So I see that you might be about to ask one.

THE COURT: Yes. I do have one.

Doesn't the fact that Mr. Dickinson signed the promissory note create -- or does it create that additional knowledge element, that additional scienter element that had been lacking in the earlier complaint that was based in large part on the magnitude of the transaction that it goes to the Court operations, etc.? Doesn't this link him, as the CFO, who is signing the note and presumably understands what that transaction is about, if there are in fact false statements about that transaction, doesn't his signature and involvement in it create that level of scienter that's been lacking in the past?

MR. MONSOUR: Yes, your Honor, I believe it does not for many reasons. First, these allegations, the heart of these allegations concern the properness of the accounting treatment of the loan. You know, was it properly listed as a liability. And for that, there remains still no allegation at all of a contemporaneous information or guidance or a statement or a witness establishing scienter or establishing a misrepresentation. Nothing contrary to indicate that Mr. Dickinson knew the proper treatment of this loan for accounting purposes and then did the opposite. That just

P2CARtdO

doesn't exist in the complaint.

Secondly, because of that, what this really is at bottom is it's another variation on a corporations doctrine argument. It's what is Mr. Dickinson's position and the fact that he signed this agreement or this loan by virtue of that position with the company.

The plaintiffs allege that Mr. Dickinson negotiated this loan, but they point to nothing to demonstrate that. It's a conclusory allegation. I would submit to the Court that in companies across the board, signatures on documents do not indicate that you were the one that negotiated the document.

Here, as far as the accounting treatment goes, nothing has really changed. The plaintiffs, again, allege that this loan should have encaptured a reported in the April 1st, 2022 annual report, which was part of the 10-K. However, that report covered the 2021 fiscal year. This loan was taken in January of 2022. I'm not an accountant. Intuitively it seems to me that a 2022 loan doesn't have to be reported in a 2021 fiscal year report, but I understand that Armanino, as the auditor, after the fact the company at least relays that the auditor indicates that the loan was not in the footnotes of the 2021 fiscal year annual report that came out in April.

But I would submit to the Court, that alone is a confusing situation on paper. And certainly, the plaintiffs are not alleging anything to make a fraudulent inference more

compelling than simply a mistake and not recording the loan, a 2022 loan, again in a 2021 fiscal year annual report. That really hasn't changed from the first complaint.

Likewise, the plaintiffs allege -- there's only two places they allege that this loan should have been accounted. One is the annual report that we just discussed. The next is a March 2022 financial statement. But when you look at the financial statement, it's much different than the annual report. It's sort of an apples and oranges comparison. The March 2022 financial report is sort of an overview. It doesn't have the same granular detail. It also, it reads sort of like a press release. And there is no line item for liabilities that we can find in that March 2022 financial statement.

But again, your Honor, this is really the primary issue, the primary fault with these allegations, is there remains no contemporaneous information, allegations that Mr. Dickinson or anyone else knew at the time that the treatment of the loan was improper accounting, that they had that type of guidance, that type of information contrary to what they did to demonstrate that they knew it was false at the time or rather they knew that it was a misrepresentation at the time. That remains missing.

We submit to the Court it's a fundamental problem with the complaint that carries over from the last dismissal. It hasn't been fixed. And that's where we are. We're talking

P2CARtdO

about the accounting treatment of the loan and whether or not there's anything to indicate that this was an intentional misrepresentation.  It just doesn't exist.

Your Honor, that's where I was going to go next anyways talking about the loan.  I'm happy to answer any other questions.  Again, I don't want to be redundant with Mr. Berg. I will just note that the geofencing allegation that you were talking to Mr. Berg about, it of course comes via the *Bloomberg* article.  It's an unnamed source.  It's attributed to an unnamed source that plaintiffs do not know.  Which of course comes under the *Novak* case.  You know, here we have an article that has unnamed sources that are unknown to the plaintiffs. In addition, to that we've noted lots of flaws, including the reliance on a presumably privileged internal investigation that plaintiffs do not respond to in their reply.  We noted that in our motion to dismiss.

So, your Honor, again, we strongly believe the *Bloomberg* article cannot sustain the allegations that plaintiffs have put forward.  But again, I keep saying this, I apologize, but it doesn't attribute anything to our clients. Despite those fundamental flaws, the article does not attribute anything to Mr. Dickinson or Mr. Clemenson.

I'll rest there, your Honor.  Happy to answer any questions.

THE COURT:  Thank you very much, Mr. Monsour.

Any other defense counsel wish to be heard?
Ms. Tighe.

MS. TIGHE:  Yes, your Honor.  Thank you.  Tara Tighe of Schertler Onorato Mead & Sears on behalf of defendant Anthony DiMatteo.

THE COURT:  Thank you.  I'm sorry to mispronounce your name, Ms. Tighe.  Go ahead.

MS. TIGHE:  Not a problem, your Honor.  We certainly echo the legal arguments that have been stated already, so we don't belabor those.  I will limit my comments to a few things specific to Mr. DiMatteo.

