UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE LOTTERY.COM, INC. SECURITIES
LITIGATION

Case No. 1:22-cv-07111 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

In 2021, a special-purpose-acquisition corporation, Trident Acquisitions Corp.

("Trident"), announced a business combination with an online lottery-sales company,

Lottery.com, Inc. ("Lottery"). This consolidated case, which involves two securities-fraud

lawsuits against individual and corporate defendants, arises from that acquisition.

In the first lawsuit, RTD Bros LLC, Todd Benn, Tom Benn, Tomasz Rzedzian, and

Preston Million (collectively, the "Class Plaintiffs") bring a putative class action against

Lottery, formerly known as Trident, Lawrence Anthony "Tony" DiMatteo ("DiMatteo"),

Matthew Clemenson ("Clemenson"), Ryan Dickinson ("Dickinson"), and Vadim Komissarov

("Komissarov") (collectively, the "Defendants"). Dkt 153 ("TAC").[1]

The Class Plaintiffs assert four cases of action. First, the Class Plaintiffs allege that

Lottery, DiMatteo, Clemenson, and Dickinson (together, the "Lottery Defendants") violated

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §

78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. TAC ¶¶ 204-208

("Class Claim I"). Second, the Class Plaintiffs allege that DiMatteo, Clemenson, and

Dickinson (collectively, the "Individual Lottery Defendants") are liable pursuant to Section

20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons with respect to the

---

[1] Citations to "Dkt." refer to the docket for Case No. 1:22-cv-07111. All citations to
"Hoffman Dkt." refer to the docket for Case No. 1:22-cv-10764.

conduct underlying Class Claim I. TAC ¶¶ 209-212 ("Class Claim II"). Third, the Class

Plaintiffs allege that Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C.

§ 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9. TAC ¶¶ 213-216

("Class Claim III"). Fourth, the Class Plaintiffs allege that Clemenson, DiMatteo, Dickinson,

and Komissarov (together, the "Individual Defendants") are liable under Section 20(a) of the

Exchange Act as controlling persons of Trident and Lottery with respect to the conduct

underlying Class Claim III. *Id.* ¶¶ 217-222 ("Class Claim IV"). The Class Plaintiffs define

the "Class Period" as "the period from October 18, 2021 through July 29, 2022, inclusive."

*Id.* ¶ 1.

In the second lawsuit, Harold M. Hoffman ("Hoffman," and collectively with Class

Plaintiffs, "Plaintiffs"), an attorney proceeding *pro se*, brings an individual action against

Lottery, DiMatteo, Clemenson, Dickinson, and Komissarov. Dkt. 154 ("SAC"). Hoffman

raises three claims. First, Hoffman alleges that Lottery, DiMatteo, Clemenson, and Dickinson

violated Section 10(b) and Rule 10b-5. *Id.* ¶¶ 194-198 ("Hoffman Claim I"). Second,

Hoffman alleges that the Individual Lottery Defendants are liable under Section 20(a) as

controlling persons with respect to the conduct underlying Hoffman Claim I. *Id.* ¶¶ 199-202

("Hoffman Claim II"). Third, Hoffman alleges that the Individual Defendants are liable under

Section 20(a) as controlling persons of Trident and Lottery with respect to the allegedly false

and/or misleading statements made in Lottery's October 18, 2021 proxy statement and

prospectus. *Id.* ¶¶ 203-208.

On February 6, 2024, this Court dismissed without prejudice Class Plaintiffs' and

Hoffman's earlier complaints for failure to state a claim for relief pursuant to Federal Rule of

Civil Procedure Rule 12(b)(6). *See generally In re Lottery.com, Inc. Sec. Litig.* (*Lottery I*),

715 F. Supp. 3d 506 (S.D.N.Y. 2024). Class Plaintiffs and Hoffman filed amended

complaints thereafter. Now before this Court are various motions to dismiss Class Plaintiffs'

Third Amended Complaint and Hoffman's Second Amended Complaint.

For the following reasons, the motions to dismiss Class Plaintiffs' Third Amended

Complaint and Hoffman's Second Amended Complaint are GRANTED in part and DENIED

in part.

## BACKGROUND

### I.    Procedural History

On August 19, 2022, Preston Million filed a putative class action against the Lottery

Defendants, asserting claims under Section 10(b) and Rule 10b-5, and under Section 20(a).

*See generally* Dkt. 1. On September 22, 2022, the case was reassigned to the undersigned.

Dkt. 14.

On October 18, 2022, Preston Million, Tim Weisheipl, Stephan de Bernede, Connor

Hitt, and Solutions Tabarnapp Inc. (collectively, the "Securities Group") moved to serve as

lead plaintiffs. Dkt. 26 at 1. That same day, RTD Bros LLC, Todd Benn, Tom Benn, and

Tomasz Rzedzian (collectively, the "Investor Group") also moved to serve as lead plaintiffs.

Dkt. 27. On November 18, 2022, the Court granted the Investor Group's motion and denied

the Securities Group's motion. *See Million v. Lottery.com Inc.*, No. 22-cv-07111 (JLR), 2022

WL 17076749, at *4 (S.D.N.Y. Nov. 18, 2022).

Hoffman filed his Complaint on December 21, 2022. Hoffman Dkt. 1. The Class

Plaintiffs filed the Amended Class Action Complaint on January 31, 2023. Dkt. 52. On

March 10, 2023, the Court consolidated Class Plaintiffs' and Hoffman's actions, explaining

that "both actions involve substantially identical questions of law and fact." Dkt. 71 at 5.

On February 6, 2024, the Court dismissed Plaintiffs' claims in their entirety with leave

to replead. *See generally Lottery I*, 715 F. Supp. 3d 506. The Court found that Plaintiffs had

plausibly pleaded that various statements made after the merger between Trident and Lottery were materially false or misleading, but held that Plaintiffs had "failed to plead sufficient facts to give rise to a strong inference of scienter for any Defendant in relation to any of the potentially actionable post-merger statements." *Id.* at 560.

On February 27, 2024, Class Plaintiffs filed a Second Amended Class Action Complaint, Dkt. 136, and on June 12, 2024, Class Plaintiffs filed a Third Amended Class Action Complaint, *see* TAC.  On June 18, 2024, Hoffman filed a Second Amended Complaint.  *See* SAC.  Both Hoffman and Class Plaintiffs assert claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, and under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.[2]  On July 12, 2024, DiMatteo filed motions to dismiss Class Plaintiffs' Third Amended Complaint and Hoffmann's Second Amended Complaint, Dkt. 161 ("DiMatteo Class Br."); Dkt. 164 ("DiMatteo Hoffman Br.").  On July 12, 2024, Komissarov and Lottery likewise filed motions to dismiss Class Plaintiffs' and Hoffman's amended complaints.  Dkt. 167 ("Komissarov Class Br."); Dkt. 170 ("Komissarov Hoffman Br."); Dkt. 173, ("Lottery Hoffman Br."); Dkt. 177 ("Lottery Class Br.").  Also on July 12, 2024, Clemenson and Dickinson filed a joint motion to dismiss the Third Amended Class Complaint and Hoffman's Second Amended Complaint.  Dkt. 181 ("C&D Br.").  On August 8, 2024, the Class Plaintiffs filed their omnibus opposition to Defendants' motions to dismiss, Dkt. 186 ("Lottery Class Opp."),[3] and

---

[2] Class Plaintiffs have dropped their control person liability claim against Komissarov based on a Section 10(b) and Rule 10b-5 violation.  Hoffman has added a control person liability claim against Komissarov based on a Section 14(a) violation.  Class Plaintiffs have also dropped various individual defendants, including Defendants Rosenberg, Gallagher, Butkevych, and Ponomarev, all of whom were affiliated with Trident.

[3] Hoffman sought to rely upon the Class Plaintiffs' omnibus opposition to Defendants' motions to dismiss the Third Amended Class Action Complaint on the ground that Defendants

on August 22, 2024, Defendants filed their replies, Dkt. 187 ("Komissarov Hoffman Reply");

Dkt. 189 ("DiMatteo Reply"); Dkt. 190 ("Lottery Reply"); Dkt. 191 ("Komissarov Class

Reply"); Dkt. 192 ("C&D Reply").  The Court held oral argument on February 12, 2024.  Dkt.

220 ("Tr.").

## II.    Factual Allegations

For purposes of the present motion to dismiss, the Court assumes that the Complaints'

factual allegations are true and construes them in the light most favorable to the respective

plaintiffs.  *See New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80

F.4th 158, 168 (2d Cir.), *aff'd in part, vacated and remanded in part on other grounds*, 122

F.4th 28 (2d Cir. 2023); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 469

(S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013).  A court "must consider the complaint

in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6)

motions to dismiss, in particular, documents incorporated into the complaint by reference and

matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,

551 U.S. 308, 322 (2007); *see, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d

Cir. 1991) (on motion to dismiss securities-fraud complaint, district court properly took

judicial notice of offer to purchase and proxy statement); *Decker v. Massey-Ferguson, Ltd.*,

681 F.2d 111, 113 (2d Cir. 1982) (considering, on review of district court's decision on

motion to dismiss, an annual report alleged to contain false and misleading statements).  A

court may also consider a document, even if not incorporated into the complaint or subject to

---

advanced the same arguments against Class Plaintiffs and Hoffman.  Dkt. 184 at 1-2.  The
Court granted Hoffman's request.  Dkt. 185.  The only argument that Hoffman contends is
"unique to [his] complaint and not applicable to the class pleading" is whether Hoffman's
SAC was properly served upon Komissarov.  Dkt. 184 at 2 n.1.  That issue is addressed
separately below.

judicial notice, if "the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (further quotation marks and citation omitted), as long as there is no dispute about the document's "authenticity or accuracy," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

As before, the Hoffman Second Amended Complaint largely mirrors the allegations contained in Class Plaintiffs' TAC. For that reason, the Court relies primarily on Class Plaintiffs' TAC.

### 1. Class Plaintiffs' First Amended Complaint

To set the stage, the Court reviews the allegations in Class Plaintiffs' First Amended Complaint, Dkt. 52 ("FAC"), and the original Hoffman Complaint, Hoffman Dkt. 1, alongside the Court's findings as to those allegations in *Lottery I*.

The FAC alleged that, from November 19, 2020, through July 29, 2022, Defendants made a series of misleading or false statements in connection with a merger between Trident, a special-purpose-acquisition corporation ("SPAC"),[4] and Lottery. FAC ¶¶ 1-2, 6, 8.

---

[4] As explained in the Court's earlier decision, a SPAC is a corporate entity designed specifically to acquire an existing private company, thereby enabling the private company to become a public company without undergoing an initial public offering. *Lottery I*, 715 F. Supp. 3d at 520-21. "The capital from the SPAC's initial public offering . . . is held in trust for a specific period of time to fund the acquisition," and "SPACs usually have an 18-to-24 month period to find an acquisition target and completion of the SPAC business combination." *Id.* at 521 (omission in original) (first quoting FAC ¶ 40; and then quoting 1 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 3:58 (Nov. 2023)). The directors and officers of a SPAC are well-incentivized to consummate a merger or acquisition: if an acquisition is not completed within the allotted time frame, "then the SPAC is dissolved and the money held in trust is returned to investors with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless." *Id.* (quoting FAC ¶ 41). "Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team." TAC ¶ 43. "Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC

According to the FAC, Defendants made a series of misstatements pre- and post-merger pertaining to Lottery's "financial and operational health," including with respect to Lottery's "cash position and revenue, its regulatory compliance, and the adequacy of its internal controls over financial reporting."  FAC ¶ 8.  The FAC pleaded that these representations were materially false when made, because, as revealed by an internal investigation that concluded in July 2022, Lottery had overstated its financials and was not in fact in compliance with state and federal laws regulating the sale and procurement of lottery tickets.  *See* FAC ¶¶ 8-9, 73-100.

### 2.  Trident's Merger with Lottery

More specifically, Class Plaintiffs' FAC alleged that Trident's leadership — who "stood to reap millions from any merger" — "rushed to orchestrate a merger between [Trident] and Lottery."  FAC ¶ 2.  According to Class Plaintiffs, due to their "ownership interests in [Trident] and the terms and financial structure of [Trident] as a SPAC," the Trident Defendants (including Komissarov) "possessed strong financial incentives to complete *any* qualifying transaction."  FAC ¶ 52.

The FAC stated that, in advance of the entities' merger, Trident issued a November 19, 2020 press release, filed with the SEC on a Form 8-K, representing that Lottery was "a pioneer in the lottery industry, working closely with state regulators to advance the industry into the digital age" and to "provid[e] official lottery games[,] increased revenues[,] and better regulatory capabilities . . . while also capturing untapped market share."  FAC ¶¶ 74. According to the FAC, these were material misstatements when made because Lottery "failed

---

stockholders, which includes the target company's financial statements and the terms of the proposed business combination."  *Id.*

to disclose that, in fact, it was not complying with state and federal laws concerning the state in which tickets are procured as well as order fulfillment." FAC ¶ 76.

The FAC further stated that Lottery's final proxy statement and prospectus filed with the SEC on October 18, 2021, included various false or misleading statements. *See* FAC ¶¶ 77-78; Dkt. 171-2 (the "Proxy"). The FAC alleged that the Proxy included "false or misleading statements regarding Lottery's regulatory compliance and potential compliance risks," including that Lottery's business model would need to vary across jurisdictions "to ensure [it] remain[ed] in compliance with that jurisdiction's laws." FAC ¶ 78. Moreover, the FAC asserted that the financial projections in the Proxy, including Lottery's projection of $70 million in revenue and more than $3 million in earnings before interest, taxes, depreciation, and amortization ("EBITDA"), were materially false or misleading when made. FAC ¶¶ 80-81. According to Class Plaintiffs, Lottery failed to disclose "(i) that [Lottery] lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue; (ii) that [Lottery] was improperly recognizing revenue; and (iii) that [Lottery's] financial results as to cash and revenue were materially overstated." FAC ¶ 81.

The FAC further alleged that, on October 21, 2021, Lottery issued a press release announcing preliminary revenue results for the third quarter of 2021, including projected revenue "between $22.0 million and $24.0 million," that were "materially false or misleading when made." FAC ¶¶ 83-84. The FAC stated that Lottery again failed to disclose that the company lacked adequate internal controls, was improperly recognizing revenue, and that as a result, its financial results were materially overstated. FAC ¶ 84.

### 3. Post-Merger Events

The FAC stated that Defendants' practice of making materially false and/or misleading statements continued post-merger. Specifically:

- In a Form 8-K and 8-K/A filed on November 15, 2021, Lottery reported that for the three months ending on September 30, 2021, revenue increased from $1.6 million to $32.25 million, and that the "increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits," which was not the company's primary business activity.  FAC ¶ 65; *see* FAC ¶¶ 85, 89.[5]  Therefore, "nearly all of the $32.25 million in revenue for the quarter was derived from a single sale of marketing credits to an affiliate."  FAC ¶ 5.

- In its quarterly report for the 2021 fiscal third quarter, filed in a Form 10-Q and also filed on November 15, 2021, Lottery reported that it restated its financial statements on June 28, 2021, after identifying a "material weakness" relating to a technical accounting issue.  Lottery represented, however, that there were otherwise "no changes in [Lottery's] internal control over financial reporting . . . during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, [Lottery's] internal control over financial reporting."  FAC ¶ 87 (emphasis omitted).

- In Lottery's March 31, 2022 press release, filed as an attachment to a Form 8-K, and 2021 Annual Report, filed April 1, 2022, Lottery touted "strong" financial results for the fourth quarter of 2021 and the full-year 2021, including $68.5 million in revenue for 2021 "driven by the sale of $47.1 million in LotteryLink Credits for prepaid advertising, prepaid lottery games, marketing materials[,] and development services in the third and fourth quarters of 2021."  FAC ¶¶ 6, 66, 91.  Lottery's 2021 Annual Report, which was signed by DiMatteo, Clemenson, and Dickinson, also reported accounts receivable of $21,696,653, thereby "representing to investors that it had been paid, at least partially, by the customer who purchased the aforementioned $30 million of 'affiliate marketing credits.'"  FAC ¶¶ 6, 66; TAC ¶ 162.

- Moreover, the 2021 Annual Report stated that Lottery "had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020" but that the weakness was "largely related to personnel and staffing."  FAC ¶ 93.  Lottery stated that it had "commenced measures to remediate the identified material weakness"

---

[5] As explained in the Court's prior opinion, Lottery termed these credits "LotteryLink Credits," which "could be purchased by [Lottery's] third-party marketers and redeemed as advertising credits to support promotional packages (such as prepaid advertising, prepaid lottery games, among other things) via [Lottery's] LotteryLink affiliate marketing program." *Lottery I*, 715 F. Supp. 3d at 525-26 (alterations in original) (quoting FAC ¶ 5 n.1).

and that there "was no change in [Lottery's] internal control over financial reporting." FAC ¶ 93 (emphasis omitted).

- The 2021 Annual Report also stated that Lottery "create[d] strong working relationships with the regulatory authorities in the jurisdictions in which [it] does business, to ensure transparent regulatory compliance." FAC ¶ 62. Lottery further stated that the company believed it was "in compliance with all material domestic and international laws and regulatory requirements applicable to [its] business." FAC ¶ 62.

- In a May 16, 2022 press release filed on a Form 8-K and Lottery's quarterly report for the first quarter of 2022 (the "2022 Q1 report") filed on a Form 10-Q, Lottery reported $21.2 million in revenue during the first quarter of 2022 and $50.8 million in cash during the first quarter of 2022, attributing the increase in revenue to "the sale of $18 million in LotteryLink credits for prepaid promotional rewards, marketing materials[,] and development services." FAC ¶¶ 67, 95.

