**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LOTTERY.COM, INC. SECURITIES LITIGATION | Case No. 1:22-cv-07111-JLR<br><br>**FIFTH AMENDED COMPLAINT OF *PRO SE* PLAINTIFF HAROLD M. HOFFMAN**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Harold M. Hoffman, *pro se* ("Plaintiff"), alleges the following upon information and belief, except as to allegations specifically concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his investigation, which includes without limitation: (i) review and analysis of regulatory filings made by Lottery.com, Inc. ("Lottery" or the "Company"), f/k/a Trident Acquisitions Corp. ("TDAC") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review of filings and proceedings in criminal proceedings brought against certain Individual Defendants (defined herein) in this action; (iii) review and analysis of the SEC Complaint against Defendants (defined herein); (iv) review and analysis of analyst and media reports; (v) review and analysis of press releases and other public statements issued and disseminated by the Company or its authorized agents; and (vi) review of other publicly available information concerning Lottery.

## I. NATURE OF THE ACTION

1. Plaintiff brings this federal securities action seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. This action concerns the improper recognition of revenue ahead of taking AutoLotto, Inc. ("AutoLotto") public through a merger with TDAC (the "Business Combination") to make it appear as an attractive acquisition target.[1] Defendants also issued materially false and misleading statements after the Business Combination.

3. The allegations herein are all confirmed by: (i) the indictment of TDAC's Chief Executive Officer Vadim Komissarov, after which he pled guilty to securities fraud and was

---

[1] By removing certain allegations dismissed by the Court's Opinion and Order dated February 25, 2025, Plaintiffs do not intend to waive their rights to later appeal their dismissal or to reassert them at a later date.

sentenced to 36 months in prison (*see* Exhibit A to D.E. #264, the "Komissarov Indictment"); (ii) the May 22, 2025 guilty pleas entered by Defendants Ryan Dickinson (the Company's former President, Treasurer, and Chief Financial Officer) and Matthew Clemenson (the Company's former Chief Revenue Officer) (*see* Exhibits C through E to D.E. #264); and (iii) the SEC's action against Defendants, in which Defendants Clemenson and Dickinson admitted that the allegations in the SEC Complaint are true and consented to the entry of judgments against themselves (*see* Exhibits F through H to D.E. #264).

4. TDAC, a special purpose acquisition corporation ("SPAC") formed to take public an Eastern European energy or oil company, was on the verge of a deadline that would force the company to liquidate, rendering Komissarov's shares worthless. After obtaining multiple extensions to close a qualifying transaction, Komissarov was running out of time. To guarantee his substantial sums, Komissarov set his eyes on AutoLotto, a gaming company that did not operate in the target industry for which TDAC was authorized.

5. Just one problem: AutoLotto was in severe financial distress and struggling to make payroll, making it unappealing for investors who had already invested $205 million into TDAC. Komissarov and the Individual Lottery Defendants (defined herein) schemed to turn AutoLotto

into an attractive business target and assure themselves of significant financial benefits. Beginning in December 2020—six months before the issuance of the Proxy Statement—Komissarov and the Individual Lottery Defendants caused AutoLotto to enter into a fake transaction with a data services company, claiming that the customer would buy data from Lottery for $9 million and create products to resell to a third party. In reality, this $9 million was funded by an investor that Komissarov located, and it was funneled through a series of transactions to disguise that it was fabricated revenue. These sham transactions enabled Defendants to falsely report $9 million of revenue, spread over three quarters preceding the Business Combination, in the Proxy Statement filed in connection with the Business Combination and effective on October 18, 2021 (the "Proxy Statement").

6. The criminal and SEC proceedings confirm that the Proxy Statement contained actionable statements. The Proxy Statement stated, for example, that AutoLotto's "[r]evenue increased $8.4 million, or 891%, to $9.3 million for the three months ended June 30, 2021, from $0.9 million for the three months ended June 30, 2020" and that this increase was partly driven by "$5 million of deferred revenue from a December 2020 third-party transaction which was earned in the three months ended June 30, 2021." According to the Komissarov Indictment, "$5 million of AutoLotto's $9.3 million revenue for the quarter (more than 50%) was fraudulently and improperly recognized in these filings." Komissarov Indictment, ¶43(b). And "almost half of AutoLotto's revenue for the first half of 2021, as reported in TDAC's SEC filings was fraudulently and improperly recognized in these filings." *Id.* Komissarov was convicted and imprisoned for making these statements in the Proxy Statement, which were found false for the same reasons as Plaintiffs allege herein; Dickinson and Clemenson pled guilty to securities fraud for these

statements in the Proxy Statement; and the SEC contends that Defendants are liable for securities fraud for the same statements.

7. The criminal and SEC proceedings also confirm that Komissarov acted with the Individual Lottery Defendants. According to the Komissarov Indictment, he conspired with AutoLotto "Executive-1" and "Executive-2." Based on (i) the Komissarov Indictment, (ii) the subsequent guilty pleas of Clemenson and Dickinson, (iii) the allegations in the SEC Complaint which Dickinson and Clemenson admit are true, and (iv) the circumstances under which the sham transactions were orchestrated, "Executive-2" is AutoLotto's Chief Financial Officer Ryan Dickinson, and "Executive-1" is AutoLotto's co-founder Matthew Clemenson. Similarly, the SEC Complaint confirms that Defendants DiMatteo, Clemenson, and Dickinson discussed Komissarov's scheme, the steps to execute it, and agreed to proceed with it in December 2020. *See* SEC Complaint, ¶ 22.

8. The criminal and SEC proceedings confirm that Defendants were motivated to falsify these transactions precisely because it would make AutoLotto appear more profitable in the Proxy Statement and thereby convince investors to approve the Business Combination. Komissarov Indictment, ¶2 ("The Revenue Scheme arose from an effort by VADIM KOMISSAROV, a/k/a 'Vlad,' the defendant, to identify a suitable target for TDAC before TDAC reached a deadline to either use or return investor funds that had been raised to support an acquisition."); SEC Complaint, ¶26 ("In carrying out the scheme, Komissarov, DiMatteo, Clemenson, and Dickinson sought to deceive investors about Lottery's financial status so they could complete the business combination and minimize shareholder redemptions from the Trident SPAC.").

9. Defendant DiMatteo, as AutoLotto's co-founder, even publicly admitted to Bloomberg that the pressure "to get a deal done" propelled the Company to go public regardless of whether it was ready to do so.[2] Indeed, "following the filing of Lottery.com's annual report, which contained additional misrepresentations and misleading omissions, and after the expiration of a six-month lock-up period, VADIM KOMISSAROV, a/k/a 'Vlad,' the defendant, sold almost 300,000 Lottery.com shares for more than $600,000." Komissarov Indictment, ¶6.

10. Defendants' false and misleading statements did not end with the Proxy Statement. Komissarov and the Individual Lottery Defendants conspired to falsify the Company's revenue by $30 million for the purported purchase of Lottery's service credits. But, as Lottery.com has since admitted, the "service credits it had sold to the customer were non-transferrable," so Lottery could never actually perform the stated purpose of the contract. "KOMISSAROV expected, initially, that AutoLotto would recognize $20 million in revenue from the transaction (the $30 million purchase price minus the $10 million value of the advertising credit)." Komissarov Indictment, ¶44. "Consistent with that expectation, on or about October 21, 2021, TDAC filed with the SEC a press release with the headline 'Lottery.com Announces Strong Preliminary Third Quarter 2021 Revenues Expected To Range Between $22 Million and $24 Million | Preliminary Revenue Figures Represent Quarterly Sequential Growth of Greater than 135%." *Id.* That means that nearly all of the revenue that Defendants "expected" for third quarter 2021 was derived from the sham transaction. The scheme did not end there. The Company invoiced more than $35 million to this one customer purportedly for Lottery's "various services and advertising credit," which sums were included in the Company's financial results as revenue of $17,117,472 in the fourth quarter of 2021

2 *See* Exhibit B, N. White, "From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded," Bloomberg Tax, (Mar. 4, 2024), *available at*: https://news.bloombergtax.com/financial-accounting/from-spac-dreams-to-a-riviera-mirage-how-lottery-com-imploded.

and $18,539,472 in the first quarter of 2022. These statements are also subjects of the criminal and SEC proceedings.

11. The Company's executives were aware of the nature and specifics of these transactions. Defendants caused Lottery.com to obtain a $30 million loan to facilitate the "customer's payment" for the service credits: Defendant Dickinson was the signatory of the loan, and Defendant Clemenson admitted that he was aware of and approved the use of the Company's cash from the Business Combination as collateral for the loan. *See* SEC Complaint, ¶84. According to the SEC Complaint, Defendant DiMatteo was also aware of and approved the use of corporate funds as collateral for the loan and intentionally concealed it from Lottery's outside directors, auditor, and Chief Legal Officer. *Id.* Moreover, given that the $30 million loan was secured by $30 million Lottery already had in its account, there is no rational way that the Individual Lottery Defendants would not have been privy to the transaction—especially in light of the fact that these sums totaled roughly *half* of the $62.6 million that Lottery reported as cash and cash equivalents as of December 31, 2021.[3] Thus, the Individual Lottery Defendants knew this was a sham transaction: the Company accepted but did not cash a check from a customer, then borrowed $30 million from a bank, and allowed that customer to use the $30 million in funds from the bank as payment to Lottery for the purported purchase of Lottery service credits. In sum, the transactions with this customer were a façade to manufacture $30 million in sales, which Lottery recognized before it had even performed its obligations under the agreement.

12. Further demonstrating that the Individual Lottery Defendants were aware the transactions were bogus, the Company only disclosed the truth after all of the Individual Lottery

---

[3] The fact that the Company never disclosed the $30 million loan in its financial statements, which would have revealed the true sham nature of these transactions, even though it was obligated to, yet included all positive results on its books further demonstrates that this scheme was intentional.

Defendants were no longer with the Company. As the Company explained in its Annual Report with the SEC on Form 10-K/A filed on May 10, 2023, "During 2022, the Company discovered that the service credits it had sold to the customer were non-transferable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits." This disclosure is an admission that the arrangement was an improper round-trip transaction and that Lottery had improperly recognized revenue for services that Lottery could never actually perform. Unsurprisingly, the Company had to restate all financial results that contained anything to do with this transaction, the Company's auditor resigned, and all the top executives of Lottery were forced out of their positions.

13. When the Company disclosed the sham nature of the transaction in its 2022 Annual Report, Lottery also revealed additional sham transactions. Specifically, the Company "decreased both accounts receivables and revenues by $17,117,472, in the restated financial statements for the year ended December 31, 2021; and $18,539,472, in the restated financial statements for the three months ended March 31, 2022." The fact that, after these executives were forced out of the Company, Lottery erased these transactions from its books entirely further confirms Defendants' involvement in transactions that lacked economic substance. Had any portion of these transactions not been fictitious, the accounting rules would have required a different treatment. Instead, Lottery simply pretended the transactions never existed.

14. As a result of the Individual Defendants' fraud, Lottery's executives have faced criminal and SEC action. On May 22, 2025, Defendants Clemenson and Dickinson pled guilty to making false and misleading statements of material fact in SEC filings. *See* Exhibits C & D. The Superseding Information filed in connection with their guilty pleas detail that, from at least

November 2020 to May 2022, Defendants Clemenson and Dickinson and others took part in a scheme to fraudulently inflate the reported revenue of AutoLotto and Lottery.com in connection with the Business Combination. *Id.* These are the same issues as in the instant action.

15. During their plea hearing, Defendants Clemenson and Dickinson admitted that the Proxy Statement and other Class Period statements were false and misleading and that they acted with scienter as to their issuance. (A copy of the plea hearing transcript is attached hereto as Exhibit E.) For example, Defendant Dickinson admitted while pleading guilty that:

> During the timeframe of November 2020 and May 2022, I was an executive of Lottery.com. In that capacity, ***I engaged in a scheme to fraudulently inflate AutoLotto's and Lottery.com's reported revenue.*** In so doing, ***I caused the SEC filings which contained misrepresentations at an inflated revenue to be filed. I also caused false and misleading statements to an accountant. At the time of these actions, I knew that they were wrong.***

*See* Exhibit E at 52:9-14.[4]

16. Likewise, Defendant Clemenson admitted that during the time period "Between November 2020 and May of 2022":

> I was an executive of Lottery.com. In that capacity, ***I engaged in a scheme to fraudulently inflate Lottery.com's revenue. In so doing, I caused SEC filings which contained misrepresentations and inflated revenue to be filed. At the time of these actions, I knew they were wrong.***

*See* Exhibit E at 54:4-11.

17. Defendants' guilty conscience is evident in their attempts to conceal their fraudulent conduct from prosecutors. According to the Komissarov Indictment, Komissarov "tried to persuade [the Individual Lottery Defendants] to conceal Komissarov's involvement in the fraudulent roundtrip transaction" through several calls and messages. Komissarov Indictment, ¶54.

4 All emphasis in bold and italics hereinafter is added.

Regarding the $9 million sham transaction ahead of the Business Combination, Komissarov stated in a call recorded by prosecutors:

> [B]ut once again guys, you do understand, you say that I was involved with this transaction, this is probably even bigger than the 30 million transaction [i.e., the fraudulent roundtrip transaction involving Data Company-2] because we based the valuation of the company on those projections on your financial statements and ***if Trident and me specifically knew about it, then I am in deep, deep, deep, deep water.*** . . . [W]e took the company public, guys, so we're the ones that were basically responsible for the valuation. . . . So, if you come out and say that I was involved, then I am in deep shit.

Komissarov Indictment, ¶54(d). Komissarov was concerned about being ***caught*** for his fraudulent conduct but does not deny his involvement, as Executive-2 states: "Vadim, I guess what I'm saying is, why don't you just lie to your lawyer before you ask us to lie to the government and give us a little time to actually talk about this?" *Id.*, ¶54(f). "KOMISSAROV responded, 'Okay, that's fine.' KOMISSAROV further emphasized, 'once again, if we say that you and Trident did it together, this becomes a huge thing.'" *Id.*

18. Tellingly, Komissarov instructed the Individual Lottery Defendants: "So, under no circumstances should we give any additional evidence to anybody because this thing can just, you know, be much, you know, end up with much easier consequences than we currently envision. . . . [I]t is very important that in this particular moment, we don't give, I mean, we don't pour oil on fire. . . . Because the fire can be potentially be extinguished, but you don't, you know, pour oil on it." Komissarov Indictment, ¶55(b).

19. In addition to these criminal proceedings, each Defendant faces securities fraud claims brought by the SEC for the same misconduct, and Defendants Dickinson and Clemenson have admitted to the allegations as true and consented to the entry of judgments that, among other things, bar them from acting as an officer or director of any public company.