This is now the plaintiff's fourth bite of the apple on their class action complaint and they still fail to meet the demanding heightened pleading burden that requires them to plead particularized facts that create a strong inference that the defendant acted with the requisite state of mind to defraud or deceit.  And they can do that in one of two ways, either by showing through particularized facts that the defendant stood to gain some concrete and personal benefit that gave them a motivation to be fraudulent or by showing evidence of recklessness or conscious misbehavior.  Neither of which have the plaintiffs done here.

With respect to motive for Mr. DiMatteo, the plaintiffs point to the fact that he received shares as a result of the business combination, and that at least some of

P2CARtdO

those shares were allegedly later sold.  And as this Court noted in the opinion dismissing plaintiff's first amended complaint, such motivation such as share price, keeping the company profitable, that are common to almost any executive, are not sufficient to establish motive without some further evidence of specific fraudulent intent.

So any motivation to keep the stock price high, to keep the business as a going concern, to take the company public, are quite simply not enough.

With respect to conscious misbehavior or recklessness, the plaintiffs point to the fact that Mr. DiMatteo was an executive within the company.  The centrality of the alleged misstatements to the corporations of Lottery's business, both with respect to the financial restatements that were made and statements about the legal and regulatory compliance.

However, as this Court pointed out on page 68 of its opinion dismissing plaintiff's first amended complaint, simply alleging the defendants held executive leadership positions within the company and that the actionable statements or omissions were part of or concerned Lottery's core operations, that's not enough to establish scienter absent something more, some specific evidence of unusual or suspicious circumstances. And plaintiffs quite simply have not alleged that here.

And, importantly, your Honor, under either standard of proving scienter, the plaintiffs have to point to some

particularized facts that show that the defendant was aware of some contradictory information that made the alleged misstatements false at the time that they were made. And that is a key defect in the plaintiffs' allegations that they have not overcome despite now filing a third amended complaint.

And as Mr. Burg and Mr. Monsour pointed out, the third amended complaint is really framed around this *Bloomberg* article, and that article compiles information that came to light as a result of the investigation that Lottery did. And as plaintiffs admit in their complaint, a lot of this information came to light long after the individual defendants were gone from the company. But even accepting the allegations in the complaint and references to the article, it still doesn't point to any specific information that Mr. DiMatteo knew that made those statements false at the time that they were made. And that is a critical underpinning of any showing of scienter.

And so despite this Court granting plaintiffs' leave to amend their complaint again, they have not overcome that specific defect in their pleading. Therefore, have not pled an actionable securities fraud claim against Mr. DiMatteo.

THE COURT: Thank you, Ms. Tighe.

All right. Okay. Any other defense counsel wishing to be heard?

MR. PISKORA: Yes, your Honor. It's John Piskora of

P2CARtdO

Loeb & Loeb for defendant Komissarov.

THE COURT:  Thank you very much.

MR. PISKORA:  I'm always last, but maybe appropriately so because my client is really the tail on the dog here.  He's differently situated.  He was never a part of Lottery.  He was an officer of Trident, which was the business combination partner.  And to kind of frame up the discussion we're going to have today, you maybe remember from the prior motions and your ruling, we didn't even get into scienter type arguments as to Mr. Komissarov because the Court didn't find any actionable misrepresentation in either the proxy or the press release, I think it was October 21, 2021.  And we really haven't moved on from that in this third amended complaint for Mr. Hoffman's second amended complaint, except that the plaintiffs have withdrawn, by deletion, their claim of securities fraud against Mr. Komissarov.  And Mr. Hoffman has added sort of control person liability claim based on a securities fraud that disappeared from the plaintiff class's complaint.

I just have five or six things that I think are dispositive as to Mr. Komissarov.  Number one, there's no actionable misrepresentation in the proxy statement.  As to legal compliance, the Court already held, and this was at your order at 31 to 33, that legal compliance statements were puffery.  And I understand that the plaintiffs want to try and resurrect this somehow, and they say, well, Lottery and their

officers purportedly knew that that statement was false, but they don't say anything about Mr. Komissarov. And in the Court's prior holding, the Court recognized and cited *City of Pontiac* as being dispositive of this issue. It doesn't matter your plaintiffs' claims that these statements were knowingly and verifiably false when made because the statements are too general and puffery to be actionable in the first place. So the claim can't survive.

Secondly, we get to the revenues and projections. And I want to bring this conversation back to reality. Although it didn't concern Mr. Komissarov, the Court did find that the plaintiffs' allegations about post-merger statements of 30 million in lottery linked credit sales, we call them the sham revenues, was a misrepresentation of a material fact. But that doesn't concern Mr. Komissarov because there was no representation either in the proxy or in the October '21 press release about $30 million in sham revenues.

And what the Court said about all of this, and it's your opinion at 45, and I think you were cited as being on point, *Lopez*, the *Lopez* case, 173 F.Supp 3d 12, which concerned preliminary revenue reports, that this was inactionable. It was protected under the bespeaks caution doctrine. And there's nothing new here.

I would just add, though, that I understand plaintiffs being a bit embolden about the Court's prior holding about the

P2CARtdO

30 million in sham revenues, try and somehow bring it back to the proxy with this press release. But there's no statement in the proxy or press release about $30 million in sham revenues.