- The 2022 Q1 report also stated that Lottery had "concluded that as of the end of the period covered by this Quarterly Report, [Lottery's] disclosure controls and procedures were not effective due to the material weakness in [its] internal control over financial reporting" related to its financial statement close and reporting processes. FAC ¶ 97 (emphasis omitted). Lottery stated, however, that "[n]otwithstanding such material weakness in [its] internal control over financial reporting, [Lottery's] management concluded that [its] condensed consolidated financial statements included in [its] Quarterly Report fairly present, in all material respects, [its] financial position, results of operations, and cash flows." FAC ¶ 97 (emphasis omitted).

The FAC further asserted that, beginning on July 6, 2022, a "series of disclosures revealed the true state of Lottery's financial and operational condition." FAC ¶ 9. In a Form 8-K filed with the SEC on July 6, 2022, Lottery disclosed that an internal investigation revealed "issues pertaining to [Lottery's] internal accounting controls" and "instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment." FAC ¶¶ 63, 68 (emphasis omitted). Lottery also disclosed that its Board had fired Dickinson from his position as Lottery's CEO, President, and Treasurer, effective July 1, 2022. FAC ¶ 68. On July 15, 2022, Lottery announced in a Form 8-K that its chief revenue officer, Clemenson, had resigned on July 11, 2022, effective immediately. FAC

¶ 69.  Lottery also reported that its internal investigation had "preliminarily concluded that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount."  FAC ¶ 69 (alteration adopted) (emphases omitted).

On July 22, 2022, Lottery filed a Form 8-K disclosing that its independent auditor had "determined 'that the audited financial statements for the year ended December 31, 2021, and the audited financial statements for the quarter ended March 31, 2022, should no longer be relied upon,' and 'that a [Lottery] subsidiary entered into an undisclosed line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.'"  FAC ¶ 71 (emphases omitted).  Lottery also disclosed the resignation of DiMatteo, Lottery's CEO, effective immediately.  FAC ¶ 71.

### 4. *Lottery I* Decision

In *Lottery I*, this Court dismissed Plaintiffs' claims in their entirety without prejudice. First addressing falsity under Federal Rule of Civil Procedure Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court held that pre-merger statements concerning regulatory compliance amounted to "non-actionable puffery" of the kind routinely deemed inactionable.  *In re Lottery.com*, 715 F. Supp. 3d at 536.  In so finding, the Court underscored that the statements were "too general to cause a reasonable investor to rely upon them."  *Id.*  With respect to the pre-merger financial projections and preliminary revenue results, the Court held that, because these were "forward-looking statements"

accompanied by "sufficient cautionary language," they were protected by the bespeaks-caution doctrine. *Id.* at 537-40.

As for Lottery's post-merger statements of regulatory compliance, the Court held that "Plaintiffs [did] not allege enough facts to support the inference that, when Lottery stated in the 2021 Annual Report that it believed it was complying with applicable laws, Lottery did not actually believe that fact." *Id.* at 551. However, the Court found that "Plaintiffs have plausibly alleged that each of the post-merger financial-performance-related statements was 'false or misleading at the time it was made.'" *Id.* at 543 (alteration adopted) (quoting *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 12 (2d Cir. 2019) (summary order)). But the Court held that claims based on these statements still failed for a lack of scienter. Specifically, the Court found that Plaintiffs failed to plead sufficient allegations to give rise to a "strong inference" of scienter either under a motive-and-opportunity theory or through strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* at 560; *see id.* at 553-60.

With respect to a motive and opportunity to defraud, the Court underscored that "[t]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." *Id.* at 554 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)). Therefore, allegations that Defendants received stock in exchange for the consummation of the business combination, or that Defendants sought to "inflate [the] company's stock price in advance of a public offering," were insufficient to establish a cognizable motive. *Id.* (citation omitted). The Court observed that, notwithstanding the unique concerns presented by SPACs, there was no SPAC-based

"exception to the general principle that the prospect of a public offering, standing alone, is insufficient to establish motive." *Id.* at 555.

As for conscious misbehavior or recklessness on the part of the Defendants, the Court rejected each of the reasons Plaintiffs alleged for finding that Defendants had knowledge of the falsity of their statements. The Court found that the July 2022 disclosures of accounting errors were not by themselves sufficient to support a "strong inference of scienter" because "plaintiffs may not plead fraud by hindsight." *Id.* at 556 (citation omitted) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010)). Likewise, the Court rejected that scienter could be inferred from the "magnitude of the restatement, the fact that the restatement concerned a core operation of the company, and the departures of the company's executives and auditor." *Id.* at 559. None of these, the Court held, amounted to an "extreme departure from the standards of ordinary care." *Id.* at 556 (quoting *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.* (*APERS*), 28 F.4th 343, 355 (2d Cir. 2022)). In so holding, the Court emphasized that "[w]hat is noticeably missing from the Amended Class-Action Complaint and the Hoffman Complaint is any allegation that Defendants had any contemporaneous basis to believe that the information they related was incorrect that would be sufficient to allege the requisite 'conscious recklessness.'" *Id.* at 558 (alterations adopted) (quoting *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012)).

## III.    Class Plaintiffs' TAC and Hoffman's SAC

The Class Plaintiffs and Hoffman thereafter filed amended complaints. Hoffman's SAC and Class Plaintiffs' TAC incorporate their prior allegations and remain centered on Lottery's "failure to adhere to gambling regulations and the improper recognition of revenue to appear more profitable ahead of taking the [c]ompany public." TAC ¶ 2. However, Plaintiffs now introduce additional facts pertaining to: (1) Lottery's revenue recognition,

13

including its recognition of an alleged $30 million sham client transaction; (2) Lottery's legal and regulatory noncompliance and, in particular, its alleged practice of purchasing lottery tickets outside of the state where customers resided; and (3) Lottery's use of geofencing technology.[6]  *See* TAC ¶¶ 75-89, 139-144.  The Court focuses primarily on these new allegations.

As an initial matter, the TAC quotes extensively from a March 2024 *Bloomberg Tax* article entitled, "From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded"[7] (the "*Bloomberg* article").  The parties dispute whether the *Bloomberg* article is a reliable source that may be considered on Defendants' motion to dismiss.  *See* C&D Br. at 20-21; Lottery Class Opp. at 20-21.  The Court finds that, at this juncture, the article is properly considered.  First, the TAC quotes extensively from the article and therefore incorporates it by reference.  *See, e.g.*, *Bergesen v. Manhattanville Coll.*, No. 20-cv-03689 (KMK), 2021 WL 3115170, at *2 (S.D.N.Y. July 20, 2021) ("A statement is incorporated in the complaint if the plaintiff makes a 'clear, definite, and substantial reference to the documents.'" (alteration adopted) (quoting *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-cv-07134 (VM), 2015 WL 4940126, at *7 (S.D.N.Y. Aug. 10, 2015))).  Moreover, newspaper articles may be credited "to the extent that other factual allegations would be," that is, "if they are sufficiently particular and detailed to indicate their reliability."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (citation omitted).  The *Bloomberg* article, which was based on

---

[6] The geofencing technology used by Lottery is a "type of geolocation technology whereby a mobile app or software uses geolocation technology to create and trigger a defined geographical boundary known as a geofence."  TAC ¶ 15 n.3.

[7] Nicola M. White, *From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded*, Bloomberg Tax (Mar. 4, 2024, 5:01 AM), https://news.bloombergtax.com/financial-accounting/from-spac-dreams-to-a-riviera-mirage-how-lottery-com-imploded.

interviews with more than a dozen current and former employees, board members and vendors; audio recordings, internal communications, and board documents; and press releases, lawsuits, and securities filings, TAC ¶ 132, clears that threshold.  The article also incorporates detailed allegations pertaining to Lottery's compliance with state and federal laws and its recognition and reporting of company revenues — issues integral to Plaintiffs' securities-fraud allegations.  It therefore bears sufficient indicia of reliability to justify consideration on a motion to dismiss.  *See, e.g.*, *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*., 19 F.4th 145, 150 (2d Cir. 2021) (relying on news articles in assessing securities-fraud claims); *Lopez v. CTPartners Exec. Search Inc*., 173 F. Supp. 3d 12, 31 (S.D.N.Y. 2016) (observing that to meet heightened pleading requirements for claims of fraud, "a plaintiff is permitted to rely on newspaper articles, provided that the reports themselves 'indicate particularized facts . . . in order to support Plaintiffs' claims'" (omission in original) (quoting *Miller v. Lazard, Ltd*., 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007))).

Defendants' assertion that the Bloomberg article is not admissible evidence because it incorporates privileged information misconstrues the standard for considering materials on a motion to dismiss.  C&D Br. at 20-21; C&D Reply at 2.  "[A] plaintiff need not offer admissible proof of its allegations for the Court [to] accept them as true at [the motion-to-dismiss] stage."  *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent., Inc*., 477 F. Supp. 3d 123, 133 (S.D.N.Y. Aug. 6, 2020) (rejecting argument that plaintiff's securities-fraud allegations were "based on hearsay and unreliable news sources"); *see also United States. v. 64 Lovers Lane*, 830 F. Supp. 750, 756 (S.D.N.Y. 1993) (explaining that the court does "not assess the admissibility or weight that should be afforded to evidence" on a motion to dismiss).  Defendants separately assert that the *Bloomberg* article is unreliable because it "relies on unnamed sources," C&D Br. at 2, including an anonymous board member's

statement that the company was "breaking the law in 42 different ways," C&D Reply at 3. The *Bloomberg* article's reliance on unnamed sources is, however, not fatal. "To make out a § 10(b) or § 20 claim, a plaintiff may rely on an unnamed confidential witness," so long as the plaintiff "identif[ies] the roles occupied by the witnesses with 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Gregory v. ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 408 n.21 (S.D.N.Y.) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)), *aff'd,* 757 F. App'x 35 (2d Cir. 2018) (summary order).  Defendants' contention that reliance on an unnamed confidential source requires the source to be "personal," that is, personally known to the Plaintiffs, reads *Novak* too narrowly; *Novak* more broadly "reject[ed] any notion that confidential sources must be named as a general matter" under the PSLRA.  216 F.3d at 314; *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (summary order) ("Although the witnesses are not identified by name in the complaint, plaintiffs' descriptions of these persons are sufficiently particular to permit the strong inference of scienter necessary for plaintiffs to sustain their burden on a motion to dismiss."); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14-cv-0950 (LAK) (AJP), 2015 WL 4931357, at *18 n. 25 (S.D.N.Y. Aug. 19, 2015) ("The PSLRA does not require confidential sources to be named in the complaint.  A complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (alteration adopted) (quoting *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,794 F.3d 297, 305 (2d Cir. 2015))), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp.3d 120, 141 (S.D.N.Y. June 28, 2021) (crediting claim based on account of a "single, unidentified

source").  More importantly, the Court's findings below would be the same even if it did not

consider the anonymous statements cited in the *Bloomberg* article and incorporated by

reference in the TAC.

The Court therefore credits the allegations made in reliance on the *Bloomberg* article

and turns to Plaintiffs' newly pleaded allegations.

### 1. Revenue Recognition

According to the TAC, on September 20, 2021, before the Proxy was issued and the

business combination was consummated, "[Lottery] entered into an agreement with a major

customer for the sale of Lottery's service credits with a total purchase price of $30 million"

(the "September 2021 Transaction").  TAC ¶ 75.  "[T]he customer was required to pay the

purchase price within 90 days pursuant to this agreement."  TAC ¶ 75.  However, "[u]pon

execution of the purchase agreement (that is, before Lottery transferred any credits to the

customer), [Lottery] recognized the $30 million as income and recorded $10 million in cost of

sales related to this transaction."  TAC ¶ 75.  According to the TAC, "the customer provided

payment prior to December 31, 2021, in the form of a check."  TAC ¶ 76.  Bloomberg

reported, and the TAC alleges, that "company officials arranged for a courier to collect [the]

check from the buyer two days before New Year's Eve."  TAC ¶ 137 (quoting White, *supra*

note 7).  Lottery did not, however, actually deposit the check; instead, on January 4, 2022, it

allegedly used proceeds from the business combination with Trident to acquire a $30 million

line of credit through its subsidiary, AutoLotto, with Provident Bank.  TAC ¶ 76.[8]  The

transaction was evidenced by a $30 million promissory note signed by Lottery's chief

---

[8] *See generally* Lottery.com Inc., Quarterly Report exh. 10.1 (Form 10-Q) (May 22, 2023),
https://sec.gov/Archives/edgar/data/1673481/000149315223018441/ex10-1.htm (Business
Loan Agreement dated January 4, 2022, between AutoLotto, Inc. and The Provident Bank).

financial officer, Dickinson.  TAC ¶ 76.  Lottery subsequently "allowed the customer to use the funds to purchase Lottery's credits."  TAC  ¶ 77.  According to Plaintiffs, this entire transaction was a "massive sham" designed "specifically to inflate [Lottery's] purported revenue."  TAC ¶ 7.

"[Lottery] invoiced more than $35 million to this one customer for 'various services and advertising credit' Lottery claimed to have provided it."  TAC ¶ 11.  "As [Lottery] explained in its May 16, 2022 quarterly report, 'Customer A' accounted for 87.7% of [Lottery's] revenue and 99.6% of [Lottery's] accounts receivable for the Lottery's 2022 fiscal first quarter."  TAC ¶ 103.  "This was included in [Lottery's] financial results as revenue of $17,117,472 in the fourth quarter of 2021 and $18,539,472 in the first quarter of 2022."  TAC ¶ 11.  Moreover, Lottery "included the $30 million of Collateral Security for the loan as cash on [Lottery's] March 31, 2022 balance in violation of GAAP [Generally Accepted Accounting Principles]."  TAC ¶ 96.  Plaintiffs allege that "[t]his was clearly improper, and [Lottery's] executives must have known as much since the collateral became restricted and remained restricted until October 12, 2022, when AutoLotto defaulted on its obligations under the Business Loan and Provident foreclosed on the $30,000,000 of Collateral Security."  TAC ¶ 96 (quotation marks omitted).  "According to Bloomberg, a member of [Lottery's] management team referred to the whole transaction as a 'check kite' a year later at a meeting explaining the transaction to an outside adviser."  TAC ¶ 138.  "As Investopedia explains, 'Kiting' involves the illegal use of financial instruments to fraudulently obtain additional credit."  TAC ¶ 138.

As relevant to the structure of the September 2021 transaction, Class Plaintiffs' TAC highlights additional language in the Proxy related to Lottery's revenue-recognition practices,

including Lottery's representation that it recognizes revenue consistently with the Financial

Accounting Standards Board ("FASB")'s Accounting Standards Codification ("ASC") 606:

> The amended guidance [regarding revenue from contracts with customers] is
> effective for accounting periods commencing on or after January 1, 2018.
>
> We have applied ASC 606 to all revenue contracts.  The core principle
> of ASC 606 is that an entity recognizes revenue to depict the transfer of promised
> goods or services to customers in an amount that reflects the consideration to
> which the entity expects to be entitled in exchange for those goods or services.
> Revenues are generally recognized upon the transfer of control of promised
> products provided to our users, customers[,] and subscribers, reflecting the
> amount of consideration we expect to receive for those products.

TAC ¶ 147.

The TAC states that these statements were materially false or misleading when made,

or omitted material facts necessary to make the statements not misleading, because Lottery

failed to disclose:

> (i) that these projections for 2021, which were provided to investors more than
> two weeks into the fourth quarter of 2021, were premised almost entirely on the
> sale of various services and advertising credits in the September 2021 Sham
> Transaction; (ii) that the company never actually transferred (or was even able
> to transfer) these purported "service credits" to the customer even though they
> had invoiced them and treated them as revenue; and (iii) that as a result,
> [Lottery's] financials, including revenue figures, were materially misleading.

TAC ¶ 149.

According to the TAC, "[l]ong after all of the Individual Lottery Defendants were no

longer with [Lottery], Lottery finally admitted that the entire $30 million transaction was a

sham."  TAC ¶ 10.  In a Form 10-Q/A filed on May 15, 2023, Lottery stated:

> On September 20, 2021, [Lottery] entered into a purchase agreement with a
> major customer for the sale of various service credits with a total purchase price
> of $30,000,000. . . . During 2022, [Lottery] discovered that the service credits it
> had sold to the customer were non-transferrable and that [Lottery] had pledged
> its own cash accounts to secure a line of credit in the amount of $30,000,000
> utilized by the customer to provide [Lottery] with payment towards the purchase
> of the service credits.

TAC ¶ 83 (citation and emphasis omitted).  Lottery thereafter "cancelled the transaction" and did not recognize the income or recognize a cash payment in the company's financial statements.  TAC ¶ 85.  "As such, the [c]ompany simply took off its books every single cent of the transactions with the 'major customer.'"  TAC ¶ 85.

The TAC further alleges that "the Lottery Defendants engaged in other acts of improper revenue recognition," TAC at 33 (capitalization omitted), including improperly recognizing revenue from a $5,000,000 agreement with a client in 2021, and improperly recording $6,500,000 as a note receivable (subsequently corrected to $2,000,000) in connection with a secured promissory note entered into with a customer, TAC ¶ 90.

According to Plaintiffs, Lottery subsequently disclosed that the September 21, 2021 transaction was effectively a sham.  Lottery's May 15, 2023 Form 10-Q/A with the SEC for the quarterly period ended March 31, 2022, explained:

> On January 4, 2022, AutoLotto entered into a Business Loan Agreement (the "Business Loan") with The Provident Bank ("Provident"), pursuant to which [Lottery] borrowed $30,000,000 from Provident, which was evidenced by a $30,000,000 Promissory Note.  In accordance with the terms of the Business Loan, upon entering into the agreement, $30,000,000 in a separate account with Provident was pledged as security for the amount outstanding under the loan ("Collateral Security").  The $30,000,000 Collateral Security became restricted and remained restricted until October 12, 2022, when AutoLotto defaulted on its obligations under the Business Loan and Provident foreclosed on the $30,000,000 of Collateral Security.

TAC ¶ 108 (citation omitted).  Moreover, on June 15, 2023, Lottery disclosed in its Annual Report on Form 10-K for the year ended December 31, 2022, that "management did not design and maintain sufficient procedures and controls related to revenue recognition, including those related to ensuring accuracy of revenue recognized from non-routine transactions such as the sales of LotteryLink Credits."  TAC ¶ 127 (citation omitted).