20. As the lack of regulatory compliance and ramifications of the sham transaction and phantom revenue were slowly revealed, the value of Lottery's securities plummeted, and Lottery's investors lost millions.

21. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff suffered significant losses and damages.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.l0b-5), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). During the Class Period, Lottery's predecessor, TDAC, resided and conducted business in this Judicial District, Lottery stock was listed and traded on the NASDAQ in this Judicial District, certain Defendants resided or conducted business in this Judicial District, and wrongful conduct took place in this Judicial District.

25. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiff

26. Plaintiff Harold M. Hoffman, a citizen of the State of New Jersey, purchased 20,000 shares of Lottery.com on November 22, 2021 at a cost of $149,397 and an average, artificially inflated price of $7.47 (hereinafter "Plaintiff's Purchase."). Plaintiff has suffered damages as a result of Defendants' federal securities law violations; Defendants' false and/or misleading statements and/or material omissions alleged herein; and, upon revelation of Defendants' alleged corrective disclosures.

**B. Defendants**

27. Defendant Lottery is incorporated in Delaware. Lottery's current principal executive offices are 20808 State Hwy 71 W, Unit B, Spicewood, TX 78669. Following the Business Combination, Lottery's shares and warrants began trading on the NASDAQ under the symbols "LTRY" and "LTRYW," respectively. Prior to the Business Combination, the Company was known as Trident Acquisitions Corp., or TDAC, and was a special purpose acquisition company, which was incorporated in Delaware with its principal executive offices located at 77 Water St. Fl 8, New York, NY 10005.

28. Defendant Lawrence Anthony "Tony" DiMatteo III ("DiMatteo") was co-founder of AutoLotto, which was doing business as "Lottery.com" prior to the Business Combination, and served as an officer and director of AutoLotto since 2015. Defendant DiMatteo became Chief Executive Officer ("CEO") of the Company and the Company's Chairman upon the closing of the Business Combination. He served in those roles at the Company until his resignation as CEO on July 22, 2022 and his resignation as a director on September 8, 2022. DiMatteo owned approximately 14% of Lottery at the time of the Business Combination and sold 375,000 Purchase Right shares at prices between $6.35 and $6.87 per share on December 2, 2021, to receive proceeds of between approximately $2,381,250 and $2,576,250 shortly after the Business Combination was completed.

29. Defendant Ryan Dickinson ("Dickinson") served as the Company's President, Treasurer and Acting Chief Financial Officer ("CFO") from October 2021 until his termination effective July 1, 2022, and Chief Financial Officer from March 2022, until his termination effective July 1, 2022. Defendant Dickinson joined AutoLotto in June 2018 and served as Executive Vice President of Product until October 2018, at which time he was appointed President and Chief Operating Officer. According to the Proxy Statement, Dickinson was to be awarded $35 million in

restricted stock upon the completion of the Business Combination that would vest after an additional six months of employment.

30. Defendant Matthew Clemenson ("Clemenson") was a co-founder of AutoLotto and served as its President from 2015 to 2019 and its Chief Commercial Officer since 2019. Upon the consummation of the Business Combination, defendant Clemenson became the Company's Chief Commercial Officer and served in that role until March 2022 at which time he became the Company's CRO. He served as a Company director from October 2021 until his resignation on July 11, 2022. Clemenson, like DiMatteo, owned approximately 14% of Lottery at the time of the Business Combination and sold 375,000 Purchase Right shares at prices between $6.35 and $6.87 per share on December 2, 2021, to receive proceeds of between approximately $2,381,250 to $2,576,250 shortly after the Business Combination was completed.

31. Defendants DiMatteo, Dickinson and Clemenson are referred to herein as the "Individual Lottery Defendants." The Individual Lottery Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lottery's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.,* the market. The Individual Lottery Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to, and indeed were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

32. Lottery and the Individual Lottery Defendants are referred to collectively as "Lottery Defendants."

33. Defendant Vadim Komissarov ("Komissarov") was CEO and a director of the Company, then known as TDAC, prior to the Business Combination. Defendant Komissarov was also TDAC's CFO until he resigned from this position on November 20, 2020. Defendant Komissarov, because of his position with the Company, possessed the power and authority to control the contents of Lottery's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.,* the market. Komissarov was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of Komissarov's position and access to material non-public information available to them but not to the public, he knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

34. Komissarov was heavily involved in TDAC's decision to enter into the Business Combination with Lottery, and he was highly motivated to complete the transaction at all costs, knowing that his personal financial interest in TDAC was dependent on it. Following three extensions to TDAC's deadline to consummate a business combination, and faced with dwindling funds with which to effectuate such a deal, Komissarov introduced TDAC's management to Lottery as a potential target for acquisition. Thereafter, Komissarov received Lottery's historical and projected financial information, as well as information necessary to perform regulatory due diligence on Lottery, met with Lottery's senior management on numerous occasions, and

ultimately signed the Business Combination Agreement with Lottery on TDAC's behalf. Komissarov also enthusiastically solicited proxies urging TDAC shareholders to vote in favor of the Business Combination, and he did so via SEC filings that contained false and misleading information about Lottery's revenue projections and results, as well as its supposed compliance with applicable laws and regulations. The Proxy Statement even referenced Mr. Komissarov's name on no fewer than 42 occasions. Komissarov's signature appeared in the Proxy Statement, and as TDAC's director and CEO, he had the power and authority to control the contents of that document and he reviewed it prior to issuance. Several days later, on October 21, 2021, TDAC filed a press release with the SEC pursuant to Rule 14a-12, in order to garner additional support for the Business Combination, as the shareholder vote regarding the transaction was just days away. The press release named Komissarov as TDAC's contact person with respect to the information provided therein, and as alleged herein, contained misleading statements.

35. The Individual Lottery Defendants and Komissarov are collectively known as the "Individual Defendants." The Individual Defendants and Lottery are referred to collectively as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Komissarov, Pressured To Consummate A Business Combination, Is The Architect Of Sham Transactions To Make AutoLotto Appear Profitable

36. Komissarov was financially incentivized to ensure that TDAC completed a business combination by its deadline. As an initial stockholder and founder of TDAC, Komissarov received his pro rata share of over 5 million shares of TDAC (valued at over $85 million at the Class Period high) for nominal consideration and 1.15 million private units (valued at $17.825 million in the Proxy Statement) that would be rendered worthless if the Business Combination was not completed, as he had waived his right to any liquidation distribution. Komissarov also

contributed over $3.4 million in cash to the Company that would not be repaid in the event the Business Combination was not completed.

37. After repeated extensions of the deadline to complete a qualifying business combination, Komissarov was desperate to complete a transaction and set TDAC's focus on AutoLotto, Inc. d/b/a Lottery.com.

38. To sweeten the deal, he orchestrated sham transactions that misled investors to believe AutoLotto was far more profitable than it was, as described herein.

39. For his misconduct, Komissarov was indicted by a grand jury on nine counts, including (i) conspiracy to commit securities fraud, to make false and misleading statements in proxy statements, and to make false filings with the SEC; (ii) securities fraud; and (iii) false and misleading statements in proxy statements. *See* Komissarov Indictment.

40. In July 2026, Komissarov was sentenced to 36 months in prison, after he pled guilty to securities fraud.

### 1. Special Purpose Acquisition Companies And Their Inherent Conflicts Of Interest

41. SPACs are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's IPO is held in trust for a specific period of time to fund the acquisition.

42. If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). *See also* Komissarov Indictment, ¶15. However, if an acquisition is not completed within that timeframe, then the SPAC is dissolved and the money held in trust is returned to investors with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire

worthless. *Id.* Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious. *Id.*

43. Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. *See also* Komissarov Indictment, ¶16. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. *Id.* Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions. *Id.*

44. Amidst a recent boom in SPAC transactions, the SEC has warned the public about serious, widespread concerns characteristic of these mergers, including "risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype."[5] These concerns raise questions as to whether SPAC sponsors have "sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter."

45. Numerous other commentators have similarly noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For example, in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to

---

5 John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at*: https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

liquidate."[6] Based on empirical research of post-merger returns to SPAC shareholders, that paper concludes that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

### 2. TDAC Was A SPAC Focused On The Eastern European Energy Sector

46. TDAC was a SPAC formed on March 17, 2016 for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination.

47. TDAC filed its IPO prospectus (the "IPO Prospectus") with the SEC on May 30, 2018. On June 1, 2018, TDAC consummated the IPO of 17,500,000 units (the "Units"). Each Unit consisted of one share of common stock and one warrant entitling its holder to purchase one share of common stock at a price of $11.50 per share. TDAC also granted the underwriters a 45-day option to purchase up to 2,625,000 additional Units to cover over-allotments, if any. On June 4, 2018, the underwriters exercised the option in full, and the closing of the issuance and sale of the additional Units occurred on June 5, 2018. Following its IPO, TDAC's units began to trade on the NASDAQ, under the symbol "TDACU" on May 30, 2018, and the common stock and warrants comprising the Units began separate trading on NASDAQ on June 13, 2018, under the symbols "TDAC" and "TDACW", respectively.

48. The total aggregate issuance by the Company of 20,125,000 Units at a price of $10.00 per Unit resulted in total gross proceeds of $201,250,000. As of June 5, 2018, a total of $205,275,000 of the net proceeds from the IPO and the private placement consummated

---

6 Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (December 20, 2021). YALE JOURNAL ON REGULATION, 2022, Volume 39, Issue 1, *available at*: SSRN: https://ssrn.com/abstract=3720919.

simultaneously with the closing of the IPO[7] were deposited in a trust account established for the benefit of the Company's public shareholders (*i.e.*, to fund a business combination).

49. Though the IPO Prospectus did not identify a target business with which TDAC would combine, it stated that the company "intend[ed] to focus [its] efforts on seeking a business combination with an ***oil and gas or other natural resources companies in Eastern Europe or interested in expanding into Eastern Europe***." In support thereof, the directors and officers of TDAC held themselves out to investors as highly experienced in industrial businesses in Eastern Europe in the energy sector. As TDAC explained:

> As Europe is striving to achieve energy independence, we believe that Eastern European oil and gas deposits, which are small and technically difficult to access, will attract the interest of investors and governments. We believe that historical exploration data can be reassessed with new geological knowledge to determine which reserves that were previously considered unrecoverable or uneconomic can be profitably recovered. Two of the most promising countries in Europe for exploration and development of oil and gas are Ukraine and Poland.
>
> We want to take advantage of privately held Eastern European oil and gas operating companies that have significant production volume and positive cash flows, but little or no reserves. By acquiring a company with undeveloped reserves and hiring companies that have engineering and geological expertise to develop the reserves, we believe that we will be able to create value for our investors.

50. TDAC's only three employees were its executive officers, all of whom claimed to be qualified and experienced in the oil and gas industries. TDAC was led by Ponomarev, whom TDAC repeatedly touted as experienced in the energy industries and working in Eastern Europe.

---

[7] Simultaneously with the closing of the IPO, the Company consummated the private placement ("Private Placement") with certain of its initial stockholders of 1,150,000 units (the "Private Units") at a price of $10.00 per Private Unit, generating total proceeds of $11,500,000. The Private Units are identical to the Units sold in the IPO except that the warrants will be non-redeemable and may be exercised on a cashless basis, in each case so long as they continue to be held by the initial purchasers or their permitted transferees. Additionally, such initial purchasers agreed not to transfer, assign, or sell any of the Private Units or underlying securities (except in limited circumstances, as described in the registration statement) until the completion of the Company's initial business combination.

For example, TDAC stated, "Mr. Ponomarev is qualified to serve as a member of our Board of Directors because his understanding of new technologies in oil & gas field and his international network of political and business leaders." Moreover, in its IPO, TDAC similarly touted the energy industry experience of COO Tymofiev and director Verona, stating as to Verona that he is "qualified to serve as a member of our Board of Directors because of his experience in the oil & gas industry, his in-depth, hands-on knowledge of Eastern European business environments, and his prominent international government affairs roles." TDAC also touted other officers' experience in Eastern Europe and CIS countries.

51. Then serving as CFO and director of TDAC, Komissarov was purportedly "qualified to serve as a member of our Board of Directors because of his expertise in international investment banking, mergers and acquisition experience in Eastern Europe and CIS countries, and his appointments on the Board of Directors of prominent Eastern European financial institutions."

52. The IPO Prospectus did not disclose whether any of its directors or officers had any experience with online technology companies or lotteries. In fact, TDAC's directors and officers had no meaningful experience in these subjects.

### 3. Komissarov Had A Financial Incentive To Complete Any Business Combination

53. Due to the TDAC's management's ownership interests in TDAC and the terms and financial structure of TDAC as a SPAC, TDAC's management, including Komissarov, possessed strong financial incentives to complete ***any*** qualifying transaction.

54. TDAC was subject to certain restrictions in its amended and restated certificate of incorporation regarding its pursuit of an acquisition. Specifically, the Company had until December 1, 2019 to consummate a business combination. If the Company was unable to consummate a business combination by then, the Company would be required to (i) cease all

operations except for the purpose of winding up, (ii) redeem 100% of the outstanding public shares as promptly as reasonably possible but no more than ten business days thereafter, and (iii) liquidate and dissolve the Company.

55. TDAC was authorized to seek stockholder approval for an extension of this deadline. However, if such an extension was approved, TDAC was required to provide shareholders with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment to the deadline. Attempting to obtain such a postponement of its deadline for a business combination thus presented serious risks that: (i) shareholders would not approve the postponement, thus forcing TDAC to liquidate if it failed to complete a transaction on time, or (ii) if a postponement was approved, shareholders may decide to redeem TDAC shares in amounts that would significantly deplete TDAC's trust account and jeopardize its ability to complete a transaction even with an extended deadline.

56. The directors and officers of TDAC acquired a significant financial interest in TDAC through the acquisition of shares and warrants prior to the IPO. These shares and warrants would be worthless if a business combination did not occur. As TDAC explained:

> In March 2016, the Company issued 3,737,500 shares of common stock to the initial stockholders (the "insider shares") for an aggregate purchase price of $25,000. In February 2018, the Company sold an additional 1,293,750 insider shares for an aggregate purchase price of $8,654, resulting in a total of 5,031,250 insider shares issued and outstanding....
>
> The initial stockholders have agreed not to transfer, assign or sell any of the insider shares (except to certain permitted transferees) with respect to 50% of the insider shares, until the earlier of (i) six months after the date of the consummation of a Business Combination and on the date on which the closing price of the Company's common stock equals or exceeds $12.50 per share for any 20 trading days within any 30-trading day period following the consummation of a Business Combination and, with respect to the remaining 50% of the insider shares, six months after the date of the consummation of a Business Combination, or if, (ii) subsequent to a Business Combination, the Company consummates a subsequent liquidation, merger, stock exchange or other similar transaction which results in all of the

stockholders having the right to exchange their common stock for cash, securities or other property (the "Lock-Up Period").