In fact, the press release, which is the latest thing, reports a lower number. It couldn't have included 30 million in sham revenues.

I think as Mr. Berg identified and argued, all right, so now in the amended pleading, the third amended complaint of the class, there are some allegations, some more collateral allegations. They don't make a difference. And I just want to go through them as far as I know them.

One is that the Trident board considered Lottery's projections. Yes, the proxy contained Lottery's projections. And the board considered them. And that's why they're appearing in the proxy. But there's no allegation that the Trident board didn't consider them. And by the Trident board considering them, that's not a representation that they're accurate factually. These are future of projections. In any event, the proxy actually says Trident hasn't made and is not making any representation as to these projections. They're not factual. There's a bucket load of contingencies and risks that would cause these not to come true.

There's an allegation, and the other attorney spoke to it briefly, I'll give you my angle on it. There's an allegation that the proxy in the section that Lottery

contributed and says this is our business.  And that's at 132 of the proxy.  They say we implement geofencing.  And this is of course a statement by Lottery that Lottery is making to Trident.  They made representations that these were true and accurate.  But it says we have geofencing.  The later, much later *Bloomberg* article, doesn't create any issue that this is a false representation.  What the *Bloomberg* article says and what the allegations say is, yes, the geofencing technology existed, but people could skirt it.  Skirt it.  That's the word in the third amended complaint.  Obviously, you can't skirt something that doesn't exist.  I mean, it's implied, therefore, that the technology did exist.

And then kind of --

THE COURT:  Mr. Piskora, let me pause you for a second.  This is similar to the question I asked of Mr. Berg. Skirting the geofencing, as you've framed it, is one thing, and whether an individual could get around it by using mobile versus a web application, something like that.  That's one thing.

But separate from that is whether internally at Lottery they were actually selling tickets from a state where the purchaser was not located.  That's I think, and maybe it's related, maybe you'll tell me that's related to the geofencing, geofencing process.  But I had understood that it was that they didn't have the right couriers to take the tickets from

P2CARtdO

wherever and that they were printing out those tickets in Texas for people who lived elsewhere, or at least that's the allegation.

Isn't that a little bit different than a user being able to get around a geofencing process?

MR. PISKORA:  Yeah, a couple points on that.  The first one is I agree with the Court that these are two different issues.  Right?  I don't necessarily connect those allegations as being together.  But what the Court raises is -- I forget the number because really this is a Lottery issue rather than a Trident issue.

THE COURT:  Mm-hmm.

MR. PISKORA:  And I'll explain why, is that there were 500,000 -- I forget the number of tickets that were sold in the wrong state, or fulfilled may be the best word.  The tickets were fulfilled in the wrong state.  And that should never have happened.

I agree that that's an issue for Lottery and what Lottery might have known.  But we got to go back.  My client is from Trident, right.  And what the plaintiffs in this case are having some difficulty with as far as Mr. Komissarov, and really anybody from Trident, is they're saying that Lottery made these false statements to them, but they can't recognize that Lottery made the same statements to Trident.  And what is going on about that is that Lottery said a couple of things to

P2CARtdO

Trident.  And, again, we're focused in on the proxy at this point.

What Lottery said is that they were in material compliance with state laws concerning, you know, how they operated, the distribution of the tickets.  And what Trident says -- and you have to understand the statements by who is making what statement -- what Trident is saying to its shareholders is Lottery has told us this.  They have represented this to be true.  That's what Trident tells its shareholders.  Nobody is saying that Trident, you're wrong, Lottery did not tell you this, or Lottery did not make that representation to you.

They can't do that because the representation is in writing.  It's in the business combination that's attached as an exhibit.  So what Trident is saying, Lottery told us certain things.  Certain things in the proxy are things that Lottery told us.  Nobody has said those are untrue.

Now, I agree with the Court.  The issue of whether 500,000 tickets were sold in the incorrect state and that's not legally correct, that's an issue for Lottery.  Right?  That's an issue for Lottery.  But it's not an issue for Trident.

And, again, the reason why that is, is this who is making what statement.  And this comes up in various context.  But, when you look at the claims against Trident, you have to say, what is Trident saying?  Trident is saying Lottery

P2CARtdO

provided us this representation that they're in compliance with law. Nobody can say that is false. Lottery provided us certain financials that they represented were true and accurate in every material respect. That, again, is in writing. So nobody can allege that that was false.

And then finally, Lottery provided certain information concerning its business, and again, it's in the proxy, beginning at 132. It says we, Lottery, this is our business. And what Trident disclosed in the proxy is they provided us this information, we considered it as a Trident board in determining whether to recommend this merger, and we're presenting it to you. That is what they presented to us and we are presenting to you. There's no fraud there.

Secondarily, getting past the claimed misrepresentations, you know, what came out of the last opinion of the Court was, hey, you got to go back and address the issue of scienter. Really, that was the issue. And with respect to Mr. Komissarov, what the plaintiff class has chosen to do is remove the claims for Section 10 liability and try and reduce it to Section 14 proxy misstatement.