## 2.    The Merger Between Lottery and Trident

According to the TAC, on October 29, 2021, Lottery announced the completion of the business combination, and, upon closing, the combined entity was named Lottery.com.  TAC ¶ 65.  On November 1, 2021, Lottery's common shares and warrants began trading on the NASDAQ under the ticker symbols "LTRY" and "LTRYW," respectively.  TAC ¶ 65. Plaintiffs' TAC pleads additional allegations pertaining to Trident's and Lottery's personal financial incentives to complete a business combination.  For instance, the TAC includes additional facts with respect to the proceeds each of the Individual Lottery Defendants received upon the closing of the business combination.  *See* TAC ¶¶ 71-74.  The TAC also pleads additional allegations pertaining to Komissarov's role in the business combination, including his financial motivations to close the transaction and his role in conducting due diligence on Lottery.  *See* TAC¶¶ 66-70.  Plaintiffs allege that "[a]s Komissarov stood to gain financially only if the Business Combination was consummated, he had the incentive to not look too closely into the legality of Lottery's operations or the assumptions underlying the Business Combination."  TAC ¶ 68.

## 3.    Lottery's Legal and Regulatory Compliance

The TAC also provides additional color on Lottery's alleged violations of gaming laws and regulations pertaining to ticket procurement and fulfillment.  "As explained in the *Bloomberg* article, under state lottery regulations, even if a lottery ticket was purchased online, Lottery (and other online retailers) would need to send a courier in 'each state to go to convenience stores and gas stations to buy tickets and store them.'"  TAC ¶ 139 (quoting White, *supra* note 7).  However, "according to an internal investigation initiated by the company's chief legal officer, Katie Lever," Lottery did not always have enough couriers to purchase tickets.  TAC ¶ 139 (quoting White, *supra* note 7).  As a result, "Lottery would print

the ticket at its backup hub in Texas," which would "resul[t] in the purchase not occurring in the correct state and more importantly, rendered it illegal." TAC ¶ 140. "According to an internal memo review[ed] by Bloomberg, the practice had been going on since before 2020 and was so wide-spread that in 'a seven-month period, Lottery.com printed out *more than 500,000 tickets* worth more than $1.1 million in Texas for out-of-state lottery players.'" TAC ¶ 141 (quoting White, *supra* note 7). "[A]ccording to a transcript of a June 2022 meeting obtained by Bloomberg, one board member [commented on the practice:] 'We are breaking the law in 42 different ways' and 'I am without words. The potential for Homeland Security, AML [anti-money laundering laws], and all the other things that come into play is beyond breathtaking.'" TAC ¶ 143 (alteration in original) (quoting White, *supra* note 7).

In its newly pleaded allegations, the TAC also highlights additional language pertaining to regulatory and legal compliance in the Proxy and the 2021 Annual Report. The Proxy asserted that, "for [Lottery's] users located within the . . . U.S., we only purchase lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted, unless an exception were to be authorized by the applicable lottery authorities." TAC ¶ 150 (citation and emphasis omitted). Moreover, Lottery stated that its business model and operations "may have to vary in each jurisdiction" it conducts business in "to ensure [Lottery] remain[s] in compliance with applicable laws"; that it "only purchase[s] lottery games . . . in accordance with applicable laws"; and that it monitored regulations to "ensure transparent regulatory compliance." TAC ¶ 152 (citation and emphases omitted). Lottery also reiterated that it was "firmly committed to full compliance with all applicable laws," and stated that it "believe[s] . . . we are currently in compliance in all material respects with all applicable laws and regulatory requirements." TAC ¶ 152 (emphases and citation omitted); *see also* TAC ¶ 152

("[W]e believe that we are in compliance with all material domestic and international laws and regulatory requirements applicable to us . . . ." (emphasis and citation omitted)).

Likewise, Lottery's 2021 Annual Report stated that Lottery "only purchase[s] lottery games . . . in accordance with applicable laws" and monitored regulations to "ensure transparent regulatory compliance." TAC ¶ 166 (emphases and citation omitted). Like the Proxy, the 2021 Annual Report also reiterated Lottery's "belie[f] that [Lottery is] currently in compliance in all material respects with all applicable laws and regulatory requirements," and Lottery's "commit[ment] to full compliance with all applicable laws." TAC ¶ 166 (emphases and citation omitted).

### 4.  Geofencing Technology

Plaintiffs' TAC now also focuses on Lottery's use of geofencing technology, defined as a "type of geolocation technology whereby a mobile app or software uses geolocation technology to create and trigger a defined geographical boundary known as a geofence." TAC ¶ 15 n.3. According to the TAC, while Lottery stated in SEC filings that it used geolocation technology to confirm the location of its web-based customers, TAC ¶ 15, Lottery's internal investigation revealed that "[a]nybody using the web-based system, as opposed to the mobile app, could skirt any jurisdictional requirement for ticket purchases," TAC ¶ 142.

According to the TAC, Lottery made misrepresentations regarding its use of geofencing technology in its public filings. For instance, the Proxy and 2021 Annual Report both stated that Lottery "verifie[s] [users'] location through geofencing technology." TAC ¶ 168 (emphasis and citation omitted); *see also* TAC ¶ 150. Moreover, the Proxy stated that for users located within the United States, Lottery "only purchase[s] lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery

23

game they are purchasing is being conducted." TAC ¶ 168 (emphasis and citation omitted); *see also* TAC ¶ 150. Plaintiffs assert that these were material misstatements because Lottery in fact "lacked the technological ability to enforce these jurisdictional requirements with respect to customers who purchased through the web-based system (as opposed to the mobile app)." TAC ¶ 151.

According to Bloomberg's review of company filings and an SEC subpoena, "[t]he SEC and Department of Justice are investigating the company and some of its founders over the findings of the internal investigation and other matters including the credit sales transaction." TAC ¶ 144 (quoting White, *supra* note 7); *see also* TAC ¶ 4. Following the internal investigation and "at the direction of the Board," management "'shut down the web-based application.'" TAC ¶ 143 (quoting White, *supra* note 7).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court accepts a complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *See DeCarlo*, 80 F.4th at 168. Still, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## DISCUSSION

### I.    Section 10(b) Claims

Plaintiffs assert Section 10b and Rule 10b-5 claims against the Lottery Defendants.

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange

Commission's Rule 10b-5 prohibit making any material misstatement or omission in

connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund,*

*Inc.*, 573 U.S. 258, 267 (2014).  To state a claim under Section 10(b) and Rule 10b-5, a

plaintiff must allege: "(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or

sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and

(6) loss causation." *Id.* (citation omitted).

Section 10(b) claims must satisfy the heightened pleading requirements of Federal

Rule of Civil Procedure Rule 9(b) and the PSLRA.  *See In re Synchrony Fin. Sec. Litig.*, 988

F.3d 157, 166 (2d Cir. 2021); *accord ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87,

99 (2d Cir. 2007).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b).  "To do so, a plaintiff must: (1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent." *In*

*re Synchrony*, 988 F.3d at 167 (quotation marks and citation omitted).  "Allegations that are

conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d

at 99.

For its part, the PSLRA "imposes procedural and substantive limitations upon the

scope of the private right of action available under § 10(b) and Rule 10b-5." *Chadbourne &*

*Parke LLP v. Troice*, 571 U.S. 377, 383 (2014).  "The PSLRA requires plaintiffs to 'specify

25

each misleading statement; . . . set forth the facts on which a belief that a statement is misleading was formed; and . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *In re Synchrony*, 988 F.3d at 166-67 (omissions in original) (quoting *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012)).  The PSLRA also requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," that is, scienter.  15 U.S.C. § 78u-4(b)(2)(A); *accord Tellabs*, 551 U.S. at 314.

As before, the Lottery Defendants challenge Plaintiffs' Section 10(b) and Rule 10b-5 claims for insufficient allegations of falsity and scienter.  The Court addresses each ground in turn.

### A.  Falsity

#### 1.  Overview of Falsity

The first element of a securities-fraud claim is "a material misrepresentation or omission by the defendant."  *Halliburton*, 573 U.S. at 267 (citation omitted).  "At the pleading stage, a plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *DeCarlo*, 80 F.4th at 182 (ellipsis and citation omitted).  In other words, there must be a "substantial likelihood" that the statement or omission "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation marks and citation omitted).

"The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."  *APERS*, 28 F.4th at 354 (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d

86, 92 (2d Cir. 2010)). Ultimately, "whether a statement is 'misleading' depends on the perspective of the reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). "The inquiry (like the one into materiality) is objective," *id.* at 187, and it considers not only a statement's "literal truth," but also the "context and manner of presentation," *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation omitted).

As this Court previously explained, the "distinction between statements of fact and statements of opinion presents another wrinkle." *Lottery I*, 715 F. Supp. 3d at 533. "In general, a fact is 'a thing done or existing or an actual happening,' while an opinion is 'a belief, a view, or a sentiment which the mind forms of persons or things.'" *DeCarlo*, 80 F.4th at 169 (quoting *Omnicare*, 575 U.S. at 183). "A statement of fact 'expresses certainty about a thing,' while a statement of opinion does not." *Id.* (quoting *Omnicare*, 575 U.S. at 183). "Under *Omnicare*, statements of opinion are actionable misrepresentations or omissions in at least three situations: (1) when 'the speaker did not hold the belief she professed'; (2) when 'the statement of opinion contains embedded statements of fact that are untrue'; and (3) when 'the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor.'" *Lottery I*, 715 F. Supp. 3d at 533 (quoting *DeCarlo*, 80 F.4th at 171); *see also DeCarlo*, 80 F.4th at 170 ("In the context of a securities transaction, a reasonable investor expects that opinion statements rest on some meaningful inquiry, fairly align with the information in the issuer's possession at the time, and do not reflect baseless, off-the-cuff judgments." (ellipsis, brackets, quotation marks, and citation omitted)).[9]

---

[9] This Court previously explained that, although *Omnicare* involved Section 11 of the Securities Act of 1933, that provision "shares the relevant text concerning false and

Plaintiffs' TAC asserts roughly three categories of material misstatements: (1) pre-merger statements; (2) post-merger statements regarding Lottery's financial performance; and (3) post-merger regulatory statements.  Many of Plaintiffs' allegations are merely variations of what this Court has already deemed insufficient for purposes of a Section 10(b) claim. Nevertheless, the Court addresses each category in turn.

### 2.  Pre-Merger Statements

Plaintiffs have identified the following alleged misstatements prior to the consummation of the merger:

- The Proxy's discussions of financial projections for the 2021 fiscal year, TAC ¶¶ 148-49;

- The statements in the October 21, 2021 Press Release regarding Lottery's revenue in the third quarter of 2021, *id.* ¶ 154;

- The Proxy's discussion of legal and regulatory compliance and potential compliance risks, *id.* ¶¶ 150-52; and

- The Proxy's discussion of Lottery's adherence to ASC 606's guidelines for revenue recognition, *id.* ¶ 147.

The Court next addresses each of these statements.

### i.    Pre-Merger Financial-Performance-Related Statements

As discussed *supra*, this Court previously considered — and rejected — Plaintiffs' assertion that the Proxy's financial projections were actionable statements.  Nothing has changed on this front in Plaintiffs' amended complaints.  For the same reasons as set forth in *Lottery I*, the Court finds that the bespeaks-caution doctrine applies to the Proxy's projections for the 2021 fiscal year.  *See Lottery I*, 715 F. Supp. 3d at 537-39.  That is, the Proxy's

---

misleading statements with Rule 10b-5." *Lottery I*, 715 F. Supp. 3d at 533 (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020)).  For that reason, the Second Circuit has "applied the holding in *Omnicare* to claims brought under Section 10(b) of the Exchange Act."  *DeCarlo*, 80 F.4th at 178 n.16.

projections are "forward-looking statements" accompanied by "sufficient cautionary language" to make them nonactionable.  *Id.* at 538.  Likewise, the October 21, 2021 press release's reporting of preliminary revenue results for the third quarter of 2021 is covered by the bespeaks-caution doctrine because "courts in the Second Circuit generally treat 'corporate statements of projections as to corporate earnings' as forward-looking statements, 'without regard to whether the last day of the covered earnings period had passed.'"  *Id.* at 540 (quoting *Lopez*, 173 F. Supp. 3d at 39).

The Court is not persuaded by Plaintiffs' argument that the cautionary language in the Proxy and October 2021 press release are deficient because they warned only of "internal control deficiencies," not of the possibility of a "sham" transaction.  Lottery Class Opp. at 49-50.  The gravamen of Plaintiffs' Complaints with respect to Lottery's financial statements is that Lottery improperly recognized revenue prior to the actual transfer of property and/or receipt of funds.  That is an internal control issue: indeed, the TAC continues to allege that Lottery "lacked adequate internal accounting controls, including controls over financial reporting of cash and revenue."  TAC ¶ 155.  The Proxy's cautionary language, including that Lottery had "not been required to document and test [its] internal controls over financial reporting," Proxy at 74, therefore sufficiently warns of the risks implicated by the September 2021 transaction.

### ii.    Pre-Merger Compliance Statements

The TAC's assertion of pre-merger statements regarding legal and regulatory compliance, however, requires closer analysis.  Lottery's pre-merger statements pertaining to regulatory and legal compliance fall within roughly three subcategories.  The first consists of specific assertions related to Lottery's compliance with jurisdictional requirements, including Lottery's statement that it "only purchase[s] lottery games for users geolocated to be

physically situated within the . . . jurisdiction where the lottery game they are purchasing is being conducted." TAC ¶ 150 (emphasis and citation omitted). The second concerns Lottery's use of geofencing technology, including Lottery's representation that it "verif[ied] [users'] location through geofencing technology integrated into [Lottery's] Platform." *Id.* (emphasis and citation omitted); *see also id.* ("Individuals that are not physically located within one of the jurisdictions where our services are offered, as verified by geofencing technology, are not permitted to register to purchase a lottery game." (emphases and citation omitted)). The third includes more generalized comments as to compliance, including that Lottery "only purchase[s] lottery games . . . in accordance with applicable laws"; "closely monitor[s]" regulations to "ensure transparent regulatory compliance" and to "ensure [Lottery] remain[s] in compliance with applicable laws"; and was "firmly committed to full compliance with all applicable laws." *Id.* ¶ 152 (emphases and citation omitted).

Turning first to the Proxy's assertion that Lottery "only" purchases tickets for users in the same jurisdiction as where the lottery game will be conducted, the Court finds that Plaintiffs have plausibly alleged that this statement was false when made. This conclusion necessarily follows from the allegations that Lottery was "printing out lottery tickets in states where the purchaser was not located" "since before 2020." *Id.* ¶ 14. The complaints also sufficiently allege facts that support a finding of materiality. Unlike "general statements about reputation, integrity, and compliance with ethical norms," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014), the statement that Lottery "only" purchases tickets in the same state where those games will be played is "sufficiently specific" and "concrete" to engender reasonable reliance by investors. *See id.* at 185 ("To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some

concrete fact or outcome which, when it proves false or does not occur, forms the basis for a

§ 10(b) fraud claim.").

Defendants argue that this assertion is nevertheless insufficiently particularized

because "nothing indicates exactly when [Lottery's] purported violations of law with respect

to out-of-state ticket printing" occurred, and "whether they occurred before or after the Proxy

or the 2021 Annual Report were issued."  C&D Br. at 21.  Defendants mischaracterize

Plaintiffs' TAC, which explicitly alleges that Lottery's practice of out-of-state printing has

taken place "since before 2020," TAC ¶ 14 — well before the issuance of the Proxy.  That

suffices at this juncture.  *See Sjunde AP-Fonden,* 545 F. Supp. 3d at 141 ("[A] plaintiff need

not plead dates, times, and places with absolute precision, so long as the complaint gives fair

and reasonable notice to defendants of the claim and grounds upon which it is based."

(quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp.2d 148, 162 (S.D.N.Y.

2008))).  As for Defendants' contention that the TAC does not describe the magnitude of the

legal infractions (whether they "occurred in isolated incidents or otherwise evaded

detection"), or "otherwise connec[t] the alleged violations of law to facts showing that they

were known to Defendants at the time," C&D Br. at 21-22, Defendants again "collapse the

falsity and scienter inquiries."  *Lottery I,* 715 F. Supp. 3d at 542.  The magnitude of Lottery's

noncompliance and Defendants' awareness thereof bears not on the question of falsity but on

scienter.  Whether Defendants "knew" of the violations is beside the point for determining the

falsity of Lottery's statements.  *See, e.g.*, *Westchester Teamsters Pension Fund v. UBS AG*,

604 F. App'x 5, 7 n.2 (2d Cir. 2015) (summary order) ("Plaintiffs need not demonstrate

Defendants had knowledge or a belief that they were making a 'material misrepresentation or

omission' in order to satisfy the [material misrepresentation or omission] element.  Rather, to

prove this first element Plaintiffs need show only that a false statement was made or that an

omission of material fact occurred."); *see also In re Lehman Bros. Sec. & ERISA Litig.*, 131 F.

Supp. 3d 241, 252 (S.D.N.Y. 2015) ("[A] statement is 'untrue' for purposes of Rule 10b-5

regardless of whether the speaker knew it was false or thought, mistakenly, that it was

correct."); *Omnicare*, 575 U.S. at 183-84 (finding a "determinate, verifiable statement" false

irrespective of "however innocently" the speaker "got the facts wrong").