### 4. Unable To Find A Suitable Target In The Energy Sector, Komissarov Set His Eyes On AutoLotto

57. TDAC had failed to enter into a business combination as the December 1, 2019 deadline approached. TDAC then sought and obtained three extensions of the deadline, and each time, a portion of shareholders sought to redeem their shares:

(a) In November 2019, TDAC sought an extension of the deadline until May 29, 2020. Stockholders approved the proposal. However, in connection with the approval of the extension, stockholders had the right to redeem their shares for cause, and shareholders elected to redeem an aggregate of 13,081,434 shares of the Company's common stock. As a result, an aggregate of approximately $137,130,484 (or approximately $10.48 per share) was removed from the Company's trust account to pay such stockholders.

(b) Even with this extension, TDAC was unable to find an appropriate company to purchase by the once-extended May 29, 2020 deadline. So, TDAC again sought an extension of the business combination deadline, and a second extension until September 1, 2020 was approved. However, holders of another 627,059 shares of TDAC's common stock redeemed their shares for cash, resulting in a trust account balance of $68,219,114.98 after giving effect to the redemptions.

(c) TDAC then sought a third extension prior to the September 1, 2020 deadline, and shareholders approved an additional three-month extension to December 1, 2020. However, holders of a further 630,037 shares of the Company's common stock redeemed their shares for cash, resulting in a trust account balance of approximately $62,286,780 after giving effect to the redemptions.

58. With each extension and corresponding redemptions by shareholders, TDAC's management saw their financial interest in the company continue to dwindle. Moreover, as

redemptions occurred, the amount of funds available to consummate an acquisition greatly declined, further shrinking the available pool of potential target companies.

59. Just 13 days shy of the deadline provided by the third extension, on November 19, 2020, TDAC announced that it had signed a letter of intent to combine with AutoLotto.

60. Komissarov introduced TDAC's management to Lottery as a potential target for acquisition. Thereafter, Komissarov received Lottery's historical and projected financial information from DiMatteo, as well as information necessary to perform regulatory due diligence on Lottery. Komissarov met with Lottery's senior management on numerous occasions, and he ultimately signed the Business Combination agreement with Lottery on TDAC's behalf.

#### 5. To Make AutoLotto, A Financially Distressed Company, Appear Profitable In The Proxy Statement, Komissarov Orchestrates Several Sham Transactions

61. Founded in 2015, AutoLotto was based in Austin, Texas and represented itself to be: (1) a leading online platform to play the lottery, offering official state-sanctioned lottery games like Powerball, Mega-Millions and other state games, in the U.S. and around the world, and (2) the world's largest provider of lottery data – such as current and previous winning numbers, jackpots and draw dates, jackpot analysis and more, covering almost 600 lottery games in 38 countries in real time – to over 400 digital publishers, including hundreds of digital newspapers, television and news sites, and major digital publishers such as Google, Verizon/Yahoo, Amazon's Alexa devices and more.

62. For a fee, AutoLotto purchased lottery tickets for customers and managed their interests in the tickets, such as by checking their numbers and redeeming their winnings. *See* Komissarov Indictment, ¶11. AutoLotto also purportedly generated revenue from (i) enabling commercial partners to purchase certain legally operated lottery games and reselling them to users located within their respective jurisdictions; and (ii) delivering global lottery data, such as winning

numbers and results, and subscriptions to data sets of propriety, anonymized transaction data to commercial digital subscribers. *Id.*

63. But AutoLotto was not profitable. By fall 2020, AutoLotto was in such financial distress that it was unable to make payroll and employees were leaving the company. *See* Komissarov Indictment, ¶13. AutoLotto's executives were concerned about the company's fate, especially because they depended on a certain data customer paying approximately $9 million remaining on its contract and they were uncertain if and when AutoLotto would receive those funds. *Id.*; SEC Complaint, ¶20.

64. Komissarov, understanding that AutoLotto was at risk of not recognizing that $9 million as revenue, devised a roundtripping scheme to fraudulently recognize revenue. According to the Komissarov Indictment, the "Sham Data Sale Agreement" was comprised of several components:

> As part of KOMISSAROV's plan, (a) AutoLotto would enter into a new agreement to sell data to Data Company-1; (b) $9 million, to which KOMISSAROV supposedly had access from an investor for a only a limited amount of time, would be transferred to Data Company-1; (c) Data Company-1 would then transfer the money to AutoLotto; (d) AutoLotto would recognize the $9 million as revenue for the data sale to Data Company-1; (e) Pan Euro would acquire ownership stakes in the Mexico Gaming Companies for approximately $1 million, and (f) AutoLotto would use the $9 million it purported to receive from Data Company-1 (plus other funds) to acquire Pan Euro's ownership stakes in the Mexico Gaming Companies for approximately $10 million, plus hundreds of thousands of AutoLotto shares. . . . The various components of KOMISSAROV's fraudulent roundtrip transaction were executed between in or about December 2020 and in or about June 2021, and they often overlapped.

Komissarov Indictment, ¶24.

65. The Sham Data Sale Agreement was premised upon a "Statement of Work" that purported to describe the products and services for which the data company would pay AutoLotto $9 million. *See* Komissarov Indictment, ¶27. Specifically, the December 2020 Statement of Work provided that "AutoLotto would sell to Data Company-1 data it had collected through Lottery.com,

. . . that Data Company-1 would create one or more products using that data," that "Data Company-1 would resell this data to a third party, and that Data Company-1 would purchase from AutoLotto more than 28 million records for a total purchase price of $9 million." *Id.*

66. Two months later, at Komissarov's "insistence," AutoLotto and Data Company-1 renegotiated the Statement of Work such that the $9 million in revenue would be "spread out . . . over three quarters." Komissarov Indictment, ¶30. Specifically, the:

> Revised Statement of Work provided that Data Company-1 would have direct access to AutoLotto's future and historic data records and that (1) Data Company-1 would pay $2 million to AutoLotto for access to "sample data records for the year 2020," (2) Data Company-1 would then pay AutoLotto another $2 million "upon receiving a USB drive with a full set of historical data of" AutoLotto; and (3) Data Company-1 would pay $5 million "for direct database access to all future records, and any previous records starting January 1, 2021."

*Id.* According to the Komissarov Indictment, these "revisions to the Statement of Work lacked economic substance and served as a pretext to recognize revenue over multiple quarters." *Id.* at ¶31. The revised Statement of Work was backdated to December 12, 2020. *Id.* at ¶30. The Indictment is consistent with the SEC's allegations. SEC Complaint, ¶¶35-36.

67. In March 2021, Komissarov arranged letters of intent by which AutoLotto would acquire 80% ownership stakes of the Mexico Gaming Companies for $10.8 million plus 2.667% of the total outstanding shares of AutoLotto. *See* Komissarov Indictment, ¶37. This price was "more than 10 times what Pan Euro agreed to pay for the same stakes just four days earlier," but it was part of the plan that Komissarov "orchestrated to fraudulently inflate AutoLotto's revenue." *Id.* at ¶38; *id.* at ¶32 ("KOMISSAROV's plan was for Pan Euro to acquire the Mexico Gaming Companies for approximately $1 million and then sell the companies to AutoLotto for approximately $10 million, plus hundreds of thousands of shares in AutoLotto"). "In exchange for 'receiving' $9 million from Data Company-1, AutoLotto agreed to overpay for the ownership stakes in the Mexico Gaming Companies by approximately $9 million." *Id.* at ¶38.

68. According to the Komissarov Indictment, "[e]xecutives at AutoLotto, including Executive-1 and Executive-2 . . . agreed to participate in Komissarov's scheme." *See* Komissarov Indictment, ¶24. For example, "Executive-1" received the Statement of Work dated December 28, 2020. *Id.* at ¶27. "Executive-2" revised the Statement of Work in February 2021 and sent it to "Executive-1." *Id.* at ¶30. Even more egregiously, "Executive-1" received false invoices created in furtherance of the scheme:

> On or about January 26, 2021, notwithstanding the fact that discussions with the Mexico Gaming Companies were at a fairly early stage, the Attorney sent Executive-1 an invoice which suggested that AutoLotto had paid $9 million to Pan Euro on that day. The invoice purported to show that, on or about January 26 , 2021, AutoLotto transferred $80,000 into the Escrow Account, that AutoLotto then transferred $9 million to Pan Euro, and that $30,000 was paid to the Law Firm. On or about January 26, 2021, the Escrow Account did receive an $80,000 transfer from another AutoLotto bank account, but the Escrow Account did not wire $9 million, or any money, to Pan Euro.

*Id.* at ¶34.

69. In addition to Executive-1's receipt of the faked invoice and Statement of Work, the Komissarov Indictment makes clear that Executive-1 was actively involved in the sham transaction. For example, to coordinate AutoLotto's purchase of the Mexico Gaming Companies at inflated prices, Defendant Komissarov used "the alias 'Vlad' and an encrypted email account that began 'vlad.paneu@' (the 'Vlad Account')." Komissarov Indictment, ¶35. Komissarov "sent Executive-1 an email from the Vlad Account, with the subject line 'Vlad,Test,' saying 'Hey, [Executive-1]. Testing the email. [The CEO of Pan Euro] will be sending my email contacts to [legal counsel for Pan Euro] and [legal counsel for one of the Mexico Gaming Companies].'" *Id.* The Komissarov Indictment continues:

> 36......... KOMISSAROV emailed Executive-1 from the Vlad Account copies of a signed letter of intent, dated March 11, 2021, between Pan Euro and the shareholders of one of the Mexico Gaming Companies, which provided that Pan Euro would acquire 80% of the capital equity of that Mexico Company for

> $750,000. A few minutes later, KOMISSAROV emailed Executive- I from the Vlad Account a signed letter of intent, dated March 11, 2021, between Pan Euro and the other Mexico Company, which provided that Pan Euro would acquire 80% of the capital equity of that Mexico Company for $280,000. Accordingly, as of March 11, 2021, Pan Euro had agreed to buy 80% of the capital equity of the Mexico Gaming Companies for a total of $1,030,000.
>
> 37. Also on or about March 16 , 2021, VADIM KOMISSAROV, a/k/a "Vlad," the defendant, emailed Executive-1from the Vlad Account a draft letter of intent, dated March 15, 2021, for Auto Lotto to acquire Pan Euro' s 80% ownership stakes of the Mexico Gaming Companies for $10.8 million plus 2.667% of the total outstanding shares of Auto Lotto. On or about March 18 , 2021, Executive-1 emailed himself a version of the letter of intent dated March 15, 2021, which he signed, for AutoLotto to acquire Pan Euro's 80% ownership stakes of the Mexico Gaming Companies for $10.53 million plus 228,702 shares of AutoLotto, corresponding to 2.667% of the total outstanding shares of AutoLotto as of January 25 , 2021.

70. AutoLotto's "Executive-1" referred within the Komissarov Indictment is Clemenson. According to the Proxy Statement, AutoLotto had 5 executive officers: the Individual Lottery Defendants, Chief Legal Officer Kathryn Lever, and Chief Financial Officer Luc Vanhal. Ms. Lever and Mr. Vanhal joined AutoLotto in April 2021 and March 2021, respectively. Therefore, Ms. Lever and Mr. Vanhal were not AutoLotto executives when the Sham Data Sale Agreement was created in December 2020 nor when it was revised in February 2021. The only executives who served AutoLotto when the relevant acts occurred in furtherance of the Sham Data Sale Agreement were the Individual Lottery Defendants. Given that "Executive-2" is Dickinson, it is reasonable to infer that Executive-1 is Clemenson and that the Individual Lottery Defendants actually knew, or were reckless in not knowing, that about half of AutoLotto's revenue was derived from a fraudulent roundtripping transaction. Moreover, Clemenson subsequently pled guilty to securities fraud in connection with his knowing participation in a scheme to inflate the Company's revenue during this period. *See* Exhibits C and E.

71. Plaintiffs are informed and believe that "Executive-2" referred within the Komissarov Indictment is Dickinson. The Komissarov Indictment states that "Executive-2" signed

the $30 million loan for the September 2021 Transaction, and Dickinson signed the $30 million Promissory Note. *See* Komissarov Indictment, ¶47. Dickinson subsequently pled guilty to criminal securities fraud charges in connection with his knowing participation in a scheme to fraudulently inflate AutoLotto's and Lottery.com's reported revenue. *See* Exhibits D and E (D.E. #264).

72. The SEC Complaint corroborates the Komissarov Indictment and directly states that "DiMatteo, Clemenson, and Dickinson discussed Komissarov's plan, whether it would work, and the steps they would take to execute it – and, in late December 2020, agreed to proceed." SEC Complaint, ¶22. By entering the consents to judgments and admitting the allegations in the SEC Complaint, Dickinson and Clemenson admit that they were aware "the money transfers would create a false appearance" and that they "sought to deceive investors about Lottery's financial status so they could complete the business combination and minimize shareholder redemptions from the Trident SPAC." *Id.* at ¶26.

73. DiMatteo also knew that this was a sham transaction because he authorized Lottery to enter an escrow agreement with a law firm to hold the $9 million. Specifically, "Data Company-1" did not have $9 million to facilitate the sham transaction, so Komissarov arranged for an investor to loan that money on the condition that it would remain in an escrow account. SEC Complaint, ¶¶28-29. Komissarov arranged for a law firm to hold the $9 million in an escrow account. *Id.* According to the SEC Complaint, "DiMatteo and Clemenson discussed the purpose of the escrow arrangement, and, on December 24, 2020, they each signed the corporate resolution authorizing Lottery to enter into an Escrow Agreement with the Law Firm." *Id.* at ¶30. Clemenson admits to that he was aware that the purpose of the escrow account was to conceal that the sale to Data Customer-1 was bogus. *See id.*

74. DiMatteo, Dickinson and Clemenson are high-ranking executives such that their scienter can be imputed to the Company. According to the SEC Complaint, DiMatteo, Clemenson, and Dickinson knew that "Vlad" was Komissarov, thus they had further reason to know that the transactions were bogus. SEC Complaint, ¶45.

75. At the center of this complex scheme was Komissarov, who as TDAC's CEO had a significant financial motive to close ***any*** business combination. As the architect of the Sham Data Sale Agreement, Komissarov had actual knowledge of the mechanics of the roundtripping transaction and of the financial impact.