So getting past the point of whether there was a misstatement, they have to allege at least negligence. And what they've done is basically say in a conclusory one paragraph that is trying to recite all of the elements of a cause of action in one paragraph, and it's third amended

complaint at 215, that Mr. Komissarov, through the proxy statement and by defendant's negligence, contained statements which at the time and in light of the circumstances which they were made were false and misleading.

You can't just read any scienter in conclusory terms. Right? So in the argument that has gone back and forth, the plaintiffs say, well, you can somehow infer negligence against Mr. Komissarov because he was involved in the due diligence process. But their only allegation about him being involved was there's paragraph 42. They're trying to bolster Mr. Komissarov's participation in the whole process and they just say he had access to materials necessary to perform regulatory due diligence on Lottery. They don't say he didn't do it. They didn't say it was negligent due diligence for any particular reason. They don't say, hey, you know, what you missed was that all these states were suing Lottery and you somehow overlooked that or you turned a blind eye, you knew something.

There's just no basis for the allegation of scienter against Mr. Komissarov. Even on a negligence standard.

And then we get into the control person claims. You can't bring it on a negligence standard. You have to have at least recklessness. So the plaintiff class, they don't even try to create recklessness. And I'm trying to figure out the right way to frame this up.

P2CARtdO

Mr. Hoffman is kind of mirroring or copying the allegations of the plaintiff class. And they've deleted all of the allegations that would have went to a securities fraud claim.

Mr. Hoffman in his complaint doesn't allege an underlying 10(b) violation against anybody at Trident, let alone recklessness and control person liability as against Mr. Komissarov. There's nothing there other than a conclusory allegation.

And then finally, Mr. Hoffman unfortunately didn't serve Mr. Komissarov properly. He served I think it was a supplemental summons himself. You can't, under Rule 4, be a party and serve. And there's a lot -- a bit of a back story to this. But six months have gone by. He could have cured and mooted this issue. It just didn't happen.

The service was defective. And Mr. Hoffman's second amended complaint has to be dismissed against Mr. Komissarov on that additional basis, but really there's no underlying claim anyway.

So unless the Court has any questions, I can leave it there.

THE COURT: No. Thank you very much.

Any other defendant wishing to be heard?

Let's move to responses then from class counsel. Is that you, Mr.? Ruf.

P2CARtdO

MR. RUF:  Yes, your Honor.

THE COURT:  Thank you.

And I would like you to address all of them.  I know there's a lot to address.  But we'll give you one chance and then we'll come back if we need to.  Go ahead.

MR. RUF:  Yeah.  Your Honor, Mr. Berg made the comment that the PSLRA was designed to prevent essentially strike suits, where when a company makes -- you know, has some error in their reported financials, that immediately all sorts of plaintiffs' lawyers rush to the courthouse and they file these strike suits without basis.  And that era is gone and PSLRA is a new era where we're really focusing on cases that have merit.

Your Honor, I would propose to you that this case is literally the poster child for an appropriate case post PSLRA.

I've been doing this for almost 30 years and the facts of this case are astounding in terms of the fraud that so clearly has occurred with respect to the debacle called Lottery.com and the de-SPACing.

So, your Honor, the first time around, we obviously, I think we can all agree, you felt that we hadn't made the grade with respect to scienter.  Well, what we know now and, you know, some of this is from filings and of course some of this is from *Bloomberg*, but we have now identified new facts that really leave almost no room for there to argue an innocent reason for the disasters that befell Lottery.

So with respect to the $30 million transaction, we now know that there is a -- literally it's a kite scheme.  And counsel for defense, you know, presents it as oh, well, it happens all the time.

You know when you buy a house, for example, you might, you know, have seller financing.  I mean, this isn't buying a house.  This is a company that claimed that it had the secret sauce.  It said that its reason for existence was that it was now going to allow people to purchase lottery tickets online.  Genius.  And that, well, needless to say, a highly regulated industry, but they had figured it out.  Lottery.com has figured out how to go about doing this.

So the $30 million transaction was, to the investors, presented as part and parcel of the business of Lottery.com, which is selling Lottery tickets.  And instead, what we learn is that it was essentially a round trip transaction where Lottery itself borrowed the money to pay itself $30 million for promotional credits, having nothing to do with the selling of Lottery tickets.  And I would just simply present to you that those facts and the facts that Mr. Dickinson entered into that transaction and the fact that Mr. Dickinson signed a promissory note.  I mean, that is so clearly material to an investor to know that that happened.

And it is, you know, yes, we have a case where we don't have the individuals involved admitting that they

P2CARtdO

committed fraud, which is pretty consistent with most securities class actions. Most of the time the bad actors don't admit that they committed fraud.

So when opposing counsel says, well, you know, this is all just guess work. That when they point out that these are massive amounts of money relative to, for example, the cash that the company claimed it had, that this transaction reflected half of that cash. Well, that doesn't mean anything, your Honor. We've already gone through that. You know, the mere fact that it's a really significant transaction, that doesn't get you there.

Well, it may or may not get you there. Everyone agrees that the size of the transaction or the corporations, these things certainly do in certain cases lead to a conclusion that there's scienter. The question is, it's a subjective one.