Lottery's statements with respect to the use of its geofencing technology are, however,

another matter.  Plaintiffs argue that Lottery's statements regarding the use of its geofencing

technology were misleading by omission.  According to Plaintiffs, the Individual Lottery

Defendants' "repeated assurances that Lottery employed geofencing technology to prevent

customers from purchasing lottery tickets in states other than where they were located were

highly misleading given the Individual Lottery Defendants' concurrent failure to disclose that

such technology could not identify where customers using Lottery's web-based system (as

opposed to its mobile application) were located."  Lottery Class Opp. at 22-23; *see also* TAC

¶ 15.  The TAC alleges that Lottery's internal investigation disclosed that "[a]nybody using

the web-based system, as opposed to the mobile app, could skirt any jurisdictional

requirement for ticket purchases."  TAC ¶ 142; Tr. at 47:6-10 (Defendants suggesting at oral

argument that customers using a VPN could bypass the geofencing technology and therefore

"skirt" jurisdictional requirements).

Plaintiffs' argument fails for at least two reasons.  First, there are no allegations that

technical difficulties with Lottery's web-based application were in fact occurring

"concurrent[ly]," Lottery Class Opp. at 23, with Defendants' representations in the Proxy.  In

other words, Plaintiffs have not pleaded any facts regarding the timing of the geofencing

technology's deficiencies, let alone facts to suggest that those deficiencies were occurring as

of October 2021.[10]  Plaintiffs argue that the "TAC plainly alleges that Lottery's out-of-state

ticket purchasing and geofencing related misconduct was ongoing since at least 2020 (*i.e.*,

prior to the start of the Class Period)."  Lottery Class Opp. at 21.  The TAC, however, alleges

only that, "[a]ccording to the Bloomberg article, since before 2020, Lottery was printing out

lottery tickets in states where the purchaser was not located, which was an illegal

practice."  TAC ¶ 14.  There are no comparable allegations with respect to the timing of the

geofencing-related issues.  And there are no allegations that connect the timing of the

geofencing-related issues, *id.* ¶ 142, with the allegations that Lottery printed out-of-state

tickets prior to 2020 because it did not always have enough couriers to purchase tickets in the

states where the customers resided, *id.* ¶¶ 139-141.  To the contrary, with respect to

geofencing, the TAC merely states that Lottery's internal investigation (which concluded in

July 2022) revealed that "[a]nybody using the web-based system, as opposed to the mobile

app, could skirt any jurisdictional requirement for ticket purchase."  TAC ¶ 142.

  Moreover, Lottery's statements did not profess to guarantee the accuracy of its web-

based applications; quite the opposite, Lottery incorporated disclaimers as to potential glitches

---

[10] Plaintiffs' cited cases do not require a different result.  The court in *In re BioScrip, Inc.
Securities Litigation* found that defendants' statements suggesting defendants "routinely
responded to investigatory requests from the Government, but was not presently in the process
of responding to such a request" were misleading because defendants failed to disclose that, a
month prior, they received such a request for information from the Government.  95 F. Supp.
3d 711, 727 (S.D.N.Y. 2015).  *Skiadas v. Acer Therapeutics, Inc.* merely reiterates the
noncontroversial proposition that omissions may be actionable under Section 10(b) "if the
omitted information is 'necessary to prevent existing disclosures from being misleading.'"
No. 1:19-cv-06137 (GHW), 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020) (quoting
*Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011)).  These cases are
distinguishable.  Here, Plaintiffs have not pleaded facts showing that technical challenges with
Lottery's geofencing technology were occurring at the same time as, or before, the Proxy was
issued.  Plaintiffs therefore have not established an "omission," let alone one that renders the
statement incomplete or misleading.

and deficiencies therein.  For example, both the Proxy and 2021 Annual Report contain

cautionary language about the efficacy of features contained in Lottery's web-based products:

> [O]ur application and web-based products may contain errors, bugs, flaws, or
> corrupted data, and these defects may only become apparent after their
> launch. . . . Furthermore, programming errors, defects, and data corruption could
> disrupt our operations, adversely affect the existence of our users or customers,
> harm our reputation, cause our users to stop utilizing our offerings, divert our
> resources, and delay market acceptance of our offerings, any of which could
> result in liability to us or harm our business, financial condition, and results of
> operations.

Proxy at 32; *see also* Dkt. 78-2 ("2021 Annual Report") at 32.  Plaintiffs contend that "[s]uch

warnings cannot immunize the Individual Lottery Defendants from liability for failing to

disclose that *existing* glitches in those products *were already preventing* legal compliance."

Lottery Class Opp. at 23.  Plaintiffs again operate on the assumption that the technical

deficiencies in Lottery's geofencing technology were occurring at the same time as Lottery's

issuance of the Proxy.  But they have not pleaded any facts to support that inference.  For this

reason, Plaintiff's cited cases — which address the insufficiency of disclaimers directed to

risks that have already transpired — are inapposite.  Lottery Class Opp. at 22; *see, e.g.*, *United

Indus. Workers Pension Plan v. Waste Mgmt, Inc.*, No. 22-cv-4838 (LGS), 2024 WL

1312593, at *5 (S.D.N.Y. Mar. 27, 2024) ("Cautionary words about future risk cannot insulate

from liability the failure to disclose *that the risk has transpired*." (emphasis added) (quoting

*Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004))); *Winter v. Stronghold Digit. Mining,

Inc.*, 686 F. Supp. 3d 295, 309 (S.D.N.Y. 2023) (explaining that cautionary words cannot

insulate defendants from liability "where a risk disclosed by [d]efendants *has already

transpired* at the time the statements at issue were made" (emphasis added)).  Lottery's

cautionary language also defeats Plaintiffs' assertion that, "[h]aving chosen to speak on the

subject of Lottery's geofencing technology, the Individual Lottery Defendants were obligated

to speak 'in an accurate and complete manner.'"  Lottery Class Opp. at 23 (quoting *In re Bioscrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 727).  Based on the facts alleged, Defendants did so, including through the inclusion of hedging language designed to acknowledge the risks inherent in their web-based application.

As for Lottery's general statements of legal and regulatory compliance, those statements resemble the pre-merger representations that this Court held constituted nonactionable puffery in *Lottery I*.  *See* 715 F. Supp. 3d at 535-37.  This Court previously deemed statements that Lottery "works closely with state regulatory" authorities to provide "better regulatory capabilities" "too general to cause a reasonable investor to rely upon them." *Id.* at 535-36 (first quoting FAC ¶ 74; and then quoting *City of Pontiac*, 752 F.3d at 183).  The statements now highlighted by Plaintiffs, including that Lottery (i) was being operated to "ensure [it] remain[ed] in compliance with applicable laws" and the laws of each jurisdiction in which it did business, TAC ¶ 152 (emphasis omitted); (ii) was "firmly committed to full compliance with all applicable laws," *id.* (emphasis omitted); and (iii) monitored regulations to "ensure transparent regulatory compliance," *id.* (emphasis omitted), are more of the same. These statements suffer from the same deficiencies as the pre-merger regulatory statements pleaded in Class Plaintiffs' FAC and Hoffman's Complaint — they are still too general to induce reasonable reliance.  *See Lottery I*, 715 F. Supp. 3d at 536-37 (collecting cases); *Singh*, 918 F.3d at 60, 63 (statement that company "established policies and procedures to comply with applicable requirements" were nonactionable puffery).  They are still far afield from the "detailed" and "specific" descriptions of compliance efforts required to trigger further disclosure.  *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) (quoting *Singh*, 918 F.3d at 63); *cf. Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249-50 (2d Cir. 2014) (deeming misleading company's omission of "serious

ongoing pollution problems" from SEC filing that otherwise detailed the company's specific compliance efforts, including company's use of 24-hour monitoring teams, specific pollution-abatement equipment, and its clean compliance record).[11]

Moreover, Plaintiffs isolate the Proxy's language pertaining to compliance from its context. Read in full, the Proxy includes cautionary language that qualifies its asserted "commit[ment] to full compliance":

> While we are firmly committed to full compliance with all applicable laws, we cannot ensure that our compliance program will prevent the violation of one or more laws or regulations, or that a violation by us, an employee, a customer[,] or other third party will not result in enforcement action, the imposition of a monetary fine or suspension or revocation of one or more of our licenses, which could have a material adverse effect on us or on our results of operations, cash flow, or financial condition.

Proxy at 149. This further detracts from the statement's materiality. *See, e.g.*, *Singh*, 918 F.3d at 64 ("Because the challenged statements are tentative and generic, and because they emphasize the complex, evolving regulatory environment that Cigna faced, we conclude that Plaintiffs have failed to plausibly allege that a reasonable investor would view these statements as having 'significantly altered the total mix of information made available.'")

---

[11] The cases cited by Plaintiffs are readily distinguishable. Lottery Class. Opp. at 24-25. Those cases involved statements of compliance with specific industry standards and regulatory requirements, not aspirational statements of compliance more generally. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp.2d 423, 459 (S.D.N.Y. 2011) (holding that statement of "compliance with CSE regulatory capital requirements" was materially false and misleading when made when company was not in fact in compliance (citation omitted)); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp.2d 241, 277 (S.D.N.Y. 2010) (deeming actionable statement that company was in "compliance with current Ambac Assurance underwriting standards" when it was not (citation omitted)). Indeed, *In re Gentiva Securities Litigation*, citing both *Bear Stearns* and *Ambac*, observed that "[c]ourts often find material misstatements where defendants claim to be compliant with standards promulgated by themselves or regulatory agencies." 932 F. Supp. 2d 352, 369 (E.D.N.Y. Mar. 25, 2013). The statements in *Bear Stearns*, *Ambac*, and *Gentiva* are different in kind from the generalized assertions in Lottery's public filings. *See, e.g.*, *Singh*, 918 F.3d at 60, 63 (holding that statements that company had "established policies and procedures to comply with applicable requirements" were nonactionable puffery (citation omitted)).

(quoting *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009))); *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 291-92 (E.D.N.Y. 2023) ("That [defendant] raised the possibility it might fail to comply with its own anti-corruption policy in the very document describing that policy further undermines the actionability of Defendants' statements.").

Plaintiffs, however, contend that Lottery had contemporaneous knowledge of purportedly illegal activities at the company, such that the FAC's generalized statements of compliance now cross the threshold to material misstatements.  Specifically, Plaintiffs assert that "Lottery routinely and brazenly purchased hundreds of thousands of tickets in Texas for out-of-state customers, in direct contravention of legal requirements," and that "customers could evade Lottery's so-called geofencing technology simply by purchasing tickets via Lottery's web-based platform, rather than its mobile application."  Lottery Class Opp. at 20. But "Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."  *City of Pontiac*, 752 F.3d at 183.  Since "a reasonable stockholder would not 'consider [these statements] important in deciding whether to buy or sell shares of stocks,'" "[t]hey cannot . . . constitute 'material misstatements.'"  *Singh*, 918 F.3d at 63 (first alteration in original); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (To satisfy 10(b), "[t]he statement must be false, and the statement must be material.  Neither immaterial false statements nor material true statements are actionable.").  These statements therefore fail for

precisely the same reason as they did before: they are too generalized to be material, regardless of whether they constitute misrepresentations.

The one notable exception, however, is the Proxy's representation that Lottery "only purchase[d] lottery games . . . in accordance with applicable laws."  TAC ¶ 152.  This statement, unlike the above-cited statements of general regulatory and legal compliance, is, when read in context, sufficiently specific as to constitute an "actionable assurance[] of actual compliance," *Singh*, 918 F.3d at 63; *see Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-cv-07199 (JMF), 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) (deeming actionable statement that company was "substantially in compliance with the relevant global regulatory requirements affecting the company's facilities and products" (alteration adopted) (citation omitted)); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15-cv-02106 (ER), 2017 WL 1169629, at *11 (S.D.N.Y. Mar. 28, 2017) (deeming actionable "positive assurances that [the company] believed it was in compliance with all applicable laws and regulations").  In the very same document, Lottery acknowledges its obligation to comply with 18 U.S.C. § 1301, which "limits [Lottery's] ability to purchase lottery games for a user located in one state from a lottery authority located in another."  Proxy at 147.  Viewed in context, a reasonable investor would have inferred that Lottery was representing its compliance with 18 U.S.C. § 1301's jurisdictional requirements.  For the reasons set forth above, Plaintiffs have plausibly pleaded that, as of October 2021, Lottery was not in fact in compliance with those requirements.  This statement therefore rises to an actionable misrepresentation when made.

Finally, the Proxy's statements of belief, for example, that Lottery "believe[d]" it was "in compliance in all material respects with all applicable laws and regulatory requirements," TAC ¶ 152 (emphasis omitted), are pure statements of opinion.  Lottery's language is a variation of the statement *Omnicare* recognized as an "unadorned statement of opinion about

legal compliance: 'We believe our compliance is lawful.'" 575 U.S. at 188. Assessing virtually identical language in Lottery's 2021 Annual Report in *Lottery I*, this Court held that such statements amount to nonactionable opinions. *See* 715 F. Supp. 3d at 551. In so holding, the Court found that Plaintiffs had not alleged sufficient facts to support an inference that (1) Lottery did not in fact believe it was in compliance with applicable laws, (2) that Lottery made this statement without undertaking "some meaningful legal inquiry," or (3) that Lottery "omit[ted] material facts about [its] inquiry into or knowledge concerning [that] statement of opinion." *Lottery I*, 715 F. Supp. 3d at 552 (alterations in original) (quoting *Omnicare*, 575 U.S. at 188-89).

Plaintiffs contend that they now satisfy *Omnicare's* standard for pleading an actionable statement of opinion, because they have pleaded facts showing that Defendants "did not, in fact, honestly believe that Lottery was in compliance with applicable legal requirements." Lottery Class Opp. at 24; *see, e.g.*, TAC ¶ 143 (alleging that the Individual Lottery Defendants "were clearly aware of these hundreds of thousands of repeated legal violations"). Specifically, Plaintiffs state that, "[t]hroughout the Class Period, Lottery personnel were purchasing hundreds of thousands of tickets in Texas for out-of-state customers in direct contravention of legal requirements that the Defendants repeatedly discussed in public filings." Lottery Class Opp. at 24. But Plaintiffs still have not pleaded any facts that suggest that, as of October 2021, Defendants were aware of either Lottery's out-of-state ticket sales or the geofencing technology's deficiencies, such that Lottery did not genuinely believe it was in legal compliance. As for assessing whether Lottery's opinion that it was in compliance with applicable legal requirements is based on a meaningful inquiry, Plaintiffs have "alleged no facts whatsoever regarding the basis" for Lottery's opinion. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 82 (S.D.N.Y. 2015)

(finding that company's stated opinion rested on a meaningful legal inquiry where plaintiff alleged "no facts concerning [the company's] understanding of the legality of its relevant practices" and "no facts regarding *how* [the company] formulated its legal opinion"); *see also Frankfurt-Tr. Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp.3d 196, 228 (S.D.N.Y. Sept. 28, 2018) (acknowledging the "high bar required to allege [d]efendants had 'no reasonable basis' for their opinion statements" (quoting *City of Westland*, 129 F. Supp. 3d at 82)), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) (summary order); *cf. In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp.3d 596, 619 (S.D.N.Y. 2017) ("Other courts in this district, analyzing similar opinion statements regarding legal matters and expected consequences, have found statements actionable where the plaintiff concretely alleged that the defendants, before making the opinion statement at issue, knew facts whose omission made the opinion statement misleading.").  *Omnicare* makes clear that showing that an opinion lacks a reasonable basis in fact is no easy feat: the plaintiff must identify "particular (and material) facts going to the basis for the issuer's opinion — facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have" whose omission renders the statement at issue misleading.  575 U.S. at 194. Plaintiffs have not done so here.

### iii.    The Proxy's Statements Regarding ASC 606

The Proxy represented that the ASC 606's amended revenue-recognition guidance was "effective for accounting periods commencing on or after January 1, 2018," and that Lottery "ha[d] applied ASC 606 to all revenue contracts."  TAC ¶ 147; *see also* TAC ¶¶ 92-95.  The Proxy further states that, under ASC 606, "*revenues are generally recognized upon the transfer of control of promised products provided to our users, customers*[,] *and subscribers*," reflecting the amount of consideration [Lottery] expect[s] to receive for those products."  TAC

¶ 147 (other emphasis omitted); *see also* Proxy at 163 ("[M]anagement concluded the adoption of [the ASC 606] standard did not result in any financial statement impacts or changes to revenue recognition policies or processes as *revenue is primarily derived from arrangements in which the transfer of control coincides with the fulfillment of performance obligations*." (emphasis added)).

Plaintiffs allege that these statements were false and/or misleading when made because "Lottery immediately recognized revenue upon execution of the purchase agreement" for the September 2021 transaction, "in complete violation of generally accepted accounting guidelines."  Lottery Class Opp. at 2.  According to the TAC, "[u]pon execution of the purchase agreement on September 20, 2021" — "before Lottery transferred any credits to the customer" — Lottery "recognized the $30 million as revenue and recorded $10 million in cost of sales related to this transaction."  TAC ¶ 7.  Plaintiffs contend that it was "materially misleading to tell investors that [Lottery] had been using the ASC 606 revenue recognition standards since 2018, while omitting to disclose that one month earlier, in September 2021, [Lottery] had recognized revenue in connection with its largest-ever transaction in direct contravention of ASC 606."  Lottery Class Opp. at 19.

Plaintiff's argument fails.  The relevant accounting period covered by the Proxy is through June 30, 2021.  *See, e.g.*, Proxy at 10 (reflecting summary of historical financial information of Trident "as of June 30, 2021").  Therefore, the Proxy's representation that Lottery "adopted [ASC 606] standards effective January 1, 2018," TAC ¶ 147, necessarily means it adopted those standards for revenue recognized through June 30, 2021.  The statement that Lottery has "applied ASC 606 to all revenue contracts," *id.*, is likewise temporally constrained.  Indeed, the Proxy's discussion of finances throughout the relevant portion of the Proxy is historical.  *See, e.g.*, Proxy at 163 ("Our financial statements *were*

prepared in conformity with U.S. GAAP." (emphasis added)).  With respect to the recognition
of future revenues, the Proxy represented only that Lottery was "in the process of assessing
the impact of these new [ASC 606] standards on future consolidated financial statements."  *Id.*
Plaintiffs argue that it is irrelevant that the Proxy only *reported* revenues through June 30,
2021, "because ASC 606 is only concerned with the timing of revenue *recognition*, not
revenue reporting, and the TAC alleges that [Lottery] *recognized* the $30 million in revenues
from the Sham Transaction when it signed the Purchase Agreement."  Lottery Class Opp. at
18-19.  But the Proxy indicates that "[t]he following discussion of [Lottery's] financial
condition and results of operations should be read in conjunction with [Lottery's] audited
consolidated financial statements and unaudited condensed interim consolidated financial
statements."  Proxy at 151.  Therefore, the Proxy's statements with respect to the application
of ASC 606 must be understood "in conjunction" with Lottery's financial statements for the
period ending June 30, 2021.  In other words, when Lottery represented that it had "applied
ASC 606 to all revenue contracts," TAC ¶ 147, that necessarily meant that it had applied ASC
606 to all contracts falling within the six-month accounting period ending June 30, 2021.  The
alleged sham transaction does not fall within that period.