76. The purported "revenue" from the Sham Data Sale Agreement was included in the Proxy to make AutoLotto look appealing. For example, the Proxy Statement reported AutoLotto's revenue for second quarter 2021 as $9,325,756. Moreover, it stated that "[r]evenue increased $8.4 million, or 891%, to $9.3 million for the three months ended June 30, 2021, from $0.9 million for the three months ended June 30, 2020" and that the revenue increase was partly driven by "$5 million of deferred revenue from a December 2020 third-party transaction which was earned in the three months ended June 30, 2021." Similarly, the Proxy Statement claimed that AutoLotto's revenue of the first six months of 2021 was $14,787,290, which included "$7 million of deferred revenue from a December 2020 third party transaction [that] was recognized in the first and second quarters of 2021." By recognizing $2 million deferred revenue for first quarter 2021 and $5 million deferred revenue for second quarter 2021 based on the Sham Data Sale Agreement, Defendants inflated Lottery's financial results by 57% and 90%, respectively. SEC Complaint, ¶37. Indeed, particularly galling is that the Proxy Statement touted that TDAC's board of directors recommended the Business Combination with AutoLotto specifically because it was a, "Fast growing business with strong execution, exceeding forecasts. Lottery.com is experiencing

significant growth, and ***it has already booked US$5.5 million of total revenue for the 3-month period ending March 2021. This represents a 270% increase in total revenue year-on-year.***"

### B. Based On The Misleading Information About AutoLotto's Profitability, TDAC Investors Approved The Business Combination

77. TDAC's announcement regarding a letter of intent with Lottery disclosed that the transaction would be structured so that Lottery's stockholders would roll 100% of their equity into the business combination, with no minimum cash requirement, and that the parties anticipated closing the business combination in first quarter of 2021.[8]

78. On October 29, 2021, the Company announced the completion of the Business Combination, and upon the closing, the combined entity was renamed Lottery.com. On November 1, 2021, Lottery's common shares and warrants began trading on the NASDAQ under the ticker symbols "LTRY" and "LTRYW," respectively.

79. Komissarov had the power to control the Proxy Statement disclosures. Komissarov solicited proxies urging TDAC shareholders to vote in favor of the Business Combination, and he did so via SEC filings that contained false and misleading information as alleged herein. In fact, the Proxy Statement referenced Komissarov's name on no fewer than 42 occasions. Komissarov's signature appeared in the Proxy Statement; as TDAC's director and CEO, he had the power and authority to control the contents of that document, and he reviewed it prior to issuance. Several days later, on October 21, 2021, TDAC filed a press release with the SEC pursuant to Rule 14a-12,

---

8 Thereafter, on November 30, 2020, TDAC held a Special Meeting of Stockholders, pursuant to which the stockholders approved the extension from December 1, 2020 to March 1, 2021, with an ability to further extend for an additional three months to June 1, 2021 if approved by the board of directors. On February 26, 2021, the board of directors approved the extension to June 1, 2021 to permit sufficient time to consummate the proposed business combination with Lottery. On May 27, 2021, the stockholders approved a further extension from June 1, 2021 to September 1, 2021, with the ability to further extend for an additional three months to December 1, 2021, if approved by the board of directors.

which named Komissarov as TDAC's contact person with respect to the information provided therein.

### C. As The Komissarov Indictment, Dickinson's And Clemenson's Guilty Pleas, And The SEC Complaint Confirm, The Individual Defendants Knowingly Engaged In Sham Transactions To Inflate Revenue After The Business Combination

#### 1. Lottery Admits That The Company's Management Knowingly Engaged In A Sham $30 Million Transaction To Inflate Revenue

80. On September 20, 2021 – well before the Proxy Statement was issued and the Business Combination was consummated – the Company entered into an agreement with a major customer (referred to as "Data Company-2" in the Komissarov Indictment) for the sale of Lottery's service credits with a total purchase price of $30 million. According to the Company, the customer was required to pay the purchase price within 90 days pursuant to this agreement. Upon execution of the purchase agreement (that is, before Lottery transferred any credits to the customer), the Company recognized the $30 million as revenue and recorded $10 million in cost of sales related to this transaction (the "September 2021 Sham Transaction").

81. On or about December 31, 2021, the customer provided a check for $30 million to be drawn on a personal credit union account belonging to the customer's executive. *See* Komissarov Indictment, ¶47. But the Company did not actually deposit this check. Instead, the Company apparently used proceeds from the Business Combination to acquire a $30 million business loan on January 4, 2022 through one of Lottery's subsidiaries, AutoLotto, with Provident Bank ("Provident"), which was evidenced by a $30 million promissory note ("the Promissory Note")[9] signed by Dickinson. This Promissory Note was "utilized by the customer to provide the

[9] Business Loan Agreement dated January 4, 2022 between AutoLotto, Inc. and The Provident Bank, sec.gov/Archives/edgar/data/1673481/000149315223018441/ex10-1.htm.

Company with payment towards the purchase of the service credits." In sum, the transactions with this customer were a façade to manufacture $30 million in sales, which Lottery recognized as revenue before it had even performed its obligations under the agreement.

82. Following the closing of the Business Combination, Komissarov pressured Lottery.com's executives "to recognize substantial additional revenue for the fourth quarter of 2021." *See* Komissarov Indictment, ¶46. As a result, Lottery.com invoiced Data Company-2 for approximately $17.1 million of goods and services that were not actually provided, which the customer never paid. *Id.* According to the SEC Complaint, the Individual Lottery Defendants also arranged for a line of credit to conceal the customer's inability to pay for earlier transactions, and the $17.1 million invoiced included $1 million of advertising credits that was a markup of three times the face value of the credits. SEC Complaint, ¶91. Thus, the Individual Lottery Defendants had reason to know that this was a sham transaction and that the customer did not have the resources to pay $17.1 million. *Id.*

83. Yet, throughout the relevant Period, the Company included revenue from the September 2021 Sham Transaction in its financial statements without disclosing the related $30 million loan.[10] For example, on November 15, 2021, Lottery reported $32.25 million revenue for the quarter ended September 30, 2021, which was a ***1,911.8% increase*** over the prior year period. Significantly, Lottery specified that this "increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits" during the quarter. That is, *nearly all* of the $32.25 million in revenue for the quarter was derived from the sham transaction.[11]

10 "Neither the loan nor the use of $30 million of Lottery.com's cash as collateral was disclosed . . . in Lottery.com's publicly reported financial statements for 2021 or the first quarter of 2022." Komissarov Indictment, ¶47.

11 The Company termed these credits "LotteryLink Credits." LotteryLink Credits could be purchased by the Company's third-party marketers and redeemed as advertising credits to support

84. Thereafter, on April 1, 2022, the Company filed its 2021 Annual Report on Form 10-K with the SEC, reporting $68.5 million in revenue, which was "driven by the sale of $47.1 million in LotteryLink Credits for prepaid advertising, prepaid lottery games, marketing materials and development services in the third and fourth quarters of 2021." Notably, the Company reported accounts receivable of just $21.7 million. Since the accounts receivable figure was lower than the amount of the $30 million sale of LotteryLink Credits announced the prior quarter, the Company was representing to investors that it had been paid, at least partially, by the customer who purchased the aforementioned $30 million of "affiliate marketing credits." However, as investors subsequently learned, there was no revenue from the purported $30 million sale. As such, Lottery's representation that it had collected this revenue was false.

85. On May 16, 2022, in a Form 10-Q filed with the SEC, the Company reported $21.2 million in revenue for the period ended March 31, 2022, which were "driven by the sale of $18 million in LotteryLink Credits for prepaid promotional awards, marketing materials and development services." This revenue figure for the first quarter 2022 was significantly overstated and false, as Defendants subsequently admitted, because $18,539,472 in the first quarter of 2022 was from a fictitious transaction and was reversed out in May 2023.

86. On July 15, 2022, providing an update on its internal investigation, the Company stated that it "preliminarily conclude[d] that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount."

---

flexible promotional packages (such as prepaid advertising, prepaid lottery games, among other things) via the Company's LotteryLink affiliate marketing program.

87. A week later, on July 22, 2022, Lottery further disclosed that the Company's auditor, Armanino LLP, determined that financial statements for the full-year fiscal 2021 and first quarter 2022 should no longer be relied upon, and that a Company subsidiary entered into an undisclosed line of credit in January 2022.

88. Long after all of the Defendants were no longer with the Company, Lottery admitted on May 15, 2023 in its filing on Form 10-Q/A with the SEC for the quarterly period ended March 31, 2022 that the entire $30 million transaction was a sham. As the Company explained:

> On September 20, 2021, the Company entered into a purchase agreement with a major customer for the sale of various service credits with a total purchase price of $30,000,000. In accordance with the terms of the purchase agreement, the customer was required to pay the purchase price within 90 days. Upon execution of the purchase agreement, the Company recognized the $30,000,0000 as income. The customer provided payment prior to December 31, 2021, in the form of a check accepted by the Company for deposit and included in undeposited funds. ***During 2022, the Company discovered that the service credits it had sold to the customer were non-transferrable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits.*** Since the Company was prohibited from transferring the advertising portion of the service credits and therefore could not complete the sale of such credits, the Company cancelled the transaction and could not recognize the income, or recognize a cash payment in the Company's financial statements.

Thus, the Company's own statements are consistent with the SEC allegations that, after obtaining the Promissory Note, Lottery.com cashed a $30 million personal check from the customer's CEO, closing the round trip transaction. SEC Complaint, ¶88 ("In effect, the $30 million purchase by and 'payment' from Company E was a round-trip transaction, *i.e.*, Lottery used its own money to 'pay' for the sale of over-priced, non-transferable advertising credits."). And by failing to disclose the Promissory Note, Defendants created the false impression that the Company had $30 million of cash, "when in fact, nearly all of that cash was a loan." *Id.*

89. Additionally, the sham nature of the transaction is further demonstrated by the fact that Lottery subsequently admitted in the same filing "that the services credits it had sold to the

customer were non-transferable." There were approximately nine months between the September 2021 Sham Transaction and the Company's July 2022 disclosure that the service credits were non-transferable. During this period, the Company invoiced more than $35 million to the customer for purported "various services and advertising credit." Under its revenue recognition policies, Lottery could only have invoiced the customer after *actually providing the services.* Here, that would have been impossible because the credits were never transferable to the customer. Given that Lottery's admission that the credits were not transferable came only after the Individual Lottery Defendants were no longer with the Company, it is likely that the Individual Lottery Defendants were aware of this fact and were complicit in recognizing income from the September 2021 Sham Transaction. *Accord* Komissarov Indictment, ¶46 (Komissarov directing the Individual Lottery Defendants to recognize substantial revenue without actually delivering goods and services).

90. Furthermore, that the entire September 2021 transaction was a sham is further confirmed by the Company's accounting treatment for the purported "revenue" and "accounts receivable" from the "major customer." As the Company explained, "Since the Company was prohibited from transferring the advertising portion of the service credits and therefore could not complete the sale of such credits, the Company cancelled the transaction and could not recognize the income or recognize a cash payment in the Company's financial statements." As such, the Company simply took off its books every single cent of the transactions with the "major customer." As the Company explained:

> the Company had invoiced the customer ***a further $17,117,472 for various services and advertising credits for the year ended December 31, 2021 and $18,539,472 during the three months ending March 31, 2022***. The Company recorded such amounts to both revenue and accounts receivable. As a result of the cancellation of the transaction, the Company decreased both accounts receivables and revenues by $17,117,472, in the Restated Audited Financials; and $18,539,472, in the restated financial statements for the three months ended March 31, 2022 included in this Amended Report.

91. Companies do not cancel all revenue and accounts receivable for legitimate transactions. Instead, they would treat said revenue or accounts receivable as bad debt or some other accounting treatment if they were legitimate transactions. By pretending the transactions simply never occurred on their books, Defendants are admitting that the transactions were fictitious.

92. Moreover, that the Company actually invoiced the major customer more than $17 million in 2021 and more than $18 million in the first quarter of 2022, demonstrates that the Individual Lottery Defendants had to be aware of the fraud.[12] If "the Company was prohibited from transferring the advertising portion of the service credits" what was the "major customer" even buying that needed to invoiced? The answer was nothing, demonstrating that these transactions were shams.

93. As the Court already found, Dickinson had requisite scienter. He was the signatory of the loan agreement for the Promissory Note, as indicated in the Company's Form 10-Q filed with the SEC on May 22, 2023 for the quarterly period ended June 30, 2022. Given that the $30 million Promissory Note was secured by $30 million Lottery already had in its account, reasonable people managing their own affairs would have inquired as to the reasons for obtaining the Promissory Note—especially because these sums totaled about half of Lottery's cash and cash equivalents of $62.6 million as of December 31, 2021. *See also* Komissarov Indictment, ¶47. It belies belief that Dickinson negotiated the terms with the major customer and the bank that enabled the scheme yet did not know the entire transaction was a sham. Certainly, as the CFO, Dickinson

12 These amounts were extremely material to the Company. In fact, this major customer is likely the largest customer of the Company responsible for 87.7% of the revenue and 99.6% of the accounts receivable for Lottery's 2022 fiscal first quarter. At these percentages, it is impossible, or at a minimum highly reckless, that management would not be aware of transactions of a customer that represented almost all of the Company's revenue and account receivables.

had to have known what was used as collateral for the Promissory Note with Provident that he negotiated and signed and that the loan was made specifically to lend money to the major customer. Any doubts as to Dickinson's scienter are laid to rest by his May 2025 guilty plea to charges of securities fraud, as well as his consent to entry of judgment against him in the SEC's action. *See* Exhibits D, E, F & H (D.E. #264).

94. DiMatteo and Clemenson also had actual knowledge, or were reckless in not knowing, that the Company had obtained a $30 million loan to fund the transaction and that, as a result, it was a sham transaction. According to the Komissarov Indictment, "Executives at AutoLotto [i.e. the Individual Lottery Defendants] and Komissarov, however, knew that neither Data Company-2 nor Individual-2 had $30 million to pay AutoLotto pursuant to the Purchase Agreement." Komissarov Indictment, ¶44. DiMatteo and Clemenson would have known or, at a minimum should have inquired, into how the transaction would be funded, given that the September 2021 Sham Transaction accounted for nearly half of the Company's half of the entire Company's revenue and cash for the 2021 fiscal year—making it a material transaction for fiscal 2021 and the driving factor in Lottery's purported 1,911.8% year-over-year increase in revenue.[13] Indeed, the SEC Complaint alleges that DiMatteo and Clemenson each approved the use of $30 million from the Business Combination as collateral for the Promissory Note. SEC Complaint, ¶84. Thus, DiMatteo and Clemenson would and should have learned that this was a sham: the Company borrowed $30 million from Provident and then allowed the customer to use the funds to purchase Lottery's credits. Through his guilty plea, Clemenson has subsequently admitted his contemporaneous knowledge. *See* Exhibits C, E, F & G (D.E. #264).