You know, as the Court said in its order, the scienter analysis must rest not on the presence of certain allegations but on a practical judgment about whether accepting the whole factual picture painted by the complaint, it is at least as likely as not that the defendant acted with scienter.

So the question is now on our third amended complaint, all of the facts being put together, have we met the standard of scienter. Does this look like a legitimate company being run by honest brokers, or does this look like a company which time and time and time again misrepresented the truth of what

it was doing?  It misrepresented this huge transaction that amounted to a 2,000 percentage increase in its revenue.  Just before the de-SPACing, which the company needed to get done after multiple extensions, after the amount of money available in the SPAC had gone from over $200 million to $60 million.  They had to get this done.

So low and behold, all of a sudden, we've got this transaction that we've done.  It's for credits that actually can't be transferred being purchased by somebody that doesn't have any money, that's going to be financed by us taking out a loan, and then we're going to take out that loan and we're going to effectively buy these credits from ourselves, which credits cannot actually be sold.  And then in our next financial statements, we won't even tell our investors that we took out this loan.  We won't even drop a footnote about it.  Oh, and by the way, you know how lottery tickets can only be purchased in the state in which the person buying them is located?  You know that thing that we not only reference in our proxy statement but in every official SEC filing.  And in those filings, we always say, hey, we have this geolocation technology that we use to assure that the tickets are being purchased in the location in which the person is located.

Oh, except for that's just not true.  It might be true with respect to somebody purchasing a ticket with their phone, but it's not at all true for anyone purchasing using a website.

And, you know, we've added the allegations with respect to the 500,000 tickets sold out of Texas in a seven-month period.

I apologize.  I think that was Alexa.

So in short, your Honor, the allegations are -- I'm sorry.  I'm going to unplug this.

The allegations are new.  We have much more detail with respect to the sham transaction for the $30 million.  We have the allegations with respect to the geofencing technology that did not exist.  And I would present to you that this is precisely the kind of case that should go forward.  This is not the stage at which we win or lose the case.  This is the keys to the kingdom to whether or not we even get forward to taking discovery, to reading the e-mails, to pursuing this case in litigation.

And I would submit that we have clearly met that standard now and that there is ample basis to believe that the executives in question had scienter with respect to the legal compliance, as well as with respect to certainly the $30 million.  But we make reference to other transactions as well in the complaint concerning recognition of revenue that shouldn't have been recognized.

THE COURT:  Mr. Ruf, how do you address the argument made by several of your colleagues across the aisle regarding the reliability of the *Bloomberg* Article.

MR. RUF:  Your Honor, again, this is -- this is not trial.  This is -- these are allegations which, you know, the standard is that the well-pleaded allegations, at this stage of the litigation, are accepted as true.

We've told the Court the basis for the allegations, but essentially they are obviously allegations, certainly made in good faith.  There's ample reason to believe that the information in the article in accurate.  I'm coaching the mock trial team right now, you know, so we can talk about exceptions to hearsay and party admissions.  You know, similarly, there were some arguments about the internal investigation and whether that will ever be admissible.  I mean, arguably that also constitutes admissions and is admissible.

THE COURT:  So, Mr. Ruf, then my next question is -- thank you.

Let's focus in on regulatory compliance a little bit and the proxy statement regarding geofencing and sales out of state.  How do you cross the scienter threshold with respect to those allegations?  Let's assume that you can get around geofencing if you use the web instead of your phone.  How do we know that the defendant knew that and knew that there was this work around?

Let's take that first, and then I want to get to the sales out of state.

MR. RUF:  Well, your Honor, you know, I think -- what

is it called.  It's the trans -- it's an oil drilling case that we had referenced in the briefing.  And in that case, the district court said that in the oil drilling industry -- there was a question of whether comments about the safety and training that the company was implementing, you know, were puffery or were more than that.  And the Court said that they're more than that in the context of an oil drilling company, because the oil drilling company, that's what they do.  They have to -- everyone would expect that the safety and the training would be, you know, vital to that kind of business.  And I would say, in a similar vein, again, in light of the fact that the so-called secret sauce, the very thing that this company purported to have solved, the reason for it to exist, was that it was allowing people to buy lottery tickets all across the country online.

So, yes, we don't have any admission of someone saying, gee, just between us, I happen to know that we really didn't have that technology.  Certainly didn't have that technology when it came to people purchasing from a source other than their phone.  But I would submit that it is so crucial and in combination with anecdotes like the fact that they sold 500,000 tickets from their own location in Texas over a period of seven months.  There would be a clear indication that there's an awareness they're actually not complying with the law and that they are not using geofencing and that they

P2CARtdO

don't have geofencing with respect to certain purchases.

THE COURT:  So it's a corporations argument?

MR. RUF:  You know, I always think of the corporations argument as, yes, it is that to some degree.  But, you know, every situation is different.  You know, in context, I would say that it just rises to the level of something that would be impossible to believe that the defendants wouldn't know about.  Which I know that part of the argument on the other side, you know, I find, again, it is up to the Court, as the Court itself said in its order that the first -- the real question for the Court is to look at the totality of the circumstances and determine if the Court believes that there is adequate allegations of scienter.