### 3.  Post-Merger Regulatory Statements

Plaintiffs identify several allegedly false or misleading post-merger regulatory
statements in the 2021 Annual Report — which was signed by DiMatteo, Clemenson, and
Dickinson, TAC ¶ 162 — including:

- that Lottery "only" purchased lottery games in "accordance with
applicable laws"; closely monitored regulations and worked with
regulatory authorities to "ensure transparent regulatory compliance"; and

was "firmly committed to full compliance with all applicable laws," TAC ¶ 166;

- that Lottery "believ[ed]" that it was "currently in compliance in all material respects with all applicable laws and regulatory requirements," *id.* ¶ 166;

- that Lottery "verif[ies] [users'] location through geofencing technology," *id.* ¶ 168; and

- that "[Lottery] only purchase[s] lottery games for users geolocated to be physically situated within the U.S. state or jurisdiction where the lottery game they are purchasing is being conducted," *id.*

With one exception, the post-merger regulatory statements in the 2021 Annual Report largely recite the assertions in the Proxy and are therefore subject to the same legal analysis. To summarize, general statements pertaining to Lottery's regulatory and legal compliance, including Lottery's representations that it was "closely monitoring . . . regulations . . . to ensure transparent regulatory compliance" and was "firmly committed to full compliance with all applicable laws," TAC ¶ 166, are nonactionable puffery. *See Lottery I*, 715 F. Supp. 3d at 550 (deeming Lottery's assurances that it was monitoring regulations to "ensure transparent regulatory compliance" to be nonactionable puffery). And, for the same reason that Lottery's statements of opinion pertaining to the company's legal and regulatory compliance were not actionable in the Proxy, they are not actionable in the 2021 Annual Report: Plaintiffs plead no facts suggesting the Individual Defendants' contemporaneous awareness of out-of-state ticket sales, or that Lottery made its statements without undertaking some "meaningful . . . inquiry," *DeCarlo*, 80 F.4th at 175 (omission in original) (quoting *Omnicare*, 575 U.S. at 188). *See, e.g., In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 580 ("[T]he [complaint] does not contain the kind of required specific factual allegations . . . that suggest if, when, or how . . . any of the makers of the statements knew about the issue (or its magnitude) . . . .").

Lottery's statements that it "only" purchased lottery games "for users geolocated to be

physically situated within the U.S. state or jurisdiction where the lottery game they are

purchasing is being conducted," TAC ¶ 168, and that it did so "in accordance with applicable

laws," *id.* ¶ 166, are, however, "determinate" and "verifiable" statements, that at this juncture,

Plaintiffs have adequately shown were false. *Omnicare*, 575 U.S. at 184. As alleged, Lottery

was procuring and fulfilling tickets out of state. Therefore, Lottery's statements that it "only"

purchased tickets in the states customers were physically located and in accordance with

applicable laws are "untrue statement[s] of fact," *id.* at 183; *cf. In re Philip Morris Int'l Inc.*

*Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) (deeming nonactionable statements that could not

be verified by "any objective, black-and-white standard").

### 4. Post-Merger Financial-Performance-Related Statements

The post-merger financial-performance-related statements identified by Plaintiffs

include:

- statements in and attached to the November 15, 2021 Form 8-K regarding Lottery's finances for the third quarter of 2021, TAC ¶¶ 156, 157, 160;

- statements in the March 31, 2022 Form 8-K and the 2021 Annual Report regarding Lottery's finances for the fourth quarter of 2021 and for 2021 overall, TAC ¶¶ 162, 168;

- statements in a press release filed with the May 16, 2022 Form 8-K and in the Q1 2022 Report regarding Lottery's finances for the first quarter of 2022, TAC ¶ 170; and

- discussions of financial-reporting issues in the Q3 2021 Report, the 2021 Annual Report, and the Q1 2022 Report, TAC ¶¶ 158, 164, 172.

This Court has already held that Plaintiffs have adequately pleaded that "each of the

post-merger financial-performance-related statements was 'false or misleading at the time it

was made.'" *Lottery I*, 715 F. Supp. 3d at 543 (alteration adopted) (quoting *In re Express*

*Scripts Holdings Co. Sec. Litig.*, 773 F. App'x at 11). The Court found that this conclusion

necessarily followed from, among other things, Lottery's admissions that it had "overstated its

available unrestricted cash balance by approximately $30 million"; that during fiscal year 2021, it "improperly recognized revenue in the same amount"; that "Lottery's auditor determined that 'the audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon'"; and that a subsidiary of Lottery had "entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements." *Id.* at 543-44 (citations omitted).

Likewise, the Court previously held that Plaintiffs "plausibly alleged that the discussions of financial-reporting issues in the Q3 2021 Report, the 2021 Annual Report, and the Q1 2022 Report contained material omissions." *Id.* at 547. The Court underscored that each of these reports "discussed the company's internal controls over financial reporting," while "fail[ing] to disclose that the purported sale of $30 million of LotteryLink Credits never happened, and that the corresponding cash and revenue statements were overstated by $30 million." *Id.* at 548.

Adopting its earlier reasoning, the Court finds that the TAC sufficiently alleges falsity with respect to the post-merger statements regarding Lottery's financial performance and financial reporting.

## B. Scienter

To summarize, the Court finds that Plaintiffs have adequately pleaded that the following statements constituted material misrepresentations or omissions: (1) the assertion in the Proxy and the 2021 Annual Report that Lottery "only" purchased tickets in the states where customers were physically located; (2) the assertion in the Proxy and the 2021 Annual Report that Lottery "only" purchased lottery games "in accordance with applicable laws"; and

(3) the post-merger financial-performance and financial-reporting statements set forth above. Having addressed falsity, the Court next moves to whether Defendants acted with the requisite scienter when making these statements.

Scienter is "the defendant's intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (quotation marks and citation omitted).  The PSLRA requires a private securities-fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "To do so, a complaint must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *APERS*, 28 F.4th at 355 (quotation marks and citation omitted).

The proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323.  Specifically:

> [A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even "the most plausible of competing inferences[.]" . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" — it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.*  "In the securities fraud context, [the Second Circuit] ha[s] typically found it sufficient to state a claim based on recklessness if the complaint 'specifically alleges defendants' knowledge of facts or access to information contradicting their public statements.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (alteration adopted) (quoting *Novak*, 216 F.3d at 308).

When a corporation is a defendant, a plaintiff must plead "facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (per curiam) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). Ordinarily, "courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." *Id.* "Under this approach, the 'most straightforward' way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.* (quoting *Dynex*, 531 F.3d at 195). "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker." *Id.* (citing *Loreley*, 797 F.3d at 177). Finally, "[i]n exceedingly rare instances, a statement may be so 'dramatic' that collective corporate scienter may be inferred," that is, scienter may be inferred on behalf of the corporate entity even though the individuals responsible for the fraudulent statement have not been identified. *Id.* at 98-99 (quoting *Dynex*, 531 F.3d at 195-96).

### 1. Motive and Opportunity

In the securities-fraud context, opportunity can be "shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged." *Blanford*, 794 F.3d at 309 (citation omitted). "The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013). "[T]o raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [Defendant] or its officers 'benefitted in some concrete and personal way from the purported fraud." *ECA.*, 553 F.3d at

198 (quoting *Novak*, 216 F.3d at 307-08). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* (citing *Novak*, 216 F.3d at 307; *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). Without more, "executive compensation dependent upon stock value does not give rise to a strong inference of scienter." *Acito*, 47 F.3d at 54.

Although Plaintiffs add more allegations pertaining to Defendants' compensation and financial incentive to consummate the business combination in the TAC, Plaintiffs effectively resort to the same theories of fraudulent motive that this Court already rejected in *Lottery I*. The TAC adds allegations about DiMatteo's, Dickinson's, and Clemenson's potential compensation after the completion of the business combination, TAC ¶¶ 36-38, 72-74; Komissarov's motivation to complete the business combination quickly, *id.* ¶¶ 66-70; and the Individual Defendants' rush into the business combination, *id.* ¶¶ 133-34. For example, where the FAC alleged only that the "Individual Lottery Defendants received far more shares than they would have been entitled to had the true value of Lottery been disclosed in connection with the Business Combination," FAC ¶ 140, the TAC now states the percentage of Lottery stock owned by the Individual Lottery Defendants and the proceeds they received after the business combination, TAC ¶¶ 71-74. Moreover, Plaintiffs allege that, in recent statements regarding the business combination, DiMatteo stated that Trident was "eager to get a deal done" and acted as the "grownups in the room." TAC ¶ 134.

These additional allegations, however, still do not rise to the level of fraudulent motive. This Court observed in *Lottery I* that courts in this Circuit routinely decline to find scienter based on a desire to "benefit from a higher share price" in the context of public offerings. 715 F. Supp. 3d at 554 (collecting cases). Moreover, citing the Second Circuit's

decision in *Acito v. IMCERA Group, Inc.*, this Court likewise rejected that scienter could be inferred from the existence of executive compensation alone. *Id.* (citing *Acito*, 47 F.3d at 54). As the Court previously explained, the "desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation[] do not constitute 'motive.'" *Id.* at 553 (quoting *ECA*, 553 F.3d at 198). Trident's desire to consummate a deal expeditiously — again, a "[m]otive . . . common to most corporate officers," *ECA*, 553 F.3d at 198 — is likewise by itself insufficient to establish fraudulent scienter.

It is true that, "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (citing *In re Time Warner Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993)). But generalized allegations of a desire to achieve favorable terms in a merger or acquisition are insufficient. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive" to appear profitable, "one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."). Plaintiffs still have not shown that Defendants received "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged," beyond those benefits sought by directors and officers generally. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).

In any event, while specific numbers as to stocks owned and proceeds received were not pled in the FAC, they were incorporated in Class Plaintiffs' briefing on the previously filed motions to dismiss, and the Court held in *Lottery I* that its decision "would be the same" regardless of whether it considered those numbers. 715 F. Supp. 3d at 553 n.9. Therefore, this Court has already effectively decided that the additional information now pleaded as to

share price, date of sale, and approximate proceeds from DiMatteo's and Clemenson's sales is insufficient to support a finding of scienter.

Nor are allegations that Defendants DiMatteo and Clemenson sold shares "shortly after the business combination was completed" sufficient to establish scienter. TAC ¶¶ 36, 38. "Stock sales may support allegations of scienter when those trades are suspicious in timing or amount." *In re Lululemon Sec. Litig*., 14 F. Supp. 3d at 584; *accord Stevelman v. Alias Rsch., Inc*, 174 F.3d 79, 85 (2d Cir. 1999) (holding that allegation of insider trading "supports the inference that [defendant] withheld disclosures that would depress his stock until he had profitably sold his shares"). "Whether trading was unusual or suspicious turns on factors" such as:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants' selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

*Glazer v. The9, Ltd*., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (collecting cases). Plaintiffs have added additional allegations pertaining to DiMatteo's and Clemenson's sales, including the share price, date of sale, and approximate proceeds. But Plaintiffs still have not alleged any facts from which this Court can infer that either DiMatteo's or Clemenson's sale of their stocks was "unusual," "as necessary to raise an inference of bad faith or scienter." *APERS*, 28 F.4th at 355-56 (citing *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 74-75 (2d Cir. 2001)). Indeed, Plaintiffs' allegations fail to address many of the *Glazer* factors necessary for finding an "unusual" trade. In any event, DiMatteo and Clemenson's sale of their shares predate the vast majority of the purportedly misleading statements (including the post-merger statements related to financial performance and reporting). Therefore, Plaintiffs have also failed to show

a "direct link" between the share of sales and the fraudulent statements. *ECA*, 553 F.3d at 201.

Plaintiffs argue that the Court did not previously reject Plaintiffs' allegations of motive but "merely ruled that the desire to complete the Business Combination could not serve as a motive for fraud with respect to *later* statements," that is, those statements postdating the merger. Lottery Class Opp. at 41 (emphasis added). This misconstrues *Lottery I's* holding. The Court's principal finding, which Plaintiffs sidestep, was that as a general matter, the "prospect of a public offering, standing alone, is insufficient to establish motive," and that no exception exists for SPACs. *Lottery I*, 715 F. Supp. 3d at 555.

Since Plaintiffs still do not "point[] to any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders," *Kalnit*, 264 F.3d at 142, Plaintiffs have not cured the deficiencies in Hoffman's Complaint or Class Plaintiff's FAC.

### 2.  Conscious Misbehavior or Recklessness

"If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care," *APERS*, 28 F.4th at 355 (quotation marks and citation omitted), "to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *Rolf v. Blyth, Eastman Dillon & Co*., 570 F.2d 38, 47 (2d Cir. 1978) (quotation marks omitted).  "The extreme departure 'approximates actual intent, and not merely a heightened form of negligence.'"  *San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc*., 732 F. Supp. 3d 300, 317 (S.D.N.Y. 2024) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015), *abrogated on other grounds by Macquarie*

*Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885 (2024)).  As the Second Circuit

has explained:

> Circumstantial evidence can support an inference of scienter in a variety of ways,
> including where defendants (1) benefitted in a concrete and personal way from
> the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts
> or had access to information suggesting that their public statements were not
> accurate; or (4) failed to check information they had a duty to monitor.

*Blanford*, 794 F.3d at 306 (quotation marks and citation omitted).  "'[W]here scienter is based

on a defendant's knowledge of and/or access to certain facts,' Plaintiffs must allege facts

showing that: (i) '*specific* contradictory information was available to defendants' (ii) '*at the

same time* they made their misleading statements.'"  *In re Citigroup Sec. Litig.*, No. 20-cv-

09132 (LAP), 2023 WL 2632258, at *22 (S.D.N.Y.  May 24, 2023) (emphasis in original)

(quoting *In re Adient plc Sec. Litig.*, No. 18-cv-09116 (RA), 2020 WL 1644018, at *27

(S.D.N.Y. Apr. 2, 2020), *aff'd sub nom. Bristol Cnty. Ret. Sys. v. Adient PLC*, No. 20-3846,

2022 WL 2824260 (2d Cir. July 20, 2022) (summary order)).  Moreover, plaintiffs "must

specifically identify the reports or statements containing" the contrary information.  *Id.*

(quoting *Novak*, 216 F.3d at 309).  Where scienter is based on a failure to check information

defendants had a duty to monitor, "[a]n egregious refusal to see the obvious, or to investigate

the doubtful, may in some cases give rise to an inference of . . . recklessness."  *Chill*, 101 F.3d

at 269 (omission in original) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.

Supp. 256, 259 (S.D.N.Y. 1989)) (citing *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142,

144 (2d Cir. 1991)).

An "inference of scienter must be more than merely 'reasonable' or 'permissible' — it

must be cogent and compelling, thus strong in light of other explanations."  *Tellabs*, 551 U.S.

at 324.  "If an inference of fraudulent intent is not 'at least as compelling' as a contrary

inference, it is inadequate, even in a 'close case.'"  *Skiadas v. Acer Therapuetics, Inc.*, No. 19-

cv-06137 (GHW), 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (quoting *Slayton*, 604 F.3d at 777).

The Court analyzes separately whether Plaintiffs have sufficiently pleaded scienter as to material misstatements relating to (1) Lottery's financial performance and financial reporting and (2) Lottery's legal and regulatory compliance.

### i.    Financial Performance and Financial Reporting

In *Lottery I,* this Court concluded that Plaintiffs had failed to raise "any allegation that [Defendants] had any contemporaneous basis to believe that the information they related was incorrect." 715 F. Supp. 3d at 558 (quoting *Dobina*, 909 F. Supp. 2d at 251). That is no longer the case. For the reasons set forth below, the Court finds that Plaintiffs have sufficiently pleaded scienter in connection with post-merger statements concerning Lottery's finances and financial reporting with respect to Dickinson, and by extension, Lottery.

Plaintiffs offer numerous reasons why the Court should infer that Defendants knowingly or recklessly made the misleading financial statements: (1) Defendants' violations of accounting principles and revenue recognition guidelines; (2) the magnitude of the fraudulent transaction; (3) Lottery's subsequent admissions that it had misstated the company's revenue and cash holdings; (4) the Individual Lottery Defendants' respective roles within the company; (5) the size of the company and the fact that the alleged misstatements concerned the company's "core operations"; (6) the timing and circumstances of the terminations/resignations and the withdrawal of Lottery's independent auditor; and (7) the fact that the DOJ and SEC are investigating Lottery and the Individual Defendants. Lottery Class Opp. at 31-40.[12] Many of Plaintiffs' bases for finding scienter were asserted — and rejected

---

[12] The TAC also alleges that Defendants engaged in "other acts of improper revenue recognition." TAC at 33 (capitalization omitted). Specifically, Plaintiffs assert that, in its

— in *Lottery I*.  The Court earlier found that "the magnitude of [the] restatement," the "centrality of [the] revenue category to [the] company's core operations," and "the departures of the company's executives and auditor," although relevant to establishing scienter, were insufficient to "'give rise to a strong inference of scienter' as to any Defendant."  *Lottery I*, 715 F. Supp. 3d at 558-59 (quoting *Tellabs*, 551 U.S. at 323).  "If scienter could be pleaded based solely on such allegations," the Court observed, then "virtually every company that issues a large restatement of revenue could be forced to defend securities-fraud actions."  *Id.* at 560.