---

13 The Company's fiscal 2021 revenue was $68.5 million.

95. The SEC further alleges that DiMatteo, Clemenson, and Dickinson "intentionally concealed"the Promissory Note from the outside directors, Chief Legal Officer, and auditor to create the false impression that Lottery.com had received payment for the September 2021 Sham Transaction. SEC Complaint, ¶84. In fact, DiMatteo and Dickinson signed and provided management representation letters to Lottery.com's auditor claiming that "there were no material transactions that have not been properly recorded," even though they had authorized the use of corporate funds to obtain the Promissory Note in furtherance of the sham transactions. For the SEC to allege after a years-long investigation that DiMatteo and Clemenson "intentionally concealed" these facts, it necessarily means that DiMatteo and Clemenson knew of sham nature of these transactions.

96. Finally, the fact that the Company failed to disclose in its financial statements that AutoLotto had entered into the line of credit in January 2022 further supports a deliberate lack of disclosure. In the Company's April 1, 2022 Annual Report filed on Form 10-K with the SEC, the Company discussed Lottery's loans and promissory notes. Yet, the $30 million Promissory Note was not disclosed at all even though it should have been, as its accountant later confirmed.[14] The fact that the Company failed to disclose its largest loan while discussing numerous smaller loans demonstrates that this was intentional, or at a minimum extremely reckless.

[14] As the Company admitted on July 22, 2022: "Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements."

#### 2. The Lottery Defendants Engaged In Other Acts Of Improper Revenue Recognition

97. On May 15, 2023, after disclosing that the entire $30 million transaction was a sham in its filing on Form 10-Q/A with the SEC for the quarterly period ended March 31, 2022, the Company explained:

> In an unrelated transaction, the Company entered into an arrangement with another customer totaling $5,000,000 in 2021. The Company recognized the full amount of the arrangement and recorded $5,000,000 as revenue and accounts receivable for the year ended December 31, 2021. The Company started performing the services under the arrangement during 2021, which services were to be completed in 2022. In October of 2021, the customer paid $500,000 towards these services. Subsequently, the Company determined that, in accordance with ASC 606, due to an uncertainty of collectability of the remaining accounts receivable, the Company should not have recognized any revenue from this arrangement during the year ended December 31, 2021. As a result of the payment of $500,000 received during the year ended December 31, 2021, the Company is allowed to record deferred revenue in the amount of $500,000. As a result, the Company (i) decreased accounts receivable by $4,500,000, increased deferred revenue by $500,000 and decreased revenue by $5,000,000, for the year ended December 31, 2021 in the Restated Audited Financials; and (ii) recorded revenue of $500,000 for the three months ended March 31, 2022.
>
> In addition, related to the transaction stated above, in February 2022, the Company loaned the customer $450,000 and initially recorded it as a bridge loan receivable from the customer. In March 2022, the parties executed a formal agreement for the arrangement described above, in the form of a secured promissory note (the "Secured Promissory Note"). The Secured Promissory Note includes provisions regarding the development, implementation, operation, and maintenance of the technology platform contemplated in the arrangement and also indicates that all work previously performed on the project is to be considered performed under and governed by the Secured Promissory Note. The Secured Promissory Note provides that the $450,000 bridge loan made in February be rolled into such note. In connection with the execution of the Secured Promissory Note, an escrow was established and the Company deposited a total of $6,050,000 in the escrow account. The parties subsequently agreed that the conditions of the escrow had been met and all of the funds were released, with $4,500,000 going back to the Company and $1,550,000 going to the customer. The Company recorded the entire $6,500,000 as a Note Receivable and reported it as such in the Original Report. In connection with the restatement of the financial statements included in the Original Report, the Company reviewed this transaction again and determined that since the Company had received $4,500,000 of the $6,050,000 from the escrow, the actual amount loaned to the customer under the Secured Promissory Note was $1,550,000 along with the $450,000 bridge loan, for a total of $2,000,000. As a result, the amount of

the Note Receivable has been corrected to $2,000,000 for the three months ended March 31, 2022. **[Paras. 98-100, and Para. 104 deleted].**

101. Further, the Company determined that approximately $2 million of "prepaid advertising credits purchased during 2017 and 2018 may not be able to be fully utilized," and as a result, the Company decreased its prepaid expenses by $2 million and increased its revenue loss for prepaid advertising credits by $2 million as of December 31, 2022.

### 3. The Company's Egregious GAAP Violations Demonstrate That The Individual Lottery Defendants Knew, Or Were Severely Reckless In Not Knowing, About The Sham Transactions

102. Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Lottery to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.[15] Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. (17 C.F.R. § 210.10-01(a)). Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. § 210.4- 01(a)(1).

103. As the Company represented in its financial statements, ASC 606 governed the Company's revenue recognition policy. Under ASC 606, Revenues are recognized upon the application of the following steps: (1) Identification of a contract or contracts with a user, customer

15 Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants (ASC 105-10-05-1).

or subscriber; (2) Identification of performance obligation(s) in the contract; (3) Determination of the transaction price; (4) Allocation of the transaction price to the performance obligations in the contract; and (5) Recognition of revenue when, or as, the performance obligation is satisfied.

105. For contracts within the scope of ASC 606, the first step is to determine whether a contract exists, for accounting purposes, between an entity and its customer. ASC 606-10-25-1 lists the criteria that must be met for a contract to exist.

a. The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.

b. The entity can identify each party's rights regarding the goods or services to be transferred.

c. The entity can identify the payment terms for the goods or services to be transferred.

d. The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).

e. It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer (*see* paragraphs 606-10-55-3A through 55-3C). In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due. The amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession (see paragraph 606-10-32-7).

106. As the Company admitted, it had pledged its own cash accounts to secure a $30 million line of credit for its customer to use in the sham transaction. As such, prongs d. and e. of ASC 606-10-25-1 had not been satisfied.

107. Likewise, the Company included the $30 million of collateral for the Promissory Note as cash on the Company's March 31, 2022 balance in violation of GAAP (ASC 230-10-20). This was clearly improper, and the Company's executives must have known as much since the collateral "became restricted and remained restricted until October 12, 2022, when AutoLotto defaulted on its obligations under the Business Loan and Provident foreclosed on the $30,000,000 of Collateral Security." This overstated the Company's cash balance and operating cash flows. Moreover, restricted funds are not the same as cash. As such, it is not surprising that in the ultimate restatement it was reclassified to "restricted cash."

108. The Company's failure to include its $30 million loan as a liability (it was not disclosed on the balance sheet at all) was clearly an egregious violation of GAAP as well. Of course, a loan is a liability to a company. Any accountant or individual with basic accounting knowledge, such as the Individual Lottery Defendants, would know as much. In fact, this abject failure to follow GAAP was noted in its auditor's resignation announcement: "Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements." If the Company had included the $30 million loan as a liability, it would have exposed the revenue fraud and related errors.

109. Furthermore, the fact that Lottery stated that its financial statements should not be relied upon is an admission that the financial statements were false and misleading when originally

issued. (Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board Statement No. 154 at ¶ 25).

110. GAAP rules and regulations regarding earnings management and revenue recognition are fundamental for publicly traded companies. Likewise, proper presentation of cash balances and loans are, presumably, also fundamental for publicly traded companies. As such, brazen violation of these basic and well-known rules, as Lottery admittedly did, further demonstrates intent, or at least severe recklessness.

#### 4. The Company Slowly Discloses That Its Public Statements Were False And Misleading Due To Lottery's Failure To Disclose Sham Transactions And That Its Executives Were Aware Of It

111. On November 15, 2021, Lottery filed with the SEC a Form 8-K announcing that, on November 10, 2021, the Board announced the dismissal of Marcum LLP as the Company's auditing firm. That same day, the Company disclosed that virtually all of its $32.5 million of revenue for the quarter was the result of a single $30 million sale of affiliate marketing credits, which was not its primary business activity. Investors would later learn this was just the slightest hint at the tip of a large iceberg of bogus revenue recognition and sham transactions.

112. On July 6, 2022, Lottery disclosed in a Form 8-K filed with the SEC that an internal investigation had revealed "issues pertaining to the Company's internal accounting controls." Further, the Board disclosed that as a result of this investigation, the Company had terminated Lottery's CEO, President, and Treasurer, Defendant Dickinson, effective July 1, 2022, ***with cause*** – just *one day* after the independent investigation concluded. As the Company explained:

> Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022.

The fact that he was terminated with cause as part of the investigation supports that he was an active and knowing participant in the fraud. The Company itself has confirmed this fact. In a

lawsuit styled, *AutoLotto, Inc., d/b/a Lottery.com v. J. Streicher Financial, LLC*, Case No. 2022-0661 (Del. Ch. Ct. Jul. 29, 2022) (Dkt. No. 1) that relates to the undisclosed line of credit, Lottery asserts that "its available unrestricted cash balance had been overstated by approximately $30 million by the actions of [Dickinson], which actions were undertaken without the knowledge of LTRY's Audit Committee." Moreover, through his subsequent guilty plea, Dickinson has admitted that he was an active and knowing participant in making materially false and/or misleading statements to investors during the Class Period.

113. Thereafter, on July 15, 2022, the Company announced in a Form 8-K filed with the SEC that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. As an update to the previously disclosed internal investigation, the Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery had:

> preliminarily conclude[d] that it has ***overstated its available unrestricted cash balance by approximately $30 million*** and that, relatedly, in the prior fiscal year, it ***improperly recognized revenue*** in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

114. The July 15, 2022 disclosure of a $30 million cash overstatement represents an admission that the $30 million "sale" of LotteryLink Credits previously announced on November 15, 2021, was entirely fabricated, and that Defendants faked the collection of that money to create the illusion of revenues. This is plainly documented by the fact that the Company essentially had one customer. As the Company explained in its May 16, 2022 quarterly report, "Customer A" accounted for 87.7% of the Company's revenue and 99.6% of the Company's accounts receivable for the Lottery's 2022 fiscal first quarter.

115. On July 22, 2022, Lottery filed a Form 8-K with the SEC that disclosed that the Company's auditor, Armanio LLP, determined "that the ***audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon***," and "that a ***Company subsidiary entered into a line of credit in January 2022 that was not disclosed*** in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements." Further, the Company disclosed in the Form 8-K that CEO and co-founder Defendant DiMatteo was resigning, effective immediately.

116. On September 9, 2022, Lottery disclosed in a Form 8-K filed with the SEC that four members of its Board had resigned, including former CEO DiMatteo. Tellingly, two of Lottery's independent directors stated in their resignation letters, attached as exhibits to the Company's Form 8-K filed on September 2, 2022, that the events leading to Dickinson's departure could not be chalked up to mere incompetence or mismanagement, but were indicative of "potentially inappropriate activity."

117. All three of the Individual Lottery Defendants' terminations and resignations were related to the investigation and misconduct. Kathryn Lever, Lottery's general counsel, has confirmed as much. According to Ms. Lever, who claims to be the person who made the report of possible misconduct to the Company's Independent Directors and supervised the resulting independent investigation for the Audit Committee, "[h]er efforts and this investigation caused the quick termination or resignation of the three other members of senior management." Dkt. No. 112 at 2. This admission further confirms that the Individual Lottery Defendants were involved in the misconduct at issue.

118. On August 16, 2022, the Company provided a further update on the internal investigation when it filed a notification of inability to timely file Form 10-Q with the SEC. As the Company disclosed:

> As previously disclosed, the Audit Committee of the Board of the Directors (the "Board") of the Company retained outside counsel to conduct an independent investigation, which was initiated after it received certain information from Katie Lever, the Company's Chief Legal Officer and Chief Operating Officer, which investigation revealed instances of non-compliance with state and federal laws concerning the state in which tickets were procured as well as order fulfillment. ***The investigation also identified issues pertaining to the Company's internal accounting controls. Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022.*** Effective July 1, 2022, Harry Dhaliwal was named as the Company's Interim Chief Financial Officer and principal financial officer. In connection with the appointment of Mr. Dhaliwal, the Company initiated a review of its cash balances and related disclosures as well as its revenue recognition processes and other internal accounting controls. ***The review led the Company to preliminarily conclude that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount. On July 20, 2022, the Company was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal years ended December 31, 2022 and December 31, 2021, that the audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon.*** Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, ***that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements***.
>
> On July 28, 2022, the Board determined that the Company did not have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations, and the Company furloughed the majority of its employees effective July 29, 2022. As the Company's capital resources are not sufficient to fund its operations for a twelve-month period, there is substantial doubt about the Company's ability to continue as a going concern. If the Company is not able to secure additional capital resources or otherwise fund its operations, the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets, including equipment and intellectual property. As a result, the Company has not yet finalized its reviews of its financial statements or its assessment of the impact of the findings of the ongoing review of the Company's internal accounting controls on its historical financial statements or for the financial statements for the quarter ended June 30, 2022, and

> is therefore unable to file the Form 10-Q on a timely basis. The Company is working toward filing the Form 10-Q as soon as practicable, but does not expect to be in a position to file it within five calendar days following the prescribed due date.

119. While the Company originally announced the need to restate its financial results in July of 2022, the full truth did not come out into May of 2023 well after all of the Individual Lottery Defendants had left the Company.[16] On May 15, 2023, the Company finally disclosed the truth about the September 2021 sham transaction in a report on Form 10-Q/A with the SEC for the quarterly period ended March 31, 2022:

> On September 20, 2021, the Company entered into a purchase agreement with a major customer for the sale of various service credits with a total purchase price of $30,000,000. In accordance with the terms of the purchase agreement, the customer was required to pay the purchase price within 90 days. Upon execution of the purchase agreement, the Company recognized the $30,000,0000 as income. The customer provided payment prior to December 31, 2021, in the form of a check accepted by the Company for deposit and included in undeposited funds. ***During 2022, the Company discovered that the service credits it had sold to the customer were non-transferrable and that the Company had pledged its own cash accounts to secure a line of credit in the amount of $30,000,000 utilized by the customer to provide the Company with payment towards the purchase of the service credits.*** Since the Company was prohibited from transferring the advertising portion of the service credits and therefore could not complete the sale of such credits, the Company cancelled the transaction and could not recognize the income or recognize a cash payment in the Company's financial statements. In addition, the Company had recorded cost of sales related to this transaction in the amount of $10,000,000. As a result, in the restated December 31, 2021 financial statements included in the Amended Annual Report (the "Restated Audited Financials"), the Company decreased both cash and revenue by $30,000,000 for the year ended December 31, 2021 and reversed the related cost of sales which resulted in a decrease to cost of sales and an increase in prepaid assets by $10,000,000 each for the year ended December 31, 2021.
>
> In addition, the Company had invoiced the customer a further $17,117,472 for various services and advertising credits for the year ended December 31, 2021 and

16 On July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. Then on July 22, 2022, the Company reported that CEO and co-founder Defendant DiMatteo was resigning, effective immediately. That is, about the same time the investigation was announced into accounting issues, the top three executives (CEO, CFO, and CRO) responsible for revenue and accounting had departed.