And, you know, the corporations test is really not even really different from that.  I mean, a court can come to the same conclusion without really saying, well, I'm doing this because of corporations.  The Court can just say I just feel like this is something that is integral to this business and, therefore, I believe that there is an adequate basis to believe that there is knowledge in scienter.

THE COURT:  And what about the magnitude of the transaction?  So do you have any allegations regarding the comparative value of the 500,000 tickets that were sold out of Texas in comparison to the sales of Lottery tickets generally at Lottery.com?  I'm only saying that because if there were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P2CARtdO

some low level employee somewhere who sold a few tickets, there may not be any reason to think that high level executives at Lottery knew about that or that there's any sort of justification for some corporate entity scienter or something like that.  It would just be so small at just sort of an errant error, if you will, out of Texas.

Do you have anything more pled regarding that circumstance?

MR. RUF:  No.

THE COURT:  Okay.

And what is your argument in response to my argument that, is that enough, just to argue that that happened, how does that support a scienter argument?

MR. RUF:  Well, there has been some discussion already about the interplay between the 500,000 tickets and the lack of true geofencing technology.  And I think it really is -- I don't think in and of itself the 500,000 tickets is itself particularly important.  I believe it is a part of or an anecdote that arises out of the fact that the company actually did not have the technology that it claimed to have.

THE COURT:  Got it.  Understood.

Okay.  Thank you.  Those are my questions.  Anything further, Mr. Ruf?

MR. RUF:  No, your Honor.

THE COURT:  Thank you.  Mr. Onorato, I see that you've

raised your hand.  Did you mean to do that?

MR. ONORATO:  Your Honor, I don't understand anything about the technology, so you can slap my hand down.

THE COURT:  That's okay.  That's fine.  It's nice to see your hand.  High five to you as well.

MR. ONORATO:  Thank you.

THE COURT:  So then with respect to plaintiffs, Mr. Hoffman, I think that brings you next.

MR. HOFFMAN:  Thank you, your Honor.  Good afternoon. I'm going to take the award for the shortest argument.

THE COURT:  I will give it to you.

MR. HOFFMAN:  Right.  In large measure, your Honor, it's because the argument which I seek to address is entirely meritless.

Counsel for Mr. Komissarov contends that I failed properly to serve the summons and second amended complaint. And the argument is predicated on Federal Rule 4(c), which forbids a party from serving another party.  But I didn't serve another party.  I served counsel because counsel demanded in writing that I do so.  They filed Dkt. No. 130 which says literally we demand that all papers in this action be served on us.  They even say you can serve them by e-mail if you wish. So I could serve in compliance with that demand by delivery to their law office or by e-mail.

Prior to service I communicated with counsel for

Mr. Komissarov by e-mail. And I said to him, I'm going to file a second amended complaint. I can ask the clerk to issue a summons. Why bother? You're going to see the pleading on the docket. And you are the agent for service and you've demanded service.

Now, under Rule 4, the rule that they cite against me, they had the duty to avoid unnecessary expense serving summons. And the Rule says that I can request that they waive service. Which is what I did.

Counsel responded eloquently: Once the summons is obtained, we can confer about service. But of course I never heard from him again. Never got back to me.

So the weather was wonderful. It was June, your Honor. I took a walk down Park Avenue and delivered the pleading to counsel's office. They had the ethical obligation to have me sidestep walking down Park Avenue, and they owe me the expense of walking down Park Avenue.

Now, your Honor, again, it was a nice day. I didn't incur a lot of expense and I'm not going to seek reimbursement. But the argument that my hand delivery to their receptionist consisted with their written demand that everything come to their firm was somehow defective is, with respect as I began, entirely meritless.

Thank you, your Honor.

THE COURT: Thank you, Mr. Hoffman.

Now we're at the point where we can hear -- I will allow a reply by defense counsel. You don't need to repeat anything that's said. But I will open the floor if there's anything that you would like to respond to with respect to what plaintiffs have presented.

So, Mr. Berg?

MR. BERG: Yes, ma'am. Thank you. Mr. Ruf made an excellent presentation and I think that I adequately addressed everything in his presentation in my original presentation. So unless you have a specific question, I don't intend to have a specific reply.

THE COURT: Thank you, Mr. Berg. I have one question.

Are you making a collective corporate scienter argument with respect to the allegedly misleading regulatory statements? Or are you alleging scienter based on an imputation -- I'm sorry. This is going to be for Mr. Ruf. But if you want to respond just to the collective corporate scienter arguments, I'm going to ask Mr. Ruf that question. But so that I don't come back to you, do you have any response to that doctrine being applied here?

MR. BERG: We don't believe that they have adequately pleaded sufficient facts to establish that.

THE COURT: And it's rarely used; would you say that as well?

MR. BERG: Well, I would, yeah, absolutely, your

P2CARtdO

Honor.  I think that goes without saying.  You just never see it because it's such a high bar to get to.

THE COURT:  Okay.  Thank you.

Let me look at my notes for a minute before I let you go, Mr. Berg.  One moment.