What differs this time around, however, is that Plaintiffs have pleaded "facts connecting" Lottery's CFO, Dickinson, "to the alleged fraud."  *Lottery I*, 715 F. Supp. 3d at 559 (quoting *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 162 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (summary order)).  Plaintiffs allege that Dickinson was the signatory of a loan obtained by Lottery and used to finance the customer's purchase of Lottery service credits, TAC ¶¶ 9, 77, 89; that Dickinson "negotiated" the loan, *id.* ¶ 88; that Lottery did not disclose the loan in either the footnotes to its December 31, 2021 financial statements or its March 31, 2022 financial statements, *id.* ¶¶ 9 n.2, 89 n.14; that service credits were non-transferable even though the company invoiced them to the customer, *id.* ¶¶ 12, 84, 89; that Lottery cancelled all transactions with the customer, *id.* ¶¶ 85-86; and that Lottery's reporting did not comply with GAAP rules and regulations, including its revenue recognition

_____

May 15, 2023 Form 10-Q/A filed with the SEC, Lottery disclosed that it had improperly recorded $5,000,000 in revenue and accounts receivable for the year ended December 31, 2021 in connection with an unrelated transaction with another customer, and that in connection with a separate transaction in February 2022, Lottery improperly reported $6,500,000 as a note receivable.  *Id.* ¶ 90.  Because Lottery does not provides facts tying these instances of revenue recognition to an Individual Defendant or otherwise suggest that any Individual Defendant had contemporaneous knowledge of these accounting mistakes, the Court does not find that these allegations bear on scienter.

guidelines, *id.* ¶¶ 92-99.  Plaintiffs allege that Defendants must have known that the "purported service credits were non-transferable," *id.* ¶ 84, or that the transaction was a "sham," *id.* ¶¶ 92-99.  Their allegations are now supported by facts from which one can sufficiently infer scienter.  That Dickinson signed the promissory note necessary to effectuate the alleged sham transaction supports the inference that Dickinson knew that Lottery was not actually receiving payment from the client in connection with the purported sale of service credits.[13]  That inference necessarily follows from the alleged structure of the transaction: Plaintiffs state that Lottery "used proceeds from the [b]usiness [c]ombination to acquire a $30 million business loan on January 4, 2022 through one of Lottery's subsidiaries, AutoLotto, with Provident Bank . . . , which was evidenced by a $30 million promissory note . . . signed by Dickinson."  *Id.* ¶ 76.  According to Plaintiffs, this Promissory Note was then "utilized by the customer to provide [Lottery] with payment towards the purchase of service credits."  *Id.* As Plaintiffs argue, "given that the $30 million loan was secured by $30 million Lottery already had in its account, there is no rational way" that Dickinson "would not have been privy to the transaction."  *Id.* ¶ 9.  Because Dickinson was CFO, one can reasonably infer that he should also have recognized that the loan was not disclosed on the company's balance sheet.  The fact that Lottery never disclosed the $30 million loan in its financial statements, notwithstanding that it disclosed all other positive results, further raises an inference that the transaction was undertaken intentionally, with knowledge of its impropriety.  *See id.* ¶ 10

---

[13] *See* Lottery.com Inc., Quarterly Report exh. 10.1, at 7 (Form 10-Q) (May 22, 2023), https://www.sec.gov/Archives/edgar/data/1673481/000149315223018441/ex10-1.htm (Business Loan Agreement dated January 4, 2022, between AutoLotto, Inc. and The Provident Bank).

n.2.[14]  At a minimum, the CFO's failure to inquire into the reasons for obtaining a $30 million

Promissory Note — secured using $30 million in Lottery's own account — amounts to

recklessness.  That is especially true here, where the sums totaled "about half of Lottery's

cash and cash equivalents of $62.6 million as of December 31, 2021."  *Id.* ¶ 77.  Dickinson's

signing of the Promissory Note therefore evinces that Dickinson "made false or misleading

statements" as to the company's financial statements and reporting, "when contradictory facts

of critical importance to the company either were apparent, or should have been apparent" to

him.  *In re Atlas Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y.

2004).

        Dickinson's signing of the Promissory Note, considered together with the magnitude

of the transaction, Dickinson's role as CFO and subsequent termination, the fact that the

transaction related to Lottery's core operations, and the omission of the loan from the

company's balance sheet, is sufficient to give rise to an inference of scienter as to Dickinson.

It is true that this Court previously found that allegations based on Defendants' "high-level

positions within the company," combined with the fact that the "underlying subject of the

alleged fraud . . . was so fundamental to the company's operations that the CEO, COO, and

CFO's knowledge about it should virtually be presumed," were insufficient to plead scienter.

*Lottery I*, 715 F. Supp. 3 at 557 (alteration adopted) (quoting *In re Skechers USA, Inc. Sec.*

---

[14] The Individual Defendants argue that Lottery should not have been expected to disclose a
loan entered in January 2022 in a report encompassing the fiscal year ending December 31,
2021.  C&D Br. at 15.  Likewise, Defendants asserted at oral argument that the March 2022
financial statements were an "overview" that did not include "line item[s] for liabilities" and
therefore would not have disclosed loans.  Tr. at 19:10-13.  In this procedural posture, the
Court credits Plaintiffs' assertion that Lottery's own auditors identified the omission of the
loan from the December 31, 2021 and March 31, 2022 financial statements as an accounting
error.  In any event, the omission of the loan from subsequent financial statements is merely
circumstantial evidence that bolsters the newly pleaded and direct evidence of scienter:
Dickinson's signing of the promissory note.

*Litig.*, 444 F. Supp. 3d 498, 528 (S.D.NY. 2020)).  But the Court did not suggest that those considerations were irrelevant.  Rather, this Court noted that "courts in this circuit have generally invoked [the core operations] doctrine to bolster *other* evidence of scienter, rather than relying on it as an independently sufficient basis." *Id.* (emphasis added) (quoting *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 533 (S.D.N.Y. 2020)).  Likewise, the Court observed that the "magnitude of a financial restatement is 'certainly a relevant factor,'" but that the "size of the fraud *alone* does not create an inference of scienter." *Id.* at 558 (emphasis added).  *Lottery I* ultimately found that Plaintiffs' FAC was flawed because it lacked any "allegation that [Defendants] had any contemporaneous basis to believe that the information they related was incorrect that would be sufficient to allege the requisite 'conscious recklessness.'" *Id.* (quoting *Dobina*, 909 F. Supp. 2d at 251).  The allegations of Dickinson's signing of the January 4, 2022 promissory note now supplies that missing link. That the transaction involved the sale of marketing credits — which accounts for the vast majority of Lottery's revenue — and Dickinson's subsequent resignation in turn bolster the inference of scienter.  *See, e.g.*, *New Orleans Emps. Ret. Sys.*, 455 F. App'x at 14 n.3 (summary order) (finding "support in decisions by this court and district courts within this circuit" for the view that "allegations of a company's core operations, GAAP violations, and removal of its executives can provide supplemental support for allegations of scienter"); *San Antonio Fire & Police Pension Fund*, 2024 WL 1898512, at *10 (observing that there are "factual allegations linking the executives' resignation[s] to the alleged fraud" (alteration in original) (quoting *Africa v. Jianpu Tech. Inc.*, No. 21-cv-01419 (JMF), 2023 WL 5432282, at *8 (S.D.N.Y. Aug. 23, 2023)).

     In sum, Plaintiffs' allegations give rise to an inference of Dickinson's scienter that is "at least as strong as the competing inferences that could be drawn." *New Orleans Emps. Ret.*

*Sys.*, 455 F. App'x at 15.  The facts alleged show that Dickinson was "specifically informed" of the loan used to finance the alleged sham transaction, and therefore "had reason to know" that the transaction would not generate any actual revenue for the company.  *Id.*  However, because the Promissory Note was dated January 4, 2022, the Court finds that Plaintiffs have only adequately pleaded scienter as to those post-merger statements postdating January 4, 2022, that is, (i) the statements in the March 31, 2022 Form 8-K and the 2021 Annual Report regarding Lottery's finances for the fourth quarter of 2021 and for 2021 overall, TAC ¶¶ 162, 168; (ii) the statements in the May 16, 2022 Form 8-K and the Q1 2022 report regarding Lottery's finances for the first quarter of 2022, *id.* ¶¶ 170; and (iii) discussions of financial reporting in the Q3 2021 Report, the 2021 Annual Report, and the Q1 2022 report, *id.* ¶¶ 158, 164, 172.[15]

Dickinson's scienter may likewise be imputed to Lottery.  *See, e.g., Dynex,* 531 F.3d at 195 ("In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant.")  Therefore, with respect to those post-merger statements of financial performance and reporting postdating January 4, 2022, Plaintiffs have alleged a Section 10(b) claim against Dickinson and Lottery.

With respect to DiMatteo and Clemenson, however, Plaintiffs have not pleaded any allegations to substantiate their conclusory assertion that DiMatteo and Clemenson were aware of the "nature and specifics of" the September 2021 customer transaction.  TAC ¶ 9;

---

[15] Plaintiffs urge the Court to find sufficient allegations of scienter for statements predating the January 4, 2022 issuance of the loan, asserting that it is "simply unbelievable" that the CFO "entered into a transaction that caused [Lottery's] quarterly revenue to increase by *nearly 2,000%* over the same quarter (a year earlier), and caused [Lottery's] reported cash to nearly double, without realizing that the Lottery service credits they were selling were non-transferable."  Lottery Class Opp. at 33.  The Court declines to credit such conclusory assertions as to what the Individual Defendants "must have known."

Lottery Class Opp. at 31 (asserting that "Lottery has admitted that Defendants were actively involved with improper financial reporting and accounting practices for the September 2021 sham transaction" (capitalization omitted)).  Plaintiffs merely resort to conclusory assertions that the "Individual Lottery Defendants . . . knew that their purported service credits were non-transferable" and that it "strains credulity to suggest" that the Individual Lottery Defendants "never realized [the credits were] non-transferable."  TAC ¶ 84.  These allegations fall short of Federal Rule of Civil Procedure Rule 9 and the PSLRA's pleading requirements.  *See, e.g.*, *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) ("[B]ald allegations of a scheme . . . are far too conclusory to satisfy the requirements of Rule 9 and the PSLRA.").  That Lottery continued to invoice the customer in 2021 and the first quarter of 2022 for "various services and advertising credits," TAC ¶¶ 84-85, supports the contrary inference: that is, that Lottery continued to believe that its credits were transferable and the transaction was therefore legitimate.  That Lottery invoiced the customer does not by itself support the inference that Lottery did so with the knowledge that its service credits were non-transferable.  Nor can the Court infer Clemenson's or DiMatteo's contemporaneous knowledge of the alleged sham nature of the transaction from after-the-fact statements made by management.  *See, e.g.*, TAC ¶ 138 ("According to Bloomberg, a member of [Lottery's] management team referred to the whole transaction as a 'check kite' a year later at a meeting explaining the transaction to an outside adviser.").  Plaintiffs separately emphasize Lottery's after-the-fact treatment of the transaction, including that Lottery "removed every single cent of revenue and cash previously recorded from the transactions with the 'major customer.'" Lottery Class Opp. at 26.  "[I]t is well settled," however, "that mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *City of Brockton*

*Ret. Sys. v. Shaw Grp. Inc*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (citing *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004)).[16]

That Plaintiffs now assert more specific violations of ASC 606's revenue guideline requirements likewise does not move the needle.  "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  *Novak*, 216 F.3d at 309 (quotation marks and citation omitted). The cases cited by Plaintiffs do not hold otherwise.  *See, e.g.*, *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006) (finding scienter where there were allegations that defendants had actual knowledge of accounting improprieties, including, for instance, instructing a confidential witness to book adjustments in the wrong quarter); *In re Gilat Satellite Networks, Ltd.*, No. 02-cv-01510 (CPS), 2005 WL 2277476, at *21 (S.D.N.Y. Sept. 19, 2005) (finding scienter where the "complaint allege[d] that defendants knowingly deviated from [the company's] publicly stated policy of adhering to GAAP," and that a confidential witness directly informed the CFO of the potential for GAAP violations).  "The

---

[16] Plaintiffs also allege that "[a]ll three of the Individual Lottery Defendants' terminations and resignations were related to the investigation and misconduct." TAC ¶ 106.  As support for this proposition, Plaintiffs cite Lever's prior motion to dismiss in this action, which stated that "[Lever's] efforts and this investigation caused the quick termination or resignation of the three other members of senior management." *Id.* (quoting Dkt. 112 at 2).  Even so, senior management's terminations and resignations are still "'at least as consistent with punishing those at the helm for their poor judgment and leadership' as with their 'relating to concocting a scheme to defraud shareholders.'" *Lottery I*, 715 F. Supp. 3d at 559 (quoting *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383 (2d Cir. 2015)).  For the same reason, Plaintiffs' assertion that Lottery's auditor resigned is, by itself, insufficient to infer fraudulent scienter. *See* Lottery Class Opp. at 38.  Even if Lottery's auditor stated in its resignation letter that it was "unable to rely on representations of management," *id.* (citation omitted), that statement is "at least as consistent" with mismanagement at the senior leadership level.

general allegation that[] 'knowledge of the accounting improprieties may be imputed to the

company's officers and directors who are involved in the day-to-day operations of the

company' does not give rise to the necessary inference of fraudulent intent (scienter), in the

absence of allegations of fact from which one could infer that the alleged accounting

improprieties are either being committed by the officer or were reported to him." *City of*

*Brockton Ret. Sys.*, 540 F. Supp. 2d at 473.  Plaintiffs make no such allegations with respect to

DiMatteo or Clemenson.

Therefore, with respect to post-merger statements of financial performance and

financial reporting, Plaintiffs have alleged a Section 10(b) claim against Dickinson and

Lottery, but have not plausibly alleged a Section 10(b) claim against either DiMatteo or

Clemenson.

### ii.    Legal and Regulatory Compliance

Turning to the pre- and post-merger statements regarding Lottery's legal and

regulatory compliance, Plaintiffs allege that Defendants engaged in "deliberately illegal"

activity, *Blanford*, 794 F.3d at 306, by "knowingly violat[ing] applicable lottery laws and

regulations" related to ticket printing, Lottery Class. Opp. at 26 (capitalization omitted).  To

the extent Plaintiffs also rely on circumstantial evidence that Defendants acted recklessly,

Plaintiffs must show that at the time of the various alleged misrepresentations — that is, as of

Proxy and the 2021 Annual Report — Defendants "knew or should have known" that (1)

Lottery was engaged in the practice of selling tickets out of the state where customers resided,

and (2) that such conduct was contrary to law.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at

76 ("Where the complaint alleges that defendants knew facts or had access to non-public

information contradicting their public statements, recklessness is adequately pled for

defendants who knew or should have known they were misrepresenting material facts with

respect to corporate business." (citing *Novak*, 216 F.3d at 308)).  "[I]n the absence of concrete

allegations that senior management knew of, but actively ignored, the purported violations,

'[e]ven an egregious failure to gather information will not establish 10b-5 liability as long as

the defendants did not deliberately shut their eyes to the facts.'"  *Ellington Mgmt. Grp., LLC*

*v. Ameriquest Mortg. Co.*, No. 09-cv-00416 (JSR), 2009 WL 3170102, at *3 (S.D.N.Y. Sept.

29, 2009) (alteration in original) (quoting *In re Bayou Hedge Fund Litig*., 534 F. Supp. 2d

405, 415 (S.D.N.Y. 2007), *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573

F.3d 98 (2d Cir. 2009)).

     Plaintiffs' argument that Defendants knowingly or recklessly made misrepresentations

regarding Lottery's legal and regulatory compliance can be distilled to four points: (1) the

"frequency and magnitude" of Lottery's "violations of applicable lottery laws and

regulations," Lottery Class Opp. at 27; (2) the small size of the company, *id.* at 39; (3) the

specificity with which Lottery discussed regulatory regulations in its public statements, *id.* at

27-28; and (4) after-the-fact statements by board members and employees regarding the

misconduct, TAC ¶¶ 143.  The TAC does not adequately allege that the Individual Lottery

Defendants possessed actual knowledge of Lottery's practice of out-of-state printing.  Instead,

Plaintiffs rest their case on the theory that the Individual Defendants "must have known" of

Lottery's illegal practice of procuring tickets out of state given their leadership roles, the

magnitude of the misconduct and the size of the company, and the close nexus between the

misconduct and the company's core operations.  To that end, Plaintiffs resort to conclusory

assertions that the "Lottery Defendants . . . were clearly aware of these hundreds of thousands

of repeated legal violations."  TAC ¶ 56; *see also id.* ¶ 143 ("The Lottery Defendants, as

[Lottery's] senior management members, were clearly aware of these hundreds of thousands

of repeated legal violations.").  This Court rejected similar scienter-based arguments in

*Lottery I*.  There, the Court explained that absent "any allegation that [Defendants] had any contemporaneous basis to believe that the information they related was incorrect," the Court could not find "conscious recklessness."  *Lottery I*, 715 F. Supp. 3d at 558 (alteration in original) (quoting *Dobina*, 909 F. Supp. 2d at 251).  The same is true here.