> $18,539,472 during the three months ending March 31, 2022. The Company recorded such amounts to both revenue and accounts receivable. As a result of the cancellation of the transaction, the Company decreased both accounts receivables and revenues by $17,117,472, in the Restated Audited Financials; and $18,539,472, in the restated financial statements for the three months ended March 31, 2022 included in this Amended Report.
>
> * * *
>
> On January 4, 2022, AutoLotto entered into a Business Loan Agreement (the "Business Loan") with The Provident Bank ("Provident"), pursuant to which the Company borrowed $30,000,000 from Provident, which was evidenced by a $30,000,000 Promissory Note. In accordance with the terms of the Business Loan, upon entering into the agreement, $30,000,000 in a separate account with Provident was pledged as security for the amount outstanding under the loan ("Collateral Security"). The $30,000,000 Collateral Security became restricted and remained restricted until October 12, 2022, when AutoLotto defaulted on its obligations under the Business Loan and Provident foreclosed on the $30,000,000 of Collateral Security. The Collateral Security, which was in the form of restricted cash, was presented as a contingent liability on the Company's balance sheet from March 31, 2022 until the obligation was satisfied in October of 2022.
>
> As previously disclosed in the Current Report on Form 8-K filed by the Company with the Securities and Exchange Commission ("SEC") on July 22, 2022, as amended on July 22, 2022, the Company's Management met on July 19, 2022 in consultation with the Chairman of the Board of Directors of the Company, the Company's legal counsel and the Company's auditors at that time (Armanino LLP) and concluded that the Company's previously issued audited consolidated financial statements for the fiscal year ended December 31, 2021, and the unaudited consolidated financial statements for the quarter ended March 31, 2022, previously filed with the SEC should no longer be relied upon and should be restated.
>
> The need for the restatement arose out of the Company's reexamination of various transactions that occurred in 2021 and which were later rescinded or canceled in 2022. The Company has restated its financial statements for the year ended December 31, 2021, as included herein as discussed below and to reflect a change in the recognition of income in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 606.

120. On June 15, 2023, the Company was forced to admit it was being investigated by the SEC and Department of Justice for its conduct. As the Company admitted:

> Certain of our former officers are currently the subject of investigations and inquiries by the SEC and the U.S. Department of Justice (the "DOJ") relating to the findings of the Internal Investigation and other matters, and we are cooperating fully with such investigations and inquiries.

### 5. No Cautionary Language Would Be Adequate To Warn Investors Of Defendants' Sham Transactions

121. The Individual Lottery Defendants failed to comply with their obligations imposed by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and to prepare financial statements in accordance with GAAP. Section 13(b)2 of the Exchange Act, entitled *Periodical and Other Reports*, states that Lottery must "devise and maintain a system of internal accounting controls" to ensure that "transactions are executed in accordance with management's general or specific authorization" and that "transactions are recorded . . . in conformity with generally accepted accounting principles." A functional and strong system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations.

122. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report"). The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. More broadly, a system of internal control also includes the actions taken by a company's board of directors, management at all levels, and employees in running the business. Moreover, "***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***."

123. The chief executive officer sets the "tone at the top," affecting integrity, ethics, and other crucial elements of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. . . . The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they control the business. The Addendum to the COSO Report makes it clear that the company's chief accounting officer plays a critical role with respect to the internal control system.

124. Thus, Defendants DiMatteo and Dickinson were responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

125. As described herein, Lottery exhibited a material weakness in its internal controls, which were necessary for the accurate preparation of financial statements and for ensuring compliance with regulatory filing requirements applicable to public companies. A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." By the Company's own admission, Lottery's internal control system completely failed to live up to the standards for an effective system of internal controls over financial reporting.

126. The Company's failure to have adequate internal controls over a function as basic as revenue recognition is egregious considering that Defendants pledged to remedy other internal control issues. On November 15, 2021, the Company disclosed in its Form 10-Q for the quarterly period ended September 30, 2021 that it had uncovered a material weakness in its internal controls related to the classification of warrants. As the Company explained:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021.

127. In the same disclosure, the Company claimed that there were no changes in internal control over financial reporting and that Lottery intended to "enhance [its] processes to identify and appropriately apply applicable accounting requirements." As the Company explained:

> **Changes in Internal Control Over Financial Reporting**
>
> Other than what was described in the 10-K/A, ***there were no changes in our internal control over financial reporting*** (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. In light of the restatement of our financial statements included in the 10-K/A, ***we plan to enhance our processes to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements. Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications***. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

128. On April 1, 2022, the Company filed with the SEC its Annual Report on Form 10K for the year ended December 31, 2021. Therein, the Company disclosed that it had identified a material weakness in internal control over financial reporting as of year-end 2021 and 2020, but described this material weakness as mainly a personnel and staffing issue related to "the design and operation of the procedures relating to the closing of [Lottery] financial statements." However, the Company reassured investors that the Company had "commenced measures to remediate" this material weakness and "there was no change in our internal control over financial reporting."

129. Then again, on May 16, 2022, the Company disclosed in its Form 10-Q for the quarterly period ended March 31, 2022 that "a material weakness in internal control over financial reporting related to ineffective controls within the Company's financial close process existed" during the Class Period. Yet, the Company still claimed that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP.

130. On July 6, 2022, the Company admitted in a Form 8-K filed with the SEC that an internal investigation conducted by outside counsel revealed "issues pertaining to the Company's internal accounting controls." As a result of the findings of the investigation, Defendant Dickinson was terminated and Defendant Clemenson resigned.

131. On June 15, 2023, the Company admitted in its Annual Report on Form 10-K for the year ended December 31, 2022 that "***management did not design and maintain sufficient procedures and controls related to revenue recognition including those related to ensuring accuracy of revenue recognized from non-routine transactions such as the sales of LotteryLink Credits.***" As a result, Lottery had overstated revenue for fiscal 2021 by approximately $52.1 million.

132. The failure to disclose that Lottery did not maintain adequate internal controls over revenue recognition is actionable. The acknowledgement of other deficiencies in Lottery's internal controls as to warrants and "complex accounting standards" do not disclose the specific deficiency regarding revenue recognition controls. More importantly, the disclosure of *some* internal control deficiencies does not give the Individual Defendants *carte blanche* to manufacture fraudulent transactions to make the Company appear more profitable. Indeed, the Sham Data Sale Agreement and the September 2021 Sham Transaction were wholly fabricated, and no cautionary language could adequately warn investors that Defendants could engage in fraud.

133. The Individual Defendants were aware of these internal control deficiencies and exploited them for their own benefit. Defendants DiMatteo and Dickinson, as CEO and CFO, bore direct responsibility to ensure Lottery instituted an effective system of internal controls to report reliable financial results. Lottery had claimed that its executives would work to remediate the internal control deficiencies regarding warrants and complex accounting standards, which suggests that the Individual Defendants were attentive to the deficiencies and purportedly working to resolve them. It begets belief that Lottery's finance and accounting team would miss such basic and massive accounting issues while working to "enhance [its] processes to identify and appropriately apply applicable accounting requirements."

134. Indeed, while making this claim, the Individual Defendants fabricated millions of dollars in revenue through multiple sham transactions. Such brazenness underscores that the Individual Defendants were aware of the undisclosed internal control deficiencies regarding revenue recognition. Their lack of knowledge is implausible: if the Individual Defendants honestly believed that the internal controls regarding revenue recognition were adequate, then they would not have engaged in the sham transactions alleged herein because effective controls would have

foiled their plot to fabricate revenue. The inference of scienter is further supported by the fact that the individuals that oversaw Lottery's financial accounting were immediately removed from their positions as a direct result of their failure to institute requisite controls and of their involvement in the sham transactions.

135. Corroborating as much, the SEC contends that Defendants filed certifications falsely claiming to have designed effective internal controls. *See* SEC Complaint, ¶108.

### D. Bloomberg Reveals That The Company Was Not In Regulatory Compliance As It Was "Breaking The Law In 42 Different Ways"

136. On March 4, 2024, Bloomberg published an investigative article entitled, "From SPAC Dreams to Riviera Mirage: How Lottery.com Imploded," which was written by Nicola M. White. A copy of the article is attached hereto as Exhibit B (D.E. #264). The article was put together "by interviewing more than a dozen current and former employees, board members and vendors, some of whom spoke on condition of anonymity; obtaining audio recordings, internal communications and board documents; and examining press releases, lawsuits, and securities filings."

#### 1. The Individual Defendants Rushed Into The Business Combination

137. As the article explains, TDAC was running out of time to find a company to merge with before it had to return the money to shareholders, so it pivoted to financial technology even though its executives were not involved in the space. To garner support for the Business Combination, "In investor pitches and SEC filings, Lottery.com predicted an eight-fold surge in revenue by 2023." The endeavor proved successful, and the deal closed in October 2021, bringing in $63 million.

138. According to Defendant DiMatteo, the pressure to close the deal and excitement of the SPAC market propelled the company to go public, whether they were ready or not. As he

explained, "They were eager to get a deal done," DiMatteo said. "We had no idea what this game was. They were the grownups in the room."

### 2. Defendants Were Intimately Involved In The Sham Transactions

139. As the Bloomberg article summarizes, while "The company's first earnings report in November 2021 boasted $32.2 million in revenue, an almost 2,000% increase from the year before." "But nearly all of that, $30 million, was based on the sale of credits the company had amassed with media partners that turned out to be nontransferable, meaning they weren't supposed to be sold, the company later said when it had to correct its financials to fix its mistakes. Beyond that, the company further erred by recognizing income from the transaction before it had been paid, according to its SEC filings."

140. The Bloomberg article further explained that the "buyer" of these credits did not actually have the money for the purchase, so the Company and its executives created this sham transaction to make it appear like a legitimate sale. As the article explained:

> The payment hadn't come in because the buyer — a payments platform company — didn't actually have the money on hand. So the company and the buyer struck a complex financing agreement in which Lottery.com pledged its own assets to secure a line of credit that the buyer would then use to pay up, the company would disclose to the SEC a year later.

141. Citing interviews and an internal Board memo, the article stated: "Feeling pressure to make year-end revenue projections, company officials arranged for a courier to collect a check from the buyer two days before New Year's Eve." This $30 million check was a pure fiction to manufacture revenue that Lottery could and should not have recorded: "When the line of credit came through, the buyer covered the $30 million check and Lottery.com in turn wired the money right back—but continued to count the money as revenue on its books until it restated, or corrected, its financial reporting five months later."

142. According to Bloomberg, a member of the Company's management team referred to the whole transaction as a "check kite" a year later at a meeting explaining the transaction to an outside adviser. As Investopedia explains, "Kiting" involves the illegal use of financial instruments to fraudulently obtain additional credit.[17] And when asked about the sham transaction, "Lottery.com's current leadership said the transaction is one of the subjects of SEC and DOJ scrutiny, and the company has been fully cooperating with authorities in their reviews."

### E. Komissarov Is Sentenced To Prison, And The Individual Lottery Defendants Face Criminal And Regulatory Action

143. On February 20, 2025, the Komissarov Indictment was unsealed. Komissarov was indicted by a grand jury on nine counts, including (i) conspiracy to commit securities fraud, to make false and misleading statements in proxy statements, and to make false filings with the SEC; (ii) securities fraud; and (iii) false and misleading statements in proxy statements. Komissarov initially pled not guilty, but on February 3, 2026, he changed his plea to guilty. On July 15, 2026, Judge Hellerstein sentenced Komissarov to 36 months in prison for securities fraud.

144. On May 22, 2025, Defendants Clemenson and Dickinson pled guilty to making false and misleading statements of material fact in applications, reports, and documents required to be filed with SEC under the Exchange Act and the rules and regulations promulgated thereunder. *See* Exhibits C & D. Specifically, Dickinson pled guilty to one count of conspiracy to commit securities fraud, to make false and misleading statements in proxy statements, and to make false filings to the SEC; one count of securities fraud; one count of making false SEC filings; and one

---

17 https://www.investopedia.com/terms/k/kited.asp

count of improperly influencing the conduct of audits. Clemenson pled guilty to the same charges, minus the count for influencing the conduct of audits.

145. In addition to these criminal proceedings, each Defendant faces securities fraud claims brought by the SEC for the same misconduct. *See generally* SEC Complaint. Defendants Dickinson and Clemenson have admitted to the allegations as true and consented to the entry of judgments that, among other things, bar them from acting as an officer or director of any public company. Specifically, on January 22, 2026, the SEC filed a complaint against Lottery.com and the Individual Defendants for primary violations of Section 10(b) of the Exchange Act, aiding and abetting violations of Section 10(b) of the Exchange Act, primary violations of Section 14(a) of the Exchange Act, and aiding and abetting violations of Section 14(a) of the Exchange Act, among others. The SEC action arises from the same misrepresentations alleged herein regarding the sham transactions. The same day that the complaint was filed, the SEC filed a motion unopposed by Defendants Dickinson and Clemenson for the entry of a judgment against themselves as to every count in the SEC Complaint. Judge McMahon entered the judgments on February 24, 2026, which also allowed the SEC to seek disgorgement of ill-gotten gains and/or a civil penalty.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

146. Throughout the Relevant Period – in the Proxy Statement soliciting approval of the Business Combination and after the closing of the Business Combination – Defendants misrepresented and/or omitted to disclose material facts to investors regarding the financial and operational health of the Company which were critical to investors.

### A. Material Misstatements And Omissions In The Proxy Statement

147. On October 18, 2021, Lottery filed the final Proxy Statement and prospectus for the Business Combination on Form 424B3, which was signed by Komissarov. The Proxy

Statement solicited shareholder approval of the Business Combination and attendant proposals necessary to effectuate the Business Combination.

**1. Financial Information Omitted To Disclose Sham Transactions**

148. The Proxy Statement reported AutoLotto's revenue for second quarter 2021 as $9,325,756. Moreover, it stated that "[r]evenue increased $8.4 million, or 891%, to $9.3 million for the three months ended June 30, 2021, from $0.9 million for the three months ended June 30, 2020." The Proxy Statement claimed that the revenue increase was partly driven by "$5 million of deferred revenue from a December 2020 third-party transaction which was earned in the three months ended June 30, 2021." Similarly, the Proxy Statement claimed that AutoLotto's revenue of the first six months of 2021 was $14,787,290, which included "$7 million of deferred revenue from a December 2020 third party transaction [that] was recognized in the first and second quarters of 2021."