Thank you.

Mr. Monsour, anything further?

MR. MONSOUR:  Thank you, your Honor.  Unless your Honor has specific questions for us, which we're happy to answer, we'll rest on our presentation and our briefs.

THE COURT:  Thank you.

Ms. Tighe?

MS. TIGHE:  Yes, very briefly, your Honor.

The Second Circuit has made clear that a plaintiff in a securities fraud matter cannot plead fraud by hindsight.  But after seeing the pleadings and hearing the presentations today, that is exactly what plaintiffs are attempting to do.  Cobbling together a series of facts and asking the Court to infer there must have been enough to prove scienter.

And Mr. Ruf, when your Honor asked about crossing the scienter threshold, said, well, it rises to a level that it's impossible to believe there wasn't.  Well, that is not enough to prove scienter.  Under any method of establishing scienter, the plaintiffs have to show that there was some knowledge of contradictory facts that made those statements false, which

they have not done here.

THE COURT:  Okay.  Thank you.

And I'm sure you mean allege as opposed to prove?

MS. TIGHE:  Correct, your Honor.

THE COURT:  Okay.  All right.  Mr. Piskora?

MR. PISKORA:  Yes, just two things, your Honor.

Obviously the plaintiffs, the class, focusing on this $30 million transaction, they've alleged it's a sham.  But you didn't hear much, you didn't hear anything about Mr. Komissarov being negligent to uncover that.  And they'll never be able to allege that.

Their third amended complaint admits that those sham revenues were not reported until after the business combination on November 15th.  That the offer of a check, you know, we sent a courier to pick up a check that was never cashed, that didn't happen until the day before New Years.  And this intercompany loan didn't occur until 2022, well after the business combination.

So you're not going to have any negligence by Mr. Komissarov to uncover those facts that happen, you know, after the fact.

The second point and the last point that I would make is plaintiffs' counsel keeps saying maybe they did so in the papers, and they certainly did in the argument, that the geoblocking technology did not exist.  And that's not what the

P2CARtdO

*Bloomberg* article says.  That's not what they alleged.

What they alleged is in paragraph 15 of the third amended complaint, they said anybody using the web based system as opposed to the mobile app could easily just skirt any jurisdictional requirement.

So for the web based system, they're saying people could skirt it presumably via using a VPN or some other technological hack.  But even that allegation presumes that the geoblocking or the geofencing technology existed but could be skirted.

So that's my last comment, your Honor.

THE COURT:  Can you address Mr. Hoffman's argument about service?  I think we all agree that service can't be made by a party.  However, you do have an obligation to avoid service expense and accept service when requested.  And you have notice of the action.  And Mr. Hoffman is pro se.

So talk to me about your response to his argument.

MR. PISKORA:  Yeah.  The reason we're bringing up a service argument, your Honor, is because of a perceived hardheadedness here.  And what Mr. Hoffman just admitted was he contacted me saying I'm about to file a second amended complaint.  And I said fantastic.  Why don't you contact me after you get a summons.  And then he never did.  He said I'm strolling down Park Avenue, and he just admitted that he served it himself.

I was -- I invited him to contact me to avoid this expense. I have never once had a case where somebody contacted me and I haven't gone back to my client and urged them just to accept service, authorize me to. Right? I never said to Mr. Hoffman that I was authorized to. What he's done in his mind is he said, oh, the Loeb & Loeb law firm and Mr. Piskora filed a notice of appearance, which is of course required by this Court, in the other case. Not his case. In the other case. But the two cases are consolidated for various purposes, doesn't mean that I've yet made an appearance in his case.

But regardless, he served it himself. I had invited him to contact me, which I thought was the prudent way to get past this. He refused to do so. Just said I'm walking over there. And he admits on this call that he served it himself.

He had six months to cure this. He could have called me. Hey, John, I see your argument here, I see the rule, will you accept service. We could have gotten past it. But he refused to do that.

If this case goes forward, and I don't think it should against Mr. Komissarov for the reasons we've discussed, you know, Mr. Hoffman is an attorney. You know, if you want a courtesy, that's fine. But act like you're asking for a courtesy and I'll give you one. We have to -- if we have to go through this case, you know, I don't want head banging with Mr. Hoffman.

P2CARtdO

So, yes, I think I've did everything I could to mitigate the expense of service.  And if he asked me for a waiver, sent me a waiver of service, we would have filled it out.  But he didn't do so and that would have put us on this different schedule because we have a different timeline.

MR. HOFFMAN:  Your Honor, may I have 30 seconds?

THE COURT:  Let me finish with Mr. Piskora.

MR. HOFFMAN:  I'm sorry, your Honor.

THE COURT:  No problem.

Mr. Piskora, anything further you would like to add?

MR. PISKORA:  No, your Honor.  Thank you.

THE COURT:  Mr. Hoffman, your 30 seconds.

MR. HOFFMAN:  Yes, your Honor.  Rule 4 says that the opposing party should waive issuance of the summons.  I call -- I texted him -- excuse me.  I e-mailed him and said will you waive issuance of the summons.  His response was get back to me after you get the summons.