Although Plaintiffs allege that the legal violations were "widespread," they do not allege the actual magnitude of Lottery's regulatory noncompliance, for instance, by quantifying what proportion of Lottery's total sales the sale of 500,000 tickets constituted.  Tr. at 40:21-41:9 (Plaintiffs conceding at oral argument that they had not pleaded anything further regarding the value of the 500,000 tickets that were sold out of Texas relative to Lottery's total sales).  Even if the Court pulls from the documents incorporated by reference in the TAC to measure the comparable magnitude of the 500,000 ticket sales — documents that reflect that Lottery delivered 1,291,870 lottery games to users of Lottery's platform worldwide in 2020, Proxy at 155, and delivered approximately 2.6 million lottery games to users in 2021, 2021 Annual Report at 99 — the magnitude of a fraud alone does not give rise to a strong inference of scienter.  *See infra* at n.17.  Plaintiffs further do not plead any facts tying the allegations of illegal ticket printing to any of the Defendants.  The Court therefore cannot conclude from the facts pleaded that the misconduct was "either known to" the Defendants or "so obvious" that the Defendants "must have been aware of it."  *Chill*, 101 F.3d at 269 (quoting *Rolf*, 570 F.2d at 47); *see also In re Marsh & Mclennan Cos., Inc.*, 501 F. Supp.2d at 486 (allegations of individual defendants' positions at the company, access to corporate information, and responsibility for financial accounting process "insufficient to raise a strong inference of scienter absent allegations that [the defendants] were exposed to contemporaneous information contradicting their public statements"); *cf. Rothman*, 220 F.3d at 90 (considering magnitude of write-off, alongside evidence of defendants'

contemporaneous knowledge that software titles at issue were not commercially viable, in

holding that company's failure to expense royalty advances was reckless).[17]

Plaintiffs' assertion that Defendants discussed the applicable gaming regulations with

"specificity" in public filings, therefore evincing that the "hundreds of thousands of violations

thereof were committed intentionally," fares no better.  Lottery Class Opp. at 28.  Plaintiffs'

allegations support only that Defendants appreciated the illegality of selling tickets outside of

the state where the customer was located, not that they had knowledge of Lottery's practice of

doing so.  Moreover, where courts have found that repeated assurances of regulatory

compliance support scienter, they have done so based on the assumption that "[i]n order to

speak so knowledgeably  .  .  . [the defendant] must have educated himself  .  .  . presumably by

reviewing data . . . and by performing his own due diligence."  *In re Nielson Holdings PLC*

*Sec. Litig.,* 510 F. Supp. 3d 217, 237 (S.D.N.Y. Jan. 4, 2021) (quoting *Haw. Structural*

*Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc*., 422 F. Supp. 3d 821, 850

(S.D.N.Y. 2019)); *see also id.* ("Defendants' repeated assurances about [the General Data

Protection Regulation ("GDPR")'s] *de minimis* impact on Nielsen throughout the first half of

2018 and the magnitude of the event support an inference that Defendants knew facts or had

---

[17] The cases cited by Plaintiffs, *see* Lottery Class Opp. at 27, are not contrary to the Court's
holding.  Rather Plaintiffs' cases support the notion that while the magnitude of the fraud is
relevant, it cannot alone establish scienter.  *See, e .g., San Antonio Fire & Police Pension
Fund*, 732 F. Supp. 3d at 318-19 (holding that magnitude of restatement and core operations
doctrine supported an inference of scienter where plaintiffs also pleaded "actual knowledge of
information contradicting [defendants'] statements," *id.* at 318); *In re Barclays PLC Sec.
Litig.*, No. 22-cv-08172 (KPF), 2024 WL 757385, at *20 (S.D.N.Y. Feb. 23, 2024)
(considering the "magnitude of [the] alleged fraud" alongside other evidence of scienter); *In
re Pareteum Sec. Litig.*, No. 19-cv-09767 (AKH), 2021 WL 3540779, at *16 (S.D.N.Y. Aug.
11, 2021) (finding that "proximity and size" of restatements added "further strength" to other
circumstantial evidence of scienter, including evidence that defendants were informed by
auditors that internal controls over financial reporting were "inadequate and ineffective").

access to information suggesting that these statements were materially misleading.").[18]  Here, Defendants' statements of regulatory compliance are not so specific and varied as to support the inference that Defendants must have investigated the company's ticket-printing practices and uncovered the misconduct at issue.  As for Plaintiffs' reliance on statements by an anonymous board member that Lottery was "breaking the law in 42 different ways" and that "[t]he potential for Homeland Security, AML [anti-money laundering laws], and all the other things that come into play is beyond breathtaking," TAC ¶ 143 (second alteration in original), those statements were made at a June 2022 meeting — *after* the circulation of the misleading statements at issue.  Plaintiffs "may not plead fraud by hindsight."  *Slayton*, 604 F.3d at 776 (citing *Shields*, 25 F.3d at 1129).  Those and other after-the-fact statements made by Board members are therefore of little import to the scienter analysis here.

Nor is the fact of pending DOJ and SEC investigations into Lottery and its executive leadership sufficient to raise a sufficient inference of scienter.[19]  When courts consider such investigations in the context of securities-fraud claims, it is as "circumstantial evidence bolster[ing] the inference of scienter" — not independent evidence thereof.  *In re Mylan N.V.*

---

[18] The cases Plaintiffs cite on this point are distinguishable.  *Pirnik v. Fiat Chrysler Automobiles, N.V.* considered Defendants' frequent discussions of "regulatory compliance in press releases, earnings calls, and SEC filings" in finding that scienter was adequately alleged. No. 15-cv-07199 (JMF), 2016 WL 5818590, at *7.  But in that case, there was also evidence that the defendants "were aware of nonpublic facts contradicting their public representations of substantial legal compliance," that is, that the individual corporate defendants were aware of at least "three deficient recalls."  *Id.*  As for *Nielsen*, defendants therein made specific statements regarding the impact of the GDPR on the company's business and access to data. 510 F. Supp. 3d at 235, 237.  The statements in *Pirnik* and *Nielsen* differ from those alleged herein both with regards to their specificity, and because in *Pirnik* and *Nielsen*, the statements were made directly by the company's executives, strengthening the inference of scienter.

[19] Since the parties' briefing and as noted below, Komissarov has been criminally indicted; however, no indictments have issued against the Lottery Defendants who are subject to Section 10(b) liability in this action.

*Sec. Litig.*, No. 16-cv-07926 (JPO), 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018). This limitation is underscored by Plaintiffs' cited cases, which either included direct evidence of Defendants' contemporaneous knowledge of the falsity of their statements, or, in the case of *In re Gentiva Securities Litigation*, ultimately held there was no scienter. *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *13 (considering receipt of DOJ subpoena alongside direct evidence of scienter, including allegations that the defendant was "repeatedly informed . . . that [it] was misclassifying its EpiPen for purposes of [the Medicaid Drug Rebate Program]"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d at 168 (considering investigation launched by DOJ where there were also specific allegations that an individual defendant "negotiated . . . agreements and committed the [c]ompany to their illegal terms"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380, 383 (E.D.N.Y. 2013) (observing that government investigations are "one piece of the puzzle" when assessing scienter, *id.* at 380, but finding that allegations nevertheless "d[id] not give rise to a compelling inference" of scienter, *id.* at 383).

        To summarize, with respect to the regulatory misstatements, Plaintiffs' TAC suffers from the same deficiencies as Plaintiffs' earlier complaints: the TAC is devoid of "any allegation that [Defendants] had any contemporaneous basis to believe that the information they related was incorrect." *Lottery I*, 715 F. Supp. 3d at 558 (quoting *Dobina*, 909 F. Supp. 2d at 251); *see also Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 557 (S.D.N.Y. 2010) ("[F]ailure to link any particular Defendant with the factual background from which Plaintiff alleges all Defendants' scienter can be inferred contravenes Rule 9(b)."). Plaintiffs' scienter argument is, at bottom, a core operations argument: according to Plaintiffs, scienter can be inferred because "the so-called secret sauce, the very thing that this company purported to have solved, the reason for it to exist, was that it was allowing people to buy lottery tickets all

across the country online." Tr. at 39:12-15.[20]  Therefore, Plaintiffs reason, Defendants "must have known" that Lottery was breaking the law.  But as countless courts in this district have made clear, this line of argument does not cross the threshold to a "strong inference" of scienter.  *See In re AT&T/DirectV Now Sec. Litig.*, 480 F. Supp. 3d at 533 ("[C]ourts in this circuit have generally invoked the doctrine only to bolster other evidence of scienter, rather than relying on it as an independently sufficient basis."); *see also Lottery I*, 715 F. Supp. 3d at 557 (collecting cases).  "[G]eneralized allegations predicated on what the Defendants must have known '[b]y virtue of their responsibilities and activities as a senior officer' are precisely the kind of conclusory allegations that fail to satisfy the PSLRA's heightened pleading standard."  *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 (2d Cir. 2022) (summary order) (second alteration in original) (citation omitted) (quoting *Kalnit*, 264 F.3d at 142).

Finding that Plaintiffs have not pleaded sufficient allegations to establish scienter on behalf of the Individual Defendants, the Court turns to whether scienter can nevertheless be established with respect to Lottery.  As noted above, "[i]t is possible 'to raise the required inference with regard to a corporate defendant without doing so with regard to a specific

---

[20] At oral argument, Plaintiffs' counsel stated that they were asserting a core operations argument "to some degree," but maintained that the circumstantial evidence "just rises to the level of something that would be impossible to believe that the defendants wouldn't know about." Tr. at 40:3-13.  Plaintiffs, however, do not plausibly articulate any of the grounds from which courts ordinarily infer scienter, for instance: that defendants "benefitted in a concrete and personal way from the purported fraud"; "engaged in deliberately illegal behavior"; "knew facts or had access to information suggesting that their public statements were not accurate"; or "failed to check information they had a duty to monitor," *Blanford*, 794 F.3d at 306 (quoting *ECA*, 553 F.3d at 199).  To the extent Plaintiffs are effectively arguing that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," *id.*, Plaintiffs have failed to "specifically identify the reports or statements containing this information," *Dynex*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309).

individual defendant'" when the magnitude of the fraud is "dramatic." *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 27 (2d Cir. 2020) (summary order) (quoting *Dynex*, 531 F.3d at 195-96).  To illustrate collective corporate scienter, the Second Circuit in *Dynex* set forth the following hypothetical:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero.  There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Dynex*, 531 F.3d at 195-96 (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).  Distinguishing between pleading and liability rules, the Second Circuit underscored that, for purposes of surviving a Federal Rule of Civil Procedure 12(b)(6) motion under the PSLRA, "corporate scienter [could] be pleaded in the absence of successfully pleading scienter as to an expressly named officer." *Id.* at 196; *see also In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp.2d at 481 (observing that the "collective knowledge doctrine serves an important function in situations where widespread corporate fraud cannot be connected to individual defendants at the pleading stage").  In other words, it is possible to raise the required inference of scienter with respect to a corporate defendant, without establishing that any specific individual defendant acted with a culpable state of mind. As the Court acknowledged in *Lottery I*, however, the "Second Circuit has cautioned that 'collective corporate scienter may be inferred' only in 'exceedingly rare instances.'"  715 F. Supp. 3d at 557 n.11 (quoting *Jackson*, 960 F.3d at 99).

Although Plaintiffs briefed the issue of collective corporate scienter, Lottery Class Opp. at 38-39, at oral argument, Plaintiffs appeared to retreat from that argument, instead asserting that scienter could be inferred on behalf of each of the Individual Lottery Defendants based on the Defendants' leadership roles and the fact that Lottery's conduct implicated the

company's core operations. *See* Tr. at 50:10-14 ("[W]ith respect to the regulatory statements we're not saying a particular executive has distinct knowledge from others. What we are saying is that all of the executives certainly understood the limitations of their technology."). In any event, as noted *supra*, collective corporate scienter is inferred in "exceedingly rare instances." *Jackson*, 960 F.3d at 99. Plaintiffs' allegations that Lottery illegally printed some portion of lottery tickets from its Texas office does not support an inference that Lottery's statements of legal and regulatory compliance were so "dramatic an announcement" to warrant an inference of collective scienter — akin to General Motors hypothetically announcing that it had sold one million SUVs in 2006, when the actual number was zero. *See Dynex*, 531 F.3d at 195-96.

The Court is also not persuaded by the cases relied upon by Plaintiffs, which only reiterate the rare circumstances in which collective corporate scienter may be inferred and generally involved more direct involvement or knowledge by corporate executives — facts dissimilar from the allegations here. *See, e.g.*, *Lea*, 837 F. App'x at 27 (inferring corporate scienter where complaint included detailed allegations as to structure of fraudulent transaction and where inference of corporate scienter was "further supported . . . by allegations . . . regarding the direct participation by individual defendants . . . in various aspects of the design and implementation of the transactions at issue"); *Sjunde AP-Fonden*, 545 F. Supp. 3d at 145 (observing only that it was "possible that at least one statement" was "a pronouncement so dramatic" that inferring corporate scienter would be appropriate, but ultimately holding that "[r]egardless . . . Plaintiff has sufficiently pled scienter as to two Individual Defendants," therefore allowing for the imputation of scienter to the corporate entity); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (inferring corporate scienter where executive officers were alleged to have had "knowledge of and

access to non-public information" regarding the company's finances "that contradicted their public statements"); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 300 (S.D.N.Y. 2009) (finding corporate scienter where confidential witnesses "described widespread knowledge" at the company that the project at issue was over budget and that reported figures were inaccurate); *In re Teva Sec. Litig.*, 671 F Supp. 3d 147, 215 (D. Conn. 2023) (finding corporate scienter for a "massive multi-year, multi-pronged company-wide scheme to push opioids for off-label use" that was alleged to have been "pushed by Teva's management"). Here, in contrast, the TAC does not allege facts from which a strong inference can be drawn that "*someone* whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements." *Dynex*, 531 F.3d at 197.

For the foregoing reasons, the Court finds that Plaintiffs have not adequately pleaded scienter with respect to either the Individual Defendants or Lottery as a collective corporate entity.

## II.    Section 14(a) Claims

Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies in contravention of any rule or regulation promulgated by the SEC." *United Paperworkers International Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993). SEC Rule 14a-9 prohibits the issuance of a proxy statement that is "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

"To state a claim under Section 14(a) . . . , and Rule 14a-9 promulgated thereunder, a shareholder must, at the very least, identify a materially misleading misrepresentation or omission in the proxy materials." *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 38

(2d Cir. 2020) (summary order) (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 383-85

(1970)). "Materiality for purposes of Section 14(a) is indistinguishable from the Section

10(b) standard." *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020);

*see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (announcing the materiality

standard applicable to Section 14(a) and Rule 14a-9 claims). For Section 14(a) liability

pursuant to Rule 14a-9, "plaintiffs need not demonstrate that the omissions and

misrepresentations resulted from knowing conduct," but rather, "[l]iability can be imposed for

negligently drafting a proxy statement." *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995

(2d Cir. 1988); *accord Sec. & Exch. Comm'n v. Hurgin*, 484 F. Supp. 3d 98, 116 (S.D.N.Y.

2020).

      Class Plaintiffs bring a Section 14(a) claim against Defendants. TAC ¶¶ 213-216.

The Court limits its Section 14(a) analysis to the Proxy statements it has already deemed to be

materially false or misleading, that is, Lottery's representation that the company "only"

purchases tickets for customers in the state where the customers are physically located and

that it "only" purchases tickets in "accordance with applicable laws." TAC ¶¶ 150, 152.[21]

---

[21] Plaintiffs assert that "Section 14(a) claims are subject to Rule 8(a)'s liberal pleading standard, requiring only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Lottery Class Opp. at 45 (quoting Fed. R. Civ. P. 8(a)(2)). Defendant Komissarov asserts that, "[u]nder the standards imposed by the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence on the part of all Defendants." Komissarov Class Br. at 21 (quoting *Bond Opportunity Fund v Unilab Corp.*, No. 99-cv-11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004) (summary order)). Aside from these brief references, the parties have not briefed the pleading standard to be applied here and there are conflicting cases in this regard. *See In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d at 218 ("Courts in this circuit have diverged on the pleading requirements for the requisite mental state in Section 14(a) claims . . . ."). The PSLRA provides that in "any private action arising under [the PSLRA] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Therefore, "[b]ecause a Section 14(a) claim can be stated under a theory of

### A.  Komissarov's Section 14(a) Liability

Turning first to Komissarov: the Court finds that Plaintiffs have not adequately

pleaded a Section 14(a) claim against Komissarov for the reasons set forth below.

As an initial matter, Komissarov argues that, under *Janus Capital Group, Inc. v. First*

*Derivative Traders*, 564 U.S. 135, 138 (2011), he is not the "maker" of compliance-related

statements in the proxy materials and therefore is not responsible for any misrepresentations

or omissions contained therein.  Komissarov Class Br. at 14.  The Court rejects this argument.