149. These statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that the purported revenue from the "December 2020 third-party transaction" was actually derived from the Sham Data Sale Agreement. According to the Komissarov Indictment, "$5 million of AutoLotto's $9.3 million revenue for the quarter (more than 50%) was fraudulently and improperly recognized in these filings." Komissarov Indictment, ¶43(b). And "almost half of AutoLotto's revenue for the first half of 2021, as reported in TDAC's SEC filings was fraudulently and improperly recognized in these filings." *Id.*

150. The Proxy Statement touted that TDAC's board of directors recommended the Business Combination with AutoLotto based on factors, including: "Fast growing business with strong execution, exceeding forecasts. Lottery.com is experiencing significant growth, and ***it has***

***already booked US$5.5 million of total revenue for the 3-month period ending March 2021. This represents a 270% increase in total revenue year-on-year.***"

151. These statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that $2 million of the reported revenue was derived from the Sham Data Sale Agreement. These facts were material because approximately 36% of the reported revenue for the first three months of 2021 were fraudulently derived through the Sham Data Sale Agreement. The Komissarov Indictment confirms that these statements "misleadingly touted AutoLotto's reported revenue growth as a factor that TDAC's board of directors considered when evaluating and recommending the Business Combination with AutoLotto." Komissarov Indictment, ¶43(c).

### 2. Revenue Recognition Policy Omitted To Disclose That Revenue Had Been Recognized From Sham Transactions

152. The Proxy Statement stated that the Company recognized revenue in accordance with ASC 606:

> Revenue
>
> In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers (Topic 606) ("ASC 606"), amending revenue recognition guidance and requiring a more structured approach to measuring and recognizing revenue as well as provide more detailed disclosures to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. The amended guidance is effective for accounting periods commencing on or after January 1, 2018.
>
> We have applied ASC 606 to all revenue contracts. The core principle of ASC 606 is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ***Revenues are generally recognized upon the transfer of control of promised products provided to our users, customers and subscribers, reflecting the amount of consideration we expect to receive for those products.*** We enter contracts that can include various products, which are generally capable of being distinct and accounted for as separate performance obligations. Revenue is recognized net of any taxes collected

> from users, commercial partners and subscribers, which are subsequently remitted to governmental authorities. The revenue recognition policy is consistent for sales generated directly with users and sales generated indirectly through affiliates, other solution partners, and our commercial partners.
>
> Revenues are recognized upon the application of the following steps:
>
> 1. Identification of a contract or contracts with a user, customer or subscriber;
>
> 2. Identification of performance obligation(s) in the contract;
>
> 3. Determination of the transaction price;
>
> 4. Allocation of the transaction price to the performance obligations in the contract; and
>
> 5. Recognition of revenue when, or as, the performance obligation is satisfied.
>
> Contracts with users and customers for lottery game sales are at the point of sale and may include transfer of multiple products to a user or a customer and generally do not require future obligations. In these situations, the Company generally considers each transferred product as a separate performance obligation. The Company also has contracts with subscribers for the continued delivery of lottery and anonymized transaction set related data over a defined period of time. In accounting for these contracts, the Company generally considers each set of data as a separate performance obligation and recognizes revenue on their delivery ratably over the service period of the agreement. The Company's products are sold without a right of return or refund; the Company's terms of service and contracts generally include specific language that disclaims any warranties.

154. However, as discussed above, the Company recognized revenue for the Sham Data Sale Agreement and engaged in the fraudulent roundtripping transactions, and according to the Komissarov Indictment, the "Statement of Work" purporting to describe the contractual terms "lacked economic substance and served as a pretext to recognize revenue over multiple quarters." Komissarov Indictment, ¶31. The components of this "fraudulent roundtrip transaction were executed between in or about December 2020 and in or about June 2021," so they had occurred within the period for which the Proxy Statement reported financial results (i.e., three and six month periods ending June 30, 2021). *Id.* at ¶24. Defendants' recognition of revenue for the Sham Data

Sale Agreement—a manufactured contract that did not actually "transfer . . . control of promised goods"—renders the foregoing statements materially misleading.

### 3. The Proxy Statement Omitted To Disclose That The Premise Of AutoLotto's Value Was The September 2021 Sham Transaction

155. The Proxy Statement also stated that TDAC's management, including Defendant Komissarov, had approved the Business Combination for several reasons, including:

- Public market-ready scale, profitability and favorable user distribution and network effect. Trident believes Lottery.com has reached critical mass as a highly valuable alternative for buying lottery tickets in brick-and-mortar stores, which in turn is driving significant revenue, EBITDA and net income growth. ***This year, Lottery.com is anticipated to generate more than US$70 million in revenue and more than $3 million in EBITDA***. . . .

- Fast growing business with strong execution, exceeding forecasts. Lottery.com is experiencing significant growth, and it has already booked US$5.5 million of total revenue for the 3-month period ending March 2021. This represents a 270% increase in total revenue year-on-year. ***Projections forecast US$70 million in revenue and more than $3 million in EBITDA for fiscal year 2021.*** The Projections forecast 750% FY19-FY21E Revenue CAGR.

- High profit margin. Lottery.com is a pure-play, with an all fee-based business and zero balance sheet exposure. The Projections forecast a 32% FY21E Gross Profit margin and 5% FY21E EBITDA margin. Lottery.com has a 100% fee-based model that generates service fees for lottery ticket sales, as well as subscription fees and data set fees for selling lottery data. Trident views the fact that Lottery.com has modest exposure to debt as advantageous in the COVID-19 environment. Lottery.com is a pure play fast growing online gaming company in a high earnings multiple segment. Trident's board of directors believes that this capital-light, highly profitable business model with minimal credit or commodity risk will continue to generate strong margins and free cash flow.

156. These statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that the basis for the forecasted revenue was the September 2021 Sham Transaction. As Komissarov himself put it: "[T]his is probably even bigger than the 30 million transaction [i.e., the fraudulent roundtrip transaction involving Data Company-2] because ***we based the value of the***

***company on those projections on your financial statements*** and if Trident and me specifically knew about it, then I am in deep, deep, deep, deep water[.]" Komissarov Indictment, ¶54(d).

### B. Materially False And Misleading Statements Following The Issuance Of The Proxy Statement

#### 1. Financial Information Omitted To Disclose Sham Transactions

157. On October 21, 2021, in an attempt to further increase shareholder interest in voting in favor of the Business Combination on October 28, 2021, Defendants issued a press release entitled, "Preliminary Revenue Figures Represent Quarterly Sequential Growth of Greater than 135%." The press release listed Defendant Komissarov as one of the two "contacts," and provided his email address and telephone number. In the release, the Company, in relevant part, stated:

> AutoLotto, Inc., doing business as Lottery.com ("Lottery.com" or the "Company"), a leading technology company that is transforming how, where and when lottery is played, and Trident Acquisitions Corp. (Nasdaq: TDACU, TDAC, TDACW) ("Trident") today provided ***preliminary revenue results for Lottery.com's third quarter 2021, which are expected to be between $22.0 million and $24.0 million. This represents sequential revenue growth of greater than 135% compared to $9.3 million in the second quarter of 2021. The strong growth was driven by increased sales in the Company's B2B segment.***
>
> ***On a preliminary basis, revenue through the first nine months of 2021 is expected to be between $36.8 million and $38.8 million on a reported basis and $38.7 million and $40.7 million on a pro forma basis*** giving effect to the acquisition of 80% interests in JuegaLotto and Aganar, two companies with legalized lottery operations within Mexico. Through the first nine months of 2021, pro forma revenue is expected to be more than 270% above the full twelve months of 2020, after giving effect to the acquisition of the interests in JuegaLotto and Aganar.

158. These statements are materially false and misleading when made because they omitted to disclose that approximately $20 million in revenue recognized for third quarter 2021 was derived from the September 2021 Sham Transactions. Indeed, according to the Komissarov Indictment, the September 2021 Sham Transaction was specifically designed to enable "AutoLotto to recognize substantial additional revenue for the third quarter of 2021." *See* Komissarov Indictment, ¶44. The revenue reported in this press release reflected the Individual Defendants'

belief that "AutoLotto would recognize $20 million in revenue from the transaction (the $30 million purchase price minus the $10 million value of the advertising credit)." *Id.* Likewise, the SEC alleges these statements are materially false and misleading because "the bulk of the revenue was from a phony transaction that Lottery entered into on September 30, 2021." SEC Complaint, ¶66; *see also Sec. & Exch. Comm'n v. DiMatteo, et al.*, Case No. 1:26-cv-00603 (CM) (S.D.N.Y. June 4, 2026), ECF No. 32 (SEC arguing that "The fraud was not based on deficient internal controls; it was based on DiMatteo and others intentionally engaging in sham transactions.").

159. On November 15, 2021, the Company issued a press release entitled, "Lottery.com Announces Strong Third Quarter Results and Year-to-Date Revenue Increase of $42.8 Million Over Prior-Year Period." This press release, which was also filed with the SEC on November 15, 2021 in a Form 8-K, in relevant part, stated:

> Third quarter 2021 revenue was $32.2 million, an increase of $30.6 million from the third quarter of 2020. The growth was driven by the global affiliate marketing program.
>
> ***
>
> The Company expects to meet or exceed its previous guidance of $71 million for full year 2021 revenue.

160. As the Komissarov Indictment shows and as the Company later admitted, these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that (i) nearly all of the reported revenue for the quarter was fabricated by the September 2021 Sham Transaction; (ii) the Company had taken a $30 million loan to facilitate the September 2021 Sham Transaction; and (iii) that as such, the Company's financial results were materially overstated.

161. Moreover, also on November 15, 2021, the Company attached a copy of AutoLotto, Inc's Management's Discussion And Analysis Of Financial Condition And Results Of Operations

to the Company's Form 8-K that day. Therein, regarding its $32.25 million revenue for the quarter ended September 30, 2021, the Company disclosed that "[t]he increase in revenue was driven by several factors including a $30 million sale of affiliate marketing credits" during the quarter.

162. As the Komissarov Indictment shows and as the Company later admitted, these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that (i) nearly all of the reported revenue for the quarter was fabricated by the September 2021 Sham Transaction; (ii) the Company had taken a $30 million loan to facilitate the September 2021 Sham Transaction; and (iii) that as such, the Company's financial results were materially overstated.

163. On March 31, 2022, the Company issued a press release, also filed as an attachment to a Form 8-K filed with the SEC on that date that was signed by Kathryn Lever. Therein, Lottery touted "strong" financial results for the fourth quarter and full-year 2021. Among the information provided, the Company reported revenue of $21.5 million for Q4 2021 (an increase of $18.2 million over the prior year period) and revenue of $68.5 million for the full year 2021 (an increase of $61 million over 2020). The Company also reported cash for Q4 2021 of $62.6 million – an increase of $58.8 million over the prior year period. Thereafter, on April 1, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021. The Annual Report, which was signed by Defendants DiMatteo, Clemenson and Dickinson, reiterated the financial results released the prior day.

164. As the Company later admitted, these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) $30 million of the cash held by the Company was encumbered as collateral for a loan obtained to facilitate the September 2021 Sham

Transaction; (ii) $17.1 million of the reported revenue was falsified in that the Company never provided services to the customer and the customer never paid the invoice; and (iii) that as such, the Company's financial results were materially overstated.

165. On May 16, 2022, the Company issued a press release, filed with the SEC on Form 8-K, announcing its financial results for the Company's 2022 fiscal first quarter, ended March 31, 2022. In relevant part, Defendants reported that Lottery's 2022 fiscal first quarter revenues were $21.2 million, an increase of $15.7 million over the prior year period and cash of $50.8 million, up $32.5 million over the prior year period. Also on May 16, 2022, the Company filed its quarterly report for the same fiscal quarter and reiterated the financial results disclosed in its press release.

166. As the Company later admitted, these statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) $30 million of the cash held by the Company was encumbered as collateral for a loan obtained to facilitate the September 2021 Sham Transaction; (ii) approximately $18.5 million of the reported revenue was falsified in that the Company never provided services to the customer and the customer never paid the invoice; and (iii) that as such, the Company's financial results were materially overstated.

### 2. Internal Controls Over Financial Reporting Were Deficient

167. Also on November 15, 2021, the Company filed its quarterly report on Form 10-Q for the 2021 fiscal third quarter ended September 30, 2021. The November 15, 2021 Form 10-Q referenced the fact that the Company had identified a material weakness relating to a technical accounting issue identified by the SEC in SPAC-related guidance. Specifically, Lottery determined that its disclosure controls and procedures were not effective as of September 30, 2021, and thus had restated its financial statements on Form 10-K/A on June 28, 2021, in order to comply with a

new SEC Staff Statement regarding the classification of warrants. With respect to Lottery's Controls and Procedures, the Company stated:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the SEC Statement, our certifying officers concluded that, ***due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021***.
>
> ***
>
> Other than what was described in the 10-K/A, ***there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*** In light of the restatement of our financial statements included in the 10-K/A, we plan to enhance our processes to identify and appropriately apply applicable ***accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements.*** Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

168. As the Company later admitted, these statements concerning the Company's internal controls were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that: (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) the Company was improperly recognizing revenue, and (iii) that as such, the Company's financial results were materially overstated.

169. The April 1, 2022 Annual Report also stated that the Company had identified a material weakness in its internal control over financial reporting as of year-end 2021 and 2020, but it described this material weakness as one largely related to personnel and staffing – specifically, it related to "the design and operation of the procedures relating to the closing of financial statements." Defendants reassured investors that the Company had "commenced measures to remediate" such material weakness and that that other than the deficiencies identified, "there was no change in our internal control over financial reporting." As the Company, in relevant part, stated:

> In connection with the audits of our condensed consolidated financial statements included in this Annual Report, ***our management has identified a material weakness in internal control over financial reporting as of December 31, 2021 and 2020 relating to deficiencies in the design and operation of the procedures relating to the closing of our financial statements.*** These include: (i) our lack of a sufficient number of personnel with an appropriate level of knowledge and experience in accounting for complex or non-routine transactions, (ii) the fact that our policies and procedures with respect to the review, supervision and monitoring of our accounting and reporting functions were either not designed and in place or not operating effectively; (iii) the timely closing of financial books at the quarter and fiscal year end, and (iv) incomplete segregation of duties in certain types of transactions and processes.
>
> ***We have commenced measures to remediate the identified material weakness***, including (i) adding personnel with sufficient accounting knowledge; (ii) adopting a more rigorous period-end review process for financial reporting; (iii) adopting improved period close processes and accounting processes, and (iv) clearly defining and documenting the segregation of duties for certain transactions and processes. The implementation of our remediation is ongoing and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles. We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting.

170. As the Company later admitted, these statements concerning the Company's internal controls over financial reporting were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that: (i) the Company lacked adequate internal accounting controls

over financial reporting of cash and revenue, (ii) the Company had pledged its own cash accounts to secure a $30 million loan for a major customer to facilitate the September 2021 Sham Transaction; (iii) the Company had recognized revenue from sham transactions, including the September 2021 Sham Transaction; and (iv) due to the inadequate internal controls, the Company's financial results were materially overstated.

171. On May 16, 2022, the Company filed a quarterly report on Form 10-Q for the 2022 fiscal first quarter ended March 31, 2022. That filing, which was signed by Defendant Dickinson, stated that management had "evaluated the effectiveness of our disclosure controls and procedures" and that:

> [b]ased on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, ***as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting with respect to our financial statement close and reporting process***....

Critically, however, the Company reassured investors that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that ***our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position***, results of operations and cash flows as of the dates and for the periods presented in conformity with GAAP.

172. As the Company later admitted, these statements concerning the Company's internal controls and financial position were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the Company failed to disclose that (i) the Company lacked adequate internal accounting controls over financial reporting of cash and revenue, (ii) the Company had recognized revenue from sham transactions, including the September 2021 Sham Transaction; and (iii) that as such, the Company's financial results were materially overstated.

## VI. CORPORATE SCIENTER AND *RESPONDEAT SUPERIOR*

173. As alleged herein, the Lottery Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of Lottery were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

174. As alleged herein, the Individual Lottery Defendants, by virtue of their receipt of information reflecting the true facts regarding Lottery, their control over, and/or receipt and/or modification of Lottery's allegedly materially misleading misstatements and/or their associations with Lottery which made them privy to confidential proprietary information concerning Lottery, participated in the fraudulent scheme alleged herein.

175. In addition, two of the Lottery Defendants, Clemenson and Dickinson pled guilty to charges of criminal securities fraud, conspiracy to commit securities fraud and causing the Company to make false SEC filings in connection with, inter their admitted knowing inflation of reported revenue in *inter alia*, the Proxy for the TDAC merger with AutoLotto, the Company's April 1, 2022 annual report on Form 10-K and the Company's May 16, 2022 quarterly report on Form 10-Q. *See generally* Exhibits C-E. For example, Defendant Dickinson admitted while pleading guilty that:

> During the timeframe of November 2020 and May 2022, I was an executive of Lottery.com. In that capacity, ***I engaged in a scheme to fraudulently inflate AutoLotto's and Lottery.com's reported revenue.*** In so doing, ***I caused the SEC filings which contained misrepresentations at an inflated revenue to be filed. I also caused false and misleading statements to an accountant. At the time of these actions, I knew that they were wrong.***

*See* Exhibit E at 52:9-14 (D.E. #264).

176. Likewise, Defendant Clemenson admitted that during the time period "Between November 2020 and May of 2022":

> I was an executive of Lottery.com. In that capacity, ***I engaged in a scheme to fraudulently inflate Lottery.com's revenue. In so doing, I caused SEC filings which contained misrepresentations and inflated revenue to be filed. At the time of these actions, I knew they were wrong.***

*See* Exhibit E at 54:4-11.

177. Each of the Individual Lottery Defendants was a high-ranking management-level employee that: (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in their role as an executive employee and representative of Lottery. The scienter of each of these individuals and all other management-level employees of Lottery is therefore imputed to Defendant Lottery.

## VII. LOSS CAUSATION

### A. Investors Suffered Significant Losses Due To The Materially Misleading Statements Issued During The Class Period

178. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff. Plaintiff purchased Lottery securities at artificially inflated prices. The price of Lottery's securities significantly declined when the misrepresentations made to the market and/or the effects thereof, were revealed or materialized, on July 6, 2022, July 18, 2022, July 25, 2022 and July 29, 2022, causing Plaintiff's losses.

179. On November 15, 2021, Lottery filed with the SEC a Form 8-K announcing that, on November 10, 2021, the Board announced the dismissal of Marcum LLP as the Company's auditing firm. That same day, the Company disclosed that virtually all of its revenue for the quarter (approximately $32.25 million) was the result of a single $30 million sale of affiliate marketing

credits, which was not its primary business activity, during the quarter. While the investing public did not yet know that the $30 million transaction was a complete sham, the information that was disclosed at this time (dismissal of the Company's auditor, and the fact that more than 90% of the Company's quarterly revenue came from a single transaction that was not even part of the Company's purported primary business activity) was sufficient to cause concerns on the part of the investing public.

180. On this news, the price of Lottery stock fell from a price of $13.25 per share on November 12, 2021, to a price of $6.98 per share on November 22, 2021, a decline of nearly 50%.

181. On July 6, 2022, the Company filed a Form 8-K with the SEC dated July 5, 2022. The Form 8-K, in relevant part, stated:

> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> The Audit Committee of the Board of the Directors (the "Board") of Lottery.com (the "Company") retained outside counsel to conduct an independent investigation that has revealed instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order fulfillment. ***The investigation also identified issues pertaining to the Company's internal accounting controls.*** Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Mr. Dickinson served as the Company's President and Treasurer since October 2021 and as the Company's Chief Financial Officer since March 2022. The Company is continuing to work with outside counsel with respect to the matters that are the subject of the independent investigation and to institute appropriate remedial measures.
>
> ***
>
> The Company's Chief Executive Officer and Board chair, Tony DiMatteo, has stepped down as Board chair effective July 5, 2022, which will enable him to devote more time to his responsibilities as Chief Executive Officer. Mr. DiMatteo will remain as a member of the Board. In his place as chair, the Board, on July 5, 2022, appointed Steven M. Cohen and Richard Kivel as co-chairs effective as of that date. In their roles as Board co-chairs, Steven will be primarily responsible for coordinating Board oversight of legal, compliance, and financial reporting matters,

> and Richard will be primarily responsible for coordinating Board oversight of business and operational matters. Katie Lever, the Company's Chief Legal Officer, will report directly to the Board co-chairs.

182. On this news, Lottery shares fell $0.15, or more than 12%, from a closing price of $1.22 per share on July 5, 2022, to a closing price of $1.07 per share on July 6, 2022, on abnormally high volume.

183. On July 15, 2022, in a Form 8-K filed with the SEC after the markets closed, Lottery announced that Defendant Clemenson, the Company's CRO, had resigned on July 11, 2022, effective immediately. Moreover, the Company provided an update on the independent investigation previously disclosed on July 6, 2022. The Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery had:

> preliminarily conclude[d] that it has ***overstated its available unrestricted cash balance by approximately $30 million*** and that, relatedly, in the prior fiscal year, it ***improperly recognized revenue*** in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

184. On this news, shares of Lottery fell $0.14, or more than 14.5%, from a closing price of $0.96 per share on July 15, 2022, to a closing price of $0.82 per share on July 16, 2022, on abnormally high volume.

185. On July 22, 2022, Lottery filed a Form 8-K with the SEC in which the Company disclosed that it had been advised by its independent accountant that its audited financial statements for the fiscal year ended December 31, 2021 and unaudited financial statements for the quarter ended March 31, 2022 should no longer be relied upon. In addition, the Company reported that CEO and co-founder Defendant DiMatteo was resigning, effective immediately. Specifically, the Company's announcement provided that:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(b) On July 20, 2022, Lottery.com Inc. (the "Company") was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal year ended December 31, 2022, that the ***audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon***. Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a ***Company subsidiary entered into a line of credit in January 2022 that was not disclosed*** in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.

***

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On July 21, 2022, Lawrence Anthony "Tony" DiMatteo III, the Chief Executive Officer (the "CEO") of the Company and a member of its Board of Directors (the "Board"), provided a notice of resignation as CEO of the Company, its wholly owned subsidiary, AutoLotto, Inc. ("AutoLotto"), and all of its other subsidiaries and affiliates with the exception of LTRY WinTogether, Inc., with immediate effect. The Company accepted his resignation from such positions. Mr. DiMatteo served as an officer and director of AutoLotto since February 2015 and as CEO of the Company since the effectuation of the business combination in October 2021.

186. On these disclosures, Lottery shares declined $0.10, or more than 12%, over the next two trading days, from a closing price of $0.82 per share on July 22, 2022, to a closing price of $0.72 per share on July 26, 2022.

187. On July 29, 2022, Lottery disclosed in a filing on Form 8-K with the SEC that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations," and that it therefore intended to furlough certain employees effective July 29, 2022. Moreover, because Lottery's resources were not sufficient to fund its operations for a twelvemonth period, "there is substantial doubt about the Company's ability to continue as a going concern," and the Company may be forced to wind down its operations or pursue liquidation of the Company's assets. In full, the Company stated that:

> **Item 8.01 Other Events.**
>
> On July, 28, 2022, the Board of Directors of Lottery.com Inc. (the "Company") determined that ***the Company does not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations. Accordingly, the Company intends to furlough certain employees effective July 29, 2022.*** As of July 29, 2022, the Company owed approximately $425,000 in outstanding payroll obligations. The Company's inability to pay this amount may result in employees terminating their relationship with the Company and/or pursuing legal remedies. Since the Company's business is dependent on the efforts and talents of its employees, particularly its developers and engineers, and the provision of ongoing services to customers by its employees, a material loss of its employee base may result in the inability of the Company to operate its technology, meet its obligations to customers, the loss of key customer relationships and revenue, and claims for breach of contractual obligations.
>
> Additionally, ***the Company's capital resources are not sufficient to fund its operations for a twelve-month period and, therefore, there is substantial doubt about the Company's ability to continue as a going concern***. If the Company is not able to secure additional capital resources or otherwise fund its operations, ***the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets***, including equipment and intellectual property.

188. On this news, shares of Lottery declined 64%, falling $0.52 per share, from a closing price of $0.81 per share on July 28, 2022 to a close of $0.29 per share on July 29, 2022.

## VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

189. The market for Lottery securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Lottery's securities traded at artificially inflated prices during the relevant Period. Plaintiff purchased the Company's securities relying upon the integrity of the market price of Lottery's securities and market information relating to Lottery, and has been damaged thereby.

190. During the relevant Period, the artificial inflation of Lottery's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff. As described herein, during the relevant Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements about Lottery's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Lottery and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when corrected, negatively affected the value of the Company's

shares. Defendants' materially false and/or misleading statements during the relevant Period resulted in Plaintiff purchasing the Company's securities at such artificially inflated price, and Plaintiff has been damaged as a result.

191. At all relevant times, the market for Lottery's securities was an efficient market for the following reason, among others:

(a) Lottery shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Lottery filed periodic public reports with the SEC and/or the NASDAQ; and/or

(c) Lottery regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and though other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

192. As a result of the foregoing, the market for Lottery's securities promptly digested current information regarding Lottery from all publicly available sources and reflected such information in Lottery's share price. Under these circumstances, all purchasers of Lottery's securities during the relevant Period suffered injury through their purchase of Lottery's securities at artificially inflated prices and a presumption of reliance applies.

193. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Plaintiff's claims are, in large part, grounded on Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a

prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. NO SAFE HARBOR

194. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

**[Paragraphs 195 – 204 are deleted]**

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

205. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of Lottery who knew that those statements were false when made.

## X. CAUSES OF ACTION

### FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against The Lottery Defendants

206. Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

207. The Lottery Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208. The Lottery Defendants violated Section 10(b) of the Exchange Act and Rule 10b5 promulgated thereunder in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff in connection with his purchase of Lottery's publicly traded securities.

209. Plaintiff has suffered damages in that, in reliance on the integrity of the market, he paid artificially inflated prices for Lottery's publicly traded securities. Plaintiff would not have purchased Lottery securities at the prices he paid, or at all, if he had been aware that the market prices had been artificially and falsely inflated by Lottery Defendants' misleading statements.

210. As a direct and proximate result of the Lottery Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchase of Lottery securities.

**SECOND CLAIM**

**Violations of Section 20(a) of the Exchange Act**

**Against the Individual Lottery Defendants**

211. Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

212. The Individual Lottery Defendants acted as controlling persons of Lottery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the

SEC and disseminated to the investing public, the Individual Lottery Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Lottery Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

213. In particular, the Individual Lottery Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

**214.** As set forth above, the Lottery Defendants each violated Section l0(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Lottery Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Lottery's and the Individual Lottery Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchase of the Company's securities.

**THIRD CLAIM**

**Violation of Section 20(a) of the Exchange Act**

**Against the Individual Defendants**

215. Plaintiff repeats and re-alleges each and every allegation as set forth above as if fully set forth herein.

216. Komissarov acted as a controlling person of TDAC as within the meaning of Section 20(a) of the Exchange Act as alleged herein and Individual Lottery Defendants acted as controlling persons of Lottery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights,

participation in and/or awareness of the companies' operations, these defendants had the power and authority to cause TDAC and Lottery to engage in the wrongful conduct complained of herein. These defendants were able to, and did, control directly and indirectly, the content of the Proxy Statement and Prospectus there causing the dissemination of the materially false and/or misleading statements and omissions as alleged herein.

217. In particular, Komissarov reviewed the Business Combination and all of the underlying due diligence materials, voted to approve the Business Combination, and solicited the approval of the Business Combination through TDAC's management's recommendation to vote in favor of the Business Combination, which appeared in the Proxy Statement and Prospectus. Moreover, the Individual Lottery Defendants reviewed the Business Combination, reviewed and furnished information for inclusion in the Proxy Statement and Prospectus, and solicited the approval of the Business Combination.

218. As set forth above, in their capacities as officers and/or directors of Lottery, these defendants participated in the misstatements and omissions set forth above. Indeed, each of these defendants had access to information regarding the circumstances surrounding the Business Combination and Lottery, including the terms of the Business Combination, analysis of Lottery's operating results and financial condition, the valuation of Lottery, and the due diligence that had and had not been performed. As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

219. As set forth above, Defendants violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. Individual Defendants were culpable participants in the violations Section 14(a) because they failed to make

a reasonable investigation and did not possess reasonable grounds for the belief that the statements in the Proxy Statement and Prospectus issued were true and free of any omissions of material fact. As detailed above, during the respective times that these defendants served as officers and/or directors of TDAC and Lottery, each is responsible for the material misstatements and omissions made in the Proxy Statement and Prospectus.

220. Plaintiff was denied the opportunity to make an informed decision in connection with his purchase of the Company's securities. Plaintiff was damaged as a direct and proximate result of said Individual Defendants' wrongful conduct.

## XI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

(a) Awarding compensatory damages in favor of Plaintiff against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b) Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c) Such other and further relief as the Court may deem just and proper.

## XII. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 7, 2026

**HAROLD M. HOFFMAN, ESQ.**

By: */s/ Harold M. Hoffman, Pro Se*
240 Grand Avenue
Englewood, NJ 07631
Telephone: (201) 410-8223
**hoffman.esq@verizon.net**