So his charitable demeanor at this argument, that all I had to do was ask, I did.  I said waive service of the summons.  Excuse me, issuance of the summons as required by the rule, and he said I'll get back to you.

THE COURT:  Okay.  Thank you very much.  Thank you.

Okay.  Is there anyone who wishes -- anyone else who wishes to be heard here?

I have a question for you, Mr. Ruf, so why don't I ask

P2CARtdO

that first.  And while I'm doing that, everyone can think if there's anything more that they need to say.

Mr. Ruf, my question that I had highlighted earlier, which is are you making a collective corporate scienter argument with respect to the regulatory statements?

MR. RUF:  As you know with respect to the 30 million, we believe there's specific allegations and reason to believe that Dickinson at least knew all about it.

THE COURT:  Yeah.

MR. RUF:  But with respect to the regulatory statements we're not saying a particular executive has distinct knowledge from others.  What we are saying is that all of the executives certainly understood the limitations of their technology.

And, your Honor, if I could add, I want to make a point, kind of a philosophical point about the constant argument from the defense that, you know, our whole case is based on "they must have known."

If there's a question about what a person knows or knew, there are two ways to understand what they know or knew.

First, the person can tell you what they knew or know. And in a securities class action, most of the time they don't. And so every securities action where a person is not admitting what they knew, always to some degree is working in the realm of, well, they must have known.  And I'll give you an analogy.

P2CARtdO

You know, if you had a question of whether somebody saw a car and the car was a block down the street, you might say, well, you know, we're not -- he may have known, and it seems like he probably had seen the truck.  It was just half a block away. But if the truck drove right by, like a foot away, you would say they must have known.  A truck drove right by them.

And I would submit that all securities class actions, you know, fall into that kind of an analysis at some point. Again, if the person has not admitted what they know, then you're always having to do an analysis about the circumstances. And whether the finder of fact concludes, well, I think they probably knew, or seems like they must have known, something in that realm.  I mean, other than people admitting what they know, there really is no alternative.

THE COURT:  Well, I agree with you, Mr. Ruf, that you're going to very infrequently have allegations that somebody admitted that they knew they were committing fraud. Cases are going to be brought, it's going to be settled, it's going to be settled beforehand.  But that's precisely why we have a test that talks about scienter being alleged through defendants having a motive and opportunity to commit a fraud or strong circumstantial evidence of conscious misbehavior or recklessness.

So I know we're throwing around some shorthand in terms of "must have known."  But there's a test for me to

apply. And it seems to me that much of what you're arguing is under that second prong. The strong circumstantial evidence of conscious misbehavior or recklessness, maybe some motive and opportunity. But those are the things that I will evaluate. And rest assured, I won't rely simply on a shorthand "must have known," but I will apply those tests.

All right. Anything further that you want to add, Mr. Ruf?

MR. RUF: No, your Honor.

THE COURT: Okay.

MR. RUF: Well, you know, one thing I didn't mention. And everyone agrees, you know, the fact that there are Justice Department and SEC investigations is relevant. And that's yet another fact. You know, this is the case where all the executives either were fired or quit.

SEC, Justice Department investigations, I mean, this case has, you know, all the earmarks of fraud.

THE COURT: Okay. Thank you very much.

All right. Last chance for anyone who has anything that they need to say? I do have excellent papers on behalf of everyone, but I just want to make sure that everyone feels heard. I see no further hands raised. Even inadvertently.

All right. That's great. So then I have one question which is -- two things to cover before we close. One is I would greatly appreciate if the parties could agree between

them to order an expedited transcript for me. I've taken good notes of oral argument, but I do want to make sure that I have that transcript available as I'm working through my decision, which I will take under advisement on the motion to dismiss. So if you could arrange that through the court reporter to have an expedited transcript, that would be most helpful.

MR. RUF: Your Honor, plaintiffs will do that.

THE COURT: Thank you. Thank you, Mr. Ruf. Appreciate that.

Okay. Then the other item we sort of covered at the beginning, which is counsel for the defendants, Mr. Burg, I spoke with your client directly and I should have addressed you since you still represent your client, but will you be able to let me know within 14 days whether you'll be withdrawing or proceeding in this matter?

MR. BERG: Yes, ma'am.

THE COURT: Okay. Good. Thank you.

So then I will presume that you're still representing the defendants until I hear from you one way or the other in 14 days as to whether you're going to continue or whether there will be alternative representation coming in.

Let me just place on the record that that which you already all know which is that a corporation cannot appear without counsel, and so counsel is necessary here. I did put out the order on January 17th when we had the withdrawal hearing. So

P2CARtdO

there has been plenty of time between then and now to consider new counsel, retaining the other counsel, etc.  So please do make sure you're acting with alacrity there to ensure that Lottery is represented as we move through this proceeding.  But for now, we will assume that current counsel is staying in place, and if there's a change, I will hear within 14 days.

Anything further from anyone else before we close?

No.  Good.  Well, thank you.  It was a pleasure seeing all of you virtually.  And I will again take the motions under advisement and court is adjourned.  Take care.  Thank you.

(Adjourned)