*Janus* only discussed the controlling standard for a Section 10(b) claim and thus does not

apply to Section 14(a) and Rule 14a-9 claims.  *See, e.g.*, *Hurgin*, 484 F. Supp. 3d at 117

(finding that *Janus* was inapposite and observing that Section 14(a) does not require a plaintiff

to allege that the defendant "personally made allegedly misleading statements or personally

---

negligence, the applicability of this provision depends on whether negligence is a 'state of
mind.'  The Second Circuit has not opined on the matter, and what authority exists is
divergent."  *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund. v. Transocean Ltd*.,
866 F. Supp. 2d 223, 240 (S.D.N.Y. 2012) (collecting cases).  Some district courts have held
that PSLRA's heightened pleading requirements apply to Section 14(a) claims.  *See, e.g.,
Bond Opportunity Fund*, 2003 WL 21058251, at *4 (holding that "Plaintiffs must plead with
particularity facts that give rise to a strong inference of negligence on the part of all
[d]efendants"); *In re Bemis Co. Sec. Litig*., 512 F. Supp. 3d 518, 529 (S.D.N.Y. 2021)
(collecting cases).  Others, following the decision of the Court of Appeals for the Seventh
Circuit in *Beck v. Dobrowski*, have found that a lower pleading standard should apply to a
Section 14 claim, notwithstanding the PSLRA, because "negligence is not a state of mind" but
rather a "failure . . . to come up to the specified standard of care."  *Bricklayers*, 866 F. Supp.
2d at 240 (quoting *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (Posner, J.)); *see,
e.g.*, *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y.
2017); *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-cv-09992 (PAC), 2021
WL 4443258, at *7-8 (S.D.N.Y. Sept. 27, 2021).  The Court is persuaded by the reasoning of
those cases that have declined to apply the PSLRA's heightened pleading standards, finding
that the standard articulated therein is more "consistent with what it takes to plead a Section
14(a) claim."  *Fresno Cnty.*, 268 F. Supp. 3d at 559; *see also Wilson*, 855 F.2d at 995
("Liability can be imposed for negligently drafting a proxy statement").  In fact, "the Second
Circuit recently cited *Beck's* articulation of the law with approval in [*Dekalb County Pension
Fund v. Transocean Ltd*.]."  *Fresno Cnty.*, 268 F. Supp. 3d at 559 (citing *Dekalb Cnty.
Pension Fund v. Transocean Ltd*., 817 F.3d 393, 408 n.90 (2d Cir. 2017)).  But even if a
heightened pleading standard were applied, the Court's holdings would be the same.

prepared the proxy materials"). "The language of Section 14(a) makes it 'unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe . . . *to solicit or to permit the use of his name to solicit* any proxy . . . ." *In re Bank of Am. Corp. Sec, Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 293 (S.D.N.Y. 2010) (omissions in original) (quoting 15 U.S.C. § 78n(a)(1)). "Thus, according to the plain language of Section 14(a), liability attaches only to defendants who actually solicited proxies or permitted the use of their names to solicit proxies." *Id.* "Neither the Second Circuit nor the Supreme Court has directly addressed whether an officer may be liable for misstatements or omissions merely because his or her name appears somewhere in the text of an allegedly misleading proxy statement. Other courts have, however, concluded that Section 14(a) requires a connection between the use of an officer's name and the company's solicitation." *Id.* at 294; *accord Hurgin*, 484 F. Supp. 3d at 117.

Even assuming that there must be "a connection between the use of an officer's name and the company's solicitation," a Section 14(a) claim is properly brought against Komissarov: Komissarov's signature appeared in the Proxy, TAC ¶ 146; his name appeared within the Proxy 42 times, *id.* ¶¶ 42, 70; and he was a member of Trident's Board of Directors, *id.* ¶¶ 42, 70, which was "soliciting proxies," Proxy at 67; *see also* Proxy at vii ("The Board is soliciting your proxy to vote for the Business Combination . . . ."). Therefore, despite "not personally mak[ing] any false statements," Komissarov, "as a member of the board of directors, solicited a proxy via a statement containing misleading statements or omissions, putting him squarely within the ambit of Section 14(a)." *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d at 218. That is sufficient to establish that a Section 14(a) claim may be brought against Komissarov. *See, e.g.*, *In re Bank of Am. Corp.*, 757 F. Supp. 2d at 293

(proxy that stated it was "[s]olicited on behalf of the Board of Directors" was sufficient to establish that directors might be subject to liability under Section 14(a) (emphasis omitted)).

Class Plaintiffs' Section 14(a) claim against Komissarov nonetheless fails, however, because, even under a liberal pleading standard, Plaintiffs have insufficiently pleaded negligence. Plaintiffs' TAC makes only the conclusory assertion that Komissarov (along with the other Defendants) solicited proxies by means of a proxy statement that "through Defendants' negligence" contained material misrepresentations. TAC ¶ 215; *see, e.g.*, *Zappia v. Myovant, Scis. Ltd.*, 708 F. Supp.3d 486, 490, 494 (S.D.N.Y. 2023) (dismissing Rule 14a-9 claim premised on conclusory statement that "[d]efendants were at least negligent in filing the Proxy with these material misrepresentations and omissions" (alteration in original)). "That threadbare recital of an essential element of a Rule 14a-9 claim does not suffice." *Zappia*, 708 F. Supp. 3d at 494.

Moreover, contrary to Plaintiffs' conclusory allegation of negligence, the facts pleaded do not plausibly allege that Komissarov acted negligently. For one, the alleged misrepresentations regarding Lottery's regulatory compliance are in the portion of the Proxy authored by Lottery and entitled the "Business of Lottery.com." Proxy at 132-150. Komissarov was never an officer or director of Lottery. Moreover, the Proxy reflects that Lottery represented that the company was operating in material compliance with all applicable laws, and Lottery's contractual agreement stated that the information it provided for inclusion in the Proxy was true and accurate, facts upon which it would be reasonable for Komissarov and Trident to rely. *See* Proxy at A-24, A-31, A-33 (Lottery's representations and warranties set forth in the parties' Business Combination Agreement); *id.* at A-31 (representing that information supplied by Lottery for inclusion in the Proxy "shall not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

therein, in light of the circumstances in which they are made, not misleading"); *id.* at 74 ("In

the Business Combination Agreement, Lottery.com makes certain customary representations

and warranties . . . relating to, among other things . . . compliance with Laws, including those

relating to foreign corrupt practices and money laundering . . . .").  And although Komissarov

undertook due diligence in advance of the business combination's consummation, the Proxy

expressly cautioned shareholders of the risk that Trident's due diligence might not have

"uncovered all material issues":

> Even though TDAC conducted a due diligence investigation of Lottery.com, it
> cannot be sure that this diligence uncovered all material issues that may be
> present inside Lottery.com or its business, or that it would be possible to uncover
> all material issues through a customary amount of due diligence, or that factors
> outside of Lottery and its business and out of its control will not later arise.

Proxy at 54.  Shareholders were therefore specifically alerted to the fact that "material

issues" might exist within Lottery that were not uncovered through Komissarov and

Trident's due diligence.

Given the foregoing, the Court finds that Plaintiffs have not satisfied even the "low bar

for pleading negligence in the Section 14(a) context" with respect to Komissarov.  *Fresno*

*Cnty.*, 268 F. Supp. 3d at 563.

### B.  Lottery Defendants' Section 14(a) Liability

Whether Class Plaintiffs have adequately pleaded a Section 14(a) claim against the

Lottery Defendants, however, requires a separate analysis.  As noted *supra*, the Court has

already determined that the Proxy's representations that Lottery "only" purchased tickets in

the state where its customers were located and that it did so in "accordance with applicable

laws" were materially misleading.  The only remaining question for this Court is whether the

complaints sufficiently allege facts supporting Section 14(a) liability for the Individual

Lottery Defendants for those misrepresentations.

Just as with Komissarov, the Court finds a sufficient "connection between the use" of

the Individual Lottery Defendants' names and "the company's solicitation" such that a

Section 14(a) claim may be brought against the Individual Defendants. *In re Bank of Am.*

*Corp.*, 757 F. Supp. 2d at 294. The Individual Lottery Defendants' names did not just

frequently appear in the Proxy (Clemenson's name making an appearance 33 times, DiMatteo

38 times, and Dickinson 23 times), but the Proxy also contained information about each

individual's qualifications, experience, and their roles in the company following the business

combination. *See, e.g.*, Proxy at xvi, 113, 142, 197, 199-200, 203. Moreover, the Proxy

indicated that each of these individuals was closely involved in the business combination

negotiations with Trident, and the Business Combination Agreement itself was signed by

Clemenson on Lottery's behalf. *See* Proxy at 83-85, Annex A-62. Where, as here

"individuals listed in a proxy statement have put their reputations in issue, they cannot divorce

themselves from improper actions taken in the proxy battle by the participants acting under

the banner of their names." *In re Bank of Am. Corp.*, 757 F. Supp. 2d at 294 (alterations

adopted) (quotation marks and citation omitted); *see also McIntosh v. Katapult Holdings, Inc.*,

No. 21-cv-07251 (JPO), 2023 WL 5049044, at *13 (S.D.N.Y. Aug. 8, 2023) ("The basis for

Section 14(a) liability is not the nature of the duty between the defendant and a shareholder,

but whether that defendant has solicited or permitted his or her name to be used in the

allegedly unlawful proxy." (quoting *In re Bank of Am. Corp.*, 757 Supp. 2d at 288)).

As for whether the Lottery Defendants acted negligently, this is a less exacting

standard than the scienter required under Section 10(b). The Court's holding that the

complaints do not sufficiently plead that the Lottery Defendants acted with the requisite

scienter to establish liability under Section 10(b) does not necessarily mean that they do not plead facts sufficient to allege that the Lottery Defendants are liable under Section 14(a). "Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive." *Wilson*, 855 F.2d at 995 (citing *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1298-1301 (2d Cir. 1973)). Indeed, under Section 14(a), a misleading proxy solicitation "violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials." *In re Bank of Am. Corp.*,757 F. Supp. 2d at 321 (quoting *Beck*, 559 F.3d at 682) (collecting cases). For the purposes of pleading negligence, "the corporation is assumed to know all that any of its agents know" (or should have known). *Bond Opportunity Fund v. Unilab Corp.*, No. 99-cv-11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (citing *Gerstle*, 478 F.2d at 1299), *aff'd*, 87 F. App'x 772 (2d Cir. 2004).

Here, Plaintiffs have adequately pleaded allegations giving rise to an inference that the Lottery Defendants acted negligently in preparing the Proxy. The Proxy's assurances that the company "only" purchased tickets in states where customers are located are belied by the allegation that, since 2020, the company sold hundreds of thousands of tickets out of state over a seven-month period, in direct violation of 18 U.S.C. § 1301. While Plaintiffs have not pleaded what proportion of Lottery's total ticket sales the 500,000 illegal ticket sales constituted, documents incorporated by reference in the complaints reflect that, in 2020, Lottery delivered 1,291,870 lottery games to users of Lottery's platform worldwide through its business-to-consumer ("B2C") platform, Proxy at 155, and approximately 2.6 million lottery games to users through its B2C platform in 2021, 2021 Annual Report at 15. Alleged illegal sales of 500,000 lottery tickets within a seven-month period therefore appear to

constitute between about 20 and 39 percent of the total number of lottery tickets that Lottery sold. This is not an insubstantial amount and while the magnitude of alleged wrongdoing is not sufficient to plead scienter, *see supra* at I.B.2.ii, the Court finds that the Individual Defendants' high-level positions; the small size of the company; the centrality of lottery ticket sales to the company's core operations; and the magnitude of the noncompliance are, considered together, "sufficient to meet the low bar for pleading negligence in the Section 14(a) context," even assuming that Plaintiffs must show a "strong inference" of negligence. *Fresno Cnty.*, 268 F. Supp. 3d at 563; *see Wilson*, 855 F.2d at 995 (observing low threshold for finding that a proxy statement was negligently drafted). Plaintiffs have plausibly pleaded that the Lottery Defendants were negligent and should have been aware of Lottery's illegal procurement of tickets out of state, particularly when Lottery was repeatedly attesting to the company's legal and regulatory compliance with respect to out-of-state lottery ticket sales.

Plaintiffs' Section 14(a) claim against the Lottery Defendants therefore survives a motion to dismiss.

## III. Section 20(a) Claims

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." *Blanford*, 794 F.3d at 305 (quoting 15 U.S.C. § 78t(a)). Thus, liability under Section 20(a) is "derivative of liability under some other provision of the Exchange Act." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253 n.2 (2010). To sustain a claim of control-person liability under Section 20(a), Plaintiffs must prove by a preponderance of the credible evidence that there was "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493

F.3d at 108; *see also Woebel v. INTL FCStone, Inc.*, No. 14-cv-00232 (AKH), 2015 WL

14081727, at *7 (S.D.N.Y. July 13, 2015).  "[C]ulpable participation is a scienter requirement

for which a plaintiff must allege some level of culpable participation at least approximating

recklessness in the section 10(b) context in order to survive a motion to dismiss."  *In re Virtus*

*Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016) (quoting *In re*

*ShengdaTech, Inc. Sec. Litig.*, No. 11-cv-01918 (LGS), 2014 WL 3928606, at *10 (S.D.N.Y.

Aug. 12, 2014)); *see also In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02-cv-00910 (GEL), 2005

WL 1907005, at *5 (S.D.N.Y. Aug. 8, 2005) ("[P]laintiffs must plead with particularity facts

giving rise to a strong inference that the controlling person knew or should have known that

the primary violator, over whom that person had control, was engaging in fraudulent

conduct." (quoting *Burstyn v. Worldwide Xceed Grp., Inc.*, No. 01-cv-01125 (GEL), 2002 WL

31191741, at *7 (S.D.N.Y. Sept. 30, 2002))).

        Both Class Plaintiffs and Hoffman assert a control person claim against the Individual

Lottery Defendants premised on Lottery's underlying primary violation of Section 10(b).  *See*

TAC ¶ 84; SAC ¶ 80.  As noted above, the Court finds that Plaintiffs have sufficiently stated a

primary violation of Section 10(b) with respect to post-merger statements related to Lottery's

financial performance and financial reporting that postdate January 4, 2022.  Moreover, the

Individual Lottery Defendants do not dispute that they are controlling persons.  *See* C&D Br.

at 24; DiMatteo Class Br. at 13-14.  As for "culpable participation," because "culpable

participation [under Section 20(a)] is a scienter requirement for which a plaintiff must allege

some level of culpable participation at least approximating recklessness," *In re Virtus Inv.*

*Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d. at 542 (quoting *In re ShengdaTech, Inc. Sec. Litig.*,

2014 WL 3928606, at *10), the failure to establish scienter with respect to Clemenson and

DiMatteo for purposes of Section 10(b) also dooms Plaintiffs' Section 20(a) claim against

Clemenson and DiMatteo. *See, e.g., In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 308 (S.D.N.Y. 2008) (dismissing a Section 20 claim as to some of the defendants for failure to plead culpable participation on the ground that the complaint failed to plead scienter under Section 10(b) against the same defendants); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *11 (same); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999) (same).  Dickinson, however, is sufficiently alleged to be a "culpable participant."  As set forth above, the TAC adequately alleges that Dickinson acted with knowledge of the sham nature of the September 2021 transaction.  Class Plaintiffs' and Hoffman's Section 20(a) claim premised on Section 10(b) can therefore proceed against Dickinson but is dismissed against the other Individual Lottery Defendants.

Class Plaintiffs and Hoffman also assert a control person claim against the Individual Defendants, including Komissarov, premised on a violation of the Section 14(a) claim.  *See* TAC ¶ 86; SAC ¶ 80.  For the reasons set forth above, the Court finds that neither Komissarov nor Trident violated Section 14(a) and therefore dismisses the Section 20(a) claim as against Komissarov.  As for Clemenson, Dickinson, and DiMatteo, the Court does not find that there are facts from which it can be inferred that they were "culpable participants" in the misstatements regarding regulatory compliance in the Proxy, for the same reasons that they did not act with the requisite scienter as to those statements for purposes of a Section 10(b) claim.  Class Plaintiffs' and Hoffman's control person claim against the Individual Defendants for Section 14(a) violations is therefore likewise dismissed.[22]

---

[22] Komissarov separately argues that Hoffman has failed to properly serve him because Hoffman served the Second Amended Complaint on Komissarov's counsel himself. Komissarov Hoffman Br. at 14-15; *see Pruthi v. Empire City Casino*, No. 18-cv-10290 (NSR), 2022 WL 596370, at *4 (S.D.N.Y. Feb. 8, 2022) (dismissing complaint where "*pro se* [p]laintiff personally attempted to effectuate service on each of [the defendants] contrary to Rule 4(c)(2)'s explicit prohibition against parties personally serving a summons and

## IV.    Motion to Amend

On February 20, 2025, Plaintiffs submitted a letter appending a sealed indictment in *United States of America v. Vadim Komissarov*, No. 25-cr-00061 (AKH) (S.D.N.Y. filed Feb. 18, 2025), for, among other things, making false and misleading statements in the October 18, 2021 proxy statement, and asking the court to "conside[r] . . . new information" contained in the indictment. Dkt. 222 at 2; *see* Dkt. 222-1 (the "Indictment"). Plaintiffs claim that the Indictment "provides substantial support for [their] allegations," including their allegations pertaining to the alleged $30 million sham transaction. Dkt. 222 at 1-2. Defendants did not file a response. Since this information is not pleaded in the present complaints, the Court declines to consider the Indictment or any additional allegations raised therein in resolving the pending motions to dismiss.

However, in the event the Court granted all or part of any of the motions, Plaintiffs requested an opportunity to amend pursuant to Rule 15. Lottery Class Opp. at 58. "'[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Veras v. N.Y.C. Dep't of Educ.*, No. 22-cv-0056 (JLR) (SN), 2024 WL 3446498, at *8 (S.D.N.Y. July 17, 2024) (quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018), *aff'd*, No. 24-1956, 2007 WL 10131754 (2d Cir. Feb. 6, 2025) (summary order). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

---

complaint"). Even if the Court were to provide Hoffman, appearing *pro se*, additional time to serve Komissarov through the proper channels, Hoffman's claims against Komissarov would still be dismissed on the merits. *See Pruthi*, 2022 WL 596370, at *4 (reaching merits despite finding that *pro se* plaintiff's service of process was insufficient).

amendment, etc.'" *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  None of those circumstances apply here.

While Plaintiffs will not be given unlimited opportunities to amend, given Plaintiffs' February 20, 2025 letter and the possibility of new information pertaining to Komissarov and the Lottery executives, the Court grants Plaintiffs leave to amend within twenty-one (21) days of the date of this decision.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in part and DENIED in part.  As set forth above, Class Plaintiffs' Section 10(b) claim shall proceed against Dickinson and Lottery based on post-merger representations regarding Lottery's financial performance and financial reporting.  Class Plaintiffs' and Hoffman's Section 20(a) claim premised on Section 10(b) shall likewise proceed against Dickinson.  Class Plaintiffs' Section 14(a) claim shall proceed against the Lottery Defendants with respect to certain legal and regulatory compliance statements in the Proxy.  The remainder of Plaintiffs' claims are dismissed, including all claims against Komissarov.  Plaintiffs shall have leave to amend **within twenty-one (21) days** of this opinion and order.

The Clerk of Court is respectfully directed to terminate the pending motions at Dkts. 160, 163, 166, 169, 172, 176, and 180.

Dated: February 25, 2025
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge